## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13-10176-01-EFM |
| | ) | |
| WALTER ACKERMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT'S
## MOTION TO SUPPRESS (DOC. 13)

On the 25th Anniversary of the World Wide Web[1], the Court is called upon by the

defendant to render a decision that no other court has fully countenanced or embraced. After

careful consideration of the issues and implications raised by the defendant's motion, the Court

should deny the motion and find:

1)      An individual, like the defendant, who chooses to use an email service provider that scans email for illegal activity as part of its terms of service, and who then violates the provider's terms of service by sending an email containing illegal child pornography, does not have a legitimate or reasonable expectation of privacy in that email which the provider captures pursuant to its terms of service.

2)      Even if the defendant did have an expectation of privacy in that email, that expectation of privacy evaporated when the service provider seized control of and terminated the email account, pursuant to its terms of service.

3)      The evaporation of any expectation of privacy occurred prior to law enforcement involvement.

---

[1] See http://www.npr.org/2014/03/13/289750726/its-been-25-years-since-the-world-wide-web-was-invented;
http://pittsburgh.cbslocal.com/2014/03/12/inventor-celebrates-reflects-on-world-wide-webs-25th-anniversary/ ;
http://news.cnet.com/2300-1023_3-10019726.html; http://googleblog.blogspot.com/2014/03/on-25th-anniversary-
of-web-lets-keep-it.html;
http://www.slate.com/blogs/future_tense/2014/03/12/techniversaries_detract_from_the_25th_anniversary_of_the_in
ternet.html

4) The capture of the email by the provider included information that effectively "field tested" the material for contraband, such that any further review by a law enforcement did not expand the provider's search in a constitutionally significant way.

5) Both AOL and the National Center for Missing and Exploited Children (NCMEC) are private entities with interests that are distinct from law enforcement and aimed at advancing each entities' respective goals and mission.

6) If a search occurred that violated the Fourth Amendment, the "Good Faith" exception would still apply under the circumstances of this case, where law enforcement acted in objectively reasonable reliance upon a statutory scheme that authorized the search.

These arguments are highly summarized here, but are developed more fully below.

The United States also disputes the defendant's factual rendition related to his interview with law enforcement, and asserts that the interview was non-custodial and neither *Miranda* nor the exclusionary rule apply.

## I.  Factual background

Because this case involves two different private entities, AOL and NCMEC, some preliminary background on those entities is necessary prior to the discussion of the facts pertinent to this case.

### A.  Background on AOL

AOL, formerly known as American Online and Quantum Computer Services, is a global Web services company.  According to its website, the company has been in existence since 1989, when it was known as Quantum Computer Services offering an online service named Q-Link.[2] Quantum launched its first instant messenger service in 1989 and welcomed users with that familiar saying "You've got mail!"  As part of its wide-ranging suite of services, AOL offers free and premium (paid) email service to its users.

---

[2] Additional information relating to the history of AOL may be obtained online:  http://corp.aol.com/about-aol/overview

To use these services, AOL requires its users to agree to Terms of Service (TOS).[3]  As of April 19, 2013, these terms include the following:

To use our Services, you must:

> a.  Comply with applicable laws and regulations and not participate in, facilitate, or further illegal activities;
> …
> d.  Not post content that contains explicit or graphic descriptions or accounts of sexual acts or is threatening, abusive, harassing, defamatory, libelous, deceptive, fraudulent, invasive of another's privacy, or tortious;
> …

To prevent violations and enforce this TOS and remediate any violations, we can take any technical, legal, and other actions that we deem, in our sole discretion, necessary and appropriate without notice to you.

Along with processing complaints by users, AOL employs an Image Detection and Filtering Process (IDFP) to systematically identify child pornography sent through its facilities or services.  This allows AOL to prevent its communications network from serving as a conduit for illegal activity.  As part of its IDFP, AOL maintains a database of hash values associated with child pornography.[4]  Through the IDFP, AOL automatically checks emails transmitted through its facilities for files containing hash values of previously identified child pornography.  When AOL detects a file that matches a hash value in its database, the email is captured and sent to the National Center for Missing and Exploited Children (NCMEC), via the latter's CyberTipline.  The report includes the intercepted email and attached file(s).

## B.  Background on NCMEC

The National Center for Missing and Exploited Children (NCMEC) is a 501(c)(3) nonprofit organization headquartered in Alexandria, Virginia.  According to the NCMEC

---

[3] Available online at:  http://legal.aol.com/terms-of-service/full-terms/

[4] A hash value is an alphanumeric sequence that is unique to a specific digital file. Any identical copy of the file will have exactly the same hash value as the original.  *See United States v. Keith*, 2013 WL 5918524 (D. Mass. Nov. 5, 2013) ; *see also United States v. Cartier*, 2007 WL 319648, *1 (D.N.D. Jan. 30, 2007) aff'd, 543 F.3d 442 (8th Cir. 2008) ("A hash value is a unique multi-character number that is associated with a computer file. Some computer scientists compare a hash value to an electronic fingerprint in that each file has a unique hash value.")

website, (www.missingkids.com), the organization was "[e]stablished in 1984, … is the leading nonprofit organization in the U.S. working with law enforcement, families and the professionals who serve them on issues related to missing and sexually exploited children."[5] Although NCMEC partners with various law enforcement agencies to perform its function, it is not a government agency. Additionally, its CyberTipline employees are not hired, managed, or supervised by any government entity.

NCMEC was borne out of the work of private citizens. In 1981, Adam Walsh, the six-year-old son of NCMEC co-founders John and Revé Walsh, was abducted by a stranger from a Florida mall and later found murdered.[6] Shortly thereafter, the Walshes established the Adam Walsh Outreach Center for Missing Children in Florida in order to provide a resource for the families of other missing children. The Walshes were involved in the passage of the federal laws that resulted in the creation of NCMEC in 1984. In 1990, the Florida-based Adam Walsh Center and its branches merged with NCMEC.

