# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action |
| | ) | |
| v. | ) | |
| | ) | No.   13-10176-01-EFM |
| | ) | |
| WALTER ACKERMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>UNITED STATE'S SENTENCING MEMORANDUM</u>

The defendant asks the Court to vary from the Guidelines, reducing his sentence to a mere 60 months.   The defendant asks the Court to impose the lowest possible sentence.   The defendant makes his request without identifying any salient characteristic that would distinguish him from the typical child pornography offender.

Instead, the defendant asserts that the penalties are too high for this offense, because "even as *the population of child pornography offenders has become less dangerous,* punishment has greatly increased,"[1] though empirical evidence indicates the opposite.   The defendant insinuates the 2G2.2 Guideline is deficient because it "concentrates offenders at or near the statutory maximum,"[2] even though cases from within the Wichita Division demonstrates otherwise.   The defendant argues the 2G2.2 Guideline "fails to meaningfully distinguish more

---

[1] Doc. 48, p. 6.

[2] *Id.*, p. 7.

serious offenders from less serious offenders,"[3] though he fails to meaningfully distinguish himself from other offenders or articulate what distinctions should exist between child pornography offenders. The defendant argues that "there is no relationship between sentence length and general or specific deterrence,"[4] by pointing to studies involving white collar or drug crimes, rather than offenses driven by base sexual desire and preference.   The defendant advocates against "unwarranted disparity" and demands sentencing "in a way that reflects the learned experience reported in the Commission's critical report,"[5] yet fails to advise the Court that the average sentence for an offender in the defendant's range was 132 months, *a full 72 months higher than the sentence that the defendant requests*.

The defendant advocates for a sentence that is untethered from reality or reason.   The United States will attempt to address these arguments in a way that provides the Court a path to achieving a sentence that reflects the seriousness of the offense, the characteristics of the defendant, promotes respect for the law, provides just punishment, and otherwise meets the factors listed in 18 U.S.C. § 3553.

**Empirical evidence shows child pornography offenders are *more* dangerous, not less, and highlight the seriousness of this type of offense**

The defendant opines that "*much less dangerous people commit this offense* than was previously the case, even though the guideline range is much higher than it was previously."[6]

---

[3] *Id.*

[4] *Id.*, p. 9.

[5] *Id.*, p. 14.

[6] *Id.*, p. 6.

He goes further to claim that "even as *the population of child pornography offenders has become less dangerous,* punishment has greatly increased."[7]   While it is true that the guidelines are higher than they were in the 1990s, it is patently untrue that the offenders are less dangerous.   In fact, very recent research published in the Journal of Sexual Aggression indicates quite the contrary:

> Crimes involving the possession, distribution, or manufacture of child pornography constitute violations of specific laws pertaining to the receipt and transmission of child abuse/exploitation images, and as a result there is a tendency for some individuals to assume these offenders are somehow distinct from child molesters (i.e., "hands-on" abusers). This assumption, in fact, is a key reason why recent years have seen an increase in judicial sentences that fall below sentencing guidelines (United States Sentencing Commission, 2012), a trend that may be attributable to an impression that the rate of "crossover" between child pornography collection and hands-on abuse is low (Eke & Seto, 2011; Endrass et al., 2009; Seto, Hanson, & Babchishin, 2011).

> The logic of this conceptual view is somewhat befuddling. It ignores the observation that individuals who molest children and those who download and masturbate to child pornographic images share a primary motivational pathway - both are sexually aroused by minors (Seto et al., 2006). It therefore should come as no surprise that offenders whose sexual fantasies and urges involve children are able to derive pleasure and gratify their deviant impulses through a variety of means, and it suggests that significant "crossover" may exist between these crimes.

> Although some research (Elliott, Beech, Mandeville-Norden, & Hayes, 2009; Howitt & Sheldon, 2007; Webb, Craissati, & Keen, 2007) has shown differences between groups of "online" and "offline" offenders, most is limited by an important assumption; that is, an individual is a hands-off offender simply because official records do not reflect contact sexual offending. This assumption appears unwise, given the base rates for detecting sexual abuse are extraordinarily low, the finding that most victims of abuse never report their victimization to law enforcement, and the low percentage of arrests leading to convictions (Centres for Disease Control and Prevention, 2010; National Centre for Policy Analysis, 1999; US Department of Justice, 2010, 2012). Researchers should never assume an offender has not committed a hands-on crime merely because his or her criminal record does not reflect such a charge or conviction.

