IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,      )
                                   )  District Court
                    Plaintiff,     )  Case No.
vs.                                )  13-10176
                                   )
WALTER E. ACKERMAN,                )  Circuit Court
                                   )  Case No.
                    Defendant.     )  14-3265


TRANSCRIPT OF MOTION TO SUPPRESS
Volume I

On the 19th day of May, 2014, came on to be heard proceedings in the above-entitled and numbered cause before the HONORABLE ERIC F. MELGREN, Judge of the United States District Court for the District of Kansas, sitting in Wichita, commencing at 1:30 PM.  Proceedings recorded by mechanical stenography.  Transcript produced by computer.


APPEARANCES:

The plaintiff appeared by and through:
         Mr. Jason Hart
         United States Attorney's Office
         1200 Epic Center
         301 North Main
         Wichita, Kansas  67202

The defendant appeared by and through:
         Mr. John K. Henderson, Jr.
         Federal Public Defender's Office
         301 N. Main
         Suite 850
         Wichita, Kansas 67202

NCMEC and John D. Ryan appeared by and through:
         Mr. Christopher J. Schmidt
         Bryan Cave LLP - St. Louis
         One Metropolitan Square
         211 North Broadway, Suite 3600
         St. Louis, Missouri  63102

I N D E X

WITNESSES                                           PAGE
            For the Plaintiff
            SPECIAL AGENT RICK MOORE
                Direct Examination by Mr. Hart        6
                Cross-Examination by Mr. Henderson   29
                Redirect Exam by Mr. Hart            66
                Recross-Exam by Mr. Henderson        73
            GREG PHILLIPS
                Direct Examination by Mr. Hart       78
                Cross-Examination by Mr. Henderson  103


EXHIBITS                                            ADMD
For the Plaintiff
 No. 1 - CyberTipline Report                         10
 No. 2 - AOL Legal Compliance and Investigations     14
 No. 3 - Search Warrant                              16
 No. 4 - Audio Interview                             23
 No. 5 - AOL Terms of Service                        82



REPORTER'S CERTIFICATE                              128

| | | |
|---|---|---|
| 13:30:33 | 1 | CLERK NALL:   All rise.  The United States |
| 13:30:35 | 2 | District Court for the District of Kansas is now in session, |
| 13:30:36 | 3 | the Honorable Eric F. Melgren presiding. |
| 13:30:38 | 4 | THE COURT:  Good afternoon.  You may be seated. |
| 13:30:43 | 5 | The court calls the case of the United States |
| 13:30:46 | 6 | versus Walter Ackerman, Case No. 13-10176.  United States |
| 13:30:51 | 7 | appears by Assistant United States Attorney Jason Hart, and the |
| 13:30:54 | 8 | defendant appears in person and by his counsel Assistant |
| 13:30:58 | 9 | Federal Public Defender John Henderson. |
| 13:31:01 | 10 | Mr. Henderson, you filed a motion to suppress, and |
| 13:31:04 | 11 | the Court has scheduled this hearing on that.  I will note that |
| 13:31:09 | 12 | I've received your motion, the Government's response, and your |
| 13:31:14 | 13 | reply to that motion.  I've received an amicus brief, which I |
| 13:31:18 | 14 | permitted to be filed, by the National Center for Missing & |
| 13:31:20 | 15 | Exploited Children. |
| 13:31:21 | 16 | Are they represented here, Mr. Hart? |
| 13:31:23 | 17 | MR. SCHMIDT:  Your Honor, Christopher Schmidt on |
| 13:31:26 | 18 | behalf of the National Center for Missing & Exploited Children. |
| 13:31:29 | 19 | I'm outside counsel with the law firm of Bryan Cave.  And |
| 13:31:35 | 20 | general counsel for the NCMEC.  Yiota Souras is also here as |
| 13:31:41 | 21 | well, Your Honor. |
| 13:31:41 | 22 | THE COURT:  All right.  Thank you.  Mr. Schmidt, |
| 13:31:43 | 23 | as I recall -- you said you're outside counsel, but as I |
| 13:31:46 | 24 | recall, you're also local counsel on the brief filed in this |
| 13:31:48 | 25 | case; is that correct? |

13:31:48  1              MR. SCHMIDT:  Correct.

13:31:49  2              THE COURT:  All right.  Had you anticipated -- I

13:31:52  3    know that you're deferentially standing behind the bar.  Had

13:31:57  4    you anticipated making argument in this case?

13:31:58  5              MR. SCHMIDT:  I have.  And I'm prepared to do so

13:32:00  6    at the close of evidence.  We will not be putting on any

13:32:03  7    evidence, but if there's -- if the Court would like to hear any

13:32:06  8    argument, we do have some brief statements that build on the

13:32:13  9    amicus brief that's been filed.

13:32:13  10             THE COURT:  All right.  We'll take that up after

13:32:16  11    the end of the evidentiary portion of the hearing.

13:32:17  12             MR. SCHMIDT:  Thank you.

13:32:18  13             THE COURT:  Thank you, Mr. Schmidt.  We will note

13:32:20  14    your appearance on the record.

13:32:21  15             It's the defendant's motion, but of course,

13:32:24  16    Mr. Hart, as you know, it's your burden.  I have every reason

13:32:27  17    to believe you have witnesses to call.  Is there any reason not

13:32:29  18    to proceed to the evidentiary portion of the hearing?  Anything

13:32:31  19    we need to take up before we do that?

13:32:33  20             MR. HART:  No, Your Honor.  I just, as a matter of

13:32:36  21    orienting the Court to how we would proceed, because Agent

13:32:40  22    Moore has a scheduling conflict for tomorrow that requires his

13:32:44  23    appearance in Chicago, Illinois, at 11:00 o'clock in the

13:32:48  24    morning, it's our intention to take up Mr. -- or Agent Moore's

13:32:54  25    testimony first, which is chronologically at the end of the

13:32:58  1   activities.

13:32:59  2           THE COURT:  Agent Moore, as I recall, was actually

13:33:06  3   involved in the search of the house and/or the interview of the

13:33:09  4   defendant at work.  Is he also your case agent?

13:33:12  5           MR. HART:  Yes, Your Honor.  And we would address

13:33:13  6   those issues first and then go back and pick up with AOL and

13:33:18  7   then NCMEC, and if our scheduling allows, if we actually get to

13:33:23  8   Detective Wright, who may or may not be necessary to testify,

13:33:28  9   just to explain the connection from NCMEC and Agent Moore and

13:33:31  10  how the information got to Agent Moore.  But otherwise we are

13:33:34  11  ready to proceed, Your Honor.

13:33:35  12          THE COURT:  Any matters we need to take up,

13:33:38  13  Mr. Henderson, before the Government proceeds putting on

13:33:40  14  evidence?

13:33:41  15          MR. HENDERSON:  No, Your Honor.  Thank you.

13:33:42  16          THE COURT:  All right.  Mr. Hart, you may proceed.

13:33:44  17          MR. HART:  Thank you, Your Honor.  We'd call

13:33:46  18  Special Agent Rick Moore to the stand.

13:33:49  19          THE COURT:  Agent, if you would stand in front of

13:33:52  20  the deputy -- you're fine, you were headed in the right

13:33:55  21  direction, just stand in front of the deputy there, she will

13:33:58  22  swear you in and then you may have a seat in the witness box.

13:34:00  23               SPECIAL AGENT RICK MOORE,

13:34:00  24  having been first duly sworn to testify the truth, the whole

13:34:01  25  truth, and nothing but the truth, testified as follows:

| | | |
|---|---|---|
| 13:34:26 | 1 | DIRECT EXAMINATION |
| 13:34:26 | 2 | BY MR. HART: |
| 13:34:29 | 3 | Q.   Good afternoon, sir.  Would you please introduce |
| 13:34:31 | 4 | yourself to the Court. |
| 13:34:33 | 5 | **A.   Rick Moore.  I'm a Special Agent with Homeland Security** |
| 13:34:38 | 6 | **Investigations here in Wichita, Kansas.** |
| 13:34:39 | 7 | Q.   And, Agent Moore, I noticed you moved the mic away from |
| 13:34:42 | 8 | your mouth.  Just go ahead and keep it there and the courtroom |
| 13:34:46 | 9 | deputy will modify the levels as we need to. |
| 13:34:50 | 10 | Can you describe for the Court how you came to be |
| 13:34:53 | 11 | involved in this case involving Mr. Walter Ackerman. |
| 13:34:59 | 12 | **A.   I received a CyberTip report from Detective Wright,** |
| 13:35:05 | 13 | **who's assigned to ICAC at Wichita PD, Kansas.** |
| 13:35:08 | 14 | Q.   And can you describe how that transpired. |
| 13:35:15 | 15 | **A.   We -- "we" being HSI, Homeland Security** |
| 13:35:22 | 16 | **Investigations -- typically collaborate with ICACs throughout** |
| 13:35:25 | 17 | **the United States, so we have a working relationship where we** |
| 13:35:29 | 18 | **work together.** |
| 13:35:29 | 19 | Q.   And so in this case Detective Wright contacted you to |
| 13:35:33 | 20 | ask for your assistance? |
| 13:35:36 | 21 | **A.   Pretty much, yes.** |
| 13:35:37 | 22 | Q.   And that involved reviewing a CyberTip? |
| 13:35:42 | 23 | **A.   Yes.** |
| 13:35:42 | 24 | Q.   And you actually received a downloaded copy of that |
| 13:35:46 | 25 | CyberTip; is that correct? |

13:35:46    1    A.   That's correct.

13:35:47    2    Q.   And just to get ourselves quickly oriented to some of

13:35:51    3    that information, I'm going to put in front of you what has

13:35:55    4    been marked for identification as Government's Exhibit No. 1,

13:36:00    5    which is, I believe, a 13-page document.

13:36:04    6          Are you familiar with this?

13:36:24    7          (Brief pause.)

13:36:42    8    A.   Yes, this is the Tipline I received.

13:36:45    9    Q.   And I notice you went through every page to make sure

13:36:48   10    that it's all there.  This is, in fact, a printed copy off of

13:36:51   11    the disc that Detective Wright provided you?

13:36:53   12    A.   That's correct.

13:36:54   13    Q.   Now, the whole CyberTip, does that involve some

13:37:00   14    additional information?

13:37:01   15    A.   There is additional information that's not here.

13:37:04   16    Q.   All right.  It's referenced in that --

13:37:05   17    A.   Yes.

13:37:06   18    Q.   -- but involves digital information?

13:37:08   19    A.   Correct.

13:37:09   20    Q.   All right.  Well, with that caveat, we'll probably

13:37:13   21    refer to this as "the CyberTip" throughout our hearing, but

13:37:17   22    understanding that it involves just a little bit more.  Now,

13:37:21   23    prior to your receiving that from Detective Wright, had you had

13:37:27   24    any contact with anyone at AOL regarding Walter Ackerman or his

13:37:35   25    account with AOL?

5-19-14   USA v. ACKERMAN   No. 13-10176

```
13:37:36   1    A.   No.

13:37:36   2    Q.   And prior to reviewing that CyberTip, had you had any

13:37:41   3    contact with the National Center for Missing & Exploited

13:37:44   4    Children or NCMEC regarding Walter Ackerman or his account with

13:37:50   5    AOL?

13:37:51   6    A.   No.

13:37:53   7    Q.   And, in fact, when Detective Wright contacted you, was

13:37:58   8    that your first indication that Walter Ackerman may have even

13:38:01   9    been on the radar?

13:38:03  10    A.   Yes.

13:38:03  11    Q.   Now, what is involved for you when you review a

13:38:07  12    CyberTip?

13:38:10  13    A.   Well, first of all, I like to see what the content is,

13:38:14  14    to even see if there's a federal nexus there or something that

13:38:19  15    would be interest -- that the United States Attorney's Office

13:38:23  16    would even be interested in.

13:38:25  17    Q.   All right.   So that when you review this, you're

13:38:29  18    actually looking at the content that's reported by the

13:38:37  19    electronic service provider?

13:38:38  20    A.   That's correct.

13:38:38  21    Q.   Now, do you -- what other activities do you undertake

13:38:41  22    then as you review this?

13:38:45  23         Well, let me back up.   There's some geographic location

13:38:50  24    information that is contained in the CyberTip; is that correct?

13:38:53  25    A.   That's correct.
```

13:38:53  1   Q.   Do you rely solely on that, or do you undertake

13:38:56  2   additional investigation on your own?

13:38:58  3   **A.   I would corroborate that the information is correct.**

13:39:02  4   Q.   And as far as that -- the information that you received

13:39:06  5   from the ESP, does it come across as a narrative report or

13:39:12  6   something else?

13:39:13  7   **A.   It doesn't come across as a narrative; it's more like a**

13:39:18  8   **snapshot.**

13:39:19  9   Q.   So when you say "snapshot," you're referring to sort of

13:39:24  10  like a visual representation of what they found?

13:39:27  11  **A.   Yes.**

13:39:27  12  Q.   Does that include the e-mail?

13:39:29  13  **A.   That does include the e-mail.**

13:39:30  14  Q.   Does that include the images that are the subject of

13:39:35  15  whatever they reported?

13:39:36  16  **A.   Yes.**

13:39:37  17  Q.   And in this particular case, the information reported

13:39:44  18  by AOL through NCMEC, did that include the e-mail and images?

13:39:50  19  **A.   It did.**

13:39:52  20  Q.   Now -- and I want to clarify.  We say "the e-mail and

13:39:56  21  images."  It's actually an e-mail file, an EML -- I should say

13:40:04  22  .eml file that AOL provides; is that correct?

13:40:06  23  **A.   Yes.**

13:40:06  24  Q.   And is that referenced in the CyberTipline?

13:40:09  25  **A.   Yes.**

| | | |
|---|---|---|
| 13:40:09 | 1 | Q.   Can you point it out for us where that is shown. |
| 13:40:14 | 2 | MR. HART:  And, Your Honor, if -- I don't believe |
| 13:40:16 | 3 | I've moved to admit Government's Exhibit No. 1. |
| 13:40:18 | 4 | THE COURT:  You have not. |
| 13:40:18 | 5 | MR. HART:  But I would at this point. |
| 13:40:20 | 6 | THE COURT:  Any objections? |
| 13:40:20 | 7 | MR. HENDERSON:  No objection, Your Honor. |
| 13:40:21 | 8 | THE COURT:  Government's 1's admitted. |
| 13:40:43 | 9 | MR. HART:  Your Honor, if I may approach and |
| 13:40:44 | 10 | retrieve the exhibit. |
| 13:40:45 | 11 | THE COURT:  You may. |
| 13:40:53 | 12 | THE WITNESS:  That's the file name, yes. |
| 13:40:54 | 13 | BY MR. HART: |
| 13:40:55 | 14 | Q.   Okay.  Let's put that on the Elmo.  So we are looking |
| 13:41:01 | 15 | at Government's Exhibit No. 1.  We're on page 3, up here at the |
| 13:41:08 | 16 | top. |
| 13:41:08 | 17 | MR. HENDERSON:  Your Honor, I apologize for |
| 13:41:10 | 18 | interrupting.  Our screen is not on.  I don't know if it's |
| 13:41:12 | 19 | something I need to do. |
| 13:41:15 | 20 | CLERK NALL:  Is there a button? |
| 13:41:28 | 21 | (Brief pause.) |
| 13:41:31 | 22 | MR. HENDERSON:  Thank you.  Thank you, Your Honor. |
| 13:41:32 | 23 | THE COURT:  Are we working? |
| 13:41:33 | 24 | MR. HART:  Yes, we now have power, Your Honor. |
| 13:41:35 | 25 | MR. HENDERSON:  Thank you. |

| | | |
|---|---|---|
| 13:41:36 | 1 | THE COURT:  All right.  Great.  Thank you. |
| 13:41:38 | 2 | MR. HART:  I'll wait till counsel has -- |
| 13:41:40 | 3 | MR. HENDERSON:  We're good.  Thank you. |
| 13:41:42 | 4 | MR. HART:  Okay. |
| 13:41:44 | 5 | BY MR. HART: |
| 13:41:44 | 6 | Q.  All right.  Now I noticed you touched the screen. |
| 13:41:47 | 7 | **A.  Sorry about that.** |
| 13:41:48 | 8 | Q.  Is this what you were referring to? |
| 13:41:50 | 9 | **A.  Yes.** |
| 13:41:50 | 10 | Q.  So this is the actual file that AOL sends through the |
| 13:41:57 | 11 | National Center for Missing & Exploited Children's Tipline? |
| 13:41:59 | 12 | **A.  That's correct.** |
| 13:42:00 | 13 | Q.  And this e-mail or .eml file, is that the one that you |
| 13:42:06 | 14 | actually open and review? |
| 13:42:08 | 15 | **A.  Yes.** |
| 13:42:08 | 16 | Q.  Now, in the -- what is depicted in that?  When you open |
| 13:42:14 | 17 | it up, what does that show you? |
| 13:42:16 | 18 | **A.  It'll show me an e-mail.  It will show me -- the e-mail** |
| 13:42:26 | 19 | **will actually show "From AOL," which it's not from AOL, the** |
| 13:42:34 | 20 | **original, but that's what I'll see, and it will show "To" -- I** |
| 13:42:40 | 21 | **think the name was zoefeather@aol.com, and then there will be** |
| 13:42:46 | 22 | **attachments, four attachments, in the e-mail.** |
| 13:42:49 | 23 | Q.  And those are the image files? |
| 13:42:50 | 24 | **A.  Yes.** |
| 13:42:50 | 25 | Q.  So as you open this, it actually looks like an e-mail, |

| | | |
|---|---|---|
| 13:42:54 | 1 | but the "From" line, instead of having plains66952, it shows it |
| 13:43:01 | 2 | as coming from AOL? |
| 13:43:02 | 3 | **A.   Correct.** |
| 13:43:04 | 4 | Q.   Now, and this is actually the thing in this case that |
| 13:43:10 | 5 | you looked at and reviewed? |
| 13:43:12 | 6 | **A.   Yes.** |
| 13:43:18 | 7 | Q.   And in your review of the .eml file, did that include |
| 13:43:22 | 8 | four images? |
| 13:43:22 | 9 | **A.   Yes.** |
| 13:43:22 | 10 | Q.   Did you look at all four images? |
| 13:43:24 | 11 | **A.   Yes, I did.** |
| 13:43:24 | 12 | Q.   And did they appear to be child pornography? |
| 13:43:26 | 13 | **A.   Yes, they did.** |
| 13:43:27 | 14 | Q.   All right.  We'll come back to that in just a moment. |
| 13:43:32 | 15 | But based on the CyberTip report, we have some additional |
| 13:43:44 | 16 | information that comes in later that is sort of added by |
| 13:43:49 | 17 | additional information provided by NCMEC.  In terms of the |
| 13:43:54 | 18 | geographical location information, did you undertake your own |
| 13:43:59 | 19 | search of that stuff? |
| 13:44:01 | 20 | **A.   A step further?  Well, I subpoenaed the IP -- the ISP** |
| 13:44:09 | 21 | **provider.** |
| 13:44:09 | 22 | Q.   All right.  And that would be AOL? |
| 13:44:12 | 23 | **A.   That was Rural Telephone, I believe, that owned the IP.** |
| 13:44:17 | 24 | Q.   Okay.  So you're talking about the IP address? |
| 13:44:19 | 25 | **A.   Yes.** |

13

| | | |
|---|---|---|
| 13:44:19 | 1 | Q.   Did you also subpoena AOL for records related to the |
| 13:44:23 | 2 | plains66952 account? |
| 13:44:27 | 3 | **A.   I did.** |
| 13:44:27 | 4 | Q.   And were they responsive to your subpoena? |
| 13:44:31 | 5 | **A.   Yes.** |
| 13:44:32 | 6 | MR. HART:  Your Honor, if I may approach. |
| 13:44:34 | 7 | THE COURT:  You may.  And you don't need to |
| 13:44:36 | 8 | request permission. |
| 13:44:36 | 9 | MR. HART:  Thank you. |
| 13:44:37 | 10 | THE COURT:  Either counsel in this hearing. |
| 13:44:39 | 11 | BY MR. HART: |
| 13:44:39 | 12 | Q.   I am showing you what has been marked for |
| 13:44:41 | 13 | identification as Government's Exhibit No. 2.  This is, what, a |
| 13:44:49 | 14 | four-page packet?  Does this represent some of the information |
| 13:44:55 | 15 | that you received from AOL?  And I'm going to put the caveat |
| 13:45:02 | 16 | strongly on there of some of the information.  It is not a |
| 13:45:05 | 17 | complete record of all the information; is that correct? |
| 13:45:07 | 18 | **A.   That's correct.   It's not a complete.** |
| 13:45:09 | 19 | Q.   And the portion that is cut out, is that essentially |
| 13:45:13 | 20 | these IP logs at the back end? |
| 13:45:16 | 21 | **A.   Yes.   There's multiple pages of IP log.** |
| 13:45:21 | 22 | Q.   All right.  But for our purposes, this account |
| 13:45:25 | 23 | information on page, I believe, 4, is that -- was that of |
| 13:45:31 | 24 | interest in terms of your investigation? |
| 13:45:34 | 25 | **A.   Absolutely, it was.** |

13:45:36   1                    MR. HART:  And, Your Honor, the Government would

13:45:38   2   move to admit Government's Exhibit No. 2.

13:45:41   3                    MR. HENDERSON:  No objection, Your Honor.

13:45:42   4                    THE COURT:  Government 2 is admitted.

13:45:46   5   BY MR. HART:

13:45:47   6       Q.  Now, did you obtain this information before you then

13:45:50   7   did the subpoena for Rural Telephone?

13:45:52   8       **A.  I think it was the opposite.**

13:45:54   9       Q.  All right.  Based upon the information that you

13:45:59  10   received from these sources, AOL, Rural Telephone, the CyberTip

13:46:05  11   report, did you obtain an a search warrant?

13:46:07  12       **A.  Yes.**

13:46:08  13                    THE COURT:  I'm sorry to interrupt, counsel, but I

13:46:10  14   think it's going to help me to follow the evidence better if I

13:46:14  15   create havoc with your investigation.

13:46:16  16                    Agent, how would you have known to subpoena or

13:46:20  17   solicit information from the Rural Telephone Company without

13:46:22  18   knowing what account you were looking for if you, in fact, went

13:46:25  19   to them before AOL?

13:46:27  20                    THE WITNESS:  I was subpoenaing for records for

13:46:30  21   the IP address.  The IP address is listed in the CyberTipline.

13:46:34  22                    THE COURT:  Okay.  The IP address through the

13:46:36  23   telephone provider?

13:46:37  24                    THE WITNESS:  The IP address is listed in the

13:46:40  25   CyberTipline that was -- that information was provided by AOL

13:46:45  1   to NCMEC.

13:46:48  2   BY MR. HART:

13:46:49  3      Q.   And, agent, what you're referring to, is that right

13:46:52  4   down here (indicating)?  Oops, you can barely see it.

13:46:57  5      **A.   Yes.**

13:46:57  6      Q.   And so you have that IP address, based on that

13:47:02  7   information you're able to go track that down?

13:47:03  8      **A.   Correct.**

13:47:06  9               THE COURT:  All right.  Thank you.

13:47:19  10              MR. HART:  And, Your Honor, I don't know if I

13:47:21  11  moved to admit Government's Exhibit No. 2, but I would.

13:47:23  12              THE COURT:  You did.

13:47:24  13              MR. HART:  All right.  Thank you, Your Honor.

13:47:25  14              THE COURT:  I think you moved, he had no

13:47:27  15  objection, I think I've admitted it.

13:47:36  16  BY MR. HART:

13:47:37  17     Q.   Now, Agent Moore, we left off with obtaining the search

13:47:41  18  warrant.  And is that search warrant what we have here in what

13:47:49  19  has been marked for identification as Government's Exhibit

13:47:53  20  No. 3?

13:47:55  21     **A.   Yes.**

13:47:55  22     Q.   And is this essentially a search warrant for the

13:47:59  23  residence of Walter Ackerman in Lebanon, Kansas?

