IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,   )
                                )  District Court
                Plaintiff,      )  Case No.
vs.                             )  13-10176
                                )
WALTER E. ACKERMAN,             )  Circuit Court
                                )  Case No.
                Defendant.      )  14-3265

TRANSCRIPT OF MOTION TO SUPPRESS
Volume II

On the 20th day of May, 2014, came on to be heard proceedings in the above-entitled and numbered cause before the HONORABLE ERIC F. MELGREN, Judge of the United States District Court for the District of Kansas, sitting in Wichita, commencing at 8:29 a.m. Proceedings recorded by mechanical stenography.  Transcript produced by computer.

APPEARANCES:

The plaintiff appeared by and through:
        Mr. Jason Hart
        United States Attorney's Office
        1200 Epic Center
        301 North Main
        Wichita, Kansas  67202

The defendant appeared by and through:
        Mr. John K. Henderson, Jr.
        Federal Public Defender's Office
        301 N. Main
        Suite 850
        Wichita, Kansas 67202

NCMEC and John D. Ryan appeared by and through:
        Mr. Christopher J. Schmidt
        Bryan Cave LLP - St. Louis
        One Metropolitan Square
        211 North Broadway, Suite 3600
        St. Louis, Missouri  63102

<u>I N D E X</u>

WITNESSES                                                    <u>PAGE</u>
<u>          For the Plaintiff</u>
<u>GARY PHILLIPS</u>
          Cont'd Cross-Exam by Mr. Henderson        3
          Redirect Exam by Mr. Hart                55
          Recross-Exam by Mr. Henderson            58
<u>JOHN SHEHAN</u>
          Direct Examination by Mr. Hart           60
          Cross-Examination by Mr. Henderson      114


<u>          For the Defendant</u>
<u>MICHELLE ACKERMAN</u>
          Direct Examination by Mr. Henderson     145
          Cross-Examination by Mr. Hart           148
<u>WALTER ACKERMAN</u>
          Direct Examination by Mr. Henderson     151
          Cross-Examination by Mr. Hart           155
          Redirect Exam by Mr. Henderson          164
          Recross-Exam by Mr. Hart                165

CLOSING ARGUMENTS:
          By Mr. Schmidt                          174
          By Mr. Henderson                        188
          By Mr. Hart                             204



REPORTER'S CERTIFICATE                            230

5-20-14   USA v. ACKERMAN   No. 13-10176

3

08:30:26  1                   CLERK NALL:   All rise.

08:30:30  2                   THE COURT:  Good morning.  You may be seated.

08:30:31  3                   As I recall, Mr. Henderson, you were

08:30:37  4   cross-examining Mr. Phillips --

08:30:40  5                   MR. HENDERSON:  Yes, Your Honor.

08:30:41  6                   THE COURT:  -- on someone that we've never heard

08:30:42  7   of and that I'm still waiting to see why we're talking about

08:30:46  8   it.  But I'm going to let you continue, with the hope that it

08:30:50  9   quickly becomes relevant.

08:30:52  10                  MR. HENDERSON:  Thank you, Your Honor.

08:30:52  11                           GARY PHILLIPS,

08:30:52  12  having been previously duly sworn to testify the truth, the

08:30:55  13  whole truth, and nothing but the truth, testified as follows:

08:30:55  14                  CONTINUED CROSS-EXAMINATION

08:30:57  15  BY MR. HENDERSON:

08:30:58  16    Q.  Mr. Phillips, first a housekeeping matter, if I may.

08:31:10  17  Referring you to Defendant's Exhibit B, yesterday when I opened

08:31:14  18  the page I saw there were only two pages and the rest of the

08:31:18  19  exhibit was missing, and I've replaced the full exhibit there

08:31:21  20  in the book.  Do you see that there?

08:31:23  21    **A.   Yes.**

08:31:24  22    Q.  Okay.  And the last page of that it says, "Thank you,"

08:31:28  23  and then it has Mr. Colcolough's name and AOL's logo?

08:31:33  24    **A.   Uh-huh.**

08:31:34  25    Q.  You have to say yes or no.

08:31:35  1    **A.   Yes.**

08:31:35  2    Q.   And, again, does that appear to be a PowerPoint or

08:31:39  3    slide presentation that you prepared?

08:31:41  4    **A.   I would assume so, yes.**

08:31:43  5    Q.   It says AOL; correct?

08:31:45  6             MR. HART:  Your Honor, I'm going to object, again,

08:31:50  7    in part he's asking the witness to confirm that this is a

08:31:54  8    presentation of some other individual who's not here to

08:31:56  9    testify, and so the witness is assuming certain things, which

08:32:00  10   is a speculative -- a question that calls for speculation of

08:32:04  11   the witness.  If Mr. Henderson would like to inquire of

08:32:07  12   Mr. Phillips as to what trainings he's provided, that would be

08:32:09  13   an appropriate line of questioning but talking about these

08:32:13  14   other trainings is not.

08:32:13  15            THE COURT:  I'm going to sustain that objection.

08:32:15  16            Mr. Phillips, it's normal in ordinary human

08:32:18  17   discourse to try to be agreeable and make assumptions on things

08:32:21  18   that are presented to you, but in the courtroom we only want

08:32:24  19   you to talk about things that you have direct knowledge of.  So

08:32:27  20   if you have to guess or assume or infer, then, in fact, your

08:32:31  21   response should be "I don't know."

08:32:32  22            And, Mr. Henderson, I really would like you this

08:32:38  23   morning to focus in on matters that this witness can present

08:32:42  24   admissible and relevant testimony about, so I'm sustaining

08:32:45  25   Mr. Hart's objection.

08:32:46  1        MR. HENDERSON:  Thank you, Your Honor.  Your

08:32:47  2   Honor, just by way of background, at least from our

08:32:52  3   orientation, since the rules of evidence don't apply to this

08:32:55  4   hearing, as a pretrial hearing, we'd respectfully submit we're

08:33:03  5   not bound by the strict constrictions with respect to hearsay,

08:33:09  6   for example, and the other evidentiary rules.

08:33:11  7        THE COURT:  Hearsay's only a fancy legal term for

08:33:15  8   determining whether or not evidence is reliable.  And if this

08:33:18  9   witness doesn't have personal knowledge about something and

08:33:20  10  you're asking him to guess or infer, that's not reliable

08:33:23  11  information.  And if he doesn't have relevant information, or

08:33:27  12  if you're asking him about matters that are not relevant, then

08:33:29  13  it's just a waste of everyone's time.

08:33:31  14        So although you're right, the rules of evidence

08:33:33  15  are relaxed in this type of a hearing, I still want to focus on

08:33:37  16  matters that this witness can give reliable and trustworthy

08:33:41  17  information about that are relevant to the issues at hand.

08:33:43  18        MR. HENDERSON:  Thank you, Your Honor.  And if I

08:33:45  19  can, just to clarify.

08:33:47  20  BY MR. HENDERSON:

08:33:48  21  Q.  Mr. Phillips, you know Mr. Colcolough; right?

08:33:50  22  **A.  Yes, I do.**

08:33:51  23  Q.  You told us yesterday he's a legend at AOL; correct?

08:33:55  24  **A.  Yes.**

08:33:55  25  Q.  You worked with him the entire time you were there?

5-20-14   USA v. ACKERMAN   No. 13-10176

6

08:33:58    1        A.   I did.

08:33:59    2        Q.   And you know he made presentations on a regular basis

08:34:03    3    outside the office?

08:34:04    4        A.   Yes, I know that.

08:34:05    5        Q.   Okay.  You do, too; correct?

08:34:08    6        A.   I have.

08:34:08    7        Q.   Okay.  Referring again to page 4 of Exhibit B, which is

08:34:19    8    where we were yesterday, we started talking about the flow of

08:34:31    9    the e-mail from the original user, which is shown on this chart

08:34:35    10   as -- or on this diagram.  Let me just put it up on the screen,

08:34:39    11   make it easier.  I'm pointing with my pen to the ISP user.  Do

08:35:00    12   you see that?

08:35:00    13       A.   Yes.

08:35:01    14       Q.   So if I'm the ISP user and I'm sending an e-mail

08:35:05    15   through AOL's system, that would be me and my e-mail from my

08:35:11    16   computer goes to the AOL -- there's a box here.  What would you

08:35:16    17   call that, the server?

08:35:17    18       A.   Mail server.

08:35:18    19       Q.   Pardon me?

08:35:18    20       A.   I would call it a mail server.

08:35:20    21       Q.   The mail server, okay.  Now, it's my understanding --

08:35:23    22   and correct me if I'm wrong -- that when the e-mail reaches the

08:35:26    23   mail server, the first thing AOL does through this IDFP program

08:35:33    24   is look for pictures, either embedded in the e-mail or attached

08:35:38    25   to the e-mail; is that correct?

5-20-14   USA v. ACKERMAN   No. 13-10176

08:35:40   1      A.   Yes, it would look first the file type of images.

08:35:44   2      Q.   Okay.  So it's looking for a picture or video, and that

08:35:50   3   you've described is a different kind of file type; right?

08:35:53   4      A.   Yes, yes.

08:35:54   5      Q.   Okay.  And if there's no image, if there's no picture,

08:35:57   6   if there's no video, then it sends the e-mail on its way to the

08:36:01   7   intended recipient; correct?

08:36:04   8      A.   Yes.

08:36:04   9      Q.   Okay.  So if I send an e-mail to my father and it says

08:36:08   10   here's what's going on, no pictures, no video, no image, it

08:36:15   11   goes from the IP user through your server on to the Internet to

08:36:20   12   my father; correct?

08:36:21   13      A.   Yes.

08:36:23   14      Q.   Now, if there is a picture, an image -- I referenced

08:36:30   15   yesterday my dog -- in that e-mail or attached to that e-mail,

08:36:35   16   then it goes on a separate track, doesn't it?

08:36:38   17      A.   Yes.

08:36:39   18      Q.   And that separate track applies to everybody; whether

08:36:44   19   it's me and it's a picture of my dog, anything, all images, all

08:36:50   20   pictures, are captured or identified in the server and then

08:36:56   21   sent on a different track; correct?

08:36:59   22      A.   Yes.

08:36:59   23      Q.   Okay.  And that different track then goes to something

08:37:03   24   called the IDFP subsystem; correct?

08:37:08   25      A.   It's actually part of the mail system, but it's part of

8

08:37:11  1   the processing that happens in the mail server, it's just

08:37:14  2   broken out this way to show the flow differently.

08:37:16  3       Q.   Okay.  But within the mail server, it goes to a

08:37:19  4   different place; right?

08:37:20  5       A.   There would be different processing that happens.

08:37:23  6       Q.   Okay.  It goes to a different place; right?

08:37:26  7       A.   Not exactly.  It's more of a flow.  It's not like a

08:37:30  8   different place.  It still stays on the mail server.  It

08:37:34  9   doesn't go to another mail server; it stays there, and there's

08:37:37  10  code that use -- that looks for the image file.

08:37:41  11      Q.   We'll get there.

08:37:42  12      A.   Okay.

08:37:42  13      Q.   Well, according to this chart, it's called the IDFP

08:37:47  14  subsystem.  Is there something called an IDFP subsystem?

08:37:51  15      A.   It's a subset of the mail server.

08:37:55  16      Q.   Okay.  So it's a subset; correct?

08:37:59  17      A.   Yes.

08:37:59  18      Q.   In the mail server?

08:38:00  19      A.   Yes.

08:38:00  20      Q.   Okay.  And I think you told us earlier, when you were

08:38:04  21  on direct, that that stream of addresses that appears in the

08:38:10  22  CyberTipline report shows that e-mail and attachments going to

08:38:15  23  those different locations as you're describing it in the mail

08:38:18  24  server?

08:38:19  25      A.   Yes.

5-20-14   USA v. ACKERMAN   No. 13-10176

9

08:38:19  1      Q.   Okay.  And one of those locations, was it the IDFP

08:38:23  2  subsystem?

08:38:24  3      A.   Yes.

08:38:24  4      Q.   Okay.  And when it gets to the IDFP subsystem, those

08:38:31  5  pictures, whether it's a picture of my dog or something else,

08:38:34  6  is hashed; right?

08:38:36  7      A.   Yes, the file type would be hashed.

08:38:38  8      Q.   Pardon me?

08:38:38  9      A.   The file, the image file, would be hashed.

08:38:41  10     Q.   Right.  It doesn't hash the e-mail; it just hashes the

08:38:46  11  image file --

08:38:47  12     A.   Yes.

08:38:47  13     Q.   -- correct?  Okay.  And we talked yesterday about hash

08:38:54  14  values.  Have you ever created a hash value?

08:38:57  15     A.   I have.

08:38:59  16     Q.   It's a long process, isn't it?

08:39:01  17     A.   Not really.

08:39:01  18     Q.   Really?  How long did it take you?

08:39:04  19     A.   A couple of minutes, at most.

08:39:06  20     Q.   Manually?

08:39:08  21     A.   Well, you use a computer.

08:39:10  22     Q.   I don't mean with a computer.  I mean manually have you

08:39:13  23  ever hashed?

08:39:14  24     A.   Oh, no.

08:39:16  25     Q.   Did you do it in school?

08:39:19    1    **A.   I've used a computer to generate a hash value.**

08:39:22    2    Q.   Okay.  So you know somebody had to program the computer

08:39:27    3    to do what it does to create a hash value; right?

08:39:31    4    **A.   Yes.**

08:39:31    5    Q.   Took AOL six years, didn't it, to develop this program

08:39:34    6    and perfect it before it went into use?  Started -- it started

08:39:41    7    in, what, 1997, 1998, and didn't go live until 2004?

08:39:48    8    **A.   I -- I don't know.**

08:39:53    9    Q.   Okay.  Referring you to Exhibit B, the second page.  Do

08:40:07    10    you see that?  Does that refresh your recollection?  It says,

08:40:13    11    "1999 AOL began hashing CP files"; do you see that?

08:40:29    12    Do you see that?

08:40:30    13    **A.   I see what it says, yes.**

08:40:31    14    Q.   Okay.  Do you agree with that?

08:40:33    15    **A.   I -- I have no direct knowledge of that date.**

08:40:36    16    Q.   So you don't know one way or the other?

08:40:38    17    **A.   It may have.  It may have.  I'm not sure.  I mean, I**

08:40:43    18    **didn't create this slide deck, so I don't know.**

08:40:47    19    Q.   Well, what were you doing in 1999?  Were you involved

08:40:50    20    in hash values and creating the IDFP?

08:40:53    21    **A.   No.**

08:40:54    22    Q.   Okay.  Were you involved with the IDFP in creating hash

08:40:59    23    values in 2003?

08:41:02    24    **A.   No.**

08:41:04    25    Q.   Where -- what's the source of your knowledge for the

08:41:07  1    IDFP?

08:41:07  2        **A.  Well, it was created in -- by members of the department**

08:41:11  3    **that I worked for, so we discussed the process and what was**

08:41:16  4    **going on, building out the database and those types of things,**

08:41:19  5    **but I don't remember -- I don't recall exactly what dates they**

08:41:23  6    **were.**

08:41:23  7        Q.  Okay.  So this could be accurate, you just don't know

08:41:26  8    for sure?

08:41:26  9        **A.  That's correct.**

08:41:27  10       Q.  Okay.  Getting back to your knowledge regarding

08:41:39  11   creating the hash values, doing it by hand and doing it -- not

08:41:43  12   doing it by computer is a long and involved process if you had

08:41:48  13   to do it by hand?

08:41:49  14       **A.  I would assume so, yes.**

08:41:50  15       Q.  Okay.  Well, let me share with you a document we've

08:42:04  16   marked Defendant's Exhibit BB.

08:42:06  17              MR. HENDERSON:  And I supplied copies to counsel,

08:42:08  18   Your Honor.  And it's not in the book.  If I could --

08:42:11  19              THE COURT:  That's fine.

08:42:21  20   BY MR. HENDERSON:

08:42:21  21       Q.  I spent the night on the Internet looking at hash

08:42:25  22   values, and I'm not saying these are authoritative at all, but

08:42:28  23   I'd be interested in getting your thoughts on it.  Defendant's

08:42:32  24   Exhibit BB, something I found, on the second change, it says

08:42:37  25   how hash algorithms actually work, then it goes on through 12

08:42:42   1   steps talking about rearranging the zeros and the ones and

08:42:47   2   grouping and blocking and chunking, a lot of mathematics.

08:42:57   3        Would you say that's a fair representation of the

08:43:00   4   manual process, not what a -- not the buttons you might push on

08:43:06   5   a computer, but the manual process?

08:43:08   6             THE COURT:  Mr. Henderson, you keep talking about

08:43:09   7   a manual process, and I don't know that this witness has ever

08:43:12   8   testified that a hash value can be created manually.

08:43:15   9   Everything I've heard is that it's created by the computer.  I

08:43:18  10   think you need to clarify your terms --

08:43:21  11             MR. HENDERSON:  Thank you.

08:43:22  12             THE COURT:  -- because I'm -- well, I've said

08:43:25  13   enough.

08:43:25  14             MR. HENDERSON:  Thank you, Your Honor.

08:43:26  15   BY MR. HENDERSON:

08:43:27  16   Q.   In order to create the hash value -- well, let me ask

08:43:30  17   you, did you participate in creating the hash value program?

08:43:34  18   **A.   No.**

08:43:35  19   Q.   Okay.  Do you know how it works?

08:43:37  20   **A.   I've a general understanding of how hash values work.**

08:43:40  21   Q.   Okay.  Did you know whether or not people within AOL at

08:43:46  22   some time between 1999 and 2003 were writing a program for the

08:43:51  23   computer to hash things?

08:43:56  24   **A.   Yes.**

08:43:56  25   Q.   Okay.

08:43:57  1  **A.   I would probably further say that a lot of programs on**

08:44:01  2  **the Internet use the MD5 hash besides -- outside of the IDFP**

08:44:06  3  **system -- to do various system things?**

08:44:08  4  Q.   Of course, of course.  But in order to create the

08:44:13  5  computer program, you have to manually input the data to tell

08:44:17  6  the computer what to do; right?

08:44:18  7  **A.   Yes, it needs a set of instructions.**

08:44:20  8  Q.   Okay.  And those instructions are created by people,

08:44:25  9  you and me, writing the program for the computer; right?

08:44:30  10  **A.   Yes.**

08:44:31  11  Q.   Okay.  And so in order to do that, you have to have a

08:44:35  12  mathematical formula; right, the algorithm?

08:44:40  13  **A.   Well, you would have to have an algorithm to use in**

08:44:44  14  **this case.**

08:44:44  15  Q.   Okay.  And is looking at Defendant's Exhibit BB, is

08:44:51  16  that a step-by-step explanation of the process that's involved

08:44:59  17  in the computer doing what it does to create a hash value?

08:45:01  18  MR. HART:  Your Honor, I'm going to object.  This

08:45:03  19  witness has just been presented this multi-page document, which

08:45:08  20  he has no previous familiarity with.  He's now asking this

08:45:12  21  witness if this is an accurate representation of what goes on.

08:45:15  22  And as I read the document myself for the first time, on the

08:45:21  23  second page, under the heading How Hash Algorithms Actually

08:45:26  24  Work, the second line of that paragraph is, "In fact, I have

08:45:31  25  intentionally left out many details because there weren't

08:45:35  1    relevant to my main cause."  (As read.)

08:45:38  2              So even by -- whoever wrote this own explanation,

08:45:43  3    they've left out a lot of information about how this process

08:45:46  4    works.  And unless AOL is using a manual, sitting down with a

08:45:51  5    pen and paper and doing a calculation manually, I do not

08:45:56  6    understand how any of this line of questioning is relevant to

08:45:59  7    the issues in this case.

08:46:00  8              THE COURT:  Mr. Phillips, are you familiar with

08:46:02  9    this document that's been marked as Exhibit BB?

08:46:04  10             THE WITNESS:  I am not.

08:46:05  11             THE COURT:  I'm going to sustain the objection.

08:46:07  12   It's unfair to hand the witness a 15-page document containing

08:46:11  13   mathematical and algorithmic calculations and ask him questions

08:46:17  14   about it when he's never seen it.  I'm going to sustain

08:46:18  15   Mr. Hart's objection.

08:46:20  16             MR. HENDERSON:  Thank you, Your Honor.

08:46:21  17   BY MR. HENDERSON:

08:46:22  18     Q.  Based upon your knowledge, how would you explain to us

08:46:35  19   how a hash value is created?  How does the computer do that?

08:46:43  20     **A.  Well, it takes a set of data on -- in the --**

08:46:50  21     Q.  In my example of the picture of the dog?

08:46:53  22     **A.  Picture of your dog, right.  So each pixel in that**

08:46:57  23   **picture has a data -- a data string, and it's going to look**

08:47:02  24   **unique to that picture.**

08:47:04  25     Q.  And those are zeros and ones?

08:47:05  1      A.   Zeros and ones.

08:47:06  2      Q.   All right.

08:47:07  3      A.   So you have -- the computer will take the zeros and

08:47:11  4   ones from that image file and apply it into the MD5 algorithm,

08:47:17  5   and then a result is produced of the hash value.  So it's just

08:47:22  6   like an equation.  You plug the data set in, you apply the

08:47:26  7   algorithm and you get an answer, and that answer's the

08:47:33  8   32-character string.

08:47:33  9      Q.   Okay.  You agree with me it's 32?

08:47:35  10      A.   Yes.

08:47:36  11      Q.   Okay.  And in the course of doing that, what the

08:47:42  12   mathematical formula does, the algorithm does, is take those

08:47:47  13   zeros and ones and takes chunks of them, kind of scrambles them

08:47:54  14   according to the algorithm, and groups them in a way that is

08:48:01  15   unique to that pixel as you describe it?

08:48:05  16      A.   The string of pixels, yes.

08:48:06  17              MR. HART:  Your Honor, I'm going to object to that

08:48:08  18   question as compound because there were multiple parts in

08:48:12  19   there, and my impression from the witness is he answered the

08:48:15  20   very last part, as opposed to many of the other lead-in

08:48:18  21   components to that question.

08:48:19  22              THE COURT:  I'm going to overrule the objection.

08:48:22  23   I'll let the witness' answer stand.

08:48:24  24   BY MR. HENDERSON:

08:48:25  25      Q.   And in order for the computer to do that, it has to

08:48:31   1   take each pixel in that picture, the zeros and ones, and

08:48:36   2   perform that algorithm -- that mathematical function against it

08:48:43   3   for each one of those pixels in the picture; right?

08:48:46   4       **A.   Well, it takes -- I think -- I believe it takes it as a**

08:48:49   5   **whole --**

08:48:49   6       Q.   Okay.

08:48:50   7       **A.   -- and then -- you apply the formula to it, and then**

08:48:54   8   **you get the output.**

08:48:55   9       Q.   Okay, okay.  And this happens really fast, doesn't it?

08:49:01   10      **A.   I would say generally, yes, depending on the size of**

08:49:04   11  **the file.   Say a video image file may contain more data, so it**

08:49:10   12  **would take a little bit longer for that to happen.**

08:49:12   13      Q.   Okay.  But if we slowed it down and watched it happen

08:49:17   14  in the computer screen, what we would see is the computer grabs

08:49:22   15  that picture; right, takes that picture; right?

08:49:26   16      **A.   It takes -- okay.**

08:49:28   17      Q.   Do you agree?  You have to say yes or no.

08:49:32   18      **A.   Yes, it would take a representation of the ones and**

08:49:35   19  **zeros and -- contained from that image file.**

08:49:38   20      Q.   I'm being real elemental here.  I'm starting at --

08:49:42   21  slowing down that process that goes like that (snapping

08:49:44   22  fingers), okay, slow it down.  What happens is that picture

08:49:49   23  comes across some sensor in the subsystem; right, the JPG file?

08:49:56   24      **A.   It's looking for the JPG file, yes.**

08:49:58   25      Q.   Okay.  Finds the JPG file; right?

08:50:02   1      **A.   Yes.**

08:50:02   2      Q.   Okay.  There's no hash number on that JPG file when

08:50:08   3  this subsystem first sees it; right?

08:50:10   4      **A.   Well, it's just a stream of ones and zeros.**

08:50:13   5      Q.   Just ones and zeros, there's no hash value yet, is

08:50:16   6  there?

08:50:16   7      **A.   No.**

08:50:16   8      Q.   No.  Okay.  So then what the subsystem does is it stops

08:50:23   9  that picture and manipulates the data; right?

08:50:27  10      **A.   No.  You're confusing -- it takes the ones and zeros**

08:50:31  11  **and it applies the mathematical formula and then you get the**

08:50:35  12  **output.  That's simply how it works.**

08:50:38  13      Q.   All right.  Okay.  Well --

08:50:39  14      **A.   Well, I mean, you can't get any more basic than that.**

08:50:42  15      Q.   Okay.  So -- but before -- when -- before it starts

08:50:48  16  counting the zeros and the ones, right, it has to stop that

08:50:51  17  picture in the flow?

08:50:52  18      **A.   Well, it takes that information from the attachment or**

08:50:56  19  **the embedded object, of the video or image file.**

08:51:00  20      Q.   Okay.  It opens it up?

08:51:02  21      **A.   It reads the data.  It reads that data.**

08:51:06  22      Q.   It reads that data.  It opens it up and it reads those

08:51:09  23  zeros and ones; right?

08:51:10  24      **A.   Yes, it takes the zeros and ones from the image file.**

08:51:12  25      Q.   Okay.  And then it does its magic and comes up with a

08:51:19   1   hash value; correct?

08:51:21   2       A.   Yes, it applies it to the MD5 algorithm and generates

08:51:26   3   the hash value.

08:51:26   4       Q.   Okay.  And then what happens to the image?  Does it

08:51:32   5   stay there and then they send the hash value to check it

08:51:34   6   against the database?

08:51:36   7       A.   Nothing happens to the image.  It stays attached to the

08:51:39   8   e-mail.  Once the hash value's attained, the computer compares

08:51:43   9   that to a list of known hash values in our hash value set.

08:51:46   10      Q.   Okay.  And referring to our chart here, it shows MD5

08:51:55   11   hash check, and I know it's hidden by the schematic there, but

08:52:04   12   referring to Defendant's Exhibit A, in the picture that we were

08:52:12   13   looking at yesterday -- I apologize, I know it's hard to read.

08:52:19   14   According to this schematic, it looks like it says MD5 hash CP

08:52:28   15   database; does that sound right?

08:52:34   16      A.   I -- I don't know 'cause I really cannot read it.

08:52:37   17      Q.   Okay.  It's hard to read.  But, at any rate, the --

08:52:54   18   there's a check against the database for MD5 hash values;

08:52:59   19   right?

08:52:59   20      A.   Yes.

08:52:59   21      Q.   Okay.  And that's another subset in the main server, in

08:53:05   22   the mail server?

08:53:06   23      A.   It's a -- it's --

08:53:08   24      Q.   Or is that another --

08:53:11   25      A.   It's just a process of -- it's just the further

08:53:14   1   **computer instruction, part of the computer code.**

08:53:16   2       Q.   Okay.   Well, we identified the IDFP subsystem as a

08:53:20   3   subset within the mail server.

08:53:22   4       **A.   It's a part of the mail system, yes.**

08:53:24   5       Q.   And is this data bank, the MD5 data bank, another

08:53:29   6   subset within the mail server?

08:53:31   7       **A.   Well, it's just a file.   It's not -- it's a database**

08:53:34   8   **file that the program is looking to to match or not match data.**

08:53:42   9       Q.   Okay.   Now, what goes to this area for matching, just

08:53:45   10   the MD5 value or the whole e-mail with the pictures and the new

08:53:50   11   hash value?

08:53:50   12       **A.   The computer program would take the hash value and it**

08:53:55   13   **would call the MD5 database or hash database set, and it would**

08:54:02   14   **do a query to see if that hash value was existing in that**

08:54:09   15   **database file.**

08:54:10   16       Q.   Okay, okay.   And if there's no match within that

08:54:16   17   database within that file, then the e-mail and the picture of

08:54:22   18   my dog goes to the intended recipient, my father?

08:54:26   19       **A.   Yes.**

08:54:27   20       Q.   If there is a match with some data in the data bank,

08:54:32   21   then it goes directly to the NCMEC with a CyberTipline report?

08:54:40   22       **A.   Well, then there's some other processing that happens,**

08:54:45   23   **but the report is generated and sent to NCMEC at that point,**

08:54:50   24   **yes, as part of that processing.**

08:54:51   25       Q.   Okay.   Well, what's that processing; what's involved in

08:54:54   1   that processing?

08:54:55   2      A.   Well, we -- there's a couple of things that happen.

08:54:58   3   One would be that the account is immediately terminated, the

08:55:01   4   account is annotated with a history of what has happens, you

08:55:08   5   know, the date, time, the -- that it was caught -- it was

08:55:16   6   terminated because of the -- it had a match with the IDFP

08:55:19   7   system, the account is bumped offline so the -- there's no

08:55:25   8   active sessions, so all access is cut off to the account, and

08:55:29   9   then the information is gathered for the report for NCMEC, and

08:55:32   10   then it's transmitted.

08:55:36   11      Q.   Transmitted to?

08:55:37   12      A.   To NCMEC.

08:55:38   13      Q.   Okay.  And then you know and the point is then to

08:55:47   14   transmit it to law enforcement for investigation, prosecution?

08:55:50   15      A.   Well, once it leaves -- once it's at NCMEC, I -- they

08:55:54   16   have certain processes that they do, and I really can't talk

08:55:57   17   about that.  I would assume that's what they do, but --

08:56:01   18      Q.   You assume that's what they do?  Don't you know?

08:56:04   19      A.   Well, I can't speak for NCMEC.

08:56:05   20      Q.   Well, I know you don't work for NCMEC, but you know

08:56:09   21   what they do, don't you?

08:56:10   22      A.   Well, they're the -- they were appointed by Congress to

08:56:14   23   be the clearinghouse for these types of reports, so I imagine

08:56:17   24   their job would be to refer them out to law enforcement.

08:56:23   25      Q.   Okay.  Now, there was a time when AOL processed the

08:56:40   1   e-mails, e-mail from me with a picture of my dog, before the

08:56:45   2   IDFP process; right?

08:56:49   3       A.   Yes.

08:56:49   4       Q.   Okay.  So before the IDFP process, again, I sent an

08:56:55   5   e-mail, it goes to the server, the server puts it on the

08:56:58   6   Internet, it goes to my father, no interruption; correct,

08:57:06   7   before IDFP?

08:57:07   8       A.   **Well, right, the process wouldn't have occurred before**

08:57:10   9   **it was in existence.**

08:57:11  10       Q.   Right.  And when they went live or started using IDFP,

08:57:20  11   then that process that used to take place was interrupted and

08:57:26  12   my e-mail, if it has an attachment with a picture or a

08:57:32  13   picture's embedded in the e-mail, is diverted on to another

08:57:35  14   path; correct?

08:57:39  15       A.   **Well, it's still part of the mail system, but yes,**

08:57:42  16   **it -- so that process would not have applied, yes.**

08:57:46  17       Q.   Okay.  If I may, referring to -- referring back to

08:58:46  18   Defendant's Exhibit A, the third page on the screen here,

08:59:03  19   reference to Today's Agenda, do you see that?

08:59:06  20       A.   Yes.

08:59:07  21       Q.   Okay.  There's a reference in Resources to an AOL Law

08:59:12  22   Enforcement Training Manual.  Do you know what that is?

08:59:17  23       A.   Yes.

08:59:17  24       Q.   What is that?

08:59:19  25       A.   **Well, the legal department produces a law enforcement**

08:59:22   1   **training manual, and it explains how to -- the most efficient**

08:59:28   2   **way for law enforcement to ask us for information that they're**

08:59:32   3   **entitled to.  In other words, it would make -- it may contain**

08:59:37   4   **sample subpoena language, sample -- and what information that**

08:59:41   5   **is available to them with a subpoena, and it would also cover**

08:59:44   6   **search warrants and what data is available for a search**

08:59:48   7   **warrant, and the court order and what types of information are**

08:59:51   8   **available from us with that type of legal process.**

08:59:57   9       Q.   Okay.  Basically teaching law enforcement how to use

09:00:00   10   the information that you have in the course of making

09:00:03   11   investigations?

09:00:04   12       **A.   No, I would say that it's what they're legally entitled**

09:00:08   13   **to get from us, and how they use it is up to them.**

09:00:10   14       Q.   Okay.  So you're saying you don't give them anything

09:00:13   15   that you're not required to?

09:00:14   16       **A.   Or that they're entitled to.**

09:00:16   17       Q.   Okay.  But you agree with the statement I just made,

09:00:19   18   that you don't give them anything that you're not required to

09:00:22   19   give them?

09:00:23   20       **A.   Yes.**

09:00:24   21       Q.   Okay.  There's a reference also there to AOL Testify

09:00:30   22   Packages.  Do you know what that is?

09:00:35   23       **A.   I do not.**

09:00:37   24       Q.   Never heard that before?

09:00:38   25       **A.   I have not heard that before.**

5-20-14   USA v. ACKERMAN   No. 13-10176

23

09:00:39   1      Q.   Never used those before?

09:00:41   2      **A.   I have not.**

09:01:03   3      Q.   We mentioned yesterday -- and it's a long PowerPoint

09:01:08   4  presentation, but it looks like it's page 19 -- we talked about

09:01:13   5  those Easter eggs.  You remember our conversation about that

09:01:17   6  yesterday?

09:01:17   7      **A.   Yes.**

09:01:18   8      Q.   Okay.  And you see here reference to the Easter egg in

09:01:23   9  Defendant's Exhibit A; do you see that?  It's on the screen.

09:01:30  10      **A.   Yes.**

09:01:30  11      Q.   Okay.  And would you agree that that's a hidden area on

09:01:35  12  the network or client application?

09:01:40  13      **A.   No, I don't agree with that statement.**

09:01:43  14      Q.   Okay.  Would you agree that it requires a sequence of

09:01:48  15  keystrokes or mouse click to uncover?

09:01:55  16      **A.   No.**

09:01:56  17      Q.   Okay.  Would you agree that there's some value inside?

09:01:59  18      **A.   I would agree with there may be value.**

09:02:02  19      Q.   Okay.  If you were talking to law enforcement, how

09:02:07  20  would you explain the Easter egg concept to them and how to

09:02:12  21  take advantage of it?

09:02:13  22      **A.   Well, I would explain it as information that's**

09:02:18  23  **contained forensically on a computer that they may not think to**

09:02:24  24  **look in to find information that may or may not be useful to**

09:02:28  25  **them.**

09:02:29   1       Q.   Okay.  So they're laypeople, trained, but not computer

09:02:37   2   experts usually; right, the law enforcement?

09:02:41   3       **A.   Yes, I would assume so, yes.**

09:02:42   4       Q.   Okay.  And so you're teaching them how to find things

09:02:46   5   on the computer that might not otherwise be -- they'd be aware

09:02:52   6   of?

09:02:53   7       **A.   Yes.**

09:02:53   8       Q.   Okay.  And you're doing that in order to help them do

09:02:57   9   what they do, investigate and prosecute crimes?

09:02:59   10      **A.   Well, we're doing it to be -- to let them know that**

09:03:03   11  **there may be information that they should be aware of.**

09:03:07   12      Q.   So they can investigate and prosecute crimes?

09:03:09   13      **A.   And that's their job, yes.**

09:03:11   14      Q.   Okay.  And you know that, don't you?

09:03:13   15      **A.   Yes.**

09:03:13   16      Q.   That's why you're there, isn't it, to help them do

09:03:16   17  their job?

09:03:17   18      **A.   No.  I'm there to do a job for our company.**

09:03:21   19      Q.   Okay.  Which is to help them do their job?

09:03:24   20      **A.   I would not phrase it that way.**

09:03:40   21      Q.   And the next page in Defendant's Exhibit A, there's a

09:03:43   22  reference to a few conceptual Easter eggs.  Do you see that?

09:03:46   23      **A.   Yes.**

09:03:48   24      Q.   Okay.  And it referenced a connectivity summary.  Do

09:03:51   25  you know what that is?

09:03:53  1      A.    Yes.

09:03:53  2      Q.    And, again, that's not something that would be obvious

09:03:56  3  to the casual observer.  You kind of have to teach them how to

09:04:01  4  find that; right?

09:04:04  5      A.    Yes.

09:04:04  6      Q.    Pardon me?

09:04:06  7      A.    Yes.

09:04:06  8      Q.    Okay.  The same thing, the next one, the screen name

09:04:14  9  .arl file, what a user has done online.  The same thing, you

09:04:18  10  have to teach them how to find that?  It's not clear to the

09:04:22  11  casual observer?

09:04:23  12      A.    I would -- I'd like to phrase that that these are all

09:04:31  13  **files, data files, contained on a member's personal computer**

09:04:36  14  **that have been using the AOL client software, and these are**

09:04:41  15  **files that are generated as the member uses the software.**

09:04:46  16  **These are different files that are created to -- for them to be**

09:04:49  17  **able to do things online and allow us to render certain**

09:04:53  18  **services to the member to make their experience better, to tune**

09:04:57  19  **the networks, to serve the pages faster.  And it also may be**

09:05:03  20  **useful in an investigative purpose, and that's why Don came up**

09:05:09  21  **with this list, to be helpful to that end.**

09:05:11  22      Q.    Okay.  And with respect to the screen name .arl, he

09:05:17  23  says, "What a user has done online."  Would you agree that

09:05:20  24  that's what that is?

09:05:21  25              MR. HART:  Your Honor, I'm going to object as to

09:05:23  1    the relevance of this.

09:05:26  2         THE COURT:  Mr. Henderson, I have been

09:05:30  3    exceptionally patient, but as far as I'm concerned, spanning

09:05:33  4    from this morning and yesterday afternoon I am utterly

09:05:37  5    mystified as to the relevance of anything you've put on in the

09:05:40  6    last hour plus, and my patience has run out.  You need to focus

09:05:45  7    questions that are relevant to the issues in this hearing and

09:05:48  8    that have a showed relevance.  I'm not going to sit here and

09:05:51  9    let you walk through a multi, multi-page PowerPoint that this

09:05:55  10   witness has never seen and did not develop, for reasons that

09:05:58  11   are a complete mystery to me.

09:05:59  12        So my patience has come to an end.  I'm shutting

09:06:04  13   down this free-ranging, wide-field investigation.  If you have

09:06:09  14   relevant questions to the issues which you yourself have raised

09:06:13  15   in this motion to suppress, let's hear them, but I'm not going

09:06:15  16   to listen to anything else.

09:06:16  17        MR. HENDERSON:  Okay.  Thank you, Your Honor.

09:06:18  18   Your Honor, if I may, the relevance to this line of questioning

09:06:24  19   is -- goes to whether or not AOL's a Government actor.  There

09:06:29  20   are two prongs, as I understand it:  the first is the extent to

09:06:33  21   which --

09:06:34  22        THE COURT:  And how does any of that relate to

09:06:35  23   defining connectivity summary and defining what the ARL is?  If

09:06:42  24   you have specific questions about AOL's functioning with law

09:06:47  25   enforcement that you want to rely on for your legal argument

09:06:49  1    that AOL is a Government actor, then ask them, but I'm not

09:06:53  2    going to sit through this continued seemingly pointless inquiry

09:06:59  3    into a PowerPoint that this witness did not develop and has

09:07:02  4    never seen.  So if you have direct questions about AOL's

09:07:05  5    interaction with law enforcement that this witness can answer,

09:07:07  6    then ask them.  Otherwise, do something else.

09:07:10  7              MR. HENDERSON:  Your Honor, if I may, the

09:07:12  8    relevance to this line of inquiry with respect to this

09:07:16  9    PowerPoint is part of what AOL is doing -- and I think we heard

09:07:22  10   from the testimony -- is going out to law enforcement and

09:07:26  11   educating them about how to use what's available on their

09:07:29  12   computer.

09:07:29  13             THE COURT:  Then ask that.  I'm not going to

09:07:32  14   listen to this.  You've spent -- you've exhausted my patience.

09:07:37  15   You've gone on with stuff with no apparent relevance.  If you

09:07:40  16   thought it had some relevance, you've not chosen to share it

09:07:42  17   with the Court, so I'm sustaining the relevance objection.  I'm

09:07:45  18   going to let you ask questions about AOL's relationship to law

09:07:49  19   enforcement, but we're not going to do any more tutorial on

09:07:54  20   issues that have no apparent relevance.

09:07:59  21             MR. HENDERSON:  Thank you, Your Honor.

09:08:03  22   BY MR. HENDERSON:

09:08:03  23      Q.  In the course of your work, have you gone out to law

09:08:06  24   enforcement and presented seminars or training for law

09:08:09  25   enforcement?

09:08:09    1       A.   I have.

09:08:11    2       Q.   And have you talked to them about Easter eggs?

09:08:18    3       A.   No.

09:08:18    4       Q.   Have you talked to 'em about finding things through

09:08:21    5   your -- through AOL's system that weren't otherwise apparent to

09:08:25    6   a layperson?

09:08:27    7       A.   No.

09:08:28    8       Q.   Have you talked to them about finding the screen name

09:08:33    9   ARL file?

09:08:34   10       A.   I have not.

09:08:35   11       Q.   Have you talked to them about finding the screen name

09:08:39   12   BAG file?

09:08:39   13       A.   No.

09:08:39   14       Q.   Have you talked to them about --

09:08:41   15            THE COURT:  Mr. Henderson, I just told you you are

09:08:42   16   not going to walk through these files.  If you have questions

09:08:45   17   to ask him, which you have about law enforcement, that's fine;

09:08:48   18   I'm not going -- you've spent my patience.  You had capital,

09:08:52   19   and you've spent it, every last dime of it.  If you have

09:08:56   20   questions about law enforcement, keep asking them.  You are not

09:08:58   21   going to walk through this file.  Can I make myself any

09:09:01   22   clearer?

09:09:04   23            MR. HENDERSON:  No, Your Honor.  I'm just --

09:09:05   24            THE COURT:  All right.  Then proceed with relevant

09:09:07   25   inquiry.

09:09:09  1          MR. HENDERSON:  Your Honor, if I may, this is the

09:09:11  2    only relevant -- or the only reference point I have is

09:09:14  3    information we've obtained --

09:09:15  4          THE COURT:  Well, you've been asking the witness

09:09:17  5    if he's talked to law enforcement about various things that

09:09:20  6    relate to what they're doing.  You can do that.  But we're not

09:09:22  7    going to walk through these PowerPoints that he's never seen

09:09:26  8    and that have no discernible relevance to this case.  So I'm

09:09:30  9    not foreclosing your inquiry that's directly relevant to AOL's

09:09:34  10   training law enforcement, if you think that goes to your theory

09:09:37  11   as to AOL as a government actor within the scope of this

09:09:40  12   witness' knowledge, but you're -- your wide-ranging and

09:09:47  13   irrelevant line of inquiry is over.

09:09:50  14          MR. HENDERSON:  Thank you, Your Honor.

09:10:18  15   BY MR. HENDERSON:

09:10:18  16    Q.   Mr. Phillips, do you know an individual by the name of

09:10:25  17   Chris -- I'll say Bubb, I'm not sure that's correct, B-U-B-B.

09:10:31  18    **A.   Yes.**

09:10:32  19    Q.   And who is Mr. -- is it Bubb or Bubb (pronouncing)?

09:10:35  20    **A.   Bubb.  It's Christopher Bubb.**

09:10:37  21    Q.   Bubb.  Thank you.  And what is Mr. Bubb's position with

09:10:40  22   AOL?

09:10:41  23    **A.   Well, he's no longer with the company, but he was an**

09:10:44  24   **attorney for our legal department.**

09:10:46  25    Q.   And was he an attorney with legal department in 2010?

| | | |
|---|---|---|
| 09:10:50 | 1 | **A.   I believe so, yes.** |
| 09:10:52 | 2 | Q.   Okay.  If I could ask you to look at Defendant's |
| 09:11:01 | 3 | Exhibit D, the second paragraph from the bottom there in the |
| 09:11:06 | 4 | text. |
| 09:11:06 | 5 | MR. HART:  Your Honor, I'm going to object again. |
| 09:11:09 | 6 | As I see Exhibit D, the nomenclature that defense has provided |
| 09:11:14 | 7 | on the front of this is Chris Bubb interview -- |
| 09:11:21 | 8 | THE COURT:  Mr. Hart, I think what needs to happen |
| 09:11:23 | 9 | here is Mr. Henderson needs to be given an opportunity to lay a |
| 09:11:26 | 10 | foundation that the witness is familiar with this document.  If |
| 09:11:29 | 11 | the witness is familiar with it, he can inquire, but if he's |
| 09:11:31 | 12 | not, then your objection would be timely at that point. |
| 09:11:34 | 13 | MR. HART:  Thank you, Your Honor. |
| 09:11:39 | 14 | BY MR. HENDERSON: |
| 09:11:39 | 15 | Q.   Do you have Defendant's Exhibit D in front of you? |
| 09:11:42 | 16 | **A.   Yes.** |
| 09:11:42 | 17 | Q.   Did you have a chance to look at the second paragraph |
| 09:11:45 | 18 | from the bottom? |
| 09:12:10 | 19 | (Brief pause.) |
| 09:12:33 | 20 | **A.   Yes, I've read it.** |
| 09:12:35 | 21 | Q.   Would you agree to -- would you agree with this -- with |
| 09:12:40 | 22 | that description of the IDFP process? |
| 09:13:12 | 23 | (Brief pause.) |
| 09:13:22 | 24 | **A.   Yes.** |
| 09:13:25 | 25 | Q.   And would you also agree that the -- with the statement |

09:13:33   1    there at the bottom that the IDFP is the linchpin of the -- was

09:13:39   2    the linchpin of the case, the Richardson case?

09:13:42   3    **A.   I'm not familiar with the Richardson case, so I cannot**

09:13:45   4    **say one way or the other.**

09:13:46   5    Q.   Would you say it's the linchpin to criminal

09:13:50   6    prosecutions in cases involving child pornography found on

09:13:55   7    AOL's lines?

09:13:56   8    **A.   Not necessarily.**

09:13:58   9    Q.   Okay.  And would you agree that Mr. Ryan designed the

09:14:11   10   system?

09:14:11   11   **A.   I would not.  I believe I've already stated that**

09:14:15   12   **Mr. Ryan and Mr. Colcolough were both involved, and as well**

09:14:19   13   **Mr. Bubb, involved on the team that came up with the IDFP**

09:14:24   14   **process.  They certainly championed it in the company and had**

09:14:27   15   **resources devoted to it, but I wouldn't say that there's any**

09:14:30   16   **one person that deserves more credit than the other.**

09:14:32   17   Q.   Okay.  But you weren't on the team; right?

09:14:36   18   **A.   No, I was not.**

09:14:39   19   Q.   And you've learned about that through other sources?

09:14:41   20   **A.   From my colleagues at AOL, yes.**

09:14:43   21   Q.   Well, and you've received training --

09:14:46   22        THE COURT:  We've covered this territory,

09:14:47   23   Mr. Henderson.  We've covered it exhaustively.  Let's cover

09:14:51   24   something we haven't.

09:14:52   25        MR. HENDERSON:  Thank you, Your Honor.

| | | |
|---|---|---|
| 09:14:55 | 1 | BY MR. HENDERSON: |
| 09:14:55 | 2 | Q.   You've received training -- |
| 09:14:57 | 3 | THE COURT:  I just addressed that issue.  We've |
| 09:15:00 | 4 | covered at great length what the role this witness had in |
| 09:15:04 | 5 | developing the IDFP, whatever it is, and the training that he's |
| 09:15:09 | 6 | had.  Ask something new. |
| 09:15:11 | 7 | MR. HENDERSON:  Your Honor, if I may -- |
| 09:15:12 | 8 | THE COURT:  Mr. Henderson, you're wearing out my |
| 09:15:14 | 9 | patience with irrelevant time-wasting for a limited hearing. |
| 09:15:17 | 10 | I'm trying to help you out so you don't run out of time in this |
| 09:15:20 | 11 | hearing.  Ask something you haven't asked. |
| 09:15:22 | 12 | MR. HENDERSON:  Your Honor, I was trying to.  If I |
| 09:15:25 | 13 | may just proffer, the question I was going to ask, was his |
| 09:15:27 | 14 | training for the purposes of testifying, not related to the |
| 09:15:32 | 15 | IDFP, has he been trained in order to do what he's doing here |
| 09:15:36 | 16 | today. |
| 09:15:37 | 17 | THE COURT:  Well, your question -- your predicate |
| 09:15:39 | 18 | was about the IDFP.  If you want to ask him about a new line of |
| 09:15:42 | 19 | inquiry, you can do that. |
| 09:15:43 | 20 | MR. HENDERSON:  Thank you, Your Honor. |
| 09:15:44 | 21 | BY MR. HENDERSON: |
| 09:15:47 | 22 | Q.   You received training at AOL and outside of AOL to |
| 09:15:52 | 23 | testify in cases, haven't you? |
| 09:15:55 | 24 | **A.   Not specific training.  I would say I've been prepared** |
| 09:15:59 | 25 | **by our attorneys what to expect in a trial, what questions may** |

09:16:04   1   be asked, those types of things, but I wouldn't call it like a

09:16:07   2   formalized class.

09:16:09   3      Q.   Okay.  Not a formalized class, but training?

09:16:14   4      A.   I would call it advice, what to expect.  I'm not sure

09:16:20   5   that I would call it training.  Training implies it's more

09:16:23   6   formalized and institutionalized.  It's just a part of doing my

09:16:26   7   job and having, you know, my boss and her colleagues explain

09:16:30   8   the legal process to me.

09:16:32   9      Q.   Okay.  And part of your job is going -- coming to

09:16:35   10  hearings like this one to testify?

09:16:37   11     A.   Yes, that's correct.

09:16:38   12     Q.   Okay.  And you receive advice or guidance on that

09:16:44   13  inside AOL and outside AOL with outside attorneys?

09:16:48   14     A.   Yes.

09:16:51   15     Q.   And as part of that advice or that process, you cover

09:16:56   16  things that you may not have actually participated in directly,

09:17:00   17  but were happening at AOL?

09:17:02   18     A.   I have a large institutional knowledge of our

09:17:06   19  procedures and processes that happen at AOL.

09:17:10   20     Q.   Okay.  And you get that in part through the advice and

09:17:15   21  the process internally there at AOL?

09:17:17   22     A.   Yes, and if there's something that I had a high level

09:17:23   23  of knowledge about, like a 30,000-foot view, there's certainly

09:17:27   24  resources available to me at the company that I could go to the

09:17:32   25  software engineers that were involved in development, in

09:17:35  1   **programming, to ask more specific technical questions.**

09:17:40  2   Q.  And you do that so you'd be better prepared to answer

09:17:43  3   questions like questions we're asking here?

09:17:45  4   **A.  Yes.**

09:17:50  5   Q.  Now, did you know that -- I don't know whether you did

09:17:57  6   or not, but did you know whether or not Mr. Ryan testified

09:18:01  7   before Congress on occasion?

09:18:03  8   **A.  I have knowledge that he did, yes.**

09:18:05  9   Q.  Okay.  Were you ever present at any of those hearings

09:18:09  10  when he testified?

09:18:10  11  **A.  I was not.**

09:18:12  12  Q.  And have you had an opportunity to review the testimony

09:18:17  13  that we submitted as exhibits in this case?

09:18:19  14  **A.  I have not.**

09:18:21  15              THE COURT:  You submitted them yesterday morning.

09:18:25  16              MR. HENDERSON:  I understand, Your Honor.

09:18:26  17              THE COURT:  When do you think this witness would

09:18:28  18  have reviewed them?  When do you think I would have reviewed

09:18:32  19  them?  You submitted them on the eve of the hearing.  Never

09:18:36  20  mind, go ahead with your line of questioning.

09:18:49  21  BY MR. HENDERSON:

09:18:51  22  Q.  Have you, in the course of your work at AOL, have you

09:18:53  23  ever had any occasions to talk to Mr. Ryan about the role that

09:19:00  24  AOL played in the -- what I'll call the child pornography

09:19:08  25  strategy, national strategy?

09:19:12  1    **A.   No.**

09:19:13  2    Q.   Have you talked to him about AOL's role in supporting

09:19:18  3    law enforcement, assisting law enforcement, in the

09:19:21  4    investigation and the prosecution of child pornography?

09:19:28  5    **A.   Not specifically, no.**

09:19:30  6    Q.   Okay.  Through the course of your time there and any

09:19:36  7    research that you might have done in preparation for

09:19:38  8    testifying, are you familiar at all with AOL's work with NCMEC,

09:19:48  9    the Department of Justice, the FBI, ICE, and Congress in

09:19:56  10   assisting law enforcement in investigating and prosecuting

09:20:00  11   child pornography cases?

09:20:02  12   **A.   Could you start with the first part of that question**

09:20:04  13   **again, before you started naming the agencies?**

09:20:09  14          MR. HENDERSON:  Your Honor, may I have it read

09:20:10  15   back.  I'm not sure I remember what it was.

09:20:12  16          THE COURT:  Could you read it back, please.

09:20:38  17          (Whereupon, the referred-to question was read back

09:20:39  18          by the Court Reporter.)

09:20:39  19   **A.   To a limited degree, yes.**

09:20:41  20   BY MR. HENDERSON:

09:20:44  21   Q.   Okay.  Can you explain how you limit the degree to

09:20:47  22   which you have that knowledge?

09:20:48  23   **A.   Well, I'm aware of our -- that we have the IDFP process**

09:20:57  24   **and that we report the images that we find to the National**

09:21:03  25   **Center for Missing & Exploited Children, and I'm aware that law**

09:21:05  1   **enforcement will send us search warrants and subpoenas and**

09:21:08  2   **court orders to obtain customer records, but other than that --**

09:21:13  3   **and then I know that those law enforcement will use that**

09:21:19  4   **information in their investigations, and if they find illegal**

09:21:23  5   **material or that laws were broken, they will arrest people and**

09:21:27  6   **then they go to prosecution.**

09:21:30  7   **        I understand where we fit into that and that we provide**

09:21:36  8   **training to law enforcement to streamline, help streamline, our**

09:21:41  9   **process and to help them request information from us**

09:21:44  10  **efficiently.  But other than the basic kind of process that --**

09:21:51  11  **in the way that that happens, I don't have knowledge about any**

09:21:57  12  **higher-level goals than that.**

09:21:59  13  Q.   Okay.  Is that something Mr. Ryan would be

09:22:02  14  knowledgeable about?

09:22:05  15  **A.   I would assume so.**

09:22:08  16  Q.   Well, you didn't testify before Congress?

09:22:10  17  **A.   I did not.**

09:22:11  18  Q.   Okay.  But he did?

09:22:13  19  **A.   Yes, he did.**

09:22:14  20  Q.   Okay.  Well, let me -- let me ask you in a couple of

09:22:34  21  areas if you're aware of these activities.  Were you aware of

09:22:42  22  any involvement, any role, that AOL played in helping NCMEC set

09:22:50  23  up the process for sending your information from the IDFP to

09:22:59  24  NCMEC?

09:23:01  25  **A.   Just from a technical perspective.**

09:23:04   1       Q.   And what do you mean, "a technical perspective"?

09:23:07   2       A.   Well, so we're transmitting data to them and they have

09:23:14   3   systems that they use, computer systems that they use, to

09:23:18   4   process the information when they get it.  So we've talked

09:23:22   5   about formatting and transmission protocols to make sure that

09:23:26   6   the data gets from our servers to their servers in a format

09:23:31   7   that's readily usable for them so that the process on both our

09:23:36   8   ends flows smoothly.

09:23:38   9       Q.   Okay.  And did you participate in that directly?

09:23:40   10      A.   I've worked on the team that does that.  I mean, I'm

09:23:46   11  not involved in the actual programming, but we've facilitated

09:23:49   12  meetings with contacts at NCMEC to make that process run

09:23:56   13  smoothly.

09:23:57   14      Q.   Okay.  Sounds like AOL and NCMEC put together kind of a

09:24:02   15  joint working group or task force to make that process happen

09:24:09   16  as smoothly as possible?

09:24:10   17      A.   It wasn't a task force or a group.  It was just that we

09:24:15   18  have a development process for our systems, and we would

09:24:19   19  talk -- have one of our developers talk to one of their

09:24:22   20  developers, to make sure that the information was flowing

09:24:25   21  smoothly.

09:24:26   22      Q.   Okay.  And, of course, doing that, did you talk to

09:24:29   23  people from NCMEC?

09:24:30   24      A.   Not directly.

09:24:39   25      Q.   Were you also aware that in -- I think it was in

09:24:47  1   2006 -- that there was an interest on the part of the attorney

09:24:55  2   general, federal attorney general, to obtain -- to have the

09:25:01  3   ISPs provide additional information to law enforcement,

09:25:07  4   information that they hadn't otherwise been providing?

09:25:10  5       **A.   I believe there's a statute change then or shortly**

09:25:14  6   **thereafter.**

09:25:15  7       Q.   Well, before there was any legislation, do you remember

09:25:18  8   that dynamic, that there was interest by law enforcement, the

09:25:24  9   attorney general, in having AOL and others provide additional

09:25:29  10  information to law enforcement?

09:25:34  11      **A.   I don't know about the -- what happened before the**

09:25:37  12  **legislation was passed.**

09:25:38  13      Q.   Okay.  And were you aware of whether or not the -- were

09:25:52  14  you aware of whether or not other providers, other ISPs like

09:25:57  15  Google or Microsoft, were resisting the Government effort in

09:26:04  16  any way; did you have any knowledge of that?

09:26:05  17      **A.   I do not.**

09:26:35  18      Q.   Now, Mr. Phillips, I assume you haven't read any of the

09:26:39  19  testimony from Mr. Ryan, but if I may, I'm going to ask you

09:26:46  20  questions about things that he said and see --

09:26:48  21           THE COURT:  No, you're not.  Unless he's familiar

09:26:51  22  with the testimony that Mr. Ryan gave to Congress, you're not

09:26:53  23  going to ask him questions about it.  Lay a foundation.  If

09:26:56  24  he's familiar with it, you can ask him.  If he's not, you

09:27:00  25  can't.

09:27:04  1        MR. HENDERSON:  Your Honor, if I may, just by way

09:27:06  2  of proffer, explain what --

09:27:07  3                THE COURT:  I've made my ruling.

09:27:08  4                MR. HENDERSON:  Thank you.  Your Honor, let me

09:27:22  5  try it this way, and I know I'm on thin ice.  I'm trying, Your

09:27:27  6  Honor.

09:27:27  7                THE COURT:  Your ice is boiling.

09:27:29  8                MR. HENDERSON:  Okay.

09:27:37  9  BY MR. HENDERSON:

09:27:37  10     Q.  Mr. Phillips, did you know whether or not in the 1990s,

09:27:46  11  when you were there -- when did you start at AOL?

09:27:49  12     **A.  1995.**

09:27:53  13     Q.  1995.  Did you know that as of 1995 and before the IDFP

09:28:00  14  program started that AOL was providing information to law

09:28:11  15  enforcement about child pornography found on its system?

09:28:16  16     **A.  Well, I knew -- I knew that we were -- that AOL was**

09:28:21  17  **responsive to search warrants and subpoenas for information,**

09:28:24  18  **and that that included instances of child pornography.**

09:28:29  19     Q.  And I understand responding to legal process, in the

09:28:34  20  way of subpoenas or summons, but independent of that, do you

09:28:39  21  know whether or not AOL voluntarily provided information to law

09:28:46  22  enforcement about child pornography found in its system?

09:28:50  23     **A.  I don't know that it was voluntary, but I remember that**

09:28:56  24  **there was a Department of Justice investigation in the late**

09:29:01  25  **'90s that -- but I believe that the Department of Justice**

09:29:06  1  **subpoenaed information on thousands of AOL accounts, and it was**

09:29:10  2  **probably one of the first child pornography -- large-scale**

09:29:15  3  **child pornography investigations.**

09:29:19  4   Q.  But the answer to the question was, no, you don't know

09:29:22  5  that AOL was voluntarily providing that information to law

09:29:25  6  enforcement?

09:29:25  7   **A.  I -- no, I do not.**

09:29:28  8   Q.  Okay.  And I think you testified earlier that AOL does

09:29:41  9  not, from your experience, from your knowledge, AOL has never

09:29:46  10  provided information to law enforcement that they weren't

09:29:51  11  required to provide; they've never been proactive about

09:29:55  12  providing that information?

09:29:56  13   **A.  That's correct.**

09:30:26  14   Q.  Now, I think you shared with us yesterday that as far

09:30:33  15  as you knew AOL was the first one to create what we've talked

09:30:38  16  about as the IDFP program; is that right?  No one else was

09:30:45  17  doing it before AOL?

09:30:47  18   **A.  I believe that's correct, yes.**

09:30:49  19   Q.  Okay.  Do you know at what point in time other ISPs

09:30:54  20  like Google, Microsoft, any of the others, started doing the

09:30:59  21  same thing, that is something like IDFP, if not exactly like

09:31:03  22  it?

09:31:03  23   **A.  I have no idea.**

09:31:05  24   Q.  Okay.  As you sit here today, do you know if others do

09:31:12  25  it?

09:31:13  1    **A.   Yes.**

09:31:15  2    Q.   Are all of them doing it?

09:31:19  3    **A.   I don't know.**

09:31:21  4    Q.   Okay.  Referring, if I may, to Defendant's Exhibit T --

09:32:12  5    and I know that Defendant's Exhibit T isn't related directly to

09:32:15  6    this case -- but do you recognize that as a CyberTipline report

09:32:19  7    that would have initiated from AOL, and the date there is --

09:32:25  8    looks like 2005?

09:32:54  9    **A.   Yes, it looks like a report to NCMEC.**

09:32:57  10   Q.   Okay.  And there's a -- the first section there is the

09:33:01  11   part that AOL provides; correct?

09:33:05  12   **A.   Which heading were you speaking about?**

09:33:08  13   Q.   Looking at the first two pages, pages 1 and 2.

09:33:14  14            THE COURT:  Do you have a very good reason for

09:33:16  15   talking about a 2005 tip with this witness that he's never seen

09:33:20  16   for a 2014 suppression hearing?

09:33:22  17            MR. HENDERSON:  Your Honor, I'm comparing it to

09:33:25  18   the one that we have in this case and showing him the

09:33:28  19   difference in the information that AOL has provided between

09:33:31  20   2005 and 2013.

09:33:32  21            THE COURT:  Because?

09:33:34  22            MR. HENDERSON:  It shows that they're providing

09:33:36  23   information that they were not otherwise required to provide,

09:33:39  24   and it also shows that it's information that's assisting law

09:33:43  25   enforcement in what they do.

| | | |
|---|---|---|
| 09:33:47 | 1 | THE COURT:  Well, if the witness is familiar with |
| 09:33:49 | 2 | this document, you can ask him about it, or with this format, |
| 09:33:53 | 3 | but if he's not, you can't. |
| 09:33:55 | 4 | MR. HENDERSON:  Thank you, Your Honor. |
| 09:34:00 | 5 | BY MR. HENDERSON: |
| 09:34:00 | 6 | Q.  Mr. Phillips, were you familiar with the format of the |
| 09:34:03 | 7 | AOL submissions to the CyberTipline in 2005? |
| 09:34:07 | 8 | **A.  Yes.** |
| 09:34:08 | 9 | Q.  And is what we have there on pages 1 and 2 of |
| 09:34:12 | 10 | Defendant's Exhibit T the standard information that you would |
| 09:34:16 | 11 | provide -- that you did provide in 2005 to the CyberTipline? |
| 09:34:23 | 12 | **A.  Yes, it's representative of the data that we would have** |
| 09:34:25 | 13 | **provided at that time.** |
| 09:34:28 | 14 | Q.  Okay.  And the key part of that data was the suspect |
| 09:34:33 | 15 | information on page 2, which is the e-mail address and the |
| 09:34:37 | 16 | screen user name; correct? |
| 09:34:39 | 17 | **A.  Yes.** |
| 09:34:39 | 18 | Q.  And then the zip code -- the additional information, |
| 09:34:45 | 19 | the zip code; is that correct? |
| 09:34:46 | 20 | **A.  Yes.** |
| 09:34:51 | 21 | Q.  Now, at some point in time the information that you |
| 09:34:55 | 22 | provided through the CyberTipline changed; correct? |
| 09:35:00 | 23 | **A.  Yes, it did.** |
| 09:35:01 | 24 | Q.  And referring to Defendant's Exhibit U, which is the |
| 09:35:07 | 25 | CyberTipline report in this case, do you see that? |

09:35:10  1    A.   Yes.

09:35:11  2    Q.   And, again, there in pages 1 and 2 and 3, that's the

09:35:20  3    information that AOL provided to CyberTipline reporting

09:35:26  4    process; is that right?

09:35:27  5    A.   Yes, yes.

09:35:27  6    Q.   And you see there's additional information than what we

09:35:31  7    saw in the 2005 report; correct?

09:35:36  8    A.   Yes.

09:35:37  9    Q.   And included in that additional information is the

09:35:43  10   e-mail -- what's described as the e-mail header there on pages

09:35:48  11   1 and 2; is that correct?

09:35:52  12   A.   Yes.

09:35:54  13   Q.   That information was not present in the 2005 report;

09:35:58  14   right?

09:35:58  15   A.   That's correct.

09:35:59  16   Q.   But it was available in 2005; it just wasn't made part

09:36:04  17   of the report?

09:36:05  18   A.   In 2005 it would have --

09:36:10  19   Q.   You could find it in the system.

09:36:12  20   A.   It would have existed with the e-mail, but it was not

09:36:15  21   required to be reported.

09:36:17  22   Q.   Okay.  And that information in the e-mail code shows a

09:36:23  23   number of things that are helpful to law enforcement; right?

09:36:27  24   A.   Well, the -- there was a change in the law that

09:36:30  25   required us to report the additional information, and I believe

09:36:34  1    that happened in 2006 or 2007.

09:36:39  2       Q.  And this additional information is there to help law

09:36:42  3    enforcement; correct?

09:36:44  4       A.  I'm not sure why it's there.  We were required to

09:36:47  5    report it, so we did.

09:36:49  6       Q.  Okay.  Well, and the information shows where the -- it

09:36:52  7    shows the paper trail for the e-mail, doesn't it?

09:36:55  8       A.  Well, it shows the -- stems from the e-mail servers and

09:36:59  9    the path that it took.

09:37:03  10      Q.  The path beginning with the user, the client?

09:37:07  11      A.  Yes.

09:37:08  12      Q.  All the way to NCMEC?

09:37:11  13      A.  Well, there's actually two sets of headers.  One is

09:37:15  14   that the path from the -- that the e-mail took and the other

09:37:18  15   one is the path of the report going to NCMEC.

09:37:24  16      Q.  And then on the third page we again have the e-mail

09:37:28  17   address; correct?

09:37:30  18      A.  Yes.

09:37:32  19      Q.  There's additional information regarding file name?

09:37:36  20      A.  Yes.

09:37:40  21      Q.  And then is it your understanding that the original

09:37:45  22   e-mail with the original attachment is then forwarded to NCMEC

09:37:50  23   as well?

09:37:51  24      A.  Yes.

09:37:59  25      Q.  And you say that the additional information in

09:38:03   1   Defendant's Exhibit U is required by statute?

09:38:07   2       A.   Yes.

09:38:08   3       Q.   And do you know the process involved in how that

09:38:13   4   statute came to be?

09:38:14   5       A.   I have no idea.

09:38:16   6       Q.   You don't know whether it was in response to the

09:38:19   7   attorney general's request for additional information?

09:38:22   8       A.   I do not.

09:38:42   9       Q.   If I could return just very briefly to the algorithm

09:38:48  10   that AOL uses for hashing.  That's the MD5 algorithm?

09:38:53  11       A.   Yes.

09:38:53  12       Q.   And I think you referenced a SHA-5 and a SHA-11

09:39:00  13   yesterday?

09:39:00  14       A.   I think it -- I think we were a little bit confused

09:39:04  15   yesterday.  It should be a SHA-1 and a SHA-5.

09:39:08  16       Q.   Okay.  Have you worked with the SHA-5?

09:39:14  17       A.   Not extensively.  I used it to hash a file that we were

09:39:21  18   sending out on a thumb drive, and we provide that hash value so

09:39:28  19   that the recipient can check it to make sure that when they

09:39:33  20   receive it they can check the file to make sure that the hash

09:39:37  21   value matches the one that we send them, so they can ensure

09:39:40  22   data integrity so they can be assured that the data has not

09:39:43  23   changed by the time it left AOL's hands until the time they

09:39:46  24   received it.

09:39:47  25       Q.   Okay.  That was one of the reasons for hash values to

09:39:49  1    begin with, right, was to make sure that this file is the same

09:39:52  2    as this file?

09:39:54  3        A.   Yes, that's one of its uses.

09:39:55  4        Q.   Okay.  Now, are you aware of any controversy regarding

09:40:03  5    the integrity of using the MD5 algorithm, whether or not it's

09:40:10  6    been compromised in any way?

09:40:12  7        A.   As far as I know, there has never been a -- what they

09:40:14  8    call a data collision in the wild, but there have been data

09:40:18  9    collisions that have been manufactured in a laboratory-type

09:40:21 10    setting.

09:40:22 11        Q.   Okay.  And when you say "data collision," that means an

09:40:27 12    instance where you had the same hash value representing two

09:40:34 13    different files, two different pictures?

09:40:38 14        A.   Yes.

09:40:39 15        Q.   Okay.  So the collisions have occurred, but not, as you

09:40:43 16    say, in the wild?

09:40:44 17        A.   Not in the wild, correct.

09:40:48 18        Q.   And this is -- I'm just asking you.  Is it your opinion

09:40:53 19    that the MD5 algorithm is still a -- should still be used, is

09:41:00 20    it still a viable security device?

09:41:02 21        A.   Absolutely, yes.

09:41:05 22        Q.   But you're aware that there are others out in the world

09:41:10 23    of hash values that would disagree?

09:41:12 24        A.   Well, from an academic or -- I would say an academic or

09:41:19 25    like a research-type setting, that they have been able to, I

09:41:25   1    guess, produce a scenario where the collisions happen.  But in

09:41:29   2    practical, everyday use, that has not occurred, and, in fact,

09:41:33   3    most of the Internet runs off of using MD5 hashes for just the

09:41:37   4    very reasons you said:  checking -- especially when an e-mail's

09:41:41   5    sent, the Internet is basically what they call a packet switch

09:41:45   6    system.  So your data -- they're ones and zeros -- as it's

09:41:50   7    transmitted across the Internet goes in different packets, and

09:41:52   8    so when you send a message your packet, say, gets broken down

09:41:56   9    to ten packets, and then the receiving host system would

09:42:01  10    receive it and it would wait for all your -- the ten packets

09:42:04  11    for that message to come in, and then they would check that

09:42:07  12    there's a hash value done, and it's MD5 is the most protocol --

09:42:13  13    the algorithmic protocol that they use.  So they would check to

09:42:17  14    see if the data was, in fact -- they would check the data

09:42:21  15    integrity and then all the packets that were received to make

09:42:24  16    sure the message was transmitted properly, and if it wasn't

09:42:26  17    they would ask for one of the packets to be resent if the data

09:42:30  18    got corrupted in transmission.

09:42:34  19        Q.   The hash values are used for securing signatures,

09:42:37  20    aren't they?  That's one of the uses for them?

09:42:40  21        A.   I believe so, yes.  Yes.

09:42:42  22        Q.   It doesn't sound like you're familiar with that,

09:42:45  23    though?

09:42:45  24        A.   Well, signatures are -- it's similar but a little bit

09:42:50  25    different.

09:42:51   1      Q.   Like passwords, right, when you put a password on a

09:42:56   2   system that's a securitization function?

09:42:59   3      **A.   Well, I would call a password an authentication**

09:43:02   4   **function.**

09:43:09   5      Q.   On direct you explained that at some point in time

09:43:15   6   somebody from AOL actually looked at the files that are

09:43:22   7   represented by the hash values in the child pornography data

09:43:28   8   bank; is that correct?

09:43:29   9      **A.   Yes, somebody reviewed the apparent image of child**

09:43:34   10  **pornography and then hash was taken and then the hash value was**

09:43:38   11  **put into the database.**

09:43:40   12     Q.   Now, did you participate in that process?

09:43:42   13     **A.   I have.**

09:43:43   14     Q.   Okay.  And do you have any idea who or when anyone

09:43:55   15  looked at the hash value in this case that was represented in

09:44:01   16  the AOL data bank?

09:44:02   17     **A.   No.**

09:44:05   18     Q.   Could have been any time between 1999 up till 2014 or

09:44:13   19  2013?

09:44:14   20     **A.   Yes.**

09:44:18   21     Q.   And the only thing in that data bank, as I understand

09:44:22   22  it, are the hash values?

09:44:25   23     **A.   That's correct.**

09:44:26   24     Q.   You don't have a library anywhere of any photographs

09:44:31   25  related to those hash values?

09:44:32  1    **A.   We do not.**

09:44:43  2    Q.   I'd like to talk a moment about the privacy notice that

09:44:49  3    you described.  I'm sorry, the Terms of Service, Government

09:44:58  4    Exhibit 5.  Do you have any knowledge who the account -- AOL

09:45:06  5    account holder was in this case?

09:45:10  6    **A.   I believe it was the -- are you talking about the**

09:45:15  7    **screen name or the person's real name?**

09:45:18  8    Q.   The account holder, the person who set up the account

09:45:22  9    at AOL.

09:45:23  10   **A.   I know what our customer service record said that the**

09:45:27  11   **account registered name is, but there's -- that's unverified**

09:45:31  12   **information.**

09:45:32  13   Q.   Okay.  Do you know what that is, who that was?

09:45:35  14   **A.   Not without reviewing the record.**

09:45:38  15   Q.   That's fine.

09:45:39  16   **A.   I know the last name.  I'm not sure about the first**

09:45:41  17   **name on the account.**

09:45:42  18   Q.   Okay.  And it's my understanding from your testimony

09:45:46  19   that the way somebody affirms agreement with the terms of

09:45:51  20   service is simply by logging on to AOL; correct?

09:45:57  21   **A.   Well, you agree when you set up the account, you agree**

09:46:00  22   **to the Terms of Service, and then -- by establishing the**

09:46:05  23   **account.  And that you have to -- there's a box that you have**

09:46:08  24   **to click when you register the account, that you agree to the**

09:46:11  25   **Terms of Service and to abide by it.**

09:46:12  1    Q.   Okay.  Do you know when this account was set up?

09:46:17  2    **A.   I don't know the specific date.**

09:46:21  3    Q.   Okay.  So that's when this Government Exhibit 5 is seen

09:46:28  4    by the AOL user, is when they set up the account?

09:46:33  5    **A.   This specific Exhibit 5?  There may have been another**

09:46:38  6    **Terms of Service that was in force when the account was**

09:46:41  7    **established.  We can add to the -- or change the terms of Terms**

09:46:45  8    **of Service over time as business needs evolve, and then we send**

09:46:49  9    **notice to members of the change in Terms of Service, and then**

09:46:54  10   **their continued use implies consent for accepting the new Terms**

09:46:58  11   **of Service.**

09:46:58  12   Q.   Okay.  So that's how you establish the consent to the

09:47:01  13   Terms of Service, is they just keep using the system?

09:47:05  14   **A.   Yes.**

09:47:05  15   Q.   Okay.  They don't have to sign anything, they don't

09:47:09  16   have to -- you don't know whether they read it or not, do you?

09:47:12  17   **A.   It's there for them to read, and we make it very easy**

09:47:15  18   **to do that.  But if they choose not to, they may click through**

09:47:19  19   **it and click Yes, or they may read it or not, that's correct.**

09:47:23  20   Q.   Okay.  And then this Government Exhibit 5 is effective

09:47:29  21   when?  When was this effective?  Last updated April 19th, 2013?

09:47:36  22   **A.   Yes.**

09:47:45  23   Q.   And when you were asked on direct questions about it,

09:47:48  24   you pointed out the reference to Subsection (a); correct?  Do

09:47:55  25   you remember that?

09:47:55  1    A.   Yes.

09:47:56  2    Q.   And then Mr. Hart directed your attention to other

09:48:01  3  subsections under that subheading; correct?

09:48:04  4    A.   Yes, there's a bunch that could apply.

09:48:08  5    Q.   So you need an attorney to help you read it, too;

09:48:11  6  right?

09:48:11  7    A.   No, I -- I don't think I made it that far, but is two

09:48:15  8  enough, is three enough?  I mean, there's three or four of

09:48:18  9  those scenarios that actually apply.

09:48:20  10   Q.   Okay.  You don't say anywhere in this Terms of Service,

09:48:25  11  do you, that AOL is capturing any images that are sent through

09:48:33  12  the server, putting them on a separate track and running them

09:48:38  13  through this IDFP program, do you?

09:48:41  14   A.   I don't believe specific -- I don't believe specific

09:48:49  15  instances of how we monitor our networks are spelled out in the

09:48:54  16  Terms of Service.

09:48:54  17   Q.   Well, you don't say anywhere in here, do you, that your

09:48:57  18  computer is going to look at their pictures?

09:49:00  19   A.   Well, we're not actually looking at the pictures; we're

09:49:04  20  taking a hash value of the picture and matching it with a known

09:49:07  21  hash value.  That's a little different than somebody sitting

09:49:11  22  there and bringing up an image and viewing it.

09:49:13  23   Q.   Correct.  That's what you and I do, but computers do it

09:49:20  24  through zeros and ones, don't they?

09:49:22  25   A.   Well, they would take a hash value and it matches or

09:49:26   1   **not, and then it would continue on its way.**

09:49:28   2   Q.   But the computer looks at that picture, it sees zeros

09:49:33   3   and ones, but it looks at that picture --

09:49:35   4   **A.   No, it takes a hash value of that picture and compares**

09:49:37   5   **it to a known hash value set.**

09:49:40   6   Q.   Okay.   But when it -- when it -- it calculates that

09:49:45   7   hash value; right?

09:49:47   8   **A.   It's reviewing the ones and zeros.**

09:49:49   9   Q.   Right.   And it can't create that hash value without

09:49:53   10   first looking at the zeros and ones; right?

09:49:56   11   **A.   I beg to differ with your terminology.**

09:49:58   12   Q.   Well, help me out.

09:50:00   13   **A.   It's taking a hash value, it's taking the data**

09:50:04   14   **represented by the image file, it's applying it to the**

09:50:07   15   **algorithm, and taking that result, the MD5 hash value, and**

09:50:12   16   **comparing it to the known hash value set that we have.**

09:50:16   17   Q.   Okay.   And just focusing on that creation of the hash

09:50:20   18   value, the computer has to look at those zeros and ones to then

09:50:26   19   calculate --

09:50:26   20           MR. HART:   Your Honor, objection, cumulative.

09:50:32   21           THE COURT:   Sustained.

09:50:34   22   BY MR. HENDERSON:

09:50:35   23   Q.   Going back to the Terms of Service --

09:50:36   24           THE COURT:   Mr. Henderson, are you about finished

09:50:38   25   with this cross-examination?

09:50:39    1          MR. HENDERSON:  I am.

09:50:40    2          THE COURT:  Let me make a point.  I set this

09:50:42    3  hearing for yesterday afternoon and this morning.  You made no

09:50:46    4  objection to the length of time that we set.  I cannot think of

09:50:50    5  a single instance when you have asked for more time for a

09:50:53    6  hearing that I've refused to give it to you.  And yet you have

09:50:56    7  completely disrespected the Court and everybody present in this

09:50:59    8  courtroom by planning a cross-examination that clearly means

09:51:03    9  that the time set for this hearing, even as I extended it at

09:51:06   10  the end of the day yesterday, is not going to be sufficient.

09:51:09   11          Had you known you were going to need more time,

09:51:12   12  the courteous and professional thing to do would have been to

09:51:15   13  have asked this court for additional time.  We're taking a

09:51:18   14  recess at 10:00 o'clock, at which point your cross-examination

09:51:21   15  of this witness will be finished.  Moreover, because you've not

09:51:25   16  objected to the time that I set and have blatantly disregarded

09:51:29   17  and abused the Court's process in abusing the time that I've

09:51:32   18  set, I'm going to impose time limits on you for the rest of

09:51:35   19  your examinations of witnesses because you've wasted our time

09:51:38   20  and disregarded our process.  You have nine minutes to finish

09:51:42   21  your cross-examination of this witness.  Use it wisely.

09:51:44   22          MR. HENDERSON:  Thank you, Your Honor.

09:51:58   23  BY MR. HENDERSON:

09:52:01   24     Q.  Did -- at the time that AOL was examining alternatives

09:52:06   25  to the IDFP program, did -- was there any consideration of

09:52:12  1   posting notices to users as the user sent an e-mail that when

09:52:23  2   the e-mail comes to AOL and the e-mail attachments come to AOL,

09:52:30  3   a warning "We're going to look at the pictures that you send to

09:52:36  4   us"?

09:52:36  5       **A.   I believe the thinking at the time was that our Terms**

09:52:40  6   **of Service covered monitoring our networks for security and**

09:52:45  7   **illegal activities, and they would rely on the Terms of Service**

09:52:52  8   **to provide that possibility.  If somebody put the pieces**

09:52:56  9   **together, they could figure out that that was going on.  But if**

09:52:59  10  **they chose not to read it, then they may not know.**

09:53:02  11      Q.   So the answer's no, that wasn't considered?

09:53:07  12      **A.   I believe the answer's we didn't -- that we felt that**

09:53:12  13  **the notice was already provided in the Terms of Service.**

09:53:15  14      Q.   Okay.

09:53:58  15              MR. HENDERSON:  Thank you very much, sir.  Thank

09:54:00  16  you, Your Honor.

09:54:01  17              THE COURT:  The Court's going to take a morning

09:54:04  18  recess.  We'll come back at ten after 10:00.

09:54:07  19              Are you going to have any more questions for this

09:54:09  20  witness, Mr. Hart?

09:54:10  21              MR. HART:  Your Honor, I have, I believe, three,

09:54:14  22  maybe four, questions to clarify a couple of issues.

09:54:19  23              THE COURT:  Is that a five-minute process?

09:54:20  24              MR. HART:  No, Your Honor.  I expect that will

09:54:22  25  probably -- oh, less than five minutes, I would expect.  We can

09:54:25  1   do it right now.

09:54:26  2              THE COURT:  Let's do it right now.

09:54:27  3              MR. HART:  Perfect.

09:54:28  4                    REDIRECT EXAMINATION

09:54:28  5   BY MR. HART:

09:54:32  6       Q.  Mr. Phillips, use of the MD5 algorithm, is that

09:54:39  7   standard for companies in the industry that you're involved in?

09:54:44  8       **A.  Yes.**

09:54:47  9       Q.  As far as the requirement -- I'm shifting gears on you.

09:54:53  10  You reference that you are required to report certain things;

09:54:56  11  do you recall that?

09:54:57  12      **A.  Yes.**

09:55:00  13      Q.  I have my Federal Criminal Code and Rules, and I

09:55:06  14  believe what you are referring to is this portion here in

09:55:09  15  Chapter 18, 2258A, where it says, "Whoever, while engaged in

09:55:16  16  providing electronic communication service," then it says,

09:55:20  17  "shall, as soon as reasonably possible, make a report of such

09:55:25  18  facts or circumstances to the CyberTipline."  (As read.)

09:55:28  19          Is that what you're referring to about your requirement

09:55:30  20  to report something?

09:55:32  21      **A.  Yes.**

09:55:32  22      Q.  And that's only when you discover it?

09:55:34  23      **A.  In the normal course of business if we discover it,**

09:55:37  24  **then that's our duty to report.**

09:55:39  25      Q.  If we look then -- that's Subsection (a).  If we look

09:55:44  1   then at subsection -- let me clear this, or not.

09:55:56  2          THE COURT:  Stephanie, can you see if you -- can

09:55:58  3   you press the lower left-hand corner of the screen,

09:56:01  4   Mr. Phillips?  Thank you.

09:56:03  5   BY MR. HART:

09:56:03  6      Q.  We see right up here at the top where it says,

09:56:06  7   "Contents of [the] Report."  "To the extent the information is

09:56:10  8   within the custody or control of an electronic communication

09:56:13  9   service provider, the facts and circumstances included in each

09:56:19 10   report may include the following information," which goes all

09:56:24 11   this length.  (As read.)  Accurate to say that what -- while

09:56:27 12   you are required to report certain things, what you are

09:56:32 13   required to report is permissible, you have certain things that

09:56:38 14   you can if you choose to do so.  Is that a fair statement?

09:56:41 15      **A.  Yes.**

09:56:50 16      Q.  I'm shifting gears again on you.  We talked about

09:56:53 17   training that you provide.  Do you only provide -- when you go

09:56:59 18   out and do trainings, do you only provide training to law

09:57:02 19   enforcement or are there any other entities that you might

09:57:05 20   provide training to?

09:57:07 21      **A.  We would probably provide it -- I have only**

09:57:10 22   **participated in a couple of trainings, and some of it was for**

09:57:18 23   **law enforcement, some of it was for prosecutors.  But our --**

09:57:26 24   **'cause I deal mainly with the criminal compliance.  It's geared**

09:57:29 25   **towards those folks 'cause they're the ones asking us for**

09:57:33  1    information.

09:57:33  2        Q.   All right.  Well, and let's focus on that.  When you

09:57:36  3    provide these trainings, are they to clarify or make more

09:57:41  4    efficient the process by which any one of these entities might

09:57:45  5    ask for information?

09:57:47  6        A.   Yes.

09:57:47  7        Q.   Why do you do that?

09:57:49  8        A.   **To save our time, because we have a lot of requests**

09:57:52  9    **that we have to process, and to also make it more efficient for**

09:57:55  10   **them so we don't waste their valuable time in investigating and**

09:57:59  11   **doing their jobs.**

09:58:00  12       Q.   Has it been your experience that when you are dealing

09:58:03  13   with an agent or law enforcement agency that has never dealt

09:58:07  14   with AOL, that they ask for things in a manner that you don't

09:58:10  15   necessarily understand?

09:58:13  16       A.   **Yes.**

09:58:13  17       Q.   And what does that require you to do?

09:58:15  18       A.   **It requires a direct follow-up with them to say that we**

09:58:20  19   **need this type of legal instrument before we can release**

09:58:23  20   **whatever type of data that they're asking for.**

09:58:25  21       Q.   So this involves additional phone calls, talking with

09:58:28  22   legal counsel, things of that nature?

09:58:30  23       A.   **Yes.**

09:58:30  24       Q.   Slows the process down?

09:58:32  25       A.   **Yes.**

09:58:32   1       Q.   Takes up more of your time?

09:58:34   2       A.   **Takes up more of our time.**

09:58:35   3       Q.   Is that dollars?

09:58:36   4       A.   **That is dollars.**

09:58:37   5       Q.   All right.

09:58:39   6             MR. HART:   Thank you, sir.  I don't have any

09:58:41   7   further questions for you.

09:58:42   8             THE COURT:   Mr. Henderson, you may recross within

09:58:43   9   the scope of the redirect for no more than five minutes.

09:58:46  10             MR. HENDERSON:   Thank you, Your Honor.

09:58:48  11                     RECROSS-EXAMINATION

09:58:48  12   BY MR. HENDERSON:

09:58:52  13       Q.   Within the industry, do you know who else uses the MD5?

09:58:56  14       A.   **I believe most Internet providers use the MD5 for one**

09:59:01  15   **purpose or another.**

09:59:04  16       Q.   But you don't know for sure?

09:59:06  17       A.   **I'm 99 percent sure most Internet providers use it in**

09:59:11  18   **their mail systems.**

09:59:13  19       Q.   Okay.  Why the MD5 system?

09:59:16  20       A.   **Yes, for when data is transmitted between providers,**

09:59:19  21   **there's a check that's done to make sure, as I explained, that**

09:59:23  22   **all the packets are received, and that's pretty much the**

09:59:26  23   **industry standard protocol that's used.**

09:59:29  24       Q.   Microsoft uses the PhotoDNA; correct?

09:59:33  25       A.   **I believe they developed PhotoDNA.  Whether they use it**

09:59:37  1    or not, I'm not sure what they use on their back-end processes.

09:59:41  2         Q.   Do you know what the PhotoDNA is used for, the

09:59:45  3    identification of child pornography?

09:59:48  4         A.   I have a basic understanding that that's what it's used

09:59:51  5    for, yes.

09:59:52  6         Q.   And PhotoDNA's different from MD5?

09:59:55  7         A.   Yes.

09:59:57  8         Q.   You indicated that you deal mainly with criminal

10:00:01  9    compliance; correct?

10:00:02  10        A.   That's correct, that's our unit within the legal

10:00:05  11   department that I work for.

10:00:06  12        Q.   Okay.  Is this the first time that you've testified

10:00:10  13   about IDFP and hash values?

10:00:13  14        A.   It's been involved in other cases, but this is probably

10:00:18  15   the most thorough that I've talked about it.

10:00:23  16        Q.   Do you mean other times have you testified about it?

10:00:27  17        A.   I've testified over a hundred times, so I'm not sure

10:00:31  18   how many cases were IDFP-specific.  I'd have to go back and

10:00:36  19   review them.

10:00:38  20             MR. HENDERSON:  Thank you.  Thank you, Your Honor.

10:00:39  21             THE COURT:  Mr. Phillips, you may step down.

10:00:42  22   You're excused from the court.  The Court's going to take a

10:00:44  23   recess.  We'll come back at 10:15.  The Court's in recess.

10:00:49  24             CLERK NALL:   All rise.

10:00:50  25             (A recess was taken from 10:00 to 10:14 AM.)

5-20-14   USA v. ACKERMAN   No. 13-10176

60

| | | |
|---|---|---|
| 10:15:06 | 1 | CLERK NALL:   All rise. |
| 10:15:09 | 2 | THE COURT:   You may be seated. |
| 10:15:10 | 3 | Mr. Hart, you may call your next witness. |
| 10:15:12 | 4 | MR. HART:   Thank you, Your Honor.   The Government |
| 10:15:14 | 5 | would call Mr. John Shehan.   If you'll stand right here, |
| 10:15:18 | 6 | Mr. Shehan, and be sworn. |
| 10:15:21 | 7 | JOHN SHEHAN, |
| 10:15:21 | 8 | having been first duly sworn to testify the truth, the whole |
| 10:15:28 | 9 | truth, and nothing but the truth, testified as follows: |
| 10:15:29 | 10 | DIRECT EXAMINATION |
| 10:15:29 | 11 | BY MR. HART: |
| 10:15:37 | 12 | Q.   Good morning, sir.   Would you please introduce yourself |
| 10:15:39 | 13 | to the court. |
| 10:15:40 | 14 | **A.   My name is John Shehan.   I am the Executive Director of** |
| 10:15:45 | 15 | **the Exploited Child Division at the National Center for Missing** |
| 10:15:48 | 16 | **& Exploited Children.** |
| 10:15:48 | 17 | Q.   How long have you been with the National Center for |
| 10:15:53 | 18 | Missing & Exploited Children or, as we may refer to it, NCMEC? |
| 10:15:55 | 19 | **A.   I joined NCMEC in February of 2000.** |
| 10:15:59 | 20 | Q.   And how long have you been in your current position? |
| 10:16:02 | 21 | **A.   My current position, I've been within that for a number** |
| 10:16:06 | 22 | **of years.   When I first joined the center, it was as a call** |
| 10:16:09 | 23 | **center specialist, where I was answering the phones, taking** |
| 10:16:13 | 24 | **leads and sightings related to missing children.   I spent about** |
| 10:16:17 | 25 | **a year or year and a half in that position.   I then joined the** |

10:16:20  1  Exploited Child Division as analyst within the CyberTipline.  I

10:16:24  2  have held a number of positions, progressing as a supervisor,

10:16:28  3  program manager of the CyberTipline, then the Director of the

10:16:31  4  Exploited Child Division, and now as the Executive Director of

10:16:35  5  the Exploited Child Division.

10:16:37  6  Q.  You've mentioned a division.  How many divisions are

10:16:40  7  within NCMEC?

10:16:41  8  A.  There are a number of different divisions within the

10:16:45  9  National Center for Missing & Exploited Children.  There are

10:16:47  10  five main divisions:  that being Missing Children, Child Sexual

10:16:54  11  Exploitation, Training, Child Safety and Prevention, Child

10:16:59  12  Victim and Family Support.  Now, under those five main

10:17:02  13  divisions there are dozens of different programs and

10:17:06  14  approximately 350 employees.

10:17:08  15  Q.  Within -- well, let's just back up a little bit and

10:17:12  16  take a larger view.  What is the overall mission of NCMEC?

10:17:16  17  A.  Sure.  NCMEC is a private, nonprofit organization that

10:17:21  18  was established in 1984.  The mission of the center is to help

10:17:26  19  reunite families with missing children, reduce child sexual

10:17:30  20  exploitation, and prevent child victimization.  We're able to

10:17:34  21  accomplish those goals through those five different divisions

10:17:37  22  that I just described.

10:17:39  23  Q.  And those five different divisions -- well, I think

10:17:46  24  we'll end up spending most of our time talking about the

10:17:48  25  division in which you are involved, but as -- you mention that

| 10:17:52 | 1 | this is a nonprofit, charitable organization.  How do you get |
| 10:17:58 | 2 | funding? |
| 10:17:58 | 3 | **A.   Well, we receive funding through federal grants, as** |
| 10:18:04 | 4 | **well as individual donations, corporate sponsorships and** |
| 10:18:09 | 5 | **donations as well, and in-kind donations, normally in the field** |
| 10:18:13 | 6 | **of software, hardware, or programming support.** |
| 10:18:17 | 7 | Q.   Now, approximately how much do you receive in terms of |
| 10:18:21 | 8 | federal dollars? |
| 10:18:23 | 9 | **A.   Around 75 percent, according to our 2012 annual report.** |
| 10:18:26 | 10 | Q.   And private funds, then are those the other 25 percent? |
| 10:18:30 | 11 | **A.   Yes.** |
| 10:18:32 | 12 | Q.   And when you talk about in-kind donations, can you |
| 10:18:35 | 13 | clarify, for those of us who don't run a nonprofit, what that |
| 10:18:39 | 14 | means? |
| 10:18:39 | 15 | **A.   Sure.  In-kind donations can be something separate from** |
| 10:18:44 | 16 | **a financial contribution.  Software, it can be something as** |
| 10:18:46 | 17 | **small as Adobe Acrobat licenses that are donated for free, or** |
| 10:18:50 | 18 | **servers, software systems.  It's something that as a nonprofit** |
| 10:18:54 | 19 | **organization we're able to accept those donations, which tally** |
| 10:18:58 | 20 | **into the millions of dollars if you were to actually add those** |
| 10:19:02 | 21 | **up.** |
| 10:19:02 | 22 | Q.   Do those in-kind donations that -- the breakdown that |
| 10:19:07 | 23 | you gave us of 75 percent federal funds, 25 percent the other, |
| 10:19:11 | 24 | the other side, are the in-kind donations that you're talking |
| 10:19:14 | 25 | about, are they part of that 75 or are those separate and on |

| | | |
|---|---|---|
| 10:19:17 | 1 | top of that 25 percent? |
| 10:19:19 | 2 | **A.  Those would be on top of that 25 percent.  It's not** |
| 10:19:22 | 3 | **calculated in that percentage breakdown.** |
| 10:19:24 | 4 | Q.  And you indicated that it would be within the millions. |
| 10:19:27 | 5 | Do you have an actual estimate as to how much -- how much money |
| 10:19:34 | 6 | would be accounted for in the in-kind donations? |
| 10:19:37 | 7 | **A.  Not a precise number.  Every year is going to be a** |
| 10:19:40 | 8 | **little different.  Let's say one particular year it was** |
| 10:19:44 | 9 | **servers.  That's a very high-dollar type of donation, which you** |
| 10:19:47 | 10 | **wouldn't need subsequently down the road, and programming as** |
| 10:19:52 | 11 | **well.  If a particular program or something was developed by** |
| 10:19:55 | 12 | **the help of a company, once it's developed it, again, may need** |
| 10:19:59 | 13 | **maintenance, but the initial start-up costs would go down, so** |
| 10:20:03 | 14 | **it varies.** |
| 10:20:03 | 15 | Q.  And fair to say that as computer technology and the |
| 10:20:08 | 16 | ways in which computers work or software works, even though you |
| 10:20:15 | 17 | got servers, at some point in the past, will you ever need |
| 10:20:19 | 18 | servers in the future? |
| 10:20:20 | 19 | **A.  Absolutely.  The CyberTipline and other areas within** |
| 10:20:23 | 20 | **the national center are always needing maintenance and upkeep** |
| 10:20:26 | 21 | **and changes.** |
| 10:20:28 | 22 | Q.  Now, let's talk about the division that you're in. |
| 10:20:35 | 23 | That's the Exploited Children Division? |
| 10:20:37 | 24 | **A.  Yes.** |
| 10:20:37 | 25 | Q.  And within that Exploited Children's Division, what are |

| | |
|---|---|
| 10:20:41 | 1 |

10:20:41   1   some of the programs that you run within that division?

10:20:43   2       A.   Within the Exploited Children Division there are three

10:20:46   3   main programs of work, all of which I oversee, the financial,

10:20:50   4   operational, and policy decisions of those, that would be the

10:20:56   5   CyberTipline, our Child Victim Identification Program, and an

10:21:00   6   Internet safety helpdesk and hotline called NetSmartz411.

10:21:06   7       Q.   Can you describe what each one of those programs do?

10:21:09   8       A.   Sure.  NetSmartz411 was created in 2007 by -- Qwest

10:21:17   9   Communications had donated $500,000.  The goal of that Internet

10:21:21  10   safety helpdesk and hotline is to provide a service to the

10:21:25  11   public, specifically towards parents and guardians of children.

10:21:29  12   What we realized through focus testing in the Internet safety

10:21:34  13   and prevention realm is that many parents were uncomfortable

10:21:37  14   with technology and computers.  Often they would say their

10:21:41  15   child knows more about the Internet than they do.  We wanted to

10:21:44  16   bridge that informational gap, so we created this hotline

10:21:47  17   service, where they can call in and speak with people, ask

10:21:50  18   about what is the computer, what is the Internet, what are

10:21:53  19   filtering and monitoring softwares I can put on my home

10:21:56  20   computer.  It's a free service, and it stays current by the

10:22:00  21   questions that come in to NetSmartz411.

10:22:03  22       Q.   And so through that service, do you have folks there

10:22:08  23   working that are actually communicating by the telephone with

10:22:12  24   parents of children?

10:22:13  25       A.   Yes, there's a toll-free hotline that they can call in,

10:22:16   1   and we also communicate via e-mail and electronically.

10:22:21   2       Q.  So that's the NetSmartz?

10:22:23   3       A.  411.

10:22:24   4       Q.  All right.  You mentioned another component or another

10:22:28   5   program.  What was that?

10:22:29   6       A.  The Child Victim Identification Program.

10:22:31   7       Q.  Yes, what is that?

10:22:32   8       A.  It was established in 2002.  After the CyberTipline,

10:22:38   9   fortunately I was with the center and in the Exploited Child

10:22:41  10   Division during its creation, and it was born because our staff

10:22:44  11   were seeing the same images recirculated online over and over

10:22:49  12   again.  We wanted to know what the story was with that child,

10:22:53  13   has that child been removed from that abusive situation, and we

10:22:57  14   started to keep track of the victims and the series, not

10:23:01  15   necessarily the victim's information per se, but just what it

10:23:05  16   was frequently traded as and whether or not that child has been

10:23:08  17   identified.

10:23:08  18           Now, the victim identification team will review copies

10:23:13  19   of seized evidence by law enforcement and can tell them, out of

10:23:17  20   10,000 files, if a certain number of those files have already

10:23:21  21   been identified by law enforcement previously, so they, in

10:23:25  22   turn, focus on potentially new victims in rescuing them from

10:23:29  23   abusive situations.

10:23:30  24       Q.  Let me stop you real quick.  That CVIP, the Child

10:23:37  25   Victim Identification Program, C-V-I-P, what was the reason to

10:23:41   1   begin that program?

10:23:41   2      A.   It was -- the beginning of that program, it was for our

10:23:45   3   own staff welfare, it was our interests in knowing if these

10:23:51   4   children have been identified and if they are out of those

10:23:53   5   abusive situations.

10:23:54   6      Q.   Fair to say, if you continually see these and you don't

10:23:57   7   know that that child's been removed from that environment, if

10:24:01   8   you continue to see these, that causes some distress?

10:24:03   9      A.   Absolutely.

10:24:04   10     Q.   So that's the genesis of that.  How is it being --

10:24:12   11   well, is that available, made available, that database -- is it

10:24:15   12   a database?

10:24:16   13     A.   There are a database of hash values of files we have

10:24:19   14   reviewed within that identification program.

10:24:22   15     Q.   Okay.  So you keep track of, hey, this set of images,

10:24:27   16   we know that that child has been identified; these, though,

10:24:30   17   brand new.  Is that kind of how it works?

10:24:32   18     A.   Correct, correct.

10:24:33   19     Q.   Now, if law enforcement wants to get information

10:24:36   20   relative to that, how would they do that?

10:24:38   21     A.   If law enforcement had -- let's use the 10,000 files

10:24:43   22   example.  If they had 10,000 files that they had just seized

10:24:47   23   and they wanted to know if any of those were previously

10:24:50   24   identified or if there are new victims, they would make a copy

10:24:54   25   of that evidence, they would send it to a federal liaison, who

10:24:58  1   **is located at the National Center for Missing & Exploited**

10:25:00  2   **Children, to maintain that badge-to-badge transfer of**

10:25:04  3   **information.  Our team would then review that material, and we**

10:25:09  4   **can produce a report that would outline how many files have**

10:25:13  5   **been previously identified, and we would also be reviewing the**

10:25:18  6   **unidentified files, in hopes of finding a location to where**

10:25:22  7   **those victims may be.**

10:25:23  8      Q.   But this is a submission that comes from law

10:25:26  9   enforcement to you, not necessarily the other way around?

10:25:29  10     **A.   Correct.**

10:25:29  11     Q.   Is law enforcement able -- well, but then when you get

10:25:32  12  done with that, do you then provide a report to law enforcement

10:25:36  13  regarding the findings?

10:25:36  14     **A.   Yes, a final report -- it's a child identification**

10:25:40  15  **report -- is provided to law enforcement that would outline,**

10:25:43  16  **out of the files submitted, how many are from previously**

10:25:47  17  **identified series.**

10:25:48  18     Q.   You identified that the disc that is provided or the

10:25:52  19  evidence that's provided by the outside law enforcement agency

10:25:56  20  comes to -- did you say an FBI liaison?

10:25:59  21     **A.   A copy of the evidence would be submitted to a federal**

10:26:03  22  **liaison.  If it's an FBI case, it would come to FBI.  If it's**

10:26:06  23  **an ICAC-type case it would go to a postal inspector.**

10:26:09  24     Q.   Well, that raises a question as to does your division

10:26:14  25  employ any law enforcement officers?

10:26:17  1        A.   No, my division does not employ any officers, nor does

10:26:20  2   the organization as a whole have any law enforcement employed.

10:26:23  3        Q.   Now, are there law enforcement folks that are colocated

10:26:28  4   in your -- I guess in the building that you occupy?

10:26:30  5        A.   Federal law enforcement have liaisons that serve their

10:26:35  6   organizations or agencies' interests that are located within

10:26:39  7   secure, separate offices at the national center.

10:26:41  8        Q.   When you say "secure, separate offices," if you wanted

10:26:45  9   to go downstairs and go to the FBI liaison office, are you able

10:26:49 10   to just pass right through their doors and go back in the back

10:26:54 11   parts of their office?

10:26:55 12        A.   No, I am not.

10:27:01 13        Q.   Now, then let's just talk about the last part of the --

10:27:05 14   the other program that you referenced, the CyberTipline.

10:27:12 15   What -- well, how did that come about?

10:27:14 16        A.   The CyberTipline was launched in March of 1998.  It was

10:27:19 17   created through a very generous donation by Sun Microsystems.

10:27:25 18   They donated the hardware, the software, helped write the

10:27:29 19   technical specs, and even provided some programming assistance

10:27:32 20   to launch the CyberTipline.

10:27:33 21        Q.   Now, before NCMEC undertook development of this

10:27:38 22   CyberTipline, had NCMEC been doing any other sort of hotline

10:27:43 23   sort of activity?

10:27:45 24        A.   We had -- we had, and still have, a toll-free hotline,

10:27:49 25   1-800-THE-LOST, where individuals could call in and report

10:27:55   1   **missing children, tips relating to missing children or child**

10:27:59   2   **sexual exploitation.**

10:28:00   3   Q.   So that's actually physical phone, you call, you talk

10:28:03   4   to a person?

10:28:04   5   **A.   Yes.  Before the CyberTipline was launched, there**

10:28:06   6   **wasn't a central location really anywhere in the world where**

10:28:08   7   **individuals could make reports online regarding child sexual**

10:28:13   8   **exploitation.**

10:28:14   9   Q.   So when you developed the CyberTipline, does this sort

10:28:18   10  of mirror what's already been going on via the telephone

10:28:20   11  services but does it via the e-mail or Internet?

10:28:23   12  **A.   Yes.  It was a more structured way for us to collect**

10:28:27   13  **information related to child sexual exploitation.**

10:28:31   14  Q.   So that is in 19 -- you said March 1998?

10:28:36   15  **A.   Correct.**

10:28:37   16  Q.   Now, when you -- well, let's continue.  Discuss --

10:28:42   17  explain for us more of the genesis of the CyberTipline.

10:28:45   18  **A.   At the time of our launch, or around the time of our**

10:28:48   19  **launch, it was Vice President Al Gore who had described the**

10:28:52   20  **CyberTipline as the 911 of the Internet.  And before its time,**

10:28:58   21  **like I mentioned earlier, there wasn't a central location where**

10:29:01   22  **individuals could report child sexual exploitation.  We send**

10:29:04   23  **reports related to online and real-world situations.  So, for**

10:29:09   24  **example, child molestation, the online enticement of children**

10:29:13   25  **for sexual acts, child sex trafficking, child pornography,**

10:29:18   1   unsolicited obscene materials sent to a child, essentially

10:29:23   2   anything related to child sexual exploitation can be reported

10:29:25   3   at CyberTipline.com or individuals can still call our toll-free

10:29:31   4   hotline.  Someone answers that line every single day 24 hours a

10:29:34   5   day and they will enter that information to CyberTipline.com

10:29:38   6   for them.

10:29:39   7       Q.  Now, I want to be clear, the CyberTipline, the public

10:29:43   8   is allowed to use that?

10:29:45   9       A.  Correct.

10:29:45   10      Q.  They can actually submit a report through -- is there

10:29:49   11  an online portal?

10:29:50   12      A.  It's an online reporting form at CyberTipline.com.

10:29:54   13      Q.  And are ISPs able to make reports through the

10:29:58   14  CyberTipline?

10:29:58   15      A.  They are, but they use a separate, secure reporting

10:30:01   16  mechanism.

10:30:02   17      Q.  All right.  And we'll get to the reasons why that is in

10:30:05   18  just a moment.

10:30:07   19          Now, were there any Congressional statutes that came

10:30:11   20  of -- or that were in play at the time the CyberTipline was

10:30:14   21  created in March of 1998?

10:30:16   22      A.  Not at the time of CyberTipline's creation.

10:30:20   23      Q.  Does Congress address the CyberTipline later?

10:30:23   24      A.  Yes.

10:30:23   25      Q.  And explain for us how that occurs.



10:30:26  1      A.  Several years later, several -- later there was a

10:30:30  2  reporting law that was enacted that not only requires

10:30:34  3  companies, if they become aware of apparent child pornography,

10:30:37  4  it also directs the CyberTipline to make these reports

10:30:41  5  available to law enforcement.

10:30:42  6      Q.  And you said "several years later."  What law are you

10:30:46  7  referencing?

10:30:46  8      A.  The very first reporting law was 42 U.S.C. 13032, which

10:30:54  9  was later updated to 18 U.S.C. 2258A.

10:30:58  10     Q.  And is it -- I want to make sure that I'm clear, is it

10:31:02  11  years, several years later, or is it several months later?

10:31:04  12     A.  I'm not sure on the exact date.

10:31:07  13     Q.  But it occurs after you all have started the

10:31:10  14  CyberTipline reporting system?

10:31:11  15     A.  Absolutely, it was after.

10:31:13  16     Q.  And we can go look up 42 whatever it was.  All right.

10:31:23  17  Now, we've covered a little bit about who the CyberTipline

10:31:28  18  services, but explain to us sort of how it operates.

10:31:31  19     A.  Information is reported in to the CyberTipline

10:31:35  20  regarding child sexual exploitation.  We serve as a

10:31:39  21  clearinghouse for information, so we are going to review the

10:31:42  22  information that's provided, we're going to attempt to find a

10:31:46  23  location so that we can make that report available to law

10:31:50  24  enforcement.

10:31:50  25          We also use information that's reported into the

10:31:53  1   CyberTipline to drive our prevention and educational

10:31:58  2   departments within the national center.  For example, through

10:32:02  3   reports by members of the public, we've found that oftentimes

10:32:06  4   children, when they're being approached by individuals who have

10:32:09  5   a sexual interest in children, they often ask for their cell

10:32:14  6   phone.  During the creation of the CyberTipline, you know, back

10:32:16  7   in the late '90s, many of the Internet safety messaging was

10:32:20  8   related to the home computer and making sure that it was in a

10:32:23  9   central location.  As we saw these trends within the tipline,

10:32:27  10  we realized we needed to adapt our prevention messages.  We

10:32:31  11  needed to make sure the parents were aware of all the

10:32:33  12  electronic devices in the home, especially the cell phone now

10:32:36  13  that there are smartphones, and the way that they connect

10:32:38  14  online and can produce photographs.

10:32:42  15      Q.   You've referenced the variety of type of reports that

10:32:47  16  the CyberTipline addresses:  child exploitation images, sex

10:32:51  17  trafficking and so forth.  When a company wants to submit --

10:32:57  18  and I'm going to move outside the public realm and deal with

10:33:01  19  the ESPs or ISPs.  When a company wants to submit a

10:33:04  20  CyberTipline report, how do they do that?

10:33:07  21      A.   We will make contact with the -- the company will make

10:33:10  22  contact with our department.  We will do a brief registration

10:33:13  23  process.  That's just collecting information as far as the

10:33:17  24  company name, who the person responsible for the types of

10:33:21  25  reports may be.

10:33:22  1     Q.   Now, is this the very first point in which an ESP or an

10:33:27  2  ISP gets in contact with you?

10:33:29  3     **A.   Yes.   They would make initial contact and say, "Dear**

10:33:34  4  **CyberTipline, I am interested in reporting to you."   So at that**

10:33:37  5  **point in time we need to set up a secure and encrypted-access**

10:33:41  6  **user permissions so they can use that secure channel.**

10:33:44  7     Q.   To your knowledge, do all ESPs have a -- this sort of

10:33:48  8  relationship with you?

10:33:50  9     **A.   There are approximate -- there are more than a thousand**

10:33:53  10  **companies who currently have access to reports, but there are**

10:33:57  11  **estimates of nearly 5,000 U.S.-based companies in existence, so**

10:34:00  12  **not every company is registered or set up to report.**

10:34:03  13     Q.   Well, and it sounds like it's perhaps a frightening --

10:34:10  14  only 20 percent -- if I understand your estimates, only 20

10:34:14  15  percent actually have this reporting relationship with you?

10:34:17  16     **A.   Through the secure channel.   Certainly a company could**

10:34:19  17  **go to CyberTipline.com and file a report.**

10:34:21  18     Q.   All right.   But let's keep then going through what they

10:34:25  19  do when they initially establish -- we want to use your -- we

10:34:29  20  want to make a report to you.   What do they do?

10:34:31  21     **A.   Uh-huh.   So we've given them their details to access**

10:34:34  22  **that secure stream, the portal, to report into the**

10:34:38  23  **CyberTipline.   At that point in time, it's up to them on what**

10:34:42  24  **type of information they want to provide.   There are two**

10:34:44  25  **elements of a report that are required.   It's what type of**

| | |
|---|---|
| 10:34:48 | 1 |

**incident are you trying to report -- normally it's child**

**pornography-related, but any one of those incident types that I**

**described earlier could now be reported -- and the date and**

**time of the incident that they want to report.  Everything else**

**is completely voluntary.**

Q.  All right.  Let's -- I'm going to put in front of you

what has been admitted as Government's Exhibit No. 1.  You have

a copy of it in front of you.

**A.  Thank you.**

Q.  I'm turning to -- it's the third page of the packet,

but it's page 1 of the report.

**A.  Uh-huh.**

Q.  In terms of what is required, is that what we see right

here?

**A.  Yes, it would be the first two, the Incident Type and**

**the Incident Time.  Those are the two required fields in order**

**to submit a report.  Anything past that is optional.**

Q.  All right.  And up to the discretion of the ESP?

**A.  Absolutely.**

Q.  Now, when you go through this initial process of

setting them up on the -- your secure system -- well, one, why

is it secure?

**A.  Well, certainly because of the transmission of files,**

**we need to make sure it's encrypted and secure so that that**

**transmission is not intercepted.**

5-20-14  USA v. ACKERMAN  No. 13-10176

| | |
|---|---|
| 10:36:12 | 1 |
| 10:36:20 | 2 |
| 10:36:24 | 3 |
| 10:36:26 | 4 |
| 10:36:32 | 5 |
| 10:36:37 | 6 |
| 10:36:40 | 7 |
| 10:36:44 | 8 |
| 10:36:47 | 9 |
| 10:36:50 | 10 |
| 10:36:53 | 11 |
| 10:36:58 | 12 |
| 10:37:01 | 13 |
| 10:37:04 | 14 |
| 10:37:05 | 15 |
| 10:37:05 | 16 |
| 10:37:08 | 17 |
| 10:37:08 | 18 |
| 10:37:08 | 19 |
| 10:37:11 | 20 |
| 10:37:13 | 21 |
| 10:37:13 | 22 |
| 10:37:18 | 23 |
| 10:37:22 | 24 |
| 10:37:27 | 25 |

Q.   And in order for them and you to know that this -- the service is working correctly, are you in communication with the ESP as they're setting this up?

A.   Yes.  We will -- we are -- we offer a test server that a company can attempt nondata-related, nonuser or a person that needs to be reported.  It's all dummied down that they can test there and then move over into production.  We would provide a feedback that it's received.  And even when we are in the live production environment, when a company successfully submits a report into the CyberTipline, they receive a confirmation receipt of report that includes the CyberTipline report number.

Q.   All right.  So let me make sure I'm understanding this. On the front end when you're just beginning, you do some dummy testing?

A.   Correct.

Q.   And then when you move to, I think you called it, live production --

A.   Yes.

Q.   -- when they're actually submitting reports, you continue to provide feedback to them?

A.   Yes.

Q.   Why do you continue to provide feedback to them?

A.   Well, certainly as part of the reporting requirement, we provide them with that receipt of report so they'll know the report number and they could save that to prove compliance.

10:37:33  1     Q.   And when you are dealing with the reports that are

10:37:35  2   submitted, when you provide that feedback -- well, have you

10:37:39  3   ever had instances where a company submits a report, it

10:37:43  4   includes an image, and your analysts review the image and they

10:37:47  5   say, this is a picture of a giraffe, what -- why did you send

10:37:52  6   us this?

10:37:52  7     A.   Yes, we have.

10:37:56  8     Q.   What do you do in that context?

10:37:58  9     A.   If a report came in and all of the uploaded files

10:38:01  10  contained inanimate objects or pictures of giraffes, we would

10:38:05  11  contact the company to be sure they were aware of that report,

10:38:09  12  to make sure it was not reported in error.

10:38:11  13    Q.   So there's sort of this feedback loop built into your

10:38:15  14  system?

10:38:15  15    A.   When needed, we would make that type of proactive call.

10:38:19  16    Q.   And is that one of the reasons why analysts of the

10:38:22  17  CyberTipline review the reports that come in?

10:38:24  18    A.   That is one reason.   Another reason is to review and

10:38:29  19  try to find locations to where we can make that report

10:38:32  20  available to law enforcement.

10:38:34  21    Q.   And can you describe what you mean by that.

10:38:37  22    A.   Sure.   An image, when you review an image, especially

10:38:39  23  when we're talking about child pornography victims, there are

10:38:42  24  times that visually when you inspect that image there are

10:38:46  25  background clues that may help you ascertain, well, from the

10:38:50  1   **beginning, where in the world this child may be, electrical**

10:38:53  2   **outlet or a keyboard are very different in the United States**

10:38:56  3   **versus Europe, for example.  That may help us.  If this**

10:39:00  4   **child -- we are not familiar with that image of that child,**

10:39:03  5   **this could be a live victim, that child could be at harm, so**

10:39:07  6   **we'd want to know that information.  There's also information**

10:39:10  7   **embedded within a digital image.  It's referred to as EXIF**

10:39:15  8   **metadata.**

10:39:15  9       Q.   And that's EXIF?

10:39:17  10      **A.   Correct.  If you were to take a picture with your**

10:39:20  11  **digital camera and you left your location services on, that**

10:39:24  12  **photograph, it may have embedded within it GPS coordinates,**

10:39:27  13  **again would help us identify a potential location to where that**

10:39:31  14  **image was taken.**

10:39:31  15      Q.   And that -- those items of information, do they then

10:39:39  16  affect on the back end who you refer it to?

10:39:41  17      **A.   It would help us to determine where we could make this**

10:39:44  18  **report available to, which location, which area we should make**

10:39:48  19  **that report available to, yes.**

10:39:49  20      Q.   All right.  So we have on one end feedback looped to

10:39:53  21  the ESP, on the other end looking at this also helps us

10:39:56  22  identify where it may need to go?

10:39:58  23      **A.   Correct.**

10:40:06  24      Q.   Now, let's get back to talking about what the ESP does

10:40:10  25  when they make a report.  You have established live

| | | |
|---|---|---|
| 10:40:13 | 1 | production -- you've gone through the dummy testing, live |
| 10:40:15 | 2 | production.  ESP wants to file a CyberTipline report.  How do |
| 10:40:19 | 3 | they do it? |
| 10:40:22 | 4 | **A.   They would access the secure mechanism, and they would** |
| 10:40:25 | 5 | **provide elements that would match within the CyberTipline and** |
| 10:40:29 | 6 | **transmit that information.  It's very -- it can be a manual** |
| 10:40:32 | 7 | **process or it can be automated.  It depends on how they decide** |
| 10:40:35 | 8 | **to make those reports.  Some companies utilize both methods.** |
| 10:40:38 | 9 | Q.   And in your experience working the CyberTipline, are |
| 10:40:44 | 10 | there a wide range or wide variety of ways in which ESPs report |
| 10:40:49 | 11 | information? |
| 10:40:49 | 12 | **A.   Absolutely.  Every company can report differently.** |
| 10:40:52 | 13 | **They can choose to use certain fields and not use other ones.** |
| 10:40:56 | 14 | **Some of the smaller companies may tend to use the manual form,** |
| 10:40:59 | 15 | **since there are significant financial investments that have to** |
| 10:41:03 | 16 | **go into the automated types of reporting, but every company** |
| 10:41:07 | 17 | **reports a little bit differently.** |
| 10:41:08 | 18 | Q.   All right.  And in AOL's case, as we see in the |
| 10:41:15 | 19 | CyberTip from Government's Exhibit No. 1, they actually provide |
| 10:41:18 | 20 | quite a bit of information? |
| 10:41:19 | 21 | **A.   Yes.** |
| 10:41:19 | 22 | Q.   They create an .eml file that is sent from AOL's |
| 10:41:27 | 23 | servers? |
| 10:41:27 | 24 | **A.   Yes, the CyberTipline looks at any file extension, any** |
| 10:41:31 | 25 | **file type.** |

10:41:33   1      Q.   Now, not every ESP does it the way AOL does?

10:41:37   2      A.   Correct.

10:41:54   3      Q.   So we have an ESP that has submitted a report.   What

10:42:00   4   does NCMEC then do with that information?

10:42:03   5      A.   NCMEC staff are going to review the information that's

10:42:06   6   been provided.   We're working off what's given to us.   That

10:42:10   7   information, once it's received, it's locked and sealed, if you

10:42:14   8   will.   My staff, none of us can change any of the information

10:42:19   9   that's provided by that reporting company.   So that part is a

10:42:22   10   permanent record within the CyberTipline.

10:42:24   11        We, again, are reviewing that information, and we're

10:42:28   12   looking for a location to make that report available to law

10:42:32   13   enforcement, and then we will do that.   Every report that comes

10:42:36   14   into the CyberTipline is made available to federal law

10:42:39   15   enforcement.

10:42:40   16      Q.   All right.   The portion that is -- you said the portion

10:42:44   17   that the ESP provides, that is -- you can't change it?

10:42:49   18      A.   Correct.

10:42:51   19      Q.   In the CyberTip report, what portion is the uneditable

10:42:56   20   portion?

10:42:56   21      A.   Section A of this report.

10:42:58   22      Q.   So that's the information that comes from the ESP?

10:43:00   23      A.   Yes.

10:43:01   24      Q.   You can't do anything to change it at all?

10:43:04   25      A.   No.

10:43:04  1    Q.   Now, what's the next part of what NCMEC does?

10:43:11  2    A.   **We're going to review the information that's within**

10:43:16  3    **that report.  We may conduct a historical search within the**

10:43:19  4    **CyberTipline, based on key elements reported, whether that be a**

10:43:23  5    **screen name or an e-mail address, for example.  That helps us**

10:43:27  6    **to say, oh, we've had past reports, whether it's from that**

10:43:31  7    **company, a member of the public, or a different company, and we**

10:43:34  8    **can see where that prior report was made available to, who,**

10:43:38  9    **what law enforcement may already be dealing with that case.**

10:43:41  10   **That way you're not -- there's a lot of reports that come**

10:43:44  11   **through our CyberTipline, 500,000 just last year alone, so we**

10:43:49  12   **don't want to duplicate efforts.  We try and make sure, if**

10:43:52  13   **there's an investigation on a particular CyberTipline report,**

10:43:55  14   **that they receive additional reports in the future.**

10:43:58  15   Q.   And we'll get into a little bit more detail as to what

10:44:03  16   the analysts actually do, but assuming they have done their

10:44:07  17   review, what do they do after they've completed their review

10:44:13  18   and analysis?

10:44:13  19   A.   **Well, at that point in time we're going to make the**

10:44:16  20   **report available to law enforcement.  It could be placing it on**

10:44:20  21   **to our virtual private network.  We actually designate it**

10:44:24  22   **towards a particular law enforcement agency, or we end up**

10:44:28  23   **closing that report and then every report is made available to**

10:44:33  24   **federal law enforcement.**

10:44:33  25   Q.   All right.  So while the analyst is doing their

10:44:36  1   analysis, this report has not yet been made available to law

10:44:41  2   enforcement?

10:44:41  3   **A.   No, it is not available to law enforcement while we are**

10:44:43  4   **processing that report.**

10:44:43  5   Q.   And just to be clear, when you finish your analysis,

10:44:49  6   you make it available --

10:44:51  7   **A.   Uh-huh.**

10:44:51  8   Q.   -- rather than send it out?

10:44:53  9   **A.   Yes, we make that report available, where law**

10:44:56  10  **enforcement can come into the CyberTipline through a virtual**

10:45:00  11  **private network, and they can actually download that report.**

10:45:03  12  **That way the center is not transmitting child pornography**

10:45:08  13  **files.  If there's an imminent risk or life-threatening**

10:45:11  14  **situation, we may e-mail or fax a paper copy of the report, but**

10:45:14  15  **it would not contain any uploaded files; it would be to give**

10:45:18  16  **them the information as quickly as possible.  But by and far**

10:45:21  17  **they are coming into our system through the virtual private**

10:45:25  18  **network to access that report.**

10:45:26  19  Q.   And they only have access after you've completed

10:45:30  20  figuring out where it should be routed to?

10:45:32  21  **A.   Correct.**

10:45:39  22  Q.   Now, let's go ahead and talk about Government's Exhibit

10:45:42  23  No. 1 and walk right through it.  And let's start with page 1.

10:45:46  24  **A.   Okay.**

10:45:51  25  Q.   Right here on the front -- actually, let's -- I want to

10:46:05  1    back up just a minute because I think this might get more

10:46:08  2    confusing if we go here before covering a couple of things.

10:46:12  3         **A.   Okay.**

10:46:12  4         Q.   When the report comes in, what processes -- what

10:46:21  5    processes does the NCMEC go through?  You indicated they review

10:46:27  6    the images.  Is there any prioritization that goes on?

10:46:31  7         **A.   Yes, and that actually happens before the CyberTipline**

10:46:34  8    **staff open the report.  So the report when it comes in, whether**

10:46:39  9    **it's from a member of the public or from a company, it goes**

10:46:42  10   **into our CyberTipline.  We've had 2.4 million reports to date.**

10:46:47  11   **Our hotline, the 24-hour, every-single-day-of-the-week**

10:46:51  12   **operation, there's a group of people that review those reports.**

10:46:55  13   **They will prioritize those reports based on a risk to a child.**

10:46:59  14        **Now, the company reports that come through the secure**

10:47:03  15   **reporting mechanism, those are automatically assigned as a**

10:47:06  16   **Priority E, which designates it as coming from an electronic**

10:47:10  17   **service provider.  But any other reports are going to be**

10:47:13  18   **triaged and reviewed on a one, two, or three scale.  A Priority**

10:47:18  19   **One is eminent risk.  That child's life is believed to be at**

10:47:22  20   **risk.  It could be a child who has just run away from home to**

10:47:26  21   **meet with someone they met online.  They need to make sure that**

10:47:29  22   **we've processed that report and made it available to law**

10:47:32  23   **enforcement in a matter of minutes, if not hours, but as**

10:47:34  24   **quickly as possible.**

10:47:35  25        **The Priority Two is -- it's still a heightened risk to**

10:47:41  1    a child, but the life-threatening, imminent-harm situation is

10:47:44  2    removed.  It could be, for example, a child who is molested

10:47:48  3    several years ago.  They're not in that imminent-harm

10:47:51  4    situation, but it certainly needs more attention, quicker

10:47:54  5    attention, than our Priority Three, which are normally web

10:47:57  6    sites, news groups, usually dealing with child sexual abuse

10:48:02  7    material that's posted on the Internet, whether it's the World

10:48:05  8    Wide Web or news groups or peer-to-peer.

10:48:07  9        Q.  So within your organization, you do this prioritization

10:48:14  10   in order to identify risk to a child?

10:48:15  11       A.  Absolutely.  If we believe a child's life is in danger,

10:48:18  12   we want to get this information and reviewed and made available

10:48:22  13   to law enforcement as quickly as possible.

10:48:23  14       Q.  All right.  And not just law enforcement, but the

10:48:25  15   appropriate law enforcement?

10:48:26  16       A.  Absolutely.

10:48:27  17       Q.  When you -- with this prioritization, that happens on

10:48:32  18   the very, very front end.  Is it possible, through the course

10:48:35  19   of the analyst's review, if in their review of images they

10:48:39  20   determine, well, this isn't just an E, a submission by

10:48:46  21   electronic service provider, but this, in fact, appears to

10:48:48  22   represent active production and should be a One.  Is the

10:48:52  23   analyst able to reprioritize within your system?

10:48:56  24       A.  Yes.  Not only can our staff escalate a report to a

10:49:00  25   Priority One, those Priority E's that I mentioned that came in

10:49:05  1  **earlier, that classification, as part of some of our**

10:49:07  2  **enhancements to the CyberTipline that took place three years**

10:49:10  3  **ago, the companies, if they have reason to believe that a**

10:49:14  4  **child's life is in immediate risk, they too can escalate at the**

10:49:18  5  **time of report.  It would not be as an E; it would be one of**

10:49:20  6  **our highest-ranking priority levels.**

10:49:42  7  Q.  And as far as we have described it up to this point

10:49:45  8  from where the CyberTip comes in and the analyst does their

10:49:50  9  work, up to the point where the report is then made available

10:49:56  10  through the virtual private network, is there any law

10:50:00  11  enforcement agent that is directing the analyst to do anything?

10:50:04  12  **A.  No.**

10:50:06  13  Q.  Is there any direction in the statutes related to NCMEC

10:50:12  14  that tell the analyst what to do?

10:50:14  15  **A.  No.**

10:50:15  16  Q.  And as far as the statutes go related to NCMEC, the

10:50:19  17  only thing that you are required to do is, when you receive

10:50:22  18  report, is transmit it to the appropriate law enforcement

10:50:25  19  authority?

10:50:26  20  **A.  It's to make those reports available to law**

10:50:28  21  **enforcement, correct.**

10:50:28  22  Q.  Make them available.  All right.  Well, then let's

10:50:41  23  then -- let's then walk through that CyberTip report,

10:50:47  24  Government's Exhibit No. 1.  And just to be clear, this report

10:50:53  25  relates to Mr. Ackerman and plains66952@aol.com.

10:50:59   1          When this report was created, had there been any

10:51:02   2   contact by law enforcement regarding Mr. Ackerman with NCMEC?

10:51:06   3      **A.   No.**

10:51:07   4      Q.   Was there any direction provided by law enforcement as

10:51:11   5   to what should be in this report?

10:51:12   6      **A.   No.**

10:51:13   7      Q.   All right.   Now, this is received -- where do we see

10:51:16   8   where it's received?

10:51:17   9      **A.   It would be in the middle of this page.   Received by**

10:51:20  10   **NCMEC on 4/23/2013 at 9:36:09 UTC.**

10:51:28  11      Q.   We've already seen the account termination on an AOL

10:51:32  12   document, indicating that that account was terminated about two

10:51:36  13   minutes before this report is received.   That is the point,

10:51:40  14   though, when any information comes into the NCMEC's hands?

10:51:43  15      **A.   Correct.**

10:51:44  16      Q.   We have a table of contents here, and then we get into

10:51:49  17   the reported information, Section A.   Let's back up.   We have

10:51:54  18   four sections here?

10:51:56  19      **A.   Yes.**

10:51:57  20      Q.   This is that -- Section A is the uneditable information

10:52:02  21   from the ESP?

10:52:03  22      **A.   It is.   This section that we created, our table of**

10:52:07  23   **contents, if you will, it was to try and make these reports**

10:52:11  24   **more user friendly, more readable.   Historically some of our**

10:52:15  25   **older reports were more difficult for law enforcement to**

10:52:19  1  understand and follow the flow of which portions are from the

10:52:22  2  company, which portions are from our staff, and which law

10:52:26  3  enforcement made it available to.  So it is a much cleaner

10:52:30  4  version here, to explain the reported information versus the

10:52:33  5  activity by NCMEC staff.

10:52:34  6     Q.   And does that -- by virtue of being a little clearer,

10:52:37  7  does that mean that you're not answering a whole lot of phone

10:52:40  8  calls?

10:52:40  9     A.   Yes.  We made these changes because it was taking a

10:52:43  10  significant number of -- a number of hours explaining the

10:52:46  11  reports over the phone, as well as at some trainings.  So from

10:52:50  12  a financial and operational aspect, we were happy to make these

10:52:53  13  changes.

10:52:54  14     Q.   And instead of -- instead of somebody at NCMEC talking

10:52:57  15  on the phone with a child or family, they were spending time

10:53:01  16  talking with a law enforcement officer?

10:53:02  17     A.   We would be spending, yes, yes, so now we have more

10:53:05  18  time to devote towards protecting children.

10:53:09  19     Q.   The Section B, it says Automated Information by NCMEC

10:53:12  20  Systems, that is -- from this point on, from B, C, and D, that

10:53:20  21  is information created by NCMEC?

10:53:21  22     A.   Correct.

10:53:21  23     Q.   Now, as it relates to A, is this same type of report

10:53:26  24  what would be generated if a private citizen made a CyberTip

10:53:30  25  report?

10:53:31   1       A.   Similar, yes.  It's the reported information, whether

10:53:33   2   it came from a company or a member of the public.

10:53:35   3       Q.   All right.  So it might look different if it was a

10:53:37   4   private citizen but otherwise --

10:53:39   5       A.   For example, you wouldn't have uploaded file

10:53:41   6   information in Section A.

10:53:42   7       Q.   All right.  So we are going to go through Section A,

10:53:47   8   and just sort of walk me through what they're seeing here?

10:53:51   9       A.   The very beginning piece, the submitter, which is this

10:53:54  10   is who the report came from, if it was a member of the contact

10:53:56  11   and they left their contact details, it would show that.  In

10:53:59  12   this case it was from America Online.  The next section is our

10:54:03  13   incident information.  They chose that reporting category, the

10:54:06  14   incident type of child pornography.

10:54:08  15       Q.   And is this selected by the ESP?

10:54:11  16       A.   Yes.

10:54:11  17       Q.   All right.  You are not able to change that in this

10:54:15  18   part of the report?

10:54:15  19       A.   We are not able to ever change that portion within the

10:54:19  20   report.

10:54:19  21       Q.   Okay.

10:54:22  22       A.   And the next would be the incident time, again provided

10:54:25  23   by the company, as well as the access date and time provided by

10:54:28  24   the company.  And one thing that I'll point out, these -- the

10:54:32  25   access date and time is a voluntary field.  We're now moving

10:54:35   1   into that section, and you'll notice there that isn't a time

10:54:38   2   zone after the 6-23.  The company chose not to fill in that

10:54:42   3   section.

10:54:44   4       Q.   Okay.  As we move into the next section titled E-mail,

10:54:47   5   what are we seeing there?

10:54:48   6       A.   This is an e-mail header, and it's information that was

10:54:52   7   provided by the reporting party at the time of submission.

10:54:58   8       Q.   And so this is something that AOL provides; it's not

10:55:03   9   extracted by NCMEC and then plugged into this report?

10:55:05   10      A.   No, that's a very good question, in the sense that

10:55:10   11  National Center for Missing & Exploited Children does not have

10:55:11   12  any access to a company's servers or systems.  Information

10:55:16   13  provided into the CyberTipline is uploaded by the company.

10:55:19   14  They choose the elements of what to provide.  And we have no

10:55:24   15  way of garnering additional information.

10:55:25   16      Q.   Right.  You can't tell them, hey, we need this thing,

10:55:29   17  cough it up?

10:55:29   18      A.   We cannot.

10:55:30   19      Q.   Okay.  So we continue on page 2.

10:55:34   20      A.   This is also the header Continued provided by the

10:55:38   21  company.

10:55:39   22      Q.   All right.  And then we turn now to page 3.

10:55:50   23      A.   Yes.

10:55:50   24      Q.   All right.

10:55:51   25      A.   This is the user or person being reported, so we have

10:55:53  1  an e-mail address of plains66952@aol.com, and the screen user

10:55:59  2  names of plains66952.

10:56:02  3      Q.  And then this additional information, what does this

10:56:08  4  relate to?

10:56:08  5      A.  The additional information section of the CyberTipline

10:56:11  6  report is an open text field where companies can provide

10:56:16  7  additional information, reporting parties.  This is their

10:56:19  8  opportunity to explain the incident that may be occurring.

10:56:23  9  It's unlimited.  So this is text that in this case the

10:56:26  10  reporting company chose to provide.

10:56:28  11      Q.  All right.  Let's then move on to the uploaded file

10:56:35  12  information.  What do we see here?

10:56:37  13      A.  In this case there is one uploaded file.  It doesn't

10:56:41  14  denote it in the report, but there were four images located

10:56:45  15  within this uploaded file, and they've provided a file name for

10:56:49  16  that one file.

10:56:50  17      Q.  All right.  And so that file, that .eml file, is that

10:56:57  18  also attached as part of what is submitted to NCMEC?

10:57:00  19      A.  Yes, the company would submit that uploaded file at the

10:57:04  20  time of the report.

10:57:04  21      Q.  And so this is the way in which NCMEC identifies, yeah,

10:57:09  22  we actually received this file?

10:57:11  23      A.  This is the file name of the file we received.

10:57:14  24      Q.  That file then sort of moves along and goes into the

10:57:18  25  VPN, where it's later accessible by law enforcement?

10:57:22  1    **A.   Yes.**

10:57:22  2    Q.   Do you do anything to alter, manipulate, change

10:57:26  3    anything related to that file?

10:57:30  4    **A.   Occasionally the file name would need to be changed.**

10:57:33  5    **It's a very rare situation.  Normally if a file name contains**

10:57:37  6    **foreign text, for example, the computers and the databases**

10:57:40  7    **cannot recognize those texts, and when we do that the file**

10:57:44  8    **would be renamed to the MD5 hash value of the file.  That did**

10:57:48  9    **not happen in this situation, and it's extremely rare.**

10:57:51  10   Q.   So it's only if -- in the file name, in this aol_idfp,

10:57:58  11   everything before .eml -- it's only when that has, I don't

10:58:02  12   know, Sanskrit or Chinese text?

10:58:05  13   **A.   Something that cannot be recognized by a database, it**

10:58:08  14   **would need -- instead of rejecting that file, it would need to**

10:58:11  15   **be renamed, and we chose -- we operationally chose to name that**

10:58:15  16   **file as the MD5 hash so we would recognize that that situation**

10:58:19  17   **was occurring.**

10:58:19  18   Q.   And as far as the -- would there be a notation that

10:58:23  19   you've made that change?

10:58:24  20   **A.   We would know, and, fortunately, changing a file name**

10:58:28  21   **does not alter the file or the hash value associated to that**

10:58:32  22   **file.**

10:58:32  23   Q.   Right.  All right.  So let's then move to Section B,

10:58:36  24   page 4.  And this is titled Automated Information by NCMEC

10:58:42  25   Systems.

10:58:43  1    A.   Yes.

10:58:43  2    Q.   Can you explain what's going on here.

10:58:45  3    A.   As part of our enhancements to the CyberTipline, we

10:58:48  4    have created automated processes.  When I first joined the

10:58:53  5    CyberTipline, we had to do a lot of manual, brute-force type of

10:58:59  6    searches and value adding.  For example, if an IP address was

10:59:05  7    reported, we would have to copy that IP address, we would have

10:59:08  8    to go out to a publicly available web site, we'd have to copy

10:59:11  9    it in, generate the WhoIs lookup for that IP address, wait for

10:59:18  10   the results, copy and paste that back into the report, and when

10:59:20  11   you're dealing with hundreds of thousands of CyberTipline

10:59:22  12   reports, every minute counts, it adds up over time, and as a

10:59:26  13   business decision we've decided to try and create automated

10:59:29  14   processes.

10:59:30  15        So now if an IP address is provided in a proper field,

10:59:35  16   a structured field, by a company at the time of report, our

10:59:38  17   system, before our analysts even open the report, it's already

10:59:41  18   gone out and run a publicly available search on that IP address

10:59:45  19   and provided that text into the CyberTipline.  This is where

10:59:49  20   that would occur, so it's clearly marked as the system running

10:59:54  21   some searches versus any activity within the staff.

10:59:58  22   Q.   All right.  And in terms of what was actually provided

11:00:02  23   in this case, what is provided is essentially, I guess, who

11:00:09  24   submitted the report and how to contact them and what their

11:00:13  25   retention policy is?

| | | |
|---|---|---|
| 11:00:14 | 1 | **A.   Yes, and in this case the IP address.   The example that** |
| 11:00:17 | 2 | **I used, there was an IP address provided, but it was not in a** |
| 11:00:20 | 3 | **structured field that would allow for automated processes to** |
| 11:00:23 | 4 | **occur, so there's nothing in this section.   If our staff** |
| 11:00:28 | 5 | **believe that we've reviewed images that appear to be child** |
| 11:00:31 | 6 | **pornography, based on that classification we have templates** |
| 11:00:35 | 7 | **that have been provided by companies that are automatically** |
| 11:00:40 | 8 | **inserted into the report as useful information to provide to** |
| 11:00:42 | 9 | **law enforcement.** |
| 11:00:44 | 10 | Q.   So this part right here, this is actually created by |
| 11:00:48 | 11 | America Online.   They gave it to you and you just know, hey, |
| 11:00:51 | 12 | when we have AOL this part goes in here automatically? |
| 11:00:53 | 13 | **A.   Yes, that language is provided in advance, that we make** |
| 11:00:57 | 14 | **sure it goes into reports.** |
| 11:00:58 | 15 | Q.   So that concludes Section B.   So this then brings us to |
| 11:01:04 | 16 | Section C, which is additional information provided by NCMEC? |
| 11:01:08 | 17 | **A.   Uh-huh.** |
| 11:01:09 | 18 | Q.   Now, is this the part where the analyst that's |
| 11:01:11 | 19 | referencing what the analyst is starting to do? |
| 11:01:13 | 20 | **A.   Yes, this would be the staff activity, correct.** |
| 11:01:15 | 21 | Q.   All right.   So let's take it from the top here, NCMEC |
| 11:01:18 | 22 | priority level. |
| 11:01:19 | 23 | **A.   So as I explained earlier, this is a Priority E, which** |
| 11:01:22 | 24 | **means it was submitted by an electronic service provider.   The** |
| 11:01:26 | 25 | **next is our NCMEC classification.   While it reads "child** |

11:01:29  1    pornography confirmed," what that means is when the staff

11:01:33  2    member viewed the uploaded files, they viewed content that

11:01:37  3    appears to be child pornography.

11:01:39  4        Q.   And not a giraffe?

11:01:41  5        A.   Correct.

11:01:41  6        Q.   So if it had been a giraffe or a 1957 Chevy or the

11:01:46  7    Statue of Liberty, this would say something different than

11:01:50  8    "child pornography confirmed"?

11:01:51  9        A.   Correct.

11:01:51  10       Q.   Then the next is when the date of processing?

11:01:55  11       A.   Yes, this is when our staff are finished with this

11:01:58  12   report.  It's been made available to law enforcement, we are

11:02:01  13   finished.

11:02:01  14       Q.   All right.  So that is the, "We're done,"

11:02:04  15   handing-it-off point?

11:02:05  16       A.   Yes.

11:02:05  17       Q.   Not when you get started?

11:02:07  18       A.   Correct.

11:02:08  19       Q.   The start would be on the very front page of when it's

11:02:11  20   received, so this process that you have, as it relates to this

11:02:15  21   report, is kind of a two -- two-day process?

11:02:17  22       A.   Well, actually there's a third piece in there, too.  So

11:02:20  23   we have the date of when it was received, and as we scroll down

11:02:23  24   in here to NCMEC Note 1, you're going to see some initials and

11:02:27  25   the date time stamp, that's when the staff member began to

11:02:30  1   **process this report.**

11:02:31  2       Q.  So you're referring, I imagine, to right here under

11:02:35  3   NCMEC Note No. 1.  Can you describe what we're seeing right

11:02:39  4   here?

11:02:39  5       **A.  Sure, our staff members always begin with ECD**

11:02:44  6   **hyphenated their initials, so this is Exploited Child Division**

11:02:46  7   **and this is the staff member that processed this report.**

11:02:49  8       Q.  All right.  And then we see this date and time stamp?

11:02:52  9       **A.  Uh-huh.  There's a Now button located within the**

11:02:56  10  **CyberTipline that would insert this date and time.**

11:02:58  11      Q.  All right.  And so is that the point in time where the

11:03:01  12  analyst first begins their process?

11:03:03  13      **A.  Yes.**

11:03:04  14      Q.  All right.  And so what do we see then as we go

11:03:07  15  through?

11:03:07  16      **A.  Well, as I mentioned earlier, there was an IP address**

11:03:10  17  **provided by the reporting company within that header**

11:03:12  18  **information.  The staff member here took that IP address and**

11:03:17  19  **had to run a WhoIs lookup.**

11:03:20  20      Q.  And WhoIs, is that publicly available -- is that using

11:03:25  21  publicly available?

11:03:26  22      **A.  Yes, there are a number of publicly available services**

11:03:29  23  **that allow you to run a WhoIs for an IP address.  It helps us**

11:03:34  24  **to determine a location to make this report available.**

11:03:36  25      Q.  And so what we're seeing here as we go through -- and

| | | |
|---|---|---|
| 11:03:40 | 1 | I'm not even going to act like I necessarily understand all |
| 11:03:43 | 2 | this -- |
| 11:03:43 | 3 | **A.   Okay.** |
| 11:03:44 | 4 | Q.   -- but we see what a look-up failed, do not find a |
| 11:03:48 | 5 | domain name corresponding to this IP address.  What do we -- |
| 11:03:51 | 6 | what is that telling us? |
| 11:03:52 | 7 | **A.   There are four parts to a WhoIs, if you will.  The** |
| 11:03:55 | 8 | **first is the Reverse DNS.  In this case it failed.  Now, none** |
| 11:03:59 | 9 | **of the four by themselves should really be relied on** |
| 11:04:02 | 10 | **independently.  You try to take all the different pieces, so** |
| 11:04:05 | 11 | **the next we're looking at is going to be the administrator of** |
| 11:04:08 | 12 | **records, as well as the IP block and the technical contacts.** |
| 11:04:13 | 13 | **That's when you're moving over into page 6 of this report.  And** |
| 11:04:18 | 14 | **you'll see there the Rural Telephone Service Company.  So** |
| 11:04:21 | 15 | **oftentimes our staff will try and figure out, is that IP block** |
| 11:04:25 | 16 | **that you see at the top, is it a relatively large block?  If it** |
| 11:04:29 | 17 | **is, that means it's a large provider.  Smaller blocks, it may** |
| 11:04:31 | 18 | **be more of a mom-and-pop or smaller type of ISP service, so now** |
| 11:04:36 | 19 | **we know this is a Rural Telephone Service Company.** |
| 11:04:38 | 20 | Q.   Let me make sure that I'm tracking with you.  This is |
| 11:04:41 | 21 | the block of IPs that you look for? |
| 11:04:43 | 22 | **A.   This is the block of IPs that are owned by Rural** |
| 11:04:47 | 23 | **Telephone Service Company, yes.** |
| 11:04:47 | 24 | Q.   All right.  Since we were dealing with that number |
| 11:04:50 | 25 | there, we kind of see that that falls within -- |

11:04:56   1      A.   Yes, that IP address will fall within that net range,

11:04:58   2   and that means that Rural Telephone Service Company owns that

11:05:01   3   IP address.

11:05:01   4      Q.   Okay.  And so then you find, well, Rural Telephone

11:05:05   5   Service Company's in Hays, Kansas.  So does this kind of give

11:05:08   6   us an indication, at least for NCMEC, that we're dealing with

11:05:11   7   somebody who's in Kansas?

11:05:12   8      A.   It helps.  When I was referring to the smaller

11:05:15   9   providers, most likely they only provide a regional service.

11:05:18   10   Obviously, if that went back to AT&T, you wouldn't send it to

11:05:22   11   the headquarters that shows up for AT&T.

11:05:24   12      Q.   Right, because the actual subscriber might be in a much

11:05:27   13   smaller town in the neighboring state?

11:05:29   14      A.   Right.

11:05:29   15      Q.   So this is drilling down to at least you have a

11:05:33   16   geographic area?

11:05:33   17      A.   Uh-huh.  And when you move into page 7, you're going to

11:05:37   18   find more related to the WhoIs.  You have the trace route,

11:05:40   19   which also gives indications of Kansas, when you look at the

11:05:43   20   very bottom, the KS on 12 within the trace route, and then the

11:05:47   21   geographical search results also point towards Kansas.  So you

11:05:51   22   look at the four areas in the culmination to decide if you can

11:05:56   23   make that type of report available.

11:05:58   24      Q.   All right.  And so far what the analyst has reported

11:06:04   25   doesn't really involve to the images; this just relates to the

| 11:06:10 | 1 | IP address? |
|---|---|---|

11:06:10   2      A.   IP address that was provided in the header, yes.

11:06:12   3      Q.   Okay.  So let's then look at Note No. 2.  What do we

11:06:17   4  see here?

11:06:18   5      A.   So this portion, now the analyst has begun by taking

11:06:22   6  that screen name that was provided by the reporting company,

11:06:25   7  and we've done a past CyberTipline technical assistant search.

11:06:30   8  I mentioned earlier that we've had more than 2.4 million

11:06:33   9  reports into the CyberTipline.  Every single report is still

11:06:36   10  within our system.  We maintain control of those reports, and

11:06:39   11  we can search to see if there's ever been any prior reports.

11:06:43   12  And in this case there were none on that screen name or IP

11:06:46   13  address.

11:06:46   14      Q.   Okay.  And so that's what this line right here, this

11:06:49   15  past CT-TA searches?

11:06:53   16      A.   Yes.

11:06:54   17      Q.   Is the CT, that stands for CyberTip?

11:06:57   18      A.   Yes.

11:06:57   19      Q.   What does TA stands for?

11:06:59   20      A.   Technical assistance.

11:07:00   21      Q.   And what is a technical -- explain that just very

11:07:02   22  briefly.

11:07:02   23      A.   Sure.  So a CyberTipline is where we're receiving

11:07:06   24  information and making it available to law enforcement.  There

11:07:08   25  are times when law enforcement will contact us within the

11:07:12  1   **CyberTipline and ask if we -- they want technical assistance.**

11:07:16  2   **They will ask if we can help run a trace route or WhoIs lookup**

11:07:20  3   **on an IP address.  They will ask if we've had past reports on a**

11:07:25  4   **screen name or e-mail address.  Maybe they have a separate type**

11:07:28  5   **of investigation not related to the center at all, and they**

11:07:30  6   **want to know if there's any information within the**

11:07:33  7   **CyberTipline.**

11:07:33  8   Q.   So if law enforcement actually is contacting you and

11:07:37  9   requesting information, that comes in as a TA?

11:07:39  10   **A.   Technical assistance.**

11:07:40  11   Q.   Technical assistance?

11:07:41  12   **A.   Uh-huh.**

11:07:42  13   Q.   In this case the analyst went ahead and ran that on the

11:07:46  14   front end, to see if they'd seen prior reports or technical

11:07:50  15   assistance requests?

11:07:51  16   **A.   Yes, because that means that there could have been some**

11:07:53  17   **type of investigation at some point in time.**

11:07:55  18   Q.   And if you had identified where that person -- that

11:07:58  19   report went to, would that assist your analyst in saying, well,

11:08:01  20   this report should go to the same place?

11:08:03  21   **A.   Yes, we certainly would make a phone call to see if**

11:08:07  22   **there is an active investigation or if we can -- if we should**

11:08:11  23   **send that report somewhere else.**

11:08:12  24   Q.   Likewise, if a law enforcement agency had called in or

11:08:16  25   done a technical assistance request for, hey, you got anything

11:08:20  1    on plains66952, that would also tip off the analyst that, hey,

11:08:27  2    maybe I should go back to that agency with this information?

11:08:30  3        A.   Correct.

11:08:30  4        Q.   In this case, though, when the analyst looked for this,

11:08:35  5    there were no results as to these -- this IP address or the

11:08:39  6    user name?

11:08:39  7        A.   Correct.

11:08:41  8        Q.   All right.  So then what do we see the analyst doing

11:08:44  9    here?

11:08:44  10       A.   So the analyst then took the e-mail address,

11:08:47  11   plains66952@aol.com, copied and pasted into publicly available

11:08:53  12   search engines and search pages, whether it's social media

11:08:57  13   sites or a Google search, to see if there's any information

11:09:02  14   related to that e-mail account that's publicly available.

11:09:04  15       Q.   All right.  And so I want to make a hundred percent

11:09:07  16   clear, publicly available means you or I get on a computer, we

11:09:10  17   Google search somebody, this would be the exact same process?

11:09:14  18       A.   Correct.

11:09:14  19       Q.   NCMEC does not have any special unauthorized back-door

11:09:18  20   access or anything like that?

11:09:19  21       A.   Correct.

11:09:19  22       Q.   All right.  So then we see Facebook.  Is the next

11:09:25  23   search that they do -- would this be a publicly available

11:09:29  24   Facebook page?

11:09:30  25       A.   Yes, it is.

5-20-14  USA v. ACKERMAN  No. 13-10176

100

11:09:31  1    Q.  If the person -- if the person had their settings

11:09:34  2    locked down to where all you get is their name, would the

11:09:38  3    analyst necessarily find anything?

11:09:39  4    **A.  We would not.  If the privacy settings were employed,**

11:09:42  5    **you may recognize that there is an account, but you would not**

11:09:46  6    **see any information related to that Facebook account.**

11:09:48  7    Q.  So here we see some information that the analyst found

11:09:53  8    related to a name of Wally Ackerman, work and education, and

11:09:59  9    what appears to be an assembler at Cawker City, Kansas.  Now,

11:10:04  10   that information also sort of helping identify, well, we were

11:10:09  11   at Hays, Kansas, and now we're more closely Cawker City,

11:10:13  12   Kansas.  Is this all still relating to finding the appropriate

11:10:16  13   law enforcement entity?

11:10:18  14   **A.  Yes, it's all about trying to find that location.  And**

11:10:20  15   **what we do is when we find a match like this, we copy it**

11:10:24  16   **exactly as we find it into the report, and save a copy of that**

11:10:27  17   **page.**

11:10:27  18   Q.  All right.  And actually I think we saw that -- we

11:10:30  19   didn't look at it but we saw it on the disc that Agent Moore

11:10:34  20   had of certain PDF files.  Is that how you save it, as a PDF

11:10:40  21   files?

11:10:40  22   **A.  As a PDF, so it cannot be altered.**

11:10:43  23   Q.  Okay.  Then we look, we have Myspace.  Is that the same

11:10:46  24   sort of search that's occurring there on Myspace?

11:10:49  25   **A.  Yes, we insert that e-mail address and see if there are**

11:10:51  1   **any publicly available results.**

11:10:57  2       Q.   And then based on the information that was found off of

11:11:00  3   Facebook and Myspace, it appears the analyst then ran some

11:11:04  4   additional looks for CT or TA searches related to those terms?

11:11:10  5       **A.   Correct.**

11:11:10  6       Q.   And then with negative results.  TLO is the next thing.

11:11:16  7   "I searched TLO for Wally Ackerman."  What's TLO?

11:11:20  8       **A.   It's a public records database search.  It's publicly**

11:11:23  9   **available information in that any member of the public could**

11:11:26  10  **have access to.**

11:11:26  11      Q.   All right.  And so we get quite a bit of information.

11:11:31  12      **A.   Yes, that would be page 9, page 10, and portions of**

11:11:35  13  **page 11, the results from that publicly available search.**

11:11:38  14      Q.   All right.  And so then based on that information found

11:11:43  15  through TLO, they do another CyberTip technical assistance

11:11:49  16  search based on these three terms, with negative results?

11:11:53  17      **A.   Correct.**

11:11:54  18      Q.   All right.  And then it says VPN Kansas ICAC.  What

11:11:59  19  does that mean?

11:12:00  20      **A.   It means at that point in time we are finished working**

11:12:03  21  **on that screen name, that e-mail address, we know this report**

11:12:06  22  **needs to be made available to the Kansas Internet Crimes**

11:12:11  23  **Against Children task force.**

11:12:11  24      Q.   And that's as it relates to plains66952?

11:12:14  25      **A.   Correct.**

5-20-14   USA v. ACKERMAN   No. 13-10176

102

| | | |
|---|---|---|
| 11:12:15 | 1 | Q.   So what do we see here in NCMEC Note No. 3? |
| 11:12:17 | 2 | **A.   Well, through that e-mail header we were able to** |
| 11:12:21 | 3 | **ascertain that the intended recipient of the uploaded file was** |
| 11:12:25 | 4 | **zoefeather.  So we wanted to also do the same types of publicly** |
| 11:12:29 | 5 | **available searches or internal searches to see if there's any** |
| 11:12:32 | 6 | **information that would lead us to a location to refer this** |
| 11:12:36 | 7 | **report.** |
| 11:12:36 | 8 | Q.   So this -- there's a silo for sender and then a silo |
| 11:12:41 | 9 | for recipient? |
| 11:12:42 | 10 | **A.   Yes.** |
| 11:12:44 | 11 | Q.   Well, it's only one little section there, so let's move |
| 11:12:48 | 12 | on to then to supplemental files.  What is this? |
| 11:12:51 | 13 | **A.   These are all of the files that the CyberTipline staff** |
| 11:12:56 | 14 | **person had saved through the course of conducting those** |
| 11:12:59 | 15 | **publicly available searches.** |
| 11:13:00 | 16 | Q.   So these would represent the Facebook page, the Myspace |
| 11:13:04 | 17 | page, the TLO information? |
| 11:13:07 | 18 | **A.   Correct.** |
| 11:13:08 | 19 | Q.   All right.  So let's then turn to page -- well, and |
| 11:13:11 | 20 | that says, "Concludes Section C." |
| 11:13:14 | 21 | **A.   Yes.** |
| 11:13:14 | 22 | Q.   So let's go -- page 12 is essentially blank, and then |
| 11:13:18 | 23 | we get to page 13, which is Section D, Law Enforcement Contact |
| 11:13:25 | 24 | and Information.  What are we looking at here? |
| 11:13:29 | 25 | **A.   This is the contact details to the Kansas Internet** |

11:13:33  1    Crimes Against Children task force.  **When we make this report**

11:13:37  2    **available to the ICAC task force in Kansas, this information is**

11:13:41  3    **auto-populated, along with the date and time that we made that**

11:13:44  4    **report available to them.**

11:13:52  5        Q.   Now, in terms of this report, fair to say we don't see

11:14:00  6    in anything about a report of what the analyst saw when they

11:14:03  7    observed the images?

11:14:04  8        A.   **Aside from that classification in the beginning of**

11:14:07  9    **their work, where there was apparent child pornography, there's**

11:14:10  10   **no addition.**

11:14:11  11       Q.   So the analyst doesn't go, I opened this, I saw this,

11:14:14  12   and provides a description?

11:14:15  13       A.   **No, they do not do a description of the content.**

11:14:17  14       Q.   And in terms of any information provided to law

11:14:20  15   enforcement about those images, fair to say there's nothing in

11:14:24  16   the report, other than the image itself which was provided by

11:14:27  17   AOL, relating to the images?

11:14:29  18       A.   **Correct, there is no additional information regarding**

11:14:33  19   **this report whatsoever other than what we've gone through.**

11:14:35  20       Q.   All right.  Now, if law enforcement wanted to find out

11:14:43  21   if the images have been previously identified as a series of

11:14:48  22   child pornography, what is the process for them to figure that

11:14:51  23   out?

11:14:51  24       A.   **They would need to contact the Child Victim**

11:14:55  25   **Identification Program.  That is not an area that the**

11:14:58   1   **CyberTipline staff deal with.**

11:14:59   2      Q.   So that information, while available for -- you at

11:15:05   3   NCMEC have that, you do not provide that in this CyberTip

11:15:09   4   report?

11:15:09   5      **A.   We do not.**

11:15:10   6      Q.   Law enforcement has to come back to you through a

11:15:13   7   technical assistance or some request of that nature to find

11:15:17   8   that information out?

11:15:18   9      **A.   Yes, when we refer this report, it may -- our**

11:15:21  10   **classification that it appears to be child pornography, but**

11:15:23  11   **ultimately it's up to law enforcement to review that file and**

11:15:26  12   **to determine whether or not they believe it is, in fact, child**

11:15:30  13   **pornography.   In regarding the victim identification, that**

11:15:33  14   **would be after the fact, reaching out to our CVIP program.**

11:15:41  15      Q.   All right.   And in terms of the contact that you have

11:16:12  16   when the CyberTip report is completed and put on -- well, is it

11:16:21  17   put on the virtual private network?

11:16:23  18      **A.   No, it's made available to law enforcement.   The**

11:16:25  19   **virtual private network is the channel in which they come into**

11:16:30  20   **the CyberTipline.   It's an encrypted method to come into the**

11:16:33  21   **system.   It's just the means of getting there.   It's security,**

11:16:36  22   **if you will.   We just make it available and it allows them to**

11:16:39  23   **come into the CyberTipline to access that report.**

11:16:41  24      Q.   Is it the same network as where the AOL would access?

11:16:48  25      **A.   No, they are separate.**

11:16:49  1      Q.   All right.  So information comes in from AOL, it gets

11:16:52  2  moved to this virtual private network?

11:16:55  3      A.   **The information is always within the CyberTipline.  The**

11:16:59  4  **virtual private network is just a mechanism to come into the**

11:17:02  5  **CyberTipline.**

11:17:03  6      Q.   Is it the interface for whichever agency?

11:17:06  7      A.   **Yes.**

11:17:06  8      Q.   So in terms of where the thing is located, it's always

11:17:09  9  in one spot?

11:17:10  10      A.   **It's always within the CyberTipline, yes, in one**

11:17:12  11  **repository, one location.**

11:17:14  12      Q.   So it's sort of like they get a key, AOL gets a key to

11:17:19  13  enter, give you something?

11:17:21  14      A.   **Then the door closes.**

11:17:22  15      Q.   And you got the key back and they can't go back in?

11:17:25  16      A.   **Correct, they can't amend the report.  The door closes**

11:17:28  17  **at the time of the final receipt, yes.**

11:17:29  18      Q.   And then on the back side of that, law enforcement

11:17:33  19  doesn't get access until you're done with your analysis?

11:17:35  20      A.   **The door's closed until we are finished, and then it's**

11:17:39  21  **always open, they can come any time and access that report.**

11:17:42  22      Q.   And they get a key, you don't take that key away?

11:17:44  23      A.   **Correct.**

11:17:46  24      Q.   All right.  How do you notify -- how does law

11:17:50  25  enforcement find out that you've completed your report?

11:17:52  1    A.  Well, they can come in any time and do a search to see

11:17:55  2  what's been made available, but they also get a daily digest.

11:17:59  3  There is a daily list, an e-mail, that goes to our points of

11:18:05  4  contacts within the Internet Crimes Against Children task

11:18:08  5  forces that provides a summary.  It will say, "Ten reports were

11:18:11  6  just made available," and we'll give the report numbers, and

11:18:14  7  details, limited details, from within the report, screen name,

11:18:18  8  e-mail addresses, that kind of information.

11:18:20  9    Q.  And that's daily, just a little, "Hey"?

11:18:24  10    A.  Yes, yes.  They used to receive an instant notification

11:18:28  11  at the time the report was made available, but due to volume,

11:18:32  12  it was overwhelming, so we had to make a change to do a daily

11:18:35  13  digest.

11:18:35  14    Q.  Okay.  As far as direct contact with law enforcement as

11:18:43  15  it relates to that, is that essentially the sum of the contact

11:18:47  16  with law enforcement after you've made the report, as it

11:18:51  17  relates to the report of getting it in their hands?

11:18:53  18    A.  The NCMEC staff member is finished at that point.  If

11:18:56  19  there is an escalated or heightened risk, we may make a phone

11:18:59  20  call so they know it's there, it's available and they may want

11:19:02  21  to look at that sooner than later, but by and far the staff

11:19:05  22  person is finished.

11:19:07  23    Now, six to eight weeks later we have a support

11:19:10  24  specialist who will send out a feedback form to ask if the

11:19:13  25  report was useful, if it did result in an investigation.

11:19:17   1   That's completely voluntary by law enforcement, whether or not

11:19:19   2   they want to fill it out or send it back.

11:19:21   3        Q.   And why do you do the feedback form?

11:19:23   4        A.   Well, certainly it's a staff welfare perspective.  Last

11:19:28   5   year alone the CyberTipline received more than 500,000 reports.

11:19:32   6   There's massive amounts of information being reported by the

11:19:35   7   public, by Internet hotlines all around the world, and

11:19:38   8   companies.  And so our staff, the last thing I would want is

11:19:41   9   for them to feel like a factory worker.  I want them to

11:19:44   10  understand that the reports we're receiving are dealing with

11:19:46   11  children, and there are child's lives at risk in the danger,

11:19:50   12  and they're important.  So we will ask law enforcement for

11:19:53   13  information, if it was helpful.  And any time that we receive

11:19:57   14  information about an arrest, you know, the staff will try and

11:20:01   15  collect a picture, you know, they'll do a wall of shame, and

11:20:04   16  they know that they're providing a service for the community.

11:20:07   17       Q.   And if the law enforcement agency says, yeah, in fact,

11:20:11   18  we found this child, I mean, do you communicate that with the

11:20:14   19  staff there?

11:20:14   20       A.   Absolutely.

11:20:16   21       Q.   You found another kid.

11:20:17   22       A.   The way the reports come in is, if there's ten analysts

11:20:20   23  that are kind of in rotation receiving reports, you're going to

11:20:24   24  get every tenth report, so your success is my success.  In some

11:20:28   25  ways it's the luck of the draw with who actually handles that

5-20-14   USA v. ACKERMAN   No. 13-10176          108

11:20:30  1   one report.  You know, I participate in the training of all the

11:20:35  2   staff analysts, and I know each and every one of them processes

11:20:38  3   reports the same way, so, again, your success is my success

11:20:40  4   because what you did, I would have done.

11:20:43  5       Q.  Now, in terms of -- well, hang on, Mr. Shehan, I might

11:21:15  6   be finished with you.  One second.

11:21:17  7            (Whereupon, a sotto voce discussion was had

11:21:17  8            between Mr. Hart and Mr. Schmidt.)

11:21:22  9   MR. HART:

11:21:36  10      Q.  I think I asked you this, but I want to make sure that

11:21:39  11  I did.

11:21:39  12      A.  Okay.

11:21:40  13      Q.  You indicated that law enforcement -- there's not any

11:21:42  14  law enforcement employees at NCMEC.

11:21:45  15      A.  There are no law enforcement employees hired by NCMEC.

11:21:50  16  We don't employ law enforcement within the National Center for

11:21:53  17  Missing & Exploited Children.

11:21:53  18      Q.  And in terms of the processing of the CyberTipline

11:21:57  19  report, when the analyst is doing their work, is there any law

11:22:01  20  enforcement involvement at that point?

11:22:02  21      A.  No, there is not.

11:22:05  22      Q.  And as far as the point where AOL or whoever sends it

11:22:14  23  in to NCMEC, is there any law enforcement involved at that

11:22:18  24  point?

11:22:18  25      A.  No, there is not.

11:22:19   1      Q.   So fair to say law enforcement's only point of

11:22:24   2  involvement is on the back end once you're done with everything

11:22:27   3  you're doing and you make it available?

11:22:29   4      **A.   That's correct.   They do not know about that report**

11:22:31   5  **until we've made it available.**

11:22:32   6      Q.   And do you even know when it is that the law

11:22:36   7  enforcement agency might access it?

11:22:38   8      **A.   Yes.**

11:22:38   9      Q.   And how do you find that out?

11:22:40  10      **A.   You have to go into an administrative type of report.**

11:22:43  11  **We have an activity report as it relates to our virtual private**

11:22:47  12  **network.   We know when the reports have been reviewed and**

11:22:51  13  **downloaded by the ICAC agencies.   That just means that they've**

11:22:55  14  **pulled the information.   We don't know anything more about when**

11:22:58  15  **they've decided or if they've decided to investigate; we just**

11:23:01  16  **know that they have accessed that information.**

11:23:02  17      Q.   And why do you -- I mean, how frequently do you check

11:23:06  18  that?

11:23:06  19      **A.   On a monthly basis.**

11:23:08  20      Q.   And why do you check that?

11:23:09  21      **A.   Just to ensure, one, that there's still a connection,**

11:23:12  22  **that there isn't a problem with the virtual private network,**

11:23:15  23  **and to ensure that these -- this information is making its way**

11:23:19  24  **to law enforcement, that they are receiving that information.**

11:23:22  25      Q.   So if you were to have maybe somebody's stopped working

11:23:26  1   that or the agency changed, you're sending stuff out but

11:23:30  2   there's no one on the back end, this is the way in which you

11:23:33  3   would identify we have a problem?

11:23:34  4       A.   Correct.

11:23:38  5       Q.   All right.   Now, in terms of the tips that are sent,

11:23:49  6   the CyberTips input by the ESPs or the public, say it is a

11:23:56  7   CyberTip involving a giraffe or a 1957 Chevy, what does NCMEC

11:24:02  8   do with that?

11:24:02  9       A.   **We still make that report available to law enforcement.**

11:24:05  10  **Every report is made available to law enforcement.**

11:24:06  11      Q.   You don't cull that one out and say, nah, nah, nah,

11:24:10  12  nah, nah, this is a waste of everyone's time?

11:24:12  13      A.   **No, it would still be made available to law**

11:24:16  14  **enforcement.**

11:24:16  15      Q.   In terms of where you would make some analysis as to

11:24:19  16  that, that would be in that "child pornography confirmed"; it

11:24:22  17  would say something different?

11:24:23  18      A.   **Yes, our staff would give it a classification of**

11:24:26  19  **inanimate object.**

11:24:32  20      Q.   Okay.   Now, does NCMEC -- to your knowledge, does NCMEC

11:24:37  21  have any authority to obtain a search warrant?

11:24:41  22      A.   **No, we do not.   We are not an investigative agency.   We**

11:24:45  23  **are a private nonprofit organization.**

11:24:47  24      Q.   Are you able to indict or prosecute or bring a case in

11:24:53  25  any court in any jurisdiction in the United States?

11:24:56   1    **A.   Absolutely not.**

11:24:57   2    Q.   And for that matter, internationally do you have the

11:25:00   3    ability to go in and prosecute?

11:25:01   4    **A.   No, we are not.**

11:25:04   5    Q.   Do you have the ability to issue subpoenas?

11:25:06   6    **A.   No, we do not.**

11:25:17   7    Q.   And if law enforcement does decide that they want to

11:25:19   8    obtain a search warrant, are you involved in that process at

11:25:22   9    all?

11:25:22   10   **A.   No, we are not.**

11:25:26   11   Q.   And do you have -- I mean, other than the process that

11:25:30   12   you've described, do you have any say as to whether or not a

11:25:34   13   law enforcement agency even investigates the CyberTips you make

11:25:40   14   available?

11:25:40   15   **A.   No, we do not.**

11:25:52   16   Q.   And this may sound -- it's a slightly different form of

11:25:59   17   that same question, but at the end of the day whether law

11:26:03   18   enforcement investigates or not, that is within their

11:26:08   19   decision-making, and you have no control over it?

11:26:10   20   **A.   Correct.**

11:26:24   21        MR. HART:  All right.  Thank you, Mr. Shehan.  I

11:26:28   22   don't have any further questions for you.

11:26:29   23        THE COURT:  Mr. Shehan, I'm confused on just one

11:26:33   24   procedural issue.  I wondered if you could help me.  Mr. Hart

11:26:38   25   asked you if, after the NCMEC analyst has finished his work,

11:26:40   1    the CyberTip is moved to the VPN.  And you said, actually, it's

11:26:45   2    not moved, it remains in the same place always, the VPN only

11:26:50   3    gives access to the report to law enforcement.

11:26:52   4         Is the VPN access then granted to law enforcement

11:26:55   5    on a CyberTip-by-CyberTip report basis.

11:26:58   6         THE WITNESS:  Yes, that's a good question there.

11:27:00   7    They're always able to come into the CyberTipline via the

11:27:03   8    virtual private network, but until we designate that report as

11:27:06   9    being made available to that agency, they would not know that

11:27:09  10    it's there, they would not have access to it.

11:27:12  11         THE COURT:  So, for example, the CyberTipline

11:27:13  12    involved in this case, Government Exhibit 1, once your analyst

11:27:17  13    was finished with it, then law enforcement's notified that it's

11:27:21  14    successful through the VPN and they're given then some sort of

11:27:25  15    a code or something that will allow them to access it?

11:27:28  16         THE WITNESS:  It would be the report number.  They

11:27:30  17    could type that individual report number in and that would pull

11:27:33  18    up that report.  There's also a program that they can use that,

11:27:39  19    actually, when you go in called a CyberTipline Downloader

11:27:43  20    program, that it will look for date range and it will just pull

11:27:46  21    all reports that have been made available within a specific

11:27:49  22    date.

11:27:49  23         THE COURT:  And then they would enter the report

11:27:51  24    number and that would give them access to the report?

11:27:53  25         THE WITNESS:  Correct.

11:27:55  1          THE COURT:  What if they said, well, the last

11:27:56  2    report number was this, let's just add, you know, 20 numbers to

11:27:59  3    that or so and see what they're working on now; is that not

11:28:03  4    accessible until you --

11:28:04  5          THE WITNESS:  It would not be accessible.  It

11:28:06  6    would show no results, no records available.

11:28:07  7          THE COURT:  And once you made this particular

11:28:10  8    CyberTip available, did you only make it available -- that is

11:28:13  9    to say, did you only provide the report number to the local

11:28:16 10    ICAC or technically could any law enforcement officer look at

11:28:19 11    it?

11:28:20 12          THE WITNESS:  It would only be made available to

11:28:22 13    the Kansas ICAC.  However, federal law enforcement have access

11:28:26 14    to every single CyberTipline report.  So from a state level, no

11:28:29 15    other state agency would have access into that report.

11:28:32 16          THE COURT:  So even after the report's available

11:28:34 17    through the VPN and you provide that report number to the

11:28:39 18    Kansas ICAC, what would happen if the Nevada ICAC, if there is

11:28:45 19    one, plugged that report number in just on sort of a search to

11:28:50 20    see what was out there; would they gain access to it?

11:28:53 21      **A.  No, it would show no results for that.**

11:28:55 22          THE COURT:  So it's limited -- access is limited

11:28:57 23    through the VPN on a report-by-report and a

11:29:01 24    recipient-by-recipient basis.

11:29:02 25      **A.  Correct.**

| | | |
|---|---|---|
| 11:29:03 | 1 | THE COURT:  All right.  Thank you very much. |
| 11:29:04 | 2 | Mr. Henderson, I'm going to give you an hour and a quarter to |
| 11:29:08 | 3 | cross-examine, the same amount of time that Mr. Hart took.  I |
| 11:29:10 | 4 | think what we'll do is we'll go for 30 minutes or so, we'll |
| 11:29:14 | 5 | take a recess, not a lunch recess, we'll take a 10- or |
| 11:29:18 | 6 | 15-minute recess, and we'll come back at that point, but you |
| 11:29:21 | 7 | may cross-examine. |
| 11:29:21 | 8 | MR. HENDERSON:  Thank you, Your Honor. |
| 11:29:23 | 9 | CROSS-EXAMINATION |
| 11:29:24 | 10 | BY MR. HENDERSON: |
| 11:29:24 | 11 | Q.  And just to follow up on the Court's questions, if I |
| 11:29:51 | 12 | may.  I think I heard you say that federal law enforcement, all |
| 11:29:56 | 13 | federal law enforcement, have access to all of those reports, |
| 11:30:00 | 14 | whether they're designated or not? |
| 11:30:01 | 15 | **A.  It would be the FBI, United States Postal Inspection** |
| 11:30:06 | 16 | **Service, Homeland Security, military liaison, Child** |
| 11:30:10 | 17 | **Exploitation & Obscenity Section of the Department of Justice.** |
| 11:30:14 | 18 | **So it's not all federal law enforcement; it's those that have** |
| 11:30:18 | 19 | **liaisons in our building, as well as the Child Exploitation &** |
| 11:30:21 | 20 | **Obscenity Section.** |
| 11:30:23 | 21 | Q.  Okay.  And so there are representatives from each of |
| 11:30:26 | 22 | those federal law enforcement agencies that you've just |
| 11:30:29 | 23 | identified in your facility? |
| 11:30:33 | 24 | **A.  Federal law enforcement do have liaisons that are** |
| 11:30:36 | 25 | **located in secure offices separate from our staff within the** |

11:30:40  1    **National Center for Missing & Exploited Children.**

11:30:58  2        Q.   If I could ask you to first look at Defendant's

11:31:03  3    Exhibits T and U, the CyberTipline reports.  First looking at

11:31:25  4    Defendant's Exhibit T, do you recognize that as a CyberTipline

11:31:29  5    report?  And there's a date there of 2005.

11:31:35  6        **A.   Yes, this is an older CyberTipline report.**

11:31:38  7        Q.   And were you working with CyberTipline reports at that

11:31:40  8    time in 2005?

11:31:41  9        **A.   Yes, I was.**

11:31:42  10       Q.   Very good.  It shows there in the first section the

11:31:49  11   date it was provided by AOL, and referring to the second page,

11:31:56  12   they provided the e-mail address and the screen user name; is

11:32:02  13   that correct?

11:32:02  14       **A.   Yes.**

11:32:02  15       Q.   Okay.  Then they also provided the zip code?

11:32:06  16       **A.   Correct.**

11:32:07  17       Q.   And at that time in 2005, that's basically all the

11:32:12  18   information they provided?

11:32:22  19       **A.   They also provided an uploaded file.**

11:32:25  20       Q.   Thank you.  They also provided the uploaded file for

11:32:29  21   the item that they looked at.

11:32:31  22       **A.   Correct.**

11:32:32  23       Q.   Okay.  And were they required to provide the uploaded

11:32:36  24   file?

11:32:38  25       **A.   No.**

11:32:38  1    Q.   So that's something they do in addition to the legal

11:32:41  2    requirements?

11:32:42  3    **A.   It's a voluntary, yes.**

11:32:44  4    Q.   And that's true today, isn't it?

11:32:46  5    **A.   Yes.**

11:32:48  6    Q.   Now, referring to Government's -- or, I'm sorry,

11:32:53  7    Defendant's Exhibit U, which is also Government Exhibit 1, the

11:32:57  8    CyberTipline report in this case, we see that AOL is now

11:33:05  9    providing additional information from 2005; is that correct?

11:33:14  10   **A.   Yes, there's different elements in this report.**

11:33:16  11   Q.   And not only different, but additional elements, things

11:33:21  12   that they didn't provide before?

11:33:23  13   **A.   Yes, there's more information in that report.**

11:33:25  14   Q.   Okay.  And as you testified earlier, that additional

11:33:29  15   information is not required by statute; they do that

11:33:32  16   voluntarily?

11:33:33  17   **A.   Correct.**

11:33:33  18   Q.   And that information is helpful to law enforcement in

11:33:36  19   doing their job?

11:33:38  20   **A.   It may be, but I wouldn't know necessarily what is or**

11:33:42  21   **is not helpful to law enforcement as they're pursuing**

11:33:45  22   **investigations.**

11:33:46  23   Q.   Okay.  Well, do you know that -- or do you -- did you

11:33:50  24   know, do you know, whether or not there was any controversy in

11:33:55  25   the business, in the field, regarding providing more

11:34:02  1   information to law enforcement; in other words, that law

11:34:06  2   enforcement wanted to get more information from the ESPs or the

11:34:11  3   ISPs and NCMEC?

11:34:14  4      A.  No, I'm not aware of any controversy or problems with

11:34:17  5   the information.  I believe the original AOL report, versus the

11:34:24  6   recent one, were just as useful for law enforcement to review

11:34:27  7   and to decide if they wanted to investigate and initiate an

11:34:30  8   investigation or not.

11:34:34  9      Q.  And just as AOL provided additional information between

11:34:39  10  2005 and 2013, NCMEC also provided additional information,

11:34:45  11  doesn't it, did it?

11:34:46  12     A.  We've made a number of changes to the CyberTipline,

11:34:49  13  whether it's the actual PDF it reads or internal processes,

11:34:54  14  even our back-end databases from the time of this report, and

11:34:57  15  we continuously make improvements and changes.  I mentioned

11:35:01  16  earlier that Sun Microsystems had donated the very early days

11:35:07  17  of the CyberTipline, whether it be the databases and the

11:35:10  18  infrastructures.  As we progress over the years up to about

11:35:16  19  three years ago, we were still using that antiquated system,

11:35:19  20  and it was time to make updates so that the reports could be

11:35:22  21  received.  You know, in the early days, if a company wanted to

11:35:25  22  upload files into a report, they could only give ten images,

11:35:29  23  and so we found often we were getting multiple reports on the

11:35:33  24  same incident, only because the file limitations were so small.

11:35:36  25  So we're always trying to improve the processes, not only in

11:35:39  1    **how we receive information but the readability in our reports**

11:35:43  2    **as well.**

11:35:45  3        Q.   Okay.  And some of the additional information that you

11:35:47  4    provided, that you provide now that you didn't provide in 2005

11:35:53  5    is basically research on public sites, researching information

11:35:57  6    about the user person who sent the e-mail with the attachments?

11:36:02  7        **A.   There's additional information in the reports.**

11:36:05  8    **Certainly, we're breaking out what's been automated by our own**

11:36:09  9    **systems by these enhancements, and we are documenting any**

11:36:12  10   **activity that our staff may participate in as regards to**

11:36:16  11   **publicly available information.**

11:36:17  12       Q.   Well, specifically, you look stuff up, right, on the

11:36:20  13   Internet, WhoIs, Facebook, other publicly available sites, to

11:36:25  14   collect information on the person who originated the e-mail?

11:36:27  15       **A.   We certainly conduct a number of publicly available**

11:36:30  16   **searches, with the goals of trying to find locations we can**

11:36:35  17   **make those reports available to law enforcement.**

11:36:36  18       Q.   Yeah, and you want to provide that information to law

11:36:39  19   enforcement to help them do their job; right?

11:36:40  20       **A.   All of our reports are made available to law**

11:36:43  21   **enforcement.**

11:36:43  22       Q.   To help them do their job?

11:36:44  23       **A.   It's to review and to decide whether or not they would**

11:36:48  24   **like to initiate an investigation.**

11:36:59  25       Q.   Referring to -- looks like page 6, I'm sorry --

11:37:05  1    **A.   Are we in Section U?**

11:37:08  2    Q.   Yes, thank you.  Page 10, for example, do you see that?

11:37:27  3    **A.   Is that the page where the top is Wally Ackerman, the**

11:37:30  4    **text?**

11:37:34  5    Q.   Let's see what you're looking at.  The next page.

11:37:48  6    Thank you.

11:37:48  7    **A.   Okay.**

11:37:50  8            MR. HENDERSON:  Your Honor, if I may, I'll just

11:37:51  9    put it on the screen.

11:37:51  10   BY MR. HENDERSON:

11:37:56  11   Q.   That's an example of the additional information that

11:37:58  12   NCMEC provides that's not required; is that a fair statement?

11:38:03  13   **A.   What you're looking at here is a portion of the public**

11:38:07  14   **records database searches that we had conducted.**

11:38:10  15   Q.   My question was that's an example of the information

11:38:12  16   that NCMEC provides -- it's not required by statute --

11:38:16  17   **A.   Correct.**

11:38:18  18   Q.   -- voluntarily?

11:38:19  19   **A.   It's information that we provide, yes.**

11:38:21  20   Q.   And it's information about criminal history, driver's

11:38:29  21   license, professional licenses, professional associations,

11:38:33  22   hunting permits, weapon permits, bankruptcies, a lot of

11:38:40  23   personal information just about anything and everything you can

11:38:43  24   find online for this individual.

11:38:47  25   **A.   This comes from a public records database search, so**

11:38:50  1  every state is different in the information that's publicly

11:38:53  2  available.  But these record searches are available to the

11:38:56  3  general public, any one of us could go and run that type of

11:39:00  4  search and collect this type of information.

11:39:02  5      Q.  And somebody at NCMEC spends the time to do this?

11:39:07  6      A.  These records are -- access to the public records

11:39:11  7  databases are donated to the center.  And our NCMEC staff, as

11:39:16  8  we are dealing with the CyberTipline reports in the normal

11:39:19  9  course of business, if we have information that would -- could

11:39:23  10  be run through a public records search, we would do so.

11:39:26  11     Q.  Okay.  So somebody at NCMEC, yes or no, provides this

11:39:29  12  information voluntarily; correct?

11:39:32  13     A.  They provide this information in the CyberTipline

11:39:35  14  report.  We would copy it into the CyberTipline report, but the

11:39:38  15  information is provided by a public records database.

11:39:40  16     Q.  Okay.  And provided to law enforcement?

11:39:43  17     A.  This information is made available to law enforcement.

11:39:45  18     Q.  All right.  And that's something that wasn't done back

11:39:48  19  in 2005?

11:39:49  20     A.  That's not correct.  We were always -- as long as I

11:39:53  21  have been employed within the Exploited Child Division, we have

11:39:56  22  had access to public records databases.  Oftentimes it depends

11:39:59  23  on what you are provided within the CyberTipline report that

11:40:03  24  would necessitate using those types of searches.

11:40:07  25     Q.  So you've always made that effort from the very

11:40:10  1  beginning, to find as much information about the individual on

11:40:13  2  public web sites and then make that available to law

11:40:16  3  enforcement?

11:40:16  4     **A.   We've always tried to use publicly available tools to**

11:40:21  5  **help identify a location so we can make that report available**

11:40:24  6  **to law enforcement.**

11:40:37  7     Q.   Referring you, if I may, to Defendant's Exhibit S, it's

11:40:45  8  a GAO report, Government Accountability Office report, 2011.

11:40:56  9  Are you familiar with that report?

11:40:57  10     **A.   Yes, I am.**

11:41:01  11     Q.   And let me ask you, were you interviewed as a part of

11:41:06  12  GAO's preparation of that report?

11:41:09  13     **A.   Yes, I was.**

11:41:09  14     Q.   And how many times were you interviewed and about how

11:41:15  15  long did the interview last; do you recall?

11:41:17  16     **A.   I don't remember the exact number of times or the exact**

11:41:20  17  **duration, but several.**

11:41:24  18     Q.   And was it your understanding -- well, have you read

11:41:27  19  the report?

11:41:27  20     **A.   I have.**

11:41:27  21     Q.   Okay.   And are there any -- it's a very lengthy report,

11:41:35  22  but as far as NCMEC was concerned and GAO's description of the

11:41:44  23  relationship between NCMEC and law enforcement, is there

11:41:47  24  anything that you disputed, disagreed with in that report?

11:41:51  25     **A.   Outside that we're a public-private nonprofit**

| | | |
|---|---|---|
| 11:41:56 | 1 | organization, I do not believe we put anything on file as far |
| 11:42:00 | 2 | as disputing the report in general.  I do know that they had |
| 11:42:02 | 3 | mentioned feedback was an area that we could enhance and do |
| 11:42:07 | 4 | better with.  It was the one main area that stood out to me as |
| 11:42:11 | 5 | an improvement that we could make within the CyberTipline. |
| 11:42:13 | 6 | Q.  And there would have been a provision for you to object |
| 11:42:17 | 7 | or respond formally to anything that you disagreed with in the |
| 11:42:20 | 8 | report? |
| 11:42:21 | 9 | A.  I was not responsible for setting up the meetings with |
| 11:42:25 | 10 | the GAO.  While I may have been interviewed about my programs |
| 11:42:28 | 11 | of work, that was another individual within the center that |
| 11:42:30 | 12 | handled that relationship. |
| 11:42:32 | 13 | Q.  But you're aware that if you did have any disputes, |
| 11:42:35 | 14 | that there was a vehicle to express those? |
| 11:42:37 | 15 | A.  We certainly had an ongoing dialogue as we were |
| 11:42:40 | 16 | explaining the process and would clarify any questions that |
| 11:42:43 | 17 | were presented to me, I did. |
| 11:42:44 | 18 | Q.  So the answer's "yes"? |
| 11:42:46 | 19 | A.  As to the portions that I had interactions, yes. |
| 11:42:51 | 20 | Q.  And you understood, didn't you, that the GAO got -- or |
| 11:42:57 | 21 | the GAO began the investigation or the review which led up to |
| 11:43:07 | 22 | this report in response to some expression by law enforcement |
| 11:43:14 | 23 | that they weren't getting enough information, that they wanted |
| 11:43:17 | 24 | more information from the ESPs and NCMEC? |
| 11:43:21 | 25 | A.  No, I was not aware of that.  And through the process |

11:43:24  1    of the GAO doing the review, I only had limited interaction

11:43:27  2    with the interviews, so portions of their activity and the

11:43:31  3    writings of the report, you know, we -- we're not reviewing a

11:43:34  4    final copy before distribution, we were not made aware of who

11:43:38  5    they were interviewing, whether it be the companies or law

11:43:40  6    enforcement.  We had a very small role to play in answering

11:43:43  7    their questions and fielding them with information about the

11:43:46  8    operations.

11:43:56  9        Q.  Well, you know from reading the report that their

11:43:58  10   recommendation was that NCMEC enhance its processes to collect

11:44:03  11   feedback to improve the tips.  That would be through

11:44:07  12   CyberTipline; correct?

11:44:07  13       A.  Correct.

11:44:10  14       Q.  And that -- yeah, and that was as to NCMEC.

11:44:17  15       A.  Uh-huh.  We've always collected feedback through the

11:44:21  16   process of those referrals.  It was around the time when they

11:44:25  17   had interviewed law enforcement and, for different reasons,

11:44:29  18   they had said that some CyberTips were not as useful, and they

11:44:33  19   had presented us with a series of opportunities to try and

11:44:36  20   collect additional information.  You know, before the GAO

11:44:40  21   report, many of our feedback types of questions would just be

11:44:44  22   was this an ongoing investigation, was it -- did it result in

11:44:47  23   an arrest, was it unfounded.  We never asked about the

11:44:51  24   usefulness of an individual CyberTipline referral.

11:44:55  25       Q.  And would you also agree that one of the complaints or

| | |
|---|---|
| 11:45:04 | 1 |
| 11:45:09 | 2 |

responses to the complaints was to provide connectivity logs to

law enforcement?

A.   No, I was not aware of that.  And that is not something
we would -- in our feedback forum or anywhere -- we would try
and collect.  We don't get into the specifics like that.

Q.   Well, at the time that this report was prepared and
shortly before and shortly after, who was the president and CEO
of NCMEC?

A.   Ernie Allen.

Q.   And do you know whether or not Mr. Allen testified,
provided sworn testimony to Congress?

A.   There were times that Mr. Allen did testify, yes.

Q.   And were you present at any of those occasions?

A.   I believe I went to one or two, but not always, and
certainly was not part of his prepared remarks.

Q.   Did you review his prepared remarks?

A.   No, not in advance of his testimony.  I had no
involvement of that activity.

Q.   But you do recall being present?

A.   Yes, I believe I had attended one, maybe two, events
when he had testified.

Q.   You testified that GAO report I referenced was issued
in March of 2011.  Would you agree with that, with reference to
Defendant's Exhibit S?

A.   Yes, the date on there reads March 2011.

11:46:32   1    Q.   And do you recall Mr. Allen testifying before Congress

11:46:39   2    on July 12th, 2011?

11:46:43   3    **A.   I do not recall any dates and times of when he would**

11:46:46   4    **have testified.  I do recall attending one or two, but I do not**

11:46:48   5    **know the dates that he did so.**

11:47:11   6    Q.   Do you recall him testifying -- well, let me ask you,

11:47:15   7    do you recall attending one of the Congressional hearings

11:47:19   8    following the issuance of the GAO report?

11:47:21   9    **A.   No, I do not.**

11:47:23   10   Q.   Well, at the time that you sat in on the testimony, do

11:47:30   11   you recall Mr. Allen talking about the connectivity logs and

11:47:34   12   the problems with the connectivity logs?

11:47:35   13   **A.   No, I do not.**

11:48:06   14   Q.   The occasions that you did sit in on testimony, do you

11:48:10   15   recall Mr. Allen describing the relationship between NCMEC and

11:48:15   16   law enforcement?

11:48:16   17   **A.   No, I don't.**

11:48:22   18   Q.   Do you recall him opening his testimony in every

11:48:27   19   instance with a list of a description of the responsibilities

11:48:32   20   of NCMEC?

11:48:34   21   **A.   No, I recall he would give a general overview of what**

11:48:37   22   **the center is and what our mission is, but I do not recall any**

11:48:41   23   **specifics of what his testimony may have been.**

11:48:44   24   Q.   Well, let me ask you, do you recall him saying that it

11:48:48   25   operates a -- NCMEC operates a national 24-hour toll-free

11:48:52  1   hotline?

11:48:52  2      **A.   I do not, but it sounds like something Mr. Allen would**

11:48:55  3   **say.**

11:48:57  4      Q.   Do you recall him saying that "NCMEC operated the

11:49:01  5   CyberTipline, the '9-1-1 for Internet' that the public and

11:49:07  6   electronic service providers and they use to report

11:49:10  7   Internet-related child sexual exploitation"?  (As read.)

11:49:12  8      **A.   No, I do not recall any of his specific testimony.**

11:49:16  9      Q.   Is that something that -- is that an accurate

11:49:18  10  statement?

11:49:19  11     **A.   Yes.**

11:49:22  12     Q.   Do you recall him saying that NCMEC provides technical

11:49:24  13  assistance --

11:49:25  14          MR. HART:  Your Honor, I'm going to object.  The

11:49:26  15  witness has identified he does not recall any specific

11:49:29  16  statements, and so we're asking a question that could simply be

11:49:37  17  asked to this witness as opposed to what this other person

11:49:40  18  said.  The question is about what another individual said are

11:49:44  19  irrelevant and ultimately calling for this witness to

11:49:46  20  speculate, but if Mr. Henderson would simply ask this witness

11:49:48  21  that issue, that may be appropriate question.

11:49:51  22          THE COURT:  Well, I'm going to overrule the

11:49:53  23  objection.  Mr. Henderson can ask the witness if he recalls

11:49:57  24  particular statements.  If he wants to ask them the way he's

11:50:00  25  doing it rather than the way you suggest, that's his

11:50:02   1   prerogative.  And since I have time-limited his

11:50:07   2   cross-examination, I'm inclined to give him some berth as to

11:50:11   3   how to use that time.  So you may proceed, Mr. Henderson.

11:50:15   4              MR. HENDERSON:  Thank you, Your Honor.

11:50:16   5   BY MR. HENDERSON:

11:50:17   6   Q.  Do you recall Mr. Allen saying that NCMEC provided

11:50:20   7   "technical assistance and training to individuals and law

11:50:24   8   enforcement agencies in the prevention, investigation,

11:50:27   9   prosecution, and treatment of cases involving missing and

11:50:31   10  exploited children"?

11:50:31   11  **A.  I do not recall him saying that.**

11:50:33   12  Q.  Would you say that's an accurate statement?

11:50:36   13  **A.  Yes.**

11:50:37   14  Q.  Do you recall him saying that NCMEC provides "forensic

11:50:41   15  technical assistance to law enforcement"?

11:50:43   16  **A.  I do not recall.**

11:50:44   17  Q.  Would you agree that that's also true?

11:50:46   18  **A.  Yes, we provide age progression as it relates to the**

11:50:50   19  **missing children's cases.  If a child's been missing for more**

11:50:54   20  **than three years, we will age progress that child and continue**

11:50:57   21  **to do so as that case remains open.**

11:51:00   22  Q.  I'm sorry to interrupt.  I'm just looking for yes-or-no

11:51:03   23  answers right now, if I could.

11:51:04   24              THE COURT:  I'm not going to hold any witness to a

11:51:06   25  yes-or-no answer, Mr. Henderson.

| | | |
|---|---|---|
| 11:51:08 | 1 | MR. HENDERSON:  Thank you, Your Honor. |
| 11:51:11 | 2 | BY MR. HENDERSON: |
| 11:51:12 | 3 | Q.  Do you recall Mr. Allen saying that NCMEC "worked with |
| 11:51:16 | 4 | law enforcement and the private sector to reduce the |
| 11:51:19 | 5 | distribution of child pornography over the Internet"?  (As |
| 11:51:21 | 6 | read.) |
| 11:51:21 | 7 | **A.  I do not.** |
| 11:51:22 | 8 | Q.  Would you agree with that statement? |
| 11:51:24 | 9 | **A.  Yes, we collaborate with the Internet industry, as well** |
| 11:51:27 | 10 | **as law enforcement, other NGO's, child welfare.  As we have a** |
| 11:51:32 | 11 | **mission to protect children, we are willing to work with anyone** |
| 11:51:36 | 12 | **who has the same mission and goals.** |
| 11:51:43 | 13 | Q.  Would you -- or did you ever hear Mr. Allen testify |
| 11:51:51 | 14 | that, "NCMEC works hand in hand with federal, state, local or |
| 11:51:55 | 15 | international law enforcement, and that the first priority is |
| 11:51:59 | 16 | always criminal prosecution"?  (As read.) |
| 11:52:01 | 17 | **A.  No, I cannot recall.** |
| 11:52:03 | 18 | Q.  Would you agree with that statement? |
| 11:52:05 | 19 | **A.  No, that's not the terminology or the wording that I** |
| 11:52:08 | 20 | **would use to describe our relationship with law enforcement.** |
| 11:52:11 | 21 | Q.  So if that was in his prepared, sworn testimony to |
| 11:52:15 | 22 | Congress, you would disagree with that? |
| 11:52:17 | 23 | **A.  I think he's probably limited in the amount of time** |
| 11:52:21 | 24 | **that he has to convey a message to members of Congress, and was** |
| 11:52:24 | 25 | **probably trying to simplify, yet eloquently describe, how we** |

11:52:29  1   **work with law enforcement.  I mean, certainly 500,000 reports**

11:52:33  2   **just last year coming into the CyberTipline, and all of those**

11:52:36  3   **being made available to law enforcement, there is a close**

11:52:39  4   **relationship, but certainly we understand our role as a**

11:52:44  5   **private, nonprofit organization, and not being an investigative**

11:52:47  6   **agency, and we certainly understand what law enforcement's role**

11:52:50  7   **and interest in protecting children is.**

11:52:54  8   Q.  Did you ever hear him make the statement, "NCMEC's

11:52:59  9   CyberTipline receives reports from members of the public and

11:53:05  10  ESPs regarding online crimes against children, making it --

11:53:11  11  CyberTipline -- a major source of leads for many law

11:53:15  12  enforcement agencies"?  (As read.)

11:53:15  13  **A.  I do not recall him saying that.**

11:53:17  14  Q.  Would you agree with that?

11:53:18  15  **A.  Yes.**

11:53:24  16  Q.  Would you -- did you ever hear him say that "This

11:53:26  17  reporting mechanism" -- again the CyberTipline -- "helps

11:53:30  18  streamline the process from detection of child sexual

11:53:34  19  exploitation to prosecution and conviction"?  (As read.)

11:53:37  20  **A.  I do not.**

11:53:38  21  Q.  Would you agree with that statement?

11:53:40  22  **A.  It's a very generalization of the process in which we**

11:53:43  23  **receive and make reports available.  I may describe it**

11:53:47  24  **differently, but yes.**

11:53:56  25  Q.  Did you ever hear him say that "This process increases

11:53:58  1    the efficiency of law enforcement efforts and maximizes the

11:54:02  2    limited resources available in the fight against child sexual

11:54:06  3    exploitation"?

11:54:07  4        **A.  No, I did not.**

11:54:07  5        Q.  Would you agree with that statement?

11:54:09  6        **A.  Yes.  Some of the information we've discussed today**

11:54:13  7    **about our past CyberTipline searches that we do certainly**

11:54:16  8    **internally help to streamline and make sure that there aren't**

11:54:20  9    **more than one law enforcement agency working on a particular**

11:54:23  10   **CyberTipline case, that the center does provide a very valuable**

11:54:26  11   **service as being a clearinghouse for information.**

11:54:29  12       Q.  Did you ever hear him say that "The value of the

11:54:33  13   CyberTipline as a source of leads for law enforcement has --

11:54:38  14   has been greatly enhanced by the collaboration of ESPs"?  (As

11:54:43  15   read.)

11:54:43  16       **A.  No, I do not.**

11:54:44  17       Q.  Would you agree with that statement?

11:54:45  18       **A.  Yes, the reports that come from the companies contain**

11:54:49  19   **information that are useful for law enforcement, and as far as**

11:54:54  20   **the center, us, being able to identify potential location and**

11:54:57  21   **make a referral.**

11:55:02  22       Q.  Did you also hear him say that "there can be no

11:55:05  23   prosecution until law enforcement connects the date and time of

11:55:08  24   that online activity to an actual person -- the type of

11:55:13  25   information found in an ESP's connectivity log"?

11:55:16  1      A.   No, I do not.

11:55:17  2      Q.   Would you agree with that statement?

11:55:19  3      A.   It's a part of what would entail potential

11:55:23  4  investigations, so yes, it's partially accurate.

11:55:27  5      Q.   And the additional information that AOL provided under

11:55:33  6  that section of e-mail header in the CyberTipline report for

11:55:37  7  2013, is that connectivity log information?

11:55:41  8      A.   Which section are we in?  Which one was that?

11:55:44  9      Q.   That would be under U, please.

11:55:47  10     A.   Under U.  And which section in U are you interested --

11:55:57  11 are we referring to?

11:55:58  12     Q.   I think it's pages 2 and 3, the AOL's additional

11:56:02  13 information that they provide.

11:56:03  14     A.   Uh-huh.  There is an IP address that's located within

11:56:07  15 the header of the report, and there is an incident date and

11:56:11  16 time that's provided here as well.

11:56:14  17     Q.   So that's -- that's information that would be

11:56:18  18 considered to be connectivity log information?

11:56:21  19     A.   Yes.

11:56:39  20     Q.   Referring you to Defendant's Exhibit X, excerpt from

11:56:54  21 the --

11:56:55  22              THE COURT:  Are you changing subject matters at

11:56:57  23 this point, Mr. Henderson?

11:56:57  24              MR. HENDERSON:  I am, Your Honor.  I'm sorry.

11:56:58  25              THE COURT:  This might be a good time to take a

| | | |
|---|---|---|
| 11:57:00 | 1 | recess then.  Why don't we come back at about ten after, and |
| 11:57:03 | 2 | we'll continue the cross-examination at that point.  Court will |
| 11:57:07 | 3 | be in recess until then. |
| 11:57:09 | 4 | CLERK NALL:  All rise. |
| 11:57:10 | 5 | (A recess was taken from 11:57 AM to 12:11 PM.) |
| 12:11:27 | 6 | CLERK NALL:  All rise. |
| 12:11:32 | 7 | THE COURT:  You may be seated. |
| 12:11:34 | 8 | Mr. Henderson, you may continue cross-examination. |
| 12:11:36 | 9 | MR. HENDERSON:  Thank you, Your Honor. |
| 12:11:37 | 10 | THE COURT:  I believe you can go till about five |
| 12:11:39 | 11 | till 1:00. |
| 12:11:40 | 12 | MR. HENDERSON:  Thank you, Your Honor. |
| 12:11:41 | 13 | BY MR. HENDERSON: |
| 12:11:46 | 14 | Q.  Mr. Shehan, I'd asked you, if you would, to refer to |
| 12:11:50 | 15 | Defendant's Exhibit X.  Do you see that? |
| 12:11:54 | 16 | **A.  Yes.** |
| 12:11:55 | 17 | Q.  Had you seen that report before the report prepared by |
| 12:11:58 | 18 | the Department of Justice? |
| 12:12:00 | 19 | **A.  I am familiar with this report.  I have seen it, yes.** |
| 12:12:02 | 20 | Q.  Okay.  And that's a report entitled The National |
| 12:12:06 | 21 | Strategy For Child Exploitation, Prevention and Interdiction, a |
| 12:12:11 | 22 | report that they made to Congress in 2010; correct? |
| 12:12:14 | 23 | **A.  Yes, that is the title of this document.** |
| 12:12:16 | 24 | Q.  Did you participate in any way in the preparation of |
| 12:12:19 | 25 | that document? |

12:12:20  1    A.   I believe I helped to generate statistics related to

12:12:24  2  our operations, but it was a very limited role.

12:12:29  3    Q.   And your organization, NCMEC, figures in that document,

12:12:38  4  doesn't it?  They talk --

12:12:40  5    A.   It may.  Is there a certain page you'd like me to refer

12:12:43  6  to?

12:12:43  7    Q.   Well, I didn't print the whole document.  I just have

12:12:47  8  the references to NCMEC there on probably about the fifth page.

12:12:52  9  You see it there?  Fifth or sixth.

12:13:04  10    A.   Is there a page number that you're on?  I see some page

12:13:07  11  numbers at the bottom.

12:13:08  12    Q.   Yes, page 93.

12:13:10  13    A.   Okay, I'm on that page.

12:13:12  14    Q.   And that's a reference to your organization, isn't it?

12:13:15  15    A.   The title there, the heading says our organization

12:13:18  16  name, correct.

12:13:19  17    Q.   Okay.  And fair to say that at that point in time in

12:13:28  18  2010 NCMEC was a significant player, a significant participant,

12:13:34  19  in the Department of Justice strategy for prosecuting child

12:13:40  20  pornography crimes?

12:13:40  21    A.   No, I would not have that information.  You would have

12:13:42  22  to ask them on what was or was not.

12:13:45  23    Q.   So you would disagree with that statement?

12:13:47  24    A.   I would say that the CyberTipline and the National

12:13:52  25  Center for Missing & Exploited Children has always served the

12:13:54  1  **public and provided information to law enforcement, but I could**

12:13:58  2  **not speak on behalf of the Department of Justice.**

12:14:03  3   Q.  Do you recall any controversy in 2006 regarding

12:14:10  4  providing additional information to law enforcement by ESPs and

12:14:16  5  through NCMEC?

12:14:17  6   **A.  No, I do not.**

12:14:28  7   Q.  Do you recall whether the attorney general, the federal

12:14:33  8  attorney general, was putting pressure on companies like AOL

12:14:38  9  and Microsoft and Google to provide additional information to

12:14:44  10  law enforcement through your organization?

12:14:46  11   **A.  No, I was not aware of any type of communications by**

12:14:49  12  **the federal attorney general.**

12:14:57  13   Q.  And referring you to a Defendant's Exhibit R, GAO

12:15:16  14  report in 2002, do you see -- do you have that?

12:15:25  15   **A.  Yes, I have it in front of me.**

12:15:26  16   Q.  That was prepared in 2002, and I think you'd only been

12:15:31  17  with NCMEC for about two years at that time; is that right?

12:15:33  18   **A.  Yes.  I'm not familiar with this report.  I would have**

12:15:35  19  **just started as a CyberTipline staff analyst.**

12:15:56  20   Q.  Now, again, keeping in mind that you weren't there

12:16:01  21  until 2000, at what point in time, if any, did you begin having

12:16:07  22  direct contact with AOL regarding the CyberTipline?

12:16:13  23   **A.  I wouldn't know an exact date.  I mean, certainly we**

12:16:17  24  **have interactions with companies.  I wouldn't know an exact**

12:16:21  25  **date, I'm sorry.**

12:16:22  1    Q.  Generally speaking, was it when you first started?

12:16:27  2    **A.  No, it would have been later through my career.  You**

12:16:31  3    **know, maybe one of my first interactions with them would have**

12:16:33  4    **just been meeting someone that was employed with the company,**

12:16:38  5    **at maybe a child safety conference or something of those sorts.**

12:16:41  6    **No, I do not remember the date or who I would have interacted**

12:16:45  7    **with in the early days.**

12:16:47  8    Q.  At some point in time AOL started using the IDFP

12:16:52  9    program.  Do you remember that?

12:16:54  10   **A.  I am aware that they use an IDFP program.**

12:16:57  11   Q.  Do you recall when they started doing that?

12:16:59  12   **A.  No, sir, I do not.**

12:17:01  13   Q.  That wasn't a significant event in the course of your

12:17:06  14   work with NCMEC?

12:17:08  15   **A.  No.  For me, especially in the early days of being an**

12:17:12  16   **analyst, how a report was generated was of inconsequence to me.**

12:17:18  17   **It was more of we had received information within the**

12:17:21  18   **CyberTipline, and as a staff analyst I would review that**

12:17:23  19   **information and try to find a location to make that report**

12:17:26  20   **available to law enforcement.  So I would be reviewing the**

12:17:29  21   **contents of what's received, not necessarily paying attention**

12:17:33  22   **to how it was identified, whether it was a member of the public**

12:17:36  23   **or if a company were to use technology such as IDFP.**

12:17:42  24   Q.  So somebody else from your organization was involved

12:17:44  25   with AOL in setting up the interface between NCMEC and the

| 12:17:48 | 1 | IDFP? |
| 12:17:49 | 2 | **A.  I don't -- I can't say that anyone from our** |
| 12:17:51 | 3 | **organization was involved in the process of creation of IDFP.** |
| 12:17:55 | 4 | **The CyberTipline itself, whether a company is responding to** |
| 12:18:00 | 5 | **becoming made aware by a citizen or they're taking proactive** |
| 12:18:04 | 6 | **measures to identify child sexual abuse material on their** |
| 12:18:10 | 7 | **network, when they report to the CyberTipline it comes through** |
| 12:18:12 | 8 | **the same channel, so I have no knowledge of our interaction** |
| 12:18:16 | 9 | **with any company related to their tools of interactions on the** |
| 12:18:22 | 10 | **day that they may build.** |
| 12:18:23 | 11 | Q.   Okay.  You just don't know? |
| 12:18:27 | 12 | **A.   Correct.** |
| 12:18:28 | 13 | Q.   Okay.  With respect to the analyst work on the |
| 12:18:30 | 14 | CyberTipline, that's something that you did on occasion; |
| 12:18:32 | 15 | correct? |
| 12:18:32 | 16 | **A.   Yes, I've processed more than 44,000 CyberTipline** |
| 12:18:35 | 17 | **reports, some of which were this year.** |
| 12:18:39 | 18 | Q.   Very good, very good.  There was that reference in the |
| 12:18:42 | 19 | CyberTipline report in this case to confirmed, that the child |
| 12:18:46 | 20 | pornography was confirmed.  Do you recall that? |
| 12:18:48 | 21 | **A.   Yes, when the analyst uses that particular** |
| 12:18:52 | 22 | **classification level, it means that they've reviewed an** |
| 12:18:55 | 23 | **uploaded file or maybe content on the web that appears to be** |
| 12:18:58 | 24 | **child pornography, so we're confirming that we've reviewed** |
| 12:19:01 | 25 | **material that appears to be child pornography.** |

12:19:03  1    Q.  Okay.  And I just wanted to confirm that.  So some

12:19:07  2  person, not a computer, is actually opening the file that was

12:19:11  3  forwarded by AOL, looking at the pictures, at the photographs,

12:19:16  4  and checking the box or entering somehow that it's confirmed?

12:19:19  5    **A.  Our staff would review files that are uploaded by a**

12:19:22  6  **company, or if it's a web site we would go and access that web**

12:19:25  7  **site and review that material.**

12:19:27  8    Q.  Okay.  And I'm correct in saying they physically open

12:19:30  9  the file, clicked on it, opened it up and looked at it?

12:19:33  10   **A.  We would.  Yes, you would have to open to view the file**

12:19:36  11  **that's uploaded by a company.**

12:19:37  12   Q.  Okay.  And then they note that it's confirmed; correct?

12:19:41  13   **A.  That is the dropdown, which denotes that the material**

12:19:44  14  **that we reviewed appears to be child pornography.**

12:19:47  15   Q.  And in your capacity -- you did that on occasion,

12:19:51  16  didn't you?

12:19:51  17   **A.  Yes, I've processed more than 44,000 CyberTipline**

12:19:55  18  **reports.**

12:19:55  19   Q.  And on those -- on those occasions, did you have any

12:20:03  20  false positives?  Did you look at something, say no, this isn't

12:20:07  21  child pornography?

12:20:07  22   **A.  There are times when companies, as I mentioned earlier,**

12:20:10  23  **have uploaded files that appeared to be inanimate objects, so**

12:20:14  24  **there are times when content is not always appearing to be**

12:20:19  25  **child pornography.**



12:20:19   1    Q.   Okay.  And you all have received training on

12:20:23   2    identifying child pornography?

12:20:25   3    A.   We spend time teaching our staff, not only how to write

12:20:30   4    the reports but how to deal with all areas of the Internet, and

12:20:34   5    also child sexual maturation indicators as it results to

12:20:38   6    viewing this type of material.

12:20:41   7    Q.   And was that training provided to you by law

12:20:44   8    enforcement or other individuals?

12:20:45   9    A.   It was not provided by law enforcement.  We have had a

12:20:48   10   forensic pediatrician who has come in to discuss physical signs

12:20:53   11   of sexual maturation, but law enforcement has never conducted a

12:20:56   12   training of that sort.

12:21:01   13   Q.   Now, the reverse is true, though, that you all provide

12:21:04   14   training to law enforcement?

12:21:05   15   A.   Yes.  For example, we provide training to law

12:21:08   16   enforcement as it relates to Internet safety and child safety.

12:21:11   17   Many of the investigators who deal with CyberTipline reports

12:21:15   18   are also school resource officers, so we try and arm them with

12:21:18   19   free educational material so that they can take this -- and we

12:21:23   20   train the trainers, so when they go to the schools they can

12:21:26   21   talk about whether it's elementary school, middle school, high

12:21:28   22   school, it's age-appropriate content as it relates to Internet

12:21:32   23   safety.

12:21:32   24   Q.   And you also educate law enforcement on how the

12:21:37   25   CyberTipline works, what information's available there?

12:21:40    1    A.  Yes, we certainly will speak about the resources of the

12:21:44    2   Exploited Child Division.  We -- earlier we looked at a report

12:21:47    3   from 2006.  Those early reports were very confusing to the

12:21:53    4   layman and law enforcement in general.  It's part of why we've

12:21:56    5   done some internal processes to not only improve our work flow

12:22:00    6   but also the readability of our PDF reports.  It was a business

12:22:05    7   justification.  We were receiving a lot of phone calls from law

12:22:08    8   enforcement, asking what does this Access Date and Time mean,

12:22:12    9   what's the Incident Date and Time.

12:22:13   10        You know, on the first page of an older PDF type of

12:22:17   11   report, you immediately see three different dates and times,

12:22:19   12   and as anyone investigating these types of cases know, an IP

12:22:23   13   address with a date and time are very important, so if you're

12:22:26   14   using the wrong date and time, you know, that's a critical

12:22:29   15   component.  And we've made those types of changes.  And we were

12:22:33   16   spending a lot of resources, traveling to law enforcement

12:22:37   17   conferences, and going line by line in those CyberTipline

12:22:41   18   reports, trying to make sure they fully understood what the

12:22:44   19   different elements meant.

12:22:46   20        So from a business justification, we've tried to

12:22:49   21   improve these reports so that we're spending less time

12:22:52   22   educating them on how to read them and more time trying to

12:22:55   23   advocate for children and child-safety issues.

12:22:57   24   Q.  And in the course of that dialogue with law

12:22:59   25   enforcement, you're also listening to their feedback?

12:23:02   1      **A.   No, this is a type of presentation where we are**

12:23:05   2   **discussing our resources, so whether it's the Missing**

12:23:09   3   **Children's Division, where we can do posters and fliers or the**

12:23:13   4   **free public records database searches, we are standing in front**

12:23:16   5   **of a group, explaining our resources.   It's not a**

12:23:20   6   **back-and-forth type of training.   We do a two-hour block and**

12:23:23   7   **we're out the door, and the trainings continue on with other**

12:23:26   8   **topics.**

12:23:26   9      Q.   But my point is if in that training law enforcement

12:23:29   10   comes up to you and say, hey, you know, we're having a problem

12:23:32   11   with this, you know, we really need some help here, can you do

12:23:35   12   this a little differently, can we get this additional

12:23:38   13   information, you listen to them, don't you?

12:23:39   14      **A.   We certainly would have dialogue if they were to**

12:23:42   15   **express concerns or have questions about the individual report.**

12:23:45   16   **Yes, there is conversation at some point in time during those**

12:23:49   17   **presentations.**

12:23:49   18      Q.   And that was points that GAO report in, I think it was,

12:23:55   19   2011, was getting you all to listen more from the feedback from

12:24:01   20   law enforcement?

12:24:01   21      **A.   The GAO report did say that we could do a better job**

12:24:04   22   **collecting individual feedback on CyberTipline reports.   As I**

12:24:08   23   **mentioned earlier, we would ask about was there an ongoing**

12:24:12   24   **investigation, was the report closed, but we never asked if the**

12:24:14   25   **report itself was useful and if it was not useful, why is that,**

12:24:17  1  was it the timeliness of the referral by NCMEC, or other areas.

12:24:21  2  We never dove into those specific areas on why a report may not

12:24:25  3  be useful.

12:24:36  4     Q.  Just a quick note, if I may, on the communication with

12:24:41  5  the law enforcement at the end of the process.  You spent a

12:24:46  6  fair amount of time describing that you make the reports

12:24:48  7  available to law enforcement and then they download them.  Is

12:24:51  8  that a fair statement?

12:24:52  9     A.  Yes, they would come into our system and download that

12:24:55  10  report, yes.

12:24:55  11     Q.  Okay.  And you used to notify them report by report by

12:25:01  12  e-mail, saying, hey, we've got a new report for your

12:25:04  13  jurisdiction, it's available here and download it?

12:25:07  14     A.  Yes.  But there were some agencies that would receive

12:25:11  15  more than a hundred e-mails a day, and in an effort not to come

12:25:14  16  across as spam or overwhelming to the volume of leads that were

12:25:18  17  actually being made available to law enforcement, we changed

12:25:20  18  that to a daily overview of what had been made available.

12:25:24  19     Q.  Okay.  So you do the same thing now, you just do it on

12:25:26  20  a daily basis, not case-by-case basis?

12:25:29  21     A.  Yes, it's less noise, if you will, coming to them on a

12:25:32  22  regular basis.  It's a digestible, daily overview that would

12:25:36  23  include priority levels, the report number, and any comments

12:25:40  24  that were escalated, it would give an overview of all the

12:25:43  25  reports from that day.

12:25:43  1      Q.   Okay.  And the way it works is they've got the list,

12:25:46  2   they've got an e-mail that they get for that day from you all,

12:25:51  3   and they click on the report number, and then that opens up the

12:25:55  4   report for them?

12:25:55  5      **A.   No, that's not correct.  The e-mail's just a summary.**

12:25:58  6   **It's just to give them an idea of what has been made available.**

12:26:00  7   **At any point in time, law enforcement can access those reports**

12:26:03  8   **that are available through the VPN.  They can go on there any**

12:26:07  9   **point in time.  There are no direct links available through**

12:26:09  10  **that e-mail that would provide them access to the CyberTipline.**

12:26:13  11         **Part of the VPN, the virtual private network, is**

12:26:16  12  **security.  There's third-party authentication that must take**

12:26:19  13  **place.  We don't just let anyone come into the network.  They**

12:26:23  14  **have to be verified and vetted that they are a law enforcement**

12:26:25  15  **entity.**

12:26:25  16     Q.   Okay.  So they log onto that web site, then they put in

12:26:29  17  that number, and then they download the report?

12:26:31  18     **A.   They can review and then download that information,**

12:26:33  19  **correct.**

12:26:33  20     Q.   Okay.  And we had earlier testimony that the officer in

12:26:39  21  this case, the agent in this case, received a hard copy of the

12:26:43  22  CyberTipline report and then a disc, apparently, from you all

12:26:50  23  and AOL?

12:26:51  24     **A.   No, that's not correct.  The disc would not be from us.**

12:26:54  25  **It's an interesting point.  And part of why we spent so much**

12:26:57  1    time trying to improve our reports themselves, why there's a

12:27:00  2    difference between our old PDF and the new PDF, what we find is

12:27:04  3    that the Internet Crimes Against Children task force, they

12:27:07  4    jurisdictionally -- there are 61 and they cover all 50 states.

12:27:10  5    Oftentimes those ICAC task forces will pull all the reports for

12:27:14  6    the state.  They, in turn, refer that information to an

12:27:18  7    affiliate.  Oftentimes when they make that referral, they're

12:27:21  8    going to provide the PDF, maybe they'll burn the content to a

12:27:24  9    disc.  We do not do any discs.  Everything comes from within

12:27:28  10   the tipline.  That's why we have that VPN.

12:27:30  11       Q.   Okay.  So if there's a disc, somebody else has

12:27:33  12   downloaded the information from your CyberTipline file?

12:27:40  13       A.   It would be one of the ICACs or one of the federal

12:27:43  14   liaisons that have access into the system.  They would have

12:27:46  15   produced that disc and provided -- referred it to a law

12:27:49  16   enforcement agency or officer.

12:27:57  17       Q.   I assume this may have changed, but do you have any

12:28:00  18   idea today as to what percentage of the tips that come across

12:28:07  19   the CyberTipline are from the ESPs, computer generated by the

12:28:13  20   ESPs, as opposed to somebody calling you on the phone?

12:28:15  21       A.   Yes, the numbers do change year by year.  It's roughly

12:28:19  22   around 70 percent come from the companies, 40 percent are from

12:28:24  23   the public.

12:29:09  24            MR. HENDERSON:  Thank you very much, sir.  Thank

12:29:10  25   you, Your Honor.

| | | |
|---|---|---|
| 12:29:11 | 1 | THE COURT:  Thank you, Mr. Henderson. |
| 12:29:13 | 2 | Mr. Shehan, both Mr. Henderson and Mr. Hart talked |
| 12:29:16 | 3 | to you about NCMEC receiving reports where the embedded image |
| 12:29:21 | 4 | was, in fact, what you described as an inanimate object or what |
| 12:29:24 | 5 | Mr. Hart described as a giraffe. |
| 12:29:26 | 6 | THE WITNESS:  Yes, sir. |
| 12:29:26 | 7 | THE COURT:  In other words, not child porn |
| 12:29:30 | 8 | material.  How often does that happen, one time out of ten, one |
| 12:29:34 | 9 | time out of a thousand; can you quantify? |
| 12:29:35 | 10 | THE WITNESS:  When we talk about the inanimate |
| 12:29:37 | 11 | objects or the giraffe, extremely rare.  I can only think of |
| 12:29:41 | 12 | one instance where there was a period in time of maybe a week |
| 12:29:45 | 13 | or so with one company that there seemed to be an issue.  It's |
| 12:29:48 | 14 | extremely rare.  So out of our 2.4 million reports, there may |
| 12:29:53 | 15 | have been five to ten. |
| 12:29:54 | 16 | THE COURT:  And most of those were from one |
| 12:29:56 | 17 | company? |
| 12:29:57 | 18 | THE WITNESS:  All of the incidents that I'm |
| 12:29:58 | 19 | thinking of was one company. |
| 12:29:59 | 20 | THE COURT:  Was that company AOL? |
| 12:30:02 | 21 | THE WITNESS:  No, it was not. |
| 12:30:02 | 22 | THE COURT:  All right.  Thank you. |
| 12:30:02 | 23 | Redirect, Mr. Hart? |
| 12:30:12 | 24 | MR. HART:  I don't think so, Your Honor. |
| 12:30:13 | 25 | THE COURT:  All right.  Mr. Shehan, you may step |

5-20-14  USA v. ACKERMAN  No. 13-10176

145

```
12:30:15   1    down.  You're excused from the process of the court.
12:30:17   2              (Witness excused from the witness stand.)
12:30:17   3              THE COURT:  Thank you very much.
12:30:18   4              THE WITNESS:  Thank you.
12:30:21   5              THE COURT:  Mr. Hart, do you have another witness?
12:30:23   6              MR. HART:  Your Honor, I do not have any
12:30:24   7    additional witnesses.
12:30:25   8              THE COURT:  The Government rests?
12:30:27   9              MR. HART:  Would rest.
12:30:28  10              THE COURT:  Mr. Henderson?
12:30:29  11              MR. HENDERSON:  Thank you, Your Honor.  Your
12:30:33  12    Honor, first of all Mrs. Ackerman.
12:30:43  13              THE COURT:  Mrs. Ackerman, if you would come stand
12:30:45  14    in front of the courtroom deputy, she will swear you in, and
12:30:48  15    then you may have a seat in the witness box.
12:30:52  16                        MICHELLE L. ACKERMAN,
12:30:52  17    having been first duly sworn to testify the truth, the whole
12:31:08  18    truth, and nothing but the truth, testified as follows:
12:31:08  19                        DIRECT EXAMINATION
12:31:08  20    BY MR. HENDERSON:
12:31:10  21      Q.  Would you please state your full name.
12:31:12  22      A.  Michelle Louise Ackerman.
12:31:13  23      Q.  And, Mrs. Ackerman, do you know a gentleman by the name
12:31:18  24    of Walter Ackerman?
12:31:19  25      A.  Yes, I do.
```

| | | |
|---|---|---|
| 12:31:19 | 1 | Q.  And who is he? |
| 12:31:20 | 2 | **A.  He's my husband.** |
| 12:31:21 | 3 | Q.  Do you recall an occasion when you were visited by law |
| 12:31:26 | 4 | enforcement at your house? |
| 12:31:27 | 5 | **A.  Yes, very well.** |
| 12:31:31 | 6 | Q.  Could you describe briefly the initial encounter with |
| 12:31:36 | 7 | law enforcement, how that occurred? |
| 12:31:39 | 8 | **A.  Sure.  It was about 7:00 AM, and I was getting ready** |
| 12:31:42 | 9 | **for work.  I had on a T-shirt and my underwear, and I happened** |
| 12:31:48 | 10 | **to look out the window and I see six or seven people rushing to** |
| 12:31:54 | 11 | **the door, and so I went and I opened the door, and I believe it** |
| 12:31:58 | 12 | **was Agent Moore and I saw a local sheriff out there and there** |
| 12:32:05 | 13 | **were numerous other officials.** |
| 12:32:08 | 14 | Q.  And in the course of subsequent conversation, did Agent |
| 12:32:16 | 15 | Moore say anything to you about speaking with your husband? |
| 12:32:23 | 16 | **A.  He asked where he was.  Well, he said he had a warrant,** |
| 12:32:26 | 17 | **and I let them in.  And he interviewed me while they searched** |
| 12:32:31 | 18 | **the house, and asked me where Walter was, and I said he was at** |
| 12:32:35 | 19 | **work, and wanted to know, you know, if he would be able to talk** |
| 12:32:39 | 20 | **to him, and I said yes and, you know, I gave him the** |
| 12:32:45 | 21 | **information of where Walter worked.** |
| 12:32:48 | 22 | Q.  And did he say anything to you one way or the other |
| 12:32:52 | 23 | about whether or not Walter was going to be arrested? |
| 12:32:56 | 24 | **A.  Just before they left, he said that he was not going to** |
| 12:33:03 | 25 | **arrest Walter unless he didn't cooperate.** |

| | | |
|---|---|---|
| 12:33:07 | 1 | Q.   Unless he didn't cooperate? |
| 12:33:09 | 2 | **A.   Correct.** |
| 12:33:11 | 3 | Q.   And did you respond to that remark? |
| 12:33:13 | 4 | **A.   I did.  I said, "You tell Walter that I said to** |
| 12:33:18 | 5 | **cooperate and he will."** |
| 12:33:22 | 6 | Q.   And then they left? |
| 12:33:23 | 7 | **A.   And then they left.** |
| 12:33:38 | 8 | Q.   I'm showing you what was marked as Government's Exhibit |
| 12:33:42 | 9 | 5.  Have you ever seen that before? |
| 12:33:44 | 10 | **A.   No.** |
| 12:33:47 | 11 | Q.   When did you open an account with AOL; do you remember? |
| 12:33:52 | 12 | **A.   I'm pretty sure it was when they first began.  It's** |
| 12:33:56 | 13 | **over 20 years.** |
| 12:33:58 | 14 | Q.   And have you continued to use AOL since you first |
| 12:34:04 | 15 | registered with them, since you first opened the account? |
| 12:34:08 | 16 | **A.   Until the end, yes.** |
| 12:34:11 | 17 | Q.   And during that entire period of time, did they ever |
| 12:34:17 | 18 | convey to you in any way that they were going to be looking at |
| 12:34:24 | 19 | images, photographs, or movies that you either embedded in |
| 12:34:31 | 20 | e-mails or attached to e-mails that you would send to other |
| 12:34:34 | 21 | people? |
| 12:34:34 | 22 | **A.   Never.** |
| 12:34:36 | 23 | Q.   If you had known that, what would your reaction have |
| 12:34:43 | 24 | been? |
| 12:34:43 | 25 | **A.   I might have gone to another provider.** |

12:34:50  1      Q.  Did you feel any -- well, I don't want to use legal

12:34:57  2  terms, but did you believe that that was private information

12:35:01  3  when you sent it online or sent it over the Internet?

12:35:06  4      **A.  Yes, I did.**

12:35:07  5      Q.  And have you done that in the past?  Have you sent over

12:35:12  6  the Internet with AOL photographs or pictures of various

12:35:16  7  things --

12:35:16  8      **A.  Yes.**

12:35:16  9      Q.  -- to different people?

12:35:18  10     **A.  Yes.**

12:35:25  11     Q.  And, again, as you used that service, did you want AOL

12:35:36  12  to be looking at those pictures?

12:35:39  13     **A.  No.**

12:35:45  14             MR. HENDERSON:  Thank you.  Thank you, Your Honor.

12:35:46  15             THE COURT:  Cross-examination, Mr. Hart?

12:35:49  16                     CROSS-EXAMINATION

12:35:49  17             THE COURT:  Ms. Ackerman.

12:35:53  18  BY MR. HART:

12:35:53  19     Q.  Ms. Ackerman, you -- after your interaction with law

12:35:57  20  enforcement there at your home, accurate to say you did not

12:36:01  21  contact your husband to tell him, hey, there's been a search

12:36:07  22  warrant at the house?

12:36:07  23     **A.  I did not.**

12:36:08  24     Q.  You wouldn't have told him anything that Agent Moore

12:36:14  25  conveyed to you?

12:36:14  1    **A.   No, I didn't.**

12:36:16  2    Q.   So even if Agent Moore said, "I won't arrest him unless

12:36:20  3    he cooperates," that statement is never communicated to your

12:36:23  4    husband?

12:36:24  5    **A.   I told him to tell him that.**

12:36:29  6    Q.   But you didn't tell Walter, "The officer told me he

12:36:33  7    wouldn't arrest you if you cooperate"?

12:36:35  8    **A.   Not that day, no.**

12:36:38  9    Q.   All right.   And as it relates to your AOL account, you

12:36:42  10   said you used it until the end, I think was your words.   When

12:36:48  11   was your account disconnected?

12:36:50  12   **A.   I didn't -- excuse me.   I didn't know it was**

12:36:53  13   **disconnected.   I had a problem logging in in April, and I**

12:36:59  14   **called them.   It said, oops, you know, we're embarrassed, we**

12:37:05  15   **can't find your account and call customer service, which I did,**

12:37:12  16   **and I -- basically I was strung along.   They said they would**

12:37:15  17   **check into it and get back to me.   Nobody ever did.   And I just**

12:37:20  18   **kept calling them.   And then I found out, you know, I kind of**

12:37:26  19   **pieced it together once the search warrant came.**

12:37:29  20   Q.   But that not being able to access your account occurred

12:37:33  21   in April?

12:37:34  22   **A.   Yes.**

12:37:34  23   Q.   And that's 2013?

12:37:36  24   **A.   Yes.**

12:37:37  25   Q.   And this account, is this an account that Mr. Ackerman

| 12:37:43 | 1 | also used? |
| 12:37:44 | 2 | **A.  He had his own e-mail address.** |
| 12:37:47 | 3 | Q.  Was it associated with your account? |
| 12:37:50 | 4 | **A.  Yes.** |
| 12:37:50 | 5 | Q.  And so when your account was shut down, was his also |
| 12:37:53 | 6 | shut down? |
| 12:37:53 | 7 | **A.  Yes.** |
| 12:37:54 | 8 | Q.  Did you all have conversations about that in April of, |
| 12:37:56 | 9 | like, golly, why can't we get into our e-mail account? |
| 12:37:59 | 10 | **A.  I did, yes.** |
| 12:38:01 | 11 | Q.  So you talked with him about being unable to get in |
| 12:38:04 | 12 | your e-mail account? |
| 12:38:04 | 13 | **A.  Yes.** |
| 12:38:05 | 14 | Q.  Did he talk with you about not being able to get into |
| 12:38:09 | 15 | his e-mail account? |
| 12:38:09 | 16 | **A.  No, because I had other addresses and I couldn't get** |
| 12:38:14 | 17 | **into any of them.  It was the whole thing.** |
| 12:38:18 | 18 | Q.  So he does not tell you at any point, yeah, you know, I |
| 12:38:23 | 19 | can't get into mine either? |
| 12:38:25 | 20 | **A.  Well, yeah, he couldn't, but it was all one account, so** |
| 12:38:29 | 21 | **I just assumed it was because it was in my name, that nobody** |
| 12:38:37 | 22 | **had access.** |
| 12:38:37 | 23 | Q.  Did he provide any explanation for why that might be? |
| 12:38:41 | 24 | **A.  No.** |
| 12:38:50 | 25 | MR. HART:  Thank you, Ms. Ackerman.  I don't have |

| | | |
|---|---|---|
| 12:38:52 | 1 | any additional questions. |
| 12:38:54 | 2 | THE COURT:  Any redirect, Mr. Henderson? |
| 12:38:55 | 3 | MR. HENDERSON:  No, Your Honor.  Thank you. |
| 12:38:56 | 4 | THE COURT:  Thank you, Mrs. Ackerman.  You may |
| 12:38:58 | 5 | step down, ma'am. |
| 12:38:59 | 6 | (Witness excused from the witness stand.) |
| 12:39:04 | 7 | MR. HENDERSON:  Your Honor, we'd call Mr. Ackerman |
| 12:39:06 | 8 | to the stand. |
| 12:39:07 | 9 | THE COURT:  Mr. Ackerman, if you would come stand |
| 12:39:09 | 10 | in front of the courtroom deputy, she will swear you in. |
| 12:39:13 | 11 | The defendant:  Yes, sir. |
| 12:39:14 | 12 | THE COURT:  And you may have a seat in the witness |
| 12:39:15 | 13 | box. |
| 12:39:16 | 14 | WALTER E. ACKERMAN, JR., |
| 12:39:16 | 15 | having been first duly sworn to testify the truth, the whole |
| 12:39:37 | 16 | truth, and nothing but the truth, testified as follows: |
| 12:39:37 | 17 | DIRECT EXAMINATION |
| 12:39:37 | 18 | BY MR. HENDERSON: |
| 12:39:39 | 19 | Q.  Would you please state your full name. |
| 12:39:40 | 20 | A.  **Walter Edmund Ackerman, Jr.** |
| 12:39:42 | 21 | Q.  And, Mr. Ackerman, you're the defendant in this case; |
| 12:39:45 | 22 | is that correct? |
| 12:39:46 | 23 | A.  **Yes, sir.** |
| 12:39:47 | 24 | Q.  Now, Mr. Ackerman, with respect to the date that you |
| 12:39:52 | 25 | first met Agent Moore, could you describe to the Court, for the |

| | | |
|---|---|---|
| 12:39:57 | 1 | Court, what you recall happening while you were at work. |
| 12:40:04 | 2 | **A.   I was working in the shop and my boss came out into the** |
| 12:40:13 | 3 | **floor and told me he wanted me in the break room.  As I got to** |
| 12:40:22 | 4 | **the break room, there were two individuals there who I didn't** |
| 12:40:26 | 5 | **know what was going on, and I believe they told me that they** |
| 12:40:35 | 6 | **were Homeland Security.  And initially I didn't know what was** |
| 12:40:40 | 7 | **going on.  I -- I was scared to death I was going to have a** |
| 12:40:49 | 8 | **heart attack.  And --** |
| 12:40:53 | 9 | Q.   At some point in time did they -- did you all walk |
| 12:40:56 | 10 | across the street? |
| 12:40:57 | 11 | **A.   Yes, sir, we did.** |
| 12:40:59 | 12 | Q.   Now, from the time that you first met the agents, they |
| 12:41:06 | 13 | introduced themselves to you as Homeland Security, did you feel |
| 12:41:12 | 14 | like you were free to say -- |
| 12:41:13 | 15 | **A.   No, sir, I never been involved with the law, say** |
| 12:41:19 | 16 | **outside of like getting a traffic violation, so I didn't think** |
| 12:41:27 | 17 | **I had any kind of a choice but to follow and do whatever they** |
| 12:41:30 | 18 | **told me to do.** |
| 12:41:35 | 19 | Q.   And as best you can remember, what was going through |
| 12:41:38 | 20 | your mind?  How did you feel when you first met them, before |
| 12:41:41 | 21 | you walked across the street? |
| 12:41:44 | 22 | **A.   I thought I was going to be arrested.  I mean, people** |
| 12:41:50 | 23 | **show up at -- Homeland or if it was regular police officers and** |
| 12:41:59 | 24 | **they're coming to see me, the first thing I'm going to assume,** |
| 12:42:02 | 25 | **what did I do and am I being arrested or what.** |

12:42:07  1    Q.   And did you ask them whether or not you were being

12:42:10  2  arrested?

12:42:10  3    **A.   I don't recollect.  All I remember was, umm, basically,**

12:42:27  4  **you know -- well, yeah, I -- actually, I think I did ask them**

12:42:29  5  **if I was being arrested, and I don't remember them actually**

12:42:32  6  **saying anything.  All I know is that I was walked across the --**

12:42:38  7  **to the office building across the street from the major plant.**

12:42:44  8    Q.   And as you walked across the street, did you feel like

12:42:47  9  you were free to go in a different direction?

12:42:49  10    **A.   No, sir.  When I was being escorted by two officers, I**

12:42:57  11  **don't feel I'm being given an opportunity to dart, you know.**

12:42:59  12  **That would be stupid anyhow.**

12:43:02  13    Q.   When you got to the location across the street, where

12:43:05  14  did you all go?

12:43:06  15    **A.   We went into an area that was -- that's designated by**

12:43:13  16  **my boss for us to sit down and chat, whatever he wanted to do.**

12:43:20  17    Q.   And did your boss then leave?

12:43:22  18    **A.   Yes, sir.**

12:43:24  19    Q.   And you heard the recording yesterday.  I think the

12:43:27  20  first word was "heart attack."  It sounded like your voice.

12:43:31  21  Was that you?

12:43:32  22    **A.   Yes, sir, it was.**

12:43:33  23    Q.   And what were you saying when you mentioned a heart

12:43:36  24  attack?

12:43:36  25    **A.   Well, basically it was -- was -- I have a problem with**

| | | |
|---|---|---|
| 12:43:44 | 1 | **anxiety, and the first thing I get -- I blow things out of** |
| 12:43:54 | 2 | **proportion sometimes, and my anxiety gets really riled up.** |
| 12:43:58 | 3 | **Basically, I didn't know what was happening, and I was scared** |
| 12:44:00 | 4 | **to death, and I didn't know what was going to be happening, if** |
| 12:44:03 | 5 | **I was going to be going home, whether or not I was going to be** |
| 12:44:06 | 6 | **going to jail or anything.  So I was really in high gear.  I** |
| 12:44:10 | 7 | **was about ready to jump out of my skin.** |
| 12:44:13 | 8 | Q.   And did you then continue to stay in the room and talk |
| 12:44:21 | 9 | with the agents? |
| 12:44:21 | 10 | **A.   Yes, sir.** |
| 12:44:23 | 11 | Q.   And during that period, entire period of time, did you |
| 12:44:27 | 12 | ever feel like you were free to leave? |
| 12:44:29 | 13 | **A.   No, sir.** |
| 12:44:33 | 14 | Q.   Referring you also, if I may, to Government's Exhibit |
| 12:44:38 | 15 | 5, have you ever seen that before? |
| 12:44:39 | 16 | **A.   No, sir.** |
| 12:44:42 | 17 | Q.   Now, your wife testified earlier that it was her AOL |
| 12:44:47 | 18 | account.  Is that accurate? |
| 12:44:48 | 19 | **A.   Yes, sir.** |
| 12:44:50 | 20 | Q.   But you used her account? |
| 12:44:52 | 21 | **A.   Yes, sir.** |
| 12:44:55 | 22 | Q.   Pardon me? |
| 12:44:56 | 23 | **A.   It was her account before we even got married.** |
| 12:45:01 | 24 | Q.   And how long -- how long have you used that account?  I |
| 12:45:06 | 25 | guess how long have you been married? |

5-20-14   USA v. ACKERMAN   No. 13-10176

155

12:45:08   1    A.   Up until it was stopped.  I didn't generally use AOL.

12:45:14   2    Just one of those things every once in awhile.

12:45:17   3    Q.   And when you used AOL, did you believe that any

12:45:22   4    information that you were sending to other people was private

12:45:25   5    information?

12:45:26   6    A.   Yes.

12:45:28   7    Q.   And would you have used AOL to send information if you

12:45:33   8    didn't think it was private?

12:45:34   9    A.   Well, my -- if you don't mind me saying so, I don't

12:45:41   10   think anybody would.

12:45:44   11         MR. HENDERSON:  Thank you.  Thank you, Your Honor.

12:45:46   12         THE COURT:  Cross-examination, Mr. Hart.

12:45:48   13                    CROSS-EXAMINATION

12:45:48   14   BY MR. HART:

12:45:52   15   Q.   Mr. Ackerman --

12:45:52   16   A.   Yes, sir.

12:45:53   17   Q.   -- the plains66952 e-mail account, that's not your

12:45:58   18   wife's account, is it?

12:46:00   19   A.   No, sir, that's my user name.  It's the -- I was a user

12:46:05   20   name used on her account.

12:46:07   21   Q.   Right.  So in this instance the person that's operating

12:46:11   22   the plains66952, that's you, not your wife?

12:46:15   23   A.   Yes, sir.

12:46:16   24   Q.   But it's under the account that has your wife's name on

12:46:20   25   it?

| | | |
|---|---|---|
| 12:46:21 | 1 | **A.   Yes.** |
| 12:46:21 | 2 | Q.   Not your name? |
| 12:46:23 | 3 | **A.   No, sir.** |
| 12:46:24 | 4 | Q.   So in terms of if someone were to research this, as |
| 12:46:29 | 5 | they did in this case, plains66952 on a cursory glance comes |
| 12:46:34 | 6 | back to your wife? |
| 12:46:36 | 7 | **A.   Yes, sir.** |
| 12:46:39 | 8 | Q.   Now, you also -- we had some discussion earlier about |
| 12:46:47 | 9 | the use of TOR.  Are you familiar with that? |
| 12:46:51 | 10 | **A.   Yes, sir.** |
| 12:46:51 | 11 | Q.   TOR is a acronym for -- |
| 12:46:54 | 12 | MR. HENDERSON:  Your Honor, I'm going to object at |
| 12:46:55 | 13 | this point, I apologize.  Beyond the scope of the direct. |
| 12:47:01 | 14 | MR. HART:  Your Honor, this relates to his belief |
| 12:47:05 | 15 | in privacy as it relates to his e-mail account. |
| 12:47:08 | 16 | THE COURT:  Remind me what TOR was.  We talked |
| 12:47:11 | 17 | about it yesterday, but I'm -- |
| 12:47:12 | 18 | MR. HART:  TOR is the onion writer, and it's an |
| 12:47:15 | 19 | anonymizing service. |
| 12:47:17 | 20 | THE COURT:  I'm going to overrule the objection |
| 12:47:18 | 21 | and allow you to proceed. |
| 12:47:20 | 22 | BY MR. HART: |
| 12:47:23 | 23 | Q.   With that explanation provided to the Court, are you |
| 12:47:27 | 24 | oriented to what we're going to be talking about? |
| 12:47:29 | 25 | **A.   TOR?** |

12:47:31  1    Q.   TOR.

12:47:32  2    **A.   Yes.**

12:47:32  3    Q.   And you're familiar with TORE, correct?

12:47:34  4    **A.   Yeah, it's called TORE Project.**

12:47:36  5    Q.   And you provided a rather lengthy explanation of TOR to

12:47:39  6    Agent Moore during the interview?

12:47:41  7    **A.   Yeah, he asked me to.**

12:47:42  8    Q.   Okay.  Now, I'm not going to ask you to provide us also

12:47:46  9    the same explanation related to TOR, but would it be accurate

12:47:50  10   to say the reason why you used TOR is to hide your identity?

12:47:56  11   **A.   It was a site that was provided to me by Gay Kruther**

12:48:12  12   **(phonetic) or -- I'm sorry, I don't recollect the other**

12:48:19  13   **person's name.  I'm sorry.**

12:48:20  14   Q.   Another user directed you to use the site?

12:48:22  15   **A.   Yes, yes.  Thank you.**

12:48:23  16   Q.   And the explanation was, this will allow you to

12:48:27  17   anonymize or hide where you are on the Internet?

12:48:29  18   **A.   Yes, sir.**

12:48:30  19   Q.   And you understood it to do that; correct?

12:48:34  20   **A.   Yeah.**

12:48:34  21   Q.   And that's why you downloaded the TOR Project, the

12:48:39  22   program, and then used it?

12:48:41  23   **A.   Yeah.**

12:48:43  24   Q.   And fair to say you did that because you know from

12:48:47  25   reading newspapers and listening to the radio and whatnot that

12:48:53   1   ISP -- or I should say ESPs, electronic service providers, are

12:48:58   2   monitoring your information, including your location?

12:49:07   3       A.   I never thought of it in those terms.

12:49:11   4       Q.   But that is why you chose to use the TOR program;

12:49:14   5   correct?

12:49:14   6       A.   Well, TOR is another service provider just like

12:49:18   7   Firefox.  You can access everything.  It just doesn't come up

12:49:24   8   as your name.  It just comes up as an anonymous number.

12:49:26   9       Q.   And you're talking about the IP address?

12:49:29   10      A.   Yeah.

12:49:29   11      Q.   So this would be a way for you to hide your IP address?

12:49:34   12      A.   Yeah, I guess so.

12:49:36   13      Q.   And so you used that in order to prevent people from

12:49:40   14   finding you if they're monitoring your IP address?

12:49:45   15      A.   I guess so, yeah.

12:49:47   16      Q.   Because you understood that other services, when you

12:49:51   17   used them, monitor your information, like your IP address?

12:49:57   18      A.   I guess.

12:49:58   19      Q.   And so when you use AOL, your understanding that you're

12:50:03   20   being monitored, you really understood it at the time you were

12:50:08   21   using AOL, did you not?

12:50:09   22      A.   Well, just -- AOL was just e-mail.  That's all it was

12:50:12   23   to me.  I didn't use anything else but use the e-mail.

12:50:16   24      Q.   All right.  Now, when law enforcement -- I'm going to

12:50:21   25   shift gears on you.

| | | |
|---|---|---|
| 12:50:22 | 1 | **A.   Okay.** |
| 12:50:23 | 2 | Q.   When law enforcement shows up to your house -- not to |
| 12:50:28 | 3 | your house, to your work, as you've described it, basically |
| 12:50:36 | 4 | exactly how Agent Moore describes it of your boss coming and |
| 12:50:39 | 5 | getting you, bringing you from the work area to a break room |
| 12:50:42 | 6 | and then walking across the street to a location your manager |
| 12:50:46 | 7 | had identified.  Am I understanding you correctly? |
| 12:50:48 | 8 | **A.   Yes, sir.** |
| 12:50:48 | 9 | Q.   And what is the type of work that you're involved in? |
| 12:50:51 | 10 | **A.   I work for -- I had worked for a company called AGCO.** |
| 12:50:58 | 11 | **They manufacture and build farm equipment.** |
| 12:51:00 | 12 | Q.   All right.  So this is a manufacturing facility? |
| 12:51:02 | 13 | **A.   Yes, sir.** |
| 12:51:03 | 14 | Q.   So welding going on? |
| 12:51:04 | 15 | **A.   Well, yeah, but I'm not a welder.  I was an assembler.** |
| 12:51:08 | 16 | Q.   All right.  An assembler.  So that's -- are you working |
| 12:51:11 | 17 | with robotic parts or is this panel drills -- |
| 12:51:14 | 18 | **A.   No, it's manually putting things together.  There is** |
| 12:51:17 | 19 | **welding in the facility, but I was not a welder.** |
| 12:51:19 | 20 | Q.   All right.  In terms of the other space you went to, is |
| 12:51:23 | 21 | that space a work space like what you're doing, or is it more |
| 12:51:27 | 22 | quiet? |
| 12:51:27 | 23 | **A.   Well, there was -- it's -- it's -- the building was** |
| 12:51:31 | 24 | **also a manufacturing building, but there was an area that was** |
| 12:51:37 | 25 | **just offices and that's where I was, in one of the empty** |

| | | |
|---|---|---|
| 12:51:39 | 1 | **offices.** |
| 12:51:40 | 2 | Q.   And so that's where you were taken by -- |
| 12:51:42 | 3 | **A.   Yes, sir.** |
| 12:51:42 | 4 | Q.   -- the boss?  All right.  Now, you're not suggesting to |
| 12:51:46 | 5 | the Court that either Officer or Agent Moore or Agent Russell |
| 12:51:51 | 6 | put their hands on you and marched you over to that location? |
| 12:51:54 | 7 | **A.   No.** |
| 12:51:55 | 8 | Q.   They just walked with you? |
| 12:51:57 | 9 | **A.   Yes.** |
| 12:51:57 | 10 | Q.   And your boss? |
| 12:51:58 | 11 | **A.   I didn't say they dragged me.** |
| 12:52:00 | 12 | Q.   Well, I want to make sure that we're clear on what it |
| 12:52:03 | 13 | is you're saying they did.  They never put their hands on you; |
| 12:52:06 | 14 | correct? |
| 12:52:06 | 15 | **A.   No, sir.** |
| 12:52:07 | 16 | Q.   Never put you in cuffs? |
| 12:52:08 | 17 | **A.   No, sir.** |
| 12:52:09 | 18 | Q.   Never pulled out their gun and waved it in your face or |
| 12:52:12 | 19 | anything like that? |
| 12:52:13 | 20 | **A.   No.** |
| 12:52:14 | 21 | Q.   And, in fact, what they actually showed you was just |
| 12:52:18 | 22 | their credentials? |
| 12:52:20 | 23 | **A.   As far as I remember, yeah.** |
| 12:52:21 | 24 | Q.   All right.  So once you get over there and you're in |
| 12:52:27 | 25 | the room and your boss has left, did you hear the recording, |

| | |
|---|---|
| 12:52:32 | 1 |
| 12:52:38 | 2 |
| 12:52:40 | 3 |
| 12:52:41 | 4 |
| 12:52:41 | 5 |

12:52:32  1   just the very first part that we played yesterday?

12:52:38  2       A.  Did I hear the recording that they played yesterday?

12:52:40  3       Q.  Yeah.

12:52:41  4       A.  Yeah.

12:52:41  5       Q.  Okay.  And during that recording Agent Moore is having

12:52:46  6   some conversation with you, and part of that conversation is

12:52:49  7   whether or not you'd be more comfortable with Erin Russell

12:52:52  8   stepping out of the room.  Do you recall that part?

12:52:54  9       A.  Yeah.

12:52:54  10      Q.  And did -- in fact, she did that?

12:52:56  11      A.  Well, I had asked her to, you know -- he had asked me

12:53:02  12   if I would be more comfortable talking with him or talking with

12:53:05  13   her in the room, and I just don't feel comfortable talking in

12:53:09  14   front of women anyhow.

12:53:11  15      Q.  She left the room?

12:53:13  16      A.  Yes.  Yes, sir, she left the room.

12:53:14  17      Q.  And then the first thing out of your mouth, is that the

12:53:18  18   words that we heard, "child pornography"?

12:53:23  19      A.  Well, he kept on asking me, he says, "Have you done

12:53:26  20   anything new?  Have you done anything different?"  And it was

12:53:29  21   the only thing I could come to mind, "Yes, child pornography."

12:53:34  22      Q.  So you understood the reason why they were there,

12:53:37  23   without him having told you what it was, related to your

12:53:41  24   involvement in child pornography?

12:53:44  25      A.  Yeah.

12:53:49  1    Q.   Now, up to that point, accurate to say, he had not told

12:53:54  2    you what his investigation related to?

12:53:57  3    **A.   No, he just kept on asking me over and over again,**

12:54:01  4    **"Have you done anything different?  Have you been doing**

12:54:03  5    **anything different on, you know, the Internet?" and stuff like**

12:54:10  6    **that there.  He kept on addressing the question, and the only**

12:54:14  7    **thing I could think of was child -- was the child pornography.**

12:54:20  8    Q.   Well, the recording that we heard, are you talking that

12:54:22  9    there is some sort of interview that occurs before we hear you

12:54:26  10   say, "I feel like I'm having a heart attack"?  Are you saying

12:54:29  11   those questions occurred before?

12:54:32  12   **A.   No, he was asking me -- I don't -- I apologize.  I**

12:54:36  13   **don't mean to raise my voice.  He had asked me repeatedly if**

12:54:41  14   **I've been doing anything differently on the Internet, 'cause he**

12:54:47  15   **did ask the question.  I'm not just imagining it.  I wouldn't**

12:54:50  16   **have answered that, said anything, if I wasn't asked the**

12:54:54  17   **question.**

12:54:54  18   Q.   Okay.  Well, and have you had an opportunity to listen

12:54:56  19   to --

12:54:57  20   **A.   Oh, I heard what was on there, but just because it**

12:55:00  21   **doesn't say it doesn't mean it wasn't said.  He did ask the**

12:55:02  22   **question.**

12:55:03  23   Q.   Well, and there's an hour and 20 minutes of recording.

12:55:07  24   Have you actually had an opportunity to listen to the recording

12:55:10  25   provided in discovery?

12:55:11   1      A.   Not the whole thing, no.

12:55:13   2      Q.   All right.  But you've listened to parts of it?

12:55:15   3      A.   Yes, I did listen to the part, he said child

12:55:18   4   pornography and then that was about it.  But he did ask me the

12:55:22   5   question.

12:55:23   6      Q.   Now, in terms of him, Agent Moore, telling you that you

12:55:26   7   were not going to be arrested, do you agree that he told you

12:55:30   8   that once?

12:55:33   9      A.   Might have been telling me that during the

12:55:36   10   conversation.

12:55:37   11      Q.   I'm sorry?

12:55:37   12      A.   During the conversation, yes.

12:55:39   13      Q.   He told you that on several occasions; is that correct?

12:55:43   14      A.   No, only heard it once.

12:55:45   15      Q.   You only heard it once?

12:55:46   16      A.   I only heard it once.

12:55:47   17      Q.   And when in the interview do you recall hearing him

12:55:51   18   say, "You are not going to be arrested today"?

12:55:55   19      A.   When we were leaving the facility, getting ready to

12:55:57   20   leave the facility.  I asked him what was going to be

12:56:01   21   happening, if I was going to be arrested.  He said nothing was

12:56:04   22   going to happen at the time unless it was deemed necessary by

12:56:12   23   the district attorney, if they felt it was something that they

12:56:15   24   needed to pursue.

12:56:16   25      Q.   All right.  Let me clarify something.  You said when

| | | |
|---|---|---|
| 12:56:19 | 1 | we're leaving the facility, are you talking -- |
| 12:56:21 | 2 | **A.   Leaving the office.** |
| 12:56:21 | 3 | Q.   Just give a moment. |
| 12:56:25 | 4 | **A.   Okay.** |
| 12:56:26 | 5 | Q.   At the end of the interview or -- well, are you talking |
| 12:56:29 | 6 | about at the end of the interview? |
| 12:56:31 | 7 | **A.   Yes, sir.** |
| 12:56:31 | 8 | Q.   So that's your recollection? |
| 12:56:33 | 9 | **A.   I apologize for raising my voice.** |
| 12:56:35 | 10 | Q.   No, that's okay.  Well, we can -- the Court will listen |
| 12:56:39 | 11 | to that, and I don't have any additional questions as it |
| 12:56:41 | 12 | relates to that part. |
| 12:56:42 | 13 | MR. HART:  One moment, Your Honor. |
| 12:56:55 | 14 | THE COURT:  All right. |
| 12:56:56 | 15 | (Whereupon, a sotto voce discussion was had |
| 12:56:57 | 16 | between Mr. Hart and Mr. Schmidt.) |
| 12:56:58 | 17 | MR. HART:  Thank you, Mr. Ackerman.  I don't have |
| 12:56:59 | 18 | any further questions for you. |
| 12:57:00 | 19 | THE COURT:  Any redirect, Mr. Henderson? |
| 12:57:03 | 20 | MR. HENDERSON:  Your Honor, just one question, if |
| 12:57:05 | 21 | I may. |
| 12:57:05 | 22 | THE COURT:  Certainly. |
| 12:57:06 | 23 | REDIRECT EXAMINATION |
| 12:57:06 | 24 | BY MR. HENDERSON: |
| 12:57:08 | 25 | Q.   Mr. Ackerman, the TOR, am I pronouncing that correctly, |

| | |
|---|---|
| 12:57:15 | 1 | TOR? |
| 12:57:15 | 2 | **A.   Yes, sir, it's T-O-R.** |
| 12:57:16 | 3 | Q.   Okay.  Is that an Internet provider; in other words, |
| 12:57:22 | 4 | can you do e-mail and send attachments through TOR? |
| 12:57:26 | 5 | **A.   Yes, all it is is a -- as the attorney -- district** |
| 12:57:31 | 6 | **attorney said, it's an anonymous -- it's kind of like Firefox,** |
| 12:57:37 | 7 | **it's still another Internet provider.  You can access anything** |
| 12:57:44 | 8 | **through TOR.  It's just a matter of you just enter -- get into** |
| 12:57:53 | 9 | **it, you open it up like any other screen, and you can access** |
| 12:57:57 | 10 | **anything.  You can access Facebook through it or anything.** |
| 12:58:02 | 11 | **It's just the same thing if you had Firefox or AOL as a** |
| 12:58:06 | 12 | **provider, the same thing, you know.  Outside of that, AOL you** |
| 12:58:10 | 13 | **have to pay for.  The rest of 'em you don't.** |
| 12:58:13 | 14 | MR. HENDERSON:  Thank you.  Thank you, Your Honor. |
| 12:58:18 | 15 | THE COURT:  Any recross within the scope? |
| 12:58:18 | 16 | MR HART:  Yes, Your Honor. |
| 12:58:29 | 17 | RECROSS-EXAMINATION |
| 12:58:29 | 18 | BY MR. HART: |
| 12:58:32 | 19 | Q.   Mr. Ackerman, I don't think I understood the very last |
| 12:58:35 | 20 | thing you said. |
| 12:58:35 | 21 | **A.   I said that most providers that you can access, like** |
| 12:58:41 | 22 | **Firefox and everything else, you don't have to pay for them** |
| 12:58:46 | 23 | **unless -- well, you have to pay, you know, you have to pay for** |
| 12:58:51 | 24 | **the Internet service to get in your house, but as far as** |
| 12:58:55 | 25 | **applications like Firefox and stuff like that, you don't have** |

12:58:58  1    **to pay to access the Internet through them; you only -- but you**

12:59:03  2    **would have to do it with AOL.   That's what I said.**

12:59:05  3         Q.   Okay.

12:59:06  4         **A.   Is that what you wanted to hear?**

12:59:08  5         Q.   Yeah, I wanted to make sure I understood.  You're

12:59:11  6    talking about there are free e-mail providers?

12:59:13  7         **A.   Yes.**

12:59:13  8         Q.   There are free browser providers?

12:59:15  9         **A.   Yes.**

12:59:17  10        Q.   Are you at all familiar with -- well, no, I think

12:59:21  11   that's outside the scope of redirect.  So thank you,

12:59:26  12   Mr. Ackerman.

12:59:29  13             MR. HENDERSON:  Nothing further, Your Honor.

12:59:30  14   Thank you.

12:59:30  15             THE COURT:  Mr. Ackerman, you may step down and

12:59:32  16   resume your seat at the table.

12:59:33  17             (Witness excused from the witness stand.)

12:59:43  18             THE COURT:  Anything further, Mr. Henderson?

12:59:44  19             MR. HENDERSON:  Your Honor, I don't have any other

12:59:48  20   live witnesses.  I did want to raise, I guess by way of

12:59:53  21   evidentiary issues before we closed, as the Court knows, we had

13:00:00  22   subpoenaed Mr. Ryan to testify, now with NCMEC but prior with

13:00:08  23   AOL, and we'd simply renew our request that he be subpoenaed,

13:00:13  24   be allowed to come to court.

13:00:16  25             As we heard testimony, particularly from the

13:00:18    1    representative from AOL, Mr. Ryan was a critical player in the

13:00:26    2    development of the IDFP.  He was on that commission or on that

13:00:29    3    group, that team, that put it together.  And he was also a

13:00:36    4    significant player with respect to, from our perspective, the

13:00:42    5    government-actor issue.  We've provided several documents,

13:00:47    6    including his testimony, sworn testimony, before Congress, and

13:00:53    7    the representative from AOL was unable to answer certain

13:00:56    8    questions about AOL's involvement and relationship at that

13:01:01    9    level, and we would simply renew our request that he be allowed

13:01:05    10   to testify.

13:01:07    11            Other than that, Your Honor, we would move for the

13:01:14    12   admission or receipt of the documents that we appended to

13:01:22    13   filing of yesterday morning, and I apologize to the Court for

13:01:25    14   providing those so late.  Up until Your Honor's ruling

13:01:31    15   regarding the motion to quash, we anticipated having live

13:01:35    16   witness to introduce many of the documents and otherwise

13:01:39    17   provide those during the course of the hearing.

13:01:42    18            When we didn't have the witness, I did everything

13:01:45    19   I could in order to collect all the material that we would have

13:01:48    20   otherwise provided as evidence, provide it as soon as I could

13:01:52    21   to counsel and the Court, which unfortunately wasn't until

13:01:56    22   yesterday morning.  I know this doesn't make any difference to

13:01:59    23   the Court, and it shouldn't, but I was in the office literally

13:02:03    24   all weekend at least ten hours each day compiling the

13:02:10    25   information, preparing this information, as evidence for the

13:02:12  1  Court, and I do apologize to both Court and the counsel and

13:02:18  2  fully anticipated that if the Government had any objections,

13:02:23  3  responses to the evidence, that certainly we would not object

13:02:27  4  to that, and that they would be allowed to do so.

13:02:31  5          And so I do apologize for that, but given the

13:02:36  6  relaxed admission rules that would apply to this hearing, we

13:02:41  7  would ask the Court to consider them and weigh them as they

13:02:44  8  may, as the Court may.  Clearly, some of the information we've

13:02:50  9  offered as supporting documentation to corroborate sworn

13:02:56  10  testimony, for example, before Congress, and other reports, but

13:03:03  11  we would ask the Court to receive those and consider it as it

13:03:06  12  would and as it may in evaluating the issues in this case.

13:03:10  13  Thank you, Your Honor.

13:03:11  14          THE COURT:  Does the Government wish to be heard

13:03:12  15  on that request?

13:03:14  16          MR. HART:  Your Honor, I have -- because they are

13:03:22  17  attached to his motion as attachments in a filing to the court,

13:03:28  18  I believe the Court may consider them in that regard.  As far

13:03:31  19  as the -- well, and I'm sure that the Court understands there

13:03:35  20  may be statements in here that are -- there's not been a

13:03:38  21  witness to testify about or be subject on cross-examination on,

13:03:43  22  and that some of this information may be presented to the Court

13:03:47  23  without the benefit of clarification.  I'm pretty sure the

13:03:51  24  Court is able to digest this information in the manner in which

13:03:56  25  it has been presented.  While I would object on relevance

13:04:02  1   grounds and lack of foundation and so forth, I don't know that

13:04:09  2   it -- quite frankly, I don't know that this information does

13:04:12  3   any particular damage to the Government, and so I don't know

13:04:15  4   that I really have a position.  And I don't necessarily think

13:04:17  5   it will affect the way the Court reviews the testimony that it

13:04:22  6   has actually been presented and solicited through direct and

13:04:25  7   cross-examination here today.

13:04:26  8            So I guess, Your Honor, what I would say is it's a

13:04:29  9   filing, and I don't even know how my objection would work, that

13:04:38  10  you would strike it from the record.  I don't think I can even

13:04:40  11  do that.  I think the Court understands how this information is

13:04:46  12  presented.  There has been no testimony, so I would object on

13:04:51  13  relevancy grounds, as well as foundational for those --

13:05:01  14  whatever has been presented here today.  To my knowledge, we

13:05:03  15  have not had foundation and even reference to half of these

13:05:08  16  things.  I would object in that regard.

13:05:15  17            I'm sorry, Your Honor, that was a very meandering

13:05:17  18  response, but --

13:05:19  19            THE COURT:  I understand, I understand.  Well,

13:05:22  20  certainly most, but not all, of these documents under the rules

13:05:25  21  of evidence failed to establish a foundation, many failed

13:05:30  22  relevance and many are hearsay.  There are a few documents,

13:05:37  23  particularly with respect to Mr. Shehan, whom he expressed

13:05:41  24  familiarity with, and through him a foundation could probably

13:05:44  25  have been laid, although it's hard for me to reconstruct that

13:05:48  1    since no evidence was offered at that time.

13:05:50  2          Given the nature of this hearing and as Mr. Hart's

13:05:52  3    noted, they are all filed on CM/ECF and I can easily determine

13:06:01  4    what proper evidentiary basis they have in this case myself.

13:06:06  5    So I don't find it necessary to admit them for this hearing,

13:06:10  6    particularly since they weren't offered during the testimonial

13:06:13  7    portion of the hearing, but they are appended to the brief that

13:06:23  8    Mr. Henderson filed yesterday, and so they're accessible in the

13:06:26  9    record.  I think that's probably adequate for our purposes.

13:06:28  10          I'm uncertain how I want to proceed at this point,

13:06:37  11    counsel.  My preference is to hear your summation arguments.

13:06:49  12    That's my strong preference.  I'm strongly disinclined to ask

13:06:53  13    for additional post-hearing briefing.

13:06:57  14          Mr. Henderson certainly has already filed three

13:06:59  15    briefs in this case.  I guess you've only filed one, Mr. Hart.

13:07:04  16    And, of course, I permitted the filing of the amicus as well.

13:07:07  17    So I'm strongly disinclined to hear argument -- I mean, to have

13:07:14  18    more briefing, and I prefer to do oral argument.  It's been a

13:07:19  19    long morning, and so I'm a little reluctant to throw you all to

13:07:25  20    do that right now.  I know Mr. Schmidt expressed to me his

13:07:28  21    interest in expressing summation on behalf of NCMEC, which I

13:07:32  22    told him at the outset of the hearing I would permit him to do.

13:07:35  23    I don't know what his travel plans are.  I want to be

13:07:37  24    sympathetic to those as well.

13:07:39  25          What -- counsel, how would you like to proceed

| | | |
|---|---|---|
| 13:07:43 | 1 | to -- all three of you -- with terms of wrapping up this case? |
| 13:07:50 | 2 | MR. HENDERSON:  Your Honor, I'll defer to the |
| 13:07:51 | 3 | Government.  I would welcome the opportunity to refresh and |
| 13:07:58 | 4 | perhaps try to -- |
| 13:08:00 | 5 | THE COURT:  I think you have a 2:00 o'clock with |
| 13:08:02 | 6 | me -- |
| 13:08:02 | 7 | MR. HENDERSON:  I do, Your Honor. |
| 13:08:02 | 8 | THE COURT:  -- in another case, so -- and I'm |
| 13:08:05 | 9 | sensitive to that as well. |
| 13:08:06 | 10 | MR. HENDERSON:  So I think -- I certainly don't |
| 13:08:10 | 11 | want to speak for the others, but personally I think if the |
| 13:08:15 | 12 | Court had time in the next day or two, I'd welcome that |
| 13:08:20 | 13 | opportunity, but at the same time, I'm here at the Court's |
| 13:08:25 | 14 | disposal and will do, clearly, whatever the Court would prefer. |
| 13:08:31 | 15 | THE COURT:  Mr. Hart?  Mr. Schmidt? |
| 13:08:34 | 16 | MR. HART:  Mr. Schmidt, you want to address that? |
| 13:08:36 | 17 | MR. SCHMIDT:  Please.  Your Honor, if it pleases |
| 13:08:38 | 18 | the Court, Chris Schmidt on behalf of the National Center for |
| 13:08:43 | 19 | Missing & Exploited Children.  If -- we would welcome the |
| 13:08:46 | 20 | opportunity to address the Court.  If there was the ability to |
| 13:08:48 | 21 | do it this afternoon, that would be preferable.  My flight |
| 13:08:54 | 22 | leaves this evening.  And so I'm at the Court's discretion, and |
| 13:09:00 | 23 | will accommodate and come back if that's what the Court would |
| 13:09:03 | 24 | prefer to do. |
| 13:09:04 | 25 | It would be -- our client is here as well, and |

| | |
|---|---|
| 13:09:08 | 1 |
| 13:09:12 | 2 |
| 13:09:17 | 3 |
| 13:09:20 | 4 |
| 13:09:24 | 5 |
| 13:09:24 | 6 |
| 13:09:27 | 7 |
| 13:09:30 | 8 |
| 13:09:35 | 9 |
| 13:09:39 | 10 |
| 13:09:43 | 11 |
| 13:09:45 | 12 |
| 13:09:49 | 13 |
| 13:09:53 | 14 |
| 13:09:55 | 15 |
| 13:10:00 | 16 |
| 13:10:03 | 17 |
| 13:10:04 | 18 |
| 13:10:07 | 19 |
| 13:10:13 | 20 |
| 13:10:20 | 21 |
| 13:10:24 | 22 |
| 13:10:28 | 23 |
| 13:10:32 | 24 |
| 13:10:38 | 25 |

they do need to leave at 3:30 this afternoon.  To the extent

that there was the ability to do summation still in the early

afternoon, I know they would very much appreciate the

opportunity to be here and hear from all sides.

THE COURT:  Mr. Hart?

MR. HART:  Your Honor, I tend to agree with the

Court that there has been a lot of briefing and no additional

briefing would probably be of benefit.  In terms of summation,

quite frankly, I don't know that there's any additional

commentary, lengthy commentary, there are a couple of things I

would like to clarify that I think have been brought out in

terms of the testimony here and even may correct some things

that were cited in the Government's factual basis.  But I don't

think summation would be particularly long from the

Government's perspective.  And I would assiduously try not to

repeat what we've essentially covered in the brief, but just

clarify a couple of things.

THE COURT:  I think we have two options that we

can proceed:  under Option A, I would propose that I hear from

Mr. Schmidt now and then hear from Mr. Hart and Mr. Henderson

at 3:00 o'clock, after my regularly scheduled criminal docket

is over.  Of course, Mr. Schmidt, you'd be certainly welcome to

stay through that, but that would at least allow your client,

who has an earlier flight, to hear, but it would give you the

disadvantage, obviously, of speaking and then this long gap.

13:10:39   1          I could, under Option B, hear from all three of

13:10:42   2   you now, but obviously you'd have to limit your remarks to

13:10:45   3   about ten minutes each because, as noted, I do have an 2:00

13:10:49   4   o'clock docket.

13:10:49   5          MR. SCHMIDT:  Your Honor, from my perspective, the

13:10:51   6   second option would be preferable, and my comments will be

13:10:54   7   certainly less than ten minutes, closer to five, five minutes,

13:10:58   8   Your Honor.

13:10:59   9          THE COURT:  Counsel?

13:10:59  10          MR. HART:  Your Honor, I'd -- I would actually

13:11:02  11   prefer Option A of having Mr. Schmidt speak now and

13:11:06  12   Mr. Henderson and I can come back later.  I would expect our

13:11:09  13   comments might -- well, I don't know, I could just see where

13:11:14  14   you're not going to get lunch and at 2:00 o'clock everybody's

13:11:17  15   going to have a "hangry" judge.

13:11:18  16          THE COURT:  I think we've passed that threshold

13:11:20  17   already.  Mr. Henderson, what's your preference?

13:11:22  18          MR. HENDERSON:  Your Honor, I really don't have a

13:11:26  19   preference.  I -- with respect to the length of my comments, I

13:11:30  20   know from prior occasions before Your Honor I think in -- I

13:11:40  21   anticipate the Court will probably have more questions for me

13:11:43  22   than I will have -- --

13:11:44  23          THE COURT:  You have argued before me before.

13:11:46  24          MR. HENDERSON:  -- than I will have any new

13:11:50  25   comments.  What I tried to do, as best I could in my filing

| | |
|---|---|
| 13:11:55 | 1 |
| 13:11:59 | 2 |
| 13:12:06 | 3 |
| 13:12:09 | 4 |
| 13:12:12 | 5 |

yesterday, was tie together all of the information that we have

and make the argument.  I would simply be highlighting certain

things, with some reference to the testimony, but I would

anticipate spending more of my time answering the Court's

questions.

THE COURT:  I think what I'm going to do is, I

think, Mr. Schmidt, I'm going to ask you to, if you can, to

present your summation to me at this point, but I do think I'm

going to defer hearing from Mr. Hart and Mr. Henderson until

probably 3:15, which would allow me to get through my 2:00

o'clock docket and have a brief break.  You're certainly

welcome to stay, but I want to accommodate your clients'

interests as well, at least in hearing from you.  I don't think

I can -- I think it unlikely that we could get through all this

in 30 or 40 minutes, and Mr. Henderson's also on my 2:00

o'clock docket.

So I think what I'll do is I'll ask you to tell me

whatever remarks you've got to make at this point on behalf of

the amicus, certainly welcome your presence at 3:15, but I

think I'm going to give Mr. Hart and Mr. Henderson until then

to make their oral summation.

MR. SCHMIDT:  Thank you very much, Your Honor.

One moment.

CLOSING ARGUMENT

MR. SCHMIDT:  Good afternoon, Your Honor.  Chris

13:13:47   1   Schmidt on behalf of the National Center for Missing &

13:13:51   2   Exploited Children.  Your Honor, thank you first for allowing

13:13:56   3   the National Center to file an amicus brief.  I am with the law

13:14:02   4   firm of Bryan Cave, LLP, and over the years have had the

13:14:08   5   opportunity to represent NCMEC, primarily on a pro bono basis,

13:14:12   6   on international child-abduction cases.

13:14:15   7            NCMEC, as a organization, is a private nonprofit.

13:14:19   8   It was formed by John and Reve' Walsh in 1984 after the

13:14:26   9   abduction and murder of their six-year-old son Adam.  From that

13:14:30  10   moment until today, the purpose of NCMEC was and remains to

13:14:34  11   help protect children from child exploitation, such as child

13:14:38  12   pornography in this case and child abductions.  To fulfill that

13:14:44  13   mission, NCMEC is engaged in a host of activities and works

13:14:47  14   with numerous different partners and constituencies.  It's

13:14:52  15   operated a 24-hour call line since shortly after its inception,

13:14:59  16   a call line that has dealt with child pornography and

13:15:01  17   exploitation.  It's provided logistical support and other

13:15:05  18   support to families.  It has coordinated programs to reunite

13:15:11  19   parents and their children.  It's worked on preventing

13:15:14  20   international child abductions.  It provides education and

13:15:18  21   training to schools.

13:15:22  22            As Mr. Shehan noted, it trains the trainers,

13:15:25  23   whether that's law enforcement or others.  It works with

13:15:29  24   nonprofits, law enforcement agencies, the general public, on

13:15:35  25   child-protection measures.  It works to reduce child

13:15:42  1   pornographic images, and it also operates the CyberTipline,

13:15:44  2   which is at issue here.  While NCMEC receives federal funding,

13:15:48  3   it also receives private funding from corporations, which makes

13:15:51  4   up 25 percent of its financial cash budget, but it also

13:15:56  5   receives significant in-kind donations in the nature of

13:16:00  6   computer servers, software support, legal assistance and in

13:16:06  7   other ways.

13:16:07  8        Your Honor, when we look at the role of NCMEC in

13:16:15  9   this case, in the CyberTipline, the question is first whether

13:16:18 10   search occurred at all, and then the second question is is

13:16:21 11   NCMEC a government actor.  And I'd like to take both of those

13:16:25 12   in turn.  With respect to the first question, was there a

13:16:28 13   search.  Here we know that AOL's Terms of Service specifically

13:16:36 14   laid out that illegal activity was not supposed to be used by

13:16:41 15   any of the subscribers, and that specifically included any

13:16:46 16   images that would be sexual in nature that would be illegal; in

13:16:52 17   other words child pornography.

13:16:52 18        In addition, the Terms of Service specifically

13:16:56 19   state on their face, a one-page document, that AOL, to prevent

13:17:02 20   violations, "can take any technical, legal, and other actions

13:17:06 21   that AOL deems necessary, in their sole discretion, without

13:17:11 22   notice to you."  (As read.)  The users are clearly on notice

13:17:17 23   that AOL, a private party, has the interest to prevent this

13:17:23 24   illegal activity and to take steps necessary to prevent this

13:17:27 25   illegal activity from occurring.

13:17:29   1          THE COURT:  What do you suggest I do with the fact

13:17:31   2    that it's highly likely that nobody reads those Terms of

13:17:36   3    Services?

13:17:37   4          MR. SCHMIDT:  So good question, Your Honor.  When

13:17:39   5    the service is first accepted, they are clicked to accept

13:17:43   6    service, and there are a host of cases all around this country

13:17:48   7    that says that click is the same as signing a contract with a

13:17:52   8    wet ink, and it is up -- in fact, there's the Electronic

13:17:59   9    Signatures Act, which says that that click is the same as a

13:18:01  10    signature.

13:18:01  11          THE COURT:  Well, that would be -- and I think

13:18:03  12    that that's true under civil contract law, but I probably have

13:18:07  13    a heightened inquiry under Fourth Amendment law.

13:18:12  14          MR. SCHMIDT:  Well, under -- with respect to the

13:18:14  15    reasonable expectation of privacy in this case, the parties

13:18:18  16    have clearly contracted as to what the terms are between AOL

13:18:22  17    and the subscriber.  They've clicked on that affirmatively,

13:18:26  18    which acknowledges those terms, and in this case it's a

13:18:29  19    one-page, simple, easy-to-read document.  This is not the case

13:18:35  20    where you have 20 different terms that scroll on for a long

13:18:40  21    period of time.  It was one page, as the Government's Exhibit 5

13:18:44  22    shows.

13:18:45  23          THE COURT:  I won't embarrass you, Mr. Schmidt, by

13:18:48  24    asking you how often you click the "I agree to Terms of

13:18:51  25    Service" without actually logging on to see if they're one

13:18:53  1   paragraph or a hundred pages, but I can tell you that in my

13:18:56  2   case I always click and I never read, and I'm guessing I

13:19:00  3   represent the lion's share of users.  And, again, I understand

13:19:04  4   that I'm bound contractually, but I wonder if that contractual

13:19:08  5   binding is sufficient to effect what in this case would amount

13:19:12  6   to a Fourth Amendment waiver.

13:19:17  7          MR. SCHMIDT:  Your Honor, with respect to that

13:19:18  8   question from a contract perspective, if we analyzed it from

13:19:22  9   that aspect for a moment, the -- the law is clear that if

13:19:27  10  someone has clicked it, they're deemed to have read it and to

13:19:30  11  be bound by that.  And I see no good reason why we should

13:19:34  12  invert that long-standing legal principle in the context of the

13:19:39  13  Fourth Amendment.

13:19:41  14          Here it's clear that AOL and any other ESP

13:19:45  15  provider has a real business interest in keeping spam and

13:19:50  16  viruses and illegal child pornography off of their system.  I

13:19:55  17  can tell you, as a father of two boys who are getting right up

13:19:58  18  to the cusp of starting to use e-mail, I, as a father, would

13:20:03  19  want my children to have a system that is safe, that I know

13:20:07  20  doesn't allow child pornography to be on it.  And that's a

13:20:11  21  material inducement in wanting to do business, and one of the

13:20:16  22  reasons why AOL does it, and one of the reasons why it's

13:20:18  23  clearly on their terms of conditions.  And it's the same as

13:20:22  24  monitoring spam or anything else, that it should not be on --

13:20:26  25  excuse me, on the -- on those systems.

13:20:32  1          So to answer your question, I don't see a good

13:20:35  2  reason why there should be a reasonable expectation of privacy

13:20:40  3  when the parties' clear contract says this is an activity that

13:20:44  4  will be monitored for and is unacceptable.

13:20:45  5          In this context, we, in preparing our amicus,

13:20:52  6  searched the law all over the this country dealing with this

13:20:58  7  precise issue of whether or not ESPs who conduct this internal

13:21:01  8  search voluntarily, whether these ESPs are conducting a search

13:21:07  9  for purposes of the Fourth Amendment.  And we've cited the

13:21:11  10  cases to the Court.  But in every single case we found, the

13:21:15  11  courts have found that entities like AOL are private actors,

13:21:20  12  with a legitimate private interest.  The Drivdahl case held

13:21:24  13  that with respect to Google, and all of these are in our amicus

13:21:28  14  brief.

13:21:28  15          THE COURT:  And I should note, I've read your

13:21:30  16  brief.

13:21:30  17          MR. SCHMIDT:  Thank you.  The Stevenson with

13:21:32  18  respect to AOL in the Eighth Circuit, the Cameron in the First

13:21:35  19  Circuit, Richardson in the Fourth Circuit.  Just as

13:21:39  20  importantly, we didn't find a single case holding the opposite,

13:21:42  21  and I wanted to make that point clear to the Court about our

13:21:47  22  attempt to be as thorough as we could with this research.

13:21:50  23          The question that comes -- so with respect to AOL,

13:21:55  24  I don't think there's any argument or any ESP that they could

13:21:59  25  have engaged in a search for purposes of the Fourth Amendment.

13:22:05  1   So then the question, if we turn to NCMEC, becomes, well, is a

13:22:09  2   repeat of a search by another entity a search under the Fourth

13:22:13  3   Amendment, even a Governmental entity, could that convert into

13:22:17  4   a search?  And the only time that it's been held to convert is

13:22:22  5   if the search is expanded in a constitutionally significant

13:22:26  6   way.  And the Jacobsen and Walsh decisions both stand for that

13:22:32  7   proposition.

13:22:34  8           Here as a predicate manner the search was not

13:22:37  9   expanded.  The only argument that the search could have been

13:22:39  10  expanded is -- and this was the argument that's been made by

13:22:42  11  counsel and has been made in the Keith decision -- was that

13:22:49  12  because NCMEC opened up the image, that that somehow expanded

13:22:54  13  the search.  And the fallacy in that argument is it was somehow

13:23:00  14  assuming that AOL never opened up the image and so it was an

13:23:06  15  expansion.  The benefit of the testimony that this Court has

13:23:11  16  heard over the last couple of days is that it has made

13:23:14  17  abundantly clear that that hashtag for -- is akin to a digital

13:23:21  18  fingerprint, and AOL in the first instance, before adding that

13:23:25  19  hashtag to its hashtag set, an AOL reviewer actually put eyes

13:23:32  20  on the image and confirmed that it was apparent child

13:23:35  21  pornography.

13:23:35  22           THE COURT:  AOL put eyes on the initial image, not

13:23:39  23  on the image contained in the immediate e-mail.

13:23:43  24           MR. SCHMIDT:  That is accurate.  That is

13:23:44  25  absolutely correct.

13:23:45   1          THE COURT:  And they identified the attachment in

13:23:47   2    this e-mail to the original image through the identity of the

13:23:50   3    hashtag?

13:23:50   4          MR. SCHMIDT:  That is correct.  That is absolutely

13:23:53   5    correct.  The key part about the testimony that we heard from

13:23:58   6    the witnesses was that that hashtag is akin to a fingerprint.

13:24:02   7    They're not aware of a single case where it has been corrupted,

13:24:06   8    that it provides a match.  And as a result, when AOL scans its

13:24:13   9    database, our e-mails going through and uses that hashtag set

13:24:18  10    and comes across another exact match, it can know with absolute

13:24:24  11    confidence that it's another image of that apparent child

13:24:28  12    pornography, and it's sent on to NCMEC at that point.  The fact

13:24:31  13    that NCMEC then opens up that image doesn't expand the search

13:24:36  14    at all, because at some point AOL also opened up that exact

13:24:41  15    same image.  And we heard testimony that changing even a pixel

13:24:45  16    changes the image itself.

13:24:50  17          Even if we put aside that for a moment and we were

13:24:54  18    to -- AOL didn't look at the image and -- at any point and

13:25:00  19    NCMEC opened up the image, even there it's not a

13:25:03  20    constitutionally significant expansion of the search.  And the

13:25:07  21    reason is is NCMEC is going in and it's opening up this image

13:25:11  22    to, one, to triage it, if there's an imminent risk or somehow

13:25:16  23    you can glean something from the image, to let law enforcement

13:25:19  24    know that a child is at risk right now, and to pass that on and

13:25:23  25    there needs to be urgent action.  That's one reason.

13:25:28  1        Another is it helps in NCMEC's ability to locate

13:25:31  2    the child.  There have been instances where you might have the

13:25:34  3    name of the school in the background or Disney World, or there

13:25:39  4    could be metadata that provides that geolocation of where the

13:25:45  5    image was actually taken, so it helps in the fundamental role

13:25:48  6    of transmitting the information in this case.  And, finally, it

13:25:54  7    helps NCMEC know how to transmit the information and where to

13:25:59  8    transmit it to law enforcement.  Under the statute, it is

13:26:02  9    NCMEC's obligation to send that image to the appropriate law

13:26:08  10   enforcement, and opening up the image helps NCMEC do that in

13:26:12  11   this case.  It is not a constitutionally significant expansion.

13:26:15  12        THE COURT:  Well, those are two different

13:26:17  13   arguments.  First is more akin to a warrantless search based on

13:26:21  14   exigent circumstances, but the latter of more administrative

13:26:24  15   convenience in another context would never be held absent other

13:26:29  16   justifiers to support a warrantless search.  Both of those

13:26:37  17   arguments, though, presuppose that NCMEC is a governmental-like

13:26:41  18   entity and not a private actor; correct?

13:26:43  19        MR. SCHMIDT:  They do.  And if I may move to that

13:26:47  20   argument, Your Honor, which is really the second step.  If we

13:26:51  21   don't get past there being a search in the first instance, a

13:26:55  22   constitutionally significant search, then we don't even get to

13:26:58  23   the government-actor question.  But on the government-actor

13:27:00  24   question, there's really a two-part inquiry:  one, was the

13:27:05  25   Government involved in NCMEC's activities; and, two, whether

13:27:09  1   the party performing the search here, NCMEC, intended to assist

13:27:13  2   law enforcement or to further its own ends.

13:27:16  3              With respect to the first step, we heard

13:27:19  4   clearly -- and there's no contrary testimony -- that the

13:27:22  5   Government had absolutely no involvement in receiving that tip,

13:27:27  6   when NCMEC received the tip, processing the tip, or making that

13:27:31  7   tip available.  The first time the government gets involved,

13:27:36  8   law enforcement gets involved, is when that tip is made

13:27:39  9   available on the VPN network, and then NCMEC's role is over.

13:27:43  10  The government can decide whether it chooses to prosecute or

13:27:47  11  not, to get a search warrant or not, to proceed or not.  The

13:27:53  12  Government is absent.  And that is the critical issue.  Both of

13:27:57  13  those factors would need to be present.

13:27:58  14             With respect to the second question, whether or

13:28:01  15  not NCMEC intended to assist law enforcement or to further its

13:28:04  16  own ends is how it's been -- been called in some cases.  With

13:28:11  17  respect to that issue, the Walther case, which is 652 F.2d 788.

13:28:20  18  It's a Ninth Circuit case from 1981.  There the court

13:28:26  19  clarified, "Whether the party intended to assist law

13:28:28  20  enforcement does not mean a court just evaluates the state of

13:28:33  21  mind.  Almost always a person making a search will pursue its

13:28:36  22  own ends, although he may have a strong intention to aid law

13:28:40  23  enforcement.  We hold this part of the test also requires that

13:28:43  24  the Court weighs the Government role in the search.  A strong

13:28:46  25  intent is not enough.  You must focus on the particular

13:28:49  1    search."   (As read.)

13:28:50  2           And here the Government had no involvement.  More

13:28:53  3    importantly, if we look at the Maurer decision, which is

13:28:56  4    another decision on this issue from the district court in

13:29:01  5    Kentucky.  In that case the court looked at this

13:29:07  6    government-actor issue, and the court specifically held that

13:29:11  7    NCMEC was not a government actor.  And there, as in here, the

13:29:16  8    defendant was arguing the government-actor argument.  In the

13:29:19  9    court note, "Many private corporations receive significant

13:29:25  10   government funding and are the subject of federal regulations.

13:29:27  11   Virtually every bank has similar interactions with law

13:29:30  12   enforcement, with respect to SARs, the suspicious activity

13:29:34  13   reports.  Once again, the primary thrust of defendant's

13:29:39  14   argument is that the reporting statute which requires NCMEC to

13:29:42  15   forward reports to designated law enforcement itself creates

13:29:46  16   Government agency relationship.  As we discussed above with

13:29:51  17   respect to the ESP, compliance with the reporting -- more than

13:29:53  18   compliance with the reporting statute is required to prove

13:29:56  19   Government action."  (As read.)

13:29:58  20          Here, if the Court were to change that, then

13:30:02  21   doctors who have a primary interest in taking care of a sick

13:30:05  22   child but come across sexual abuse and are mandated to report

13:30:10  23   that sexual abuse and that doctor may receive all this funding

13:30:14  24   from the government by the way of Medicare and Medicaid, we'd

13:30:17  25   have to turn that doctor into a government actor, and that

13:30:20  1   would be an absurd result.  The same analogy would apply with

13:30:23  2   respect to banks with suspicious activity reports or even a

13:30:26  3   battered women's shelter.

13:30:27  4            THE COURT:  But the key decision relied on the

13:30:29  5   fact that, unlike a doctor or a teacher, there are specific

13:30:34  6   Congressional statutes directed towards NCMEC which gives you

13:30:41  7   at least quasi a different status.

13:30:44  8            By the way, are there other decisions besides

13:30:47  9   Keith that have found that NCMEC is a government actor?

13:30:51  10           MR. SCHMIDT:  There are not, Your Honor.  And with

13:30:54  11  all due respect to how the Keith decision was decided, I don't

13:30:58  12  think the court had the benefit of as detailed of testimony.

13:31:02  13  There certainly wasn't the benefit of NCMEC having an

13:31:06  14  opportunity, through private counsel, to have its voice heard

13:31:09  15  as well, and so didn't have the full information of our law

13:31:14  16  available to it.

13:31:15  17           The fundamental, I think, breakdown with the Keith

13:31:22  18  decision is, one, there was not an expansion of the search;

13:31:26  19  two, trying to equate NCMEC with the government actor, I think,

13:31:31  20  fundamentally falls apart.  They're really no different than

13:31:34  21  that doctor.  They are a clearinghouse that's transmitting the

13:31:37  22  information to law enforcement.  At that point law enforcement

13:31:41  23  has complete discretion.

13:31:42  24           And sometimes that discretion means nothing

13:31:45  25  happens.  Sometimes it means an investigation occurs and a

13:31:48   1   search warrant proceeds and we reach a point like we have here

13:31:51   2   today, but that's entirely up to law enforcement.  And NCMEC,

13:31:57   3   while it works with law enforcement, works with many, many of

13:32:01   4   its partners in protecting children.

13:32:02   5              THE COURT:  So how do I weigh the Congressional

13:32:05   6   statute that specifically reference NCMEC in a law enforcement

13:32:07   7   context?

13:32:09   8              MR. SCHMIDT:  Well, so where I think Keith is

13:32:12   9   inaccurate is government statutes also apply to banks and to

13:32:16   10  other non -- or private entities.  For example, a bank must

13:32:22   11  report a suspicious activity report and --

13:32:26   12             THE COURT:  Does it make a difference that those

13:32:29   13  statutes don't refer to the First National Bank of Wilmington,

13:32:33   14  whereas the NCMEC statutes refer by name to the national

13:32:37   15  center?

13:32:38   16             MR. SCHMIDT:  Functionally it does not, because

13:32:41   17  NCMEC has no law enforcement role in terms of proceeding with a

13:32:46   18  search warrant or doing the on-the-job investigation.  What

13:32:51   19  NCMEC has been, since day one, is a critical clearinghouse to

13:32:56   20  help protect children in these dangerous situations.  And they

13:33:01   21  are very careful to fulfill that role to the best of their

13:33:04   22  ability.  But once it's in law enforcement's hands, it's up to

13:33:08   23  law enforcement to decide how to proceed.

13:33:16   24             THE COURT:  All right.

13:33:17   25             MR. SCHMIDT:  Your Honor, thank you.  Thank you

13:33:20  1   very much for the opportunity to speak to the Court.  If the

13:33:25  2   Court has any further questions, please feel free to let me

13:33:30  3   know, but to summarize, here there was no constitutionally

13:33:35  4   significant expansion of the search; second, NCMEC is a private

13:33:39  5   nonprofit, founded by two parents who dealt with a very

13:33:44  6   difficult situation, to help other parents and children

13:33:48  7   navigate through these difficult type of child-exploitation

13:33:52  8   situations.  Thank you, Your Honor.

13:33:53  9              THE COURT:  All right.  Thank you, Mr. Schmidt.

13:33:56  10  And you can now see the wisdom of Mr. Henderson's concern that

13:33:58  11  even though you may have only thought you had 5 or 7 minutes,

13:34:03  12  he knew that I tend to prolong those arguments.

13:34:05  13             MR. SCHMIDT:  Thank you very much.

13:34:06  14             THE COURT:  I appreciate your input.  This case

13:34:08  15  will be in recess until about 3:15, at which point I'll hear

13:34:12  16  from the other counsel.

13:34:15  17             MR. SCHMIDT:  Thank you, Your Honor.

13:34:16  18             THE COURT:  We're in recess until then.

13:34:23  19             (A recess was taken from 1:34 to 3:12 PM.)

15:13:03  20             CLERK NALL:  All rise.

15:13:06  21             THE COURT:  You may be seated.

15:13:07  22             Mr. Hart, do you go first?  I'm always a little --

15:13:27  23  have to stop and think on this.  It's his motion and your

15:13:30  24  burden.

15:13:31  25             MR. HART:  Well, Your Honor, it's actually my

15:13:33  1    burden as to the statements component of his motion because of

15:13:39  2    the Jackson v. Denno case.  As to the other part it's actually

15:13:43  3    his burden, but I don't generally quibble with that.  It makes

15:13:46  4    things faster.  I will defer to the Court as to who you want to

15:13:49  5    hear from first.

15:13:51  6              THE COURT:  What do you want, Mr. Henderson?

15:13:52  7              MR. HENDERSON:  Your Honor, I'm happy to go first.

15:13:59  8              THE COURT:  Why don't you go ahead and go first,

15:14:01  9    Mr. Henderson.

15:14:02 10              MR. HENDERSON:  Thank you.

15:14:02 11                        CLOSING ARGUMENT

15:14:12 12              MR. HENDERSON:  Your Honor, as I indicated, we

15:14:24 13    prepared the submission with an eye toward pulling all --

15:14:30 14    pulling together all of the information that we had, all of the

15:14:34 15    exhibits, and at least perhaps anticipated testimony.

15:14:40 16              Focusing on first the question of search, an

15:14:46 17    intensely factual issue, we had a lot of discussion about that

15:14:52 18    through the AOL witness particularly, and I know I tried Your

15:14:58 19    Honor's patience in that examination and I apologize.  But I

15:15:04 20    think what finally, from my perspective, bubbled to the surface

15:15:08 21    was a clear picture that the flow of e-mails and, particularly,

15:15:16 22    the attachments to the e-mails or embedded pictures has been

15:15:21 23    interrupted by this IDFP process intentionally, deliberately,

15:15:26 24    and purposefully to search for child pornography.  That's what

15:15:33 25    it's there for.

15:15:35  1        And in order to accomplish that purpose, AOL

15:15:42  2   ingeniously devised this program to divert the traffic onto a

15:15:52  3   separate track from the main course, thereby seizing that

15:15:59  4   information once it's identified as a photograph or an embedded

15:16:03  5   video and then calculating the hash value.  And there's a lot

15:16:17  6   of semantics, analogies, that can be and were brought to bear

15:16:22  7   in trying to wrap our minds around that.  But what is clear, I

15:16:28  8   believe, is that this hashing value, this hash function,

15:16:38  9   establishes, creates, a numerical signature, identifier for a

15:16:49  10  much larger file of zeros and ones that didn't exist when that

15:16:57  11  photograph or those photographs started down the path, did not

15:17:04  12  exist when those photographs were first identified as

15:17:07  13  photographs and diverted on to another course.

15:17:10  14        THE COURT:  Did it not exist or had it not simply

15:17:14  15  been derived?  I mean, my DNA coding exists.  I don't know what

15:17:19  16  it is, but it exists.  It just hasn't been derived.

15:17:24  17        MR. HENDERSON:  There's no question, Your Honor,

15:17:28  18  that these zeros and ones that made up that picture existed.

15:17:34  19  There's no question about it.  What didn't exist until they

15:17:42  20  applied the IDFP program to those zeros and ones was that hash

15:17:50  21  value.  It'd be one thing -- and quite honestly, when I first

15:17:54  22  started reading the records in other cases and trying to sort

15:17:59  23  out what factual predicate there had been to -- for the courts

15:18:06  24  in those cases, as I read through all of that material -- and

15:18:09  25  there wasn't much, but what I read, I thought, well, clearly

15:18:16  1    when the picture runs through the system, it has a hash value,

15:18:21  2    and all they're doing is seeing the hash value and then

15:18:24  3    comparing it to something else.

15:18:27  4           Then when I started thinking about it some more

15:18:32  5    and working through the layers, I realized, no, that's not what

15:18:38  6    happens.  It doesn't already have that identifier tagged to it.

15:18:44  7    They have to create it.  The raw zeros and ones that they

15:18:54  8    relied upon, that they used to create that hash value, are

15:18:57  9    always there.  Our DNA is there.  You know, the analogies, we

15:19:07  10   could go crazy.  But another analogy I thought, well, you know,

15:19:10  11   I take a picture of my dog and it's a picture, and we're used

15:19:17  12   to looking at things in terms of colors, shapes, and forms.

15:19:22  13   But the computer looks at it in terms of zeros and ones, like

15:19:27  14   the movie Matrix, you know, the world with zeros and ones.  If

15:19:33  15   I take a picture of my dog with an x-ray machine, the picture's

15:19:38  16   going to look very different.  Same dog, but different picture.

15:19:46  17   Similarly, it depends upon which formula you use to create that

15:19:53  18   hash value, whether it's the MD5, the SHA-1, or some other

15:19:58  19   variation on that.

15:20:04  20          So what they do through the computer, the computer

15:20:12  21   gremlin puts on his eyeglasses and all he sees are zeros and

15:20:15  22   ones.  He looks at this picture, he sees the zeros and ones,

15:20:18  23   and he calculates the hash value and then attaches that hash

15:20:22  24   value to that file as it progresses through the system,

15:20:29  25   something that didn't exist before.  And then they make the

15:20:35  1    comparison.

15:20:36  2            That comparison, again by analogy, is taking the

15:20:42  3    reference information -- in other words, when it creates the

15:20:47  4    hash value, that's just a number.  It doesn't really mean

15:20:51  5    anything.  Like we automatically register colors, shapes, and

15:20:56  6    forms, our brain processes this is what I see and that's what

15:21:06  7    it is based upon prior history, prior memory.  So they see what

15:21:14  8    it is, they create the hash value, and then they compare it to

15:21:17  9    their past memory, is this something we've seen before.  And

15:21:24  10   that's the second function.  Our position is that's a search.

15:21:32  11   It was an unlawful seizure to begin with.  It was an unlawful

15:21:36  12   search when they performed that function.

15:21:43  13            THE COURT:  What's the seizure?

15:21:44  14            MR. HENDERSON:  The seizure is taking control of

15:21:49  15   that picture and diverting it onto a side road.

15:21:54  16            THE COURT:  Well, the user -- the user gave the

15:21:57  17   e-mail to AOL.  I'm not sure there's a seizure there.  They

15:22:02  18   gave the e-mail to AOL.

15:22:05  19            MR. HENDERSON:  What they did was they put the

15:22:09  20   e-mail in the Internet stream, if you will, and that stream

15:22:16  21   takes them to the AOL server, and then, as far as they know,

15:22:23  22   sends it to the intended recipient.  But that doesn't happen.

15:22:30  23   Our position is AOL diverts that traffic, seizes those images,

15:22:39  24   only -- and for no other reason than they're images.

15:22:44  25            Similarly, a DUI or a drug checkpoint on Kellogg

15:22:56  1   stops every single car that has a GPS in it, analogizing to an

15:23:10  2   e-mail that has a picture.  Every single one they divert off

15:23:15  3   onto this side track, and they're going to search that car.

15:23:24  4   That's, we submit, a seizure.

15:23:25  5          THE COURT:  That's certainly a seizure, but the

15:23:27  6   analogy's poor because, first of all, the user of the AOL

15:23:33  7   system is giving AOL the e-mail to deliver.  So in a way the

15:23:39  8   law enforcement doesn't have the car driving down Kellogg.  And

15:23:43  9   secondly, although you asked the witness about that diagram, he

15:23:48  10  said that's not really the way it works.  It's not sent off to

15:23:51  11  another way.  It actually happens as a part of the server where

15:23:56  12  it goes through.  It's a subset of that server, but it happens

15:24:00  13  as a part of that server.

15:24:02  14         MR. HENDERSON:  Yeah, and I -- I think perhaps a

15:24:07  15  difference there in presentation, the written presentation,

15:24:14  16  designates that subset with a different server, maybe not

15:24:17  17  physically a different server, but it makes the point --

15:24:20  18         THE COURT:  But the witness said that's not

15:24:22  19  actually the way it happens.  That's just done for

15:24:24  20  comprehension purposes, but that doesn't really represent what

15:24:27  21  happens.

15:24:27  22         MR. HENDERSON:  And accepting that, respectfully,

15:24:32  23  I don't think that makes a difference because it's still

15:24:36  24  interrupting the flow and going to a different location, albeit

15:24:40  25  in the same housing.  It's diverting it to a different location

15:24:44  1   to perform that function.

15:24:44  2            THE COURT:  But even if it's a seizure and a

15:24:47  3   search, that's irrelevant unless AOL's a government actor.

15:24:51  4            MR. HENDERSON:  And that, Your Honor, is probably

15:24:55  5   the biggest issue and the one we devoted most of our time to in

15:25:03  6   our presentation.

15:25:07  7            What we found was a number of different reference

15:25:10  8   points, a number of different pieces of information that tell

15:25:17  9   the story.  And, again, with all due respect, we would have

15:25:24  10  loved to have had Mr. Ryan here.  And I understand the Court's

15:25:29  11  decision not to allow us to do that, and we've renewed the

15:25:34  12  request, and I understand the Court is not granting that.  But

15:25:45  13  what we found through, first of all, the testimony, the sworn

15:25:48  14  testimony, of Mr. Ryan to Congress, at a very interesting point

15:25:53  15  in time, a very dynamic point in time in the industry, in the

15:25:57  16  context of a potential debate.  We had first pressure by the

15:26:09  17  attorney general, the United States Attorney General, on the

15:26:15  18  companies, the ISP companies like AOL and Google, to provide

15:26:20  19  more information to assist law enforcement.  And we also had

15:26:26  20  some litigation involving Google, where Google stood --

15:26:31  21            THE COURT:  Litigation?

15:26:32  22            MR. HENDERSON:  Litigation with Google, where

15:26:36  23  Google stood alone and challenged a Department of Justice

15:26:41  24  subpoena to obtain additional information.  And during the

15:26:47  25  Congressional hearing on that at this time -- this was in

15:26:52  1   2006 -- a number of things were happening.  And, again, relying

15:26:59  2   upon the excerpts from the testimony, as well as Mr. Ryan's

15:27:05  3   testimony.  First of all, the members of the subcommittee, and

15:27:13  4   one in particular, really went after Google in no uncertain

15:27:18  5   terms and said, "Either you're with us or against us.  Either

15:27:26  6   you're for child pornography or you're against child

15:27:30  7   pornography.  There's no middle ground.  We don't want to hear

15:27:34  8   about privacy issues.  We don't want to hear about

15:27:37  9   constitutional issues."

15:27:39  10              And then another Congressman basically goes down

15:27:43  11  the list of things that they want you -- the ISPs to do in

15:27:51  12  order to enhance law enforcement's ability to do their job:

15:27:57  13  "Are you going to provide them the information they need?  Are

15:28:01  14  you going to work with AOL and its group to -- and AOL being

15:28:08  15  the leader -- to pull together information and present it in a

15:28:16  16  way that NCMEC can then provide to law enforcement?"  And,

15:28:25  17  again, the Congressman who took Google to task made it clear in

15:28:30  18  no uncertain terms, "Either you toe the line and you get with

15:28:35  19  the program, or there are going to be consequences."

15:28:41  20              THE COURT:  Well, Mr. Henderson, I've worked for

15:28:45  21  Congress, and so I have a hard time taking any of that

15:28:47  22  seriously.  They're not the Department of Justice.  Congressmen

15:28:51  23  showboat in hearings all the time.  They're the legislative,

15:28:55  24  not the executive, branch.  I -- I mean, even assuming that all

15:29:02  25  of that's properly in evidence in this case, which I'm not

| | | |
|---|---|---|
| 15:29:05 | 1 | going to quibble with, I can't take one Congressman's |
| 15:29:13 | 2 | representation at a public hearing as indicating what the |
| 15:29:16 | 3 | Department of Justice position is in a separate branch of the |
| 15:29:24 | 4 | government. |
| 15:29:25 | 5 | MR. HENDERSON: I understand, Your Honor. And I'm |
| 15:29:27 | 6 | not offering that in isolation. It's part of, again, several |
| 15:29:30 | 7 | reference points that we're offering the Court to consider. |
| 15:29:35 | 8 | The second reference point, again in the context |
| 15:29:39 | 9 | of the same hearings, was Mr. Ryan's testimony. This is the |
| 15:29:45 | 10 | chief legal officer in charge of the criminal section within |
| 15:29:51 | 11 | AOL, the individual we heard about who played a significant |
| 15:29:55 | 12 | role in IDFP. And he, in his testimony, his sworn testimony, |
| 15:30:06 | 13 | expounds upon and very candidly explains how much effort AOL |
| 15:30:13 | 14 | has expended in order to facilitate prosecution, investigation |
| 15:30:22 | 15 | of individuals pursuant to law. And that's -- we're not saying |
| 15:30:28 | 16 | there's anything wrong with that. That's -- that's, you know, |
| 15:30:32 | 17 | heroic in many respects. The problem is, the problem is, the |
| 15:30:39 | 18 | Fourth Amendment. |
| 15:30:40 | 19 | THE COURT: The problem is how do you hinge that |
| 15:30:43 | 20 | to the legal standard, which you've yet to mention, as to how |
| 15:30:46 | 21 | an actor is considered to be a private -- an otherwise private |
| 15:30:50 | 22 | party is to be considered to be acting as a government agent? |
| 15:30:56 | 23 | There are legal standards that measure that, that really have |
| 15:31:00 | 24 | nothing to do with statements made in highly publicized |
| 15:31:04 | 25 | Congressional hearings. |

15:31:07    1              MR. HENDERSON:  The standards are, number one, did

15:31:12    2    they -- do they or did they assist law enforcement.  The

15:31:17    3    operative event here is providing -- well, the operative event

15:31:21    4    is first searching for the material, and then providing it to

15:31:30    5    law enforcement.

15:31:34    6              The whole foundation, the whole -- the critical

15:31:39    7    basis for their effort and what they're talking about, not only

15:31:45    8    during these hearings where they specifically talk about Cyber

15:31:49    9    Line (sic), they specifically talk about the IDFP, they

15:31:52   10    specifically talk about how we gather this information and send

15:31:56   11    it, search for this information and send it on to law

15:32:00   12    enforcement.  It's not only there but also in the context of

15:32:05   13    the GAO evaluation in 2011 indicate a single-minded effort on

15:32:18   14    the part of AOL in this case to search for that information and

15:32:25   15    provide it to law enforcement in order to get people locked up,

15:32:35   16    prosecuted --

15:32:35   17              THE COURT:  But a desire on behalf of a private

15:32:37   18    entity to be useful and helpful to law enforcement in

15:32:43   19    crime-resistance efforts is also not the standard, the legal

15:32:48   20    standard, in determining whether a private agency is performing

15:32:51   21    as a government actor.  Lots of organizations decide we want to

15:32:57   22    assist law enforcement, whether it's the Neighborhood Watch or

15:33:01   23    whomever.  That doesn't make them government actors.

15:33:04   24              MR. HENDERSON:  No, the other part of it is that

15:33:08   25    not only are they doing it, but the government is encouraging

15:33:13   1    it, government knows what they're doing and encouraging them to

15:33:16   2    do that.

15:33:16   3            THE COURT:  Do you have any cases -- my

15:33:20   4    understanding is that no court has ever found AOL to be a

15:33:24   5    government actor.  But apart from that, do you have any cases

15:33:26   6    that closely analogize this type of activity to where a court

15:33:31   7    has found it to be government action?  'Cause I don't remember

15:33:35   8    reading any in your three briefs that you filed.

15:33:38   9            MR. HENDERSON:  Thank you, Your Honor.  Your

15:33:41  10    Honor, first of all, the decisions that have addressed it in

15:33:47  11    this specific context clearly have gone against us.  There's no

15:33:51  12    question about that.  But we would respectfully submit that

15:33:55  13    this is not a question that's a matter of law, as was argued

15:34:01  14    by -- in the amicus brief, but this is an intensely factual

15:34:04  15    issue as well.  And the facts that we have discovered,

15:34:10  16    collected, from our review of the records in each of those

15:34:15  17    cases, was not presented.  We did not find references to -- we

15:34:23  18    found in one case one reference to Mr. Ryan's testimony, but we

15:34:28  19    didn't find references to the discussion with Congress.  We

15:34:31  20    found no references to the GAO reports.  We found no references

15:34:36  21    to the training materials that Mr. Colcolough prepared.  We

15:34:43  22    found, similarly, a lack of a record in those cases.  And the

15:34:50  23    Fourth Circuit's decision -- and Richardson, I think, is one of

15:34:53  24    the best examples.  And what we did find was an effort in some

15:34:56  25    cases by defense counsel to present that, but it was thwarted

15:35:03  1    by motions to quash or simply a failure to present evidence and

15:35:11  2    call witnesses.

15:35:16  3              With respect to analogous cases, we would submit

15:35:22  4    that there are cases.  And I apologize, I can't cite to a name.

15:35:30  5    I believe they're referenced in our brief.  But even that, I'm

15:35:33  6    a little fuzzy on that 'cause I haven't reviewed that part.

15:35:36  7    But there are cases in the context of the FedEx, the post

15:35:48  8    office, other instances unrelated to the Internet and to

15:35:54  9    computers, where the test that was set forth in the Tenth

15:36:01  10   Circuit cases that we did cite make it clear that if a private

15:36:08  11   citizen is proactively -- and that's a word that Mr. Ryan used

15:36:19  12   regularly -- proactively is engaging in activity to assist law

15:36:30  13   enforcement, i.e. searching through somebody's luggage or

15:36:35  14   searching through somebody's packages and law enforcement knows

15:36:40  15   they're doing it and encourages them to do that, that's --

15:36:46  16   they're going to be held to be government actors.

15:36:48  17             THE COURT:  But the "know and encourage" is a

15:36:51  18   specific instance, not a generalized.  If you look in the --

15:36:55  19   there's a lot of case law on this, particularly in the Tenth

15:36:58  20   Circuit, and to say that the law enforcement knew and

15:37:01  21   encouraged them to do it is always a particularized inquiry,

15:37:05  22   that in that particular instance law enforcement was

15:37:08  23   encouraging them, why don't you do this, as opposed to just we

15:37:11  24   know that you do this in general.  That -- I'm unaware of any

15:37:15  25   case that has found that a generalized knowledge and

15:37:19  1    encouragement, as opposed to a specific targeted one, has been

15:37:23  2    held to meet the first standard of the test.

15:37:30  3              MR. HENDERSON:  Thank you, Your Honor.  And I

15:37:32  4    appreciate the opportunity to address that because I think

15:37:33  5    that's a really a good issue.  Our response is that it's the --

15:37:42  6    it's in -- it has to be considered in the context of the event,

15:37:49  7    what's going on.  In the instances that -- where there's case

15:37:55  8    law, that -- here in the Tenth Circuit, you have a specific

15:37:59  9    event, an isolated event:  the post office worker, for example,

15:38:06  10   who takes a package off the assembly line, puts it in their

15:38:13  11   office, sometime later opens it up and sees, oh, my goodness,

15:38:18  12   there are drugs here, and then they call the police.  Every one

15:38:26  13   of those cases addresses an isolated event.

15:38:33  14              In this case the event is sending the CyberTipline

15:38:39  15   report -- well, is first looking at the contents of the e-mail

15:38:43  16   and the attachments and then sending the CyberTipline report.

15:38:47  17   And as we heard testimony, that happens millions of times over

15:38:53  18   whatever period you want to set, whether it's a year or a

15:38:58  19   couple of years.  That -- and Your Honor's correct, there's no

15:39:05  20   evidence that for this particular event, as the information

15:39:17  21   accelerated through the AOL system and then to NCMEC, there's

15:39:21  22   absolutely no evidence that someone specifically knew about it

15:39:31  23   or conversed with law enforcement about it as to that specific

15:39:36  24   event, but that's because of the nature of the animal.

15:39:39  25              This is a highly automated system that does this

15:39:45    1   millions of times over a certain period, and so we would submit

15:39:51    2   it has to be understood in those terms, in that content.

15:39:55    3   Setting up the system that searches, setting up the system that

15:40:02    4   sees it, setting up the system that transfers this to NCMEC, to

15:40:08    5   law enforcement, that is the context in which we have to

15:40:11    6   analyze whether or not there was action by AOL in order to

15:40:21    7   assist law enforcement, and it's in that context we have to

15:40:25    8   analyze whether or not the government not only knew about it

15:40:29    9   but encouraged it.

15:40:31   10        And it's clear from every source we could find and

15:40:37   11   presented here, the GAO reports, the dialogue in Congress, the

15:40:43   12   statements by the leadership of NCMEC and AOL themselves, media

15:40:51   13   discussion about it, the Department of Justice involvement, all

15:40:58   14   tell the same story.  And the story is that this process of

15:41:05   15   seizing it, looking at it, and sending it along to law

15:41:11   16   enforcement is the linchpin, as one person said, is the key, is

15:41:14   17   the foundation, to a national strategy to get rid of child

15:41:21   18   pornography.

15:41:21   19        THE COURT:  I don't know who said that, but I know

15:41:22   20   that the witness who testified here said it was not the

15:41:25   21   linchpin.

15:41:26   22        MR. HENDERSON:  Understood.

15:41:26   23        THE COURT:  And that's the evidence that was

15:41:28   24   received in this case.

15:41:28   25        MR. HENDERSON:  Understood.  And we would,

15:41:31  1  obviously, challenge that and refer the Court to the Department

15:41:34  2  of Justice own report, which titled it The National Strategy,

15:41:41  3  and prepared a report to Congress about that.  And there's

15:41:45  4  discussion in the other context.

15:41:49  5          With respect to the national -- with respect to

15:41:54  6  NCMEC, the evidence was clearly that they opened the e-mail

15:42:05  7  attachment and somebody actually looked at it.  We understand

15:42:12  8  the argument, the amicus argument, and appreciate that, but we

15:42:17  9  would respectfully respond with a question:  "Well, so why do

15:42:21 10  you confirm it?  What's the point?  Why do you put somebody

15:42:26 11  through that process?" which they admit is an unpleasant

15:42:31 12  process.

15:42:33 13          THE COURT:  I don't think that's a legally

15:42:35 14  relevant question, why they do it.

15:42:39 15          MR. HENDERSON:  Well, it's --

15:42:42 16          THE COURT:  Unless it's that they have to do it.

15:42:50 17          MR. HENDERSON:  I don't --

15:42:50 18          THE COURT:  The legally relevant standard is does

15:42:53 19  the activity of NCMEC, once they receive the embedded e-mail

15:42:57 20  image through the CyberTipline, does it substantially expand

15:43:00 21  the scope of the search that's been conducted by AOL.

15:43:05 22          MR. HENDERSON:  And an alternative to our argument

15:43:09 23  with respect to AOL, we would submit that, at the point in time

15:43:18 24  that the information gets to NCMEC, all they know is that at

15:43:26 25  some time between 1999 and 2013 some unknown person at some

15:43:33  1    unknown time associated a hash value with child pornography.

15:43:44  2    They don't even have the pictures in the data bank.  All they

15:43:49  3    have is -- and I'm ad-libbing, perhaps, but all they have is a

15:43:56  4    container, a data bank, of short numbers.  And because they're

15:44:02  5    in this data bank, they are presumed to be short numbers

15:44:09  6    associated with child pornography based upon what somebody did

15:44:13  7    at some point in time between 1999 and 2013.  So now that hash

15:44:20  8    number, with the report, goes to NCMEC.  And they open the box

15:44:26  9    and look in, for the first time, and we submit that that's an

15:44:33  10   expansion of what existed before.

15:44:37  11            With respect to their role as a government actor,

15:44:43  12   I think the best and the clearest evidence of that is that 2011

15:44:47  13   GAO report.  I mean, here you have the Government -- I forget

15:44:51  14   what they called themselves at the time, accounting office,

15:44:55  15   accountability office, in essence reviewing critically -- and I

15:45:04  16   don't mean that in an offensive way but critically reviewing

15:45:10  17   NCMEC and, in particular, the CyberTipline and how it's managed

15:45:16  18   as if they're a government agent.  And it arose or initially it

15:45:24  19   was initiated because the Department of Justice complained and

15:45:28  20   law enforcement was complaining about "There's more information

15:45:35  21   out there, we want it, give it to us, and let's have more

15:45:42  22   feedback, let's -- or be more responsive to our feedback."

15:45:49  23            I think coupling with that, again, are statements

15:45:55  24   by their then-president and CEO, Mr. Allen, sworn testimony

15:46:01  25   before Congress, as well as the -- of the reference by the

15:46:13  1  Department of Justice in their national strategy report and the

15:46:17  2  other GAO report.  They are so intertwined with law

15:46:24  3  enforcement.  And, again, the ends could not be more noble, but

15:46:31  4  they're so intertwined with law enforcement that I think it's

15:46:35  5  very difficult to see how they could not be a government actor.

15:46:45  6            And with that, Your Honor, unless there are any

15:46:49  7  other questions --

15:46:50  8            THE COURT:  Do you want to talk about the *Miranda*

15:46:52  9  issue?

15:46:54  10           MR. HENDERSON:  Thank you, Your Honor.  The

15:46:57  11  evidence on that is what it is.  It's a thin argument on our

15:47:05  12  part, we recognize, but we respectfully submit that two points

15:47:11  13  came out from the evidence:  number one, that Mr. Moore, Agent

15:47:23  14  Moore, made it clear when he first spoke to Mrs. Ackerman that

15:47:32  15  his frame of mind was, and what he expressed to her was, that

15:47:37  16  as long as he cooperates, he won't be arrested.

15:47:42  17           THE COURT:  I don't think that what he said, what

15:47:45  18  Agent Moore may have said to Mrs. Ackerman, has any legal

15:47:48  19  relevance to the interrogation that the agents conducted with

15:47:54  20  Mr. Ackerman, particularly given that Mrs. Ackerman testified

15:47:57  21  that she did not communicate any of that to her husband before

15:48:00  22  the agents showed up.

15:48:01  23           MR. HENDERSON:  And I understand --

15:48:03  24           THE COURT:  I was concerned, Mr. Henderson,

15:48:04  25  because your brief, your opening brief, says on page 5, "When

15:48:09  1    the agent met with Mr. Ackerman, he was told that he would be

15:48:13  2    arrested unless he cooperated."  What did you base that

15:48:17  3    statement on --

15:48:17  4                   MR. HENDERSON:  And --

15:48:19  5                   THE COURT:  -- when you filed this brief?

15:48:23  6                   MR. HENDERSON:  I appreciate, Your Honor.  And

15:48:26  7    that's clearly not the evidence, and we apologize.  It was my

15:48:32  8    understanding at the time I wrote that, based upon information

15:48:35  9    I'd collected to that point, that that conversation with the

15:48:39  10   wife was a conversation that had happened -- similar

15:48:46  11   conversation that had happened at the time of the first

15:48:48  12   meeting.

15:48:48  13                  THE COURT:  All right.

15:48:48  14                  MR. HENDERSON:  So I was mistaken.  I apologize

15:48:52  15   for that.  Otherwise we have nothing further.

15:48:56  16                  THE COURT:  All right.  Thank you, Mr. Henderson.

15:48:57  17                  MR. HENDERSON:  Thank you, Your Honor.

15:48:59  18                  THE COURT:  Mr. Hart?

15:49:01  19                           CLOSING ARGUMENT

15:49:01  20                  MR. HART:  Your Honor, the issues in this case are

15:49:17  21   novel and they're interesting, and they kind of take us on a

15:49:21  22   winding path, but the beginning point of that path is not

15:49:25  23   simply the question of is there a search, but more properly is

15:49:29  24   there a search that implicates the Fourth Amendment.  And to

15:49:33  25   begin that in court, we have to look at whether or not there's

15:49:38  1    an expectation of privacy.  And there are two components to

15:49:41  2    that.

15:49:41  3              One, the expectation of privacy must be

15:49:44  4    subjectively held by the individual, meaning the defendant --

15:49:49  5    the defendant, if he didn't believe he had any expectation of

15:49:52  6    privacy, then we don't even get there.  But even if the

15:49:57  7    defendant has a subjective belief or expectation of privacy,

15:50:03  8    that subjective belief must be objectively reasonable.  And

15:50:09  9    it's on this component that the defendant clearly does not meet

15:50:12  10   his burden.

15:50:14  11             To put a finer point on it, this is not just is

15:50:19  12   there an expectation of privacy but an objectively reasonable

15:50:24  13   expectation of privacy, one that society is prepared to

15:50:29  14   consider reasonable.  So in this case is there a subjective

15:50:33  15   expectation of privacy?  Our evidence on that is, I think,

15:50:38  16   questionable at best, but the tie goes to the runner and we'll

15:50:43  17   give that to the defendant, that he had an objectively

15:50:46  18   reasonable expectation.

15:50:47  19             His subjective expectation is that AOL will not

15:50:50  20   engage in monitoring the content on its servers, period.

15:50:55  21   That's his subjective belief.  Now, whether or not that's

15:50:58  22   reasonable, that's another inquiry.  The unreasonableness of

15:51:03  23   the defendant's position is that, quite simply, society is not

15:51:08  24   willing to accept that position, in part because we expect that

15:51:13  25   our electronic service providers will monitor the content and

15:51:17  1   the things coming across its servers in order to protect us,

15:51:23  2   the users of their service, from malware, from viruses, and

15:51:28  3   from unwanted content like child pornography.  We as a society

15:51:32  4   expect that they will do that.

15:51:35  5         No case law has been presented that supports the

15:51:38  6   defendant's position that society has adopted a very different

15:51:44  7   position.  Previous cases involving electronic service

15:51:49  8   providers would also indicate that these providers have a

15:51:53  9   legitimate business interest in monitoring their facilities and

15:51:55  10  servers, indicating that society believes they should be doing

15:51:58  11  that, and I would note that if society did not expect that

15:52:04  12  these ESPs, electronic service providers, were monitoring

15:52:08  13  systems, things like the TOR Project would not exist.  Things

15:52:14  14  like Hushmail, which I referenced in my brief, would not exist.

15:52:18  15        The very fact that they exist indicates that our

15:52:22  16  society expects that it's happening.  And while we may not like

15:52:25  17  the fact that Google looks at our e-mail to target us for

15:52:28  18  specific advertising, we accept that that's the cost of doing

15:52:32  19  business.  Where these providers offer us a free service, we

15:52:37  20  acknowledge that, well, in order to make use of that, they're

15:52:41  21  going to get some benefit out of that.  But we also expect that

15:52:45  22  they will protect us from these unwanted things that I've

15:52:49  23  described before.

15:52:49  24        The defendant's position runs extremely counter to

15:52:54  25  that and would effectively disallow AOL or any electronic

15:52:58  1  service provider from being able to examine its own property,

15:53:03  2  that being its servers in its facilities that it uses to

15:53:08  3  transmit this data.  The defendant's position would disallow

15:53:14  4  AOL or any ESP for examining those things, for illegal content,

15:53:18  5  for malware, for viruses, for child pornography.

15:53:21  6        Well, just to caution the Court, an unintended

15:53:25  7  consequence of agreeing with the defendant's position would be

15:53:28  8  the prevention of Google and other companies from being able to

15:53:33  9  monitor content in order to sell targeted advertising to the

15:53:38  10  folks on the other side of the coin, because they effectively

15:53:41  11  would not be able to scan content and know that you're looking

15:53:44  12  at a vacation in Germany and then to target travel plans in the

15:53:47  13  little banners.

15:53:48  14        Well, what that would cause is that these

15:53:51  15  providers would not be able to operate free e-mail services,

15:53:55  16  and this would effectively bring the global economy to a

15:53:58  17  screeching halt.  That's the position the defendant asks the

15:54:01  18  Court to accept.  And I would submit that is an outcome that

15:54:08  19  society is not ready or prepared to consider reasonable.

15:54:16  20        So as to the initial question -- and I think it's

15:54:18  21  a threshold question -- does the defendant meet his burden, and

15:54:21  22  it is his burden, to show that he has a subjective and

15:54:27  23  objectively reasonable expectation of privacy, the Government

15:54:30  24  would submit that he has not, and thus, any further inquiry is

15:54:34  25  unnecessary because if he has no reasonable expectation of

15:54:41  1   privacy in this particular e-mail, the Fourth Amendment's not

15:54:43  2   implicated and we don't even get down the road as to these

15:54:46  3   other questions.

15:54:48  4          Now, I know the Court had some question during the

15:54:54  5   statements by Mr. Schmidt, representative for NCMEC, related to

15:55:00  6   the Terms of Service that AOL has and do those Terms of Service

15:55:03  7   constitute consent.  And I, like the Court, have probably just

15:55:08  8   blazed through and clicked the "I agree to the Terms of

15:55:13  9   Service" and move on.  I am not going to stand here and argue

15:55:17  10  before you that the defendant has consented to the search such

15:55:22  11  that there's a consent that gets around the Fourth Amendment

15:55:27  12  search.  But I would tell you that there's not a Fourth

15:55:31  13  Amendment search to begin with, so we don't really have to go

15:55:34  14  down that path, in terms of common authority another argument

15:55:37  15  related to searches -- that's derived from the Matlock case I

15:55:42  16  referenced in our brief, which is a Supreme Court case -- do

15:55:46  17  the Terms of Service allow AOL to exert common authority in the

15:55:53  18  examination of its property, its servers, for illegal content.

15:55:56  19  And under the Terms of Service there is that common authority,

15:56:00  20  and they are allowed to do that.  So even if the Court were to

15:56:03  21  find, well, golly, there is a Fourth Amendment search here, the

15:56:07  22  defendant has shown a subjective and objectively reasonable

15:56:12  23  expectation of privacy, the fact that he has done -- he's

15:56:15  24  agreed to the Terms of Service by using a service that he knows

15:56:19  25  is monitored by AOL or operated by AOL, he has agreed to their

15:56:24  1    review of that under a common-authority analysis.

15:56:29  2              Now, I would note, when AOL terminates his

15:56:34  3    account, there's no longer common authority.  The only

15:56:37  4    authority that exists at that point is AOL's.  The defendant

15:56:41  5    doesn't even have access to that.  And it's after they have

15:56:45  6    terminated the account that any activity by NCMEC or law

15:56:50  7    enforcement occurs.  And I think that's important as --

15:56:51  8              THE COURT:  I have real trouble with that portion

15:56:53  9    of your argument, Mr. Hart, because once the defendant placed

15:56:59  10   the e-mail into the stream of Internet commerce, he had done

15:57:05  11   all he could do with respect to that Internet, and the fact

15:57:07  12   that subsequent intervening events terminated his ability to

15:57:14  13   have access to that -- to have the same access to that stream

15:57:18  14   of commerce doesn't seem to me to be relevant to what his

15:57:24  15   expectations were when he placed that e-mail in the stream of

15:57:27  16   commerce; that is to say I think his expectations of privacy

15:57:31  17   have to be measured at the point he took the last actions that

15:57:35  18   he did or could take with respect to that.

15:57:37  19             MR. HART:  And, Your Honor, I don't think the case

15:57:39  20   law quite agrees with you.  In part, if I may, I believe it's

15:57:49  21   the -- there are a number of cases that I referenced in the

15:57:53  22   brief.  United States v. Young, which is an Eleventh Circuit

15:57:56  23   case; United States v. Leffall, which is a Tenth Circuit case;

15:58:00  24   United States v. Matlock.

15:58:01  25             THE COURT:  They were on a very different factual

15:58:03  1   bases, though.

15:58:04  2          MR. HART:  Right.  But what they involved are mail

15:58:07  3   carriers and individuals who are putting something into a mail

15:58:09  4   carrier's hands and then the mail carrier does something.  And

15:58:13  5   that is actually very analogous to the set of circumstances

15:58:17  6   that we have in this case.

15:58:18  7          THE COURT:  But that goes to whether the sender

15:58:21  8   had a reasonable expectation of privacy to begin with, which I

15:58:26  9   think is a critical inquiry.  But if he had a reasonable

15:58:33 10   expectation of privacy when he put it in the course of

15:58:40 11   commerce, just because the Government intervenes later doesn't

15:58:45 12   mean that he loses the expectation of privacy then such that

15:58:48 13   Fourth Amendment rights, which were previously implicated, no

15:58:52 14   longer are.

15:58:53 15          If there was a Fourth Amendment interest on behalf

15:58:55 16   of the defendant's property at the time that he last controlled

15:59:00 17   it, then he can't lose that Fourth Amendment interest by

15:59:05 18   subsequent events that are after he's placed it, done the last

15:59:14 19   thing he does with it.

15:59:15 20          MR. HART:  And, Your Honor, I was having a moment

15:59:18 21   trying to figure out where I referenced these cases that relate

15:59:21 22   to that issue.  And they're on page 16 of my brief, really

15:59:28 23   starting with the second paragraph relating to whether the

15:59:32 24   defendant essentially has standing to challenge a search -- and

15:59:37 25   perhaps I'm conflating the two -- is whether he has a

15:59:41  1  reasonable expectation of privacy versus the ability to

15:59:47  2  challenge the search.

15:59:47  3           THE COURT:  Well, this is where you talked about

15:59:49  4  rental cars, which I didn't see as analogous at all.

15:59:53  5           MR. HART:  Well, what I would -- it is analogous

15:59:56  6  in the sense that they're making use of a facility of

15:59:59  7  interstate commerce, and when they lose control of that thing,

16:00:02  8  the car, they lose the expectation of privacy in that.  And so

16:00:08  9  here we have the usage of an e-mail account.  And when they

16:00:12  10 lose control of that, they are then losing control --

16:00:16  11          THE COURT:  But at the point that he'd lost

16:00:18  12 control of the e-mail account, he had already sent off his

16:00:22  13 e-mail.

16:00:22  14          MR. HART:  Well, and, in fact, no, he had not.  It

16:00:25  15 was located on AOL's servers.

16:00:27  16          THE COURT:  He had sent it.  It hasn't been

16:00:28  17 delivered, but he had sent it.

16:00:32  18          MR. HART:  Your Honor, I would say he had pressed

16:00:34  19 Send, and I don't believe it had gone anywhere.

16:00:36  20          THE COURT:  But he had done the last thing that

16:00:39  21 you would ever expect him to do to send the e-mail.  The fact

16:00:42  22 that it wasn't delivered, because of subsequent events, is

16:00:46  23 indisputable, but it had nothing to do with any actions on his

16:00:49  24 part.  He had sent it.  The sending was interrupted and

16:00:53  25 intercepted, but he had sent.

16:00:55    1          MR. HART:  Yes.  And I suppose if we were to

16:00:57    2    analogize the rental car, that is the defendant has used the

16:01:02    3    car, he has driven out of the parking lot of Avis, parked the

16:01:07    4    car, turned off the keys, and handed the keys back in.  He is

16:01:11    5    now done with his part and he has walked away.  And while these

16:01:16    6    are not an exact analogy, that is, I think, gets to the issue

16:01:21    7    of common authority that I raised.  Again, though, I don't

16:01:25    8    think we really even get there because I don't believe we have

16:01:28    9    a Fourth Amendment search, the

16:01:31   10    reasonable-expectation-of-privacy issues that I previously

16:01:33   11    addressed.

16:01:34   12          The last issue related to those, you know,

16:01:39   13    consent, common authority, or waiver, and I think the Court may

16:01:42   14    have had a question about waiver, is whether the Terms of

16:01:45   15    Service acted as a waiver.  Waiver only is involved where you

16:01:49   16    actually have a Fourth Amendment search.  And here we're not

16:01:53   17    arguing that there was a Fourth Amendment search and, thus,

16:01:56   18    this constitutes a waiver, but that there was not a Fourth

16:02:00   19    Amendment search to begin with, there was no expectation of

16:02:04   20    privacy, so I don't think we even get to the waiver argument.

16:02:07   21          And as I recall the Court's questions, waiver, I

16:02:15   22    believe, needs to be very specific as --

16:02:17   23          THE COURT:  Well, the Terms of Service waiver

16:02:19   24    argument really only engages if we determine, first of all,

16:02:24   25    that there was a Fourth Amendment expectation of privacy in the

16:02:28  1   e-mail that was sent and, secondly, that AOL was acting as a

16:02:35  2   government agent when it took the actions it did with that.

16:02:38  3   You would have to get through both of those hurdles before the

16:02:41  4   waiver argument under the Terms of Service would even engage.

16:02:43  5          MR. HART:  And you're right, Your Honor.  And I

16:02:45  6   don't believe we get to either of those.

16:02:47  7          I would say perhaps the analogy that may shed

16:02:53  8   some -- may provide some explanation or clarification as to

16:03:00  9   what AOL does in this case is this is similar to an individual

16:03:05  10  who is kicked out of a hotel and the hotel owner goes in and

16:03:10  11  takes pictures of the scene.  They take pictures of the bag of

16:03:15  12  meth on the bed, the wad of cash next to the television, scales

16:03:20  13  found on the bathroom counter, other drug paraphernalia

16:03:24  14  scattered throughout the room, receipts, ledgers, things of

16:03:28  15  that nature.  The hotel operator then sends these to law

16:03:34  16  enforcement as part of a report of drug activity going on in

16:03:37  17  the hotel.

16:03:38  18         Now, that private citizen who operates that hotel

16:03:43  19  obviously is assisting law enforcement, has provided law

16:03:47  20  enforcement essentially a snapshot of what they found in the

16:03:49  21  room as they entered.  But that private citizen has their own

16:03:55  22  business interest in preventing people from using their

16:03:59  23  facility, using the hotel, for drug dealing, because they

16:04:05  24  recognize it interferes with other guests' use of the

16:04:09  25  facilities.  They are motivated by a strong business interest

16:04:13 1    to do these things.

16:04:15 2         So in the context of a hotel operator doing that,

16:04:18 3    would there be a Fourth Amendment search?  Law enforcement's

16:04:22 4    not been contacted until after the fact.  The answer to that

16:04:26 5    question of is there a Fourth Amendment search would be no.

16:04:30 6    And that's effectively what AOL has done in this case by

16:04:33 7    creating a snapshot of what they found on their service.  And

16:04:37 8    as a point -- this may be an extremely technical point, but I

16:04:42 9    think it's a point that needs to be made for purposes of the

16:04:47 10   record.  The e-mail that the defendant attempts to send or

16:04:52 11   sends, depending on how you look at it, is stopped on AOL's

16:04:55 12   servers.  And when AOL sends a report, they create their own

16:05:01 13   e-mail, a new e-mail.  And while it has all the information

16:05:04 14   related to the defendant's e-mail, it is a new e-mail.  It has

16:05:10 15   the AOL IDFP information on it.  And as we saw -- and I'm going

16:05:15 16   to put it on the Elmo, what we've marked now as defendant's

16:05:19 17   Exhibit 2, this was referenced in the testimony, they present

16:05:24 18   sort of this visual representation, but it's coming from

16:05:33 19   ncmec.receipts@corp.aol.com.  So this is essentially AOL's

16:05:38 20   version of a narrative report that has images or a snapshot of

16:05:43 21   what they found embedded in it.  Now, it may not present in our

16:05:50 22   traditional way of thinking of a narrative report, but this is

16:05:53 23   what it does.  The defendant's e-mail is actually still located

16:05:57 24   back on AOL's servers, and is for a time until they get rid of

16:06:01 25   it.  But this is AOL's report.

16:06:11  1        Now, if we were to carry the analogy along

16:06:14  2   further -- well, let's just stick with moving forward to the

16:06:18  3   state agent arguments, unless the Court has any questions about

16:06:21  4   what we've covered so far.  As to the state agent arguments, I

16:06:25  5   think the testimony's relatively clear.  AOL has a private

16:06:30  6   business interest in the things that they do.  They monitor

16:06:33  7   these things for the protection of their customers and for the

16:06:38  8   protection of their business reputation.  They do it in order

16:06:41  9   to retain customers.  They do not do it at the direction and

16:06:46 10   behest of law enforcement, and I think it's notable that when

16:06:49 11   law enforcement wants to get information from them, law

16:06:52 12   enforcement still has to go through the channels of subpoenaing

16:06:55 13   business records or going through a search warrant.

16:06:57 14        So there is none of this clearly helping law

16:07:01 15   enforcement and doing those things as the Court has already

16:07:04 16   referenced what the standard is related to the state -- or

16:07:09 17   agent-of-the-government arguments.

16:07:11 18        As it relates to NCMEC, the testimony again is

16:07:14 19   they're a nonprofit, nongovernmental organization.  They are

16:07:19 20   funded by the government, but simply being funded by the

16:07:22 21   government does not turn -- it's not the touchstone for being a

16:07:26 22   state agent.  As counsel for NCMEC referenced, we would

16:07:30 23   otherwise be turning doctors who are working in a clinic out in

16:07:34 24   southwest Kansas into government agents, banks, and on down the

16:07:39 25   line.

16:07:39   1           And one of the questions the Court has is, well,

16:07:43   2   what about the reference in the statute?  And as I recollect,

16:07:46   3   the Court is referring to 18 U.S.C. 2258A, which references

16:07:53   4   NCMEC specifically by name.  And, in fact, the reference -- and

16:08:04   5   it's throughout this -- is "CyberTipline of the National Center

16:08:10   6   for Missing & Exploited Children or any successor to the

16:08:13   7   TipLine operated by such center."  (As read.)  And we see it

16:08:17   8   named specifically.

16:08:17   9           Now, if I may address the significance of naming

16:08:22   10   NCMEC specifically, well, there is not really any significance

16:08:26   11   in the context of this statute, but there is significance in

16:08:31   12   naming NCMEC in the statutes authorizing NCMEC to receive the

16:08:37   13   child pornography images.  And that is important because

16:08:40   14   there's a limited number of individuals who may lawfully

16:08:45   15   receive child pornography, because otherwise it's a crime, a

16:08:49   16   federal crime, of distribution.

16:08:50   17           So in order to allow or to specifically identify

16:08:56   18   who may have it, NCMEC is identified by name.  It would not do

16:09:01   19   to say, well, we will allow a clearinghouse organization to

16:09:06   20   receive these, because then you may have individuals who pop up

16:09:10   21   attempting to be a clearinghouse to receive images.

16:09:12   22           THE COURT:  I'm not sure if that argument helps

16:09:14   23   you or hurts you, because since Congress has specifically

16:09:17   24   licensed NCMEC to receive what would be contraband for you or I

16:09:23   25   or anybody else to receive, doesn't the fact that NCMEC is then

16:09:30  1    offering, as a licensee of the Government, with respect to this

16:09:33  2    one discrete issue, give them the imprimatur of being a

16:09:38  3    government agent in that regard?

16:09:39  4             MR. HART:  Well, I don't think so, Your Honor.  I

16:09:41  5    think it recognizes the practical implications of what NCMEC

16:09:44  6    has been doing.

16:09:45  7             THE COURT:  Oh, I understand why the Government

16:09:46  8    has to do it.  I understand that completely.  I understand the

16:09:50  9    practical implications of it, but I'm just saying that having

16:09:53  10   done that seems to me to bestow some sort of a licensee status

16:10:00  11   on NCMEC, a governmental licensee that allows them to do things

16:10:05  12   that most people or entities can't do, i.e., have child

16:10:11  13   pornography legally transmitted to them.

16:10:13  14            MR. HART:  Well, Your Honor, if you think in terms

16:10:15  15   of what AOL was doing at its inception, it was running a

16:10:20  16   hotline.  It was one of the very first things they were doing

16:10:22  17   was a hotline where people could call in.  And that's in the

16:10:29  18   early '80s.  As computers come about in the late '80s and in

16:10:34  19   the early 90s with "You've Got Mail" and things like that where

16:10:37  20   people start using the computers, NCMEC then develops the

16:10:43  21   CyberTipline, which kind of moves in conjunction with this

16:10:45  22   hotline.  They develop that before Congress actually enacted

16:10:52  23   that statute by either years or months.  But when they create

16:10:57  24   that, they are doing it not as a licensee of the government,

16:11:02  25   but on their own benefit.  And the question is not are they a

16:11:07  1   licensee.  That's not our standard.  It's whether the

16:11:12  2   government knew of and acquiesced in the intrusive account and

16:11:17  3   whether the party intended to assist law enforcement or to

16:11:19  4   further his or its own ends.

16:11:23  5           And in this case the fact that Congress, the

16:11:26  6   legislative branch, authorizes NCMEC does not necessarily mean

16:11:30  7   that they're a licensee of the executive branch, the Department

16:11:34  8   of Justice, it's just that Congress has recognized in order for

16:11:38  9   them to fulfill this function --

16:11:40  10          THE COURT:  Well, they've licensed them in the

16:11:42  11  criminal code.  That's a pretty clear indication --

16:11:45  12  notwithstanding my discussions in my rather derogatory comments

16:11:48  13  about Congressional hearings and the Department of Justice

16:11:52  14  during Mr. Henderson's argument -- Congress enacts something in

16:11:54  15  the criminal code is very different than making aggrandizing

16:11:58  16  statements in a Congressional hearing.  So, I mean, everything

16:12:01  17  the Department of Justice does is authorized by Congress.  Much

16:12:04  18  of it is in 18 U.S.C.

16:12:06  19          MR. HART:  And authorizing NCMEC to receive these

16:12:10  20  things is pretty much as far as it goes as far as what they are

16:12:13  21  directing NCMEC to do.  They do direct NCMEC to provide the

16:12:17  22  report or make it available to law enforcement, as we see in

16:12:20  23  2258A.  But they're not directed to and they're not

16:12:24  24  authorized -- perhaps this is a more important point -- they're

16:12:27  25  not authorized to undertake -- they're not given subpoena

16:12:31  1  power, they're not given search warrant power, they're not

16:12:35  2  given any sort of special status to come in here and prosecute

16:12:38  3  this case, like I am.  They serve a limited function.  And that

16:12:43  4  is as a clearinghouse.  They are the pass-through for the

16:12:48  5  information that comes from the ESPs.  Because if you think

16:12:51  6  about it in terms of a 911 call, you know, if we were to go way

16:12:56  7  back, arguably not so far back, but what NCMEC serves as is

16:13:03  8  they're the old switchboard operator.  You called up for

16:13:06  9  Transylvania or Pennsylvania six five thousand and they put you

16:13:10  10  through to that place.  That's what NCMEC's function is as it

16:13:15  11  relates to the ESPs finding the appropriate law enforcement

16:13:18  12  agency.

16:13:19  13       To bring that into a more modern time, if you have

16:13:25  14  your cell phone and you're here in Wichita, Kansas and you dial

16:13:29  15  911, it will find the 911 operator that's here where you are.

16:13:35  16  But if you were to go to St. Louis or Seattle and you pick up

16:13:40  17  your phone and you dial 911, your provider, generally speaking,

16:13:44  18  has created mechanisms that will direct your call to the 911 in

16:13:51  19  the area where you're located.  So what that does, that exists

16:13:56  20  in that 911 realm.  But we do not have a similar feature or

16:14:00  21  automated service by which AOL can identify where a particular

16:14:05  22  thing came from because there's multiple parts to e-mail

16:14:09  23  traffic.  There's the client, like AOL -- and I say "the

16:14:14  24  client," I mean the interface, the way in which a user

16:14:17  25  interfaces with the Internet, but you also have the ISPs, the

16:14:22  1   folks that are actually providing the connection between the

16:14:24  2   person's house and whatever web site they're accessing.  So in

16:14:29  3   this case we have Rural Telephone is the ISP and AOL is the

16:14:34  4   ESP.  In order for AOL to figure out where it is they would

16:14:38  5   need to send the report, they would actually have to get some

16:14:42  6   information from Rural Telephone, but they don't have the

16:14:45  7   ability to do that.

16:14:46  8          And so rather than put the onus on the ESPs, they

16:14:52  9   have created what is essentially -- well, NCMEC created what is

16:14:56  10  essentially the 911 hotline for the ESPs, as well as for

16:14:59  11  private citizens.  But they create this in order to facilitate

16:15:05  12  getting the ESPs or private citizen connected with the

16:15:09  13  appropriate law enforcement agency.  That's all they do,

16:15:12  14  though.  They're just a pass-through.

16:15:13  15         When the report comes in from AOL, they don't do

16:15:17  16  anything to manipulate or change that report.  It just comes in

16:15:21  17  on one end and they lift the door up on the other side or give

16:15:25  18  'em a key and then they have access.

16:15:27  19         THE COURT:  Talk to me about whether the

16:15:30  20  activities of NCMEC, particularly in this particular case,

16:15:33  21  expanded the scope of the search that AOL had conducted.

16:15:36  22         MR. HART:  And, Your Honor, it did not.

16:15:38  23         THE COURT:  And I understand that that's an issue

16:15:39  24  that we may not get to, but talk to me about that issue.

16:15:43  25         MR. HART:  Certainly.  In this case, as AOL

16:15:45  1   described, the reasons why they look at an image relate to the

16:15:51  2   front side of the equation, things related to what the ESP has

16:15:57  3   provided, confirming that it's not a giraffe or a 1957 Chevy or

16:16:01  4   the Statue of Liberty, so there's that component of a reason of

16:16:06  5   an interest that they have in making sure the system continues

16:16:08  6   to work, and that there's not these -- I believe the term was

16:16:14  7   "inanimate objects" or noncontraband images coming through.

16:16:18  8   Now, they acknowledge they still send those through even when

16:16:21  9   they do come through, but they look at those to determine if

16:16:24  10  there's some problem with the system.

16:16:34  11         They also indicated that they look at the images

16:16:35  12  to determine prioritization, whether they have the appropriate

16:16:39  13  priority level or if there is a more emergent need.  That

16:16:43  14  relates to service to the child that may be depicted in that,

16:16:47  15  and that's their overarching mission, is helping these kids

16:16:50  16  out, helping the families of these kids.

16:16:51  17         THE COURT:  Well, again, you're talking about why

16:16:53  18  they do what they do, and it may be well justified but that

16:16:59  19  doesn't address the question of whether what they're doing is

16:17:02  20  expanding the scope of the search.

16:17:04  21         MR. HART:  Well, on the issue of expanding the

16:17:05  22  scope of the search, is there anything that NCMEC found from

16:17:10  23  the images that they then provided to law enforcement?  And the

16:17:13  24  answer to that question in this case is no.  Anything derived

16:17:18  25  from the images that they obtained did not end up going to law

16:17:21  1    enforcement.

16:17:27  2              THE COURT:  I'm trying to -- I'm trying to process

16:17:30  3    your argument, because what NCMEC tells law enforcement is

16:17:37  4    "Here are pictures of child porn.  We've confirmed them."  So

16:17:42  5    the "confirmed" is something that they add due to their own

16:17:47  6    viewing.

16:17:47  7              MR. HART:  Well, and the confirmation of -- of the

16:17:53  8    images as child pornography, the "this is a known series,"

16:17:59  9    that's actually an additional step and we talked about that

16:18:02  10   that takes place after they've reviewed the report and the

16:18:05  11   agent submit a request, technical assistance request, for --

16:18:08  12   through the CVIP program to determine if these images are a

16:18:13  13   known series or whatnot.  The "child pornography confirmed"

16:18:17  14   simply means that what we looked at is not a giraffe, not an

16:18:22  15   inanimate object, not these things.  That does not expand the

16:18:26  16   scope of the search because AOL has already identified these

16:18:30  17   things are child pornography.  So when AOL looks at them and

16:18:34  18   says, well, yeah, they are what you say, they haven't expanded

16:18:37  19   the scope of the search.

16:18:38  20             THE COURT:  Didn't the Keith decision hold

16:18:41  21   contrary?

16:18:44  22             MR. HART:  I don't know that the Keith decision

16:18:45  23   had as much technical --

16:18:46  24             THE COURT:  They clearly didn't, but -- and

16:18:50  25   clearly there's been a great deal more information presented in

16:18:55    1    this case, than it appears the Keith decision had in issuing

16:19:00    2    its opinion. And I can't remember the exact language, but it

16:19:05    3    seems to me that at least implicitly the Keith court decided

16:19:07    4    that NCMEC -- actually, the Keith court -- well, first of all,

16:19:12    5    the Keith court decided that NCMEC was a government agent or

16:19:16    6    government actor. But coupled with that, they had to decide

16:19:19    7    that the NCMEC investigation expanded the scope of the search

16:19:25    8    in order for them to find a Fourth Amendment violation, which

16:19:29    9    then led to their Leon analysis. Isn't that how that played

16:19:32    10   out? 'Cause ultimately they held on good-faith exception under

16:19:39    11   Leon, but you wouldn't have gotten there unless they would have

16:19:43    12   decided, A, that NCMEC was a government actor, which I remember

16:19:47    13   they specifically did, but even if NCMEC was a government actor

16:19:50    14   if it didn't expand the scope of the search on AOL, which Keith

16:19:54    15   held was not a government actor, then the Fourth Amendment

16:19:56    16   wouldn't have been implicated. They implicated the Fourth

16:20:00    17   Amendment, so they had to have determined that, don't they?

16:20:03    18             MR. HART: I think so, Your Honor. I think when

16:20:05    19   it got to that point, what's noticeable from the Keith decision

16:20:08    20   is they really didn't address the reasonable expectation of

16:20:11    21   privacy part.

16:20:12    22             THE COURT: It was an abbreviated opinion.

16:20:14    23             MR. HART: Yes, Your Honor. And when it gets into

16:20:18    24   what NCMEC does, I don't think there was actually a clear

16:20:21    25   understanding of exactly what NCMEC does. It was sort of like,

16:20:24   1    well, golly, they looked at it, boom, we're done, we're not

16:20:29   2    actually looking at what NCMEC does with the information that

16:20:32   3    they see.  And where the -- where NCMEC looks at the pictures

16:20:36   4    but does nothing to pass on, you know, a description or

16:20:39   5    anything related to those pictures, the known series

16:20:44   6    identifiers that they might otherwise have to law enforcement,

16:20:49   7    they're not acting in the manner that our case law talks about

16:20:53   8    as whether the party intended to do assist law enforcement.

16:20:56   9    They are essentially only using the information to identify the

16:21:00  10    correct -- or appropriate law enforcement agency, which relates

16:21:05  11    to their ends as the pass-through, but they're not doing

16:21:09  12    anything to either expand what AOL has provided already, and

16:21:16  13    they really -- none of that even goes to the agents.

16:21:19  14             So I think Keith missed that part of the equation.

16:21:25  15    And that's not the fault of the court.  I think the evidence

16:21:28  16    may not have been developed with as much detail as we have done

16:21:31  17    here, but ultimately that part just kinda got glossed over.

16:21:38  18             THE COURT:  I can't disagree.

16:21:42  19             MR. HART:  As I mention, even where NCMEC could

16:21:44  20    provide additional details such as that CVIP report, the way

16:21:50  21    NCMEC operates is they require law enforcement officers to come

16:21:54  22    back and ask for 'em.  And I think that's important in the

16:21:56  23    consideration of are they government agent, because they're not

16:21:59  24    just loading everything they have into the report; they really

16:22:06  25    truly just operate as a pass-through.

16:22:08   1         And this, I think, is in the context and backdrop
16:22:10   2   of NCMEC having run the hotline from its inception and then
16:22:15   3   developing the CyberTipline to meet the need of parents and
16:22:19   4   ESPs and public entities for reporting, to give them a place
16:22:25   5   where they can go and figure out, hey, how do we report this.
16:22:31   6   Because it -- the ISPs and ESPs cannot simply pick up the phone
16:22:35   7   and dial 911 and the problem fixes itself.  So AOL's -- they're
16:22:44   8   NCMEC's function as a pass-through.  That's essentially all
16:22:47   9   they are.  They provide a secure environment for that to occur.
16:22:49  10   That does not get -- raise them to the level of a government
16:22:53  11   agent.
16:22:54  12         In terms of the expansion of the search, it's the
16:23:00  13   Government's position that there is no expansion of the search
16:23:03  14   by NCMEC or even Agent Moore.  It is not a simple issue of AOL
16:23:10  15   runs these hash values and some unknown person at an unknown
16:23:14  16   time saw them, and so we move on from there.  This is actually
16:23:19  17   a known person.  It's an employee of AOL.  And it's during a
16:23:24  18   known time.  It's during the existence of IDFP.  And while that
16:23:28  19   is -- that's not giving you a name and exactly when they saw
16:23:31  20   it, those are important because of the way AOL operates its
16:23:35  21   IDFP.  It has to be something that somebody has seen, actually
16:23:40  22   put eyeballs on.
16:23:42  23         And so when they find an image, when law
16:23:48  24   enforcement actually opens it up after they've made the report,
16:23:51  25   is that an expansion of the search?  No.  Is it an expansion of

16:23:55  1    the search in a constitutionally significant way, which is

16:23:59  2    another part of that?  Also the answer to that is no.  And I

16:24:03  3    would note, as we have sort of talked about here, the law

16:24:09  4    enforcement officer is examining AOL's work product.  I mean,

16:24:12  5    this is a report that AOL has done.  So the officer's review of

16:24:17  6    AOL's report, this isn't the officer going in or the agent

16:24:21  7    going in and looking at the defendant's e-mail.  That's an

16:24:24  8    entirely different issue and it's not in this case, and those

16:24:27  9    are not the facts before the court.  But what we see here is a

16:24:31  10   report generated by AOL.  Quite frankly, I'm not even sure the

16:24:35  11   defendant has standing to challenge what AOL provided to law

16:24:38  12   enforcement, even if -- well --

16:24:41  13            THE COURT:  That's probably not your best avenue.

16:24:43  14            MR. HART:  No, Your Honor.  I think it gets a

16:24:46  15   little bit confusing when we drill down that far.  But I would

16:24:52  16   submit, Your Honor, there is no expansion of the search.

16:24:56  17            I wanted to clarify a couple of things.  I believe

16:25:04  18   in my briefing I indicated that NCMEC provides -- periodically

16:25:09  19   provides hashes to AOL, and I think our testimony indicates

16:25:15  20   that is not accurate at all.  AOL works off of its own.  And I

16:25:23  21   think my brief failed to clarify exactly when AOL terminated

16:25:27  22   the account, that that occurs before the report is made to

16:25:30  23   NCMEC.

16:25:37  24            And when we contemplate the expansion of the

16:25:41  25   search, I think it's useful for the Court to think about what

| | | |
|---|---|---|
| 16:25:45 | 1 | was provided to law enforcement.  It's a container.  It's the |
| 16:25:48 | 2 | e-mail.  Opening up the subordinate attachments, the picture |
| 16:25:54 | 3 | files in there, is not an expansion of the capture of that |
| 16:25:58 | 4 | whole e-mail.  It's sort of like, as the Court was talking |
| 16:26:04 | 5 | about, the DNA example, the sample of DNA.  If the sample of |
| 16:26:08 | 6 | DNA is taken and compared to DNA on -- DNA file on hand and |
| 16:26:12 | 7 | then that info is submitted to law enforcement in one |
| 16:26:16 | 8 | container, so in the nature of a report, is that -- when law |
| 16:26:22 | 9 | enforcement reviews that, is that all an expansion of the |
| 16:26:25 | 10 | search that whoever took the DNA sample did?  And, no, it would |
| 16:26:29 | 11 | not be. |
| 16:26:29 | 12 | In this case it's opening the .eml file to review |
| 16:26:34 | 13 | what it is that AOL provided.  And I think the Court, in |
| 16:26:51 | 14 | answering or asking certain questions, keyed in on the |
| 16:26:55 | 15 | defendant's argument about encouragement of these individuals |
| 16:27:00 | 16 | by "the Government."  It needs to be specific as to this |
| 16:27:05 | 17 | particular instance. |
| 16:27:06 | 18 | THE COURT:  I don't think you need to address |
| 16:27:07 | 19 | that. |
| 16:27:08 | 20 | MR. HART:  All right.  And I will move on from |
| 16:27:10 | 21 | that, Your Honor. |
| 16:27:10 | 22 | As it relates to the statements of the defendant, |
| 16:27:17 | 23 | I believe, Your Honor, as you listen to Government's Exhibit |
| 16:27:20 | 24 | No. 4, it will render -- there will be no doubt that it was a |
| 16:27:27 | 25 | noncustodial interview and the defendant was fully advised of |

16:27:30   1   that repeatedly throughout the course of the interview and then

16:27:34   2   was subsequently not arrested and went home, worrying about

16:27:38   3   what his wife was going to say when he got there.

16:27:40   4         With that, Your Honor, I don't have any further

16:27:42   5   comments.  Thanks.

16:27:43   6         THE COURT:  All right.  Thank you, counsel.

16:27:44   7         It's a very interesting issue.  I probably can

16:27:50   8   assure you that I will not issue an abbreviated opinion on

16:27:55   9   this, which means that I will not issue a speedy opinion on

16:27:59   10  this, but obviously we're not going to take, you know, a month

16:28:02   11  to get this out.  But I do think there are a number of issues

16:28:07   12  that probably courts have not really addressed before, and so

16:28:10   13  we're going to want to carefully analyze them and go through

16:28:13   14  them.  And I'm mindful, of course, of the interests of speed in

16:28:18   15  a criminal prosecution, and so we'll do them as efficiently as

16:28:21   16  we can, without sacrificing quality.

16:28:24   17        Do I have Government Exhibit 4?

16:28:28   18        MR. HART:  Yes, Your Honor.  And just to --

16:28:31   19        THE COURT:  I have at least copies of the other --

16:28:37   20  well --

16:28:38   21        CLERK NALL:  I'll get them.

16:28:39   22        THE COURT:  All right.  Government Exhibit 4 is

16:28:42   23  the tape recording.

16:28:43   24        MR. HART:  There's Government's 1 through 5.

16:28:46   25        THE COURT:  I have at least bench copies of 1

16:28:48  1   through 5 except for 4.  If we have 4 --

16:28:54  2                CLERK NALL:   There.  You want me to carry this

16:28:56  3   all back?

16:28:58  4                THE COURT:  We'll all carry stuff.  Anything else

16:29:00  5   we need to take up this evening?

16:29:02  6                MR. HART:  No, Your Honor.

16:29:03  7                MR. HENDERSON:  No, Your Honor.  Thank you.

16:29:04  8                THE COURT:  All right.  The matter is submitted.

16:29:06  9   And as I said, I will try to get an opinion out as quickly as

16:29:11  10  possible.  Thank you, counsel.  We're in recess.

16:29:13  11               CLERK NALL:   All rise.

16:29:14  12               (Whereupon, the proceedings were concluded at

16:29:16  13               4:29 PM.)

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 8th day of January, 2015.


s/ Johanna L. Wilkinson
Johanna L. Wilkinson, CSR, CRR, RMR
United States Court Reporter