IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS (WICHITA)

UNITED STATES OF AMERICA,
    Plaintiff,

                              Case No. 6:13-cr-10176-EFM-1

v.

                              Hon. Eric F. Melgren
WALTER ACKERMAN,           United States District Judge
    Defendant.               Presiding

---

## DEFENDANT'S BRIEF ON REMAND

---

In August 2016, the Tenth Circuit reversed and remanded for further proceedings on Walter Ackerman's motion to suppress. 831 F.3d 1292 (10th Cir. 2016). At a status conference in November 2016, this Court set a briefing schedule. D.E.73.[1] The government filed its brief on February 7, 2017, asking this Court to deny the motion to suppress for three reasons: (1) there was no search for Fourth Amendment purposes; (2) if so, the search was permissible under the special-needs doctrine; and (3) if nothing else, the good-faith exception should save the search. D.E.84.

We disagree. Under a Fourth Amendment trespass theory, the government searched Mr. Ackerman's email for Fourth Amendment purposes when it opened the email and attachments. If not, under a Fourth Amendment expectation-of-privacy theory, a Fourth Amendment search occurred because Mr. Ackerman had both a subjective and objective expectation of privacy in his email. Moreover, the government's reliance on a special-needs balancing test lacks merit because the search in this case was an investigatory search of an item fully protected by the Fourth Amendment. Finally, law-of-the-case principles preclude consideration of the government's good-faith argument.

---

[1] We cite the docket entries as "D.E." followed by the docket number, followed by a pinpoint citation within the docket entry. Thus, the first page of the first docket entry would be cited as "D.E.1 at 1."

If not, this Court should decline to apply the good-faith exception to this warrantless, investigatory search of Mr. Ackerman's email.[2]

## I. The government searched Mr. Ackerman's email.

The Fourth Amendment protects against unreasonable searches of "persons, houses, papers, and effects." U.S. Const. Amend. IV. The amendment's protection embodies "a particular concern for government trespass upon" these enumerated areas. *United States v. Jones*, 565 U.S. 400, 406 (2012). Where "the Government obtains information by physically intruding on a constitutionally protected area," a Fourth Amendment "search has undoubtedly occurred." *Id.* at 406 n.3.

In addition, absent a trespass, the Fourth Amendment protects against governmental actions that violate a person's privacy rights. *Jones*, 565 U.S. at 406, 409 (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)); *see also Ackerman*, 831 F.3d at 1307. This non-trespassory test is twofold: (1) the person must have a subjective expectation of privacy in the item searched; and (2) that subjective expectation of privacy must be objectively reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

The Tenth Circuit has already held that "NCMEC conducted a 'search' when it opened and examined Mr. Ackerman's email." 831 F.3d at 1308. But it remanded the case for this Court to determine whether the third-party doctrine upset that determination. *Id.* at 1304-1305, 1308. On remand, however, the government has expressly declined to invoke the third-party doctrine. D.E.84 at 8-9. That should end the matter. A Fourth Amendment search occurred in this case. The Tenth Circuit so held. 831 F.3d at 1308; *United States v. West*, 646 F.3d 745, 747-748 (10th Cir. 2011) ("[W]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal.").

---

[2] We do not rehash the underlying facts. Those facts are set forth in detail in the Tenth Circuit's decision, the parties' briefs on appeal, and this Court's previous decision. We will address the facts as needed.

Regardless, the government's revamped argument falls on the merits. Mr. Ackerman had a Fourth Amendment property interest in his electronic mail, and that property interest existed until his mail reached its intended recipient. Because the government searched the mail prior to this point, the search implicated the Fourth Amendment. If not, the search implicated the Fourth Amendment because Mr. Ackerman had a subjective expectation of privacy in his email, and that subjective expectation of privacy was objectively reasonable.

**A. Under a trespass theory, the government searched Mr. Ackerman's email.**

A Fourth Amendment search occurs when "the Government obtains information by physically intruding on a constitutionally protected area." *Jones*, 565 U.S. 400, 406 n.3. A mailed communication is undoubtedly a constitutionally protected area. *Ex parte Jackson*, 96 U.S. 727, 733 (1877).

> Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be. Whilst in the mail, they can only be opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household.

*Id.* An individual's Fourth Amendment rights in mailed communication ends, at the earliest, "upon delivery" of the communication to the recipient. *United States v. Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1999).

The Tenth Circuit's decision holds that electronic mail, like physical mail, is an "effect" for Fourth Amendment purposes. 831 F.3d at 1304.[3] The decision also extends Fourth Amendment

---

[3] *See also United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) ("Given the fundamental similarities between email and traditional forms of communication, it would defy common sense to afford emails lesser Fourth Amendment protection."); *United States v. Forrester*, 512 F.3d 500, 511 (9th Cir. 2007) ("E-mail, like physical mail, has . . . a package of content that the sender presumes will be read only by the intended recipient. The privacy interests in these two forms of communication are identical.").

trespass theory to electronic mail. *Id.* at 1308. In doing so, the decision notes that "many courts have already applied the common law's ancient trespass to chattels doctrine to electronic, not just written, communications." *Id.* (citations omitted).

This case is thus an easy application of *Ex parte Jackson* to electronic mail. When Mr. Ackerman sent his email, he retained a Fourth Amendment property interest in the contents of the email until its delivery to the recipient. The email was "fully guarded from examination and inspection" "wherever [it] may be." *Ex parte Jackson*, 96 U.S. at 733. When, prior to its delivery, the government opened the email and examined it, the government conducted a Fourth Amendment search under a traditional trespass theory. *Ackerman*, 831 F.3d at 1308; *see also United States v. Mohamud*, 843 F.3d 420, 442 (9th Cir. 2016) ("until electronic communications reach the recipient, they retain the same level of privacy interest as if they were still in the home"). Because that search was done without a warrant, it violated the Fourth Amendment. *Ex parte Jackson*, 96 U.S. at 733. Suppression is appropriate.

