**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

_____

UNITED STATES OF AMERICA,                )
                                         )
          Plaintiff,                     )
                                         )
                                         )  Case No. 13-cr-10176-EFM
          v.                             )
                                         )
WALTER ACKERMAN,                         )
                                         )
          Defendant.                     )
_____ )

BRIEF *AMICUS CURIAE* OF
UNITED STATES JUSTICE FOUNDATION,
DOWNSIZEDC.ORG, DOWNSIZE DC FOUNDATION,
GUN OWNERS FOUNDATION, GUN OWNERS OF AMERICA, INC., AND
CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND,
IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS (DOC. 13)

Robert J. Olson                     Joseph W. Miller (Kansas Bar No. 20771)
Herbert W. Titus                    United States Justice Foundation
William J. Olson                    1532 S. 1400 Road
Jeremiah L. Morgan                  Council Grove, KS  66846
William J. Olson, P.C.              (540) 751-8559
370 Maple Ave. W., Ste. 4          (888) 421-8803 (fax)
Vienna, VA  22180-5615             miller@kansaslaw.us, joe@usjfmail.net
(703) 356-5070

Mark Fitzgibbons
9625 Surveyor Court
Suite 400                           Counsel for *Amicus Curiae*
Manassas, VA  20110                 Dated:  April 10, 2017

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTEREST OF THE *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    The Tenth Circuit Provided the Guidelines to Resolve this Case, Yet the
      Government Failed to Address Them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.   Under United States v. Jones, NCMEC's Opening and Viewing Ackerman's
      Email and Attachments Was an Unreasonable Search . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    The Katz Privacy Test is Secondary to the Jones Property Principle . . . . . . . . . . . 7

      B.    The Jones Property Test Applies Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    The Tenth Circuit Found that the NCMEC Search Violated Ackerman's
            Fourth Amendment Property Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      D.    NCMEC's Search of Ackerman's Email and Attachments Trespassed upon
            His Property Rights under his AOL Terms of Service Contract . . . . . . . . . . . . . 11

III.  Ackerman Clearly Had a Protected Fourth Amendment Privacy Interest
      in His Email . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    Ackerman Had a Subjective Expectation of Privacy in His Email . . . . . . . . . . . 13

      B.    Believing One's Email to be Private Is Objectively Reasonable . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ii

# TABLE OF AUTHORITIES

Page

**CONSTITUTION**

First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, *passim*

**STATUTES**

18 U.S.C. § 2258A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**CASES**

District of Columbia v. Heller, 354 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

Florida v. Jardines, 133 S.Ct. 1409 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Katz v. United States, 389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 11

Riley v. California, 134 S.Ct. 2473 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Smith v. Maryland, 442 U.S. 735 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Jacobson, 466 U.S. 109 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Jones, 132 S.Ct. 945 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**MISCELLANEOUS**

W. Blackstone, Commentaries on the Laws of England (U. Chi. Facsimile ed. 1766) . . . . . . . . 12

J. Cribbet, Principles of the Law of Property (Found. Press 1975) . . . . . . . . . . . . . . . . . . . . 12

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici curiae* United States Justice Foundation, Downsize DC Foundation, DownsizeDC.org, Gun Owners Foundation, Gun Owners of America, Inc., and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal income taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code.

Each *amici* organization is dedicated, *inter alia*, to the correct construction, interpretation, and application of the law. Central to that endeavor are efforts to protect the "unalienable Rights" recognized in and protected by the Bill of Rights. The instant case raises critical, contemporary questions regarding application of the Fourth Amendment to private digital communications (specifically, emails and email attachments). Importantly, the Tenth Circuit expressly remanded the case to the district court to consider those questions in accordance with the textual and historic property basis of the Fourth Amendment recently reestablished by United States v. Jones, 132 S.Ct. 945 (2012) — a case in which all of these *amici* participated by filing *amicus* briefs at both the petition and the merits stage.[2] The property question posed here is whether the government's search of one's email for the purpose of obtaining information about private communication constitutes a physical intrusion (a trespass) on a constitutionally protected person, house, paper, or effect, thereby requiring a warrant.