NCMEC is engaged in a wide variety of work to further its mission of responding to the problem of missing and exploited children. For example, in recent years NCMEC, among other functions central to its mission as an NGO, (1) provided victim and family support in cases involving child sex trafficking; (2) worked with Internet companies to encourage adoption of PhotoDNA in an effort to combat trafficking of child pornography images; (3) launched a national child safety campaign; (4) led training and educational programs across the country addressing programs for missing children with special needs; (5) collaborated with Internet and financial service companies to disrupt the use of credit cards for purchasing online child pornography; (6) notified Internet companies about Web pages containing apparent child

---

[5] Available at: http://www.missingkids.com/NCMEC
[6] More information about the history of NCMEC is available online: http://www.missingkids.com/History

pornography; (7) distributed posters and photographs depicting missing children; (8) provided children, parents, educators, and child care providers with educational materials and training concerning child safety; (9) ran a campaign encouraging local officials to take a more active role in the prevention of sexual exploitation of minors; (10) offered financial and logistical support for reunification of missing children with their families; and (11) provided assistance to families with missing and sexually exploited children by offering peer support, resources and empowerment from trained volunteers.[7]

By statute, an electronic service provider (ESP) or internet service provider (ISP), such as AOL, has a duty to report to NCMEC any apparent child pornography it discovers "as soon as reasonably possible." 18 U.S.C. § 2258A(a)(1). A CyberTipline report is typically created by direct upload to NCMEC's server through a facility made available by NCMEC to an ISP such as AOL specifically for that purpose.

After a report is made to the CyberTipline, a NCMEC analyst will use conventional "open source" search engines to try to identify the sender's geographic location, as well as the ISP through which the sender accessed the internet. When the general geographic location and the relevant ISP for the computer of interest have been determined, the report is made accessible to the appropriate law enforcement agency or agencies in the identified geographic location. This is done via a virtual private network ("VPN") that is dedicated to that use.

### C.     Factual background pertinent to the investigation

The defendant, Walter Ackerman, was a user of AOL Mail, utilizing screen name "plains66952". On April 22, 2013, at 10:23 UTC, AOL's IDFP detected an email sent by "plains66952@aol.com" to "zoefeather@riseup.net", which contained child pornography. As a

---

[7] Additional information is available online:  http://www.missingkids.com/publications

result of AOL's discovery that "plains66592" had violated its TOS by distributing images of child pornography, the defendant's account was immediately terminated.

AOL submitted a report to NCMEC (identified as CyberTipline Report 1883287, which was received by NCMEC on April 23, 2013. AOL's report included the intercepted email and attached files. The report included the email header information, including the involved usernames, the IP address (198.54.94.217) of the sender (plains66952), and the IDFP hash value.

After receiving the report, NCMEC confirmed the presence of child pornography. NCMEC identified the ISP for the identified IP address. NCMEC searched its records for past tips associated with the username "plains66952" and the IP address. NCMEC searched publicly available services, such as Spokeo, Google, Tagged, Facebook, Myspace for additional information related to "plains66592." NCMEC identified a related Facebook profile for "Wally Ackerman" which indicated he worked in Cawker City, Kansas. NCMEC searched for additional information related to Wally Ackerman in Kansas, and identified a recent address in Lebanon, Kansas. After established the likely geographic location of the sender, NCMEC forwarded the tip to the appropriate law enforcement entity, which was the Kansas Internet Crimes Against Children (ICAC) Task Force in the Wichita/Sedgwick County Exploited and Missing Children's Unit (EMCU).

EMCU requested the assistance of Special Agent Rick Moore (SA Moore) of the Department of Homeland Security, Homeland Security Investigations (HSI) in the review of CyberTipline Reports. On May 17, 2013, SA Moore accessed and reviewed CyberTipline Report 1883287, which included the email and attached images. SA Moore then began his investigation, starting with confirmation of the ISP for the identified IP address. He issued a

subpoena for the subscriber information for that IP address at it was utilized on April 22, 2013 at 10:23 UTC.

On May 21, 2013, SA Moore received the subscriber information from the ISP, which showed that the IP address was assigned to Michelle Ackerman residing at a specified address in Lebanon, Kansas. The ISP also showed that an additional authorized contact was a Walter Ackerman. Additional database checks confirmed that Walter Ackerman, the defendant, resided as the specified address in Lebanon, Kansas.

On May 22, 2013, SA Moore served AOL with a preservation letter for email account plains66952@aol.com. On May 24, 2013, SA Moore applied for and obtained a search warrant for the defendant's residence in Lebanon, Kansas. On May 30, 2013, SA Moore executed the search warrant with the assistance of Wichita Police Department (Kansas ICAC) and Smith County Sheriff's Department. The defendant was not home at the time; his wife advised he was at work in Cawker City, Kansas. Agents found multiple digital items, which were forensically previewed and revealed the presence of child pornography. The search was completed at 9:30am.

On that same day, SA Moore and SA Erin Russell (HSI) went to the defendant's place of work, Sunflower Manufacturing. Both SA Moore and SA Russell were dressed in civilian clothes. Neither agent had their badges or service weapons in view. The agents contacted the manager and identified themselves as agents with HSI. SA Moore asked if Walter Ackerman was working, to which the manager replied he was. SA Moore asked if he could speak with Ackerman in a private area, and the manager provided the agents an office area. The manager then found Ackerman and brought him to SA Moore and Russell's location.

Both SA Moore and Russell identified themselves to Ackerman as special agents with HSI and provided credentials for verification. SA Moore asked Ackerman if he would speak with them, and told Ackerman that his manager had agreed to provide a space to speak in private. Ackerman said he would speak with SA Moore and Russell and walked into the office area. SA Moore activated a recorder in the room, which Ackerman did not notice until later (approximately 22 minutes into the interview).

Before the interview began, Ackerman asked "what's going on", to which SA Moore advised Ackerman that he was not under arrest and that they were not there to arrest him. SA Moore asked him why he thought they would be there to talk with him, to which Ackerman said he had no idea. SA Moore informed Ackerman that they had just conducted a search warrant at his house. Ackerman then said, "yeah, I know… it has to be…" and said he had been trading pictures on the internet. He said he knew what it was, but he did not like to say it. SA Moore understood that Ackerman was embarrassed to discuss his activities with SA Russell, a female agent, present. As soon as SA Russell left the office, Ackerman announced, "Child Pornography." Ackerman defined child pornography as pictures of nude children. He described chatting with zoefeather (the username reported by AOL). Ackerman described learning about an anonymizing web service, which he accessed and observed bondage and snuff films involving children. Ackerman told SA Moore where he stored his child pornography images. Approximately twenty minutes into the interview, SA Moore reiterated to Ackerman that he was not there to arrest Ackerman, and that he was not under arrest.

The next portion of the interview, from roughly 22 minutes to 35 minutes, involved Ackerman providing a remarkably detailed description of the anonymizing service. It was at this point that Ackerman noticed SA Moore's recording device, but he evinced no concern about

being recorded. This portion of the interview featured Ackerman explaining where one finds the anonymizing service, how it works, what one finds when using the service, etc. This portion was largely a monologue by Ackerman, demonstrating his expertise on the subject, with minimal interruption to SA Moore.