> …

---

 [7] *Id.*

In an interesting study by Buschman et al. (2010), which unfortunately has a small sample size, data were collected from Dutch offenders who had downloaded child pornography. The researchers were able to ensure that disclosures would not be used against the offenders in court-immunity that obviously facilitated more complete honesty. Self-report and post-polygraph confessions were compared, and researchers found that while the majority of participants (21 of 25) initially denied any high-risk behaviours towards children in their self-report, following polygraph examination many offenders admitted they had engaged in such acts, and five participants acknowledged they had a plan to sexually abuse children if the opportunity arose.[8]

This study goes on to describe its own processes as well as results.   The study was comprised of 127 persons under investigation for the possession, receipt, or distribution of child pornography who agreed to take a polygraph examination regarding their hands-on activity.[9]   These individuals had no known history of hands-on offending.[10]   Six individuals (4.7%) admitted to sexually abusing at least one child *prior* to the polygraph.[11]   However, during the polygraph procedures, an additional 67 individuals (52.8%) of the study sample provided disclosures about hands-on abuse they had perpetrated.   That means a total of 57.7% of the sample admitting to *previously undetected hands-on sexual offenses*.[12]   For children and judges, that is worse odds than a coin-toss.   Even more shocking is the total number of hands-on victims for these 73 individuals:   282 children, nearly four per offender.[13]

This study is important because it supports the results of prior studies, i.e., that child pornography offenders have high rates (as high as 85%) of previously unreported sexual offenses

---

[8] M.L. Bourke, et. al., "The use of tactical polygraph with sex offenders," *Journal of Sexual Aggression* (2014), p. 5-6. For the Court's convenience, this study has been attached as Exhibit 1.

[9] *Id*. at 8.

[10] *Id*.

[11] *Id*.

[12] *Id*.

[13] *Id*. at 9, Table I.

against children.[14]  This should come as little surprise, as other studies that relied solely upon prior official reports (arrests or convictions) showed a 20-28% association between child pornography offenses and contact sex offenses.[15]  The defendant's argument that "much less dangerous people" commit the offense flies in the face of the empirical science.

As an additional indicator of the dangerousness of these offenders, there is the very real effect that consumers, like Ackerman, have had on the producers of child pornography.[16]  "[I]n recent years there has been an increase in the frequency with which particularly violent images and images of younger children are found in offender collections."[17]  Mr. Ackerman's collection was

---

[14] Michael L. Bourke & Andres E. Hernandez, "The 'Butner Study' Redux: A Report on the Incidence of Hands-On Child Victimization by Child Pornography Offenders," 24 J. FAM. VIOLENCE 183 (2009) (study of 155 federal child pornography offenders in the United States who participated in the residential sex offender treatment program at FCI Butner from 2002–05; finding that official records, including the offenders' presentence reports in their child pornography cases, revealed that 26% had previously committed a contact sex offense, yet finding that "self reports" of the offenders in therapy revealed that **85% had committed prior "hands on" sex offenses**)(emphasis added); *see also* United States Sentencing Commission "Report to Congress: Federal Child Pornography Offenses," (2012) Ch. 7, p. 173 ("The six self-report studies taken together reported a rate of **55 percent**.").

[15] Janis Wolak et al., "Child Pornography Possessors: Trends in Offender and Case Characteristics," 23 SEXUAL ABUSE 22, 33–34 (2011) (finding, based on 2006 data from surveys of approximately 5,000 law enforcement officials throughout the United States, that 21% of cases that began with investigations of child pornography possession "detected offenders who had either committed concurrent sexual abuse [offenses] or been arrested in the past for such crimes"); Richard Wollert et al., "Federal Internet Child Pornography Offenders — Limited Offense Histories and Low Recidivism Rates," in THE SEX OFFENDER: CURRENT TRENDS IN POLICY & TREATMENT PRACTICE Vol. VII (Barbara K. Schwartz ed., 2012) (based on a study of 72 federal child pornography offenders in the United States who were treated by the authors during the past decade, the authors found that 20, or 28%, had prior convictions for a contact or non-contact sexual offense, including a prior child pornography offense).

[16] *United States v. Regan*, 627 F.3d 1348, 1355 (10th Cir. 2010) (affirming guideline sentence) ("Because child pornography promotes the victimization of children, individuals like Regan create a demand for its further production and abuse of children, even if their conduct is purely voyeuristic. Moreover, the volume of images in Regan's possession, including the images which conformed to the Guideline definition of sadistic or masochistic conduct, increased the seriousness of his offense).

[17] United States Sentencing Commission "Report to Congress: Federal Child Pornography Offenses," (2012), Ch. 4, p. 85.  Available online at:
http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-por nography-offenses

no exception, as it included bondage, bestiality, and prepubescent children.[18]   Even Mr. Ackerman acknowledged that he experienced a "chill" from some of the things he viewed via the TOR program, including people doing "harm to their kids to the point of killing them."[19]  Notably, his "friend" in the community described committing acts of bondage and sado-masochism with his "entire family" which, presumably, included minors.[20]

This trend towards violence is driven by the consumers, like Ackerman.  Sadly, this is reflected in the prevalence of the 2G2.2(b)(4) violence and sadism Special Offense Characteristic (SOC) appearing in a high number of cases.   However, the prevalence of that SOC should not be met with "Golly, it appears so frequently, I should ignore it."   Indeed, quite the opposite response should occur.   As has been said by another district court, "There can be no keener revelation of a society's soul than the way in which it treats its children…   Given the recent statistics surrounding child pornography, we are living in a country that is losing its soul."[21]

The fact that offenders have reached the point of demanding child sexual abuse images that culminate in death should counsel the Court from viewing these offenders as anything but *extraordinarily* dangerous.   The defendant was actively engaging with another offender whom he met on a BDSM website who engaged in BDSM with his entire family.[22]   Again, when the defense says "the population of child pornography offenders has become less dangerous," the empirical evidence indicates quite the contrary.