13:48:03  24     **A.   Yes.**

13:48:04  25     Q.   All right.

| | | |
|---|---|---|
| 13:48:04 | 1 | MR. HART:  Your Honor, the Government would move |
| 13:48:06 | 2 | to admit Government's Exhibit No. 3 or take judicial notice of |
| 13:48:09 | 3 | its own file, I suppose. |
| 13:48:11 | 4 | THE COURT:  Do you have any objection to the |
| 13:48:12 | 5 | admission? |
| 13:48:12 | 6 | MR. HENDERSON:  No objection, Your Honor. |
| 13:48:13 | 7 | THE COURT:  Seems simpler, so we'll admit it. |
| 13:48:17 | 8 | BY MR. HART: |
| 13:48:18 | 9 | Q.  Now, when is it that you executed this search warrant, |
| 13:48:28 | 10 | Agent Moore? |
| 13:48:29 | 11 | A.  May 30th, 2013. |
| 13:48:35 | 12 | Q.  And what -- when you executed the search warrant, who |
| 13:48:39 | 13 | was present at the Lebanon address? |
| 13:48:42 | 14 | A.  Ms. Ackerman. |
| 13:48:43 | 15 | Q.  Was the defendant present? |
| 13:48:45 | 16 | A.  No. |
| 13:48:45 | 17 | Q.  What did you find there at the Lebanon address? |
| 13:48:48 | 18 | A.  As you initially walk into the residence, there was a |
| 13:48:55 | 19 | living room setting, and it appeared immediately to me that |
| 13:49:02 | 20 | there was individual computer setups for two individuals, one |
| 13:49:08 | 21 | on each side of the room. |
| 13:49:09 | 22 | Q.  So one for him, one for his wife? |
| 13:49:12 | 23 | A.  Yes. |
| 13:49:12 | 24 | Q.  Now, did you seize all those devices? |
| 13:49:15 | 25 | A.  No. |

| | | |
|---|---|---|
| 13:49:16 | 1 | Q.   Did you forensically preview the devices found at the |
| 13:49:19 | 2 | residence? |
| 13:49:20 | 3 | A.   Yes. |
| 13:49:21 | 4 | Q.   And were there any of the devices that you found there |
| 13:49:26 | 5 | that had child pornography on them? |
| 13:49:29 | 6 | A.   Yes. |
| 13:49:29 | 7 | Q.   And can you describe for the Court what those were. |
| 13:49:33 | 8 | A.   Yes.   There was an external hard drive that was plugged |
| 13:49:37 | 9 | into what was identified as the defendant's laptop, and during |
| 13:49:46 | 10 | the preview the forensics detective was able to locate the same |
| 13:49:54 | 11 | four images that AOL submitted to NCMEC. |
| 13:49:57 | 12 | Q.   Were there additional -- aside from those four that had |
| 13:50:01 | 13 | been reported through the CyberTip, were there additional |
| 13:50:04 | 14 | images of child pornography that were located? |
| 13:50:07 | 15 | A.   On his computer and the external hard drive. |
| 13:50:11 | 16 | THE COURT:  Is that a "yes"? |
| 13:50:12 | 17 | THE WITNESS:  Yes.  I'm sorry. |
| 13:50:16 | 18 | BY MR. HART: |
| 13:50:16 | 19 | Q.   Now, you indicated that Mr. Ackerman's wife was home. |
| 13:50:20 | 20 | Did you interview her at all while there at the residence? |
| 13:50:24 | 21 | A.   Yes, briefly. |
| 13:50:25 | 22 | Q.   And did she tell you where the defendant was? |
| 13:50:29 | 23 | A.   Yes. |
| 13:50:30 | 24 | Q.   And where was he? |
| 13:50:31 | 25 | A.   He was working in Beloit. |

13:50:34  1      Q.   Now, that's a neighboring town?

13:50:37  2      **A.   Yes, sir.**

13:50:37  3      Q.   Did you and another agent then proceed to Beloit where

13:50:41  4    he was working?

13:50:42  5      **A.   Yes.**

13:50:42  6      Q.   What was -- who's that other agent?

13:50:44  7      **A.   It is Agent Russell, Erin Russell.**

13:50:47  8      Q.   And is that a female agent?

13:50:50  9      **A.   Yes.**

13:50:51  10     Q.   Now, did you make -- were you actually able to meet

13:50:56  11   with the defendant at his workplace?

13:50:58  12     **A.   Yes.**

13:50:58  13     Q.   Can you describe for the Court how that came about.

13:51:02  14     **A.   Before we approached the company, I was very aware that**

13:51:10  15   **I didn't want to have the persona of law enforcement, so we**

13:51:17  16   **were at a search warrant, so I instructed Agent Russell to take**

13:51:20  17   **off her raid jacket and cover up any badge or gun, and I myself**

13:51:27  18   **did the same thing.**

13:51:28  19          **So we walked in to the company in plainclothes.  I**

13:51:36  20   **approached the manager.  I asked the manager if the defendant**

13:51:39  21   **was working.  He told me he was, and then I asked if I could**

13:51:44  22   **use a private room, if need be, to speak with the defendant.**

13:51:52  23     Q.   Now, I want to take little pieces of this.

13:51:56  24     **A.   Sure.**

13:51:57  25     Q.   Is this interview that you're going to attempt to do

5-19-14   USA v. ACKERMAN   No. 13-10176

19

| | | |
|---|---|---|
| 13:51:59 | 1 | the same day as the search warrant? |
| 13:52:03 | 2 | **A.   Yes.** |
| 13:52:06 | 3 | Q.   You indicated that you were in plainclothes.  Were your |
| 13:52:10 | 4 | service weapons out or visible? |
| 13:52:12 | 5 | **A.   Everything was concealed.  We were in total** |
| 13:52:16 | 6 | **plainclothes.** |
| 13:52:17 | 7 | Q.   In terms of a badge or anything like that? |
| 13:52:19 | 8 | **A.   Nothing was exposed.  I made sure of that.** |
| 13:52:22 | 9 | Q.   And when you asked about the manager, if there might be |
| 13:52:27 | 10 | a private space, why did you ask that? |
| 13:52:31 | 11 | **A.   I -- the nature of this investigation, I -- I don't** |
| 13:52:46 | 12 | **feel as a special agent it's my obligation to -- to speak** |
| 13:52:54 | 13 | **freely and maybe demoralize an individual and talk about their** |
| 13:53:00 | 14 | **pedophilia in open public.  So the reason why is I give the** |
| 13:53:07 | 15 | **person the ability to talk in private.** |
| 13:53:09 | 16 | Q.   Because of the nature of the subject matter? |
| 13:53:12 | 17 | **A.   Correct.** |
| 13:53:12 | 18 | Q.   So fair to say rather than conduct an interview with |
| 13:53:17 | 19 | the manager sitting right there, talking about these type of |
| 13:53:20 | 20 | things, you allow the individual to have a more private |
| 13:53:23 | 21 | conversation? |
| 13:53:24 | 22 | **A.   Yes.** |
| 13:53:26 | 23 | Q.   Now, had you told the manager what you were -- the |
| 13:53:30 | 24 | nature of the investigation at that point? |
| 13:53:33 | 25 | **A.   No.** |

5-19-14   USA v. ACKERMAN   No. 13-10176

20

13:53:33   1      Q.   Does the manager identify a location for you to conduct

13:53:39   2   the interview?

13:53:40   3      **A.   Yes.**

13:53:44   4      Q.   And how is it that you are -- that you actually get in

13:53:47   5   contact with Mr. Ackerman?

13:53:52   6      **A.   Well, Mr. Ackerman is working in a building that's**

13:53:54   7   **right across the street.  In a small rural town, it's more like**

13:53:59   8   **a sidewalk, but it's a street, no traffic.  We walk across the**

13:54:05   9   **street, and Agent Russell and myself, we wait in the small**

13:54:11   10  **waiting area while the manager goes and gets the defendant from**

13:54:18   11  **the work area, and then provides him to us.**

13:54:22   12     Q.   And what type of work are we talking about?

13:54:26   13     **A.   I believe it's welding or something like that.  I'm**

13:54:29   14  **really not sure what type of work.**

13:54:32   15     Q.   But it's not a -- it's not an office environment,

13:54:36   16  where, you know, this is much more like a welding,

13:54:41   17  construction, mechanical type of environment?

13:54:43   18     **A.   Right.**

13:54:44   19     Q.   Is the location where you are going to be talking, is

13:54:47   20  it quiet?

13:54:49   21     **A.   Well, it was an open room, but there was traffic, there**

13:54:53   22  **were people there, there were employees walking in and out.**

13:54:57   23     Q.   In the room that you're standing with --

13:55:00   24     **A.   Yeah, the room was probably as big -- maybe almost**

13:55:06   25  **equivalent to the size of this courtroom.**

5-19-14  USA v. ACKERMAN  No. 13-10176

13:55:08  1    Q.   All right.  Now, when you say the size of the

13:55:11  2    courtroom --

13:55:11  3    **A.   Maybe in half or something, cut in half.**

13:55:13  4    Q.   Okay.  Now, the room that you actually end up

13:55:15  5    conducting the interview, is it that same room or different

13:55:19  6    room?

13:55:19  7    **A.   No, it's in the office -- in the building where the**

13:55:24  8    **manager was located, and it's actually in a little room.**

13:55:27  9    Q.   Okay.  So back across the street?

13:55:29  10   **A.   Yes.**

13:55:30  11   Q.   Now, when the manager returns with Mr. Ackerman, can

13:55:36  12   you describe for the Court what the nature of your conversation

13:55:39  13   is with him at that point.

13:55:41  14   **A.   Yes, I show the defendant my credentials, Agent Russell**

13:55:47  15   **shows the defendant her credentials, and I simply ask**

13:55:55  16   **Mr. Ackerman if he'd like to speak with me.  And then I also**

13:55:59  17   **tell him that the manager will provide a quiet or private area**

13:56:05  18   **where we can -- where we can speak.**

13:56:07  19   Q.   What was Mr. Ackerman's response to that?

13:56:10  20   **A.   He said yes.**

13:56:11  21   Q.   And did you go to the location that the manager had

13:56:15  22   previously identified?

13:56:17  23   **A.   Yes.**

13:56:19  24   Q.   Describe for us how the interview progresses from

13:56:25  25   there.

13:56:29  1       A.   Well, once we get into the room, maybe after that

13:56:34  2   conversation, maybe just to walk across the street, 30 seconds,

13:56:39  3   maybe 60 seconds, I had a tape recorder and I started the

13:56:44  4   recorder.  At that time the defendant was unaware of that.

13:56:51  5   When we sat down, I immediately tell Mr. Ackerman that he's not

13:56:55  6   under arrest, and --

13:56:58  7       Q.   Now, from this point, the rest of your interview, is it

13:57:02  8   recorded?

13:57:03  9       A.   Yes.

13:57:05  10      Q.   And is that contained on Government's Exhibit No. 4?

13:57:09  11      A.   Yes.

13:57:10  12            MR. HART:  And, Your Honor, we would move to admit

13:57:12  13  Government's Exhibit No. 4.

13:57:13  14            THE COURT:  Is that an audio recording?

13:57:14  15            MR. HART:  It is an audio recording.

13:57:16  16            THE COURT:  Do you have a transcript?

13:57:17  17            MR. HART:  I do not have a transcript of this,

13:57:20  18  Your Honor, I don't believe.

13:57:20  19  BY MR. HART:

13:57:21  20      Q.   Do we have a transcript of this, detective -- or Agent

13:57:24  21  Moore?

13:57:24  22      A.   I don't have one.

13:57:25  23            MR. HART:  All right.  And I don't believe I have

13:57:27  24  one either, Your Honor.

13:57:28  25            THE COURT:  All right.  Mr. Henderson?

13:57:29  1          MR. HENDERSON:  Your Honor, we don't have any

13:57:33  2     objection.  There's really only about, I think, the first five

13:57:36  3     minutes of the tape that's relevant to our motion, so, I mean,

13:57:40  4     we'd have no objection to excising that and having a transcript

13:57:45  5     prepared, but the answer is we have no objection.

13:57:51  6          THE COURT:  Do you propose to play the entire

13:57:54  7     75-minute interview?

13:57:55  8          MR. HART:  Not today, Your Honor, no.

13:57:57  9          THE COURT:  That was the right answer.  Government

13:58:02  10    4's admitted.

13:58:04  11    BY MR. HART:

13:58:06  12    Q.  And, Agent Moore, before I play just the very, very

13:58:10  13    beginning of this, had you told -- prior to recording, had you

13:58:14  14    told Mr. Ackerman the reason why you were there to talk with

13:58:19  15    him?

13:58:19  16    **A.  No.**

13:58:20  17    Q.  Had you told him he was gonna be arrested unless he

13:58:26  18    talked with you?

13:58:27  19    **A.  No.**

13:58:29  20    Q.  Do you recall how many times throughout the interview

13:58:34  21    you would have told him that he was not going to be arrested

13:58:37  22    that day?

13:58:39  23    **A.  Maybe four to six times throughout the interview.**

13:58:42  24    Q.  All right.  Now, let's go ahead and play the very

13:58:46  25    beginning of this.

13:59:37   1          (Listening to audio excerpt of Government's Exhibit 4

13:59:47   2    in open court.)

14:01:39   3    BY MR. HART:

14:01:40   4       Q.  Now, Agent Moore, up to that point had you told him

14:01:46   5    anything -- had you even referenced child pornography?

14:01:49   6       **A.  No.**

14:01:50   7       Q.  And what immediately preceded his announcement of child

14:01:57   8    pornography?

14:01:57   9       **A.  Once Agent Russell left the room and the door shut, he**

14:02:03  10    **just said it.**

14:02:05  11       Q.  Now, for the remainder of the interview, is it just you

14:02:10  12    and Mr. Ackerman?

14:02:12  13       **A.  Yes.**

14:02:12  14       Q.  During the course of the interview, is there ever any

14:02:16  15    instance where you threaten him?

14:02:18  16       **A.  No.**

14:02:19  17       Q.  Do you ever brandish your weapon?

14:02:21  18       **A.  No.**

14:02:21  19       Q.  Any sort of -- anything that he might construe as being

14:02:27  20    threatening?

14:02:28  21       **A.  No.**

14:02:29  22       Q.  Can you describe how you all are positioned while you

14:02:33  23    were in this room.

14:02:34  24       **A.  We're facing each other.  We're sitting in a chair,**

14:02:42  25    **like one of those chairs, and we're just facing each other.**

14:02:45  1   **There's no table.  There's no nothing in between us.  We're**

14:02:49  2   **just sitting there talking.**

14:02:51  3       Q.   And at the end of the interview, is Mr. Ackerman

14:03:00  4   arrested?

14:03:01  5       **A.   No.**

14:03:01  6       Q.   Is he allowed to go home?

14:03:03  7       **A.   Yes.**

14:03:06  8       Q.   And does this recording -- well, never mind.  You've

14:03:09  9   already indicated this recording contains the full -- the whole

14:03:13  10  shooting match of that interview?

14:03:14  11      **A.   Yes.**

14:03:16  12      Q.   Now, during this interview, and during all of this

14:03:23  13  interaction, is Mr. Ackerman in handcuffs?

14:03:27  14      **A.   I didn't even pat him down.**

14:03:29  15      Q.   So he's not in handcuffs?

14:03:31  16      **A.   He's not in handcuffs.  I didn't pat him down.**

14:03:47  17      Q.   And as far as -- well, we won't get into the content of

14:03:52  18  the interview since it's recorded there.  But would it be

14:03:57  19  accurate to say that during the course of the interview

14:04:00  20  Mr. Ackerman made admissions to using the account that AOL had

14:04:05  21  identified?

14:04:05  22      **A.   Yes.**

14:04:06  23      Q.   As well as made admissions relating to his involvement

14:04:09  24  with child pornography?

14:04:11  25      **A.   That's correct.**

14:04:12    1       Q.    Now, did he also discuss with you an anonymizing

14:04:19    2    service?

14:04:21    3       **A.    Are you referring to Tor?**

14:04:24    4       Q.    Yes.

14:04:25    5       **A.    Yes.**

14:04:25    6       Q.    What did he tell you about Tor?

14:04:29    7             MR. HENDERSON:  Your Honor, I'm going to object at

14:04:31    8    this point.  I don't know that this is relevant to the motion,

14:04:34    9    that we're getting --

14:04:36    10            THE COURT:  I'm going to let counsel proceed for a

14:04:38    11   while.

14:04:38    12            MR. HART:  It'll be very brief.

14:04:39    13            THE COURT:  If it seems irrelevant, we can

14:04:43    14   readdress it.

14:04:43    15            MR. HENDERSON:  Thank you, Your Honor.

14:04:44    16            THE COURT:  But I'm going to overrule the

14:04:45    17   objection for now.

14:04:45    18   BY MR. HART:

14:04:46    19      Q.    What did he tell you about Tor?

14:04:48    20      **A.    He went into great detail how Tor works.**

14:04:55    21      Q.    And what was his reason for using Tor, this anonymizing

14:05:00    22   service?

14:05:01    23      **A.    Well, what Tor does is it masks your IP, so it can make**

14:05:06    24   **someone anonymous; therefore, you can freely go out**

14:05:13    25   **undetected -- well, individuals believe undetected -- and get**

14:05:21  1   **illicit material that's illegal.**

14:05:25  2       Q.   All right.  Now, that's as much as I had related to Tor

14:05:31  3   that I wanted to ask you about.

14:05:32  4           I want to go back, though, to some timing issues on the

14:05:40  5   CyberTipline report in the AOL account information.  Now, let's

14:05:51  6   start with the AOL account information.  This has been admitted

14:05:56  7   as Government's Exhibit No. 2.  And turning to page 4 of that,

14:06:08  8   which is -- actually contains the substantive material there,

14:06:21  9   and this plains66952, is that the account associated with the

14:06:28  10  defendant?

14:06:28  11      **A.   That's correct.**

14:06:29  12      Q.   Now, this -- as you looked at this, this is a number

14:06:39  13  of -- well, this account was associated with sort of master

14:06:43  14  account for Michelle Ackerman?

14:06:45  15      **A.   Yes.**

14:06:45  16      Q.   And we see down here on Account Status -- and I'm going

14:06:49  17  to blow this up a little bit -- "Account Status:  Terminated

14:06:56  18  13-4-23," which did you understand that to be April 23rd, 2013?

14:07:02  19      **A.   Yes.**

14:07:03  20      Q.   At 0534 and 13 seconds eastern daylight time.

14:07:12  21          Now, let's -- I'm going to put next to that the -- I

14:07:25  22  don't know if I can get this.  But the CyberTip report has a

14:07:31  23  received date of the 24th -- or the 23rd of April, 2013, at

14:07:39  24  9:36 UTC.  Now, in terms of when that account was terminated,

14:07:45  25  have you done the conversion of that Eastern Daylight Time,

14:07:50   1    what it would be in UTC?

14:07:52   2        **A.    The conversion was done.**

14:07:55   3        Q.    Do you know where it falls in relation to the CyberTip

14:07:59   4    report?

14:07:59   5        **A.    The termination date and time occurred before the**

14:08:07   6    **CyberTipline report was created.**

14:08:09   7        Q.    All right.  So the account actually -- I want to make

14:08:14   8    sure I'm understanding this.  The account is terminated, and

14:08:16   9    then the CyberTip report is received by NCMEC?

14:08:22   10       **A.    Correct.**

14:08:34   11       Q.    One moment, Agent Moore.

14:08:50   12               (Whereupon, a sotto voce discussion was had

14:08:51   13               between Mr. Hart and Mr. Schmidt.)

14:08:53   14               MR. HART:  Thank you Your Honor.  I don't have any

14:08:54   15    further questions for Agent Moore.

14:08:56   16               THE COURT:  Agent, you indicated that when you

14:08:59   17    executed the search warrant on the house you discovered images

14:09:03   18    on a hard drive associated with what was the defendant's

14:09:07   19    computer out of the two computers in the room.  How did you

14:09:10   20    identify that computer as the defendant's computer?

14:09:16   21               THE WITNESS:  Well, Ms. Ackerman was there, and

14:09:19   22    she indicated that that was his space and not her --

14:09:24   23               THE COURT:  So she he told you this was his

14:09:26   24    computer and this was hers?

14:09:27   25               THE WITNESS:  Right.

14:09:28   1                    THE COURT:  When you got to the agent -- I mean,

14:09:30   2       to the defendant's place of employment, you said you had

14:09:33   3       concealed your badge and your gun.  How did you identify

14:09:37   4       yourself to the manager?  Did you identify yourself as law

14:09:40   5       enforcement?

14:09:41   6                    THE WITNESS:  Yes, I did.  I showed him my

14:09:43   7       credentials.

14:09:44   8                    THE COURT:  Did you tell him why you wanted to

14:09:45   9       talk to Mr. Ackerman?

14:09:46  10                    THE WITNESS:  I didn't tell him why.  I told him I

14:09:49  11       wanted to.

14:09:49  12                    THE COURT:  And nothing more?

14:09:50  13                    THE WITNESS:  Nothing more.

14:09:51  14                    THE COURT:  All right.  Thank you, agent.

14:09:52  15                    Mr. Henderson, you may cross-examine.

14:09:54  16                    MR. HENDERSON:  Thank you, Your Honor.

14:09:55  17                              CROSS-EXAMINATION

14:09:55  18       BY MR. HENDERSON:

14:09:58  19          Q.   Agent, I'd like to begin with the search, the actual

14:10:27  20       presentation or your presence at the house, and then at the

14:10:31  21       workplace.  When you went to Mr. Ackerman's house, I assume you

14:10:38  22       knocked on the door, rang the doorbell?

14:10:42  23          **A.   No.  That didn't occur.**

14:10:44  24          Q.   How did you gain entrance to the house?

14:10:46  25          **A.   Well, Ms. Ackerman was there.  Unfortunately, we went**

14:10:51   1   **with the local sheriff and he hit his sirens by accident;**

14:10:58   2   **therefore, alerting Ms. Ackerman of our presence and she**

14:11:02   3   **stepped out the door, and so she was already out the door and**

14:11:06   4   **so I just introduced myself and informed her what we had.**

14:11:09   5       Q.   Okay.  So when did he hit the sirens, when you pulled

14:11:14   6   in the driveway, in front of the house?

14:11:16   7       A.   **When he pulled up, I don't know what he was trying to**

14:11:20   8   **do.  That was not discussed.  I didn't tell him to do that.  He**

14:11:24   9   **hit the sirens.**

14:11:25   10      Q.   Okay.  But my question is where were you physically

14:11:29   11  when that happened; were you in the driveway, in the street?

14:11:31   12      A.   **There wasn't really a driveway.  We were parking**

14:11:34   13  **alongside of a road, and I believe when the sirens were going**

14:11:38   14  **off I was stepping out of my vehicle right at the time.**

14:11:40   15      Q.   Okay.  And so it's clear that you're in front of the

14:11:44   16  house with the sirens going, and she steps outside?

14:11:46   17      A.   **Yes.**

14:11:46   18      Q.   Okay.  And you say you introduced yourself to her?

14:11:52   19      A.   **Yes.**

14:11:52   20      Q.   Showed her credentials?

14:11:54   21      A.   **Yes.**

14:11:56   22      Q.   Your firearms were observed at that time?

14:12:00   23      A.   **We were in raid jackets.  We were on a search warrant,**

14:12:04   24  **yes, I imagine so.**

14:12:05   25      Q.   So your firearms were displayed when you saw

14:12:08  1   Ms. Ackerman; correct?

14:12:09  2        **A.   We were at a search warrant, correct.**

14:12:11  3        Q.   Okay.  And you had jackets, raid gear, as you described

14:12:16  4   it?

14:12:16  5        **A.   Well, a raid jacket.  I don't know what you're trying**

14:12:20  6   **to say.  Did we have machine guns or anything like that?  No,**

14:12:24  7   **we had a raid jacket that has our HSI logo on it and our**

14:12:32  8   **regular sidearm, and that was it.**

14:12:35  9        Q.   Okay.  And did she invite you into the house or did you

14:12:38  10  say -- announce that you're simply coming in to serve the

14:12:41  11  search warrant?

14:12:42  12       **A.   No, I introduced myself and I informed her that we have**

14:12:45  13  **a search warrant.**

14:12:46  14       Q.   And was she compliant?

14:12:48  15       **A.   Absolutely.**

14:12:49  16       Q.   Okay.  And when you were inside the house and talking

14:12:55  17  to her about Mr. Ackerman, did you indicate to her that you

14:13:00  18  were going over to speak with Mr. Ackerman?

14:13:03  19       **A.   Well, how that came about was I asked her where he was.**

14:13:08  20  **She informed me where she was (sic), and then I informed her**

14:13:12  21  **that I would be going and talking to him, and that I believe I**

14:13:16  22  **did ask her not to contact her -- contact Mr. Ackerman.**

14:13:22  23       Q.   Okay.  And did she ask you if he was going to be

14:13:24  24  arrested?

14:13:26  25       **A.   I can't remember.  I can't remember.**

| | | |
|---|---|---|
| 14:13:29 | 1 | Q.   And did you tell her that he wouldn't be arrested as |
| 14:13:33 | 2 | long as he cooperated? |
| 14:13:36 | 3 | **A.   No.  I would never say that.** |
| 14:13:38 | 4 | Q.   My question is not whether you never say it; my |
| 14:13:43 | 5 | question is do you remember saying that? |
| 14:13:44 | 6 | **A.   No, I did not say that.** |
| 14:13:48 | 7 | Q.   All right.  So then you leave the house and you go to |
| 14:13:51 | 8 | his workplace?  You have to say yes or no. |
| 14:13:54 | 9 | **A.   Oh, yes, sorry.** |
| 14:13:55 | 10 | Q.   And when you got to the workplace, you found his |
| 14:13:58 | 11 | manager? |
| 14:13:58 | 12 | **A.   Yes.** |
| 14:13:59 | 13 | Q.   Did you speak to anyone else in a supervisory position |
| 14:14:05 | 14 | at the organization before you spoke to his manager? |
| 14:14:08 | 15 | **A.   No.** |
| 14:14:09 | 16 | Q.   And exactly what do you remember telling the manager. |
| 14:14:14 | 17 | **A.   I told the manager -- I identified myself and I simply** |
| 14:14:18 | 18 | **said that I'd like to speak with Mr. -- well, first I asked him** |
| 14:14:22 | 19 | **if Mr. Ackerman works there.  He informed me that he did, and I** |
| 14:14:26 | 20 | **said I would like to speak with him, and then I asked him if** |
| 14:14:30 | 21 | **I -- if he had a private area, in case Mr. Ackerman wanted to** |
| 14:14:34 | 22 | **speak, that we could use.** |
| 14:14:37 | 23 | Q.   Okay.  And did he ask you what's this all about? |
| 14:14:41 | 24 | **A.   He may have.** |
| 14:14:43 | 25 | Q.   Do you remember what you said? |

14:14:46   1      A.   I didn't tell him anything.