The government offers no meaningful trespass-theory analysis, instead focusing almost exclusively on an expectation-of-privacy-theory analysis. D.E.84 at 7-11. To the extent the government touches on trespass theory, it makes two points, largely contained in footnotes: (1) Mr. Ackerman could not have had a lawful property interest in contraband; and (2) Mr. Ackerman lacked a possessory interest, and thus a property interest, in the sent email at the time the government searched it. *Id.* at 9-10, 10 n.37, 38. Neither point is persuasive.

The first point misunderstands the facts of this case. The government did not conduct a search that could have only disclosed contraband. The Tenth Circuit expressly rejected that theory on appeal. 831 F.3d at 1305-1306. Instead, the government opened Mr. Ackerman's electronic mail, 831 F.3d at 1304 n.6, and, in doing so, "quite easily could have disclosed information previously

unknown to the government besides whether the one attachment contained contraband," *Id.* at 1306.

> Indeed, when NCMEC opened Mr. Ackerman's email it could have learned any number of private and protected facts, for (again) no one before us disputes that an email is a virtual container, capable of storing all sorts of private and personal details, from correspondence to other private (and perfectly legal) images, video or audio files, and beyond. And we know, too, that this particular container did contain three additional attachments, the content of which AOL and NCMEC knew nothing about before NCMEC opened them too. As far as anyone knew at the time, they could have revealed virtually any kind of noncontraband information to the prying eye.

*Id.* (citation omitted).

As the Tenth Circuit explained, "[n]o one in this appeal disputes that an email is a 'paper' or 'effect' for Fourth Amendment purposes, a form of communication capable of storing all sorts of private and personal details, from correspondence to images, video or audio files, and so much more." 831 F.3d at 1304. "The undisputed facts show, too, that NCMEC opened Mr. Ackerman's email, found four attachments, and proceeded to view each of them. And that sort of rummaging through private papers or effects would seem pretty obviously a 'search.'" *Id.*

The Tenth Circuit's decision thus confirms that this case does not involve a search that could have revealed "no information other than the location of" contraband. *Illinois v. Caballes*, 543 U.S. 405, 410 (2005) (cited in the government's footnote 37). It is thus beside the point whether Mr. Ackerman could have had a "lawful property or possessory interest in the four contraband child pornography images themselves." D.E.84 at 10 n.37. Mr. Ackerman had a Fourth Amendment property interest in his own email, whether it contained contraband or not. 831 F.3d at 1305-1306; *United States v. Jeffers*, 342 U.S. 48, 53-54 (1951) (rejecting government's assertion that a search that uncovers contraband is not a Fourth Amendment search); *see also United States v. Jacobsen*, 466 U.S. 109, 114 (1984) (rejecting the argument that a warrantless search of a mailed package could "be

characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered").

The government's second point suggests that Mr. Ackerman lacks standing under a trespass theory "because he neither controlled nor had constructive or actual possession of the email and images at the time of the purported intrusion, when NCMEC reviewed the email and images." D.E.84 at 10 n.38. This argument runs contrary to established precedent in two respects.

First, the government is wrong that an individual does not retain constructive possession over mailed items. *United States v. Medina-Ramos*, 834 F.2d 874, 878 (10th Cir. 1987) (noting that an individual who mails a package containing contraband "would not prevail on an argument that he lacked constructive possession of the package en route and when it reached its destination, even though the defendant did not travel"). The one case the government cites, *United States v. Lopez*, 372 F.3d 1207, 1212 (10th Cir. 2004), had nothing to do with mail or the Fourth Amendment (the case involved a jury instruction on constructive possession in a firearms case).

Second, the government cites no authority for the proposition that Fourth Amendment rights turn on possession alone. Fourth Amendment trespass theory involves *property* rights, not *possessory* rights. *Jones*, 565 U.S. at 405-406. In the context of mail, until it reaches its intended recipient, the Fourth Amendment protects it "wherever it may be." *Ex parte Jackson*, 96 U.S. at 733. Even assuming that the individual who places a letter in the mail loses possession over it, he does not forfeit his Fourth Amendment property interests in its contents. *Id.*[4] So too with electronic mail. 831 F.3d at 1304, 1308; *see also Jones*, 565 U.S. at 403-404 (trespassory search when officers installed an electronic monitoring device on a vehicle parked in a public parking lot, at a time when the

---

[4] *See also Warshak*, 631 F.3d at 285 ("While a letter is in the mail, the police may not intercept it and examine its contents unless they first obtain a warrant based on probable cause. This is true despite the fact that sealed letters are handed over to perhaps dozens of mail carriers, any one of whom could tear open the thin paper envelopes that separate the private words from the world outside.") (citation omitted).

defendant (who did not even own the vehicle) had neither actual nor constructive possession over it).

Still, the government summarily opines that Mr. Ackerman lacked a Fourth Amendment property interest in the email "[w]hen AOL exercised its rights to monitor Ackerman's email, terminated Ackerman's account, generated a report containing the email and embedded images, and turned it over to NCMEC." D.E.84 at 10. But the government never says why this is so. It cannot be because of the private-search doctrine. The Tenth Circuit has already rejected that assertion. 831 F.3d at 1305-1306. Nor could it be because of the third-party doctrine. The government expressly disavows any reliance on that doctrine. D.E.84 at 8-9. The government also does not rely on an abandonment theory. *See, e.g.*, *Abel v. United States*, 362 U.S. 217, 241 (1960) (no standing to challenge search of discarded item). Nor does it claim that Mr. Ackerman somehow consented to the government's search (thus making irrelevant his rights in the property).