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] *See* Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Respondent (merits) (Oct. 3, 2011), http://www.lawandfreedom.com/site/constitutional/USvJones_Amicus_Merits.pdf. *See also* Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.* in Support of Neither Party (petition) (May 16, 2011), http://www.lawandfreedom.com/site/constitutional/USvJones_amicus.pdf.

It is an unfortunate truth that the scope of Fourth Amendment rights is often defined in cases involving the commission of serious crimes. For example, United States v. Jones involved drug-related crimes. Nevertheless, these *amici curiae* are committed to protecting the constitutional rights of all against a government that operates in an increasingly intrusive and lawless fashion, and to stand by those constitutional protections irrespective of the nature of the underlying criminal charge. Here, the outer bounds of that principle are being tested, as these *amici* find those who trade in child pornography to be absolutely reprehensible. But allowing Defendant's heinous acts to excuse a warrantless search of private email communications would do violence to the Fourth Amendment protections which must be available to all Americans.[3] In short, although Ackerman himself is an undeserving person, the government's surveillance of private email in this case provides the Court with an important opportunity to apply profound Fourth Amendment principles to protect Americans against unconstitutional searches and seizures, necessitating the filing of this *amicus curiae* brief.

## STATEMENT OF THE CASE

On April 22, 2013, Walter Ackerman attempted to send an email containing four apparent child pornography images. U.S. v. Ackerman, 2014 U.S. Dist. LEXIS 89243, *8 (D. Kan. 2014). AOL, Ackerman's Internet Service Provider ("ISP"), apparently employs an Orwellian surveillance program to monitor its clients' communications. When Ackerman clicked "send" on his email, AOL first intercepted that email and scanned its attachments, one of which was

---

[3] The Fourth Amendment reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." As the Supreme Court stated in District of Columbia v. Heller, 354 U.S. 570 (2008), in all seven "provisions of the Constitution that mention "the people," the term unambiguously refers to **all** members of the political community, not an unspecified subset." *Id*. at 580 (emphasis added).

flagged as possibly[4] containing "identified" child pornography.[5]  U.S. v. Ackerman, 831 F.3d 1292, 1294 (8th Cir. 2016).  AOL suspended Ackerman's Internet service, and then forwarded Ackerman's email to the National Center for Missing and Exploited Children ("NCMEC").  Id.  NCMEC technically may be a "nonprofit" corporation, but it enjoys "law enforcement powers [well] beyond those enjoyed by private citizens" (831 F.3d at 1296), receives most of its funding from the federal government (2014 U.S. Dist. LEXIS 89243, *6), and essentially functions as an arm of federal law enforcement (see 831 F.3d at 1297-98).[6]

　　　　When NCMEC received AOL's report, an NCMEC employee opened Ackerman's email and all four attachments to determine if they, in fact, "appeared to be" child pornography, and if verified to be such, to alert law enforcement.  831 F.3d at 1294.  One month later, law enforcement obtained a warrant to search Ackerman's home.  2014 U.S. Dist. LEXIS 89243, *10.  Ackerman was charged with possession and distribution of child pornography and, after the federal district court denied his motion to suppress the evidence, Ackerman pled guilty, reserving

---

[4]  This is an important point.  The AOL hash value search of Ackerman's attachment led only to a suspicion that it was child pornography.  Even the AOL witness made sure to point out that it was only "[a]lleged child pornography."  Tr. at 84, l. 4.

[5]  AOL maintains a database of "hash values," which are "string[s] of characters" that are unique to each picture — essentially, the picture's digital fingerprint.  831 F.3d at 1294.

[6]  Federal law requires ISPs to report to NCMEC any child pornography concerning which it "obtains actual knowledge."  18 U.S.C. § 2258A(a).  It is debatable whether a "hash value" match constitutes "actual knowledge," as opposed to mere suspicion, and thus debatable whether AOL was actually required to report Ackerman's email.  Federal law certainly does not require ISPs to monitor their clients' emails to uncover child pornography — and, indeed, expressly states that ISPs are not required to monitor their users.  18 U.S.C. § 2258A(f).  Rather, AOL takes it upon itself to monitor communications that cross its servers.

his right to appeal the constitutionality of the search of his email and attachments.  831 F.3d at 1294.