The next portion of the interview, from roughly 35 minutes to 43 minutes, featured Ackerman describing features of his family history. Again, this was presented largely in monologue fashion, with minimal interruption by SA Moore.

After discussing of his family history, SA Moore asked Ackerman to reconcile his report of childhood physical abuse with his conduct of trading images of child sexual abuse. Ackerman likened the images of children to images of adults, described them as just an image and nothing personal. Ackerman described the images as similar to "wallpaper" for a computer.

At approximately 54 minutes, SA Moore again reiterated that Ackerman was not being arrested. SA Moore said he would be leaving in a moment, and that he was not promising what would happen in the future. Ackerman indicated he understood. Ackerman asked if SA Moore told his wife (Michelle Ackerman) about why HSI was at the residence, to which SA Moore said she had a copy of the search warrant and the list of items taken. Some additional discussion occurred relating to Ackerman's justification for looking at child pornography. Ackerman further demonstrated that he understood he was not in custody or being arrested by discussing what he expected to happen when he got home that evening. SA Moore concluded the interview by reiterating a fourth and fifth time that Ackerman was not under arrest, and that he would be providing the information to the prosecution for a later determination regarding charges.

The recording is approximately 1 hour and 15 minutes long. However, the substantive portion of the interview is less than an hour, and primarily occurs within the first twenty minutes.

On November 6, 2013, a Grand Jury indicted the defendant on one count of Distribution of Child Pornography, a violation of 18 U.S.C. 2252(a)(2), occurring on or about April 22, 2013, and one count of Possession of Child Pornography, a violation of 18 U.S.C. 2252(a)(4)(B), occurring on or about May 30, 2013.

## II.     Authority and Analysis as to the Email Evidence

The threshold question in assessing whether an official search violated the Fourth Amendment is whether a "search" subject to Fourth Amendment scrutiny occurred at all. Outside the context of physical trespass, a search within the meaning of the Fourth Amendment only occurs when governmental action infringes "an expectation of privacy that society is prepared to consider reasonable." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). *See also Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); *United States v. Jones*, — U.S. —, 132 S.Ct. 945, 950 (2012). Warrantless searches of "effects" in which there is a legitimate expectation of privacy are "presumptively unreasonable," and the "reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." *Jacobsen*, 466 U.S. at 114-115. A defendant has the burden of proving a legitimate expectation of privacy. *Rawlings v. Kentucky*, 448 U.S. 98, 104-105 (1980).

### A.     The defendant fails to demonstrate a reasonable expectation of privacy in the single email captured by AOL

In this case, the defendant does not articulate how he would have had a reasonable expectation of privacy in an email which clearly violated the Terms of Service of his chosen service provider, such that there was a search within the meaning of the Fourth Amendment. Instead, the defendant generally refers to "a momentum of authority" for the proposition that *all*

email is expected to be private, regardless of whether the email service provider specifically advises that it will review content by whatever means it deems appropriate.  The situation in the present case is precisely why, in the 25 years since email and internet messaging has been in existence, the courts have not settled the question.[8]

The defendant acknowledges that neither the Supreme Court nor the Tenth Circuit have addressed a person's expectation of privacy as to emails (much less a singular email that violates a provider's terms of service).  *See* Doc. 13, Defendant's Motion To Suppress, p. 2.  Even so, the defendant boldly asserts "the momentum of authority reflects the natural extension of the expectation as it applies to new technology, such as emails…"  *Id*.  The phrase "momentum of authority" dramatically overstates how courts have approached this issue.  Considering that a *quarter of a century* has passed, the "momentum" of the courts tends more towards well-considered caution in the midst of evolving technologies by sundry providers.

One of the biggest problems that courts have in wrapping their arms and brains around issues like these is the inadequacy of current analogies.  Digital evidence exists in a manner different than physical evidence.  Analogies to physical mail carriers are inadequate, not least because of the small number of physical mail carriers as compared to the continually expanding number of email and messaging providers, but also because email and messaging involves using a third party's service not just to send, but to compose and to read.  What would a "spam filter" be in the context of physical mail?  Digital evidence is examined differently than physical evidence.  A prime example of this is AOL's IDFP, which perform a type of field test that is manifestly different than any field test performed on physical mail.  For example, to analogize

---

[8] For instance, AOL's services have been offered since 1989.  According to its website, "When first started, the company was known as Quantum Computer Services offering an online service named Q-Link. Quantum launched its first instant messenger service in 1989 and welcomed users with that familiar saying 'You've got mail!'"  Available online at: http://corp.aol.com/about-aol/overview

IDFP to a field test by Fed Ex, one would imagine that Fed Ex has a giant syringe that can pierce a package's contents, extract or inject a reacting agent that tests for whatever drug might be in there, and the syringe turns a color to inform Fed Ex that there is a specific drug located inside… and that Fed Ex performs this test on every package that passes through its facilities. While this example may seem comical, it highlights the inadequacies of our current analogies and the tremendous difference between what *can* be done in the physical realm versus what *is* being done in the digital realm, as related to "mail carriers."

To be clear, the United States does not argue that the defendant lost control and a reasonable expectation of privacy in the entire contents of his account. More importantly, the Court need not and should not address that issue given the facts of this case. In this case, the issue relates to a single email. Put another way, the issue before the Court is not whether the defendant has an objectively reasonable expectation of privacy in his email account, but whether the defendant had an objectively reasonable expectation of privacy in a single email that violated the terms of service of his chosen email provider.

It is important to point out, *the defendant was not required to use AOL's email service*. There are email providers who do not scan the content of its users, and who highlight such as a selling point.[9] Some (if not all) of these unmonitored email providers offer their services for free. In this case, the defendant chose to use AOL, and thus subjected himself to their terms of service. This difference between service providers also highlights what society has come to expect – that certain providers will monitor its services for illegal activity, while others will not.