---

[18] PSR, ¶51.

[19] PSR, ¶31.

[20] PSR, ¶29.

[21] *United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010).

[22] PSR, ¶29.

The United States does not ask the Court to use the Bourke study, or any of the studies discussed, as proof of uncharged crimes.   However, the United States asks the Court to find that these studies highlight the seriousness of the offense.   These studies support the Guidelines, and indicate a lengthy and substantial sentence for the defendant is appropriate given the dangerousness of the offense.   As another district court in the 10th Circuit recently observed, regarding one of the predecessors to the Bourke study:

> "The Butner Study Redux has some purpose, however. When defendants come to Court and ask the Court to make some *Kimbrough v. United States* variance, and argue that the guideline range is too harsh, the Court is inclined to reject such arguments, based in part on the Butner Study Redux and other standards. **At the present time, the studies indicate a strong correlation between looking and touching in the past for many defendants, regardless whether the correlation is eighty-five percent or fifty-five percent. This correlation is disturbing. As long as the strong correlation remains unrefuted, there is no reason to have a substantive disagreement with the guideline range.**" [23]

In review of the *Crisman* court's lengthy opinion, it is clear that the judge did not have the benefit of the 2014 Bourke study.   Even so, that court refused to vary downward based on the defendant's arguments that the guidelines are too harsh.   In fact, the Court observed that, even if the guidelines were revised, the defendant's guideline would likely still be the same given other non-SOC conduct:

> "Although the Court supports the Sentencing Commission's recommendations, it is not saying that it views Crisman as a victim of outmoded guidelines; rather, the Court thinks that, in this case, the guideline range appropriately reflects Crisman's conduct, and it suspects that, if Congress responds to the Sentencing Commission's recommendations, the range would not greatly change. … Updating the sentencing guidelines could affect the guidelines calculation in Crisman's case, but the Court suspects that the updated enhancements could balance themselves out as applied to Crisman." [24]

---

[23] *United States v. Crisman*, 2014 WL 4104415, at *57 (D.N.M. July 22, 2014) (emphasis added).

[24] *Id*., at *64.

In the current case, even if the Commission changed the SOC for number of images, it is unlikely that the defendant's 973 images and 28 movies would put him in the bottom rung of offenders.   Assuming at least a 2 level enhancement for the number of images, as well as an enhancement for active involvement with another offender (and an apparent active BDSM offender), and his use of encryption technology, and very likely the defendant is back or above his current position on the guideline.

In this regard, the United States challenges the defendant to identify characteristics of other offenders *commonly* seen (i.e., not unusual out-liers that would not be used by the Commission as an SOC) that are *worse* than the defendant's conduct.   If the defendant is truly an average (or below average, given the defendant's request for the mandatory minimum) offender, then the defendant should be able to articulate to the Court without equivocation the aggravating specific offense characteristics that are absent in his conduct, which would otherwise justify a statutory maximum sentence.

### Despite the Stabenow mythology, local sentencing outcomes do not reveal 2G2.2 concentrating offenders at the top of the statutory range

On June 10, 2008, Troy Stabenow, an Assistant Federal Public Defender from the Western District of Missouri, posted *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, on the Office of Defender Services website. Shortly thereafter, a district court in Wisconsin glommed onto the opinion piece, lifting whole sections in support of a variance.[25]   Very quickly, additional courts latched on to opinion piece,

---

[25] *United States v. Hanson*, 561 F. Supp. 2d 1004, 1005 (E.D. Wis. 2008).

using it to support their policy disagreements with the guidelines.[26]   However, other courts have

since scrutinized the Stabenow opinion piece, and found it failing in many respects.