14:14:48   2      Q.   So you just -- you didn't say --

14:14:51   3      A.   No, I'd say, "I can't tell you right now."

14:14:55   4      Q.   And did he ask you why you needed a private room?

14:14:59   5      A.   I don't believe he did ask me that.

14:15:01   6      Q.   And he said he'd go get Mr. Ackerman?

14:15:07   7      A.   Yes.

14:15:09   8      Q.   And I was a little unclear on the logistics.  He takes

14:15:15   9   you across the street to another --

14:15:18   10     A.   Another building that's right across the street.  It's

14:15:20   11   adjacent.  And I believe the building he was in was like a

14:15:24   12   manager building, I believe.  I'm not really sure.  And then

14:15:27   13   across the street was like a work area kind of where they do

14:15:32   14   the work.

14:15:33   15     Q.   Okay.  And so he takes you across the street; correct?

14:15:37   16     A.   Correct, yes.

14:15:38   17     Q.   Okay.  And you wait there in another room?

14:15:42   18     A.   Yes, right at the entrance of that building.  There's a

14:15:47   19   room that's maybe about this size, maybe a little smaller,

14:15:51   20   right as you enter the building.

14:15:52   21     Q.   Okay.  Kind of lobby area?

14:15:55   22     A.   I guess it would be more described as a lobby than a

14:15:58   23   room because it's kind of like this size.  It's not really a

14:16:01   24   room.

14:16:02   25     Q.   So he leaves, and then when he returned he has

| | | |
|---|---|---|
| 14:16:06 | 1 | Mr. Ackerman with him? |
| 14:16:06 | 2 | A.   Correct. |
| 14:16:08 | 3 | Q.   And then you, the manager, and Mr. Ackerman walk back |
| 14:16:14 | 4 | across the street to the private room? |
| 14:16:18 | 5 | A.   Well, after I show him my credentials, and then I ask |
| 14:16:25 | 6 | him if he'd be willing to speak with me, and then I tell him |
| 14:16:29 | 7 | that, you know, his manager's providing a private room, and |
| 14:16:34 | 8 | then Mr. Ackerman says, yes, he'd be willing to speak with me, |
| 14:16:38 | 9 | and then we go across to the room. |
| 14:16:42 | 10 | Q.   Okay.  And so you all then cross back? |
| 14:16:47 | 11 | A.   Yeah. |
| 14:16:47 | 12 | Q.   Go back across the street? |
| 14:16:49 | 13 | A.   Maybe 30 seconds, 60 seconds before maybe the tape |
| 14:16:53 | 14 | recording starts, maybe. |
| 14:16:57 | 15 | Q.   And once you get into the private room, the manager |
| 14:16:59 | 16 | leaves? |
| 14:17:00 | 17 | A.   Yes. |
| 14:17:03 | 18 | Q.   And how soon after the manager left did you turn on the |
| 14:17:07 | 19 | tape recorder? |
| 14:17:08 | 20 | A.   The tape recorder was going on probably before we even |
| 14:17:13 | 21 | go into the door.  If you listen closely, you can hear the door |
| 14:17:17 | 22 | shut, so . . . |
| 14:17:19 | 23 | Q.   And the first thing that we hear on the tape recording |
| 14:17:23 | 24 | is Mr. Ackerman saying, "I'm having a heart attack"? |
| 14:17:26 | 25 | A.   Yes. |

14:17:26   1        Q.   And "What's this all about"?

14:17:29   2        A.   Right.

14:17:40   3        Q.   And you indicated that four to six times during the

14:17:44   4   course of the interview you explained to him that you're not

14:17:47   5   going to arrest him?

14:17:49   6        A.   Yeah, probably four to six.  I didn't count.  I'm just

14:17:53   7   guessing maybe four to six times.

14:17:56   8        Q.   And that was because he was asking you, "Am I going to

14:17:59   9   be arrested"?

14:18:00  10        A.   No.

14:18:00  11        Q.   You just volunteered that?

14:18:02  12        A.   Yes.  I wanted him to know that he's not being

14:18:06  13   arrested.  He never asked.

14:18:16  14        Q.   Just a quick question on the Tor program you're talking

14:18:20  15   about.  Was that the first time you heard about that?

14:18:23  16        A.   Tor, T-O-R.  The onion router, that's what it's short

14:18:28  17   for.  No, that's not the first time I've heard about that.

14:18:32  18        Q.   Okay.  Let's talk about the CyberTipline then.

14:18:36  19        A.   Okay.

14:18:38  20        Q.   Now, as I think you testified earlier, you didn't know

14:18:42  21   anything about Mr. Ackerman and you didn't know anything about

14:18:47  22   any child pornography related to Mr. Ackerman until you

14:18:50  23   received the CyberTipline; is that right?

14:18:53  24        A.   Correct, yes.

14:18:54  25        Q.   And I think you also indicated that there was

14:18:58  1  information on the CyberTipline that came directly from AOL?

14:19:06  2  **A.  I believe the whole thing was generated from AOL, I**

14:19:10  3  **believe.**

14:19:10  4  Q.  Okay.

14:19:12  5  **A.  From -- correction, NCMEC put together the report by**

14:19:17  6  **information that they received from AOL.**

14:19:36  7  Q.  You told us about a file that you got with the

14:19:43  8  CyberTipline report; correct?

14:19:47  9  **A.  I don't understand what you're saying.**

14:19:50  10  Q.  Well, didn't you testify earlier that you got a copy of

14:19:54  11  the actual e-mail and a copy of the attachments?

14:19:58  12  **A.  Oh, you're talking about the file link, yes.**

14:20:01  13  Q.  I'm sorry, what?

14:20:02  14  **A.  Yes, I understand what you're trying to say.**

14:20:04  15  Q.  I want to make sure I use the right term.  You call it

14:20:08  16  a file what?

14:20:09  17  **A.  A link to the file.  Yes, I received a file that**

14:20:12  18  **contained all that.  I received it from Detective Jennifer**

14:20:17  19  **Wright, who works at Wichita PD, the ICAC office here, and she**

14:20:25  20  **receives the information directly from NCMEC.  And you have to**

14:20:30  21  **have special access to get that information.  They're just not**

14:20:34  22  **going to make it available to anyone.  So she provided me with**

14:20:37  23  **that information and put the contents onto a disc, which I was**

14:20:41  24  **able to view from the disc, not directly from NCMEC.**

14:20:46  25  Q.  Okay.  So going back to the file that I asked you

14:20:52  1    about --

14:20:52  2        A.   Okay.

14:20:53  3        Q.   -- I think what you said was there was a file link,

14:20:57  4    L-I-N-K.  Did I say that correctly?

14:21:00  5        A.   Yeah.

14:21:01  6        Q.   And where was that file link?  Was that on some e-mail

14:21:08  7    message that you received?

14:21:08  8        A.   **Well, it's listed right on the CyberTip report.  It's**

14:21:13  9    **listed on the CyberTip report.**

14:21:15  10       Q.   Okay.  And did you just click on it, or was that

14:21:19  11   something that you had to enter?

14:21:22  12       A.   **I really don't understand your question 'cause**

14:21:25  13   **you're -- what you're alluding to is that I was on NCMEC.  What**

14:21:30  14   **I received from Detective Wright was a disc, and the disc**

14:21:37  15   **contained the information that NCMEC had, and in there was a**

14:21:42  16   **file, and I just clicked on the file on the disc and it had all**

14:21:45  17   **the information that was provided to Detective Wright.**

14:21:49  18       Q.   Okay.

14:21:50  19       A.   **I wasn't on the NCMEC web site, if that's what you're**

14:21:54  20   **referring to.  I really don't understand where you're going.**

14:21:57  21       Q.   I didn't ask you that.  I'm just trying to find out how

14:22:00  22   you got to the file.  I think I understand it.

14:22:02  23       A.   **Okay.**

14:22:03  24       Q.   Let me try to break it down and see if you agree with

14:22:05  25   me.

5-19-14   USA v. ACKERMAN   No. 13-10176

38

| | | |
|---|---|---|
| 14:22:06 | 1 | **A.   Okay.** |
| 14:22:06 | 2 | Q.   In terms of physical things, you received a disc from |
| 14:22:13 | 3 | Jennifer Wright, Detective Wright; is that correct? |
| 14:22:16 | 4 | **A.   That's correct.** |
| 14:22:17 | 5 | Q.   You didn't receive an e-mail from the NCMEC, you didn't |
| 14:22:25 | 6 | receive an e-mail from Detective Wright, you got a hard copy, |
| 14:22:29 | 7 | physical disc? |
| 14:22:29 | 8 | **A.   I got a physical disc, along with a printed copy of the** |
| 14:22:34 | 9 | **CyberTip report.** |
| 14:22:35 | 10 | Q.   Thank you. |
| 14:22:35 | 11 | **A.   Yes.** |
| 14:22:36 | 12 | Q.   So from Detective Wright, you received a hard copy of |
| 14:22:41 | 13 | the CyberTipline report; correct? |
| 14:22:43 | 14 | **A.   Correct.** |
| 14:22:44 | 15 | Q.   And included in that envelope was a disc? |
| 14:22:46 | 16 | **A.   Correct.** |
| 14:22:47 | 17 | Q.   Okay.  And that was the first time you knew anything |
| 14:22:50 | 18 | about this case? |
| 14:22:52 | 19 | **A.   Yes.** |
| 14:22:52 | 20 | Q.   Okay.  You didn't receive a heads-up e-mail or phone |
| 14:22:57 | 21 | call or anything of that sort? |
| 14:22:58 | 22 | **A.   No.** |
| 14:22:58 | 23 | Q.   Okay.  Very good.  And this -- and you receive these in |
| 14:23:01 | 24 | the normal course of your business, don't you? |
| 14:23:03 | 25 | **A.   We collaborate -- "we" being HSI and ICAC, Wichita** |

14:23:10  1   PD -- about cases.  They're overwhelmed, and so periodically I

14:23:15  2   will go over to their office and see if they have anything

14:23:19  3   available that I can assist them, and this happened to be one

14:23:21  4   of those cases.

14:23:22  5       Q.  So you didn't receive this in the mail; it's something

14:23:27  6   you actually just picked up in their office?

14:23:29  7       A.  No, I went over to Detective Wright and I go, "Is there

14:23:32  8   anything I can help you with?  Do you have any cases pending

14:23:34  9   that you need assistance with?"  And she went on the NCMEC web

14:23:39  10  site or whatever and then found this case, and said, "You might

14:23:46  11  want to look at this."  And that's the first time that I saw

14:23:50  12  it.

14:23:50  13      Q.  Okay.  So then she hands you hard copy of the report

14:23:53  14  and a disc?

14:23:54  15      A.  She downloads it, puts it on a disc, and then, yes, the

14:23:58  16  hard copy, correct.

14:23:59  17      Q.  Okay.  Very good, very good.  Now, with respect to the

14:24:03  18  disc, you put that into your computer and you open it up;

14:24:07  19  right?

14:24:08  20      A.  Yes.

14:24:09  21      Q.  Okay.  And what is that?  Is that another copy of the

14:24:14  22  cyber line tip report?

14:24:15  23      A.  It has additional information on there that's -- it's

14:24:20  24  briefly touched on the CyberTipline, but there's some --

14:24:25  25  CyberTip report, but they don't have the photos, the actual

14:24:30  1    e-mail, which is contained on that disc.

14:24:35  2        Q.   Okay.

14:24:35  3        A.   Also what's contained on the disc is open source

14:24:39  4    material relating to Mr. Ackerman.   I believe that's all the

14:24:53  5    information.   I'd have to look at the disc.

14:24:55  6        Q.   Okay.

14:24:55  7        A.   There could be additional information, but I'd have to

14:24:57  8    review.

14:24:58  9        Q.   Okay.   And do you get this information on discs like

14:25:03  10   this routinely, or was this something special, to have it on a

14:25:06  11   disc like that?

14:25:08  12       A.   No, if I'm going to assist them, that's typically how

14:25:12  13   they give me the evidence.

14:25:14  14       Q.   Okay.   Where -- who created that disc?   Where'd that

14:25:18  15   disc come from?

14:25:19  16       A.   Detective Wright put the material on that disc.

14:25:24  17       Q.   And do you know where she got it?

14:25:27  18       A.   Well, from the NCMEC portal, I believe.

14:25:32  19       Q.   Now, have you --

14:25:33  20       A.   I'm not sure the correct articulation because I don't

14:25:37  21   work with it, but I believe it's some NCMEC portal.   I don't --

14:25:42  22       Q.   So you think she got it from NCMEC?

14:25:45  23       A.   Yes.

14:25:45  24       Q.   Okay.   Now, have you done that yourself?   Have you gone

14:25:49  25   to NCMEC and downloaded the same thing that was on that disc in

14:25:53  1    other cases?

14:25:54  2        A.   No.

14:25:54  3        Q.   Okay.  But you routinely get discs like the one that

14:26:01  4    you got that has that kind of information on it?

14:26:05  5        **A.   When I work with the Detective Wright, I will get -- if**

14:26:09  6    **I'm going to work a child exploitation case, she will put any**

14:26:16  7    **evidence on a disc.**

14:26:19  8        Q.   Okay.  All right.  Again, you put the disc in, you

14:26:25  9    looked at what was on it, and on that disc, in addition to the

14:26:29  10   information you've described, was a link, a hyperlink, to --

14:26:33  11       **A.   That's a poor articulation.  It's not really a**

14:26:37  12   **hyperlink.  What is going to be on there is just a file.  It's**

14:26:41  13   **not a hyperlink like it'll put you on a web page and bring up a**

14:26:45  14   **web page.  That is not correct.  It's just a file on a disc.**

14:26:49  15   **Like anything you put on a disc, any kind of file, you click on**

14:26:52  16   **it and it opens it up.  It's not a hyperlink where it'll open**

14:26:55  17   **up a web page.**

14:26:57  18       Q.   Okay, okay.  Very good.  So you clicked on it.  It's

14:27:01  19   just like opening a document?

14:27:02  20       **A.   Correct.  Thank you.**

14:27:03  21       Q.   Okay.  Making sure we're on the same page.

14:27:08  22       **A.   We're on the same page.**

14:27:09  23       Q.   So you open it up and you see this document, and this

14:27:12  24   document is from AOL; correct?

14:27:14  25       **A.   Yes.  Well, it's -- it's from NCMEC, and it's from**

14:27:20  1    information that was provided from AOL, so the information I'm

14:27:26  2    receiving is from NCMEC; it's not directly from AOL.

14:27:33  3         AOL sends the information to NCMEC, and then NCMEC

14:27:37  4    sends it to me, so -- or a detective or ICAC or whatever.  I

14:27:42  5    didn't get it directly from AOL, if that's what you were

14:27:45  6    asking.

14:27:45  7    Q.   Well, you got it directly from Detective Wright;

14:27:48  8    correct?

14:27:49  9    A.   Well, right.

14:27:50  10   Q.   Okay.  And all you saw was this e-mail, and I thought

14:27:55  11   you testified that it had an .aol file.  That's what you

14:28:01  12   clicked on; right?  It was an .aol file; correct?

14:28:05  13   A.   Correct.

14:28:05  14   Q.   Not .ncmec, but .aol?

14:28:10  15   A.   Correct.

14:28:10  16   Q.   And I thought you told us that that was from AOL.

14:28:15  17   A.   I don't believe -- and we could look at the record --

14:28:18  18   that I ever said that.  I said that I'd received information

14:28:20  19   from NCMEC.

14:28:21  20   Q.   Okay.

14:28:22  21   A.   Now, NCMEC would receive the information from AOL.

14:28:27  22   Q.   Okay.  So if it said .aol on it, as far as you know, it

14:28:34  23   originated with AOL, came through NCMEC, and Jennifer -- and

14:28:38  24   Detective Wright got it from NCMEC?

14:28:40  25   A.   Yes, that would be correct.

5-19-14  USA v. ACKERMAN  No. 13-10176

43

14:28:41  1    Q.  Okay.  Okay.  Now, let's go back to the beginning of

14:28:53  2    the CyberTipline.  How long have you been working in this area?

14:29:00  3    **A.  In Wichita, I've been here since 2003.**

14:29:04  4    Q.  And how long have you been working in the area of child

14:29:09  5    pornography investigations?

14:29:10  6    **A.  2005-2006.**

14:29:17  7    Q.  And since 2005-2006, or perhaps even before, have you

14:29:22  8    received any training, instruction, on how the CyberTipline

14:29:27  9    works, been to any seminars, training --

14:29:34  10   **A.  Yes.**

14:29:34  11   Q.  -- conferences?

14:29:36  12   **A.  Actually, I have gone to several trainings, but**

14:29:44  13   **actually how the CyberTipline works, I haven't had any direct**

14:29:57  14   **training on actually the functions of how they do every**

14:30:03  15   **intimate detail of NCMEC.**

14:30:06  16   Q.  Okay.  But you have received some training and

14:30:09  17   instruction on cyber line, generally how it works?

14:30:12  18   **A.  Generally.**

14:30:13  19   Q.  Okay.  In the course of those instructions, have you

14:30:18  20   also received training from AOL?

14:30:22  21   **A.  No.**

14:30:23  22   Q.  No?

14:30:25  23   **A.  No.**

14:30:26  24   Q.  Know a gentleman by the name of Mr. Colcolough?  I'm

14:30:33  25   probably mispronouncing it.  C-O-L-C-O-L-O-U-G-H, Colcolough.

| | | |
|---|---|---|
| 14:30:41 | 1 | **A.   No, the name doesn't sound familiar.** |
| 14:30:43 | 2 | Q.   Okay.  Do you have a copy of your report with you? |
| 14:30:51 | 3 | **A.   What one are you referring to?** |
| 14:30:54 | 4 | Q.   I'm sorry -- |
| 14:30:56 | 5 | **A.   Report number?** |
| 14:30:58 | 6 | Q.   No. 1. |
| 14:31:09 | 7 | **A.   Yes.** |
| 14:31:10 | 8 | Q.   Okay.  And referring you to the second page of that |
| 14:31:13 | 9 | report, do you see it? |
| 14:31:20 | 10 | **A.   The second page, yes.** |
| 14:31:22 | 11 | Q.   Yes.  You've talked there about America Online and hash |
| 14:31:33 | 12 | values.  Do you see that? |
| 14:31:34 | 13 | **A.   Yes.** |
| 14:31:35 | 14 | MR. HENDERSON:  Your Honor, just for ease of |
| 14:31:36 | 15 | reference, may I put that on the screen? |
| 14:31:40 | 16 | THE COURT:  Any objection, Mr. Hart?  Apparently |
| 14:31:42 | 17 | this is a page from the agent's report? |
| 14:31:44 | 18 | MR. HENDERSON:  It is, Your Honor. |
| 14:31:46 | 19 | THE COURT:  You can put it on the screen. |
| 14:31:48 | 20 | MR. HART:  I don't have an objection.  I'm just |
| 14:31:49 | 21 | not sure where he's referencing. |
| 14:31:51 | 22 | THE COURT:  Well, once he puts it on the screen, |
| 14:31:53 | 23 | we'll probably all know. |
| 14:31:54 | 24 | MR. HART:  Okay. |
| 14:31:56 | 25 | (Whereupon, a sotto voce discussion was had |

| | | |
|---|---|---|
| 14:31:57 | 1 | between Mr. Henderson and Mr. Hart.) |
| 14:32:08 | 2 | BY MR. HENDERSON: |
| 14:32:08 | 3 | Q.   Underneath the details of investigation, you see there |
| 14:32:11 | 4 | the reference to America Online? |
| 14:32:14 | 5 | **A.   Yes, the first paragraph?** |
| 14:32:15 | 6 | Q.   Yes. |
| 14:32:17 | 7 | **A.   Okay.** |
| 14:32:17 | 8 | Q.   How do you -- how did you learn that America Online |
| 14:32:20 | 9 | routinely monitors hash values and attachments sent through |
| 14:32:24 | 10 | e-mail correspondence; where did you learn that? |
| 14:32:26 | 11 | **A.   That was just my understanding at the time when I wrote** |
| 14:32:29 | 12 | **the report, that that's what AOL did.** |
| 14:32:33 | 13 | Q.   Okay.   That's a fairly specific reference to some |
| 14:32:37 | 14 | technical information, though.   Where would you learn that? |
| 14:32:41 | 15 | How did you learn that?   That's not something you learned for |
| 14:32:44 | 16 | the first time in this case, is it? |
| 14:32:50 | 17 | **A.   I don't have any specific instance where I could tell** |
| 14:32:55 | 18 | **you where I exactly learned that information.** |
| 14:33:01 | 19 | Q.   Then you go on to say that hash values are unique |
| 14:33:05 | 20 | number and letter sequences similar to DNA that are assigned to |
| 14:33:09 | 21 | each individual picture and video. |
| 14:33:11 | 22 | The same question, where did you learn that?   That's |
| 14:33:14 | 23 | pretty specific technical information, too, isn't it? |
| 14:33:17 | 24 | **A.   Well, that's -- not really.   That's kind of common** |
| 14:33:21 | 25 | **knowledge on that part, anything that has to do with hash** |

14:33:25   1   **values.  That's not very -- that's not very technical.  That's**

14:33:31   2   **kind of common knowledge.**

14:33:33   3   Q.   Okay.  So you're well aware, very familiar, with the

14:33:38   4   concept of hash values?

14:33:39   5   **A.   I'd say that I'm familiar with hash values.  I'm not**

14:33:42   6   **going to sit here and say I'm an expert on hash values and how**

14:33:45   7   **they work.**

14:33:48   8   Q.   Then you go on to say that AOL works closely with

14:33:54   9   NCMEC.  Where did you learn that?

14:33:56   10   **A.   That's my interpretation of what I believe, based on**

14:34:02   11   **reports that I receive, that there's, I would say, a**

14:34:08   12   **collaboration of sorts, if they see something, to -- "see"**

14:34:14   13   **meaning AOL -- for business purposes that might be against**

14:34:21   14   **their business policy, that could be child-porn related, they**

14:34:27   15   **relay that information to NCMEC.  And I believe there's**

14:34:29   16   **probably a law that says they have to.**

14:34:32   17   Q.   So somewhere -- somewhere you were trained that AOL

14:34:37   18   gives information to NCMEC about child pornography for their

14:34:42   19   internal business reasons?

14:34:43   20   **A.   Well, you have to define to me what training is.  I**

14:34:48   21   **mean, I don't know what you mean by training.**

14:34:51   22   Q.   Well, you leave the office on occasion to sit in a room

14:34:58   23   with other law enforcement individuals, don't you?

14:35:01   24   **A.   If you mean training by collaborating with other**

14:35:04   25   **individuals or in a formal setting of type of training, that**

14:35:08    1    **it's all the same, well, then I would say, yes, I collaborate**

14:35:14    2    **with other people and that's what I get as what I believed at**

14:35:17    3    **the time I wrote this report, not a formal-type training.   I**

14:35:24    4    **don't know what you mean by "training."  Do you mean formal**

14:35:28    5    **setting or do you mean do I collaborate with other people and**

14:35:31    6    **you call that training?**

14:35:33    7        Q.   Just keep it simple.  Where did you learn this

14:35:36    8    information?

14:35:36    9        **A.   Just talking with other law enforcement.**

14:35:38   10        Q.   Okay.  Now, how many -- if you can estimate, how many

14:35:53   11    CyberTip reports that you received in your career?

14:36:04   12        **A.   Like have I --**

14:36:05   13              MR. HART:  Your Honor, I'm going to object.  One

14:36:07   14    is relevance and calls for speculation.

14:36:10   15              THE COURT:  Overruled.

14:36:13   16        **A.   Like what do you mean like directly from NCMEC, or**

14:36:18   17    **from --**

14:36:18   18    BY MR. HENDERSON:

14:36:18   19        Q.   From any source.

14:36:19   20        **A.   From any source?**

14:36:20   21        Q.   Yes.

14:36:21   22        **A.   Oh, boy --**

14:36:24   23        Q.   Just ballpark.  A hundred, thousand?

14:36:26   24        **A.   Hundred maybe.  I don't know.  A hundred.**

14:36:29   25        Q.   Okay.  All right.  So it's not an unfamiliar document

14:36:31   1   to you, is it?

14:36:32   2       A.   It's not unfamiliar.

14:36:33   3       Q.   And as you described in the first paragraph here, it's

14:36:36   4   not an unfamiliar process, is it?

14:36:40   5       A.   It's what I believe it is.

14:36:42   6       Q.   Okay.  And what you believe it is --

14:36:44   7       A.   At the time I wrote the report.

14:36:47   8       Q.   Okay.  At the time that you wrote this report, you

14:36:51   9   clearly understood, didn't you, that AOL sends hash values to

14:37:00  10   NCMEC for information that they believe is child pornography,

14:37:06  11   and then NCMEC generates a CyberTipline report and sends it to

14:37:11  12   you, or to law enforcement?