The government cannot dispute that it conducted a trespassory search of Mr. Ackerman's email account. 831 F.3d at 1308. Blackletter law also establishes that Mr. Ackerman's property interests in his sent mail would have diminished, at the earliest, upon its delivery to the intended recipient. *Ex parte Jackson*, 96 U.S. at 733. Mr. Ackerman's email never made it to its intended recipient. And while the government is correct that a private party, and not the government, intercepted the email, the government has done nothing to demonstrate why a person loses his property interests in his mail when a private party intercepts it. "[T]he ability of a rogue mail handler to rip open a letter does not make it unreasonable to assume that sealed mail will remain private on its journey across the country." *Warshak*, 631 F.3d at 287. So too with electronic mail. *See id.*

The government also makes no claim that Mr. Ackerman lacked ownership rights in his emails. Service providers like AOL are intermediaries, the "functional equivalent of a post office or a telephone company." *Id.* at 286. When Mr. Ackerman hired AOL to deliver his electronic mail, he

7

did not give AOL ownership rights in that mail. Like physical mail, electronic mail belongs to the customer alone, not the email provider. After all, email is "intimate," *Warshak*, 631 F.3d at 284, and can contain "[t]he sum of an individual's private life," including "a record of all his communications," "a thousand photographs," and materials like "a prescription, a bank statement, a video," *Riley v. California*, 134 S.Ct. 2473, 2489 (2014).[5]

Finally, the government does not suggest that AOL's terms of service provided that AOL, rather than Mr. Ackerman, owned the contents of Mr. Ackerman's email account. Nor could it. The five-page terms of service introduced by the government at the suppression hearing does not provide that AOL owns the content of a private email account. Exh. 1. Just the opposite. The terms of service recognize the customer's ownership rights in the customer's content, as well as AOL's ownership rights in its own content (and trademarks). *Id.* at 2. The terms of service further provide that AOL "may be required by law to release information to a third party about *your* account, including the content of e-mail," and that, if so, it will provide notice to the owner of the account, and the owner agrees "to hold [AOL] harmless for the release of any information." *Id.* at 5 (emphasis added). This language would make no sense if AOL owned the content of the email account.

Nor does the government assert that the terms of service provide that the content of an email account is somehow owned by AOL if AOL terminates the account. *See id.* If that were true, service providers would hold unfair advantage over their customers – continue to pay the provider for its service, or else the provider can take personal communications and do with them what the provider

---

[5] Thus, AOL could not have consented to the warrantless search of Mr. Ackerman's mail. *See, e.g., Stoner v California*, 376 US 483, 489 (1964) (search of hotel room without warrant violated Fourth Amendment, even though one who engages a hotel room gives implied permission to hotel personnel to enter to perform their duties); *Chapman v United States*, 365 US 610, 616-18 (1961) (search of house occupied by tenant violated Fourth Amendment, even though landlord had authority to enter house for some purposes). Again, the government never suggests otherwise.

wishes. But even more so, the terms of service provide that a customer's "sole remedy" in "any dispute with [AOL]," "is to stop using your account and cancel any fee-based services." *Id.* at 5. This includes disputes related to, *inter alia*, a customer's "ability to access or use the Services," and "the amount or type of fees, surcharges, applicable taxes, billing methods, or any change to the fees, applicable taxes, surcharges or billing methods." *Id.* It cannot be that the sole remedy for such disputes is to cancel your service, effectively forfeiting your property rights in the content of your emails.

Instead, a third-party provider's "right to possession hinges on whether the third party created the record" at issue, rather than simply facilitating a transaction between two independent parties. *See In re U.S. for Historical Cell Site Data*, 724 F.3d 600, 611 (5th Cir. 2013). Email providers do not create the contents of emails; they are paid to store and transport the email from one address to the next (a responsibility that has nothing to do with the email's content). The email is the customer's property, not the service provider's property. If it were true that Mr. Ackerman's Fourth Amendment property interest in the email evaporated solely because AOL terminated his account, one would think that the Tenth Circuit would have said so. Instead, absent the now irrelevant third-party doctrine, the Tenth Circuit held, under a Fourth Amendment trespass theory, that the government searched the email. 831 F.3d at 1305-1306, 1308. The government has done nothing on remand to upset that holding.

**B. Under an expectation-of-privacy theory, the government searched Mr. Ackerman's email.**

Alternatively, even if this Court finds that Mr. Ackerman lacked a Fourth Amendment property interest in his email, the government still conducted a Fourth Amendment search under an expectation-of-privacy theory. *See, e.g., Warden v. Hayden*, 387 U.S. 294, 305-306 (1967) ("we have given recognition to the interest in privacy despite the complete absence of a property claim by suppressing the very items which at common law could be seized with impunity: stolen goods,

instrumentalities, and contraband") (citations omitted). The record establishes that Mr. Ackerman had a subjective expectation of privacy in his email, and that expectation of privacy was objectively reasonable.

### 1. Mr. Ackerman had a subjective expectation of privacy in his emails.

Under a privacy-rights theory, an individual must have a subjective expectation of privacy in an item searched in order to challenge the constitutionality of that search. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). As the government notes, D.E.84 at 5-6, it is Mr. Ackerman's burden to prove that he had a subjective expectation of privacy in his searched emails. *United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995).