On appeal, the Tenth Circuit held that (i) the NCMEC was acting as an arm of government when it opened the email attachment (*id*. at 1298), (ii) noted that the NCMEC "review" of Ackerman's email almost certainly was a Fourth Amendment search (*id*. at 1304), (iii) found that it was highly likely that Ackerman had a reasonable expectation of privacy in his email (*id*. at 1306), and (iv) also opined that Ackerman may raise a successful Fourth Amendment property claim under U.S. v. Jones, 132 S.Ct. 945 (2012).  831 F.3d at 1307-08.  In response to these concerns expressed by the Tenth Circuit, these *amici* address two of the several questions before this Court on remand:

> 1. Did Ackerman have a Fourth Amendment protected property interest in his email and attachments which was unconstitutionally invaded by the government?  *See* Section II, *infra*.

> 2. Did Ackerman have a reasonable expectation of privacy in his email and its attachments?  *See* Section III, *infra*.

**ARGUMENT**

The Tenth Circuit remanded this case to this Court for factual determinations as to whether the Government violated Ackerman's reasonable expectation of privacy, and whether the Government invaded his protected property interests.  On both of these issues, the Tenth Circuit did more than pose the questions — it gave this Court important guidance as to how those issues should be addressed.  Even so, the United States' Supplemental Response to Defendant's Motion to Suppress ("Gov't. Br.") all but ignores the lengthy and thoughtful Tenth Circuit

opinion, as if that court had offered no direction as to how this case should be analyzed and resolved. The guidance offered by the Tenth Circuit on each of those issues, overlooked by the government, is addressed herein. In addition, the government now raises another issue not left open by the Tenth Circuit — whether there was a Fourth Amendment search at all. This last issue is discussed first, *infra*.

## I.    THE TENTH CIRCUIT PROVIDED THE GUIDELINES TO RESOLVE THIS CASE, YET THE GOVERNMENT FAILED TO ADDRESS THEM.

The government brief appears to assert that there is no need to consider Mr. Ackerman's protected privacy or property interests, as his challenge fails upon consideration of the "threshold question" in this case — "whether a 'search' subject to Fourth Amendment scrutiny occurred at all." Gov't. Br. at 5. However, the Tenth Circuit gave guidance on this issue, noting that:

> The undisputed facts show ... that NCMEC opened Mr. Ackerman's email, found four attachments, and proceeded to view each of them. And that sort of rummaging through private papers or effects **would seem pretty obviously a 'search.'** After all, if opening and reviewing 'physical' mail is generally a 'search' — and it is ... — why not 'virtual' mail too? [831 F.3d at 1305.]

In spite of this not-so-subtle hint, the government argues that no search occurred because Ackerman had no "reasonable expectation of privacy" in preventing government agents from opening and viewing his pictures — because those images had already been searched by an allegedly private party — here, an AOL computer. Gov't. Br. at 2. But the Tenth Circuit noted that:

> when NCMEC opened Mr. Ackerman's email it could have learned any number of **private** and **protected** facts, for (again) no one before us disputes that an email is a virtual container, capable of storing all sorts of **private** and **personal** details, from correspondence to other **private** (and perfectly legal) images, video or audio files, and beyond. [*Id*. at 1304.]

The Tenth Circuit all but ruled that Mr. Ackerman's expectations of privacy were real and, based on the record, reasonable.  The Tenth Circuit then focused its attention on the three attachments which AOL had not examined in any way:

> this particular container *did* contain three additional attachments, the content of which AOL and NCMEC knew nothing about before NCMEC opened them too. As far as anyone knew at the time, they could have revealed virtually any kind of noncontraband information to the prying eye."  [*Id*. at 1306.]

The Tenth Circuit's observation that Ackerman's email could have contained any sort of private, personal, intimate information about his life seems to foreclose the government's argument now that the search does not implicate any privacy interest at all because AOL had already violated any privacy interest that had existed.