In some cases arising outside the electronic communication context, courts have found that terms of service were specific enough to completely defeat any expectation of privacy in

---

[9] A prime example would be Hushmail, who advertises "Hushmail won't scan your email to collect information for advertising or other purposes." See: https://www.hushmail.com/about/technology/security/

items shipped — even in the absence of any private search. For example, in *United States v. Young*, 350 F.3d 1302 (11th Cir. 2003), the IRS asked Federal Express to turn over packages shipped by targets of an IRS investigation; after FedEx complied, the government then x-rayed fourteen packages and found large amounts of currency. 350 F.3d at 1304. It was only after this initial search that the government obtained search warrants to open the packages and search the defendant's residence and business. *Id.* at 1305. The court held that when the defendants: "elected to ship the ill-gotten proceeds of their tax fraud scheme through Federal Express despite explicit warnings on the airbill and envelopes that (1) sending cash was illegal, and (2) Federal Express retained the right to inspect any package for any reason, defendants had no legitimate expectation of privacy in the contents of the packages." *Id.* at 1303.

In the alternative, the *Young* court held that irrespective of any privacy interest, the "right to inspect" defeated the defendants' Fourth Amendment challenge because it authorized Federal Express, "as a bailee of the packages, to consent to a search." *Id.* at 1308. Under this approach, Federal Express retained possession and control of the package and had rights either to inspect the packages itself or to turn them over to law enforcement for inspection. When the defendants chose to ship large amounts of cash with Federal Express they "assumed the risk that Federal Express might consent to a search" and could claim no Fourth Amendment violation. *Id.* at 1308-09. *See also United States v. Leffall*, 82 F. 3d 343, 345-347 (10th Cir. 1996) (contract with air freight company authorized search by air freight employee)*; United States v. Matlock*, 415 U.S. 164, 171 (1974) (consent to search may be given by a "third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected). It is important to note, in the present case, the government did not approach AOL nor request

access to the email, which puts the actions of the government much further on the right side of *Young* and similar cases.

In the present case, AOL's Terms of Service prohibited both illegal activity and sexually explicit content. AOL advises that, "[t]o prevent violations and enforce this TOS and remediate any violations, we can take any technical, legal, and other actions that we deem, in our sole discretion, necessary and appropriate without notice to you." Because of the terms of service of AOL and the defendant's selection of AOL's service despite having other options, the defendant cannot be said to have "an expectation of privacy that society is prepared to consider reasonable." *Jacobsen*, 466 U.S. at113. He assumed the risk that AOL would monitor and detect the child pornography he was distributing.

If the Court were to determine that the defendant had a reasonable expectation of privacy in the email that violated AOL's Terms of Service, such that AOL was not authorized to act according to its terms, the Court would undermine AOL's (and any other ISP's) legitimate business interest in monitoring content sent through its facilities. As noted in the recent *Keith* decision, AOL has an important business reason for its IDFP filtering process:

> We found that, again, providing a safer, more family-friendly environment for our users sustains our ability to keep our members. We've noticed when members call and say, "I want to discontinue my AOL service," we usually ask them why. And there are many reasons why somebody may want to leave, but one of these that we're routinely concerned about is objectionable content sent to them through our servers by other members or other Internet users. So they end up leaving AOL because of this bad content. So as a business, we would like to actually keep the members who complain about it and have a countermeasure against those who do it.

*United States v. Keith*, 2013 WL 5918524 (D. Mass. Nov. 5, 2013). Outside of the context of commercial ISPs, there is fairly well-developed case law that warning banners or computer use agreements can make any expectation of privacy unreasonable or establish that the system

administrator retained the ability to consent to a search or provide notice such that, by using the network in light of the notice, the user impliedly consents to monitoring.[10]  In this case, AOL acted according to the terms of its agreement with the defendant, and the Court should give full force and meaning to those terms.

The Court should also consider whether the defendant had any expectation of privacy in the email after AOL seized control of and terminated his account.  Though the United States contends the defendant's expectation of privacy in the email extinguished when he pressed "send" in violation of AOL's TOS, the United States also contends that his expectation of privacy in that email fully evaporated when his account was terminated.  That occurred on April 23, around the time that NCMEC received the CyberTipline Report, and prior to law enforcement involvement.  The Supreme Court has directed that courts must assess the reasonableness of an official invasion of the citizen's privacy "on the basis of the facts as they existed at the time that invasion occurred."  *Jacobsen*, 466 U.S. at 115.  In this instance, the inquiry is no longer "does a defendant have a reasonable expectation of privacy in the contents of his email account" but rather "does a defendant have a reasonable expectation of privacy in the contents of a file that the ISP has already identified as containing contraband in violation of the terms of service and removed from its communications system."

---

[10] *See, e.g., United States v. Angevine*, 281 F.3d 1130, 1132-34 (10th Cir. 2002) (university's computer use policy stating that the university would periodically monitor network traffic and warning of consequences for illegal activity meant no reasonable expectation of privacy); *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000) (any subjective expectation of privacy government employee may have had was unreasonable in light of Internet usage policy stating that employer would periodically monitor users' Internet access as deemed appropriate); *Borninski v. Williamson*, 2005 WL 1206872, at *13 (N.D. Tex. May 17, 2005) (employee signed Application for Internet Access, which stated that use of system implied consent to monitoring; *United States v. Greiner*, 235 Fed. Appx. 541, 542 (9th Cir. 2007) (unpublished) (banner authorizing the employer to "monitor communications transmitted" by the employee defeated any reasonable expectation of privacy and also constituted consent; *See also United States v. Hamilton*, 701 F.3d 404, (4th Cir. 2012) (by using public university computer system in light of explicit warnings that communications would be monitored, defendant waived marital privilege in email communications with his wife).

The terms of service put the defendant on notice that he was violating those terms by sending illegal child pornography images across AOL's network and that AOL would take steps, including "technical" and "legal" action, to enforce those terms of service. The defendant's use of AOL's system to send an item prohibited by those terms rendered any subjective expectation of privacy in that item objectively unreasonable. This is especially so in light of the Supreme Court's recognition that where Congress has decided to treat the interest in "privately" possessing a substance as illegitimate, governmental conduct that can reveal only that a substance is contraband, and no other arguably "private" fact, "compromises no legitimate privacy interest." *Jacobsen*, 466 U.S. at 123.[11] Here, AOL identified the email as containing contraband. Like the additional act of field testing the white powder in *Jacobsen,* an additional "official" act of opening the image, either by NCMEC or SA Moore, does not compromise any legitimate privacy interest. Indeed, AOL's IDFP essentially conducted the "field test," identifying the hash value of suspected child pornography.