> There is no dispute that certain enhancements apply in nearly every child pornography case. The 2–level enhancement for use of a computer applies in 96.5% of cases. The 2–level enhancement for images involving a prepubescent child applies in 95.5% of cases. The enhancement for possessing sadistic or masochistic images applies in over 60% of cases. Based on the frequency of the application of these enhancements, Cunningham seems to contend that his sentence should be lower. This argument suffers from several fatal flaws.
>
> Initially, the Court notes that the frequency of the enhancements was expressly acknowledged by the Commission when it set the base offense levels for these offenses. The Commission was clear that it took into account the frequent use of these enhancements when it set the base offense levels. For example, the base offense level herein is 22 and results in a sentencing range of 41 to 51 months, or 9 to 19 months below the mandatory minimum. The bottom of the Guideline range remains below the mandatory minimum until a 4–level increase to offense level 26, resulting in a 63 to 78 month range. Applying the two most common enhancements, the use of a computer and possession of images of prepubescent children, generates a level 26 offense. In other words, once the two most common enhancements are applied, offenders effectively start off at the mandatory minimum. If the Court factors in acceptance of responsibility, an additional 3–level enhancement could occur, followed by the deduction for acceptance of responsibility, and the Guideline range would remain near the mandatory minimum. In other words, the Court could find that seven levels of enhancement are appropriate, yet still be in position to sentence an offender to the mandatory minimum with only a 3–month variance. The Court, therefore, affords little weight to the fact that some enhancements apply in nearly every instance. It is clear that the Guidelines have taken this factor into account.
> ....
>
> Finally, the entirety of this argument is somewhat confusing to the Court. The fact that certain enhancements apply on a frequent basis does not serve as a basis for negating the Guidelines. If anything, the fact that more than fifty percent of offenders have over 300 images and that over sixty-percent have sadistic and masochistic images supports a conclusion that even more harsh sentences are required for deterrence.

---

[26] *See United States v. Grober*, 595 F. Supp. 2d 382, 394 (D.N.J. 2008) aff'd, 624 F.3d 592 (3d Cir. 2010) (listing decisions that used the research in Stabenow's post.)

The assertion that sentences should be reduced because it is easy to accumulate a large number of pictures quickly also rings hollow. The Court does not dispute that it is very likely that a defendant could acquire more than 600 images with just a few mouse clicks and several emails. But that number of images is not collected by accident. Instead, those images are sought out by a troubled mind, from like-minded individuals. Thus, a defendant makes a cognitive choice to seek out that level of images. Moreover, the Court has never before seen an argument that because a crime is easy to commit, it should be punished less severely. Robbery is certainly simplified from the criminal's perspective by the use of a firearm and the choice of a feeble, elderly victim. The Guidelines, however, do not lessen punishment because the crime was easier to commit. In fact, seeking out a vulnerable victim leads to a 2–level enhancement under the Guidelines. U.S.S.G. § 3A1.1(b)(1). This Court, therefore, will not alter its sentence simply because accessing and growing a database of child pornography has become easier as technology has advanced.[27]

The Stabenow opinion piece has now been largely replaced by United States Sentencing Commission's "Report to Congress: Federal Child Pornography Offenses,"(hereinafter, The Report)[28], but the arguments remain the same: the 2G2.2 guideline should be abandoned because every offender gets every SOC, resulting in distinguishable offenders all receiving a statutory maximum sentence.

The Report does not counsel disregard of the 2G2.2 guideline or the SOCs in the guideline, nor does it identify defects within the guideline. The Report does recommend the following amendments to 2G2.2:

---

[27] *United States v. Cunningham*, 680 F.Supp.2d at 851–53 (emphasis in original); *see also* U*nited States v. Johnson*, 765 F. Supp. 2d 779, 782 (E.D. Tex. 2010) ("Gratuitous attacks on the Guidelines or Congress by a defendant for 'policy reasons' add nothing to the analysis of a particular case, or to the law in general. Claiming that there is a disparity between the Guidelines sentence for a first-time offender who has visually raped numerous children and one who has possessed illegal drugs ignores congressional intent to 'avoid unwarranted sentence disparities among defendants ... guilty of similar conduct.'").

[28] The Report is available online at:

http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses

The Commission believes that the following three categories of offender behavior encompass the primary factors that should be considered in imposing sentences in §2G2.2 cases:

1)   the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology);

2) the degree of an offender's engagement with other offenders — in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and

3) whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.[29]

The Commission still found value in many of the current SOCs, as reflected in the first category. The Commission observed "the current scheme places insufficient emphases on other relevant aspects of collecting behavior as well as on offenders' involvement in child pornography communities and their sexual dangerousness."[30]   The Commission specifically referenced the current SOC for number of images as outdated, but maintained the volume of images was an important factor (and, as one can see, listed volume in the first category above).   The Commission observed "[a]t the same time, [the guideline] results in *unduly lenient* ranges for other offenders who engaged in aggravated collecting behaviors not currently addressed in the guideline, who were involved in child pornography communities…"[31]

To be clear, the Report does not counsel or encourage the Court to abandon the Guideline.   The guideline remains the starting point for fashioning a sentence that avoids

---

[29] The Report, p. 320.

[30] *Id.*, p. 321.

[31] *Id.*

unwarranted sentencing disparities.   However, the Report highlights certain additional areas for the Court to consider when fashioning an appropriate sentence.   It should not go unnoticed that "the degree of an offender's engagement with other offenders," such as Ackerman's involvement with his "friends" and accumulation of "friends" by trading child pornography, is highlighted as one of those areas that would serve as an aggravating factor. Likewise, the "use of sophisticated technology," such as Ackerman's use of the TOR program to anonymize his activites, is highlighted as one of those areas that would serve as an aggravating factor.   Additionally, the nature of his offending behavior shows his clear *focus* on prepubescent children ("the ages of the victims depicted"), as more than 750 images of his collection were of prepubescent children.   If the Court looks at the Report as support for a variance, *as the defendant himself advocates*, the Court should remain mindful of how the defendant would measure up under a new guideline structure.