14:37:13  13       A.   At the time I wrote this report, that's my fundamental

14:37:17  14   belief of what happened.

14:37:19  15       Q.   Okay.  And that's always been true, as -- from the time

14:37:28  16   that you first started working with CyberTipline reports?

14:37:34  17       A.   That's what I believed.

14:37:36  18       Q.   Okay.  And you received no training on it, no

14:37:41  19   instructions, no conferences, no seminars; it's just from

14:37:44  20   talking to other law enforcement?

14:37:46  21       A.   I've gone to a couple conferences.

14:37:48  22       Q.   Oh.

14:37:49  23       A.   But we did not discuss CyberTips.  We would discuss how

14:37:55  24   you can work a child exploitation case to better your skills in

14:38:02  25   doing that.  We didn't specifically talk about CyberTip or

14:38:07  1  **NCMEC for that matter.**

14:38:09  2    Q.  Okay.  In any of those conferences, did you receive

14:38:16  3  instruction from someone, anyone, from AOL, about how to use

14:38:21  4  their information in order to do your job better, more

14:38:26  5  effectively?

14:38:27  6    **A.  No.  It was other agents, working cases, and how they**

14:38:32  7  **did it.  It was local, state and locals, and how they worked**

14:38:37  8  **cases.  You'd use it as a go-by, if you will, with maybe**

14:38:43  9  **something similar you're working.**

14:39:11  10    Q.  Now, you told us earlier that you opened up the four

14:39:15  11  attachments and looked at them; is that right?

14:39:18  12    **A.  That's correct.**

14:39:21  13    Q.  And, again, orient ourselves, were those attachments on

14:39:28  14  that disc?

14:39:30  15    **A.  I guess technically they were put on that disc, so**

14:39:34  16  **technically they would be on that disc.**

14:39:37  17    Q.  Okay.  So you went to the disc, you clicked on an icon

14:39:42  18  of some kind?

14:39:43  19    **A.  It was a file.**

14:39:44  20    Q.  Okay.  Do you remember what the file was called?

14:39:47  21    **A.  I'd have to review the -- I would say the e-mail, but**

14:39:54  22  **I'd have to actually look at the disc.**

14:39:57  23    Q.  Okay.  So you either said e-mail or attachment or

14:40:00  24  something else; right?

14:40:01  25    **A.  Or pictures.  I'd have to review the disc to give you**

14:40:04   1    an absolute.

14:40:05   2        Q.  Okay.  But you do recall you had to click on an icon?

14:40:09   3        A.  It wasn't an icon; it was a file.

14:40:12   4        Q.  Clicked on a file.  It was just, what, stream of

14:40:16   5    letters?  Did it have a name?

14:40:17   6        A.  Well, actually what popped up was an e-mail, and it was

14:40:22   7    an e-mail and up on top it said, like, to or from AOL and I

14:40:32   8    believe it said to zoefeather, something like that, then it had

14:40:38   9    the four attachments.

14:40:40  10        Q.  Okay, okay.  All right.  So the header for this -- I'm

14:40:50  11    sorry, the header for this .eml -- sorry, the header for this

14:40:56  12    e-mail that you're talking about, and it's the e-mail from

14:41:01  13    Mr. Ackerman; right?

14:41:02  14        A.  That's correct.

14:41:03  15        Q.  Okay.  So the header for this e-mail from Mr. Ackerman

14:41:10  16    showed .aol, indicating that it was from AOL; correct?

14:41:17  17        A.  Yes.

14:41:18  18        Q.  So based upon your understanding, AOL forwarded that

14:41:23  19    e-mail to someone and it eventually found its way on the disc?

14:41:29  20        A.  Yes.

14:41:30  21        Q.  Okay.  And when you looked at the e-mail, there were

14:41:37  22    four attachments to the e-mail?

14:41:39  23        A.  There was four attachments in the e-mail.

14:41:42  24        Q.  Okay.  And so you clicked on each of those four

14:41:47  25    attachments; correct?

14:41:48  1      A.   Yes.

14:41:49  2      Q.   And then that caused it to open up; correct?

14:41:53  3      A.   That opened up an image; correct?

14:41:55  4      Q.   It opened up an image?

14:41:56  5      A.   Uh-huh, yes.

14:41:57  6      Q.   And that --

14:41:59  7      A.   I just was saying yes, instead of uh-huh.

14:42:02  8      Q.   Thank you.  Okay.  And so when you opened it up, then

14:42:05  9  you saw the image?

14:42:07  10     A.   Yes.

14:42:07  11     Q.   Okay.  And you confirmed that it was child pornography?

14:42:12  12     A.   Yes.

14:42:13  13     Q.   Okay.

14:42:14  14     A.   Well, I believed it to be child pornography.

14:42:17  15     Q.   Okay.  I understand.  I understand.  Now, do you have a

14:42:26  16  copy of that e-mail with those attachments from AOL anywhere in

14:42:31  17  your file?

14:42:35  18     A.   It's going to be really difficult to print off.  It's

14:42:38  19  not going to look the same if you print it off, unless you get

14:42:41  20  a screen shot.  That's the only way that -- and I didn't screen

14:42:46  21  shot it.

14:42:46  22     Q.   Okay.

14:42:47  23     A.   If you just hit print, it won't appear the same as what

14:42:52  24  you see on the screen.

14:42:54  25     Q.   So we'd have to go to your office or go someplace --

14:42:58  1      **A.   Or get a screen shot capture of it and print it.**

14:43:01  2              MR. HART:  Your Honor, if I may, if counsel would

14:43:03  3      like to use the computer, then we'd put the disc in here,

14:43:06  4      that's fine with me.  It may expedite some of these questions.

14:43:10  5              THE COURT:  The disc that the agent received from

14:43:13  6      the ICAC you have present?

14:43:16  7              MR. HART:  I believe -- I believe Agent Moore has

14:43:18  8      it in his case file.

14:43:20  9              THE COURT:  Has that disc been produced to

14:43:23  10     Mr. Henderson?

14:43:23  11             MR. HART:  The disc has not been produced, in part

14:43:26  12     because it has child pornography on it.

14:43:27  13             THE COURT:  That makes sense.

14:43:28  14             MR. HART:  But the report has been produced, the

14:43:31  15     CyberTip report, which sort of contains the referenced

14:43:34  16     information there.

14:43:35  17             MR. HENDERSON:  What I would be interested, Your

14:43:36  18     Honor, in seeing is -- and we don't need to do that right

14:43:41  19     now -- but seeing the e-mail with the designated attachments.

14:43:46  20     We don't need to open the attachments.

14:43:48  21             THE COURT:  What does seeing the e-mail with the

14:43:51  22     attachments give us, Mr. Henderson?

14:43:54  23             MR. HENDERSON:  And if I -- I'll just ask -- if I

14:43:57  24     could ask another couple questions.

14:43:58  25             THE COURT:  All right.

5-19-14   USA v. ACKERMAN   No. 13-10176                     53

14:43:59   1   BY MR. HENDERSON:

14:44:03   2       Q.   When you looked at the e-mail with the attachments,

14:44:07   3   before you opened up the attachments, was there a reference

14:44:10   4   anywhere to a hash value?

14:44:15   5       **A.   In the NCMEC report or, I'm sorry, the CyberTip report,**

14:44:23   6   **is that what you're referring?**

14:44:24   7       Q.   No, focus with me.

14:44:26   8       **A.   I'm trying.**

14:44:26   9       Q.   We're talking about that e-mail.

14:44:28  10       **A.   Okay.**

14:44:28  11       Q.   It says .aol from AOL, and it has the e-mail from

14:44:33  12   Mr. Ackerman.

14:44:34  13       **A.   Okay.**

14:44:34  14       Q.   And it has the attachments.  And you click on the

14:44:39  15   attachment to open them up?

14:44:40  16       **A.   Okay.**

14:44:40  17       Q.   Before you do that, before you click on the attachment

14:44:42  18   and open it up, is there anything on the face of that page that

14:44:46  19   I've just described for you that references the hash value?

14:44:48  20       **A.   No, no.**

14:45:00  21            MR. HENDERSON:  Your Honor, we don't need

14:45:03  22   to necessarily see it right now, but it would be -- it would be

14:45:06  23   helpful at some point to be able to see that, just to confirm

14:45:10  24   there's no reference to a hash value on that page.

14:45:13  25            THE COURT:  Well --

14:45:14   1            MR. HENDERSON:  We're going on your recollection,

14:45:15   2    I understand.

14:45:16   3            THE COURT:  I'm confused by you're saying you

14:45:18   4    don't need to see it now.  If it's relevant to this suppression

14:45:21   5    hearing, when do you want to see it?

14:45:23   6            MR. HENDERSON:  You're right, Your Honor.  If we

14:45:25   7    could see that.

14:45:26   8            THE COURT:  Can you do that --

14:45:29   9            MR. HART:  Yes, Your Honor.

14:45:30   10           THE COURT:  -- Mr. Hart without, obviously,

14:45:33   11   displaying the attachments?

14:45:35   12           MR. HART:  Yep.

14:45:41   13           MR. HENDERSON:  Let me know when you're ready.

14:45:42   14           MR. HART:  Uh-huh.

14:45:59   15           (Brief pause.)

14:46:02   16           MR. HART:  Stephanie, yeah, just wait a minute.

14:46:05   17   It depends which e-mail program you use to open it.  My

14:46:10   18   recollection is Outlook does not open the image attachments

14:46:15   19   automatically, whereas Thunderbird does.  I believe this will

14:46:19   20   open under Outlook on this computer, so that it will have --

14:46:30   21           MR. HENDERSON:  Your Honor, I can look at it on

14:46:32   22   his computer before we broadcast it.

14:46:34   23           MR. HART:  And it's opening under Outlook, so we

14:46:37   24   should not see the attachments.  Here we go.

14:46:44   25           CLERK NALL:  So we can bring it up?

| | | |
|---|---|---|
| 14:46:45 | 1 | MR. HART:  Yeah. |
| 14:47:14 | 2 | MR. HENDERSON:  Your Honor, if we could, after the |
| 14:47:19 | 3 | hearing, just make a copy of that and mark it as Defendant's |
| 14:47:28 | 4 | Exhibit Z. |
| 14:47:28 | 5 | THE COURT:  You want a screen shot of this image? |
| 14:47:32 | 6 | MR. HENDERSON:  Yes, Your Honor, if we may, just |
| 14:47:38 | 7 | so there's a record of what we're looking at, Your Honor. |
| 14:47:41 | 8 | THE COURT:  All right. |
| 14:47:41 | 9 | MR. HART:  One second, Your Honor. |
| 14:48:45 | 10 | (Brief pause.) |
| 14:48:50 | 11 | THE COURT:  What's -- what are we doing, counsel? |
| 14:48:53 | 12 | MR. HART:  I'm making a screen capture of what |
| 14:48:56 | 13 | Mr. Henderson has requested. |
| 14:48:57 | 14 | THE COURT:  All right.  And when you make that |
| 14:48:59 | 15 | screen capture, you're going to send it somewhere else to have |
| 14:49:02 | 16 | it printed? |
| 14:49:03 | 17 | MR. HART:  Not immediately, but -- |
| 14:49:04 | 18 | THE COURT:  So there's really -- we can continue |
| 14:49:06 | 19 | with the examination while you're doing that? |
| 14:49:09 | 20 | MR. HART:  Correct, Your Honor. |
| 14:49:09 | 21 | THE COURT:  All right.  Let's do that. |
| 14:49:11 | 22 | MR. HENDERSON:  Thank you, Your Honor.  I |
| 14:49:12 | 23 | apologize. |
| 14:49:20 | 24 | BY MR. HENDERSON: |
| 14:49:22 | 25 | Q.   Well, it doesn't appear we can have that on the screen |

| | | |
|---|---|---|
| 14:49:27 | 1 | while we're working on it.  Do you recall seeing a series of |
| 14:49:33 | 2 | numbers before the reference to JPEG on two of those files? |
| 14:49:40 | 3 | **A.   I believe some of them did, yes.** |
| 14:49:41 | 4 | Q.   Yes.  And is that your understanding that that's the |
| 14:49:47 | 5 | hash value? |
| 14:49:47 | 6 | **A.   No.** |
| 14:49:48 | 7 | Q.   Do you have the hash values recorded in your records? |
| 14:49:54 | 8 | **A.   I don't believe I do have the hash values of those** |
| 14:49:59 | 9 | **photos.** |
| 14:50:01 | 10 | Q.   So you don't know for sure whether those are the hash |
| 14:50:06 | 11 | values or not, do you? |
| 14:50:11 | 12 | **A.   Well, what are you talking about?** |
| 14:50:14 | 13 | Q.   That series of numbers before the -- |
| 14:50:17 | 14 | **A.   I know for a fact that's not the hash value.** |
| 14:50:19 | 15 | Q.   What are they? |
| 14:50:20 | 16 | **A.   That's a file name.  That's a file name.  That's not a** |
| 14:50:24 | 17 | **hash value.** |
| 14:50:25 | 18 | Q.   Okay.  So when I put a picture and send it to a member |
| 14:50:36 | 19 | of my family, what we see is the reference to JPEG; right? |
| 14:50:42 | 20 | **A.   Okay, yes.** |
| 14:50:44 | 21 | Q.   There isn't a series of numbers before that, generally |
| 14:50:48 | 22 | speaking; correct? |
| 14:50:49 | 23 | **A.   There could be.  It depends on what kind of device** |
| 14:50:52 | 24 | **you're using --** |
| 14:50:53 | 25 | Q.   Okay. |

| | | |
|---|---|---|
| 14:50:55 | 1 | **A.   -- to capture the image.** |
| 14:50:58 | 2 | Q.   How do you know for certain that that's a name for the |
| 14:51:01 | 3 | file? |
| 14:51:02 | 4 | **A.   That's a file name.  .jpeg is a file name.  It's not a** |
| 14:51:09 | 5 | **hash value.** |
| 14:51:09 | 6 | Q.   The numbers before the .jpeg, though, do you know -- |
| 14:51:13 | 7 | **A.   Well, have you -- a hash value is --** |
| 14:51:17 | 8 | Q.   Let me ask it this way.  You saw the numbers before |
| 14:51:20 | 9 | .jpeg; correct? |
| 14:51:21 | 10 | **A.   Yes.** |
| 14:51:22 | 11 | Q.   You say you think that's the name of the file; correct? |
| 14:51:26 | 12 | **A.   That's the name of the file.** |
| 14:51:28 | 13 | Q.   Did you put that name of the file on there? |
| 14:51:31 | 14 | **A.   No.** |
| 14:51:32 | 15 | Q.   Okay.  It came from AOL through NCMEC; correct? |
| 14:51:37 | 16 | **A.   Yes.** |
| 14:51:38 | 17 | Q.   Okay.  So you don't know for a fact who put the numbers |
| 14:51:44 | 18 | there or what they mean? |
| 14:51:47 | 19 | **A.   I don't know what they represent.** |
| 14:51:49 | 20 | Q.   Thank you.  Okay. |
| 14:52:06 | 21 | When you received the CyberTipline report, referring |
| 14:52:17 | 22 | you to -- referring you to page 5 of that report -- and, again, |
| 14:52:33 | 23 | this is the hard copy document that you had accompanying the |
| 14:52:39 | 24 | disc; correct? |
| 14:52:41 | 25 | **A.   Yes.** |

14:52:41   1      Q.   Okay.  And you see there under the category or the

14:52:47   2   section Additional Information Provided By NCMEC, you see there

14:52:53   3   under NCMEC Classification reference to "child pornography

14:52:59   4   (confirmed)."  Do you see that?

14:53:00   5      A.   Yes.

14:53:02   6      Q.   And there's a date that it was processed, and that's

14:53:05   7   April 25, 2013; correct?

14:53:10   8      A.   Yes.

14:53:13   9      Q.   And from your training, instruction, knowledge that you

14:53:21  10   picked up since 2004-2005, do you have an understanding as to

14:53:25  11   what that means what when it says confirmed?

14:53:29  12      A.   **My understanding is that NCMEC would have confirmed**

14:53:32  13   **that it -- one of the images is a known victim.**

14:53:39  14      Q.   Okay.  And based upon your training and information, do

14:53:45  15   you know how they do that?

14:53:47  16      A.   **Well, if a victim is identified, NCMEC is given that**

14:53:53  17   **information and then a series or set of images would be**

14:53:59  18   **identified.**

14:54:00  19      Q.   But my question to you is.  And you may not know -- but

14:54:04  20   based upon what training you've received and information you've

14:54:07  21   received, do you know how they confirmed that it was child

14:54:13  22   pornography?

14:54:13  23      A.   **No.**

14:54:14  24      Q.   Okay.   Referring to page 1 of the CyberTipline report,

14:54:31  25   under the section Reported Information, it's your

14:54:38  1  understanding, isn't it, that this information is the

14:54:40  2  information that's provided by AOL to NCMEC?

14:54:45  3      **A.   Yes.**

14:54:48  4      Q.   And you see there under the subheading E-mail, roughly

14:54:55  5  for half a page and then another full page, single-spaced

14:55:05  6  information.  Do you know what that is?  Do you know what's

14:55:13  7  contained on this half page and the full page following?

14:55:17  8      **A.   Some of it, I do.  Some of it's going to indicate who**

14:55:23  9  **the e-mail was sent from and to, and some of it, I believe it's**

14:55:30 10  **going to show what even the attachments were in there, and**

14:55:35 11  **it'll have times that it was sent, so some of it, yeah.**

14:55:40 12      Q.   And is that helpful information to you in putting

14:55:44 13  together your investigation?

14:55:47 14      **A.   Yes.**

14:55:49 15      Q.   And, in fact, there was a time, was there, when this

14:55:53 16  information was not provided?

14:55:57 17      **A.   I don't remember that.  There could have been.  I don't**

14:56:01 18  **know.**

14:56:24 19      Q.   I'm showing you a --

14:56:28 20          MR. HENDERSON:  Your Honor, I'm referencing

14:56:30 21  Defendant's Exhibit T, which is a CyberTipline report included

14:56:45 22  in our exhibits.

14:56:46 23          THE COURT:  T as in Tom?

14:56:47 24          MR. HENDERSON:  Yes, Your Honor.

14:57:07 25  BY MR. HENDERSON:

14:57:08   1      Q.   Now, I know this isn't involving you and it doesn't

14:57:10   2   involve your case, but going back, if you may, if you will, to

14:57:17   3   your earlier days, in 2005 or 2006, do you recall receiving

14:57:27   4   CyberTiplines like the one I'm showing you here that did not

14:57:32   5   contain that long list of information but simply contained

14:57:39   6   there on the second page --

14:57:41   7                    MR. HART:  Your Honor.

14:57:42   8      Q.   -- the e-mail address and the zip code?

14:57:45   9                    MR. HART:  I object, in part because I don't

14:57:48  10   understand what could possibly be the relevance of a CyberTip

14:57:52  11   that appears to be a Kentucky case from 2005 would have as to

14:57:59  12   Agent Moore's investigation in this case.

14:58:01  13                    THE COURT:  Well, for reasons I don't understand

14:58:03  14   yet, I believe Mr. Henderson is trying to indicate that the

14:58:07  15   format of CyberTips has evolved to include information that

14:58:13  16   they didn't used to include.

14:58:15  17                    Am I tracking with you, Mr. Henderson?

14:58:16  18                    MR. HENDERSON:  Thank you, Your Honor, yes.

14:58:19  19                    THE COURT:  I don't know, however, whether the

14:58:22  20   defendant can testify -- I'm sorry, whether the witness can

14:58:26  21   testify as to this document because I have yet to hear any

14:58:33  22   information that the format or the presentation that Exhibit T

14:58:37  23   is in is one that's familiar to him.  I understand that

14:58:40  24   Mr. Henderson's not presenting Exhibit T with any reference to

14:58:43  25   the substance of whatever's reported there; merely to the

5-19-14    USA v. ACKERMAN    No. 13-10176

61

14:58:49  1    format of it.  But, again, if the witness is not familiar with

14:58:54  2    the format, then all this is for naught.

14:58:59  3    BY MR. HENDERSON:

14:59:00  4        Q.   And the question, if I may, Your Honor, is this format

14:59:04  5    familiar to you going back to the 2005-2006 time period?

14:59:11  6        **A.   It doesn't look familiar, although, you know, we're**

14:59:16  7    **going back 11 years.  Could I have had a CyberTip back then**

14:59:24  8    **that contained that, that looked like that?  Probably.  But I**

14:59:28  9    **just don't recall.**

14:59:29  10               THE COURT:  Well, Agent Moore, obviously we don't

14:59:31  11   want you to speculate, so if you don't recognize -- again, not

14:59:35  12   the substance.  We don't care about the substance.  I don't

14:59:37  13   think Mr. Henderson cares about the substance of this report.

14:59:39  14   But if you don't recall the format or the style of this report,

14:59:45  15   then we don't want to you speculate.

14:59:47  16               THE WITNESS:  Then it'd be "no."

14:59:49  17   BY MR. HENDERSON:

14:59:50  18       Q.   Okay.  And just one last question on that.  Do you

14:59:58  19   recall that there was an evolution that you at one time did not

15:00:06  20   get all the information that's contained in that page and a

15:00:16  21   half of the CyberTipline report in this case?

15:00:19  22       **A.   No.**

15:00:21  23       Q.   You recall always getting all that information?

15:00:24  24       **A.   Yes.**

15:00:25  25       Q.   Okay.  You indicated that you sent a subpoena to AOL

| | | |
|---|---|---|
| 15:01:03 | 1 | for additional records, additional information? |
| 15:01:05 | 2 | THE COURT:  Mr. Henderson, I'm sorry to interrupt |
| 15:01:06 | 3 | you, but it sounds like we're starting into a new line of |
| 15:01:10 | 4 | inquiry and, if so, I wonder if this might be a good time for |
| 15:01:15 | 5 | an afternoon recess. |
| 15:01:15 | 6 | MR. HENDERSON:  Thank you. |
| 15:01:16 | 7 | THE COURT:  Are you starting a new line of |
| 15:01:18 | 8 | inquiry? |
| 15:01:18 | 9 | MR. HENDERSON:  It is.  It'll be brief, but yes. |
| 15:01:20 | 10 | THE COURT:  Is that your last line of inquiry? |
| 15:01:23 | 11 | MR. HENDERSON:  I think it may be, Your Honor. |
| 15:01:24 | 12 | THE COURT:  All right.  Well, go ahead and finish |
| 15:01:26 | 13 | then. |
| 15:01:26 | 14 | MR. HENDERSON:  Okay. |
| 15:01:29 | 15 | BY MR. HENDERSON: |
| 15:01:29 | 16 | Q.  You indicated that you sent a subpoena to AOL for |
| 15:01:32 | 17 | additional information? |
| 15:01:34 | 18 | **A.  For subscriber information for the e-mail account, yes.** |
| 15:01:38 | 19 | Q.  Okay.  And referring again to the CyberTipline, was |
| 15:01:45 | 20 | there subscriber information contained in that report to you |
| 15:01:50 | 21 | that you had received from Detective Wright? |
| 15:01:55 | 22 | **A.  May I look at it?** |
| 15:01:56 | 23 | Q.  Please. |
| 15:02:04 | 24 | THE WITNESS:  Thank you. |
| 15:02:05 | 25 | MR. HENDERSON:  Oh, I'm sorry, I thought you had. |

15:02:06  1    I apologize.

15:02:38  2        **A.   I don't see any subscriber information in here.**

15:02:47  3    BY MR. HENDERSON:

15:02:47  4        Q.   And when you refer to subscriber information, what in

15:02:51  5    particular are you looking for?

15:02:53  6        **A.   I'm looking for who created the account, when was the**

15:03:00  7    **account created, what IP, what address did they use to create**

15:03:07  8    **the account.**

15:03:28  9        Q.   Well, let's look at it here, beginning on page --

15:03:54  10   page 5.  This is information, as you understand it, that was

15:04:01  11   provided by NCMEC?

15:04:02  12       **A.   Correct.**

15:04:04  13       Q.   And they identified for you the provider, the Internet

15:04:17  14   provider; correct?

15:04:18  15       **A.   Correct.**

15:04:21  16       Q.   And on the next page they provided you with additional

15:04:32  17   information regarding the provider; is that correct?

15:04:36  18       **A.   Yes.**

15:04:41  19       Q.   Then on the next page they provided you with reference

15:04:51  20   to the hash values; correct?

15:04:53  21       **A.   It looks like that's the hash values.  That could be.**

15:04:57  22   **What page is that on?**

15:04:58  23       Q.   Page 7.

15:05:14  24       **A.   Those are what appear to me to be hash value sets right**

15:05:18  25   **there.  They appear to be.**

15:05:19  1    Q.   Okay.  And then they provided you with some

15:05:28  2  geographical information about where the computer was located?

15:05:40  3    **A.   I believe they're trying to track the IP address.**

15:05:45  4    Q.   Okay.  They tracked it to Hays and the zip code --

15:05:49  5    **A.   Yes.**

15:05:49  6    Q.   -- area code?  And then they provided you with

15:06:00  7  reference to Mr. Ackerman and his Facebook account?

15:06:03  8    **A.   Yes.**

15:06:04  9    Q.   Information about his high school?

15:06:06  10   **A.   Uh-huh, yes.**

15:06:12  11   Q.   Information about his age?