Mr. Ackerman has met his burden. At the suppression hearing, Mr. Ackerman testified that he expected that his private emails would remain private. D.E.62 at 155. He further testified that he would not have used AOL had he known that his information would not remain private. *Id.* ("if you don't mind me saying so, I don't think anybody would"). His conduct was consistent with this expectation. Mr. Ackerman sent an email from his private email account to one other person's private email account. D.E.45 at 2. He did not post the email to a public site, send the email to hundreds of people, or do anything else that would undermine his stated expectation of privacy in the email. His testimony was clear and uncontroverted, and his expectation of privacy in the email is inherent in his account of the situation. *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 374 (2009) ("Savana's subjective expectation of privacy against such a search is inherent in her account of it"). This Court should credit his testimony and find that Mr. Ackerman had a reasonable expectation of privacy in his emails (whenever they were accessed).

The government does not ask this Court to discredit Mr. Ackerman's testimony. *See* D.E.84 at 6-7. The government does not suggest that Mr. Ackerman lied under oath or otherwise misled this Court. *Id.* Nor does it cite precedent for the proposition that Mr. Ackerman's uncontradicted

testimony was insufficient to establish a subjective expectation of privacy in his emails. *Id.* Instead, the government asserts that this Court "may find" that Mr. Ackerman failed to meet his evidentiary burden because, according to the government, Mr. Ackerman "failed to present any evidence that he maintained an actual, subjective expectation of privacy in the email *after AOL terminated access to his account.*" *Id.* (emphasis in original).

But Mr. Ackerman's testimony was not limited to a certain time frame. He did not testify that he thought his emails were private only until his account was terminated. Instead, he testified that he thought that "any information" he sent to others via his AOL email account "was private information," and that he would not have used AOL if he knew otherwise. D.E.62 at 155. It is beyond cavil, quite frankly, to think that Mr. Ackerman would have sent child pornography via his AOL email account if he did not think that the emails sent from that account would remain private.

The government also implies that Mr. Ackerman shared his email account with his wife. D.E.84 at 6. This is untrue. Mrs. Ackerman's wife testified that they had different email accounts. D.E.62 at 149-150. And while the AOL account was in Mr. Ackerman's wife's name, this fact does nothing to undermine Mr. Ackerman's subjective expectation of privacy in his own email account. There is no evidence that Mrs. Ackerman had access to Mr. Ackerman's email account.

Mr. Ackerman subjectively expected his emails to remain private. Thus, this Court should find that he had a subjective expectation of privacy in his emails even after his account was terminated.

### 2. Mr. Ackerman's expectation of privacy was objectively reasonable.

Mr. Ackerman's expectation of privacy in his emails must have also been objectively reasonable. *Smith*, 442 U.S. at 740. It was. The government does not dispute that Mr. Ackerman had a reasonable expectation of privacy in his email account. D.E.84 at 2 n.2, 8-9 (citing *Warshak*, 631 F.2d at 287-288). Instead, the government asserts that Mr. Ackerman's expectation of privacy ended when "AOL terminated his account," and because the government searched the email after AOL

terminated the account, the search was no search at all. *Id.* at 8-11. The government likens this scenario to four "hotel search cases," and a fifth case involving the search of a rented storage unit (all from the Tenth Circuit). *Id.* at 7-8, 10. From these cases, the government divines a rule that an individual loses his expectation of privacy in otherwise protected items when a third party provider "affirmatively exercise[s] its rights to control" the items, and it does so to the exclusion of the individual. *Id.* at 11.

This Court should reject the government's rule for two reasons. First, the rule does not exist. The cases cited by the government do not support it. And second, the government's proposed rule would be an unwarranted extension of existing precedent.

> **1. The government's "hotel search cases" do not create a rule forfeiting privacy rights upon termination of services by third-party providers.**

The government cites four "hotel search cases" for its purported third-party-termination rule: *United States v. Croft*, 429 F.2d 884 (10th Cir. 1970); *United States v. Conway*, 73 F.3d 975 (10th Cir. 1995); *United States v. Gordon*, 168 F.3d 1222 (10th Cir. 1999); and *United States v. Creighton*, 639 F.3d 1281 (10th Cir. 2011). None of the cases come close to establishing the rule invoked by the government.

In *Croft*, the defendant rented a hotel room for two days. 429 F.2d at 886. When this rental period expired, officers, with permission of the hotel, searched the room. *Id.* The Tenth Circuit upheld the search because it occurred after the rental period expired, at a time when the room was not rented to the defendant. *Id.* at 887. "Since after the rental period *expires* a guest has no right to privacy, there can be no invasion thereof." *Id.* (emphasis added).

*Croft* turns on the expiration of a rental agreement, not the agreement's termination by a third-party provider (in that case, the hotel). Had the Ackermans let their AOL account expire, the case might have some relevance (although we have difficulty conceiving it). But because the case does not involve termination by a third party, the case does not support the government's third-party-

termination rule.[6]

The defendant in *Conway* did not rent the hotel room at issue. 73 F.3d at 978. He was in the room as a guest, and he was allowed in the room for limited circumstances ("to engage in sexual relations with a female friend"). *Id.* The issue in the case had nothing to do with the actions of a third party or the termination of an agreement, but rather the defendant's "guest status." *Id.* at 979-980. The case is inapposite.

Similarly, *Gordon* turned on the commercial-guest status of the defendant in that case. 168 F.3d at 1226-1227. Because the defendant was in the hotel room for a short time in order to purchase drugs, he could not challenge the search of the hotel room. *Id.* The case is also inapposite. Moreover, in *Gordon*, after entry into the room, officers obtained a warrant to search it, *id.* at 1224, which is what should have happened in this case. For that additional reason, *Gordon* could not plausibly be read to support the government's position in this case.