As to the property issue, the Tenth Circuit stated that it could not "see how we might ignore <u>Jones</u>'s potential impact on our case." *Id.* at 1307.  The government, however, argues that <u>Jones</u> in fact does not apply at all, summarily dismissing the case in a footnote — claiming that "Ackerman would lack standing to bring such a claim because he neither controlled nor had constructive or actual possession of the email and images at the time of the purported intrusion, when NCMEC reviewed the email and images."  Gov't. Br. at 10 n.38.  Yet the Government's Brief does not even address whether a search occurred under the Supreme Court's decision in <u>Jones</u> — and that truly is the threshold issue here.  If Ackerman's property interests were violated, there most certainly was a search, which would have required a warrant.  In spite of the government's casual dismissal of <u>Jones</u>, that decision's revitalization of the Fourth Amendment's property rights "baseline" clearly applies to the facts of this case — and, indeed, governs its outcome.

6

Lastly, the Tenth Circuit noted that the district court might consider whether Ackerman gave up his privacy interest based on the "third-party doctrine." *Id.* at 1304.  The government, however, expressly waives that issue, stating that it "is not relying on the third-party doctrine or otherwise claiming that a person who uses a third-party email provider generally lacks a reasonable expectation of privacy in the contents of his account."  Gov't. Br. at 8.  Accordingly, these *amici* do not address the "third-party doctrine" that has now been waived by the government.

## II.    UNDER <u>UNITED STATES</u> V. <u>JONES</u>, NCMEC'S OPENING AND VIEWING ACKERMAN'S EMAIL AND ATTACHMENTS WAS AN UNREASONABLE SEARCH.

### A.    The <u>Katz</u> Privacy Test is Secondary to the <u>Jones</u> Property Principle.

As demonstrated in Part III below, the NCMEC's warrantless search in this case violates the Fourth Amendment because its opening and viewing of Ackerman's email and all of its attachments breached his reasonable expectation of privacy under <u>Katz</u> v. <u>United States</u>, 389 U.S. 347 (1967) and its progeny.  But, as the Tenth Circuit held, even if this Court should decide that NCMEC's actions pass the <u>Katz</u> test, that "doesn't mean it doesn't trigger the Fourth Amendment."  831 F.3d at 1307.  Quoting <u>Jones</u>, the Tenth Circuit ruled that "'Fourth Amendment rights do not rise or fall with the *Katz* formulation.'"  *Id.*  Thus, after discussing how NCMEC's warrantless search did not pass the <u>Katz</u> test, the Tenth Circuit proceeded to examine that search under the <u>Jones</u> rule, noting that "the warrantless opening and examination of ... private correspondence that could have contained much besides potential contraband ... seems pretty clearly to qualify as exactly the type of trespass to chattels that the framers sought to prevent when they adopted the Fourth Amendment."  *Id.*  After further analysis demonstrating

7

how the common law property principle applies by analogy to "electronic, not just written,

communications," the Tenth Circuit concluded:

> [W]hether we analyze the "search" question through the lens of the government's
> preferred authority – ... *Katz* – or through the lens of the traditional trespass test
> suggested by *Jones*, they yield the same ... result: NCMEC conducted a "search"
> when it opened and examined Mr. Ackerman's email.  [*Id.* at 1308.]

In light of these two alternative holdings, it is surprising that, on remand, the Government

has chosen to ignore that, even if the NCMEC action passes the <u>Katz</u> test, that does not defeat

Ackerman's motion to suppress.  Although the Government's Supplemental Response does indicate

that there are "other questions" besides the <u>Katz</u> privacy ones (Gov't. Br. at 1), those issues are

dwarfed by the Government's obsessive preoccupation with privacy.  *See id.* at 5-13.  In contrast,

the Government gives short shrift to the <u>Jones</u> property test, relegating it to two very brief references.

*See id.* at 5, n.26 and 10, n.38.  Such practical subordination of <u>Jones</u> under <u>Katz</u> directly contradicts

not only the holding in <u>Jones</u>, but also the holding in <u>Florida</u> v. <u>Jardines</u>, 133 S.Ct. 1409 (2013).  In

<u>Jones</u>, the Supreme Court ruled that "the *Katz* reasonable-expectation-of-privacy test has been *added*

*to,* not *substituted for,* the common-law trespassory test."  *Id.*, 132 S.Ct. at 952 (italics original).  *See*

*also* <u>Jardines</u> at 1417.  The Supreme Court has twice stated that the <u>Jones</u> property principle, not the

<u>Katz</u> privacy formulation, is the Fourth Amendment's "baseline."  *See* <u>Jones</u> at 952 and <u>Jardines</u> at

1414.