Arguably, when the defendant violated the terms of service with AOL and when AOL took action in response to that violation, the defendant became an unauthorized user of AOL's system and, as such, lacked a legitimate expectation of privacy. Several Courts of Appeal have recognized that an unauthorized driver cannot challenge the search of a rental car. *See United States v. Roper*, 918 F.2d 885, 887-88 (10th Cir.1990); *United States v. Wellons*, 32 F.3d 117, 119 (4th Cir.1994); *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir.1990); *But see United States v. Thomas*, 447 F.3d 1191, 1199 (9th Cir. 2006) (unauthorized driver may have standing to challenge a search if he or she received permission); *see also United States v. Haywood*, 324

---

[11] *Jacobsen* explicitly contrasted its treatment of contraband to obscene items, which are not contraband in that purely "private" possession may not be outlawed whereas distribution in commerce may. 466 U.S. at 123, n. 23 (citing *Stanley v. Georgia*, 394 U.S. 557 (1969)). Child pornography is contraband and starkly contrasts with obscenity, which is not obscene absent a judicial determination and which has been recognized as being constitutionally protected when possessed in the home.

F.3d 514, 516 (7th Cir.2003) (concluding that where the driver lacks a valid license, the rental company would not have granted permission to use the vehicle, and there is no expectation of privacy); *see also United States v. Cooper*, 133 F.3d 1394, 1401 (11th Cir. 1998) (recognizing that while "dormant right of repossession" would not vitiate reasonable expectation of privacy of rental car driver after rental contract expired, steps by lessor to enforce its contractual rights to vehicle might). Along these lines, a user may have a subjective expectation of privacy in the contents of emails sent in violation of an ISP's terms of service, but, where the ISP takes steps to enforce its terms of service, the defendant's expectation of privacy is not one that society is prepared to recognize as reasonable.

The Court should find that the defendant has no legitimate privacy interest in the email. The Court should also find that the defendant not met his burden to show he had an objectively reasonable expectation of privacy in the email, either when he pressed "send," or when his account was terminated by AOL. On this basis, the defendant's motion as to the suppression of the email evidence should be denied.

## B.     AOL was not and is not a state actor

Assuming, *arguendo*, the Court determines the defendant retained a reasonable expectation of privacy in the single email captured by AOL, the Court must still determine whether there was an official invasion of the defendant's privacy interest. *Jacobsen*, 466 U.S. at 114-115. On this point, the defendant contends that AOL, a private entity, was acting as a state agent, such that the initial capture of the defendant's email was an official search.

The Tenth Circuit has set for its rule for determining whether private party is acting as a state agent for 4th Amendment purposes:

> We have stated the applicable test to determine when a search by a private person becomes government action as a two-part inquiry, "1) whether the government

knew of and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Pleasant v. Lovell*, 876 F.2d 787, 797 (10th Cir.1989) (*Pleasant I* ) (citations omitted).  Both prongs of the test must be met before it is governmental conduct. *Id*.; *Pleasant II*, 974 F.2d at 1226.

*United States v. Leffall*, 82 F.3d 343, 347 (10th Cir. 1996).  The defendant fails to meet either prong of this test.  As to the first prong, AOL's capture and report was done without any involvement of the government.  As to the second prong, AOL is motivated by a legitimate business interest in deterring the use of its services for this type of conduct.  In the *Keith* decision, the Court observed:

> "AOL is not required by law to monitor email traffic for possible child pornography, 18 U.S.C. § 2258A(f), but only to report it when it is found, id. § 2258A(a). The government exercises no control over AOL's monitoring of its network. Most importantly, the evidence considered on the present motion established, and I find, that AOL is motivated by its own wholly private interests in seeking to detect and deter the transmission of child pornography through its network facilities.

*United States v. Keith*, 2013 WL 5918524 (D. Mass. Nov. 5, 2013).  For the same reasons, the defendant's motion fails on this point.

### C.      NCMEC was not and is not a state actor

The United States does not concede that NCMEC is a state actor, despite the finding of the district court in *Keith*.  To the contrary, the United States asserts that, under prevailing Tenth Circuit law, NCMEC does not meet both prongs of the test as articulated and required in *United States v. Leffall*.   82 F.3d at 347.

While NCMEC does "partner" with law enforcement, it also partners with a variety of corporations.[12]   Additional program partners include technology companies that provide pro bono services, materials, and software to assist NCMEC in its mission.[13]  Though it partners with

---

[12] A listing of Corporate Partners is available online:  http://www.missingkids.com/CorporatePartners
[13] A listing of Program Partners is available online:  http://www.missingkids.com/ProgramPartners

a variety of corporations, technology companies, and law firms, NCMEC operates as a private entity in providing victim and family support, educational materials for schools and charities, along with training and resources for law enforcement and internet service providers.

In *Keith*, the district court expressly limited its consideration of NCMEC's role as a state actor to its involvement in the CyberTipline, finding "NCMEC's goal in operating the CyberTipline is a worthy and laudable one, but it is one that it pursues in 'partnership,' 42 U.S.C. § 5771(9)(B), with the government… NCMEC's operation of the CyberTipline is intended to, and does, serve the public interest in crime prevention and prosecution, rather than a private interest." 2013 WL 5918524, *6. The court in *Keith* appears to completely overlook the broader goals, mission, and interests of NCMEC. The court in Keith also appears to overlook the other half making use of NCMEC's CyberTipline: the millions of internet users and the thousands of internet service providers who rely on the CyberTipline service.

NCMEC's operation of its CyberTipline furthers the overall goal and mission of NCMEC. Just as AOL has a legitimate interest in serving its customers by detecting certain material, NCMEC has a legitimate interest in providing the millions of users of internet and the thousands of internet service providers (ISPs) an easy way to report child exploitation, thus serving families of missing or exploited children and the children themselves. As a non-profit charitable organization, does NCMEC have a legitimate motivation in identifying gaps and establishing linkages that ultimately aid families and children in need? Imagine if NCMEC did not operate the CyberTipline – would it receive as much support from corporations and via charitable giving? Imagine if its constituent users or ISPs had to track down which law enforcement agency should receive the report? Certain agencies, where ISPs are located, would be overwhelmed with reports that ultimately should be investigated in one of 49 other states.

While one side of the coin is that NCMEC assists law enforcement by operating the CyberTipline, the other side of the coin is that NCMEC assists users and ISPs in finding the right law enforcement agency. Primarily, the CyberTipline aims at providing a centralized conduit between a user or ISP and the appropriate law enforcement agency. NCMEC's CyberTipline speeds up the process from both ends, which encourages users and ISPs to utilize its service, thus advancing the goals of NCMEC.