Turning back to the "sentencing disparity" argument, Chapter 8 of the Report discussed sentencing disparities among child pornography offenders.   In particular, the Report discussed sentencing trends for Distribution offenders in the 210-240 month range, the range in which the defendant would fall (had he fully accepted responsibility rather than unsuccessfully attempt to suppress lawfully seized evidence).   The Report observed that 81.5% received a below-range sentence, with the average sentence being 132 months.[32]   According to the Report, the average sentence is still *72 months higher* than the sentence requested by the defendant.

The Report makes clear: there is wide-variation in the sentences levied for child pornography offenses.   The Report notes that this is due in part to charging practices and the

---

[32] *Id.*, p. 218 and Figure 8-7.

exercise of judicial discretion in profoundly different ways.   In fact, one need look no further than the Wichita Division to see how outcomes vary for "similarly-situated offenders" appearing in different courtrooms.

During the time period when the Wichita Division of the United States Attorney's Office has had a specially assigned Project Safe Childhood prosecutor (since March 2010), more cases involving child pornography offenses have been filed (including Production cases), and the majority of the non-Production cases have involved defendants indicted for Distribution rather than Possession of Child Pornography.   The defendant confirms this, noting "here in the Wichita Division distribution is almost always charged and results in conviction."[33]   Though there has been an increase in charge/plea consistency (i.e., pleas to accurately charged conduct, rather than lesser conduct), the District Courts in the Wichita Division have varied from the guideline range in the majority of contested sentences in non-Production child pornography cases over the last four years.[34]

In the contested sentencing context, there have been only *three* non-Production cases in the Wichita Division that have resulted in a guideline range sentence: *United States v. Andy Nghiem*, 10-CR-10069-MLB (Range of 121-151 months, sentenced to 121 months); *United States v. Kenneth Cheatum*, 11-CR-10122-MLB (Range of 78-97 months, sentenced to 78 months); and *United States v. Deric Davin*, 12-CR-10141-01-EFM (Range of 121-151 months,

---

[33] Doc. 48, p. 12.

[34] The term "contested" excludes 11c1C pleas or those pleas where the parties presented a joint recommendation.

sentenced to 121 months).[35]   Outcomes for the remaining contested sentencings are reflected in
the following catalogue of cases:

> United States v. David Ellis, 10-10068-JTM (Variance from 97-121 to 60 months);
> United States v. Kenneth Wilhelm, 10-10126-MLB (Variance from 210-240 to 120 months);
> United States v. Kevin Chapin, 10-10188-WEB (Variance from 151-188 to 75 months);
> United States v. Gary West, 11-10012-EFM (Variance from 78-97 to 60 months);
> United States v. Austin Ray, 11-10029-EFM (Variance from 151-188 to 102 months);
> United States v. John Roach, 11-10086-MLB (Variance from 108-120 to 60 months);
> United States v. Matthew Alter, 11-10225-MLB (Variance from 78-97 to 72 months);
> United States v. William Dearnley, 12-10061-EFM (Variance from 210-240 to 160 months);
> United States v. Jacob Grigsby, 12-10062-JTM (Variance from 121-155 to 72 months);
> United States v. Brian Welch, 12-10127-JTM (Variance from 151-188 to 72 months);
> United States v Barry Thompson, 12-10227-JTM (Variance from 151-188 to 60 months);
> United States v. Amel Loop, 13-10007-JTM (Variance from 210-240 to 60 months);
> United States v. Justin Tatum, 13-10015-MLB (Variance from 210-240 to 180 months);
> United States v. Mark Phillips, 13-10147-EFM (Variance from 97-121 to 87 months); and
> United States v. Jaime Menchaca, 14-10012-MLB (Variance from 210-240 to 110 months).

Two things should be immediately apparent from the above catalogue.   First, for each of
the above cases, a variance was granted with the extent of variance being heavily dependent
upon the judicial assignment.   For Judge Marten (who, notably, has not levied a guideline
sentence in any contested sentencing), variances have been to or within 12 months of the
mandatory minimum term of 5 years.   The extent of variance has been as little as 37 months
(Ellis) to as much as 150 months (Loop), although the extent of variance in both of those cases
was foreclosed by the mandatory minimum.   While consistent, this means, for offenders

---

[35] Two cases which are not included in this list are *United States v. Donald Schmidt*, 10-10102-MLB, and *United States v. Armando Ramos*, 10-10126-MLB.   In these two cases, the District Court determined that the "use of computer" and "600+ images" should not apply due to the frequency of appearance of those adjustments in child pornography cases.   The guideline for Schmidt was reduced from 210-240 down to 97-121, and he received a 120 month sentence.   The guideline for Ramos was reduced from 151-188 to 70-87, and he received an 87 month sentence.   Interestingly, both defendants received sentences reflecting the high-end of their judicially-modified ranges.   However, the United States considers both of these cases to reflect a variance rather than a guideline sentence.