15:06:15  12   **A.   Yes.**

15:06:28  13   Q.   Information regarding his motor vehicle, bankruptcies,

15:06:41  14  the kind of information you'd look up on a personal search web

15:06:44  15  site?

15:06:44  16   **A.   Yes.**

15:06:53  17   Q.   And, again, geographical references to possible

15:06:56  18  addresses?

15:06:58  19   **A.   Correct.**

15:07:08  20   Q.   From your -- in your opinion and from your experience,

15:07:13  21  was there anything that you needed in addition to the

15:07:17  22  information contained on this CyberTipline report and that was

15:07:22  23  on that disc, was there any other information -- was there any

15:07:28  24  information other than what was on there that you felt you

15:07:31  25  needed in order to prepare an application for a search warrant?

15:07:35  1     A.   Yes.

15:07:35  2     Q.   What did you need?

15:07:36  3     A.   I wanted information from the ISP provider.  That's the

15:07:42  4  Rural Telephone Service that use the IP address.  And also I

15:07:49  5  wanted to get subscriber information from AOL.

15:07:53  6     Q.   And what information did you need from the ISP?

15:07:58  7     A.   I wanted to corroborate that it's all linked to the

15:08:03  8  same individual address.  I want to see the IP address on the

15:08:11  9  IP log from AOL that the e-mail account was utilizing, and then

15:08:16  10  I want to see what rural -- the Rural Telephone, the ISP

15:08:22  11  provider, who they have listed as utilizing that IP address at

15:08:31  12  that particular time and date and see that they corroborate.

15:08:37  13     Q.   Okay.  So basically what you want to do is get

15:08:39  14  information from those two sources to corroborate what you have

15:08:44  15  in the CyberTipline?

15:08:44  16     A.   And aside from just locals doing a local verification,

15:08:49  17  to see who resides at the residence and whatnot.

15:08:53  18     Q.   I understand that part.  But in order to prepare the

15:08:57  19  search warrant, what you needed from these other two was

15:09:00  20  information to corroborate what was in the CyberTipline?

15:09:02  21     A.   I would use -- yes.

15:09:04  22          MR. HENDERSON:  Thank you.  Your Honor, I think

15:09:08  23  that's all I have.  Thank you.

15:09:09  24          THE COURT:  Thank you, Mr. Henderson.

15:09:10  25          Why don't we take our morning recess.  Mr. Hart, I

15:09:13   1   suspect you'll have some redirect and we'll do it at that

15:09:17   2   point.  Let's -- well, let's give ourselves 15 minutes, I

15:09:22   3   guess, and we'll come back at about 3:25.  We'll be in recess

15:09:26   4   until then.

15:09:28   5              (A recess was taken from 3:09 to 3:25 PM.)

15:26:15   6              CLERK NALL:  All rise.

15:26:19   7              THE COURT:  You may be seated.

15:26:22   8              Agent Moore -- I assume you have some redirect,

15:26:25   9   Mr. Hart?

15:26:25  10              MR. HART:  Yes, Your Honor.

15:26:27  11              THE COURT:  You may retake the witness stand.

15:26:29  12   And, Mr. Hart, you may inquire.

15:26:36  13                       REDIRECT EXAMINATION

15:26:36  14   BY MR. HART:

15:26:41  15   Q.  Agent Moore, there's a little bit of conversation about

15:26:45  16   your training relative to these investigations.  You had

15:26:49  17   indicated that you had been to conferences, trainings, relative

15:26:52  18   to child exploitation crimes, but I wanted to clarify a

15:26:57  19   specific part of that.  Have you ever been to a training from

15:27:03  20   NCMEC, the National Center for Missing & Exploited Children?

15:27:12  21   **A.  I've gone to an ICAC, so not specifically for neck.**

15:27:18  22   Q.  When you say ICAC, you're talking International Crimes

15:27:24  23   Against Children task force?

15:27:25  24   **A.  Correct.**

15:27:25  25   Q.  As far as having a representative from NCMEC ever teach

15:27:28  1    you how to do something, you have not experienced that?

15:27:31  2        A.   No.

15:27:33  3        Q.   As far as training from AOL goes, have you ever been to

15:27:36  4    a training where AOL teaches you how to do something relative

15:27:40  5    to your job?

15:27:41  6        A.   No.

15:27:44  7        Q.   And in terms of what you have learned about how Nick

15:27:50  8    does things, where does that information come from?

15:27:54  9        A.   **I just hear it from other agents or local law**

15:28:00  10   **enforcement.**

15:28:00  11       Q.   So in communication with other agents who -- are these

15:28:04  12   agents that are also involved in these type of investigations?

15:28:08  13       A.   **Yes.**

15:28:08  14       Q.   Is that the same as it relates to AOL?

15:28:13  15       A.   **Yes.**

15:28:14  16       Q.   Now, in terms of figuring out what type of -- well, you

15:28:21  17   said one of the things that you would get in these

15:28:23  18   conversations or communications with other law enforcement

15:28:27  19   officers is I think the word was "go-bys"; is that what you

15:28:31  20   said?

15:28:31  21       A.   **Yes.**

15:28:31  22       Q.   Are you reference -- what are you referencing when you

15:28:34  23   say a "go-by"?

15:28:36  24       A.   **When you say like "go-by," like an example or a**

15:28:38  25   **template.**

68

15:28:39   1     Q.   A template.  Would that be like a search warrant?

15:28:41   2     **A.   Yes.**

15:28:41   3     Q.   To identify what information a particular ESP might

15:28:47   4   provide?

15:28:48   5     **A.   Correct.  So it was basically a template of how to**

15:28:52   6   **conduct an investigation that may be similar to something that**

15:28:57   7   **you're currently looking at investigating.**

15:28:59   8     Q.   Okay.  Now, you've said before that you are not -- you

15:29:08   9   would not be able to be an expert as it relates to these -- how

15:29:15   10   AOL works or NCMEC works.  I want to make sure that we're clear

15:29:19   11   on your qualifications.  While you have been doing these

15:29:23   12   investigations for a long period of time, fair to say you are

15:29:26   13   not a computer forensic analyst or a computer forensic

15:29:30   14   examiner?

15:29:31   15     **A.   Correct.**

15:29:31   16     Q.   So when you get too far in the weeds on the technical

15:29:35   17   side, is that where you're out of your depth?

15:29:37   18     **A.   Yes.**

15:29:37   19     Q.   That being said, have you been trained on what a hash

15:29:42   20   value, what that means in the context of these investigations?

15:29:46   21     **A.   I have a general idea of what it means.**

15:29:49   22     Q.   And can you explain that to the Court, what your

15:29:52   23   understanding of what hash value is.

15:29:53   24     **A.   My understanding of what a hash value is is that every**

15:29:57   25   **image or video is assigned a hash value that's unique to that**

15:30:02  1  **particular image or video.  If the image or video is**

15:30:07  2  **manipulated in any type of way, resized, whatnot, the hash**

15:30:12  3  **value will change.  That's my basic understanding of what a**

15:30:15  4  **hash value is.**

15:30:16  5  Q.  And if you were to copy that particular image and make

15:30:21  6  an exact copy of it, would the hash value be the same or

15:30:24  7  different?

15:30:24  8  **A.  My understanding is that it will be the same.**

15:30:28  9  Q.  And does that hash value change or degrade over time or

15:30:33  10  will it remain constant so long as the thing does not change?

15:30:37  11  **A.  My understanding is that it always remains the same**

15:30:40  12  **unless the image or video is manipulated.**

15:30:45  13  Q.  Now, we had a little bit of conversation about the disc

15:31:01  14  that Detective Wright provided you related to the CyberTip.

15:31:06  15  You remember that?

15:31:08  16  **A.  Yes.**

15:31:08  17  Q.  We had a lot of conversation about the .aol and things

15:31:11  18  like that.  I want to go back and actually look at that again,

15:31:15  19  so that we all have our same understanding of what you were

15:31:19  20  dealing with.

15:31:20  21  **A.  Okay.**

15:31:20  22  Q.  All right.  Now, I have pulled up here what is the

15:31:28  23  folder structure underneath that disc, which has the CTL1883287

15:31:38  24  at the top.  Do you see that there?

15:31:40  25  **A.  Yes.  CyberTipline and then that's the number**

15:31:43   1   **associated with it.**

15:31:43   2       Q.   And then we see a number of folders down here.  And

15:31:47   3   just to confirm, many of these folders are actually empty; is

15:31:51   4   that right?

15:31:51   5       **A.   Yes.**

15:31:51   6       Q.   So like Additional has nothing in it, Childrens Photos

15:32:00   7   has nothing in it; is that correct?

15:32:02   8       **A.   Correct.**

15:32:03   9       Q.   The one that you were referring to is down here under

15:32:08  10   images?

15:32:09  11       **A.   Yes.**

15:32:13  12       Q.   And that has that aol_idfp_3644.eml file name?  That's

15:32:24  13   the one that you opened?

15:32:25  14       **A.   Yes.**

15:32:25  15       Q.   Does that bring us to this screen right here?

15:32:28  16       **A.   Yes.**

15:32:32  17       Q.   Now, as we look at this, we see right here that From

15:32:40  18   name, and is this where you're talking about the .aol?

15:32:45  19       **A.   Yes.**

15:32:45  20       Q.   'Cause we see that in there, the .aol.com at the tail

15:32:52  21   end.  And accurate -- would it be accurate to say that when

15:33:01  22   we're talking about this file, that's what this is right here?

15:33:06  23       **A.   Correct.**

15:33:07  24       Q.   And I'm pointing at Government's Exhibit No. 1, page 3,

15:33:14  25   under the Uploaded File Information?

| | | |
|---|---|---|
| 15:33:18 | 1 | **A.   Yes.** |
| 15:33:25 | 2 | Q.   Now, as you look at this, when you looked at this, it |
| 15:33:29 | 3 | was clear to you this is not from plains66952@aol.com? |
| 15:33:38 | 4 | **A.   Correct.** |
| 15:33:39 | 5 | Q.   Is that information you found in a different place in |
| 15:33:45 | 6 | the CyberTip report? |
| 15:33:46 | 7 | **A.   Yes.** |
| 15:33:47 | 8 | Q.   And did you point that out earlier? |
| 15:33:52 | 9 | **A.   I believe I --** |
| 15:33:55 | 10 | Q.   Could you point it out again. |
| 15:33:57 | 11 | **A.   It's in the header information.** |
| 15:33:58 | 12 | Q.   All right.  Show me. |
| 15:34:11 | 13 | **A.   Can I look at mine?  I have it highlighted.** |
| 15:34:14 | 14 | Q.   Yes. |
| 15:34:20 | 15 | **A.   Right here (indicating).** |
| 15:34:22 | 16 | Q.   Okay.  All right.  I see where you're at.  So you |
| 15:34:29 | 17 | pointed to page 1, and right down here, plains -- actually no, |
| 15:34:39 | 18 | you pointed right here, where it has original from and then the |
| 15:34:46 | 19 | plains66952@aol.com? |
| 15:34:50 | 20 | **A.   Yes.** |
| 15:34:50 | 21 | Q.   We also see down here this is a file name? |
| 15:34:54 | 22 | **A.   Yes.** |
| 15:34:55 | 23 | Q.   And then an MD5 hash value and then the IP address? |
| 15:35:03 | 24 | **A.   Correct.** |
| 15:35:04 | 25 | Q.   And that's the one you referenced earlier? |

15:35:07  1    **A.   Yes.**

15:35:08  2    Q.   Okay.  We've now flipped back to the disc as you are

15:35:20  3    looking at it, and there were a couple of questions about the

15:35:23  4    numbers that were on -- you said these numbers are file names.

15:35:28  5    **A.   Yes.**

15:35:28  6    Q.   What were you referencing?  Can you point to it on your

15:35:32  7    screen?

15:35:33  8    **A.   These numbers right here (indicating).  Sorry about**

15:35:37  9    **that.  And right there and even over there.**

15:35:44  10    Q.   Okay.

15:35:45  11    **A.   Before the .jpeg, I believe that's what the numbers --**

15:35:55  12    **when Mr. Henderson was talking about.**

15:35:57  13    Q.   And you were clarifying those are a file name, not

15:36:01  14    necessarily a hash value?

15:36:02  15    **A.   Yes.**

15:36:04  16    Q.   Okay.  All right.  And as far as -- I don't have any

15:36:25  17    more questions for you about that.  But as far as the -- as far

15:36:32  18    as the information you received from NCMEC through the

15:36:38  19    CyberTip, you had to go -- accurate to say you did not receive

15:36:41  20    the subscriber information?

15:36:43  21    **A.   Correct.**

15:36:43  22    Q.   You actually had to go through the court -- or through

15:36:48  23    a subpoena in order to get that information?

15:36:51  24    **A.   Yes.**

15:36:52  25    Q.   Did the same thing for the Rural Telephone ISP

| | | |
|---|---|---|
| 15:36:58 | 1 | information? |
| 15:36:58 | 2 | **A.   Correct.** |
| 15:37:00 | 3 | Q.   And as far as -- well, no, one second.  I think that |
| 15:37:17 | 4 | may be it, Agent Moore. |
| 15:37:19 | 5 | (Whereupon, a sotto voce discussion was had |
| 15:37:20 | 6 | between Mr. Hart and Mr. Schmidt.) |
| 15:37:22 | 7 | MR. HART:  Thank you, Agent Moore.  I don't have |
| 15:37:23 | 8 | any further questions for you. |
| 15:37:24 | 9 | THE COURT:  Agent, I'm going to ask you a |
| 15:37:27 | 10 | follow-up question.  When Mr. Hart was talking to you about |
| 15:37:30 | 11 | hash values, you said, every image is assigned a unique hash |
| 15:37:36 | 12 | value, and "assigned" sounds to me like an arbitrary |
| 15:37:39 | 13 | designation.  Is the hash value assigned or is it something |
| 15:37:46 | 14 | that is somehow forensically derived from the image itself, or |
| 15:37:50 | 15 | do you know? |
| 15:37:51 | 16 | THE WITNESS:  I can't -- I don't know, Your Honor. |
| 15:37:54 | 17 | THE COURT:  All right.  That's fair enough. |
| 15:37:55 | 18 | Mr. Henderson? |
| 15:37:56 | 19 | MR. HENDERSON:  Thank you, Your Honor. |
| 15:38:00 | 20 | RECROSS-EXAMINATION |
| 15:38:00 | 21 | BY MR. HENDERSON: |
| 15:38:05 | 22 | Q.   You referenced, both in the -- you referenced both in |
| 15:38:17 | 23 | the CyberTipline report and on the header or the information |
| 15:38:23 | 24 | that you found the file in the disc to this particular address, |
| 15:38:28 | 25 | and I'm pointing with my pen, AOL_IDFP and then that number. |

| 15:38:37 | 1 | **A.   You're referring to the IP address?** |
| 15:38:40 | 2 | Q.   Yes. |
| 15:38:41 | 3 | **A.   Yes.** |
| 15:38:41 | 4 | Q.   Okay.  That's the same address that was on the e-mail |
| 15:38:47 | 5 | that you opened up on the disc; correct? |
| 15:38:50 | 6 | **A.   That was -- I believe, yes.** |
| 15:38:54 | 7 | Q.   Okay.  As I recall the screens, we clicked -- |
| 15:38:59 | 8 | MR. HENDERSON:  Maybe we could do that.  I |
| 15:39:00 | 9 | apologize. |
| 15:39:10 | 10 | (Whereupon, a sotto voce discussion was had |
| 15:39:11 | 11 | between Mr. Henderson and Mr. Hart.) |
| 15:39:16 | 12 | MR. HENDERSON:  I apologize, Your Honor. |
| 15:39:20 | 13 | BY MR. HENDERSON: |
| 15:39:20 | 14 | Q.   Okay, you told -- oh.  You told us that you opened up |
| 15:39:25 | 15 | the disc and this is what you saw; correct? |
| 15:39:27 | 16 | **A.   Correct.** |
| 15:39:28 | 17 | Q.   Then you clicked on images? |
| 15:39:35 | 18 | MR. HART:  I think we just reorganized them. |
| 15:39:37 | 19 | MR. HENDERSON:  Sorry. |
| 15:39:39 | 20 | THE WITNESS:  Might be at the bottom. |
| 15:39:40 | 21 | MR. HENDERSON:  Apologize. |
| 15:39:46 | 22 | **A.   No.** |
| 15:39:47 | 23 | MR. HART:  Hang on. |
| 15:39:49 | 24 | THE WITNESS:  Scroll down.  I think you might have |
| 15:39:54 | 25 | put it into another file. |

15:39:56  1          MR. HENDERSON:  I apologize, Your Honor.

15:40:02  2          THE WITNESS:  Subject photos maybe.

15:40:06  3          THE COURT:  I don't mind telling you I'm very

15:40:08  4  nervous about playing around with this disc in open court,

15:40:11  5  given that there's contraband on it, so I would encourage you

15:40:16  6  to be careful about that.

15:40:19  7          MR. HENDERSON:  Let me try to do it with the

15:40:21  8  questions, Your Honor.

15:40:21  9          THE COURT:  That will be fine.

15:40:23  10  BY MR. HENDERSON:

15:40:23  11     Q.  You opened up the screen and we had the menu, we had

15:40:25  12  the list of things to click on; right?

15:40:28  13     **A.  Yes, sir.**

15:40:29  14     Q.  One was images?

15:40:30  15     **A.  Yes.**

15:40:30  16     Q.  You clicked on images?

15:40:32  17     **A.  Yes.**

15:40:32  18     Q.  And then that gave you just a header that said

15:40:36  19  AOL_IDFP?

15:40:38  20     **A.  Yes.**

15:40:38  21     Q.  Okay.  Stop right there.  Do you know what IDFP stands

15:40:44  22  for?

15:40:44  23     **A.  No, I do not.**

15:40:58  24     Q.  And after you clicked on AOL_IDFP, then that opened you

15:41:04  25  up to the e-mail with the attachments; correct?

15:41:08  1      A.   Correct.

15:41:08  2      Q.   Okay.  And it's your testimony that, as far as you

15:41:13  3  know, the numbers before the JPEG are information regarding the

15:41:20  4  title?

15:41:21  5      A.   Of file names, correct.

15:41:23  6      Q.   File names, correct.  Not the hash value?

15:41:25  7      A.   Correct.

15:41:26  8      Q.   'Cause you know the hash value calculated in this case

15:41:31  9  has more numbers than the numbers that were there?

15:41:34 10      A.   Yes.

15:41:45 11      Q.   And, again, just very quickly, your education, your

15:41:50 12  information regarding hash values, is based upon perhaps that

15:41:54 13  one conference and then just on-the-job training?

15:41:58 14      A.   Yes.

15:42:05 15      Q.   Now, and I apologize, Your Honor, this wasn't

15:42:08 16  specifically asked on redirect but I think it's related, if I

15:42:11 17  may, and I'll ask the question, anticipating an objection.

15:42:17 18          During your direct you said that someone compared the

15:42:23 19  photograph from the disc that you received to the photograph on

15:42:27 20  the computer; is that right?

15:42:30 21      A.   Are you referring to the preview?

15:42:32 22      Q.   Yes.

15:42:32 23      A.   At the house during the search warrant?

15:42:34 24      Q.   Yes.

15:42:35 25      A.   Yes, that was done at the search warrant on a preview.

15:42:38  1    Q.   Okay.  Do you know where the disc -- or where the

15:42:45  2  photographs on the disc came from?

15:42:50  3    **A.   Okay, I'm trying to understand your question.  What are**

15:42:55  4  **you -- the disc --**

15:42:56  5    Q.   Let me ask it this way.  And it may be you just don't

15:43:00  6  know.  But do you know how AOL identifies photographs in their

15:43:11  7  data bank with the hash values?

15:43:17  8    **A.   I have no idea exactly how they identify suspected**

15:43:23  9  **child pornography.**

15:43:25  10    Q.   Okay.  So you don't know whether the photograph on the

15:43:28  11  disc is a photograph from their hash value data bank or a

15:43:33  12  photograph from the actual e-mail?

15:43:41  13    **A.   I don't under --**

15:43:42  14    Q.   You didn't create the e-mail?

15:43:44  15    **A.   Right, right, I did not create the e-mail.**

15:43:48  16         MR. HENDERSON:  Thank you, sir.  Thank you, Your

15:43:49  17  Honor.

15:43:51  18         THE COURT:  May the witness step down?

15:43:53  19         MR. HART:  Yes, Your Honor.  And so the Court and

15:43:56  20  counsel's aware, I am -- whatever Mr. Henderson did to the

15:43:59  21  disc, the folder that we were accessing is now gone.  However,

15:44:04  22  the information that we were looking at I did manage to save,

15:44:09  23  and I have a screen capture of that, so we do have that, Your

15:44:15  24  Honor.

15:44:15  25         MR. HENDERSON:  I apologize.  It wasn't

15:44:16  1    deliberate.

15:44:17  2                    THE COURT:  All right.  You may step down, Agent

15:44:19  3    Moore.

15:44:20  4                    (Witness excused from the witness stand.)

15:44:20  5                    THE COURT:  Are we, I hope, Mr. Hart, going to

15:44:23  6    hear from someone who can talk knowledgeably about hash values?

15:44:28  7                    MR. HART:  Yes, Your Honor.

15:44:29  8                    THE COURT:  Excellent.  You may call your next

15:44:31  9    witness.

15:44:31  10                   MR. HART:  Thank you, Your Honor.  The Government

15:44:32  11   would call Greg Phillips from AOL.  I'll go retrieve him.

15:44:39  12   Ms. Reece is not here today, Your Honor.

15:45:05  13                   (Brief pause.)

15:45:08  14                   THE COURT:  Mr. Phillips, if you'll come stand in

15:45:11  15   front of the courtroom deputy, she will swear you in, and then,

15:45:13  16   sir, you may have a seat in the witness box.

15:45:16  17                           GREG PHILLIPS,

15:45:16  18   having been first duly sworn to testify the truth, the whole

15:45:29  19   truth, and nothing but the truth, testified as follows:

15:45:29  20                        DIRECT EXAMINATION

15:45:29  21   BY MR. HART:

15:45:30  22       Q.  Good afternoon, sir.

15:45:42  23       **A.  Good afternoon.**

15:45:43  24       Q.  Would you please introduce yourself to the Court.

15:45:45  25       **A.  Sure.  My name is Greg Phillips, and I work for America**

| | | |
|---|---|---|
| 15:45:50 | 1 | **Online.** |
| 15:45:50 | 2 | Q.   And how long have you been working for America Online? |
| 15:45:53 | 3 | **A.   Nineteen years.** |
| 15:45:55 | 4 | Q.   And what is your current title or assignment? |
| 15:45:59 | 5 | **A.   My current title is Senior Technical Security** |
| 15:46:04 | 6 | **Investigator.** |
| 15:46:04 | 7 | Q.   And what does that mean? |
| 15:46:07 | 8 | **A.   Well, I do -- most of my job deals with responding to** |
| 15:46:15 | 9 | **subpoenas and search warrants from law enforcement or** |
| 15:46:23 | 10 | **government, and I also do technical analysis with explaining** |
| 15:46:30 | 11 | **data to our attorneys and to people that are consumers of our** |
| 15:46:35 | 12 | **data.** |
| 15:46:36 | 13 | Q.   All right.  So when you -- in that capacity, you are |
| 15:46:38 | 14 | sort of the translator for the really, really technical guys |
| 15:46:43 | 15 | for the nontechnical folks? |
| 15:46:44 | 16 | **A.   Yes.** |
| 15:46:45 | 17 | Q.   All right.  Now, how -- you said you've been with AOL |
| 15:46:49 | 18 | for 19 years.  How long have you been in your current position? |
| 15:46:58 | 19 | **A.   Seventeen.** |
| 15:47:01 | 20 | Q.   Seventeen years? |
| 15:47:03 | 21 | **A.   Yes.** |
| 15:47:03 | 22 | Q.   All right.  Now, what other jobs have you had while |
| 15:47:07 | 23 | you've been there at AOL? |
| 15:47:08 | 24 | **A.   I was a fraud analyst.  That's how I -- that was my** |
| 15:47:11 | 25 | **first position at AOL, where AOL was experiencing problems with** |

15:47:15  1    credit card fraud.  And my background just prior to that was

15:47:20  2    with Citibank and also with credit card fraud, so it was a

15:47:25  3    perfect match.

15:47:26  4        Q.   Now, in the length of time that you've been there with

15:47:30  5    AOL, have you seen a variety of changes in how AOL does its

15:47:34  6    operations?

15:47:35  7        A.   Yes.

15:47:35  8        Q.   What has been really the driving factor for many of

15:47:39  9    those changes?

15:47:40 10        A.   Technology and the consumer marketplace.

15:47:43 11        Q.   When you say that, can you give us an example of how

15:47:47 12    the consumer marketplace dictates what you at AOL do?

15:47:52 13        A.   A part of that is technology has evolved.  It changes

15:47:58 14    every two to three years, I would say, on average, and

15:48:02 15    consumers kind of move from one thing to whatever the newest

15:48:05 16    sort of thing is.

15:48:06 17        Q.   So, for instance, I think in current history we might

15:48:11 18    be talking about the move from instant messaging to Twitter and

15:48:15 19    that type of really abbreviated instant messaging, those sort

15:48:20 20    of phenomena?

15:48:21 21        A.   Yes.