*Creighton* reiterates *Croft*'s rule that an individual's expectation of privacy in a hotel room "is lost when the rental period for the room *expires*." 639 F.3d at 1286 (emphasis added). In that case, the defendant failed to pay his rent, after being asked to do so repeatedly by hotel management. *Id.* at 1286-1287. Officers evicted the occupants of the room because of the unpaid rent. *Id.* at 1287. The facts of this case are not remotely similar to the facts in *Creighton*. Mr. Ackerman was not evicted from his email account by law enforcement because he failed to pay for it (after having been

---

[6] Likely to his detriment, the defendant in *Croft* did not advance a trespass-theory basis for Fourth Amendment protection. The Kansas statutory scheme cited in *Croft* makes clear that an individual who rents a hotel room, and leaves items in the room, does not forfeit his property rights in those items. *See, e.g.*, Kan. Stat. 36-201 *et seq.* Instead, the hotel owner has a lien on any items, but only if the individual has unpaid fees, and only to cover those fees. Indeed, the Second Circuit case cited in *Croft* involved a defendant who failed to pay his rent. *United States v. Cowan*, 396 F.2d 83, 87 (2d Cir. 1968).

Common sense confirms this point. When we leave items in a hotel room, and we have paid the hotel for our stay, the hotel does not get to keep our items. Here, even engaging the government's argument, there is no indication that the Ackermans owed AOL money. Nor do we know of any statutory scheme that allows email providers to sell private emails (or whatever else one might find in an email account) to recoup service fees. *Croft* is doubly irrelevant.

expressly asked to do so). As importantly, the defendant in *Creighton* challenged the warrantless *entry* into the hotel room, not the *search* of the room. *Id.* at 1285. The government did much more than "enter" Mr. Ackerman's email account; it conducted a warrantless search of his email.

The only other case cited by the government – *United States v. Johnson*, 584 F.3d 995 (10th Cir. 2009) – is even more irrelevant than the previous four. The case involved a warrantless search of a storage locker the defendant's girlfriend rented with a stolen credit card. *Id.* at 996. The Tenth Circuit held that the defendant could not challenge the search of the storage locker because it was fraudulently rented in another person's name. *Id.* That is a sensible rule, and one with no relevance to this case. Mr. Ackerman did not fraudulently obtain anything from AOL (or anyone else). And, as the government recognizes, D.E.84 at 8, the third-party provider in *Creighton* had not terminated the contract at the time officers searched the storage unit, so the case cannot possibly support a third-party-termination rule.[7]

In support of its third-party-termination rule, the government cites no case involving third-party termination. That is sufficient reason enough for this Court to reject the argument. *See, e.g., Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429, 436 (2016) (declining to "lay out a test . . . in the absence of adequate briefing by the parties"). In the end, a person should not lose his legitimate expectation of privacy in his personal effects sent by a third-party provider because the third-party provider unilaterally, and without notice, cancels its service. Such a rule is not one that society is prepared to recognize as reasonable.

### 2. The government's proposed rule is an unwarranted extension of existing precedent.

On a number of occasions, the Supreme Court has addressed Fourth Amendment protections in

---

[7] The cases cited by the government also involve rental agreements. This case does not. Unlike a hotel room (or storage unit), which is rented serially to countless individuals, an email account is created for one person. There is no risk that personal mail in an email account will be found by a subsequent renter.

the context of third-party providers. But absent the private-search and third-party doctrines, doctrines which are not at issue on remand in this case, at no point has the Court held that actions taken unilaterally by a third-party provider forfeit an individual's expectation of privacy in constitutionally protected items. And again, the government has pointed to no case that actually supports its third-party-termination rule.

In *Katz*, 389 U.S. at 353, for instance, the Court held that the defendant in that case had a reasonable expectation of privacy in the content of his telephone conversations made from a public phone booth. This was so, as the Sixth Circuit later explained, "notwithstanding the fact that the telephone company had the capacity to monitor and record the calls." *Warshak*, 631 F.3d at 285. "In the eyes of the Court, the caller was surely entitled to assume that the words he uttered into the mouthpiece would not be broadcast [by the third-party provider] to the world." *Id.* (quotations and alterations omitted). At no point in *Katz* did the Court even hint that the defendant's use of a third-party provider to transmit his private communications somehow lessened his Fourth Amendment rights in those communications.

Then in *Jacobsen*, a case also involving the interception of mail by a private carrier "pursuant to a written company policy regarding insurance claims," the Court made clear that Fourth Amendment privacy rights do not dissipate any time a private carrier intercepts a package. 466 U.S. at 111, 114-115. Instead, the Court recognized that "[l]etters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable." *Id.* at 114. The Court continued:

> Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package. Such a warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered.

*Id.*

The question in such circumstances is whether the governmental search "exceeded the scope of the private search." *Id.* at 115. "[T]he legality of the governmental search must be tested by the scope of the antecedent private search." *Id.* at 116.

> This standard follows from the analysis applicable when private parties reveal other kinds of private information to the authorities. It is well-settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information.

Id. at 117. But the Fourth Amendment still protects "information with respect to which the expectation of privacy has not already been frustrated." *Id.*

This is the proper test to employ in this case. And the government has already lost this case under *Jacobsen*'s test. *Ackerman*, 831 F.3d at 1305-1306. For that reason, the government asks this Court to supplement *Jacobsen* with a termination test; the test, according to the government, is not whether the governmental search exceeded the scope of the private search, but whether the third-party provider terminated the service prior to the governmental search. D.E.84 at 8-11.

But the government never sufficiently explains the significance of third-party termination, particularly in a case involving sent mail. It cannot be that the individual loses "access or control" of the email. D.E.84 at 9. *Ex parte Jackson* says otherwise. 96 U.S. at 733. Nor can it be that the third-party provider (AOL) took "specific actions" with respect to the email. D.E.84 at 9. *Jacobsen* makes clear that the inquiry focuses on *governmental* action, not *private* action, and whether the government exceeded the scope of the private search. 466 U.S. at 115-117. Nor can it be that AOL provided the email to the government. D.E.84 at 9. *Jacobsen* rejects that argument as well. 466 U.S. at 114; *see also Walter v. United States*, 447 U.S. 649, 651 (1980) (holding unconstitutional the search of a mailed package intercepted and turned over to law enforcement, who searched the package without a warrant).