**B.    The <u>Jones</u> Property Test Applies Here.**

To be sure, the Government appears to recognize that "**[o]utside the context of physical**

**trespass**, a search within the meaning of the Fourth Amendment occurs when governmental action

infringes 'an expectation of privacy that society is prepared to consider reasonable.'" Gov't. Br. at

5 (emphasis added).  However, at no point does the Government elaborate on the meaning of "physical trespass."  In support of this implication that there was no physical trespass here, the Government cites three cases:  two cases decided before Jones, and then Jones itself.  The first case cited, Smith v. Maryland, 442 U.S. 735 (1979), states flatly that the Fourth Amendment's "lodestar" is Katz.  Smith at 739.  In contrast to Smith, the Supreme Court in Jones states that Katz and its privacy progeny "deviated from [the] exclusively property-based approach," and that Jones was designed to restore "property rights" to the Fourth Amendment's original primary place.  Jones at 949-50.  The second pre-Jones case, United States v. Jacobsen, 466 U.S. 109 (1984), also "invoked Katz and held there was no 'reasonable expectation of privacy,' in concealing whether something is or isn't contraband," to which the Tenth Circuit responded, "[b]ut after [Jones], there's reason to wonder about that conclusion [because] Jones held that the Katz formula is **but one way** to determine if a constitutionally qualifying 'search' has taken place."  831 F.3d at 1307 (emphasis added).

As for Jones itself, the Tenth Circuit acknowledged that, "[i]n light of the Fourth Amendment's original meaning, Jones explained that government conduct can constitute a Fourth Amendment search ... when it involves a physical intrusion (a trespass) on a constitutionally protected space or thing ('persons, houses, papers, and effects') for the purpose of obtaining information."  Id.  The absence of a "physical intrusion" is not at all self-evident, as the Government seems to assume.  The Government encapsulated its entire analysis in a single footnote on page 10, responding to what the Government describes as the Tenth Circuit "**suggest[ion]** that review of the copy of the email and images ... might be considered a trespass to chattels under the framework of [Jones]."  Gov't. Br. at 10, n.38 (emphasis added).

9

**C.     The Tenth Circuit Found that the NCMEC Search Violated Ackerman's Fourth Amendment Property Rights.**

But the Tenth Circuit's treatment of NCMEC's trespass upon Ackerman's property rights was far more than a suggestion.  Rather, it was a serious attempt by the Tenth Circuit to apply the <u>Jones</u> trespassory test to the facts of this case.[7]  *See* 831 F.3d at 1307-08.  First, the Tenth Circuit restated the <u>Jones</u> 18th century common law benchmark, observing that while an intrusion upon "private property might not amount to a trespass under modern tort law," the Fourth Amendment is no less protective of persons and property than the common law was "at the time of the founding." *Id.* at 1307.  Second, the court continued, at the time of the founding, a common law trespass to chattels could be sustained by proof of "a violation of 'the dignitary interest in the inviolability of chattels,'" without proof of any physical damage to the chattel.  *Id.*  Applying these two factors here, the Tenth Circuit concluded as follows:

> We are dealing ... with the warrantless opening and examination of (presumptively) private correspondence that could have contained much besides potential contraband for all anyone knew.  And that seems pretty clearly to qualify as exactly the type of trespass to chattels that the framers sought to prevent when they adopted the Fourth Amendment.  [*Id.*]

From this common law baseline, the Tenth Circuit asserted that while "the framers were concerned with the protection of physical rather than virtual correspondence ... a more obvious analogy from principle to new technology is hard to imagine."  *Id*. at 1308.  Indeed, the court pointed out that "many courts have already applied the common law's ancient trespass to chattels doctrine to

---

[7]  Two members of the Tenth Circuit panel addressed this question, with a third member declining without explanation to join that part of the opinion.

electronic, not just written, communications." *Id.*[8] Thus, the court concluded that, under **either** Katz

or Jones, "NCMEC conducted a 'search' when it opened and examined Mr. Ackerman's email." *Id.*

### D.    NCMEC's Search of Ackerman's Email and Attachments Trespassed upon His Property Rights under his AOL Terms of Service Contract.