While NCMEC does some investigation relative to a CyberTipline report, that investigation generally relates to identifying the appropriate point of referral. NCMEC does not initiate its own investigations, apply for search warrants, or effectuate arrests, as would a law enforcement agency. NCMEC is no more a state actor than a grant-funded battered women's shelter advocate that accompanies a victim to an interview.

Because NCMEC is a private entity and not a government agency, the Court applies the two-prong test referenced above: "1) whether the government knew of and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Leffall*, 82 F.3d at 347. As to the first prong, in this case the government did not know of NCMEC's review of AOL's report. As to the second prong, the Court must also weigh the government's role in the search, and a government agent must be involved, either directly as a participant or as the encourager:

> We believe our earlier statement of the test's second prong, "whether the party performing the search intended to assist law enforcement officers or to further his own ends," does not mean that the court simply evaluates the private person's state of mind - whether his motive to aid law enforcement preponderates. Almost always a private individual making a search will be pursuing his own ends-even if only to satisfy curiosity-although he may have a strong intent to aid law enforcement. We hold this part of the test also requires that the court weigh the government's role in the search. A government agent must be involved either directly as a participant - not merely as a witness - or indirectly as an encourager

of the private person's search before we will deem the person to be an instrument
of the government.

*United States v. Leffall*, 82 F.3d 343, 347-48 (10th Cir. 1996) (citations omitted).  In this case, NCMEC's review of the CyberTipline report, and specifically the email and its contents, was undertaken to further the ends of NCMEC, in its mission as a charitable non-governmental organization.  There was no government agent involved as a participant, either directly or indirectly.  In terms of encouragement, the United States contends the *Keith* court failed to consider NCMEC's overarching mission, and failed to consider that, as an entity, NCMEC is more encouraged to do its work by the children it locates or rescues, and not by virtue of its "partnership" with law enforcement.

It is also helpful to consider what is contemplated under the law by the term "encouragement."  As discussed in *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996), "the government agent must also affirmatively encourage, initiate or instigate the private action." In *Smythe*, the manager of a bus station became suspicious of a package that the defendants attempted to ship via the bus.  *Id*. at 1241.  The manager contacted law enforcement, who came to the bus station and advised the manager that he could open the package but that law enforcement could not. *Id*. at 1242.  The law enforcement officer never touched the package, did not assist, ask or otherwise encourage the manager to open the package and stepped away as the manager opened the package.  *Id*.  In *Smythe*, the Tenth Circuit determined that the government had not encouraged the private actor, though the private actor had actual and personal contact with law enforcement and the government was present during the search.  *Id*. at 1243.  It is difficult, if not impossible, to reconcile *Keith's* extremely broad interpretation of "encouragement," which is not binding authority, with the Tenth Circuit's interpretation of

"encouragement."  As applied in this case, any "encouragement" that NCMEC receives from law enforcement is not for the purpose of encouraging unauthorized searches of individual's emails.

Another instructive case is *United States v. Leffall*, where an air freight employee contacted law enforcement prior to opening a package he suspected contained contraband. *Leffall*, 82 F. 3d 343, 345-347 (10th Cir. 1996).  In *Leffall*, the air freight employee had authority to open the package, derived from his understanding of the air freight company's contract of service.  *Id*.  He contacted law enforcement prior to opening the package, and law enforcement agreed that he had authority to open the package.  *Id*. at 346.  Law enforcement was present during the private search.  *Id*. at 347.  The defendant argued that the air freight employee's "crime prevention motive" converted the search into a government action implicating the Fourth Amendment.  *Id*.  Both the district court and the Tenth Circuit disagreed, finding that "in no case in this circuit have we found a private person to be a government agent or instrumentality when government participation was as minimal as in the instant case."  *Id*. at 348.  In the present case, a "crime prevention motive" on the part of NCMEC does not convert its review of the captured email into a government action implicating the Fourth Amendment, because there is a total absence of law enforcement involvement in the search.

The United States contends the Court should determine that NCMEC, and its CyberTipline, are private actors.  Further, the Court should find that the defendant has failed to meet both prongs of the two-part test, as required and discussed above.

### D.     Neither NCMEC nor SA Moore expanded the scope of AOL's search in a constitutionally significant way

Because the Fourth Amendment constrains only government action, when a private party conducts a search that frustrates an individual's reasonable expectation of privacy and delivers information to the government, the Fourth Amendment is "implicated only if the authorities use

information with respect to which the expectation of privacy has not already been frustrated." *Jacobsen*, 466 U.S. at 117. To determine whether "additional invasions" of privacy by a government actor are subject to Fourth Amendment scrutiny, they must be "tested by the degree to which they exceeded the scope of the private search." *Id.* at 115 (citing *Walter v. United States*, 447 U.S. 649 (1980)). Additional invasions by the government that exceed the scope of the private search no longer fall within the private search exception to the warrant requirement and must be assessed for whether they constitute an "unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment." *Jacobsen*, 466 U.S. at 122.

In *Keith*, having found that NCMEC was an agent of the government in the CyberTipline context, the court rejected outright the notion that, if law enforcement had received the image file directly from AOL, it could have opened and inspected the contents of the file without a warrant. 2013 WL 5918524 at *7. Relying heavily on the Supreme Court's decision in *Walter* (in which the FBI used a projector to view films not previously viewed during the private search) the court found that NCMEC's act of opening the image file provided by AOL was an expansion of AOL's private search that violated the Fourth Amendment. *Id.*

The *Keith* court's reliance on *Walter* was misplaced, for several reasons. One is that the lack of a majority opinion in *Walter* makes it difficult to discern a standard for assessing what "degree" of government expansion of a private search becomes constitutionally significant. Four Justices in *Walter* found that while the FBI was legitimately in possession of the films, projecting the films to see their content constituted a separate search for which a warrant was required. *See, e.g.,* 477 U.S. at 657 (opinion of Stevens, J., joined by Stewart, J.). Four Justices found that since the private search had "so fully ascertained the nature of the films before contacting the authorities . . . the FBI's subsequent viewing of the movies on a projector did not 'change the

nature of the search' and was not an additional search subject to the warrant requirement." 477 U.S. at 663-64 (Blackmun, J., dissenting, joined by Burger, C.C., Powell and Rehnquist, JJ.) (citation omitted). Justice Marshall did not join any opinion when casting the deciding vote in favor of suppression. *Walter* may thus be described as a case without a holding, since the narrowest position of the five Justices concurring in the judgment says nothing at all. *See Marks v. United States*, 430 U.S. 188 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds'"). Reliance on *Walter* is typically limited to the general proposition that additional governmental incursions of privacy following a private search should be "tested by the degree to which they exceed the scope of the private search." *See Jacobsen*, 466 U.S. at 115; *United States v. Runyan*, 275 F.3d 449, 460 (5th Cir. 2001); *United States v. Snowadzki*, 723 F.2d 1427, 1430 (9th Cir. 1984) (noting "bizarre facts" and lack of majority opinion in *Walter*).