appearing before Judge Marten, the range for *all* child pornography offenders has been effectively reduced to 60-72 months, regardless of the technologies used, involvements with other offenders, historical involvements with children, etc.   For Judge Belot, variances have been less consistent, with as little as 6 months (Alter) to as much as 100 months (Menchaca). Equally striking is the percentage of variance from the bottom end of the guideline range: for Judge Marten the percentage of variance has been as high as 71% with the lowest at 38%, while Judge Belot's percentage of variance has been as high as 47% with a low of 7%.   For this Court, variances have been far less dramatic, tending closer to the guideline range with the greatest variance of being 50 months (Dearnley).   In terms of percentages, this Court varied only 23% from the bottom end of the guideline range in both Dearnley and West, only 10% in Phillips, and 32% in Ray.   This comparative view of local outcomes signals the opposite of the defendant's claim:   abandonment of the Guideline actually results in wildly disparate sentences.

Second, contrary to the mythology of the defense, the Child Pornography guidelines do not always pitch a defendant to the statutory maximum.   For instance, the West case involved a conviction for Distribution, but a guideline of only 78-97 months.   In two Receipt cases (Ellis and Phillips), the guidelines called for a range of only 97-121 months.   In five cases (Chapin, Ray, J. Grigsby, Welch, and Thompson), the 2G2.2 guideline set ranges between 121 and 188 months, smack in the middle of the statutory range.   In only 4 of the 15 cases above, or 27%, did the guideline reach the statutory maximum of 240 months.   That left 73% well below the statutory maximum.   Adding in the 3 cases that resulted in a guideline sentence, and the percentage of "statutory maximum" cases drops to 22%.[36]   Nevertheless, the defense persists in

---

[36] Even adding cases involving joint-recommendations and 11c1C pleas, only 3 more cases reach the range of 210-240, while 5 more cases were well below the statutory maximum.

the mythology that the child pornography guideline "concentrates offenders at or near the statutory maximum and thus fails to meaningfully distinguish between more serious offenders from less serious offenders."[37]

Likewise, the defense asserts that certain SOCs are inherent to the crime, but that is not the case.   SOCs inher to the *investigations*.   Given the limitations or resources (stretched ever thinner by the more frequent appearance of ridiculously large computer storage), investigations have tended to focus on certain types of offenders, i.e., the worst of the worst.   The reason for that focus is simple: it tends to reveal more Producers.   The above catalogue of cases demonstrate more resources going to Distribution defendants than Possessors.   Even with that focus on Distribution offenders, the above catalogue of cases still demonstrates that the 2G2.2 guideline is not inherently broken, and that it still does meaningfully distinguish between offenders at fundamental levels.   Courts are still called upon to exercise their discretion, however, to identify characteristics associated with the offense conduct, and not merely those characteristics that serve to justify a downward variance.[38]   Indeed, noticeably absent from the Report is a section titled "Aggravating offense characteristics not associated with an existing SOC that judges relied upon in fashioning a sentence."

This Court, if it finds certain SOCs overstate the offense level, may (and should) still find characteristics that justify a long sentence.   Such characteristics could include: whether the defendant was in direct communication with other offenders (he was); with what type of offender did the defendant associate himself (he described one as a BDSM/incest offender); whether the

---

[37]  Doc. 48, p. 7.

[38]  18 U.S.C. § 3553(a)(1)("The court, in determining the particular sentence to be imposed, shall consider – (1) the nature and circumstances of the offense…")

defendant used sophisticated encryption technology (he did); and the duration of the defendant's involvement in child pornography (he described being involved in child pornography years earlier, and deleting images in the past[39]).   None of these characteristics are captured in the current SOCs.   However, all apply to the defendant, and all weigh in favor of a substantial sentence.

As discussed above, the United States asserts that the defendant has failed to identify those Special Offense Characteristics that would meaningfully distinguish him, in a mitigating fashion, from any other child pornography offender.   This is likely because defense counsel knows that he would surely represent "that offender" in a future sentencing, and be forced to acknowledge he is now representing "that offender."   If the defendant seeks to distinguish himself from the mine-run of child pornography offenders (as the United States has), the Court should challenge his counsel to identify the current "mine-run" defendant in meaningful terms to aid the Court in finding its way among defendants hereafter.

**Deterrence remains critical, especially for sex offenses involving children**

The defendant argues "there is no relationship between sentence length and general or specific deterrence,"[40] by pointing to studies involving white collar or drug crimes, rather than offenses driven by base sexual desire and preference.   If understood, these studies indicate that those types of offenders will return to offending at varying rates regardless of the sentence.

---

[39] PSR, ¶¶ 28, 44.

[40] Doc. 48, p. 9.