15:48:26 22        Q.   Well, let's then back up a minute and talk about the

15:48:28 23    type of services that AOL actually provides.  What is the range

15:48:35 24    of services that AOL involves itself in?

15:48:38 25        A.   We're probably best known for being an Internet service

5-19-14   USA v. ACKERMAN   No. 13-10176

15:48:42  1   **provider, and that was mainly focused on dial-up customers**

15:48:47  2   **using our -- using a dial-up modem to connect to the Internet.**

15:48:53  3   **Now we're sort of a -- we've evolved from that.  That's still**

15:48:56  4   **part of our business, but it's not a huge part of our business.**

15:48:59  5   **Now we're selling ads based on our core, what they call the AOL**

15:49:05  6   **core, which would be e-mail, instant messaging, and content.**

15:49:10  7       Q.   And content, when you talk about content, in your lingo

15:49:14  8   what does that mean for the layperson?

15:49:16  9       **A.   That would mean things like articles written,**

15:49:21  10  **Moviefone, Huffington Post, data.  We have different what we**

15:49:28  11  **call lifestyle channels that would be, like, for women or for**

15:49:32  12  **men or for parenting, that kind of thing.**

15:49:34  13      Q.   Are these actual web pages and web-based content that a

15:49:40  14  consumer might be able to access?

15:49:41  15      **A.   Yes.**

15:49:44  16      Q.   Now, you indicated -- and I wanted to make sure I was

15:49:46  17  clear on this -- AOL used to be in the business of actually

15:49:49  18  providing dial-up service so folks could connect to the

15:49:53  19  Internet.  Did I understand you correctly?

15:49:56  20      **A.   Yes.**

15:49:59  21      Q.   All right.  Now, as part of AOL's business model, the

15:50:09  22  fact that you all provide e-mail, instant messaging, and a

15:50:13  23  variety of those services, do you all have Terms of Service for

15:50:17  24  those folks that use your product?

15:50:19  25      **A.   Yes.**

15:50:22   1        Q.   And I'm going to present to you what has been marked

15:50:26   2    for identification as Government's Exhibit No. 5.  Have you

15:50:29   3    looked through this before?

15:50:30   4        A.   Yes.

15:50:30   5        Q.   Are these your current Terms of Service?

15:50:33   6        A.   Yes, they are.

15:50:33   7        Q.   And were these last updated on April 19th, 2013?

15:50:40   8        A.   That's correct.

15:50:42   9        Q.   All right.

15:50:44   10             MR. HART:  Your Honor, I'd move to admit

15:50:46   11   Government's Exhibit No. 5.

15:50:49   12             MR. HENDERSON:  No objection, Your Honor.

15:50:51   13             THE COURT:  Government 5's admitted.

15:50:54   14   BY MR. HART:

15:50:55   15       Q.   Now, that Terms of Service, does that apply to your

15:50:58   16   e-mail users?

15:51:00   17       A.   Yes.

15:51:00   18       Q.   And does a user have to agree to these terms in order

15:51:07   19   to have an account with AOL?

15:51:08   20       A.   Yes, they do.

15:51:09   21       Q.   Now, I note that this is updated on April 19th, 2013.

15:51:19   22   If you make changes to the Terms of Service, how is a user

15:51:25   23   notified?

15:51:25   24       A.   They receive an e-mail from AOL to all their e-mail

15:51:31   25   addresses that are registered, and in the body of the e-mail it

15:51:38  1   says that the new Terms of Service are coming out, and it gives

15:51:41  2   the date that they will become effective, and your log-in at

15:51:48  3   that time or after implies consent to accept the new Terms of

15:51:52  4   Service.

15:51:52  5       Q.   All right.  So this is actually something that is sent

15:51:55  6   to anybody who's using your e-mail; they actually get an

15:51:58  7   e-mail?

15:51:59  8       A.   Yes.

15:52:00  9       Q.   So there's sort of this direct connection to that user?

15:52:03  10      A.   Yes, they're directly notified.

15:52:04  11      Q.   Now, how do you actually go about enforcing the Terms

15:52:11  12   of Service as it relates to e-mail specifically?  Do you have

15:52:18  13   any processes at AOL that allow you to enforce the Terms of

15:52:26  14   Service?

15:52:26  15      A.   Yes.

15:52:27  16      Q.   What are those?

15:52:28  17      A.   So there's a couple of things.  One would be that if a

15:52:34  18   member receives an e-mail that they think is in violation of

15:52:37  19   our Terms of Service, they can send it in as a complaint,

15:52:42  20   saying, hey, this is illegal.  If they think it's spam or that

15:52:45  21   somebody's trying to send them a virus or some sort of scam

15:52:52  22   e-mail, they'll report it.

15:52:53  23           On the back end, we also have a system that we call

15:53:02  24   IDFP, which scans the e-mail when it is sent, saved, or

15:53:07  25   forwarded from an account.  It scans the attachments to scan

15:53:13  1  **for malware, viruses, and illegal images.**

15:53:20  2  Q.   And when you say "illegal images," is that child

15:53:25  3  pornography, as we would understand it?

15:53:26  4  **A.   Alleged child pornography.**

15:53:28  5  Q.   And I understand your caveat there.

15:53:32  6      Now, is there a reason -- the IDFP, what does that

15:53:38  7  stand for?

15:53:39  8  **A.   Image Detection and Filtering Process.**

15:53:42  9  Q.   And when you say image detection, you just rattled off

15:53:46  10  you're looking for malware and virus and these images, does the

15:53:50  11  IDFP only relate to the images?

15:53:52  12  **A.   Yes, yes.**

15:53:54  13  Q.   Now, I want to talk about that in just a moment, but

15:53:57  14  what is the reason why AOL utilizes IDFP or these other

15:54:07  15  back-end monitoring actions?

15:54:10  16  **A.   We do it to protect our members and to protect our**

15:54:13  17  **business interests, because if people knew that we were sending**

15:54:17  18  **out viruses or illegal content, they would look upon our brand**

15:54:22  19  **as not being trustworthy or secure, and they wouldn't want to**

15:54:25  20  **use our services.  The more people we get using the services,**

15:54:28  21  **the more ads we sell, the more money we make.**

15:54:31  22  Q.   So if you keep folks happy, they stick around, more

15:54:34  23  money's made?

15:54:35  24  **A.   Yes.**

15:54:40  25  Q.   Now, has it always been AOL's perspective to do this

| | | |
|---|---|---|
| 15:54:44 | 1 | sort of monitoring or sort of protection of your business |
| 15:54:49 | 2 | interests, to do these things? |
| 15:54:50 | 3 | **A.   Yes.** |
| 15:54:50 | 4 | Q.   Who developed -- well, let's talk about IDFPs |
| 15:54:54 | 5 | specifically.  I mean, you've described it as image |
| 15:54:57 | 6 | detection -- |
| 15:54:58 | 7 | **A.   Image Detection and Filtering Process.** |
| 15:55:00 | 8 | Q.   Who developed that? |
| 15:55:02 | 9 | **A.   I believe there was -- I'm not exactly sure there was** |
| 15:55:06 | 10 | **one person or two.  There was a business need that was** |
| 15:55:08 | 11 | **identified, and I'm sure it was championed by our legal** |
| 15:55:12 | 12 | **department.  And they came to -- at the time I was in operation** |
| 15:55:17 | 13 | **security, and they came to -- and we have a bunch of software** |
| 15:55:21 | 14 | **engineers there, and they came to us and said, hey, we have** |
| 15:55:25 | 15 | **this problem that we need to do something about, what are your** |
| 15:55:27 | 16 | **ideas for how do we prevent this from happening, and how can we** |
| 15:55:32 | 17 | **make it streamlined and efficient to look through, you know,** |
| 15:55:37 | 18 | **hundreds of thousands and millions of e-mails -- I wouldn't say** |
| 15:55:41 | 19 | **"look through," but detect the bad activity going on to make** |
| 15:55:47 | 20 | **it -- to help the business.** |
| 15:55:48 | 21 | Q.   And so was this done in house? |
| 15:55:51 | 22 | **A.   Yes.** |
| 15:55:52 | 23 | Q.   This isn't a thing where you asked, I don't know, FBI |
| 15:55:56 | 24 | or some law enforcement agency, do you have something we could |
| 15:55:59 | 25 | use? |

15:56:01    1      A.   We did not do that.

15:56:02    2      Q.   All right.  So this is completely in house.  And you

15:56:06    3   said that you wanted something that would allow the process to

15:56:11    4   be efficient.  And I understood you to -- you may have even

15:56:16    5   said quick.  What do you mean by looking for a process that's

15:56:19    6   efficient or quick?

15:56:20    7      A.   Well, we -- it can't impact our -- the customer's

15:56:27    8   expectation of having something almost instantaneously, so it

15:56:30    9   has to happen in real time, and it can't -- you can't have an

15:56:34   10   e-mail sent and then have it be delivered, say, tomorrow or

15:56:38   11   next week or something.  That would be ridiculous.

15:56:40   12      Q.   So as soon as somebody presses Send, that process?

15:56:43   13      A.   Has to kick off and go.

15:56:44   14      Q.   And it's gotta be fast?

15:56:46   15      A.   Yes.

15:56:46   16      Q.   So these are sort of the parameters by which you at AOL

15:56:51   17   developed this IDFP?

15:56:53   18      A.   Yes.

15:56:53   19      Q.   Now, what -- I think you've described for us kind of

15:56:57   20   generally what IDFP does, but can you describe with more

15:57:00   21   particularity how IDFP works.

15:57:04   22      A.   Yes.  So we developed a database of -- or what we call

15:57:09   23   a hash set, and that hash set contains hash -- MD5 hashes of

15:57:21   24   apparent child pornography that we have come across in the

15:57:24   25   course of doing our business.

| 15:57:25 | 1 | Q.   And let's stop there before we get any further 'cause |
| 15:57:29 | 2 | you've talked about an MD5 hash.  Are you familiar with that |
| 15:57:32 | 3 | term and do you understand it? |
| 15:57:33 | 4 | **A.   Yes.** |
| 15:57:33 | 5 | Q.   Can you give the Court just a crash course, at the |
| 15:57:39 | 6 | layman's level, of what that means. |
| 15:57:42 | 7 | **A.   Sure.  So MD5 is algorithm that is used against a known** |
| 15:57:49 | 8 | **data set.  So you use the data set that you have, and you kind** |
| 15:57:54 | 9 | **of put it in the equation of the algorithm, and then a number** |
| 15:57:57 | 10 | **is produced, a data string is produced.  Each one of those is** |
| 15:58:01 | 11 | **unique.  It's kind of like -- most people refer to it as a** |
| 15:58:04 | 12 | **digital fingerprint because it's unique and it -- you can do** |
| 15:58:11 | 13 | **the equation on images and video very quickly, so it doesn't** |
| 15:58:16 | 14 | **take -- the computation doesn't take very long to produce.** |
| 15:58:19 | 15 | Q.   And so a hash value, that is done by a computation, |
| 15:58:24 | 16 | plugging in through an algorithm? |
| 15:58:26 | 17 | **A.   Yes.** |
| 15:58:26 | 18 | Q.   Is there any -- is that done -- is that a forensic |
| 15:58:37 | 19 | process where you have to stop stuff and then do the |
| 15:58:39 | 20 | computation, or can it be done as the thing's going through the |
| 15:58:43 | 21 | pipe? |
| 15:58:43 | 22 | **A.   It happens pretty quickly.  So something would be --** |
| 15:58:50 | 23 | **you would look for a file that's going across a network, you** |
| 15:58:53 | 24 | **would pull it real quick, do the computation, and then it would** |
| 15:58:56 | 25 | **be passed through.** |

15:58:59  1     Q.   Now, as far as working with the hash values, you said

15:59:02  2   you have a "hash set."

15:59:04  3     A.   Yes.

15:59:05  4     Q.   Can you describe what you mean by that a little bit

15:59:07  5   clearer?

15:59:09  6     **A.   Yes.  So we have -- especially historically, there were**

15:59:17  7   **people reporting what we call illegal files when they received**

15:59:23  8   **their e-mail, so if they -- somebody received an image of child**

15:59:28  9   **porn or a virus or something, they could report that file to**

15:59:32  10  **us.  We had a graphics review team that would review those**

15:59:35  11  **files and images, and when they were discovered to be apparent**

15:59:41  12  **child pornography, we would use those -- we would take a hash**

15:59:44  13  **of that known image and add it to the database.**

15:59:47  14    Q.   All right.  So what you're left with then is the hash

15:59:51  15  value.  You sort of put it through the sausage maker, this

15:59:55  16  algorithm, you get a hash value, from that then you can work

15:59:58  17  off the hash value versus actually working off the image

16:00:00  18  itself?

16:00:01  19    **A.   Yes.**

16:00:01  20    Q.   Does this allow you then not to, I guess, have a whole

16:00:06  21  database full of child pornography images?

16:00:07  22    **A.   That's correct.**

16:00:08  23    Q.   All right.  And this hash value that you have computed

16:00:14  24  on the -- based on the user complaint, is that sort of where

16:00:21  25  your data set began?

16:00:24  1       A.   Yes.

16:00:25  2       Q.   Now, over the course of years, has it increased, has it

16:00:28  3  grown?

16:00:28  4       A.   Yes, it has.

16:00:30  5       Q.   And how -- can you describe for the Court how your data

16:00:32  6  set, your hash set, your database, how has that increased?

16:00:38  7       A.   **We started with zero, and now we have about a hundred**

16:00:42  8  **thousand hashes.**

16:00:45  9       Q.   And are these based on user complaints?

16:00:49  10      A.   Yes.

16:00:50  11      Q.   Any other ways in which you find them?  And let me ask

16:00:53  12  it a little bit more specifically.  Do you get hash sets from

16:00:58  13  other companies?

16:00:59  14      A.   No.

16:00:59  15      Q.   And it seems to me that that would be a very easy thing

16:01:04  16  to do.  Why do you not do that?

16:01:06  17      A.   **Because it represents a liability that we're using**

16:01:10  18  **somebody else's data that we have not produced.**

16:01:13  19      Q.   And I want to make sure that we're a hundred percent

16:01:16  20  clear.  When you guys produce this, what does that involve?

16:01:21  21      A.   **One of our employees actually viewing the image and**

16:01:25  22  **making the hash value.**

16:01:26  23      Q.   All right.  So a person at AOL actually puts eyeballs

16:01:30  24  on a picture?

16:01:32  25      A.   Yes.

16:01:32  1    Q.   And then that is converted into a hash value that you

16:01:37  2    can use for later reference?

16:01:39  3    A.   That's correct.

16:01:40  4    Q.   So then that worker doesn't have to always go back to

16:01:44  5    that picture that they've seen and relive it every time?

16:01:45  6    A.   Yes.

16:01:49  7    Q.   Now, you do not get hash values from other businesses.

16:01:52  8    Do you get hash values from any law enforcement agencies?

16:01:56  9    A.   No.

16:01:56  10   Q.   Is there a reason why you don't get hash values from

16:01:59  11   any law enforcement agencies?

16:02:00  12   A.   Well, for the same reason, we can't verify the

16:02:03  13   integrity of the data, and we don't want to assume the

16:02:06  14   liability of somebody else's work.

16:02:07  15   Q.   Do you get hash values from the National Center for

16:02:13  16   Missing & Exploited Children?

16:02:13  17   A.   No.

16:02:13  18   Q.   So these are the -- the only place that your hash set

16:02:17  19   comes from is from your graphics --

16:02:19  20   A.   Review team.

16:02:20  21   Q.   -- graphics review team there at AOL?

16:02:23  22   A.   Yes.

16:02:24  23   Q.   Now, let's go back to talk about how the IDFP works.

16:02:52  24   Where does that occur in your system?  Where does that kick --

16:02:56  25   where does IDFP kick off in your system?

16:02:59  1      A.   It lives with the mail servers.

16:03:01  2      Q.   You said it lives with the mail servers?

16:03:04  3      A.   Yes.

16:03:05  4      Q.   This is -- is that an automated program?

16:03:08  5      A.   Yes.

16:03:09  6      Q.   Walk us through how that works.  Somebody comes into --

16:03:14  7  on to AOL, logs in, composes an e-mail?

16:03:19  8      A.   Yep.  So if they hit the send button, once the send

16:03:24  9  happens if there's a certain file attachment or embedded

16:03:28  10  object, 'cause you can either have it as an attachment or you

16:03:31  11  can have it in the body of the e-mail, when that -- if a

16:03:35  12  certain file type is detected, an image file, the IDFP process

16:03:40  13  would quickly take a hash of that and compare it to our known

16:03:45  14  hash set.  So it would compare the two, and if it matched, it

16:03:49  15  would do -- it would not send the image and it would do a

16:03:52  16  process, and then if it did not match the hash set, it would

16:03:56  17  pass through and be sent.

16:03:57  18      Q.   And how quickly does that take?

16:03:58  19      A.   Milliseconds.

16:03:59  20      Q.   And as far as where that's going on, is that on your

16:04:03  21  mail servers?

16:04:04  22      A.   Yes.

16:04:05  23      Q.   So this is before it has even left AOL?

16:04:09  24      A.   Yes.

16:04:09  25      Q.   Now, if it is -- I understand if it doesn't ring the

16:04:13  1   bell on any of your hash set, it goes on out and you would

16:04:17  2   never generate an IDFP report relative to this, but if it does

16:04:21  3   ring the bell, does the IDFP -- what does it do then?

16:04:26  4       **A.   A couple of things.  So, first of all, it would**

16:04:30  5   **terminate the user's account, there would be notes left in the**

16:04:34  6   **account as to what happened, then a report gets generated and**

16:04:40  7   **sent to the National Center for Missing & Exploited Children**

16:04:44  8   **that contains the hash value and the image in the e-mail and**

16:04:48  9   **certain other account information that we're required to send.**

16:04:51  10      Q.   All right.  Now, under your -- you've described a

16:04:55  11  number of things there, of closing the account and generating a

16:04:59  12  thing to NCMEC.  I want to stop with the termination of the

16:05:04  13  account.

16:05:05  14      What allows you to run this IDFP program and if they

16:05:10  15  catch an illegal image or an inappropriate image to shut down

16:05:14  16  the account?  What allows you to do that?

16:05:16  17      **A.   Our Terms of Service.**

16:05:17  18      Q.   Can you point out to the Court where it is on there.

16:05:20  19      **A.   Sure.  It's actually on the first page here under Using**

16:05:25  20  **Our Services.**

16:05:28  21      Q.   Would it help if I blow it up on the Elmo a little bit?

16:05:31  22      **A.   No, I got it.  I just need to focus in on it.  So under**

16:05:34  23  **Using Our Services, letter (a), it says, "Comply with**

16:05:38  24  **applicable laws and regulations and not participate in,**

16:05:44  25  **facilitate, or further illegal activities," and then there is**

16:05:47  1    letter (e), "Not engage in an activity that is harmful to us,

16:05:50  2    our customers, advertisers, affiliates, vendors, or anyone

16:05:56  3    else."

16:05:57  4       Q.   All right.   So what you just read was to use our

16:06:03  5    services you must, (a) -- well, would that also fall under (d),

16:06:10  6    "Not post content that contains explicit or graphic depictions

16:06:15  7    of sexual acts"?

16:06:16  8       A.   That would also apply.

16:06:17  9       Q.   All right.   And then you said "not engage in activity

16:06:21  10   that is harmful to us or our customers, advertisers,

16:06:22  11   affiliates, vendors, or anyone else."   (As read.)

16:06:23  12            Who is affected by, and this is -- forgive the sounding

16:06:28  13   of this question, but who is affected by the distribution by

16:06:33  14   somebody attempting to send an image of child pornography on

16:06:36  15   AOL?   Who's affected by that?

16:06:39  16      A.   The children.

16:06:41  17      Q.   Does it affect AOL?

16:06:43  18      A.   It affects our reputation and brand, because we don't

16:06:47  19   want to be considered associated with that activity.

16:06:50  20      Q.   And if it goes to another AOL customer, does it affect

16:06:53  21   that customer?

16:06:54  22      A.   Yes, it would.

16:06:55  23      Q.   Have you ever worked on the graphics review team?

16:06:58  24      A.   Actually, for a short time, I did.

16:07:01  25      Q.   Do you remember the images that you've seen?

16:07:03  1    **A.   I -- they're seared into my brain.   There's no way to**
16:07:06  2    **delete them.**
16:07:07  3    Q.   All right.   Now, I believe you started reading this,
16:07:11  4    and you may have even completed this, "To prevent violations
16:07:14  5    and to enforce this TOS."   Did you read that part?
16:07:18  6    **A.   No, I didn't, but I can.   That's "To prevent violations**
16:07:22  7    **and enforce our Terms of Service and remediate any violations,**
16:07:25  8    **we can take any technical, legal, or other actions that we**
16:07:28  9    **deem, in our sole discretion, necessary and appropriate without**
16:07:32  10   **notice to you."   (As read.)**
16:07:32  11   Q.   And so that is how you guys get to do the IDFP?
16:07:38  12   **A.   Yes.**
16:07:38  13   Q.   And, for that matter, the review of virus and malware
16:07:43  14   and those sort of things?
16:07:45  15   **A.   Yes.**
16:07:51  16   Q.   Now, let's then go -- you said that the IDFP program
16:07:59  17   terminates the account.   Can you describe how that happens.
16:08:04  18   **A.   Again, it's an automated process that issues a cancel**
16:08:09  19   **code, cancels the account.   It bumps the member offline so that**
16:08:14  20   **they're logged out of any services they may be currently logged**
16:08:17  21   **into.   That's it for the customer account.**
16:08:22  22   Q.   Okay.   So if a person's actually using it right then,
16:08:25  23   kachunk and they are offline and don't know what's going on?
16:08:28  24   **A.   Yes.   There may be a slight delay if it happens.   We**
16:08:33  25   **run it in a batch process, so that they could still be online**

16:08:36  1    but they may not be.

16:08:38  2    Q.  So the termination of accounts run in batches of

16:08:43  3    accounts that have rung the bell in the IDFP program?

16:08:46  4    A.  Yes.

16:08:48  5    Q.  Do you always terminate the account before a CyberTip

16:08:53  6    is reported, or do you know?

16:08:54  7    A.  I believe that happens first.  (Nods head.)

16:08:57  8    Q.  Okay.  And when a CyberTip is reported, what happens --

16:09:02  9    what is involved in that process?  Is that also through IDFP?

16:09:05  10   A.  Yes, it's also through IDFP, and it is also automated.

16:09:09  11   Q.  Can you describe for us what happens in that part of

16:09:12  12   it.

16:09:12  13   A.  So we take the image and a copy of the e-mail,

16:09:19  14   including any images that are contained within, and information

16:09:25  15   gets added from the account, like the zip code, phone number,

16:09:31  16   address.  There may be some other data that we add, but I'm not

16:09:35  17   sure of all of it.

16:09:37  18   Q.  Would it help you to look at the CyberTip report?

16:09:40  19   A.  And then also the IP address of where the image -- the

16:09:44  20   member was logged in from.

16:09:45  21   Q.  All right.  The IP address from where the member was

16:09:48  22   logged in there?

16:09:49  23   A.  Yeah, I think that's it.

16:09:50  24   Q.  Okay.  Let me --

16:09:52  25          MR. HART:  Your Honor, if I may approach.  Well,

16:09:53  1   I've already asked you that and you've already told me.  I

16:09:56  2   apologize.

16:09:56  3   BY MR. HART:

16:09:57  4       Q.  I am showing you what has been previously admitted as

16:10:00  5   Government's Exhibit No. 1.  It's the CyberTipline report.  It

16:10:05  6   has National Center for Missing & Exploited Children at the

16:10:09  7   top.  Now, the information that you guys provide, is that in

16:10:14  8   this front part?

16:10:21  9       **A.  Yes.**

16:10:36  10      Q.  All right.   Okay.  And does that go all the way back

16:10:41  11  to -- what did you point to here?

16:10:42  12      **A.  That's just the NCMEC.  That's their section.**

16:10:45  13      Q.  Section B begins the automated information added by

16:10:49  14  NCMEC's systems.  That's at page 4.

16:10:53  15          Now, in what form do you send the information that you

16:11:09  16  captured off of your system, how does that go to NCMEC?

16:11:11  17      **A.  It's basically an e-mail.**

16:11:13  18      Q.  All right.  Who is the e-mail from, though?

16:11:16  19      **A.  AOL.**

16:11:17  20      Q.  So rather than just taking a -- capturing an e-mail

16:11:22  21  that is sent by the user, am I to understand you correctly that

16:11:27  22  you actually create a new e-mail as your report that you send

16:11:32  23  to NCMEC?

16:11:33  24      **A.  Yes.**

16:11:34  25      Q.  Now, does that contain essentially the information that

16:11:37  1    is discovered by the user's account?

16:11:40  2        A.  Yes.

16:11:40  3        Q.  Or I should say through the e-mail that was attempted

16:11:43  4    to be sent through AOL's services?

16:11:47  5        A.  Yes.

16:11:47  6        Q.  Does that include every attachment?

16:11:51  7        A.  Yes.  **It's the whole e-mail as it was intended to be**

16:11:57  8    **sent.**

16:11:57  9        Q.  All right.  But that is something that is generated as

16:12:00  10   a new e-mail from AOL?

16:12:03  11       A.  Yes.