Beyond this, the government makes no argument that Mr. Ackerman, or any other AOL user,

16

would have understood AOL's terms of service as authorizing the dissemination of private emails to the government or anyone else (let alone the monitoring or inspecting of such emails) upon termination of his account. Other than general testimony that users are sent the terms of service electronically, the government introduced no evidence that Mr. Ackerman actually received, let alone read, the terms of service.[8] And even if we assume that he did, the terms of service say nothing of monitoring emails, inspecting emails, or disseminating emails to others upon termination of an account (or prior to termination, for that matter). Exh. 1. This is not a case like *United States v. Young*, 350 F.3d 1302, 1304, 1307 (11th Cir. 2003), where a user agreement provided that Federal Express could inspect and search a package. Indeed, the government has abandoned its reliance on *Young* (and similar cases).

Finally, the government's position cannot be squared with the Supreme Court's decision in *Riley*. In *Riley*, the Court held that warrantless searches of cell phones were unconstitutional absent a valid exception to the warrant requirement. 134 S.Ct. at 2485. The Court spoke at length about the amount and type of information found on cell phones, at one point noting that "[m]ost people cannot lug around every piece of mail they have received for the past several months." *Id.* at 2489. The Court found that it "generally makes no difference" if information on the cell phone is stored on the device or on remote servers. *Id.* at 2491. The Court made clear that technology does not diminish our right to privacy in our personal effects. *Id.* at 2494-2495. But under the government's theory, in order to search a cell phone, law enforcement need only wait out the termination of a third-party contract. As the contract goes, so goes our privacy rights.

At the end of the suppression hearing, the government attempted to make this argument, but

---

[8] As we understand it, an individual would have been asked to accept the terms of service, which the individual would do by clicking on a box with something like "accept," in it. We would also assume that AOL would keep an electronic copy of such acceptances (at a minimum), particularly in light of the contractual terms contained within the terms of service. The government introduced no evidence confirming that Mr. Ackerman ever accepted the terms of service introduced by the government at the suppression hearing.

was interrupted by this Court:

> I have real trouble with that portion of your argument, Mr. Hart, because once the
> defendant placed the e-mail into the stream of Internet commerce, he had done all
> he could do with respect to that Internet, and the fact that subsequent intervening
> events terminated his ability to have access to that – to have the same access to that
> stream of commerce doesn't seem to me to be relevant to what his expectations were
> when he placed that e-mail in the stream of commerce; that is to say I think his
> expectations of privacy have to be measured at the point he took the last actions that
> he did or could take with respect to that.

D.E.62 at 209. This Court continued, "if he had a reasonable expectation of privacy when he put it

in the course of commerce, just because the Government intervenes later doesn't mean that he loses

the expectation of privacy then such that Fourth Amendment rights, which were previously

implicated, no longer are." *Id.* at 210. We agree.

The government's rule is as unwise as it is untenable. This Court should reject it. Mr. Ackerman

had a reasonable expectation of privacy in his sent email, whether AOL terminated his account or

not. No doubt the government could have lawfully seized the email "to prevent loss or destruction

of suspected contraband," but "the Fourth Amendment require[d] that [it] obtain a warrant before

examining the contents of [the email]." *Jacobsen*, 466 U.S. at 114. This Court should suppress.

## III. Special-needs balancing does not apply to this investigatory search of an item fully protected the Fourth Amendment.

For the first time, the government asserts that this case is controlled by a special-needs balancing

test. D.E.84 at 11-13. Assuming this Court entertains the claim, it should reject it as without merit.

Ordinarily, a search is reasonable under the Fourth Amendment only when conducted pursuant

to a warrant supported by probable cause, *Veronia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995),

or, at a minimum, based upon "individualized suspicion of wrongdoing," *Washington v. Wyandotte*

*County*, 847 F.3d 1192 (10th Cir. 2017); *see also Chandler v. Miller*, 520 U.S. 305, 308 (1997) (the Fourth

Amendment "generally bars officials from undertaking a search or seizure absent individualized

suspicion"). Some warrantless, suspicionless searches are upheld under a special-needs balancing test, however, if the government's interests outweigh the individual's privacy interests. *Veronia*, 515 U.S. at 653.

As the Tenth Circuit recently confirmed, special-needs balancing applies only when "the government asserts a 'special need' beyond ordinary crime detection." *Washington*, 847 F.3d at 1198. The government does not assert such a special need here. Instead, it summarily states that Mr. Ackerman had "only a diminished expectation of privacy" in his emails. D.E.84 at 12. From what we can tell, this is so, according to the government, because Mr. Ackerman used a third-party provider to send his email. But that cannot possibly rise to the level of a special need. If so, the Court would not have suppressed evidence in *Katz*, 389 U.S. at 351, or *Walter*. 447 U.S. at 658. Nor, under the government's theory, would the Supreme Court have employed the private-search doctrine in *Jacobsen*; instead, it would have balanced the interests to determine whether to suppress the evidence. *See* 466 U.S. at 114-117.