In response to this careful and reasoned assessment of Ackerman's motion to suppress based

on the Jones trespassory test, the Government has lamely claimed that Ackerman would "lack

standing to bring such a claim because he neither controlled nor had constructive or actual

possession of the email and images at the time of the purported intrusion, when NCMEC reviewed

the email and images." Gov't. Br. at 10, n.38.  But Ackerman need not claim a possessory property

interest, entitling him to exercise "control or dominion" over his emails, as the Government appears

to contend.  *See id.*  Rather, according to the standard AOL Terms of Service contract providing

access to the Internet, including the sending and receiving of email, the user retains "ownership of

all rights, title, and interests" in the contents.[9]

In essence, the standard AOL Terms of Services contract is a kind of common law bailment

contract — a delivery of a thing in trust for some special object or purpose, creating a qualified

---

[8]  This is far from a novel constitutional proposition.  The First Amendment protects the 21st Century blogger's WordPress website every bit as much as it protects the 18th Century pamphleteer's printing press.  And, the Fourth Amendment must have the same application to a person's email account as it had to the letters in his saddlebags when the Amendment was ratified.  *See*, *e.g.*, District of Columbia v. Heller, 554 U.S. 570, 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the *Second Amendment*.  We do not interpret constitutional rights that way.  Just as the *First Amendment* protects modern forms of communications, ... and the *Fourth Amendment* applies to modern forms of search, ... the *Second Amendment* extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

[9]  *See* http://legal.aol.com/terms-of-service_full-terms/

property interest in both the user and the server — transferring to AOL the user's personal property **without the transfer of ownership**, for the accomplishment of a particular purpose. *See* II W. Blackstone, <u>Commentaries on the Laws of England</u> at 395-96 (U. Chi. Facsimile ed. 1766). Although Ackerman's property interest in his emails is subject to exceptions, those exceptions do not include the wholesale abandonment of his property rights upon AOL's unilateral transfer of the emails to NCMEC.

To be sure, the AOL Terms of Service agreement states that an account may be terminated at AOL's will, but that does not mean that a contracting user, such as Ackerman, has no property rights to be protected by the Fourth Amendment. A diminished right is no less a property interest; it is just less valuable. *See*, *e.g.*, J. Cribbet, <u>Principles of the Law of Property</u> at 13, n.6 (Found. Press 1975). An email, for example, does not lose its protected position in the Fourth Amendment's property lineup of "persons, houses, papers and effects," just because there may be probable cause that an attachment to an email turns out to be contraband. To the contrary, the warrant and probable cause requirements of the Fourth Amendment are designed to protect possible property rights by interposing a magistrate between the government and a person suspected of possessing contraband. That protection was denied to Ackerman because NCMEC decided unilaterally to search and seize his email and attachments without a warrant.

## III.    ACKERMAN CLEARLY HAD A PROTECTED FOURTH AMENDMENT PRIVACY INTEREST IN HIS EMAIL.

In addition to his primary Fourth Amendment property interest, Ackerman also clearly had a protectable privacy interest in his personal email account. In its Supplemental Memorandum, the Government disputes an obvious reality that any ordinary American would accept — when a person

sends an email over the Internet, the only person he expects to be opening and reading it is the recipient. Gov't. Br. at 6-7. The Government, however, takes a "deny everything, admit nothing" approach, even when the very facts that it denies exist appear in black and white in the record, as demonstrated by numerous examples.

### A.    Ackerman Had a Subjective Expectation of Privacy in His Email.

The Government's memorandum claims that Ackerman "has not met his burden of showing that he had an actual, **subjective expectation of privacy** in the email and images at issue." Gov't. Br. at 6 (emphasis added). That is quite a remarkable assertion, especially since Ackerman testified specifically that he "**believe[d]** that any information [he was] sending to other people was **private** information." Tr. part 2 at 155 (emphasis added). Similarly, Mrs. Ackerman testified that she believed information she sent over the Internet was private. Tr. part 2 at 148. When Ackerman was asked if he "would ... have used AOL to send information if [he] didn't think it was private," he answered "if you don't mind me saying so, I don't think anybody would." *Id.* at 155.