The *Keith* opinion also falls short in its analogy to the facts involved in *Walter*, stating that "[a]lthough the media in which criminally obscene material was stored are different in *Walter* and this case, the pattern is the same. A label (here, hash value) that is examined without opening the film or file suggested the nature of the contents. For that reason, concerned private parties provided the film or file to the government without first reviewing the contents themselves." 2013 WL 5918524 at *7. There are two main flaws with this part of the court's factual analogy. First, there is a significant difference between multiple rolls of film, each with multiple frames per second, and a single image file that has been isolated and provided by the ISP. Second, and most important, a hash value is not similar to a label. A file name is similar to a label, and the file name at issue in *Keith* was "12yo preparing to enter.jpg." A hash value, by

contrast, is an algorithmic calculation that specifically corresponds to the content and properties of an individual file. When the hash values of two files match, there is over a 99.9% certainty that those files are identical down to the pixel level.

The court in *Keith* minimized the significance of the hash value match, stating that "matching the hash value of a file to a stored hash value is not the virtual equivalent of viewing the contents of the file. What the match says is that the two files are identical; it does not itself convey any information about the contents of the file." *Id.* at 8. While the court was correct in the abstract – a hash value alone does not provide any information about the content of a file, or even the nature of a file (document, image, spreadsheet) – it dismisses the relevance of the hash value in this context. AOL only uses hash values of files that it or another ISP has opened, viewed, and determined to be child pornography. So when AOL finds a file on its system that matches one of the hash values in its library, the government can be substantially certain that the identified file depicts child pornography of some kind. Whereas in *Walter* the labels describing the films were distinct from their contents, AOL's hash value match revealed (before any government action) that the contents of the file were identical to an image file identified as child pornography.

While it is true that the viewing of the file would confirm that it is child pornography and show which child pornography image the defendant possessed, this does not constitute a constitutionally significant expansion of the scope of the private search. AOL's private search had already thoroughly frustrated defendant's expectation of privacy in the contents of the image file. *Cf. Jacobsen*, 466 U.S. at 117.

Furthermore, the *Keith* court's requirement that AOL determine the exact contents of the file before NCMEC or law enforcement can open the file without a warrant is not anchored in

settled legal doctrine. There is very little precedent considering the scope of a private search in the context of digital evidence, and courts have struggled to analogize digital media to containers. The Fifth Circuit took a very broad approach in *United States v. Runyan,* 275 F.3d 449, 453-454 (5th Cir. 2001), which involved a private search in which the defendant's ex-wife broke into his home and took CD's, floppy disks and ZIP disks; she and her friend viewed portions of some of the disks, saw images of child pornography, and turned all of the materials over to law enforcement. The court stated that "under *Jacobsen*, confirmation of prior knowledge does not constitute exceeding the scope of a private search" and reasoned that "opening a container that was not opened by private searchers would not necessarily be problematic if the police knew with substantial certainty, based on the statements of the private searchers, their replication of the private search, and their expertise, what they would find inside." 275 F.3d at 463. Applying this "substantial certainty" standard, the court in *Runyan* found that the police exceeded the scope of the private search when they reviewed unlabeled disks that the private searchers had not reviewed and about which they had no knowledge. *Id*. at 464. As to any storage media reviewed by the private searchers, police did not expand the private search by examining "more files on each of the disks than did the private searchers." *Id.* at 464-65. The approach taken by the court in *Runyan* was recently adopted by the Seventh Circuit as well. *Rann v. Atchison*, 689 F.3d 832, 838 (7th Cir. 2012) (noting that because private searchers knew some contents of the "digital media devices when they delivered them to police, the police were 'substantially certain' the devices contained child pornography.").

In contrast, some cases considering the scope of a government search following the private search of a computer have held that the government must get a warrant to view individual files not opened and viewed during the private search. *See United States v. Barth*, 26 F. Supp. 2d

929, 937 (W.D. Tex. 1998); *See also United States v. Howe*, 2011 WL 2160472 (W.D.N.Y. May 27, 2011) (unpublished). The First Circuit seems to take a somewhat different approach to the private search doctrine, describing *Jacobsen* as requiring a "virtual certainty that the government's search will reveal 'nothing else of significance' other than the evidence to which they were tipped off by the private party" to remain within the scope of the private search. *United States v. D'Andrea*, 648 F.3d 1, 9 (1st Cir. 2011).

Under either a "substantial certainty" standard or the "virtual certainty" standard, once AOL or another private carrier uses a hash value to identify an image on its system as being identical to an image that an ISP employee previously opened, viewed, and recognized as child pornography, and then delivers that image to NCMEC or law enforcement, it is virtually certain that opening that image will reveal child pornography, and not some other type of material or data. In this regard, neither NCMEC nor SA Moore expanded the scope of AOL's completed private search, practically or in a constitutionally significant way.

If the Court finds that opening an image file or a set of image files went beyond the scope of the private search in a constitutionally significant way, it is by no means the end of the inquiry. In *Jacobsen*, Federal Express employees opened a box and removed plastic bags containing a white powdery substance from a tube inside the box, and contacted the DEA, which then removed the bags and field tested the substance to determine that it was cocaine. 466 U.S. at 111-12. The Supreme Court broke its inquiry into several parts, first stating as a general matter that the package was an "effect" within the meaning of the Fourth Amendment in which the public has a legitimate expectation of privacy, 466 U.S. at 114, then determining that the government's reenactment of the private search did not expand the scope of the private search and thus infringed no legitimate expectation of privacy. *Id.* at 120. After determining that the

warrantless seizure of the package was also justified, the Court turned to the additional "intrusion" of opening the plastic baggies and conducting a field test for cocaine, concluding that the field test "exceeded the scope of the private search." *Id.* at 122. Despite this, the additional intrusion of the field test was not a "search" within the meaning of the Fourth Amendment because it did not infringe on any expectation of privacy that society is prepared to consider reasonable. *Id.* at 123. As the Court in *Jacobsen* explained, "governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." *Id.* at 123. In the present case, the "field test" has already been accomplished by AOL, when its IDFP filter identified the hash value in the defendant's email.