Where the offender's victim is children, however, any "rate of return" is unacceptable.   For this reason, "[g]eneral deterrence is crucial in the child pornography context."[41]

The defendant, specifically, will certainly be deterred by a longer sentence.   Deterring someone from an economic crime is quite a different matter than deterring sexual urge and desire.   Is a longer sentence more appropriate when the offender's conduct is based on sexual preference or sexual desire?   The answer is common sense, and it is yes.

That answer has also been confirmed by empirical study.   It has been observed that pedophiles do not follow the same pattern of "aging out" like other offenders:

> "In a study that examined the relationship between age and types of sexual crimes, Dickey (et al) found that up to 44% of pedophiles in their sample of 168 sex offenders were in the older adult age range (age, 40-70 years). When compared with rapists and sexual sadists, pedophiles comprise 60% of all older offenders, indicating that **pedophiles offend in their later years at a greater rate than other sexual offenders**."   *See* Ryan C.W. Hall & Richard C.W. Hall, *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 Mayo Clinic Proc. 457, 458 (2007)(emphasis added).

Considering the defendant's characteristics and what is known generally about those who offend against children, a shorter term would provide *inadequate* deterrence.

Furthermore, a recidivism study, specific to sex offenders, has concluded that there is no empirical basis to account for age in sex offenders when assessing future risk of reoffending.[42] Unfortunately, defendant's age at the time of release is no indication that he will not remain a risk to the community upon his release.   If sentenced to even 150 months (12.5 years), the defendant

---

[41]  *United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012) cert. denied, 133 S. Ct. 423, 184 L. Ed. 2d 288 (U.S. 2012).

[42]  G. Harris and M. Rice, *Adjusting Actuarial Violence Risk Assessments Based on Aging or the Passage of Time*, 34 Crim. J. and Behav., 310-11, (2007).

will be approximately 69 years old at the time of release to supervision.   That's still four years younger than the defendant Donald Schmidt (10-10102-MLB) was when he was caught.   In terms of "aging out", it is notable that the average age for child pornography offenders is 42, with over 50% being over 41 years, and half of those (25.2% of the total) being over 50 years old.[43]   The defendant's age at the time of release is not something the Court should rely on in support of shorter sentence.

If there was any question about the level of risk that the defendant poses, the Court should consider this: at 56 years of age, the defendant was complaining about his sex life and described turning to child pornography and involving himself with a BDSM/incest cohort for satisfaction.[44]


**The defendant's requested sentence would manifest unwarranted sentencing disparity**

The defendant advocates against "unwarranted disparity" and demands sentencing "in a way that reflects the learned experience reported in the Commission's critical report,"[45]  yet fails to advise the Court that the average sentence for an offender in the defendant's range was 132 months, *a full 72 months higher than the sentence that the defendant requests*.

The defendant fails to identify any characteristics of the defendant's conduct that are unusual for a child pornography defendant.   For his personal traits, though he claims "he

---

[43]  See United States Sentencing Commission, "2013 Sourcebook of Federal Sentencing Statistics," Table 6 - Age of Offenders in Each Primary Offense Category; available at: http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2013/Table06 .pdf

[44]  PSR, p. 2 and ¶ 29.

[45]  Doc 48, p. 14.

responded to probing challenges during his interrogation" and "thoughtfully reflected on the consequences of his actions with an increasing awareness, revulsion, and remorse,"[46] his interview with law enforcement revealed the opposite: to him, child pornography was like baseball cards, just an image, "not nothing personal", like "wallpaper" for one's computer, and there was no difference between an adult in the same situation.[47]   Instead of immediately accepting responsibility, he came before this Court on a motion to suppress and bogusly claimed that the agent coerced a confession from him.[48]   He points to his absence of criminal record (which is already factored into his guideline), but skirts the fact that he'd been involved with child pornography before.   He references his childhood physical abuse as though that, in and of itself, merits a variance, although that abuse as a child appears to have had no relation to his decision to victimize children some 40 years later.

### The Court has discretion to disregard the defendant's policy-based arguments

If the Court feels like there is momentum in favor of deviating from the 2G2.2 guideline, the Court should not feel such pressure.   Very recently (within this past week), in *United States v. Morrison*, the 10th Circuit addressed a challenge to a 2G2.2 guideline sentence.[49] In the *Morrison* case, the defendant claimed his 120–month sentence (the statutory maximum and guideline) for Possession of Child Pornography was procedurally unreasonable, because the district court failed to "properly examine a policy disagreement with the child pornography

---

[46] *Id.*, p. 1-2.

[47] PSR, ¶¶46, 47.

[48]  Doc. 13, p. 5 (Defendant claimed "he was told that he would be arrested unless he cooperated.").

[49] *United States v. Morrison*,2014 WL 6056536 (10th Cir. Nov. 13, 2014).

guidelines," and that the district court applied "an overly rigid test" and "extreme deference" to the two-level enhancement under § 2G2.2(b)(6) for use of a computer "because it was congressionally imposed and not based on "empirical data and national experience."[50]   The 10th Circuit affirmed the district court's decision, emphasizing "that district courts *are not obligated* to vary from the child pornography Guidelines on policy grounds if they do not have, in fact, a policy disagreement with them."[51]   The 10th Circuit went on to hold that "[t]he district court thus had broad discretion to disregard the policy argument Mr. Morrison advanced at sentencing" and affirmed the 120 month sentence.