16:12:03  12       Q.  Do we see the address that it comes from in the

16:12:08  13   CyberTip report?

16:12:09  14       A.  Yes.

16:12:09  15       Q.  And where do we see that?  Let me get another copy up

16:12:15  16   here on the screen so that you can follow along with me.  What

16:12:17  17   page are you on?

16:12:18  18       A.  **It's on the third page there.  Right -- yeah.**

16:12:23  19       Q.  So this is page 1?

16:12:24  20       A.  **Yep.**

16:12:30  21       Q.  And where are we looking?

16:12:32  22       A.  **In the -- it would be the top line where it says**

16:12:42  23   **ncmec.receipts@corp.aol.com.**

16:12:47  24       Q.  And does -- as we go through, if you were to read

16:12:52  25   through some of this line -- and I know we see down here

16:12:56  1  idfp@aol.net.   Is there some sort of interchanges where things

16:13:01  2  are racheting through the system?

16:13:02  3  **A.   Yes.   There's a series of servers that to get from the**

16:13:06  4  **e-mail system over to the IDFP system and then the IDFP system**

16:13:16  5  **sending the report out, so it bounds across a whole bunch of**

16:13:21  6  **servers.**

16:13:25  7  Q.   Now, I want to make sure.   Does the IDFP program check

16:13:28  8  the entire e-mail and all the attachments when it runs?

16:13:32  9  **A.   It would check every -- it would check a certain set of**

16:13:36  10  **file types, so if there were, say, ten graphics files attached,**

16:13:42  11  **it would check all ten.**

16:13:43  12  Q.   All right.   And this -- in order for there to be a hash

16:13:48  13  that hits, somebody had to actually put eyeballs on the thing,

16:13:52  14  pre -- at some point in time previously a graphics review

16:13:55  15  analyst actually had to see the image that was hashed?

16:13:58  16  **A.   That created the hash, and then the hash was added to**

16:14:02  17  **the database and then the process would use that hashtag.**

16:14:07  18  Q.   All right.   Now, in terms of doing this IDFP, in using

16:14:26  19  this process, have you received any direction or, like, anybody

16:14:33  20  telling you what to do from law enforcement as it relates to

16:14:37  21  the IDFP program?

16:14:39  22  **A.   Not to my knowledge.**

16:14:46  23  Q.   And as far as telling you what to do with the IDFP

16:14:48  24  program, have you received any direction or instruction from

16:14:54  25  the National Center for Missing & Exploited Children?

16:14:57   1      **A.   Well, no, except for to make sure that we have our**

16:15:01   2   **reports in a certain order that their systems can receive it,**

16:15:04   3   **just technical advice on how they need to receive the reports.**

16:15:09   4      Q.   Gotcha.  But as far as what's contained in those,

16:15:13   5   what's contained in the report that you send to the National

16:15:20   6   Center for Missing & Exploited Children, who has decided what

16:15:23   7   you provide?

16:15:24   8      **A.   I believe there's a legal statute that says that if you**

16:15:29   9   **discover apparent illegal image of child pornography, that you**

16:15:37   10   **must report it to the Center and it must include these data,**

16:15:43   11   **these types of data relating to that.**

16:15:46   12      Q.   And is that 18 U.S.C. 2258A?

16:15:50   13      **A.   I believe so.**

16:15:51   14      Q.   Okay.  But in terms of actually running this program,

16:15:56   15   is there any law that you know that requires you to run IDFP?

16:16:01   16      **A.   No.**

16:16:01   17      Q.   And is there any requirement of exactly what you submit

16:16:06   18   to NCMEC in terms of the information that you provide?

16:16:12   19      **A.   Not that I'm aware of.**

16:16:15   20      Q.   And why is it that AOL undertakes to do this?

16:16:24   21      **A.   To protect their brand and image and so the customers**

16:16:29   22   **will stay with AOL and feel safe and secure.**

16:16:33   23      Q.   Do you know how old your average customer is these

16:16:36   24   days?

16:16:37   25      **A.   I couldn't hazard a guess, but I'm guessing --**

5-19-14  USA v. ACKERMAN  No. 13-10176

100

16:16:42  1          MR. HENDERSON:  I object, hazard a guess.

16:16:45  2          THE COURT:  If you're guessing, then we don't

16:16:48  3  really like guessing.

16:16:55  4          MR. HART:  One moment, Your Honor.

16:17:02  5          (Whereupon, a sotto voce discussion was had among

16:17:03  6          Mr. Hart, Agent Moore, and Ms. Abigail Abraham.)

16:17:21  7  BY MR. HART:

16:17:23  8    Q.  Mr. Phillips, we had some questions earlier about hash

16:17:27  9  values that we asked a different witness.  And there was one I

16:17:31  10  asked you a couple questions about but one that I did not ask

16:17:34  11  you.  The hash values, the hash sets that you create, is there

16:17:40  12  anything about the hash value that degrades over time?

16:17:45  13    **A.  No.**

16:17:46  14    Q.  So if you discovered this image back in -- when did you

16:17:50  15  guys start doing your data set?

16:17:53  16    **A.  The early 2000s.  I'm not sure of the exact date.**

16:18:01  17    Q.  Right.  But if you had discovered an image in 2001,

16:18:03  18  would it be -- would you expect it to be any different today, a

16:18:07  19  different hash value, just because of the passage of time?

16:18:11  20    **A.  No, it would be the same exact value.**

16:18:35  21    Q.  In terms of the images that you send to -- along with

16:18:41  22  the CyberTip report, I want to make sure that we are clear

16:18:45  23  where the images are coming from.  Are they at all derived from

16:18:52  24  your hash set?

16:18:53  25    **A.  No.**

16:18:53  1    Q.  Where do they come from?

16:18:55  2    **A.  It's whatever the member composed in their e-mail.**

16:18:59  3    Q.  So it's derived from that user's content?

16:19:03  4    **A.  Yes.**

16:19:03  5    Q.  And so in order for something to get put into your

16:19:06  6  port, it had to be there with the user?

16:19:09  7    **A.  Right.  It would -- they would -- there would have to**

16:19:13  8  **be a match to a known value in the hash set.**

16:19:17  9    Q.  But what I want to make a hundred percent clear, you

16:19:20  10  don't have a bucket of images and you nail the hash down and

16:19:24  11  you just transfer an image over here that you know comports

16:19:28  12  with that hash?

16:19:29  13    **A.  No.**

16:19:33  14    Q.  And even if you wanted to do that, does AOL maintain

16:19:39  15  any images as part of its hash set?

16:19:43  16    **A.  No.  We just have the hash values.**

16:19:56  17          MR. HART:  All right.  Thank you, sir.  I don't

16:19:57  18  have any further questions for you.

16:19:58  19          THE COURT:  Mr. Phillips, I'm struggling to

16:20:03  20  understand exactly how the hash value concept works, and so I

16:20:07  21  want to ask you a question in terms of an analogy, but if my

16:20:10  22  analogy doesn't make any sense, or if the two examples I give

16:20:15  23  you both miss the mark, I want you to go with the one that's

16:20:19  24  closest.  I don't want you to say no.  I'm just trying to get

16:20:23  25  you to help me out.

| | | |
|---|---|---|
| 16:20:24 | 1 | THE WITNESS:  Okay. |
| 16:20:25 | 2 | THE COURT:  It seems to me that, as I've listened |
| 16:20:27 | 3 | to testimony about the hash values, that there are two |
| 16:20:30 | 4 | different ways that this could work:  one, that AOL could have |
| 16:20:35 | 5 | a comprehensive protocol such that when you analyzed some sort |
| 16:20:42 | 6 | of an image file, your protocol would create a framework |
| 16:20:47 | 7 | whereby you would end up with a hash value identification for |
| 16:20:53 | 8 | that image, but that's not necessarily the same hash value that |
| 16:21:00 | 9 | someone else analyzing it under a different protocol would |
| 16:21:03 | 10 | assign to that image.  The second, I guess, is more like a DNA |
| 16:21:08 | 11 | sample, where if -- presumably, if two chemists analyze a |
| 16:21:14 | 12 | forensic sample to come up with a DNA string of identifiers, |
| 16:21:20 | 13 | they'll come up with the same string of identifiers. |
| 16:21:23 | 14 | Do either one of those analogies come close to how |
| 16:21:28 | 15 | you identify the hash value?  I guess my question is do you |
| 16:21:31 | 16 | assign a hash value to an image, or do you derive that hash |
| 16:21:36 | 17 | value from the image? |
| 16:21:37 | 18 | THE WITNESS:  It's derived from the image. |
| 16:21:40 | 19 | THE COURT:  So if someone completely unassociated |
| 16:21:45 | 20 | with AOL -- well, let me ask another question first.  Do |
| 16:21:53 | 21 | entities other than AOL develop hash values of images? |
| 16:21:57 | 22 | THE WITNESS:  Yes. |
| 16:21:57 | 23 | THE COURT:  And if someone completely unassociated |
| 16:21:59 | 24 | with AOL ran whatever the process is to derive that hash value |
| 16:22:06 | 25 | from an image, would I expect that they would come up with the |

5-19-14  USA v. ACKERMAN  No. 13-10176                    103

| | | |
|---|---|---|
| 16:22:10 | 1 | same hash value AOL did, even though they had never consulted |
| 16:22:13 | 2 | with AOL? |
| 16:22:14 | 3 | THE WITNESS:  Yes. |
| 16:22:15 | 4 | THE COURT:  All right.  Thank you. |
| 16:22:17 | 5 | Mr. Henderson, you may cross-examine. |
| 16:22:18 | 6 | MR. HENDERSON:  Thank you, Your Honor. |
| 16:22:19 | 7 | CROSS-EXAMINATION |
| 16:22:19 | 8 | BY MR. HENDERSON: |
| 16:22:24 | 9 | Q.  If I may start where the Court left off with your |
| 16:22:45 | 10 | question -- with the questions regarding the hash value for |
| 16:22:49 | 11 | just a moment.  There's an MD5 hash value; correct? |
| 16:22:54 | 12 | **A.  Yes.** |
| 16:22:54 | 13 | Q.  And then there's an SH-something hash value; correct? |
| 16:22:58 | 14 | **A.  Yes.** |
| 16:22:58 | 15 | Q.  Different hash values? |
| 16:23:00 | 16 | **A.  Different algorithms.** |
| 16:23:03 | 17 | Q.  Thank you.  Different algorithms, different formulas |
| 16:23:07 | 18 | for calculating that hash value; correct? |
| 16:23:09 | 19 | **A.  Yes.** |
| 16:23:09 | 20 | Q.  The MD5 hash value has 32 digits; correct? |
| 16:23:18 | 21 | **A.  I believe it's a little shorter than that.** |
| 16:23:21 | 22 | Q.  31? |
| 16:23:23 | 23 | **A.  Haven't counted them.  It's a -- say about 30.** |
| 16:23:27 | 24 | Q.  Okay.  And the SH -- what is it? |
| 16:23:31 | 25 | **A.  SHA.  It's commonly referred to as SHA.  There's** |

| | | |
|---|---|---|
| 16:23:34 | 1 | **different -- there's like SHA-5, SHA-11.** |
| 16:23:38 | 2 | Q.   Okay.  Let's take one of them. |
| 16:23:40 | 3 | THE COURT:  How's SHA spelled? |
| 16:23:43 | 4 | THE WITNESS:  S-H-A. |
| 16:23:44 | 5 | THE COURT:  S-H-A. |
| 16:23:45 | 6 | THE WITNESS:  And then there would be dash 5 or |
| 16:23:49 | 7 | dash 11. |
| 16:23:50 | 8 | BY MR. HENDERSON: |
| 16:23:51 | 9 | Q.   SHA-5, how many digits does that have? |
| 16:23:53 | 10 | **A.   Significantly more.   Let's say about a hundred.** |
| 16:23:58 | 11 | Q.   A hundred digits? |
| 16:23:59 | 12 | **A.   Yeah.** |
| 16:23:59 | 13 | Q.   So 30-something up to a hundred; right?  Correct? |
| 16:24:04 | 14 | **A.   Yes.** |
| 16:24:04 | 15 | Q.   And SHA-11, how many digits does that have? |
| 16:24:09 | 16 | **A.   I think it's another couple of bits, so probably like** |
| 16:24:13 | 17 | **another, I think, another 46.** |
| 16:24:16 | 18 | Q.   Another 46 on top of the hundred? |
| 16:24:18 | 19 | **A.   Yeah.** |
| 16:24:18 | 20 | Q.   Okay.  So the MD5 algorithm generates a hash value of |
| 16:24:25 | 21 | about 30 digits, you say? |
| 16:24:27 | 22 | **A.   Yes.** |
| 16:24:27 | 23 | Q.   The SHA-5 generates a hash value of about a hundred |
| 16:24:35 | 24 | digits; is that right? |
| 16:24:37 | 25 | **A.   Yes.** |

| | | |
|---|---|---|
| 16:24:37 | 1 | Q.  And the SHA-11 generates a hash value of 140 digits, |
| 16:24:45 | 2 | approximately? |
| 16:24:46 | 3 | **A.  (Nods head.)** |
| 16:24:46 | 4 | Q.  Is that right? |
| 16:24:47 | 5 | **A.  Yes.** |
| 16:24:48 | 6 | Q.  Okay.  So referring back to the Court's analogy |
| 16:24:55 | 7 | regarding the calculation of the hash value and the DNA |
| 16:25:03 | 8 | example, if you take the MD5 hash value for a photograph and |
| 16:25:12 | 9 | you compare it to the SHA-5 and the SHA-11, you're going to |
| 16:25:22 | 10 | have three different hash values; correct? |
| 16:25:25 | 11 | **A.  Yes.** |
| 16:25:26 | 12 | Q.  Just because the numbers are bigger; right? |
| 16:25:29 | 13 | **A.  Right.  Well, the algorithms are different, so they** |
| 16:25:32 | 14 | **calculate the value in a certain way.  But if person A took** |
| 16:25:35 | 15 | **that same image file and did one hash value and then you gave** |
| 16:25:40 | 16 | **it to a professor at a university and they were given the same** |
| 16:25:43 | 17 | **image file that was not changed one bit, they would get the** |
| 16:25:48 | 18 | **same hash value.** |
| 16:25:49 | 19 | Q.  If they're using the same algorithm? |
| 16:25:51 | 20 | **A.  Well, it would be a different algorithm -- sorry.** |
| 16:25:55 | 21 | **Every -- each different algorithm that's used produces a unique** |
| 16:26:02 | 22 | **value.** |
| 16:26:02 | 23 | Q.  Exactly. |
| 16:26:03 | 24 | **A.  So MD5 does it using one algorithmic formula, SHA-5** |
| 16:26:09 | 25 | **uses another algorithmic form, but if you take the same SHA-5** |

16:26:14  1    **and the same image file, anybody who runs that algorithm will**

16:26:18  2    **get the same value.**

16:26:19  3        Q.   Yeah, using the same algorithm.

16:26:21  4        **A.   Yes.**

16:26:21  5        Q.   Okay.

16:26:21  6        **A.   So it's not -- like you can't compare MD5 to SHA-5 --**

16:26:21  7        Q.   Right.

16:26:26  8        **A.   -- apples and oranges.**

16:26:27  9        Q.   Apples and oranges; right?  Correct?

16:26:31  10       **A.   Yes.**

16:26:31  11       Q.   Okay.  So again following the Court's question, let's

16:26:39  12   take a photograph of my dog.  A photograph of my dog is going

16:26:42  13   to have different numbers depending upon which algorithm you

16:26:48  14   use when you're calculating the hash value for that picture?

16:26:51  15       **A.   Yes.**

16:26:52  16       Q.   That picture does not have just one hash value?

16:27:00  17       **A.   I'm --**

16:27:01  18       Q.   It depends on which algorithm you use?

16:27:04  19       **A.   Well, yes.**

16:27:07  20       Q.   How many algorithms are there?

16:27:10  21       **A.   I'm not a math major.  I can't -- I'm not sure.**

16:27:14  22       Q.   Well, there's at least three; right?

16:27:17  23       **A.   Yes, certainly, but there could be an unlimited amount**

16:27:22  24   **of algorithms that I'm not aware of.**

16:27:25  25       Q.   Okay.  There could be an unlimited number of algorithms

5-19-14   USA v. ACKERMAN   No. 13-10176

107

| | | |
|---|---|---|
| 16:27:28 | 1 | used to calculate hash values on that one picture of a dog; |
| 16:27:32 | 2 | right? |
| 16:27:32 | 3 | **A.  Yes.** |
| 16:27:32 | 4 | Q.  So you could have an infinite number of hash values and |
| 16:27:36 | 5 | each one of those hash values is going to be different for each |
| 16:27:39 | 6 | different algorithm? |
| 16:27:41 | 7 | **A.  Yes.** |
| 16:27:48 | 8 | Q.  I know you're not a fingerprint forensics; correct? |
| 16:27:50 | 9 | **A.  Correct.** |
| 16:27:50 | 10 | Q.  But you and I have a fingerprint; right? |
| 16:27:52 | 11 | **A.  We sure do.** |
| 16:27:53 | 12 | Q.  And as far as we know, my fingerprint is going to be |
| 16:27:57 | 13 | different from your fingerprint; right? |
| 16:27:58 | 14 | **A.  They better be.** |
| 16:27:59 | 15 | Q.  And there's no other person on this world, as far as we |
| 16:28:03 | 16 | know, that has the same fingerprint that you have; is that |
| 16:28:07 | 17 | right? |
| 16:28:07 | 18 | **A.  Yes.** |
| 16:28:08 | 19 | Q.  Okay.  And that's not the same for hash values 'cause |
| 16:28:13 | 20 | there could be an infinite number of fingerprints? |
| 16:28:15 | 21 | **A.  No, it actually is.  If you use the same hash -- same** |
| 16:28:21 | 22 | **algorithm, but we're not using different algorithms, we're only** |
| 16:28:25 | 23 | **using one algorithm here and it doesn't matter how you run the** |
| 16:28:30 | 24 | **algorithm, if the data set has not changed, that algorithm will** |
| 16:28:33 | 25 | **produce the same result each time.** |

16:28:35  1      Q.   Right, right.  And what you're saying is --

16:28:37  2      **A.   And commonly we only use the MD5 hash algorithm to do**

16:28:42  3  **this process.**

16:28:43  4      Q.   I understand, I understand.  Other companies use

16:28:47  5  different algorithms; right?

16:28:49  6      **A.   Yes.**

16:28:49  7      Q.   Microsoft uses a different?

16:28:52  8      **A.   They may.**

16:28:52  9      Q.   You know PhotoDNA; right?

16:28:56  10     **A.   Yes.**

16:28:56  11     Q.   That's not the same as IDFP, is it?

16:28:59  12     **A.   No, it's not.**

16:28:59  13     Q.   So fair to say they use a different algorithm?

16:29:02  14     **A.   Yes.**

16:29:02  15     Q.   Okay.  Going back to the fingerprint analysis, the

16:29:10  16  fingerprint for the dog -- the picture of my dog, if you use

16:29:16  17  MD5, is always going to be the same; right?

16:29:19  18     **A.   Yes.**

16:29:20  19     Q.   And it's always going to be different from any other

16:29:25  20  fingerprint created by a different algorithm; correct?

16:29:29  21     **A.   It will be the same for each algorithm that you use.**

16:29:32  22     Q.   But different from the other algorithms; correct?

16:29:36  23     **A.   I'm not sure I understand.  You're actually confusing**

16:29:40  24  **me here.**

16:29:41  25     Q.   I don't mean to do that.  Different number fingerprint

16:29:48   1    for each algorithm; correct?

16:29:51   2        **A.   Well, it's actually a unique fingerprint for each**

16:29:55   3    **algorithm.**

16:29:56   4        Q.   Exactly.  But it's different between the infinite

16:30:01   5    number of algorithms; correct?  You're not going to have the

16:30:05   6    same 16 numbers when you've got a hundred numbers or 140?

16:30:10   7              MR. HART:  Your Honor, I'm going to object as to

16:30:12   8    relevance and argumentative.  I think we've covered this -- and

16:30:16   9    cumulative.  We've covered this ground, and I don't understand

16:30:18  10    the point of asking questions about infinite numbers of SHA

16:30:23  11    values when he's clearly identified they use MD5.

16:30:26  12              THE COURT:  Mr. Henderson, I want to give you

16:30:30  13    broad leeway in your examination, so I'm reluctant to sustain

16:30:38  14    the objection, but it seems to me that what you're asking the

16:30:41  15    witness is, well, if I take a fingerprint of the suspect and

16:30:45  16    then I take a DNA analysis of the suspect, those will be

16:30:49  17    different, the fingerprint and the DNA analysis will be

16:30:51  18    different.  And that's true, but it seems to me highly

16:30:54  19    irrelevant.

16:30:55  20              If you can -- if you've got more in this inquiry

16:30:59  21    line that you can focus in that's relevant for what the process

16:31:04  22    was that AOL used here, I'm going to allow you to do that.  But

16:31:08  23    right now it seems to me that we're -- your line of inquiry is

16:31:12  24    really somewhat irrelevant.

16:31:16  25              MR. HENDERSON:  I think I made my point, Your

16:31:18   1    Honor.

16:31:18   2              THE COURT:  That's fine.  If you're ready to go

16:31:19   3    on, that's certainly fine with me.

16:31:21   4              MR. HENDERSON:  And I would simply, in responding

16:31:23   5    to the Court's analogy, respectfully submit that when we're

16:31:30   6    talking fingerprints, there's a class or a category of

16:31:38   7    fingerprints that are the hash values, and all we're pointing

16:31:42   8    out is that there are different fingerprints for the same

16:31:46   9    picture.

16:31:46   10             THE COURT:  And my fingerprint on my index finger

16:31:49   11   is different than the one on my thumb.

16:31:51   12             MR. HENDERSON:  Exactly.

16:31:52   13             THE COURT:  Which is maybe like a different

16:31:54   14   algorithm.  All metaphors break down at some point, and we're

16:31:59   15   probably past that point.

16:31:59   16             MR. HENDERSON:  Thank you, Your Honor.  Thank you.

16:32:04   17   BY MR. HENDERSON:

16:32:05   18      Q.  Let's talk about -- first let's talk about the IDFP

16:32:10   19   program and how that works.

16:32:11   20      **A.  Okay.**

16:32:14   21      Q.  You know a gentleman -- and I'll mispronounce his

16:32:16   22   name -- by the name of Colcolough?

16:32:20   23      **A.  That's exactly right.  That's how he says it.**

16:32:23   24      Q.  Okay.  A legend at AOL; correct?

16:32:27   25      **A.  Yes, he's infamous.**

16:32:32  1      Q.   Okay.  And was he there when you first started or did

16:32:34  2   he come after you started?

16:32:35  3      **A.   I think he came a little bit after me, but he was**

16:32:37  4   **actually in charge of the graphics review team for a long time.**

16:32:41  5      Q.   Okay.  And is it fair to say that he's the guy who

16:32:46  6   created IDFP?

16:32:47  7      **A.   I think he championed it.  I wouldn't say that he**

16:32:51  8   **created it.**

16:33:02  9      Q.   Do you know who created it?

16:33:03  10     **A.   I believe there's not any one person.  You know, Don**

16:33:06  11  **was certainly involved.  We had a team of engineers that were**

16:33:09  12  **involved.  John Ryan and Chris Bubb, some attorneys that worked**

16:33:13  13  **for AOL, they were also involved.  So there was, you know, a**

16:33:16  14  **business need identified and stuff happening on the service,**

16:33:20  15  **and everybody got together and this program was the result of**

16:33:24  16  **that work.**

16:33:29  17     Q.   And you mentioned John Ryan.  Was he there when you

16:33:32  18  started?

16:33:33  19     **A.   Yes.**

16:33:34  20     Q.   And he was in the legal department?

16:33:36  21     **A.   That's correct.**

16:33:38  22     Q.   And he's somebody that you worked with in addition to

16:33:41  23  Mr. Colcolough?

16:33:43  24     **A.   Yes.**

16:33:59  25     Q.   I placed a book of exhibits in front of you, and we're

16:34:05   1   going to go through those if you don't mind.  I'd like to start

16:34:10   2   just with Mr. Colcolough to lay the groundwork.  Referring you

16:34:14   3   to what I've marked as Exhibit L, Mr. Colcolough's biography.

16:34:24   4   Do you see the tabs?  There you are.  When you come to that, if

16:34:36   5   you could just look at that briefly.

16:34:38   6             MR. HART:  Your Honor, I'm going to object as to

16:34:41   7   the introduction of another individual's resume would appear to

16:34:46   8   be inappropriate through this witness.

16:34:48   9             THE COURT:  Well, it may be, but let's see where

16:34:50   10  this examination goes, and then we can make that determination.

16:34:52   11            MR. HENDERSON:  Thank you, Your Honor.

16:34:54   12  BY MR. HENDERSON:

16:34:54   13    Q.  If you could look at it just briefly and tell me

16:34:57   14  whether or not, based upon your knowledge of Mr. Colcolough,

16:35:00   15  whether that's an accurate description of his background.

16:35:06   16            THE COURT:  If the witness knows.

16:35:08   17            MR. HENDERSON:  Yes, of course.

16:35:14   18  BY MR. HENDERSON:

16:35:15   19    Q.  You know Mr. Colcolough and you worked with him?