The textbook examples of "diminished expectations of privacy" involve prisoners, *Bell v. Wolfish*, 441 U.S. 520, 557 (1979), parolees, *Samson v. California*, 547 U.S. 843, 852 (2006), probationers, *United States v. Knights*, 534 U.S. 112, 122 (2001), arrestees, *Maryland v. King*, 133 S.Ct. 1958, 1969 (2013), school children, *Veronia*, 515 U.S. at 658, and railroad employees (in the context of drug tests), *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 628 (1989). Mr. Ackerman, like most of the other hundreds of millions of people who use email, was none of these things. Not even close. Nor could the government seriously contend that Mr. Ackerman's electronic mail carried a diminished expectation of privacy. *See, e.g.*, *United States v. Van Leeuwen*, 397 U.S. 249, 251-252 (1970) (explaining the importance of mail, and emphasizing its constitutional protections). Indeed, the search in this case was a criminal investigatory search. For that reason alone, special needs balancing does not apply. *Washington*, 847 F.3d at 1198.

The government also claims that special-needs balancing applies because, in light of AOL's actions, the intrusion was "minimal." D.E.84 at 12. This argument also lacks merit in light of *Walter* and *Jacobsen*. Either the private-search doctrine applies or not. And here, the Tenth Circuit has already held that it does not. *Ackerman*, 831 F.3d at 1305-1306. Nor is it plausible that the warrantless search in this case was reasonable because law enforcement suspected child pornography. D.E.84 at 12. "There is no precedent for the proposition that whether a search has occurred depends on the nature of the crime being investigated." *Jones*, 565 U.S. at 412. This was an investigatory search of an item protected by the core of the Fourth Amendment. The government's special-needs argument lacks merit.

## IV. The good-faith exception has no application.

The government raised the good-faith exception initially and on appeal. D.E.14 at 28-30; Gov't Br. 43. Although this Court did not address the good-faith exception, the Tenth Circuit did, rejecting the argument because the government insufficiently briefed it. 831 F.3d at 1308. Nonetheless, the government argues good faith on remand. D.E.84 at 13-17. This Court should reject the argument for two reasons. First, the government's good-faith argument is precluded by law-of-the-case principles. And second, on the merits, the good-faith exception has no application to this warrantless investigatory search.

### A. Law-of-the-case principles preclude application of the good-faith exception.

Res judicata generally holds "that an issue once determined by a competent court is conclusive." *Arizona v. California*, 460 U.S. 605, 619 (1983), decision supplemented, 466 U.S. 144 (1984). The doctrine precludes "parties from contesting matters that they have had a full and fair opportunity to litigate." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Although primarily a civil concept, it applies with as much force in the criminal context. *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 359 n.2 (2016).

The doctrine is aimed at providing preclusive effect to issues and claims decided in prior litigation. *See, e.g., id.* at 356-357.

Law-of-the-case principles work similarly with respect to issues and claims raised in ongoing litigation. *See Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979). "As most commonly defined, the [law-of-the-case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. at 618; *see also United States v. Webb*, 98 F.3d 585, 587 (10th Cir. 1996) ("Under the law of the case doctrine, findings made at one point during litigation become the law of the case for subsequent stages of that same litigation."). "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). Thus, "no question, once considered and decided by [a higher] court, can be re-examined at any subsequent stage of the same case." *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 259 (1895); *see also Ute Indian Tribe v. Utah*, 114 F.3d 1513, 1520-1521 (10th Cir. 1997) ("[O]nce a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case.").

"The doctrine has particular relevance following a remand order issued by an appellate court. When a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal." *Huffman v. Saul Holdings Ltd.*, 262 F.3d 1128, 1132 (10th Cir. 2001) (alteration and quotation omitted). "The law of the case doctrine is intended to prevent continued re-argument of issues already decided." *Id.* (quotation omitted). Thus, on remand, a lower court can consider only "matters left open by the mandate" of the higher court. *Quern*, 440 U.S. at 347 n.18. This "mandate rule" is an "important corollary" to the law-of-the-case doctrine. *Ute Indian Tribe*, 114 F.3d at 1520-1521.

21

Neither the law-of-the-case doctrine nor the mandate rule permit lower courts to revisit issues already decided by the Tenth Circuit. *Huffman*, 262 F.3d at 1132-1133; *Procter & Gamble v. Haugen*, 317 F.3d 1121, 1132 (10th Cir. 2003); *United States v. Triangle Oil*, 277 F.3d 1251, 1259 (10th Cir. 2002) ("Courts use law of the case to promote decisional finality and rely on it to prevent relitigation of an issue already decided in prior proceedings of the same case."). A district court is not free to pass on issues either expressly or implicitly disposed of on appeal. *Procter & Gamble v. Haugen*, 317 F.3d at 1126.

On appeal, the government asked the Tenth Circuit to affirm on the basis of the good-faith exception. Gov't Br. at 43. The Tenth Circuit addressed the issue and disposed of it. 831 F.3d at 1308. Because the good-faith issue was expressly disposed of on appeal, the good-faith exception is no longer available to the government. *Procter & Gamble*, 317 F.3d at 1126; *see also United States v. Husband*, 312 F.3d 247, 251 (7th Cir. 2002) (in the Fourth Amendment context, holding that "any issue conclusively decided by this court on the first appeal is not remanded"). This Court should not consider it.

**B.  The good-faith exception should not save this warrantless investigatory search.**

Alternatively, if this Court considers the merits of the government's good-faith argument, the argument should be rejected. As originally conceived, the good-faith exception excused unconstitutional searches conducted pursuant to search warrants. *United States v. Leon*, 468 U.S. 897, 922 (1984). The Supreme Court created the exception to cover instances where an officer reasonably relied on a judge's misguided probable-cause determination. *Id.* But this case involves a warrantless search. Thus, this case falls outside the original basis for the good-faith exception.

Since *Leon*, the Court has extended the good-faith exception to warrantless searches in three different contexts. First, if an officer relies on another person's negligent mistake, exclusion is

typically not an appropriate remedy. *Herring v. United States*, 555 U.S. 135, 147-148 (2009). The government does not rely on *Herring*. Nor would the underlying facts support reliance on *Herring*.