Ackerman's testimony on this point is completely credible. Does it make any sense that Ackerman would send child pornography if he did not expect complete privacy — from AOL, the NCMEC, the Department of Homeland Security, and everyone else? Would anyone email child pornography believing that the government would intercept it? Yet the government, contrary to record testimony and all logic, disputes that Ackerman has shown that he believed his emails were private. Gov't. Br. at 6.

Next, the government claims that Ackerman "has not presented **any** evidence on how he sought to preserve privacy in the AOL account that ... he shared with his wife." *Id*. at 6. Yet at Ackerman's suppression hearing, government counsel questioned Ackerman as to his "use of TOR"

— an "anonymizing service" that "will allow you to anonymize or hide where you are on the Internet." Tr. part 2 at 156-57. As the government lawyer put it, "the reason why [Ackerman] used TOR is to **hide [his] identity** ... in order to prevent people from finding [him] if they're monitoring [his] IP address." *Id.* at 157-58 (emphasis added). It is quite remarkable that government argues that Ackerman gave "no evidence" of his attempts to keep his activities private while eliciting such testimonial evidence in the first place.

While disregarding certain unhelpful facts in the record, the government obfuscates with respect to other unhelpful facts. The government claims that Ackerman's email was sent through "the AOL account that ... he shared with his wife." Gov't. Br. at 6. The clear implication was that, since Ackerman's AOL account was "shared with his wife," he clearly could not expect it to be private. Although it is true that Ackerman shared the couple's "AOL account" (AOL was the paid-for Internet Service Provider that provided internet access to the Ackerman home) with his wife, that does **not mean** Ackerman **shared his personal email account** with his wife. Indeed, as AOL's witness Greg Phillips testified, there could be more than one email account under one AOL account. Tr. at 82 ll. 24-25. And, in fact, Mrs. Ackerman testified that "**He [Ackerman] had his own e-mail address.**" Tr. Part 2 at 150 (emphasis added). Moreover, the government counsel specifically asked Ackerman "the plains66952 e-mail account, that's not your wife's account, is it?" and Ackerman responded "No, sir, that's my user name. It's the -- I was a user name used on her account." *Id.* at 155. Clearly, Ackerman's personal email account was just that — personal.

Finally, the government claims that Ackerman "failed to present any evidence that he maintained an actual, subjective expectation of privacy in his email *after AOL terminated access to his account*," and before AOL sent its report to NCMEC. Govt. Br. at 6. Apparently, the

14

government believes that, since AOL terminated Ackerman's account, including "his ability to access or control his email" (Govt. Br. at 7), that all of his privacy interest in his email account was lost forever and as to all persons. Thus, according to the government's theory, it doesn't matter that NCMEC also violated Ackerman's privacy by reading his email and viewing its attachments.

Of course, from a privacy perspective, it's one thing to have a computer scan an email, and automatically terminate access to an email account, without human involvement. It's quite another thing to open an email, read its contents, and view its attachments. AOL's Terms of Service state that the company could automatically terminate Ackerman's email account — but did not state that AOL might turn over his email to the government for law enforcement review. And, the Tenth Circuit didn't buy into the government's argument, noting that AOL's "private search" was greatly expanded by NCMEC, which conducted a completely new and much more invasive search of Ackerman's email and all its attachments. *See* 831 F.3d at 1306.

### B.    Believing One's Email to be Private Is Objectively Reasonable.

Next, the government claims that, even if Ackerman had a subjective expectation of privacy, it is not "one that society is prepared to recognize as objectively reasonable." Gov't. Br. at 7. Apparently, the government would not go so far as to argue that people generally do not believe their email accounts to be private. Thus, the government includes the caveat that the court should only consider Ackerman's expectations of privacy in his email "**after** AOL terminated his account and his ability to access or control his email." *Id.* (emphasis added). The best authorities the government can muster for this claim are cases which involve motel rooms where the "rental period expires" or where the guest is evicted for "non-payment of rent." *Id.* In other words, the Government claims that because AOL believed that Ackerman violated the terms of his contract with AOL, and

15

terminated his account — his personal email account was then forfeited to access by the Government.