Even assuming that *Keith* correctly determined that NCMEC's opening of the image file exceeded the scope of the private search, the court in *Keith* committed a critical error by not conducting a more narrow and focused inquiry into whether the defendant retained any legitimate expectation of privacy in the single image file following AOL's private search and removal of that file from its system. On this point, the United States reasserts the argument advanced above, relating to the defendant's loss of any legitimate expectation of privacy in the email when AOL captured it.

### E.     Application of Good Faith Exception

As the defendant acknowledges, in circumstances similar to this case, a district court determined that the "good faith" exception to the exclusionary rule applies. In *Keith*, the district court noted:

> Evidence obtained in violation of the Fourth Amendment may not be used against a defendant in a criminal prosecution. *Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The exclusionary rule, however, is not a remedy for a completed private wrong, but a practical means of deterring future unlawful behavior by agents of the government. *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The Supreme Court has

observed that "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct" to deprive a defendant of a guaranteed right. *United States v. Peltier*, 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) (internal quotation marks omitted). As a corollary, the Court has concluded that the deterrent effect of exclusion of evidence is minimal where an officer has acted on an objectively reasonable belief that his actions did not violate the Fourth Amendment. United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

…

The Court has also held that the exclusionary rule should not be applied to suppress evidence obtained by officers who acted in objectively reasonable reliance on a statutory scheme that authorized warrantless administrative searches, even though the statute was later found to violate the Fourth Amendment. *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). That is similar to this case. Congress has by statute given NCMEC's CyberTipline a significant role in the investigation and subsequent prosecution of child pornography crimes, and has directed that it be supported by government grants. While I have concluded that NCMEC conducts its CyberTipline program as an agent of law enforcement so that its inspections of the content of emails are subject to the Fourth Amendment, it still must be acknowledged that those who heretofore regarded NCMEC's role only as that of a private party, so that the Fourth Amendment was inapplicable, were not acting in willful or negligent disregard of constitutional principles, but rather pursuant to a view of NCMEC's statutorily sanctioned role and activity that was, under all the circumstances, objectively reasonable, just as the officers' view of the statutory scheme was found to be in Krull. In that case the Court explained that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Krull*, 480 U.S. at 348–49, 107 S.Ct. 1160 (internal quotation marks and citation omitted).

There is nothing in the record in this case that would suggest either NCMEC or the police or the magistrate who issued the warrant knew or ought to have known that by relying on the CyberTipline report they were doing something that was unconstitutional under the Fourth Amendment. No persuasive argument can be made that an organization like NCMEC needs to be deterred from acting in good faith in a way that is consistent with explicit congressional will.

*United States v. Keith*, 2013 WL 5918524, *10-11 (D. Mass. Nov. 5, 2013). While the United

States disagrees with the district court's analysis as to NCMEC's status as a state actor, the

United States concurs that the "good faith" exception should apply in the circumstances of the instant case for the reasons stated therein.

Although the defendant asserts that there is established precedent that should have alerted AOL, NCMEC, and SA Moore that there was an expectation of privacy in the captured email, that does not make it so. The *Keith* decision highlights the novelty of this area of law, and that the involved actors acted on an objectively reasonable belief that their actions did not violate the Fourth Amendment. *Id*. The *Keith* court's analysis related to *Walter* and *Jacobsen* further highlight the fact that the law is not clear in this particular circumstance. *Id*. at *7.

The United States notes that the *Keith* decision is not binding authority. More importantly, the *Keith* decision did not exist at the time AOL, NCMEC, and SA Moore undertook their respective actions in this case. The *Keith* case was decided in November 2013. NCMEC's involvement in this case began and concluded in April 2013, several months before *Keith*. SA Moore's action of reviewing the CyberTipline report and obtaining a warrant based on information obtained from AOL and NCMEC occurred in May 2013, several months before *Keith*. Clearly, none of the involved actors were aware that the rules had changed or were going to change, and were operating in accordance with their understanding of the law and the Fourth Amendment. If the Court does not deny the defendant's motions on the grounds previously stated, the circumstances of this case deserve application of the "good faith" exception.

III.    **Authority and Analysis as to the Defendant's Statement**

For his motion, the defendant claims he was told that he would be arrested unless he cooperated. *See* Doc. 13, Defendant's Motion To Suppress, p. 5. The United States disputes the defendant's claim. The interview of the defendant was recorded, and the defendant was

repeatedly told that he was not going to be arrested. At no time was that conditioned upon the defendant's cooperation. At no time during the recorded interview does the defendant reference this purported "you will be arrested unless you cooperate" statement that he now attributes to law enforcement for the purposes of his motion.

In order for the Miranda warning to be required, the defendant must have been subjected to custodial interrogation. If the defendant was not in custody, the *Miranda* warning was not required before interrogation. *Miranda v. Arizona*, 384 U.S. 436, n. 4 (1966); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("[P]olice officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited."); *see also United States v. Higgins*, 2 F.3d 1094 (10th Cir.1993) (encounter at defendant's office was non-custodial). In the present case, there was no restriction on the defendant's liberty as to render him "in custody."

Although the defendant was provided with a private room to speak to the officers, that does not turn the encounter into a coercive environment. *See Beckwith v. United States*, 425 U.S. 341, 342-343 (1976) (agents' interview at private home to spare defendant potential embarrassment was not improper); *see also United States v. Higgins*, 2 F.3d 1094 (10th Cir.1993) (encounter at defendant's office was non-custodial). The defendant was not handcuffed. He was expressly told he was not under arrest before and throughout the interview. He evinced understanding that he was not under arrest by discussing what would happen when

he got home that night.  The interview was conducted in a conversational tone, with only one agent present.  The interview was not unusually long.  The length of the interview was due largely to SA Moore allowing the defendant to speak on topics unrelated to his investigation, further indicating the conversational tone of the interview.

In this case, the interview was non-custodial, such that *Miranda* and the exclusionary rule do not apply.  The defendant's motion on this point should be denied.


Respectfully submitted,

BARRY R. GRISSOM
United States Attorney


s/ Jason W. Hart
JASON W. HART, #20276
Assistant U.S. Attorney
1200 Epic Center, 301 N. Main
Wichita, Kansas 67202
Telephone: (316) 269-6481
Fax: (316) 269-6484
jason.hart2@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of March, 2014, I electronically filed the foregoing Response with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the appropriate parties.


s/ Jason W. Hart
JASON W. HART
 Assistant U.S. Attorney