In the present case, the defendant has advanced similar policy-based arguments, to the exclusion of demonstrating to the Court what takes the defendant out of the mine-run of cases. He has ignored aspects of the Report that are contrary to his position.   He stakes out a position that is both procedurally and substantively unreasonable, and invites the Court to error.

### The Nature and Characteristics of the Defendant are only unusual for the aggravating factors identified by the Government

Generally, the defendant's history is virtually indistinguishable from other offenders of this type of offense.   Despite the mythology that these offenders are social misfits incapable of human interaction, most offenders generally have jobs, some college education, and families. A lack of criminal history coupled with a history of employment and education are all characteristics that this Court sees regularly for this type of offender.   The defendant's age, gender, and marital status are also typical for this type of offender.   In many ways, the

---

[50] *Id., at* \*2.

[51] *Id*., \*4.

defendant is almost identical to most defendants before this Court on charges of this nature.

The United States does not believe that there are any characteristics specific to the defendant himself that support a downward variance, much less a downward variance to the extent requested by the defense.   The United States' asserts that the defendant's conduct, referenced above relating to his BDSM/incest cohort, the use of TOR, and so forth, should serve to elevate the defendant from the "average" child pornography offender.   It is appropriate that his guideline is at the top, because of these characteristics.


## A path to avoiding Sentencing Disparity

As noted above, there is wide variation among district courts, both locally and nationally. However, the choice is not "the Guideline or the bottom."   Looking at Figure 8-7 in the Report (below), the average of 132 is so low because a large number of judges depart in a manner similar to Judge Marten: going from 210-240 to a range of 60-72 months (circled):



Figure 8-7
Variation of Sentence Length for Case Type Three Offenders
Convicted of Possession and Distribution Offenses

The United States' submits that the average number would likely be higher but for the cases circled above, which appear to represent those judges who believe these offenders simply are not dangerous and undeserving of even the mandatory minimum.[52]   In this regard, following the average means following those judges who routinely vary to the bottom.   For this reason, the United States believes the average in the Report understates the seriousness of the offense.   The average is still helpful in demonstrating the unreasonableness of the defendant's position.

The easiest path to avoiding unwarranted sentencing disparities is to sentence the defendant to a Guideline sentence.   No defendant has successfully demonstrated that a 2G2.2 Guideline sentence results in an "unwarranted sentencing disparity."   A second possible path is to follow the Court's own track record, and vary no more than 32% of the bottom end (235), which equates to 160 months.   A third possible (but not recommended) path is to identify the "average 2G2.2 offender," identify those characteristics of the defendant that distinguish the defendant from the average, and add or subtract the value of those characteristics from the 132 average (despite its apparent limitations).

For its part, the United States encourages the Court to follow the Guidelines range.   The United States asserts that any "policy disagreements" with SOCs of the Guidelines should be

---

[52] *See, e.g.*, *United States v. Reingold*, 731 F.3d 204, 222 (2d Cir. 2013) (remand to district court with specific direction to correctly calculate the guideline in accordance with the Circuit Court, because district court refused to follow the guidelines or adhere to the statutorily mandated minimum sentence.); *see also United States v. Hardrick*, 766 F.3d 1051, 1057-58 (9th Cir. 2014) (Concurrent opinion of Circuit Judge Reinhardt:   "I do not profess to know the solution to the problem of how to cure the illness that causes otherwise law-abiding people to engage in the viewing of child pornography. I know only that lengthy sentences such as the one in this case, ten years (and below the guidelines at that) for a first offense, cannot be the answer. … Incarcerating them will not end the horror of child pornography or the injury it inflicts on innocent children. All it accomplishes is to create another class of people with ruined lives—victims of serious mental illness who society should instead attempt to treat in a constructive and humane manner.").

offset by those offender characteristics (discussed above) which are not included in the Guideline but present in the defendant's conduct.

**Conclusion**

In many respects, the defendant presents as the middle-of-the-road distribution offender. The defendant veers to the more serious and dangerous side, though, because of his involvement with other offenders, including a BDSM/incest offender.  His use of sophisticated encryption technology likewise takes him into a higher category of offender.    For this reason, the United States requests the Court impose a sentence of 240 months, in accordance with the Guideline range, but in no event less than 160 months, followed by 10 years of supervised release.

Respectfully submitted,

BARRY R. GRISSOM
United States Attorney


s/ Jason W. Hart
JASON W. HART, #20276
Assistant U.S. Attorney
1200 Epic Center, 301 N. Main
Wichita, Kansas 67202
Telephone: (316) 269-6481
Fax: (316) 269-6484
jason.hart2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of November, 2014, I electronically filed the foregoing Sentencing Memorandum with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the appropriate parties.


s/ Jason W. Hart
JASON W. HART
Assistant U.S. Attorney