16:35:18   20    **A.  Yes, to the best of my knowledge, that is accurate.**

16:35:45   21    Q.  Thank you.

16:35:46   22            MR. HENDERSON:  Your Honor, we'd move for the

16:35:47   23  admission of Defendant's Exhibit L.

16:35:54   24            THE WITNESS:  As it relates to AOL.  I mean --

16:35:56   25            THE COURT:  Right, I understand.  But,

16:35:59  1   Mr. Henderson, a few very different things here.  If you want

16:36:02  2   to ask the witness if that generally is -- that generally

16:36:05  3   relates to what he understands Mr. Colcolough's background to

16:36:09  4   be, that's one thing, but I don't think you've laid a

16:36:12  5   foundation with this witness that he can actually verify, for

16:36:16  6   admissibility purposes, that this resume is accurate as to

16:36:20  7   Mr. Colcolough.  I think those are two very different issues.

16:36:23  8   So I'm not sure why you want to have this admitted, but at this

16:36:26  9   point I don't think you've laid a foundation to do that.  And,

16:36:29  10  frankly, I'm skeptical that you can, unless this witness is

16:36:35  11  intimately familiar and best friends or professional agent or

16:36:41  12  something with this Mr. Colcolough.

16:36:44  13  BY MR. HENDERSON:

16:36:45  14      Q.   When you testified earlier that you believe it's

16:36:46  15  accurate --

16:36:47  16      **A.   I was referring to his, like, job title.**

16:36:50  17      Q.   I'm sorry, his what?

16:36:51  18      **A.   His job title and his -- like the first bullet point**

16:36:56  19  **that you have, Director of Investigations and Online Security,**

16:37:02  20  **I believe that was his last job title at AOL, and that he had**

16:37:07  21  **managed the Network Security Investigations Department, that**

16:37:10  22  **would be our graphics review team, for the eight years prior to**

16:37:13  23  **assuming that title, which is accurate.  The rest of the bullet**

16:37:17  24  **points I cannot speak to because I'm not that familiar with his**

16:37:21  25  **educational background.**

16:37:29  1    Q.   Okay.  Well, based upon your work with him, was he

16:37:38  2  involved, heavily involved, in training and providing seminars,

16:37:43  3  putting on seminars and instruction outside of AOL?

16:37:46  4    **A.   Well, I believe he actually went out on behalf of AOL**

16:37:54  5  **to educate law enforcement as to what our business is and how**

16:37:58  6  **to interact with our business efficiently and in a timely**

16:38:02  7  **manner.**

16:38:02  8    Q.   Okay.  He went out and he taught law enforcement how to

16:38:08  9  use what you had, use your systems, what was available through

16:38:12  10  AOL?

16:38:12  11   **A.   Right, how to use the software, how to navigate on the**

16:38:16  12  **Internet through our web properties, that sort of thing, yes.**

16:38:19  13   Q.   I think there was reference in one item to hidden eggs.

16:38:23  14  Do you know what that refers to?

16:38:25  15   **A.   I believe he was referring to our client software and**

16:38:34  16  **different things that that would produce on -- forensically on**

16:38:39  17  **a machine, a PC, or that would be useful for law enforcement.**

16:38:46  18   Q.   So basically teaching them how to find things that

16:38:50  19  might not otherwise be --

16:38:52  20   **A.   Obvious.**

16:38:52  21   Q.   -- apparent or obvious?

16:38:55  22   **A.   Yes.**

16:38:55  23   Q.   I apologize for the analogy, my computer game

16:38:58  24  experience is very limited, but I remember a long time ago

16:39:01  25  Mario Brothers, you hit on things and all of a sudden something

**JOHANNA L. WILKINSON, CSR, CRR, RMR**
U.S. District Court, 401 N. Market, Wichita, KS 67202
(316) 315-4334

16:39:05  1   pops up that you didn't know was there.  Is that kind of what
16:39:08  2   we're talking about?
16:39:09  3       **A.   In a forensic sense, maybe a little sketchy, but kinda.**
16:39:13  4       Q.   Okay.  Based upon your experience with him there at
16:39:22  5   AOL, was he involved in testifying in court?
16:39:28  6       **A.   Yes.**
16:39:29  7       Q.   In fact, he was the go-to person, wasn't he, to
16:39:32  8   testify?
16:39:32  9       **A.   He was one of 'em, yeah.  I'd be another.  We had --**
16:39:38  10      **there was a bit of technical experts over the years.**
16:39:53  11      Q.   And referring you to Defendant's Exhibit C, which
16:40:00  12  was -- which we've described as Mr. Colcolough's LinkedIn
16:40:10  13  profile, do you see that?
16:40:11  14      **A.   Yes.**
16:40:11  15      Q.   Do you know what LinkedIn is?
16:40:13  16      **A.   Yes.**
16:40:13  17      Q.   Do you have a LinkedIn profile yourself?
16:40:16  18      **A.   I do.**
16:40:17  19      Q.   And have you looked at Mr. Colcolough's LinkedIn
16:40:21  20  profile before?
16:40:21  21           MR. HART:  Your Honor, I'm going to object as to
16:40:23  22  relevance as well as if he's going to be moving to admit this.
16:40:28  23  I don't see how there's any foundation laid for this or could
16:40:32  24  possibly be.
16:40:33  25           THE COURT:  Mr. Colcolough sounds like a

16:40:35  1   fascinating individual, Mr. Henderson, but why are we talking

16:40:37  2   about him?

16:40:37  3           MR. HENDERSON:  I just have a reference here that

16:40:39  4   I was going to ask him about, whether he knew -- whether this

16:40:44  5   was an accurate statement.

16:40:45  6           THE COURT:  But why do I care, in the context of

16:40:48  7   this hearing?

16:40:49  8           MR. HENDERSON:  Well --

16:40:50  9           THE COURT:  How is it relevant to why we're here

16:40:52  10  today?

16:40:52  11          MR. HENDERSON:  Well, one of the -- one of the

16:40:54  12  issues, we submit, Your Honor, is the extent to which AOL was

16:41:02  13  operating as a government actor.

16:41:06  14          THE COURT:  I understand your legal theory on

16:41:08  15  that.

16:41:08  16          MR. HENDERSON:  And Mr. Colcolough's involvement

16:41:12  17  with law enforcement in representing AOL and interacting with

16:41:17  18  law enforcement is relevant.  That's one area.

16:41:20  19          THE COURT:  Well, I'm going to allow you to use

16:41:23  20  the exhibits.  I again am skeptical that you can actually admit

16:41:27  21  them as to genuineness, but you can lay a foundation and do it

16:41:32  22  with this witness, but if you want to use them to refresh my

16:41:36  23  recollection he might have as to Mr. Colcolough's activities

16:41:38  24  regarding law enforcement while they worked together at AOL, I

16:41:41  25  will let you do it within those parameters.

16:41:43   1          MR. HENDERSON:  Thank you, Your Honor.  Thank you.

16:41:46   2   And if I may, Your Honor, the next question I have actually

16:41:49   3   refers to his -- Mr. Colcolough's work on the IDFP.

16:41:56   4   BY MR. HENDERSON:

16:41:56   5      Q.   Referring you, if I may, to the second page of

16:41:59   6   Defendant's Exhibit C, there at the top under -- well, I guess

16:42:09   7   it's the fifth bullet point, "Envisioned and created."  Do you

16:42:15   8   see that?  It's hard to read.  Do you see that one bullet

16:42:33   9   point?

16:42:33  10      **A.   Yes.**

16:42:34  11      Q.   Would you agree that he "envisioned and created a

16:42:38  12   revolutionary Image Detection and Filtering Process (IDFP) that

16:42:43  13   is now used industry-wide to proactively intercept child

16:42:47  14   pornography and to report offenders to law enforcement"?

16:42:51  15      **A.   That may be a little puffed up.**

16:42:53  16      Q.   A little what?

16:42:54  17      **A.   As I previous -- that would be a little puffed up.**

16:42:58  18      Q.   How so?

16:42:58  19      **A.   As I previously stated, I believe he worked on the team**

16:43:01  20   **that developed that, but I don't think he was the visionary.  I**

16:43:09  21   **would take issue, take umbrage, with that use of that word.**

16:43:12  22   **But, I mean, this is more of like a resume context, so that's**

16:43:15  23   **kind of what you want to do in that arena, but I would say he**

16:43:20  24   **was one of the people that were involved in the development of**

16:43:23  25   **the IDFP process.**

16:43:23  1      Q.   Is there anyone who you would identify who was more of

16:43:26  2   an expert on IDFP than he is?

16:43:33  3      **A.   It's hard to say.  I don't think so, 'cause I think it**

16:43:40  4   **is -- it is really a collaborative effort, 'cause there was**

16:43:45  5   **identified a business need to protect the network and**

16:43:49  6   **restore -- retain our brand image, and there was engineers who**

16:43:54  7   **said, oh, I have a perfect solution that we can try out, let's**

16:43:58  8   **try to see if this works, and, you know, the IDFP probably**

16:44:01  9   **wasn't the first thing that they tried, but, you know, they**

16:44:05  10  **quickly figured out that it would happen, but I -- I can't**

16:44:11  11  **point to any one person.  I mean, I know who those folks were**

16:44:15  12  **that worked on it, but I would say he was one of a team of five**

16:44:19  13  **or ten people.**

16:44:19  14     Q.   And were you one of the people?

16:44:22  15     **A.   No, but I worked with everybody, so I knew what was**

16:44:25  16  **going on.**

16:44:25  17     Q.   Okay.  So you weren't directly involved in this group?

16:44:28  18     **A.   I may have done some testing at the time and what have**

16:44:31  19  **you, but I, you know, I wasn't directly involved.**

16:44:38  20     Q.   Okay.  And would you agree that the IDFP system is used

16:44:51  21  industry-wide?

16:44:54  22     **A.   Well, I think that ID -- I'm not sure what that means.**

16:45:02  23  **I mean, we certainly don't share our hash set with others.**

16:45:05  24  **Actually, I'm sorry, I misspoke.  We do share our hash set with**

16:45:09  25  **others, but I think the idea of using hashes to identify**

16:45:13  1  **content and files online is used by other providers.**

16:45:22  2    Q.   Okay.  Not always the case.  That's evolved over time,

16:45:26  3  hasn't it?

16:45:26  4    **A.   Yes, I think we were the first to do such a program.**

16:45:30  5    Q.   Okay.  And would you also agree that it's used to

16:45:35  6  intercept child pornography and report offenders to law

16:45:42  7  enforcement?

16:45:42  8    **A.   Yes.**

16:45:43  9    Q.   I mean, that's what it's there for; right?

16:45:46  10   **A.   Yes.**

16:45:51  11   Q.   Referring you, if I may, to first Defendant's Exhibit A

16:45:56  12  and then B.  Starting with Defendant's Exhibit A, do you

16:46:11  13  generally recognize what that is?  What is that?

16:46:18  14   **A.   It looks like a presentation that was used for**

16:46:24  15  **explaining AOL's technology and services.**

16:46:29  16   Q.   And going to the very last page of Defendant's

16:46:34  17  Exhibit A, do you recognize the person identified there?

16:46:38  18   **A.   You said the last page?**

16:46:40  19   Q.   Yes, sir, of Defendant's Exhibit A.

16:46:46  20   **A.   Yes.**

16:46:46  21   Q.   Is that Mr. Colcolough?

16:46:48  22   **A.   Yes.**

16:46:49  23   Q.   Okay.  Did you yourself go out on trips to teach law

16:47:02  24  enforcement how to use AOL?

16:47:04  25   **A.   I have.**

16:47:05  1      Q.   Okay.  And have you used a similar presentation,

16:47:10  2  similar to what's shown in Defendant's Exhibit A?

16:47:13  3      **A.   Similar, but maybe not as lengthy.**

16:47:16  4      Q.   Okay.   And were you doing that in 2009?  This one's

16:47:31  5  dated 2009.  Were you also doing that in 2009?

16:47:34  6      **A.   I don't recall.   But I did it more earlier than that.**

16:47:39  7      Q.   Okay.  Let's go through it, if I may.  It's hard to

16:47:51  8  read the page numbers, I know.  Referring you to what appears

16:48:20  9  to be -- well, it's around 8 or 9, but it looks like this

16:48:25  10  (indicating).  Do you see that?

16:48:55  11      Counting back from another page I can read, it looks

16:48:58  12  like it's page 13.

16:49:06  13      **A.   Got it.**

16:49:07  14      Q.   Okay.  Does that look familiar?

16:49:14  15      **A.   Yes.**

16:49:14  16      Q.   Okay.  Is that a slide that you may have used in your

16:49:17  17  own presentations?

16:49:20  18      **A.   I probably used one similar, but not this exact one.**

16:49:23  19      Q.   Okay.  And is it fair to say that what this slide shows

16:49:27  20  in the presentation is how the host connects with AOL clients

16:49:34  21  in the normal flow of e-mail traffic?

16:49:38  22      **A.   Yes, but I want to caution you that there are other**

16:49:42  23  **ways to send e-mail that don't involve the client software.**

16:49:45  24      Q.   Okay.  But if I'm sending an e-mail to a relative on

16:49:51  25  AOL, my e-mail, as it shows here, goes to the AOL host, the

5-19-14   USA v. ACKERMAN   No. 13-10176

121

16:50:01   1   server; is that right?

16:50:02   2       **A.**   **Yes.**

16:50:02   3       Q.   And then it goes from the server to the recipient?

16:50:06   4       **A.**   **It goes out to the Internet and then to the recipient.**

16:50:09   5       Q.   Okay.  Thank you.  All right.  So it goes from my

16:50:13   6   computer to the AOL computer to the Internet to the recipient?

16:50:19   7       **A.**   **To the recipient, yes.**

16:50:21   8       Q.   Is that correct?

16:50:22   9       **A.**   **Basically, yes.**

16:50:23   10       Q.   Okay.  Now, turning to the next page, there's a

16:50:30   11   schematic description entitled IDFP.  Do you see that?

16:50:37   12       **A.**   **Yes.**

16:50:38   13       Q.   And is that also a slide that you've used?

16:50:42   14       **A.**   **No.  I would -- I never mentioned the IDFP process.**

16:50:46   15       Q.   You never taught anyone about the IDFP process?

16:50:49   16       **A.**   **No.**

16:50:49   17       Q.   Why is that?

16:50:51   18       **A.**   **It wasn't really relevant to what we were doing.**

16:50:55   19       Q.   Okay.

16:50:56   20       **A.**   **Mainly my focus was to explain the technology on a high**

16:51:02   21   **level to law enforcement and how it's used and how it can be**

16:51:06   22   **utilized by the public and how to get in touch with the legal**

16:51:14   23   **department to help their investigations.**

16:51:17   24       Q.   Okay.  Looking at this slide that's entitled IDFP, do

16:51:26   25   you understand it?

| | | |
|---|---|---|
| 16:51:33 | 1 | **A.   Sort of.  Some of it's a little fuzzy to read.** |
| 16:51:36 | 2 | Q.   Well, let's -- if you could turn to Defendant's |
| 16:51:45 | 3 | Exhibit B and it's the third page.  Do you see the same |
| 16:51:47 | 4 | schematic, only much clearer? |
| 16:51:54 | 5 | **A.   Three pages prior --** |
| 16:51:56 | 6 | Q.   No, no, no. |
| 16:51:57 | 7 | **A.   -- or after?** |
| 16:51:58 | 8 | Q.   Defendant's Exhibit B, the next exhibit, sorry.  Does |
| 16:52:41 | 9 | that appear to be the same schematic? |
| 16:52:45 | 10 | **A.   Just about -- except for the writing is kind of** |
| 16:52:50 | 11 | **obscured on the one image in the upper left hand -- or upper** |
| 16:52:53 | 12 | **right-hand corner.** |
| 16:52:54 | 13 | Q.   Right.  We'll get to that.  And, again, this |
| 16:52:58 | 14 | Defendant's Exhibit B, do you recognize on the first page there |
| 16:53:18 | 15 | the reference to the Third World Congress?  Do you know whether |
| 16:53:25 | 16 | Mr. Colcolough made a presentation to them? |
| 16:53:27 | 17 | **A.   I have no idea.** |
| 16:53:30 | 18 | Q.   All right.  Well, with reference to what's shown in |
| 16:53:33 | 19 | Defendant's Exhibit B, does this fairly describe the IDFP |
| 16:53:43 | 20 | program or IDFP progress, as you understand it? |
| 16:53:47 | 21 | **A.   It looks to be the general process, although I'm not** |
| 16:53:50 | 22 | **sure with the one thing up in the corner that I mentioned says,** |
| 16:53:54 | 23 | **so I'm not sure about that part, but everything else looks like** |
| 16:53:57 | 24 | **the basic process.** |
| 16:54:00 | 25 | Q.   Okay.  And in this schematic then it shows the ISP |

| | | |
|---|---|---|
| 16:54:09 | 1 | user.  That would be me, let's say, in the case where I'm |
| 16:54:12 | 2 | sending an e-mail to a family member, and the e-mail goes to |
| 16:54:19 | 3 | the AOL server; correct? |
| 16:54:21 | 4 | **A.   Yes.** |
| 16:54:23 | 5 | Q.   And instead of sending it to the Internet under the |
| 16:54:31 | 6 | IDFP program, the server sends it to a subsystem, the IDFP |
| 16:54:38 | 7 | subsystem; correct? |
| 16:54:43 | 8 | **A.   Well, it's actually part of the -- it's not really a** |
| 16:54:46 | 9 | **separate system.  All mail gets scanned in some way as it comes** |
| 16:54:52 | 10 | **in or goes out --** |
| 16:54:53 | 11 | Q.   Okay. |
| 16:54:53 | 12 | **A.   -- for various things.  So the IDFP is actually part of** |
| 16:54:59 | 13 | **the mail system.  I think it's just easier to visualize the** |
| 16:55:03 | 14 | **process flow that way, but it's actually baked into the mail** |
| 16:55:07 | 15 | **system.** |
| 16:55:07 | 16 | Q.   Okay.  And clearly all mail, all mail, whatever it is, |
| 16:55:15 | 17 | comes first into the server, that first big box; right? |
| 16:55:19 | 18 | **A.   Yes.** |
| 16:55:20 | 19 | Q.   And then it's screened in that big box; right, for |
| 16:55:27 | 20 | images? |
| 16:55:28 | 21 | **A.   It scans the image files.  It takes a hash of the image** |
| 16:55:33 | 22 | **files and matches it against the known data set.** |
| 16:55:37 | 23 | Q.   We're not there yet. |
| 16:55:38 | 24 | **A.   Okay.** |
| 16:55:40 | 25 | THE COURT:  Well, I'm wondering if we're going to |

16:55:42  1   get there in the next three minutes.

16:55:44  2          MR. HENDERSON:  You're right, Your Honor.  This is

16:55:46  3   going to take some time.

16:55:47  4          THE COURT:  Well, then why don't we do it

16:55:50  5   tomorrow.

16:55:50  6          MR. HENDERSON:  Thank you, Your Honor.

16:55:51  7          THE COURT:  I think we'll go ahead and take an

16:55:52  8   evening recess at this point.  We'll reconvene tomorrow morning

16:55:55  9   at 9:00 o'clock.

16:55:59  10         How many more witnesses do you anticipate calling,

16:56:01  11  Mr. Hart?

16:56:02  12         MR. HART:  Your Honor, I would expect to call John

16:56:08  13  Shehan, who's with the National Center for Missing & Exploited

16:56:12  14  Children, and I want to think about whether or not we need to

16:56:15  15  hear from Detective Wright.  Based on the information that

16:56:18  16  Agent Moore has provided, I don't know that her testimony would

16:56:21  17  really add anything.

16:56:28  18         THE COURT:  So you're saying one or maybe two more

16:56:30  19  witnesses?

16:56:31  20         MR. HART:  Correct.

16:56:32  21         THE COURT:  All right.  And, Mr. Henderson, I know

16:56:36  22  at one point you'd anticipated or at least suggested to me that

16:56:40  23  you might call your client.  Obviously, that's a decision that

16:56:47  24  you and he would make.  Do you anticipate having any other

16:56:50  25  witnesses that you would call?

| | | |
|---|---|---|
| 16:56:50 | 1 | MR. HENDERSON: Your Honor, I do, but they'll be |
| 16:56:52 | 2 | very brief. I don't think they'll, combined, take more than |
| 16:56:56 | 3 | about 45 minutes. |
| 16:56:57 | 4 | THE COURT: Are we going to be finished by noon |
| 16:56:59 | 5 | tomorrow? |
| 16:57:01 | 6 | CLERK NALL: Originally started at 8:30, too. |
| 16:57:04 | 7 | THE COURT: We can do that, too. |
| 16:57:06 | 8 | CLERK NALL: Okay. |
| 16:57:06 | 9 | THE COURT: Nevertheless, even if we start at 8:30 |
| 16:57:09 | 10 | tomorrow, will we be finished by noon? |
| 16:57:13 | 11 | MR. HENDERSON: If we are, it will be close, Your |
| 16:57:15 | 12 | Honor. I -- I think there's a good chance that we will. |
| 16:57:22 | 13 | THE COURT: What time are my first hearings in the |
| 16:57:24 | 14 | afternoon; Stephanie, do you know? You know, what, I can tell |
| 16:57:27 | 15 | right here. 1:00 o'clock. I guess what I'm asking is |
| 16:57:49 | 16 | whether -- oh, no, no, no, I'm looking at the wrong day, 2:00 |
| 16:57:53 | 17 | o'clock. I'm looking at the wrong day. So if we're not |
| 16:57:55 | 18 | finished by noon, you think we'll be close? |
| 16:57:57 | 19 | MR. HENDERSON: I think so, Your Honor. |
| 16:57:58 | 20 | THE COURT: And, actually, I'd scheduled to start |
| 16:58:01 | 21 | at 11:30 because I had a conflict then as well, but I can move |
| 16:58:05 | 22 | or avoid that one if I have to. |
| 16:58:11 | 23 | All right. We're going to reconvene at 8:30. |
| 16:58:14 | 24 | It's going to be my intent to go until we're finished, even if |
| 16:58:20 | 25 | we push past the 12:00 hour. |

| | | |
|---|---|---|
| 16:58:25 | 1 | MR. HART:  Your Honor, if I may.  John Shehan, he |
| 16:58:31 | 2 | has a previously scheduled engagement on Wednesday, and as a |
| 16:58:35 | 3 | result his flight departs Wichita at 3 -- 3:00 and 3:30, which |
| 16:58:42 | 4 | my experience out there he needs to be out at the airport by 45 |
| 16:58:46 | 5 | minutes to an hour ahead of time.  So if we go much past 1:00 |
| 16:58:50 | 6 | o'clock, 1:30, I think that will -- |
| 16:58:52 | 7 | THE COURT:  I have a 2:00 o'clock docket tomorrow. |
| 16:58:57 | 8 | And if we go much past 1:00 o'clock, then I'd have to go |
| 16:59:00 | 9 | straight into that docket, working through lunch, and nobody |
| 16:59:02 | 10 | wants that to happen. |
| 16:59:03 | 11 | MR. HART:  No, Your Honor. |
| 16:59:03 | 12 | THE COURT:  Least of all me.  So what I'm telling |
| 16:59:08 | 13 | you is that I'd scheduled to go from 8:30 to 11:30 tomorrow.  I |
| 16:59:13 | 14 | can work around my 11:30 conflict and we can push into the noon |
| 16:59:18 | 15 | hour if we want, but I'm telling you that I want to be done by |
| 16:59:24 | 16 | 1:00 o'clock.  Is that -- |
| 16:59:25 | 17 | MR. HART:  Your Honor, I want to be done by 1:00 |
| 16:59:28 | 18 | o'clock, so . . . |
| 16:59:29 | 19 | THE COURT:  I guess my -- it's a preference on my |
| 16:59:32 | 20 | part.  The question is on the execution on your part.  Is that |
| 16:59:36 | 21 | doable?  Is that an achievable goal? |
| 16:59:38 | 22 | MR. HENDERSON:  I think it is, Your Honor. |
| 16:59:41 | 23 | MR. HART:  Certainly. |
| 16:59:42 | 24 | THE COURT:  All right.  Well, the later we push, |
| 16:59:48 | 25 | the less time you have for summation, and I'm not going -- we |

16:59:51  1    already have a plethora of briefing.  I'm not going to take a

16:59:54  2    lot more briefing in this case.  So we'll be in recess until

16:59:57  3    8:30 tomorrow morning, and we'll continue with the

17:00:01  4    cross-examination of Mr. Phillips at that time.  The Court's in

17:00:04  5    recess.

17:00:05  6                    CLERK NALL:   All rise.

17:00:06  7                    (Whereupon, the proceedings were adjourned at 5:00

17:00:15  8                    PM.)

          9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court
Reporter in and for the District of Kansas, do hereby
certify:

That the above and foregoing proceedings were
taken by me at said time and place in stenotype;

That thereafter said proceedings were
transcribed under my direction and supervision by means
of computer-aided transcription, and that the above and
foregoing constitutes a full, true and correct
transcript of said proceedings;

That I am a disinterested person to the said
action.

IN WITNESS WHEREOF, I hereto set my hand on
this the 8th day of January, 2015.


    s/ Johanna L. Wilkinson
    Johanna L. Wilkinson, CSR, CRR, RMR
    United States Court Reporter