Second, warrantless searches conducted in reliance on binding appellate precedent are not subject to the exclusionary rule. *Davis v. United States*, 131 S.Ct. 2419, 2423-2424 (2011). The government does not rely on *Davis* either. Nor could it. There is no binding precedent from the Tenth Circuit (or any other) upholding the actions at issue here.

Third, the good-faith exception applies when an officer relies on a statute that (unconstitutionally) authorizes warrantless administrative searches. *Illinois v. Krull*, 480 U.S. 340, 359 (1987). This is the basis the government invokes to excuse the unconstitutional search in this case. D.E.84 at 14-17. For three reasons, this Court should decline the offer.

First, unlike the statutory scheme at issue here, the statute at issue in *Krull* expressly authorized the warrantless searches at issue. 480 U.S. at 343. Under provisions of Illinois' Vehicle Code, state officials were authorized to "inspect" the records of businesses dealing in automotive parts, as well as to "examin[e] . . . the premises" of such businesses. *Id.* In contrast, the government can point to no provision within the statutory scheme creating NCMEC that authorizes warrantless searches of protected communications. The two provisions cited by the Tenth Circuit undoubtedly allow NCMEC to possess contraband (a fact important to its governmental-entity status), but neither authorizes warrantless searches of private communications. *See* 18 U.S.C. § 2258A(a), (b)(4). Nor did the Tenth Circuit otherwise suggest that the statutory scheme authorized warrantless searches of private communications. Acknowledging that NCMEC may "receive contraband" and "review its contents intentionally" is not an acknowledgment that NCMEC can conduct warrantless searches. 831 F.3d at 1297. Unlike the statutory scheme in *Krull*, the statutory scheme at issue here says nothing of inspections or examinations of protected communications.

Second, the statutory scheme at issue in *Krull* was an administrative scheme. 480 U.S. at 342. It was aimed at "regulating the sale of motor vehicles and vehicular parts." *Id.* In contrast, this case involves an investigatory scheme. 831 F.3d at 1300. Indeed, the Tenth Circuit has already rejected the argument that the statutes at issue here are similar to "routine federal grant-making or state licensing statutes." *Id.* Because *Krull* involved a state licensing scheme, 480 U.S. at 342-343, the Tenth Circuit has already effectively rejected the analogy advanced by the government on remand.[9]

Finally, the government's premise – that government agents may violate the Fourth Amendment until told not to do so, D.E.84 at 14-15 – is directly contrary to controlling law. The exclusionary rule does not apply when government agents "conduct a search in compliance with binding precedent that is later overruled." *Davis*, 564 U.S. at 231. But here, the government, without citation, asks this Court to eschew the exclusionary rule because of a lack of precedent, not because officers relied on binding precedent. Unlike the latter situation, the search here was the fault of the government, not the fault of appellate judges (or anyone else). *Id.* at 241.

Nor is it tenable to assert, as the government does, D.E.84 at 14-15, that the government should not have known that NCMEC was a governmental entity. The Tenth Circuit had no problem declaring NCMEC a government entity. 831 F.3d at 1295-1300. Indeed, the government could barely muster a reply to the argument. *Id.* at 1298. It cannot be that the application of the Fourth Amendment's exclusionary rule turns on whether the government invokes an ostrich-like head-in-the-sand strategy with respect to entities like NCMEC. If that were the law, it would take little imagination for the government to avoid suppression, particularly in the context of emerging technologies.[10]

---

[9] This fact undermines the government's reliance on the district court's decision in *United States v. Keith*, 980 F.Supp.2d 33, 45-46 (D. Mass. 2013). The district court in *Keith* found the statutory scheme at issue here "similar" to the scheme in *Krull*. *Id.* at 46. But the Tenth Circuit (rightfully) noted otherwise. 831 F.3d at 1300
[10] In a footnote, the government summarily suggests that suppression of the email would not result in suppression of the materials found at Mr. Ackerman's residence. D.E.84 at 14 n.45. This Court should not

In the end, the application of the exclusionary rule to this case will work a needed deterrent effect on governmental conduct. It will reaffirm the centrality of the warrant requirement to warrantless investigatory searches. And it will remind the government that it cannot avoid the results of constitutional overreach by delegating duties to governmental entities it later argues are not part of the government. Suppression is warranted.

<div style="margin-left: 50%;">

Respectfully submitted,

s/ Melody Brannon
MELODY BRANNON # ADD
Federal Public Defender


s/ Daniel T. Hansmeier
DANIEL T. HANSMEIER #IL6288086
Appellate Chief
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, KS 66101
Telephone: 913-551-6712
Fax: 913-551-6562
daniel_hansmeier@fd.org

</div>

---

consider this unsupported argument. *See, e.g., MacArthur v. San Juan Cnty.*, 495 F.3d 1157, 1160-61 (10th Cir. 2007) ("'[M]ere conclusory allegations with no citations to the record or any legal authority for support' does not constitute adequate briefing."); *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005) ("we cannot . . . craft[] arguments and perform[] the necessary legal research" for a party). Moreover, the materials found at Mr. Ackerman's residence are undoubtedly fruits of the unlawful search at issue here. Without the initial intrusion, the government would have never searched Mr. Ackerman's residence. The government advances no argument to the contrary.

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2017, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Jason Hart
Assistant United States Attorney
Jason.hart2@usdoj.gov

s/ Daniel T. Hansmeier
DANIEL T. HANSMEIER #IL6288086
Appellate Chief
Assistant Federal Public Defender
500 State Avenue, Room 201
Kansas City, KS 66101
Telephone: 913-551-6712
Fax: 913-551-6562
daniel_hansmeier@fd.org