Of course, any motel guest knows that he must keep current on his room payments or be evicted from the room. But almost no ordinary email account holder knows the technical provisions of his terms of service agreement with his provider.[10] As this Court has already noted at Ackerman's suppression hearing, "it's highly likely that nobody reads [AOL's] Terms of Services." Tr. part 2 at 177. Even though it may be technically true that AOL could terminate Ackerman's email account as a matter of "civil contract law," this Court previously noted that there likely is "a heightened inquiry under Fourth Amendment law." *Id.* The Court maintained serious reservations whether "that contractual binding is sufficient to effect what in this case would amount to a Fourth Amendment waiver." *Id.* at 178.

In addition to the fact that almost no ordinary, reasonable people (including most lawyers — and judges) ever read the copious pages constituting the AOL Terms of Service before they click the "I accept" button, it is also worth noting that AOL's current Terms of Service for email accounts mandate that AOL may "terminate or deactivate your account **for inactivity or any other reason**...."[11] And, after AOL makes such a decision to terminate a user's account in its sole discretion, AOL claims that "we have no obligation to retain, store, or provide you with any data, information, e-mail, or other content that you uploaded, stored, transferred, sent, mailed, received, forwarded, posted or otherwise provide to us...." *Id.* That is quite different from the contractual

---

[10] Such agreements are often considered to be "contracts of adhesion," making them difficult to enforce.

[11] *See* http://legal.aol.com/terms-of-service_full-terms/

16

provisions at a motel for a nonpaying guest, which must abide by strict legal obligations and even state law when dealing with the belongings of evicted guests.  Here, the government's argument rests on the assumption that, whenever AOL terminates a customer's email account, that customer must have done something to violate the terms of service.  But as AOL's terms of service makes clear, the company can revoke an account for any reason — or no reason at all.  The average reasonable person clearly would not accept this at-will arrangement as acceptable justification for losing one's Fourth Amendment privacy rights in their email.[12]

What's more, accepting the government's argument would mean that, after his account was terminated, Ackerman loses any privacy interest he had — not just in the single email that apparently contained pornography — **but in his entire email account**.  As we know all too well, a person's email account is an amalgamation of their digital lives — a window into their thoughts, feelings, relationships, hopes, and prayers.  Often, an email account contains detailed information on one's finances, commercial transactions, legal matters, and their medical records.  It could contain information about spiritual beliefs, political affiliations, sexual proclivities, and other personal and intimate details of life.  As the Supreme Court has noted with respect to cellular phones (a digital cousin of an email account), "it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate ...  Allowing the police to scrutinize such records on a routine basis is quite different from allowing them to search a personal item or two in the occasional case."  Riley v. California, 134 S. Ct. 2473, 2490 (2014).  Likewise, a personal email

---

[12]  As a contract of adhesion, unreasonable provisions are often subject to judicial modification.

17

account is quite different in both scope and scale to a search of "a personal item or two" — some toothpaste and socks — to be cleaned out of a motel room before it is rented to the next guest.

If this Court accepts the government's argument, then whenever AOL or any other ISP terminates a person's email account (for any reason), that person loses not only actual control, but also his Fourth Amendment privacy rights, over extensive digital information revealing virtually every aspect of his life.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress should be granted.

Respectfully submitted,

    */s/ Joseph W. Miller*

Robert J. Olson                              Joseph W. Miller (Kansas Bar No. 20771)
Herbert W. Titus                             United States Justice Foundation
William J. Olson                             1532 S. 1400 Road
Jeremiah L. Morgan                           Council Grove, KS  66846
William J. Olson, P.C.                       540-751-8559
370 Maple Ave. W., Ste. 4                    888-421-8803 (fax)
Vienna, VA  22180-5615                       miller@kansaslaw.us, joe@usjfmail.net
(703) 356-5070
wjo@mindspring.com                           Counsel for *Amicus Curiae*
                                             Dated:  April 10, 2017
Mark Fitzgibbons
9625 Surveyor Court
Suite 400
Manassas, VA  20110

18