IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,    )
                                 )   District Court
                  Plaintiff,     )   Case No.
v.                               )   13-10176
                                 )
WALTER ACKERMAN,                 )   Circuit Court
                                 )   Case No.
                  Defendant.     )   17-3238


TRANSCRIPT OF MOTION TO SUPPRESS HEARING

On the 19th day of September, 2017, came on to be heard proceedings in the above-entitled and numbered cause before the HONORABLE ERIC F. MELGREN, Judge of the United States District Court for the District of Kansas, sitting in Wichita, commencing at 1:30 P.M. Proceedings recorded by machine shorthand. Transcript produced by computer-aided transcription.

APPEARANCES:

The plaintiff appeared by and through:
        Mr. Jason W. Hart
        United States Attorney's Office
        301 North Main Street
        Suite 1200
        Wichita, Kansas  67202-4812

The defendant appeared by and through:
        Mr. Daniel T. Hansmeier
        Federal Public Defender's Office
        500 State Avenue
        Suite 201
        Kansas City, Kansas 66101-2400

13:30:06   1          CLERK NALL:  All rise.  The United States District

13:30:07   2   Court for the District of Kansas is now in session, the

13:30:09   3   Honorable Eric F. Melgren presiding.

13:30:14   4          THE COURT:  Good afternoon.  You may be seated.

13:30:22   5          All right.  We're back on the case of the

13:30:25   6   United States versus Walter Ackerman, Case No. 13-10176.  This

13:30:35   7   case is older than most cases on my criminal docket.  The

13:30:39   8   Government -- I mean, the defendant, of course, filed a motion

13:30:41   9   to suppress initially.  I denied that motion.  That matter's

13:30:46  10   been appealed to the Tenth Circuit, who's issued its opinion

13:30:49  11   and remanded the matter to us for further consideration, and

13:30:54  12   that's why we're here.

13:30:55  13          Why don't we start with appearances, please.

13:30:57  14          MR. HART:  Thank you, Your Honor.  The Government

13:30:58  15   appears by and through Jason Hart, Assistant United States

13:31:02  16   Attorney.

13:31:02  17          MR. HANSMEIER:  Dan Hansmeier on behalf of the

13:31:05  18   defendant, who is here in person.

13:31:07  19          THE COURT:  Very well.  Thank you.

13:31:07  20          Mr. Hansmeier, this was initially -- although

13:31:10  21   there's a lot of water under the bridge -- this was officially

13:31:13  22   the defendant's motion to suppress, so it seems we're still

13:31:17  23   here on your motion so I'm going to ask you to start.

13:31:20  24          MR. HANSMEIER:  Okay.

13:31:21  25          THE COURT:  I have -- to say the least, I have

| | | |
|---|---|---|
| 13:31:23 | 1 | read your briefs, I've gone through these matters.  I've looked |
| 13:31:25 | 2 | at this a lot.  So I'm familiar with what you've written, but, |
| 13:31:30 | 3 | nevertheless, I'm looking forward to discussing with both of |
| 13:31:32 | 4 | you about this.  Mr. Hansmeier? |
| 13:31:36 | 5 | MR. HANSMEIER:  Do you want me up here? |
| 13:31:37 | 6 | THE COURT:  You know, you can speak wherever |
| 13:31:39 | 7 | you're most comfortable. |
| 13:31:40 | 8 | MR. HANSMEIER:  Okay.  I'll just stay here, if |
| 13:31:42 | 9 | that's okay. |
| 13:31:43 | 10 | THE COURT:  That's fine. |
| 13:31:43 | 11 | MR. HANSMEIER:  Okay.  May it please the Court, |
| 13:31:46 | 12 | counsel.  I guess the way -- is that going to pick me up? |
| 13:31:52 | 13 | THE COURT:  You can move it closer. |
| 13:31:53 | 14 | MR. HANSMEIER:  Okay. |
| 13:31:54 | 15 | THE COURT:  You can also scoot it forward if you |
| 13:31:57 | 16 | want. |
| 13:31:57 | 17 | MR. HANSMEIER:  Okay.  So I thought it might make |
| 13:32:01 | 18 | a little bit of sense to try to categorize the issues.  The way |
| 13:32:06 | 19 | I see it, there are three what I would call them real issues: |
| 13:32:10 | 20 | standing.  I call it standing.  I know some courts don't like |
| 13:32:14 | 21 | that but it makes sense to me, standing.  This warrantless |
| 13:32:16 | 22 | search issue, the Government raises what we would call "special |
| 13:32:20 | 23 | needs balancing."  Then the third umbrella issue would be the |
| 13:32:24 | 24 | good-faith exception. |
| 13:32:25 | 25 | THE COURT:  What's your second issue again? |

13:32:27    1            MR. HANSMEIER:  So that's the Government's claim

13:32:32    2    that you can just do a reasonableness balancing and uphold the

13:32:38    3    search even though it's warrantless.

13:32:42    4            THE COURT:  All right.  Well, we'll, I guess, talk

13:32:44    5    about that more as we talk about it.

13:32:46    6            MR. HANSMEIER:  Yeah, it's page 11 to 13 of the

13:32:50    7    Government's brief.

13:32:54    8            THE COURT:  Their initial brief?

13:32:57    9            MR. HANSMEIER:  The --

13:32:58   10            THE COURT:  I say their "initial," but their

13:33:00   11    supplemental response?

13:33:01   12            MR. HANSMEIER:  Yeah, the February 2017 response.

13:33:06   13    So I guess I would just --

13:33:08   14            THE COURT:  That's their -- this is sort of their

13:33:12   15    balancing test?

13:33:13   16            MR. HANSMEIER:  Yes, right.

13:33:13   17            THE COURT:  All right.

13:33:14   18            MR. HANSMEIER:  Yes.  So that's what I would

13:33:17   19    consider the three umbrella issues.  I'll just start with

13:33:22   20    standing.  I think this is sort of the meat of the issue.  It's

13:33:25   21    the one issue that has been briefed the most.  It breaks down,

13:33:31   22    I think, into two sub-issues:  trespass theory and privacy

13:33:36   23    theory, and then the privacy theory has a subjective component

13:33:40   24    and objective component.

13:33:42   25            You know, the trespass theory, this is the *Jones*

13:33:46  1   theory, we're essentially saying that a search is a search.

13:33:53  2   The basis of our argument really is the Tenth Circuit's

13:33:55  3   decision in Ackerman in this case.  I think the language in

13:34:01  4   that opinion reads to us as if the court found that this was a

13:34:06  5   search and that it was sending this back for determinations on,

13:34:12  6   obviously, his subjective intent, I think.  That would relate

13:34:16  7   to some sort of an abandonment theory.

13:34:18  8               THE COURT:  I remember when I first read the Tenth

13:34:20  9   Circuit's opinion --

13:34:21  10              MR. HANSMEIER:  Uh-huh.

13:34:22  11              THE COURT:  -- and for that matter when I last

13:34:24  12  read its opinion, I saw that Judge Gorsuch said this matter's

13:34:29  13  remanded to the district court for reconsideration of these

13:34:32  14  difficult issues, but I was confused as to what difficult

13:34:35  15  issues they thought they were remanding us to consider.

13:34:37  16              MR. HANSMEIER:  Uh-huh.

13:34:38  17              THE COURT:  I note, conspicuous by its absence

13:34:41  18  from your list, is expectation of privacy.  I gather from your

13:34:44  19  briefing you don't consider that to still be an open issue.

13:34:48  20              What are the difficult issues that you think --

13:34:53  21  are these three that you've indicated the difficult issues --

13:34:56  22  I'm using, of course, then Judge Gorsuch's language --

13:35:01  23              MR. HANSMEIER:  Right.

13:35:02  24              THE COURT:  -- that he's remanded to us to

13:35:04  25  determine?

13:35:04  1          MR. HANSMEIER:  No, so I -- when I -- I didn't

13:35:10  2   mean to exclude expectation of privacy.  That's -- that would

13:35:13  3   be a second theory, understanding the privacy.  I'm just

13:35:16  4   calling it privacy theory.  So, yes, reasonable expectation of

13:35:20  5   privacy, that prong of it could come into play, I think.

13:35:23  6          THE COURT:  I thought your second issue was the

13:35:25  7   warrantless, special-needs-balancing issue.

13:35:27  8          MR. HANSMEIER:  Okay, right.  So the umbrella

13:35:31  9   issues, standing, the special needs balancing, and good faith,

13:35:34  10  those are the umbrella issues.  So I think understanding you

13:35:38  11  have the trespass theory, which is essentially a search is a

13:35:44  12  search, and then you also have, I guess, the *Katz*, you know,

13:35:51  13  reasonable expectation of privacy theory.  Those are the two

13:35:55  14  ways we can establish standing under the Fourth Amendment.

13:35:58  15          Does that make sense?

13:35:59  16          THE COURT:  Yeah.  I didn't -- I didn't have the

13:36:03  17  impression that standing was one of the Government's main

13:36:07  18  assaults against your position.

13:36:11  19          MR. HANSMEIER:  Okay.  Maybe I'm using -- I don't

13:36:13  20  know if I'm using "standing" for talking.  Maybe we're just

13:36:18  21  semantically confused.  This is essentially everything -- I

13:36:23  22  guess what I'm calling standing is everything the Government

13:36:26  23  briefs from pages 1 to 10 that it --

13:36:29  24          THE COURT:  But they don't call that standing.

13:36:30  25          MR. HANSMEIER:  They just say that it wasn't a

| | | |
|---|---|---|
| 13:36:32 | 1 | search, and then they go into subjective expectation of privacy |
| 13:36:37 | 2 | and objective expectation of privacy. |
| 13:36:38 | 3 | THE COURT:  Right.  I mean, the standing issues |
| 13:36:40 | 4 | that I thought existed in this case, but not significantly, |
| 13:36:43 | 5 | were the fact that the AOL account was in Mr. Ackerman's wife's |
| 13:36:47 | 6 | name, not his, and then the issue about possessory interests or |
| 13:36:51 | 7 | property interests in the email account at or about the time |
| 13:36:55 | 8 | AOL terminated it. |
| 13:36:56 | 9 | MR. HANSMEIER:  Okay. |
| 13:36:56 | 10 | THE COURT:  Those are what I would have thought |
| 13:36:58 | 11 | were standing issues, but I didn't -- the latter, of course, |
| 13:37:03 | 12 | bleeds into the expectation of privacy argument. |
| 13:37:06 | 13 | MR. HANSMEIER:  Right. |
| 13:37:06 | 14 | THE COURT:  We're probably getting unnecessarily |
| 13:37:08 | 15 | hung up on nomenclature. |
| 13:37:10 | 16 | MR. HANSMEIER:  Yeah, that's probably my fault.  I |
| 13:37:13 | 17 | think we're on the same page as far as the discussion and |
| 13:37:17 | 18 | whether we can establish that he has essentially a Fourth |
| 13:37:22 | 19 | Amendment right in the stuff.  Two ways, if it was a physical |
| 13:37:26 | 20 | search, a trespass, or if he had a reasonable expectation of |
| 13:37:31 | 21 | privacy in the email. |
| 13:37:34 | 22 | I can -- so let me just talk about reasonable |
| 13:37:37 | 23 | expectation of privacy because -- well, do you want -- do you |
| 13:37:40 | 24 | want me to discuss what I think the difficult issues are?  I |
| 13:37:43 | 25 | think that was your initial question.  I don't know that I ever |

13:37:45  1    answered it.

13:37:46  2              So just to answer that, what we think the issue

13:37:50  3    was that the court was interested in was the third-party

13:37:54  4    doctrine.  That seemed to be the elephant in the closet when I

13:38:00  5    was up there arguing it.  I thought --

13:38:02  6              THE COURT:  But Judge Gorsuch used the plural

13:38:04  7    form.

13:38:04  8              MR. HANSMEIER:  He did.

13:38:05  9              THE COURT:  Which would suggest there was more

13:38:06  10   than one.

13:38:07  11             MR. HANSMEIER:  That's true.  I can't argue with

13:38:11  12   that.  So, yeah, I mean, I think if you look at the briefing,

13:38:17  13   in our briefing we -- you know, we said a few things.  One of

13:38:22  14   the things we said had to do with a subjective -- the

13:38:25  15   subjective expectation of privacy analysis, which would have to

13:38:31  16   do with the factual findings you would need to make.  So in our

13:38:33  17   brief, we said that -- you know, we didn't ask for a full

13:38:38  18   reversal on appeal.  We just said, look, NCMEC is a

13:38:41  19   governmental entity, it has to go back for further findings.

13:38:44  20   That's always been -- that was our position on appeal.  We

13:38:47  21   didn't ask the Tenth Circuit to reverse outright.  And the

13:38:49  22   reason why we didn't do that was because there were no findings

13:38:52  23   on his subjective expectations.

13:38:54  24             THE COURT:  No findings by the court.

13:38:56  25             MR. HANSMEIER:  Correct, no findings by the court.

13:38:58   1               THE COURT:  Right.  Mr. Ackerman gave testimony as

13:39:00   2  to those.

13:39:00   3               MR. HANSMEIER:  Yes.

13:39:01   4               THE COURT:  But they didn't factor into their

13:39:03   5  decision that I initially --

13:39:05   6               MR. HANSMEIER:  Correct.

13:39:05   7               THE COURT:  Right.

13:39:05   8               MR. HANSMEIER:  So it's our position that based on

13:39:07   9  his testimony and the record as a whole, he did have a

13:39:11  10  subjective expectation of privacy.

13:39:13  11               THE COURT:  That seems to be the easier of the two

13:39:15  12  prongs.

13:39:15  13               MR. HANSMEIER:  Yes.  And that would be the

13:39:16  14  factual finding that you would have to make on remand.  That

13:39:21  15  would be one of the issues.  Whether that's difficult -- I

13:39:24  16  mean, I don't think that's a difficult issue, but this is --

13:39:27  17  certainly I think you need to redefine, under the expectation

13:39:31  18  of privacy theory, that he had a subjective expectation of

13:39:32  19  privacy.  And, again, I don't really plan to go into it.  But

13:39:37  20  based on his testimony, we do think he did have that subjective

13:39:41  21  expectation of privacy.

13:39:42  22               Then, you know, on that expectation of privacy

13:39:50  23  analysis, it also has to be subjectively reasonable.  And this

13:39:53  24  is where things, I think, get -- I think this is the debate,

13:39:59  25  the meat of the debate.  And I think it's hard to draw a line

13:40:03  1   between the privacy -- I don't know, privacy -- what's a good

13:40:10  2   word? -- theory, I don't know, and the trespass theory.  I

13:40:14  3   think it's hard to draw that line because courts have not been

13:40:17  4   drawing that line.

13:40:19  5                THE COURT:  I thought Judge Gorsuch pushed that

13:40:22  6   case a bit farther --

13:40:26  7                MR. HANSMEIER:  Uh-huh, *Jones*.

13:40:26  8                THE COURT:  Right.  A bit farther than I had seen

13:40:30  9   it pushed, not that I pretend to have read most of those issues

13:40:34  10  that have come down.  I assume that's why Judge Hartz declined

13:40:38  11  to join that part of the opinion.

13:40:40  12               MR. HANSMEIER:  Yeah.

13:40:40  13               THE COURT:  But, of course, Judge Hartz didn't

13:40:42  14  tell us why, so we don't know.

13:40:44  15               MR. HANSMEIER:  I think that's true.  I think it

13:40:45  16  did, particularly because this is electronic mail and I think

13:40:49  17  traditionally that would be a expectation of privacy theory

13:40:53  18  because it's electronic.  But, you know, Judge Gorsuch, in the

13:40:58  19  opinion, said that this type of trespass, the chattels

13:41:04  20  analysis, would apply to electronic mail.  And so, you know,

13:41:07  21  it's hard -- because there's not a lot of precedent on this.

13:41:12  22  We're essentially just relying on what Judge Gorsuch said in

13:41:17  23  his decision with respect to our trespass theory.

13:41:19  24               We think the -- and I think the Government

13:41:22  25  disagrees with us, which is fine, but we think that the case,

13:41:26  1  as written, you know, establishes that a search is a search.

13:41:33  2  Electronically it's a trespass theory.  What the Government did

13:41:37  3  in this case was search the email.  That should be enough,

13:41:41  4  outside of some sort of third-party doctrine.

13:41:45  5          THE COURT:  Well, I --

13:41:48  6          MR. HANSMEIER:  And that's not at issue because of

13:41:50  7  the evidence.

13:41:50  8          THE COURT:  I read this a little differently, but

13:41:52  9  I tell you this at the outset that I do not have high

13:41:57  10  confidence in my own interpretation of these issues.  I was

13:42:02  11  talking with my law clerks earlier and I said Judge Gorsuch

13:42:05  12  writes brilliantly, but in this case at least maybe not

13:42:09  13  particularly clearly.

13:42:11  14          MR. HANSMEIER:  Yeah.

13:42:11  15          THE COURT:  It seemed to me that, with respect to

13:42:14  16  the *Katz* issue, the more troubling prong, as I said, is the

13:42:19  17  subjective expectation of privacy, and that there, perhaps,

13:42:22  18  remains an unanswered issue as to whether, given the nature of

13:42:28  19  electronic communication, perhaps, although this is barely

13:42:32  20  discussed given the Terms of Service, and then of course if the

13:42:39  21  Government's theory that his expectation of privacy elapsed

13:42:42  22  when -- I don't see that theory being acknowledged by the Tenth

13:42:45  23  Circuit's opinion, but that there's still a remaining potential

13:42:52  24  issue as to the objective reasonableness of the expectation of

13:42:57  25  privacy under *Katz*.  But it seems to me that what Judge

| | |
|---|---|
| 13:43:01 | 1 |
| 13:43:06 | 2 |
| 13:43:12 | 3 |
| 13:43:18 | 4 |
| 13:43:21 | 5 |
| 13:43:22 | 6 |
| 13:43:25 | 7 |
| 13:43:29 | 8 |
| 13:43:32 | 9 |
| 13:43:37 | 10 |
| 13:43:40 | 11 |
| 13:43:40 | 12 |
| 13:43:45 | 13 |
| 13:43:47 | 14 |
| 13:43:50 | 15 |
| 13:43:54 | 16 |
| 13:43:56 | 17 |
| 13:43:58 | 18 |
| 13:44:01 | 19 |
| 13:44:02 | 20 |
| 13:44:05 | 21 |
| 13:44:05 | 22 |
| 13:44:07 | 23 |
| 13:44:09 | 24 |
| 13:44:10 | 25 |

1  Gorsuch's opinion says is that but even if -- he wouldn't put

2  it that way -- regardless of how the *Katz* issue is resolved, we

3  think there's a second way that *Jones* now requires that these

4  cases be looked at, and that is under the trespass theory.

5          MR. HANSMEIER:  Uh-huh.

6          THE COURT:  And so I was left with the

7  impression -- again, as I've already admitted to my lack of

8  confidence in this -- but I was left with the impression that

9  Judge Gorsuch was saying that there is a trespass which

10 ultimately makes the second prong of *Katz* irrelevant.

11         MR. HANSMEIER:  Uh-huh.

12         THE COURT:  Because whether he had an objectively

13 reasonable expectation of privacy or not, there was a trespass;

14 therefore, there's a Fourth Amendment violation.

15         Tell me where you think that you would have read

16 this somewhat differently.

17         MR. HANSMEIER:  No, I'm fine with that.  I think

18 that's how we read it.  That's why we addressed the trespass

19 theory first in our brief.

20         THE COURT:  Because it seems to trump --

21         MR. HANSMEIER:  Correct.

22         THE COURT:  -- the *Katz* issues.

23         MR. HANSMEIER:  Correct.  So like from pages 3 to

24 10, that's what we talk about.

25         And then we get into the expectation of privacy

13:44:13  1    because it's just an alternative argument.

13:44:15  2              THE COURT:  All right.

13:44:16  3              MR. HANSMEIER:  If that makes sense.  And, again,

13:44:23  4    I think all of this comes -- I think our position on this

13:44:26  5    really is pretty simple, and it's -- and it, you know, the

13:44:31  6    primary premise of the argument is that, you know, in 1877 the

13:44:35  7    United States Supreme Court said that we have a Fourth

13:44:37  8    Amendment interest in our mail, and that interest exists until

13:44:42  9    the mail is delivered.  And really that is the bedrock

13:44:46  10   principle that we're relying on.  This is the mail and it was

13:44:48  11   never delivered, and because it was never delivered, there is a

13:44:52  12   Fourth Amendment right in it.

13:44:54  13             And when you -- and when the Government, you know,

13:44:58  14   does something to the mail, opens it, that's a trespass, and it

13:45:03  15   needs a warrant to do it.  And really that's the essence of the

13:45:07  16   argument.  And I think it tracks what Judge Gorsuch said.  I

13:45:14  17   don't know that it's any different than what he said.  I don't

13:45:17  18   think it is.  I think we're reiterating what he said in the

13:45:21  19   decision.  Yeah, I think it does get confusing because of the

13:45:31  20   remand and it wasn't clear what difficult issues he thought

13:45:35  21   existed.

13:45:38  22             I guess I can address, you know, the

13:45:41  23   Government's -- I'm not entirely sure I understand what the

13:45:45  24   Government is saying, but from what I understand, that the idea

13:45:47  25   is that a third party can terminate your rights to something

13:45:53  1  and then just do what it wants.

13:45:55  2          THE COURT:  You know, Mr. Hansmeier, I'm going to

13:45:57  3  ask you to hold that argument for your rebuttal.

13:46:00  4          MR. HANSMEIER:  Okay.  That's fine.

13:46:01  5          THE COURT:  Because I'm not sure I completely

13:46:03  6  understand Mr. Hart's argument on that either.

13:46:05  7          MR. HANSMEIER:  Okay.

13:46:05  8          THE COURT:  And I want to explore that with him.

13:46:07  9          MR. HANSMEIER:  Okay.

13:46:07  10          THE COURT:  And I think following that

13:46:09  11  exploration, then you might be able to address that more --

13:46:15  12          MR. HANSMEIER:  Okay.

13:46:16  13          THE COURT:  -- directly.

13:46:17  14          MR. HANSMEIER:  That's fine.  I mean, I don't know

13:46:21  15  that -- if you have questions for me on the trespass theory,

13:46:23  16  like I said, I think our position is very straightforward and I

13:46:26  17  just said it.  I don't know that I need to say anything more to

13:46:29  18  get my point across.

13:46:30  19          THE COURT:  You would agree that it appears that

13:46:32  20  Judge Gorsuch's opinion, joined at least by one other panel

13:46:36  21  member, was that a trespass occurred in this case?

13:46:38  22          MR. HANSMEIER:  Yes.

13:46:40  23          THE COURT:  And that that conclusion by the

13:46:48  24  circuit court is, therefore, somewhat conclusive as to at least

13:46:54  25  the threshold Fourth Amendment inquiry?

13:46:58  1          MR. HANSMEIER:  Right.  I think we meet our burden

13:47:02  2   to get on that.

13:47:03  3          THE COURT:  All right.  So, again, I guess your

13:47:05  4   reference of standing or your -- when you were talking about

13:47:11  5   nomenclature, that encompasses this whole discussion we've just

13:47:14  6   been having?

13:47:15  7          MR. HANSMEIER:  Absolutely.

13:47:15  8          THE COURT:  All right.  Well, let's go on to the

13:47:17  9   next issue.

13:47:17  10         MR. HANSMEIER:  Okay.  So this is -- this is -- I

13:47:22  11  think the Government's initial brief that was filed in

13:47:25  12  February, after remand, essentially makes a

13:47:29  13  special-needs-balancing test argument, I mean, the cases the

13:47:32  14  Government cites, *Veronia*, *Maryland v. King*, these are just

13:47:38  15  your, you know, black letter, special-needs-balancing cases

13:47:41  16  where there is a nonlaw enforcement purpose for something and,

13:47:45  17  therefore, courts weigh the interest to decide whether that

13:47:49  18  nonlaw enforcement interest, you know, is okay, does that trump

13:47:55  19  the warrant requirement.

13:47:56  20         The problem with that argument in this case is

13:48:01  21  this isn't an investigatory search.  These were -- this was a

13:48:06  22  crime -- a criminal investigation where the, you know, NCMEC

13:48:13  23  and the Wichita law enforcement people were investigating a

13:48:18  24  crime and, for that reason, you don't balance anything.  When

13:48:24  25  it's -- when it involves a criminal investigation, the

13:48:27   1   question, you know, doesn't -- you know, you just don't

13:48:30   2   balance.  The test is irrelevant.

13:48:31   3           And what's kind of odd is that the Government --

13:48:35   4   so we say this and we go through this special needs balancing

13:48:38   5   in our brief and explain why it's irrelevant in this case, and

13:48:42   6   I think the reply the Government then -- I'm not entirely sure

13:48:46   7   if they switch gears, but they say it's not special needs

13:48:49   8   balancing, which the Government didn't call it that, we call it

13:48:52   9   that, so more semantics, I guess, but then they essentially say

13:48:56   10   we're relying on this Eleventh Circuit case, *United States v.*

13:49:01   11   *Davis*, which is historical cell site information.

13:49:08   12           And so I don't know if that's the entirety of the

13:49:10   13   thing now or if there's still this *Maryland v. King* issue.  But

13:49:16   14   even *Davis* -- so *Davis* has to do -- first of all, *Davis* is a

13:49:21   15   third-party doctrine case.  What the Eleventh Circuit said in

13:49:25   16   that case was that the third-party doctrine applied and you

13:49:29   17   have no rights in essentially a record created by a cell phone

13:49:35   18   company.  So there was an alternative holding on

13:49:38   19   reasonableness.  There was a sense -- it was inbound and there

13:49:44   20   was concurrences who just stuck with the third-party doctrine,

13:49:47   21   so I'm not sure there was a majority of judges on the Eleventh

13:49:50   22   Circuit who bought the alternative holding, but I think it's

13:49:52   23   dicta.  But the thing with *Davis* is that it's a Stored

13:49:59   24   Communications Act case.  So the Stored Communication Act

13:50:02   25   requires a judge to sign.  It's not a warrant, obviously, but

13:50:09  1   it's -- what's the word?  What is it?  I can't think of the

13:50:17  2   word.  It's a court order, right?

13:50:22  3                THE COURT:  An authorization.

13:50:24  4                MR. HANSMEIER:  An authorization, right.  And this

13:50:26  5   is from *Davis*.  It has to be based on specific and articulable

13:50:29  6   facts that there were specific grounds to believe that the

13:50:31  7   records were relevant and material to an ongoing criminal

13:50:34  8   investigation.  So my point is that in *Davis* there is a

13:50:38  9   judicial determination of something.  You don't just get the

13:50:43  10  information.

13:50:44  11               And here that doesn't exist.  So even if a court

13:50:48  12  wanted to recognize this type of balancing outside of special

13:50:55  13  needs, just citing this *Davis* case doesn't -- in my opinion --

13:51:00  14  doesn't get you there because *Davis,* there is judicial

13:51:04  15  authorization, and here there's not.  So at least in that

13:51:09  16  context, there's something to hang your hat on as far as

13:51:15  17  getting beyond, you know, the warrant requirement, that sort of

13:51:19  18  thing, and I think that makes it different.

13:51:21  19               But, really, I mean, I don't -- I don't want to

13:51:28  20  give any indication that I agree with that alternative holding

13:51:30  21  in *Davis* 'cause I don't think it's right.  I don't see the

13:51:33  22  Supreme Court going down that road that the special needs

13:51:36  23  balancing is going to apply in a criminal investigation.  That

13:51:39  24  just seems wrong to me.  I don't think the Supreme Court has

13:51:41  25  ever done that.  I don't think it will.  And that's the reason

13:51:44  1   why that second umbrella issue, there's just no -- I mean, the

13:51:50  2   precedent just doesn't support it because this is criminal

13:51:53  3   investigation, so you don't balance.  That's, in a nutshell,

13:52:00  4   our position on that.

13:52:01  5              THE COURT:  All right.

13:52:01  6              MR. HANSMEIER:  Do you have any questions on that?

13:52:04  7              THE COURT:  No.  Again, we may want to revisit

13:52:06  8   that on rebuttal because, as you have admitted, you may not

13:52:11  9   completely apprehend Mr. Hart's argument.  I'm not sure that I

13:52:13  10  completely apprehend his argument on that.  So we'll --

13:52:16  11             MR. HANSMEIER:  Okay.

13:52:16  12             THE COURT:  -- possibly come back to that on

13:52:18  13  rebuttal as well.

13:52:20  14             MR. HANSMEIER:  So the good-faith exception is

13:52:21  15  what I would consider the last issue, and I think it has two

13:52:26  16  subparts.  We've argued that that's essentially not on the

13:52:28  17  table here, the law-of-the-case doctrine, and they've ruled.

13:52:33  18             THE COURT:  Right.

13:52:33  19             MR. HANSMEIER:  And that argument -- I mean, the

13:52:39  20  Government -- what happened on appeal is that we raised the

13:52:43  21  government-entity argument.  And we said in our brief that

13:52:47  22  there were these other things, these other issues, that you

13:52:50  23  didn't address, and that if we won the government-entity

13:52:53  24  argument, it should come back to you to address, one of which

13:52:56  25  was good faith.  That's what we said in our brief.

| | | |
|---|---|---|
| 13:52:58 | 1 | THE COURT:  Right. |
| 13:52:58 | 2 | MR. HANSMEIER:  The Government could have said |
| 13:53:01 | 3 | yes, we agree with that, let's just brief the government-entity |
| 13:53:05 | 4 | issue, and if we lose it can all go back.  But the Government |
| 13:53:08 | 5 | instead made some sort of strategic decision to sort of do a |
| 13:53:13 | 6 | shotgun-type brief, put all of this stuff in, asking the Tenth |
| 13:53:16 | 7 | Circuit to affirm on alternative grounds.  And one of the |
| 13:53:19 | 8 | issues the Government raised was good faith.  The problem is |
| 13:53:23 | 9 | the Government didn't raise it correctly.  And, you know, we |
| 13:53:27 | 10 | filed our reply brief, explaining that based on Rule 28 of the |
| 13:53:31 | 11 | appellate rules, the briefing was inadequate, the court should |
| 13:53:35 | 12 | dispose of it that way.  The court agreed with us.  You know, |
| 13:53:39 | 13 | in Judge Gorsuch's opinion, he says the good faith is out the |
| 13:53:43 | 14 | door. |
| 13:53:43 | 15 | THE COURT:  Right.  And so the question is whether |
| 13:53:45 | 16 | that disposal, as inadequate, is, in fact -- given that I had |
| 13:53:50 | 17 | not addressed that issue previously -- |
| 13:53:52 | 18 | MR. HANSMEIER:  Correct. |
| 13:53:52 | 19 | THE COURT:  -- is, in fact, law of the case. |
| 13:53:54 | 20 | MR. HANSMEIER:  Correct. |
| 13:53:55 | 21 | THE COURT:  Here's, I think, your biggest |
| 13:53:57 | 22 | challenge on that, on this rather interesting list in the final |
| 13:54:05 | 23 | paragraph of the Tenth Circuit's opinion where they're talking |
| 13:54:11 | 24 | about matters that may remain to be decided on remand, some |
| 13:54:14 | 25 | matters of which have never been discussed in this case before. |

13:54:17  1   And I was puzzled by their inclusion in the list.  But,

13:54:23  2   nevertheless, one of those is the good-faith exception to

13:54:27  3   excuse warrantless searches just at the top of page 1309.  So

13:54:33  4   it seems to me that after everything else is said and done the

13:54:34  5   circuit itself identifies good faith as an issue on remand.

13:54:38  6             MR. HANSMEIER:  Yeah, see, I just read that

13:54:41  7   question -- I read that sentence differently.  I read that in

13:54:45  8   other cases, so it may be possible that the Government could

13:54:48  9   cite exigent circumstances or attenuation doctrine or

13:54:52  10  special-needs doctrine or the good-faith exception to excuse --

13:54:56  11            THE COURT:  You think they're no longer talking

13:54:57  12  about our case?

13:54:58  13            MR. HANSMEIER:  Because it says to exclude

13:54:59  14  warrantless searches or avoid suppression in at least some

13:55:03  15  cases.  I think what they're -- I think what Judge Gorsuch is

13:55:07  16  saying is, look, this case, we have it, this is the way it is.

13:55:10  17  But in another case maybe some of these other doctrines would

13:55:13  18  apply because --

13:55:14  19            THE COURT:  So you read that -- and this has

13:55:16  20  occurred to me -- you read that as Judge Gorsuch saying, in

13:55:23  21  essence, "They screwed up here but, gosh, those guys at NCMEC

13:55:28  22  are doing the Lord's work and there are other ways they can

13:55:32  23  keep doing that, and whatever you do, don't take that opinion

13:55:37  24  as thinking that I'm in favor of child porn and, therefore,

13:55:41  25  you're not going to vote to confirm me to the Supreme Court."

13:55:43  1              MR. HANSMEIER:  I do -- I agree.  I think there is

13:55:45  2    some truth to that.  I think it's --

13:55:47  3              THE COURT:  It's a possible reading.

13:55:48  4              MR. HANSMEIER:  Yeah.  And if you think about the

13:55:50  5    list, I mean, exigent circumstances, that's not an issue here.

13:55:53  6              THE COURT:  It was a very confusing list to me.

13:55:55  7              MR. HANSMEIER:  Attenuation doctrine.  No issues

13:55:58  8    here.  Special-needs doctrine, I mean, that's -- that wasn't an

13:56:01  9    issue.  Now I guess it is.

13:56:03 10              THE COURT:  So the Government says that it's not

13:56:05 11    the law of the case because it's not been ruled on, and that

13:56:10 12    the circuit isn't affirming my rejection of good faith.

13:56:13 13              MR. HANSMEIER:  Yeah.

13:56:14 14              THE COURT:  It's simply declining to address the

13:56:19 15    Government's good-faith arguments as alternative grounds --

13:56:22 16              MR. HANSMEIER:  Yeah.

13:56:22 17              THE COURT:  -- for affirmance by saying that's not

13:56:26 18    adequately developed, which would still cause it to survive

13:56:29 19    remand.  What's your response to that?

13:56:32 20              MR. HANSMEIER:  I mean, the Government cites this

13:56:34 21    Concrete Works case.  I mean, I've read it.  I mean, that's the

13:56:38 22    facts of the case.  The facts of the case in that case is that

13:56:41 23    the district court ruled on it and then it went up on an amici

13:56:45 24    briefing and it was disposed of that way.  There's nothing in

13:56:48 25    that case that says, the way I -- that that had any --

| | | |
|---|---|---|
| 13:56:52 | 1 | THE COURT:  I thought that was just an |
| 13:56:54 | 2 | illustrative example and also to be an example of the law of |
| 13:57:00 | 3 | the case there has to have been a ruling on the issue at some |
| 13:57:02 | 4 | point in the case.  I certainly didn't rule on the issue.  The |
| 13:57:04 | 5 | circuit declined to rule on the issue, so the issue's not been |
| 13:57:05 | 6 | ruled on, is the argument. |
| 13:57:10 | 7 | MR. HANSMEIER:  So Proctor & Gamble is this case |
| 13:57:12 | 8 | that we cite, a Tenth Circuit case from 2003, and the quote is |
| 13:57:15 | 9 | "The district court on remand is free to pass upon any issue |
| 13:57:18 | 10 | which was not expressly or impliedly disposed of on appeal." |
| 13:57:22 | 11 | THE COURT:  Exactly. |
| 13:57:24 | 12 | MR. HANSMEIER:  Right. |
| 13:57:24 | 13 | THE COURT:  Right.  And so the question is was |
| 13:57:26 | 14 | this issue disposed of on appeal. |
| 13:57:27 | 15 | MR. HANSMEIER:  Correct.  And it was.  I think it |
| 13:57:29 | 16 | was.  I mean, that's my position. |
| 13:57:31 | 17 | THE COURT:  And you think it was because? |
| 13:57:34 | 18 | MR. HANSMEIER:  I mean, page 13 -- because the |
| 13:57:36 | 19 | Government raised it, the Government raised good faith. |
| 13:57:39 | 20 | THE COURT:  But the circuit didn't rule on good |
| 13:57:41 | 21 | faith.  It declined to rule on good faith. |
| 13:57:43 | 22 | MR. HANSMEIER:  Well, see, I disagree with that. |
| 13:57:45 | 23 | I don't think it declined to rule on it.  I think it rejected |
| 13:57:48 | 24 | the Government's argument.  Now, did it reject that argument on |
| 13:57:51 | 25 | the merits?  No.  It rejected it on a procedural issue, but |

13:57:55  1    that doesn't mean that it didn't dispose of the issue.

13:57:58  2            I think -- so let me give you an example.  Let's

13:58:01  3    take a sentencing.  Let's say an if a criminal defendant goes

13:58:04  4    up on appeal, two issues.  Let's just make it easy, two

13:58:08  5    guideline issues.  Let's say the court of appeals says, "You

13:58:10  6    know what, that one guidelines, that was an error, that was a

13:58:14  7    guidelines error.  But the other issue, you know, you didn't --

13:58:16  8    you didn't brief that adequately, and so it wasn't done

13:58:20  9    correctly, and you -- so you don't get any relief on that,

13:58:24  10   remand for resentencing."

13:58:26  11           THE COURT:  But -- but the problem with your

13:58:28  12   analogy is that, assuming that the hapless district court below

13:58:33  13   had at sentencing at least considered, as we're required to do,

13:58:39  14   what the guideline recommendation was, in that consideration it

13:58:43  15   would had to have passed on your second guideline issue,

13:58:46  16   whereas here I did not pass on, yea or nay, the good-faith

13:58:50  17   issue.

13:58:50  18           MR. HANSMEIER:  Well, doesn't -- we can say it's

13:58:53  19   plain error.  Does that help?  Let's say it wasn't raised

13:58:56  20   below.  There was no objection below.  It goes up --

13:58:59  21           THE COURT:  There was no objection below here or

13:59:01  22   in your example?

13:59:02  23           MR. HANSMEIER:  In my example.

13:59:03  24           THE COURT:  But, nevertheless, in your example,

13:59:04  25   even if not objected to, if it's a guideline issue, then it's

13:59:08   1   factored into what the guideline was, or at least what the

13:59:11   2   guideline should have been, which the court accepted and made

13:59:17   3   at least consideration of in determining what the sentence

13:59:19   4   would be.  So it would not have been an issue that played no

13:59:23   5   role in the court's decision below because in passing on

13:59:27   6   sentencing the court would have had to consider the cumulative

13:59:31   7   effect in the final result of the guidelines.

13:59:32   8                  MR. HANSMEIER:  Yeah, and I don't know.

13:59:33   9                  THE COURT:  So I don't think that example works.

13:59:38   10                  MR. HANSMEIER:  Okay.  I mean, I think you could

13:59:39   11   turn the tables on this issue.  I think the Government would

13:59:44   12   argue waiver.  I think it's -- so the law of the case, you

13:59:50   13   know, the mandate rule, these type of prudential rules, they

13:59:55   14   exist, you know, a lot -- one of the primary reasons is to save

13:59:59   15   judicial resources.  If you don't do something right, a court

14:00:02   16   doesn't have to do it for you.  And I think that, when you take

14:00:05   17   those principles, it makes a lot of sense to apply them here,

14:00:09   18   'cause the Government -- and on top of that, parties get to

14:00:14   19   decide their own fate in some sense.  I mean, the Government

14:00:17   20   could have not raised good faith.  It could have said, look,

14:00:20   21   the -- we raised one issue.  It was a very clean brief, one

14:00:24   22   issue.  Everything else go -- we asked, look, we think NCMEC is

14:00:30   23   a government entity.  If we're right, send it back and let's

14:00:33   24   start over.  That was our position.

14:00:35   25                  The Government could have -- could have briefed

14:00:38    1    this cleanly.

14:00:39    2              THE COURT:  So you think if the words "good faith"

14:00:42    3    had never appeared in the Government's brief, the result might

14:00:45    4    be different?

14:00:45    5              MR. HANSMEIER:  Oh, absolutely, absolutely.

14:00:46    6              THE COURT:  But because they appeared, that the

14:00:49    7    court determined that they appeared inadequately or whatever,

14:00:55    8    insufficiently --

14:00:56    9              MR. HANSMEIER:  Uh-huh.

14:00:56    10             THE COURT:  -- that the result changes?

14:00:59    11             MR. HANSMEIER:  Right.  I mean, the Government

14:01:01    12   could -- the court of appeals could have said, you know, the

14:01:04    13   good-faith exception, the Government didn't do a good job on

14:01:07    14   the deal, we're sending it back, district court deal with it.

14:01:11    15   They could have said that.  They didn't.  What the court of

14:01:13    16   appeals said is that we're addressing good faith.  You didn't

14:01:16    17   brief it adequately.  You lose.  That, to me, is law of the

14:01:20    18   case.  And the Government shouldn't get --

14:01:22    19             THE COURT:  But they don't say "you lose."  They

14:01:24    20   say it's insufficient for appellate review.

14:01:29    21             MR. HANSMEIER:  Well, they sure didn't say "you

14:01:32    22   won," I guess.

14:01:32    23             THE COURT:  Well, they sure didn't say "you won,"

14:01:35    24   which is consistent with the position that they didn't address

14:01:39    25   it, because they didn't say "you lose" or win; they said the

14:01:42  1   argument's insufficient for review, and the question is whether

14:01:46  2   that note of insufficiency is still a finality determination at

14:01:51  3   the circuit with respect to this issue.

14:01:55  4                MR. HANSMEIER:  I mean, I just find it hard to

14:01:57  5   believe that when a party briefs an issue and does -- doesn't

14:02:00  6   do an adequate job and gets a remand, that the party can raise

14:02:03  7   that.  I just -- that -- and there's no case.  The Government

14:02:09  8   hasn't cited a case that says that.  And I can't think of a

14:02:13  9   case that says that.

14:02:14  10               I think the rule, the general rule, is that if --

14:02:20  11   and I just said it, I mean, it's something that is disposed of

14:02:23  12   on appeal, is not --

14:02:26  13               THE COURT:  Right.  Nobody quibbles with that

14:02:28  14   general rule.  The question is whether it was disposed of.

14:02:31  15               MR. HANSMEIER:  Yeah, and I think -- I don't

14:02:33  16   really -- I think it was disposed of.  That's -- I think if the

14:02:38  17   shoe were on the other foot, the Government would not come in

14:02:41  18   here and say, oh, yeah, Mr. Ackerman can raise an issue he

14:02:45  19   didn't brief adequately on appeal and lost.  I think that's --

14:02:48  20   maybe, maybe I'm wrong about that, but that seems like

14:02:51  21   something a party would do.  That's --

14:02:54  22               THE COURT:  Well, then that still leaves me with

14:02:57  23   only one hard question to be resolved on appeal, that being the

14:03:01  24   third-party doctrine, which the Government's expressly

14:03:04  25   disallowed or disavowed.  I don't want to put too much stock on

14:03:10  1    one solitary letter.

14:03:12  2              MR. HANSMEIER:  Right.

14:03:16  3              THE COURT:  But it does confuse me as to what

14:03:19  4    Judge Gorsuch thought those hard questions were.

14:03:21  5              MR. HANSMEIER:  Right.  I mean, I don't disagree

14:03:24  6    with you.

14:03:24  7              And on the merits, I -- look, I think we'd win on

14:03:28  8    good faith, too.  I don't think the good-faith exception

14:03:30  9    applies in this case.  And that's primarily because there is no

14:03:34  10   real good-faith reliance on somebody else.  And, I mean, that's

14:03:38  11   sort of the background of the good-faith exception.  And I

14:03:42  12   think the Tenth Circuit just sort of made this clear with

14:03:44  13   *Nelson*, which was decided about two weeks ago, which was a case

14:03:47  14   out of our office.  There's a line in there, 'cause the

14:03:50  15   Government was trying to argue -- and that was a

14:03:52  16   protective-sweep case.  The Government was trying to argue good

14:03:55  17   faith and a warrantless search, protective sweep, and the court

14:03:58  18   of appeals said no, the good-faith exception exists to shield

14:04:03  19   officers from other's mistakes.

14:04:05  20             THE COURT:  This was the case where the circuit

14:04:09  21   said unsubstantiated concerns that you may be in danger are

14:04:15  22   insufficient for a protective sweep?

14:04:16  23             MR. HANSMEIER:  Yeah.

14:04:16  24             THE COURT:  Yeah, I read that case.

14:04:18  25             MR. HANSMEIER:  And if you read the good-faith

14:04:20  1   exception part of it, that's exactly what they say.  So here

14:04:23  2   there's no good faith --

14:04:24  3           THE COURT:  Yeah, the good faith was an ill fit

14:04:26  4   there.  But here it seems that somebody -- was this amicus

14:04:30  5   brief?  I don't recall -- someone points out there's a

14:04:32  6   statutory framework that tells NCMEC to do what they did, and

14:04:41  7   that statutory framework having not yet been found wanting, is

14:04:45  8   the legal basis for their good-faith argument on the merits,

14:04:48  9   assuming that those merits can be reached.

14:04:50  10          MR. HANSMEIER:  So, right, so I think the

14:04:52  11  good-faith exception turns on the administrative search, so

14:04:57  12  there's these administrative search good-faith exception cases,

14:05:01  13  *Illinois v. Krull*, I think you can put the railroad case,

14:05:05  14  *Skinner*, probably in there, the railroad case, drug-testing

14:05:09  15  case, those types of cases where you have a statutory scheme

14:05:12  16  that tells you to do stuff, you do it.  And the courts have

14:05:16  17  said that's fine, that's good faith.

14:05:18  18          So the problem with applying that line of cases in

14:05:23  19  this case is that those statutes at issue in those cases were

14:05:29  20  search cases.  They were cases that said -- so *Illinois v.*

14:05:35  21  *Krull* involved, I think, the Illinois vehicle code.  And it

14:05:38  22  expressly said -- this is in the briefing -- it expressly talks

14:05:41  23  about inspecting vehicles, you know, essentially searching

14:05:45  24  vehicles.  That was what the statutory scheme told the

14:05:51  25  Government officials to do.

14:05:52    1            The difference here is that there's -- you know,

14:05:54    2    this statutory scheme isn't an administrative search scheme;

14:05:59    3    it's this scheme that's set up so that these ISPs can report

14:06:06    4    any information to the Government, and so -- because this is

14:06:09    5    contraband.

14:06:10    6            THE COURT:  Well, to the Government, given that

14:06:11    7    NCMEC is an agency of the Government as the Tenth Circuit

14:06:14    8    decided.

14:06:14    9            MR. HANSMEIER:  Correct.

14:06:14   10            THE COURT:  'Cause that's who they report to.

14:06:16   11            MR. HANSMEIER:  Correct.

14:06:16   12            THE COURT:  And doesn't NCMEC then, under that

14:06:19   13    statutory scheme, do an administrative search like, perhaps, in

14:06:25   14    *Illinois v. Krull*?

14:06:25   15            MR. HANSMEIER:  Well, they do.  That's the

14:06:28   16    problem.  I think the question is whether this statute

14:06:33   17    authorize -- I mean, not only authorizes it but tells them to

14:06:37   18    do it, and it doesn't.  There's nothing in the statutory scheme

14:06:40   19    that says, "NCMEC, search this stuff when you get it."  And I

14:06:44   20    think that's the difference.  So it's not written as an

14:06:46   21    administrative-search scheme.

14:06:48   22            THE COURT:  Well, doesn't the statute in *Illinois*

14:06:51   23    *v. Krull* require a vehicle search?

14:06:53   24            MR. HANSMEIER:  Yes, I think so.

14:06:54   25            THE COURT:  Or did it authorize one?

14:06:58  1          MR. HANSMEIER:  "Authorized to inspect records of

14:07:01  2   businesses, examine the premises of such businesses."

14:07:03  3          THE COURT:  But it didn't require them to do it;

14:07:05  4   it merely authorized them to do it.

14:07:08  5          MR. HANSMEIER:  Well, I assume that that's true.

14:07:11  6   I mean, I don't think that there was --

14:07:12  7          THE COURT:  I mean, I can't imagine a statute

14:07:14  8   requiring.

14:07:14  9          MR. HANSMEIER:  Yeah, I don't know what that would

14:07:16 10   mean.

14:07:17 11          THE COURT:  So how is that materially different

14:07:19 12   than the NCMEC statute?

14:07:21 13          MR. HANSMEIER:  Because the statute authorized

14:07:24 14   searches, and the NCMEC -- this 2250, et al., is not an

14:07:32 15   administrative search scheme.

14:07:35 16          THE COURT:  What is it?

14:07:36 17          MR. HANSMEIER:  It's a scheme to allow ISPs to

14:07:40 18   report contraband to the Government.

14:07:45 19          THE COURT:  And under that scheme that authorizes

14:07:52 20   the Internet service providers to do that, it's assumed that

14:07:55 21   once it's reported to the government it's going to be stored in

14:08:00 22   a warehouse along with the arc of the covenant at the end of

14:08:03 23   the Raiders of the Lost Ark and never looked at?  I mean, isn't

14:08:07 24   it implicit in that scheme that if it's reported it's going to

14:08:11 25   be -- I haven't looked at the language of the statute.

14:08:14  1          MR. HANSMEIER:  Yeah.

14:08:14  2          THE COURT:  But clearly it seemed to me the

14:08:16  3    statutory scheme said "reported," so that you can't do this,

14:08:20  4    but so that NCMEC can look at it.  I mean, they're not just

14:08:23  5    reporting them for long-term storage.

14:08:25  6          MR. HANSMEIER:  So I -- well, I mean, that's

14:08:28  7    obviously true, but the question is whether they need a warrant

14:08:31  8    to go any further and whether they have proper cause under the

14:08:34  9    Fourth Amendment.

14:08:35  10          THE COURT:  So you think the statutory scheme does

14:08:38  11    not excuse the requirement for the Government agency, i.e.

14:08:43  12    NCMEC, to then get a warrant once it's been reported to them?

14:08:45  13          MR. HANSMEIER:  Right.

14:08:46  14          THE COURT:  That's the difference.

14:08:47  15          MR. HANSMEIER:  Right.  Yeah, it's not an

14:08:49  16    administrative search.

14:08:49  17          THE COURT:  All right.

14:08:49  18          MR. HANSMEIER:  You can draw all kinds of

14:08:52  19    analogies where you would have a private party giving something

14:08:55  20    to the Government and the Government can't just search it.  I

14:08:59  21    mean, we're back to the private-search doctrine, which we won

14:09:02  22    on appeal.  So I think there's a pretty clear difference

14:09:05  23    between a scheme that says the Government searched this and the

14:09:07  24    Government that says third party, you know, you can report this

14:09:10  25    stuff.  And, again, I think the scheme has to exist because

| | | |
|---|---|---|
| 14:09:13 | 1 | this is contraband; right?  And then the scheme itself, you |
| 14:09:16 | 2 | know, part of this thing allows ISPs -- it essentially says you |
| 14:09:20 | 3 | can look at it and you're not going to be, you know -- you |
| 14:09:26 | 4 | know, going to be prosecuted. |
| 14:09:27 | 5 | THE COURT:  Right, it's a protection for them. |
| 14:09:28 | 6 | MR. HANSMEIER:  Correct.  It's like immunity.  So |
| 14:09:32 | 7 | that's part of it.  It wouldn't make sense to call it an |
| 14:09:35 | 8 | administrative search scheme if you had a provision saying if |
| 14:09:37 | 9 | you search, it's okay.  I don't know.  That's how I look at it. |
| 14:09:42 | 10 | It's just different.  If you read the statute, *Illinois v.* |
| 14:09:47 | 11 | *Krull* and *Skinner*, it's just different.  Those are |
| 14:09:49 | 12 | administrative search schemes.  This isn't.  I don't know that |
| 14:09:55 | 13 | I have anything else on that.  I think it turns on whether it's |
| 14:09:58 | 14 | an administrative search scheme, and we don't think it is, for |
| 14:10:03 | 15 | those reasons. |
| 14:10:03 | 16 | THE COURT:  All right. |
| 14:10:04 | 17 | MR. HANSMEIER:  And I think -- well, it's hard -- |
| 14:10:07 | 18 | so I think maybe that's all I'll address now unless you want |
| 14:10:10 | 19 | me -- it's hard to differentiate between everything and the |
| 14:10:15 | 20 | Government's sort of termination theory.  But if you want them |
| 14:10:18 | 21 | to go first on that, maybe I should be done right now.  Do you |
| 14:10:24 | 22 | have questions? |
| 14:10:24 | 23 | THE COURT:  What's the termination theory? |
| 14:10:26 | 24 | MR. HANSMEIER:  The whole hotel search cases, |
| 14:10:30 | 25 | expectation of privacy. |

14:10:31  1          THE COURT:  I think I want to hear from them first

14:10:32  2   on that.

14:10:33  3          MR. HANSMEIER:  Yeah, so -- I don't know, do you

14:10:37  4   have any questions for me?

14:10:38  5          THE COURT:  No, I think that's good for now.

14:10:40  6   Let's go to Mr. Hart.

14:10:42  7          MR. HART:  Your Honor, on that last point that you

14:10:44  8   all were discussing, the statute at issue is 18 U.S.C. 2258A.

14:10:50  9   It's big A.  In that statute -- which we reference in our

14:10:55  10  initial supplemental response, which is document 84, on

14:11:00  11  page 13, which is part of our, I guess, discussion of the

14:11:07  12  reasonableness argument -- there is an authorization in that

14:11:12  13  statute that NCMEC -- that the complete communication

14:11:15  14  containing any image of child pornography is what ISPs are

14:11:19  15  authorized and required, once they find, to submit -- well, let

14:11:24  16  me back up.  They're required to submit a report but that

14:11:27  17  report may include the complete communication containing any

14:11:31  18  image of apparent child pornography.  And then, in subpart --

14:11:40  19  my briefing here says 18 U.S.C. 2258D(d)(1), that NCMEC shall

14:11:47  20  "minimize the number of employees that are provided access to

14:11:50  21  any image provided under subsection 2258A." [As read.]

14:11:53  22          So these provisions demonstrate that Congress had

14:11:58  23  the intent that NCMEC employees would review the CyberTipline

14:12:04  24  and that they may access the images that are then submitted

14:12:07  25  with those communications, which contained child pornography.

14:12:09  1  So this actually is very much like the *Illinois v. Krull* case

14:12:14  2  that the Court was discussing, whether it's an administrative

14:12:16  3  search, an administrative --

14:12:18  4         THE COURT:  So you're saying that it goes beyond

14:12:20  5  authorizing and immunizing the ISPs from providing this

14:12:24  6  information to NCMEC, but it then requires certain activities

14:12:28  7  on behalf of the NCMEC?

14:12:28  8         MR. HART:  It doesn't require NCMEC to do it.

14:12:30  9         THE COURT:  Or authorizes.

14:12:31 10         MR. HART:  Correct.

14:12:32 11         THE COURT:  Authorizes certain activity on behalf

14:12:35 12  of the NCMEC.

14:12:35 13         MR. HART:  And so that gets to that issue of

14:12:42 14  whether this is good faith on the part of NCMEC.  But where we

14:12:47 15  have presented that in reasonableness, that this is a

14:12:50 16  reasonable undertaking by NCMEC because it's in compliance with

14:12:53 17  a statute --

14:12:54 18         THE COURT:  Explain your reasonableness argument

14:12:56 19  and how that fits in with the Fourth Amendment in a criminal

14:12:58 20  case.

14:12:59 21         MR. HART:  Well, Your Honor, that's where the

14:13:01 22  Fourth Amendment sort of starts.

14:13:03 23         THE COURT:  Well, I understand.  I know how the

14:13:05 24  Fourth Amendment reads.  But I was never quite clear in your

14:13:09 25  beef -- it seemed to me that you were saying, in really serious

14:13:14   1    cases we don't have to worry about that.  I'm being a bit

14:13:18   2    facetious, of course, but I wasn't really sure what you were

14:13:22   3    arguing, given that these were compelling -- the balancing

14:13:25   4    test, the compelling need.  I mean, what does all that do with

14:13:31   5    respect to our Fourth Amendment analysis?

14:13:34   6               MR. HART:  Well, with the Fourth Amendment

14:13:36   7    analysis it's not simply was there Fourth Amendment violation.

14:13:39   8    I think very frequently that that's how the argument is

14:13:42   9    presented by the defense, hey, there was a violation, we're

14:13:45  10    done and we're out, and the analysis is over.  And that's not

14:13:49  11    the analysis.

14:13:49  12               The question is, and as we put it here, even if

14:13:55  13    Ackerman could establish that he has a Fourth Amendment

14:13:57  14    interest in the contents, as the text of the Fourth Amendment

14:14:01  15    indicates, "the ultimate measure of constitutionality of the

14:14:05  16    governmental search is reasonableness."

14:14:07  17               And it's based upon that that we have those cases

14:14:10  18    like *Illinois v. Krull*, which is a warrantless search but it's

14:14:15  19    based upon administrative provisions that made the activity

14:14:18  20    reasonable.  And that's, I guess, where we're at.  We're not

14:14:22  21    arguing special needs.  And we didn't try to make it special

14:14:27  22    needs.  I would say the defense is trying to make it special

14:14:30  23    needs.

14:14:31  24               We have clearly veered away from special needs.

14:14:34  25    We're not employing that particular test because there's

14:14:38  1  specific requirements for special needs, which may be reached

14:14:44  2  in this case but, by the powers that be, we are not arguing

14:14:47  3  special needs, but we are arguing that the conduct of NCMEC in

14:14:52  4  this case was reasonable.

14:14:54  5           And so part of that reasonableness is balancing

14:15:00  6  the defendant's privacy concerns with the reasonableness of the

14:15:07  7  search.  And this is stuff that's coming from *Maryland v. King*,

14:15:11  8  which was decided in 2013 by the Supreme Court, which is post

14:15:15  9  *Jones*.

14:15:19  10          So what we're arguing is that NCMEC's review of

14:15:26  11  the CyberTipline Report that AOL sent was reasonable, in light

14:15:31  12  of these provisions and in light of the defendant's diminished

14:15:35  13  or nonexistent expectation of privacy.

14:15:38  14          THE COURT:  Well, see, I always -- and this is

14:15:40  15  very, very broad brush, but I always look at the reasonable

14:15:43  16  language of the Fourth Amendment or the unreasonable language

14:15:46  17  to relate to issues that we encompass and talk about in terms

14:15:51  18  of reasonable expectations of privacy and such.  You're taking

14:15:56  19  that to say that -- I mean, this is really an *Illinois v. Krull*

14:16:02  20  argument, in essence.

14:16:03  21          MR. HART:  Yes, Your Honor.

14:16:03  22          THE COURT:  That there's authorization, and you

14:16:06  23  call that authorization the reasonableness -- it's your

14:16:10  24  argument on reasonableness balancing.

14:16:11  25          MR. HART:  Well, Your Honor, I'm not calling it

14:16:16  1  that.  I'm referring to the Supreme Court's analysis and how it

14:16:19  2  begins it.  And I think it's by virtue the reasonable analysis

14:16:23  3  that the Supreme Court is able to decide cases like *Illinois v.*

14:16:27  4  *Krull* in the manner in which it does.

14:16:29  5          This is a unique case.  There's not really any

14:16:33  6  question about that, because we have an ISP -- we have a

14:16:36  7  private individual, an ISP, NCMEC, which up until Ackerman was

14:16:42  8  a private entity and now is a government entity, and then

14:16:47  9  Special Agent Rick Moore.  I can think of not very many cases

14:16:51  10  that have that many players in it that involve these different

14:16:55  11  things, but *Illinois v. Krull* comes pretty close.  It doesn't

14:17:00  12  have the AOL-type character.  It had a DMV or -- I don't know

14:17:08  13  exactly what the person was, but a clerk, who made an

14:17:11  14  administrative -- who made a clerical error, as I recall, but

14:17:15  15  ultimately its reliance on that statutory authority to

14:17:19  16  authorize that search that the officers then go and search the

14:17:23  17  Krull's business.  And so that's kind of what we have here.

14:17:30  18          And so that turns on a reasonableness -- an

14:17:33  19  extension of that reasonableness.  The reasonableness is not

14:17:36  20  necessarily going to be involved in all -- I think it would be

14:17:40  21  involved in all cases, but in terms of whether or not the agent

14:17:47  22  did something that is unreasonable or reasonable, that then

14:17:52  23  gets right into the good faith.  I mean, it gets --

14:17:55  24          THE COURT:  It seems to me that they would overlap

14:17:58  25  considerably.

14:18:00  1          MR. HART:  I think they do.  But --

14:18:02  2          THE COURT:  They're not the same.

14:18:02  3          MR. HART:  -- they're not the same.

14:18:03  4          THE COURT:  But there is a large degree of

14:18:06  5  overlap.

14:18:07  6          MR. HART:  But there is a large degree of overlap.

14:18:11  7  And what we have here -- I mean, what's interesting here is the

14:18:12  8  defendant would suggest that, you know, NCMEC could get a

14:18:15  9  warrant.  That was part of our arguments earlier is NCMEC

14:18:19 10  can't.  They're unable to.  They don't have that authorization.

14:18:22 11  But what they do have is what's listed in the statute.

14:18:25 12          THE COURT:  I'm sorry, you made the argument that

14:18:27 13  NCMEC cannot get a warrant?

14:18:29 14          MR. HART:  Correct.  NCMEC, in and of itself, as

14:18:33 15  you recall, that was part of our arguments in briefing, is

14:18:36 16  NCMEC does not enjoy the policing powers that law enforcement

14:18:40 17  does.  They don't have a warrant power.  They don't have

14:18:43 18  subpoena power.

14:18:44 19          THE COURT:  And that may change following the

14:18:46 20  circuit's decision in this case.

14:18:48 21          MR. HART:  I doubt it.  That would be unusual to

14:18:51 22  grant search warrant authority to an entity like NCMEC, I

14:18:56 23  should think.  But --

14:18:58 24          THE COURT:  Well, I would agree it would be

14:19:00 25  unusual.

14:19:01   1           MR. HART:  But -- so, Your Honor, as far as that

14:19:04   2   particular issue, I know I've jumped right to the very back end

14:19:07   3   of the defendant's -- what the defendant was discussing.  But

14:19:13   4   that, I think the Court is correct, that the reasonableness

14:19:16   5   does somewhat dovetail into the good-faith arguments.  But I

14:19:23   6   think there is a -- specifically related to the reasonableness

14:19:26   7   of NCMEC's undertaking, whether that search was reasonable, is,

14:19:34   8   by virtue of they're -- sort of they're government entity but

14:19:38   9   they're not law enforcement specifically, you know, how do you

14:19:41   10  suss that out and how do you evaluate that search.  So I think,

14:19:46   11  Your Honor, the reasonableness, as we've presented it, is

14:19:50   12  actually clear.  There's a considerable amount of citation that

14:19:54   13  we put in it, and we never attempt to categorize it as a

14:19:58   14  special-needs doctrine.  If the defense counsel was confused on

14:20:02   15  that, I apologize, but I feel we were pretty clear that we were

14:20:04   16  focusing on the reasonableness.

14:20:06   17           As it relates to the *U.S. v. Davis* case, which we

14:20:10   18  did cite, we actually referenced that in a note, in our

14:20:16   19  original briefing.  It's footnote 42.  And we reiterate that,

14:20:21   20  again, in paragraph -- in section five of our, I guess, reply

14:20:28   21  to the defendant's brief.

14:20:29   22           THE COURT:  What was the fact pattern underlying

14:20:31   23  the dispute in *Davis*?

14:20:32   24           MR. HART:  Well, that was obtaining the phone

14:20:34   25  carrier cell site information.

14:20:38  1            THE COURT:  Because?

14:20:39  2            MR. HART:  Oh --

14:20:41  3            THE COURT:  I mean, was it in the direct context

14:20:43  4   of a criminal investigation?  That's Mr. Hansmeier's argument,

14:20:46  5   that it's a very different factual predicate than here.  This

14:20:51  6   was -- certainly at the time we get to those issues, we're in

14:20:54  7   a -- obviously, by the time the agency was up -- we're in a

14:20:58  8   classic criminal investigation.

14:20:59  9            MR. HART:  Well, and I think -- I'm trying to

14:21:02  10  remember the *Davis* case.  My recollection was it was a

14:21:07  11  drug-related case.  I believe it was.  I believe it was a

14:21:15  12  direct law enforcement investigation, so these are officers,

14:21:18  13  agents, who were obtaining cell site location records with a

14:21:23  14  court order.  But what's interesting about the *Davis* and the

14:21:26  15  reason why we refer to it is because there is that alternative

14:21:30  16  holding that even if obtaining those records was a search --

14:21:34  17  which they were addressing whether or not obtaining the records

14:21:37  18  was a search and they said it wasn't -- that even if it was, it

14:21:43  19  would be constitutionally reasonable.  All right?  So what we

14:21:46  20  actually have there in the Eleventh Circuit is an application

14:21:50  21  of the *Maryland v. King* and *Illinois v. Krull* type of cases,

14:21:54  22  which are reasonableness, not necessarily good faith.

14:21:58  23            And so we're not making this up or pulling it out

14:22:02  24  of the air.  There's a line of cases that would -- I think the

14:22:08  25  Court should consider.  And this is -- because this is an

| | | |
|---|---|---|
| 14:22:13 | 1 | interesting issue that involves, I think, different or atypical |
| 14:22:17 | 2 | players than the Court would see, we really have to flesh out |
| 14:22:20 | 3 | each and every individual part.  And so as it relates to NCMEC, |
| 14:22:27 | 4 | we are arguing that the search was reasonable.  And there is |
| 14:22:30 | 5 | support in the case law from the Supreme Court, from the |
| 14:22:34 | 6 | Eleventh Circuit, which would suggest that that is an |
| 14:22:37 | 7 | appropriate course of analysis for this court to undertake. |
| 14:22:40 | 8 | And we believe it falls, in light of the statutes and the |
| 14:22:45 | 9 | defendant's diminished privacy interest, if they even exist, |
| 14:22:50 | 10 | that it falls in the favor of the Government. |
| 14:22:52 | 11 | THE COURT:  If what even exists? |
| 14:22:54 | 12 | MR. HART:  The privacy interest. |
| 14:22:56 | 13 | THE COURT:  Let's talk about that next. |
| 14:22:57 | 14 | MR. HART:  Do you want me to talk about the *Jones* |
| 14:22:58 | 15 | argument or the privacy-interest argument first? |
| 14:23:01 | 16 | THE COURT:  Umm -- |
| 14:23:03 | 17 | MR. HART:  Can I do the *Jones* first? |
| 14:23:05 | 18 | THE COURT:  All right. |
| 14:23:05 | 19 | MR. HART:  Simply because I have it on my list |
| 14:23:07 | 20 | here.  I've got 'em separated in two spots.  I think the *Jones* |
| 14:23:11 | 21 | privacy-interest argument, I -- I think we put this in our |
| 14:23:17 | 22 | brief.  This is dicta and this is not controlling and this is |
| 14:23:20 | 23 | sort of a little bit of meandering.  I don't know what you |
| 14:23:25 | 24 | would call it, not pontification but sort of musings by the |
| 14:23:30 | 25 | court about whether or not *Jones* might apply. |

14:23:33  1        I would note this.  Since Ackerman was decided,
14:23:37  2  there have been three, at least three, cases that have
14:23:40  3  referenced Ackerman, and none of them have relied on the *Jones*
14:23:44  4  trespass analysis.  The first case is actually out of this
14:23:50  5  district.  It's -- and these are district court cases, so the
14:23:53  6  court is aware.  *United States v. Stratton*, which was decided
14:23:57  7  by Judge Crabtree.  That is 229 F. Supp. 3d, 1230.  That was
14:24:04  8  decided in January of 2017.  That case follows basically
14:24:12  9  strictly a privacy analysis.
14:24:14  10        The next case is *United States v. Miller*, which is
14:24:21  11  out of Florida -- no, Eastern District of Kentucky.  And that
14:24:27  12  case is -- does not have an F. Supp. citation.  It is 2017
14:24:34  13  Westlaw 2705963.  And in that case it applied again the privacy
14:24:52  14  analysis.  It also found that *Jones* does not apply.  I think
14:24:57  15  though it is specific to the facts of that case, where Google
14:25:01  16  hashed all of the images, and so they said *Jones* doesn't apply,
14:25:03  17  but it is almost a footnote as to the *Jones* analysis because
14:25:08  18  they're not approaching these cases under a *Jones* analysis;
14:25:12  19  they're approaching it under a privacy analysis.
14:25:13  20        The last case is *United States v. Wilson*, which
14:25:16  21  was -- well, and just so the court is aware, that case was
14:25:20  22  decided, the *Miller* case, was decided on June 23rd, 2017.
14:25:24  23        The *United States v. Wilson*, which is out of the
14:25:28  24  Southern District of California case, this is 2007 Westlaw
14:25:36  25  2733879, is another motion -- or another case involving a

14:25:46  1   motion to suppress.  And again that court provides substantial

14:25:54  2   analysis under the privacy analysis.  It does not approach it

14:25:58  3   under a *Jones* theory analysis.  And I think there's some good

14:26:01  4   reason for this.  If you apply the *Jones* theory analysis to a

14:26:08  5   digital communication, it's hard to see where that ends,

14:26:12  6   because the *Jones* theory is a property interest.  You have to

14:26:16  7   have a property interest.  As a central question then for a

14:26:23  8   property interest is the court has to determine is the email in

14:26:29  9   this case, is the email that is the CyberTip, the CyberTip

14:26:34  10  itself, is that the defendant's or is it AOL's.  Now, we

14:26:39  11  haven't briefed that or argued that because we've approached it

14:26:41  12  under --

14:26:42  13          THE COURT:  Well, the cyber tip is really just

14:26:45  14  forwarding Mr. Ackerman's email from the ISP to NCMEC, though;

14:26:49  15  correct?

14:26:51  16          MR. HART:  I don't know that I would use the word

14:26:52  17  "forward," but I think that's a pretty accurate description.

14:26:54  18          THE COURT:  So really substantively it's still

14:26:57  19  initially the citizen's communication.

14:26:59  20          MR. HART:  Well, Your Honor, if I send

14:27:02  21  Mr. Hansmeier an email and he forwards it to you, is that a

14:27:09  22  communication from me to you or is it a communication from

14:27:13  23  Mr. Hansmeier to you?

14:27:14  24          THE COURT:  So you send Mr. Hansmeier an email

14:27:18  25  that says "Judge Melgren is an idiot" and he forwards that to

14:27:22  1   me and so I have an email in my box from Dan Hansmeier that

14:27:26  2   substantively says "Judge Melgren is a blithering idiot," the

14:27:30  3   truth of that assertion aside, who am I going to be mad at,

14:27:33  4   Mr. Hansmeier, who I got the email from, or the guy who

14:27:36  5   initiated it?  So it's really your communication.

14:27:39  6              MR. HART:  Well, the attribution of the contents

14:27:43  7   may be absolutely Mr. Ackerman's.  And the communication -- the

14:27:48  8   attribution of those comments would be mine, though I would

14:27:52  9   never send that email.

14:27:54  10             THE COURT:  You'd just look at it for a few days

14:27:57  11  and delete it before sending it.

14:27:59  12             MR. HART:  No, I wouldn't, Your Honor.  But that

14:28:01  13  email is Mr. Hansmeier's.

14:28:05  14             THE COURT:  So what's the significance of that?

14:28:07  15             MR. HART:  Because it relates to the privacy

14:28:08  16  interest, and the difficulty in assessing whether or not the

14:28:13  17  defendant has a privacy interest in what was submitted to

14:28:15  18  NCMEC, because this is essentially -- that gets to the --

14:28:17  19             THE COURT:  Okay.  But that's a different analogy

14:28:19  20  than yours because the defendant did not send the email to

14:28:23  21  NCMEC, whereas you did send the email to Mr. Hansmeier and,

14:28:27  22  therefore -- in the hypothetical -- and, therefore, any privacy

14:28:31  23  interests you would have had in that would have been lost once

14:28:37  24  you had sent it to him and he could have sent it on to me.  But

14:28:42  25  Mr. Ackerman did not send the email to NCMEC.

14:28:44  1          MR. HART:  Absolutely.  And in that case that fact

14:28:47  2  actually weighs in favor of identifying this email as AOL's.

14:28:51  3          THE COURT:  I can't agree with that.  Because AOL

14:28:56  4  is the sender in the same that Mr. Hansmeier's the sender of

14:28:59  5  the "blithering idiot" email, but the substance comes from

14:29:03  6  someone else.  AOL sent Mr. Ackerman's email on to NCMEC, true,

14:29:07  7  but the matter contained in what was sent on was

14:29:11  8  Mr. Ackerman's, not AOL's.

14:29:13  9          MR. HART:  And I think what the Court -- where the

14:29:16  10 Court is unseparating attribution from property interest.  And

14:29:23  11 *Jones* does not turn on attribution.  *Jones* turns on a property

14:29:29  12 interest.  And what's, I think, important about that, while

14:29:33  13 attribution may be this person said something, that's not

14:29:37  14 really the question that *Jones* gets to.  *Jones* gets to who has

14:29:42  15 a property interest in the thing.  So that is the very first

14:29:47  16 question, is whose email is the CyberTip.

14:29:55  17          The second thing is did the defendant retain a

14:29:58  18 property interest once AOL took its action of terminating his

14:30:03  19 access.  And that's the -- that's where the importance of the

14:30:09  20 hotel cases turn because our jurisprudence would indicate that,

14:30:13  21 no, he does not retain a property interest.

14:30:16  22          THE COURT:  I -- I have major problems with your

14:30:20  23 hotel cases, which is the nice way of saying that I reject your

14:30:24  24 analogy.  When I rent a hotel room, I know at the outset that

14:30:31  25 my interest in that room has an expiration date.  And when I

14:30:37  1    leave that room and leave stuff behind or when I'm evicted from

14:30:44  2    that room because I don't pay for the room and leave stuff

14:30:49  3    behind, those are all scenarios that I understood at the moment

14:30:52  4    I rented the hotel room that I had a limited property interest

14:30:58  5    or privacy interest in that room that would terminate at a

14:31:01  6    certain time upon certain facts.

14:31:03  7            Likewise, the example you gave of the case where

14:31:08  8    the letter was sent to the prison.  I know when I mail a letter

14:31:12  9    to a prison, when I send it out, that there are going to be

14:31:19  10   reviews of that letter that inform my objectively reasonable

14:31:27  11   expectations of privacy at the front end, just as happens when

14:31:30  12   I rent a hotel room.

14:31:31  13           Those are not analogous to Mr. Ackerman sending an

14:31:37  14   email, because he had no reason to expect at the outset that a

14:31:42  15   prison would search his mail or that the hotel would reclaim

14:31:47  16   its possession interest in the hotel room if either his lease

14:31:51  17   expired or he failed to pay for it.  He had no reason to expect

14:31:54  18   that.  And the fact that there was an unforeseen intervening

14:31:59  19   sequence of events that disrupted his privacy -- that's not the

14:32:06  20   word I want but we'll go with it -- in the email, because it

14:32:10  21   was not foreseen, makes his case, I think, very different from

14:32:14  22   your hotel cases because it informs what the objectively

14:32:18  23   reasonable basis of expectations of privacy were at the outset,

14:32:23  24   and they're very different when you know or should know that

14:32:28  25   there's going to be some intervening element, which he would

| | | |
|---|---|---|
| 14:32:31 | 1 | not have known in this case. |
| 14:32:32 | 2 | MR. HART:  And, Your Honor, I think the Terms of |
| 14:32:38 | 3 | Service -- where the Court is kind of wandering into is the |
| 14:32:42 | 4 | Terms of Service question. |
| 14:32:43 | 5 | THE COURT:  Well, frankly, I was surprised the |
| 14:32:46 | 6 | Terms of Service issue was not briefed in this case because I |
| 14:32:48 | 7 | thought it might play a larger role than it seems to. |
| 14:32:51 | 8 | MR. HART:  Well -- |
| 14:32:52 | 9 | THE COURT:  I'm not sure how I feel about the |
| 14:32:54 | 10 | Terms of Service argument, but -- |
| 14:32:55 | 11 | MR. HART:  Well, I think, Your Honor, the Terms of |
| 14:32:58 | 12 | Service are relatively clear in the sense that AOL required the |
| 14:33:01 | 13 | users to comply with applicable laws, not participate in |
| 14:33:05 | 14 | illegal activities, not post content that contains explicit or |
| 14:33:09 | 15 | graphic descriptions of sex acts, and not engage in activity |
| 14:33:13 | 16 | that's harmful to AOL or anyone else, and expressly advised |
| 14:33:16 | 17 | that AOL could take any technical, legal, or other action to |
| 14:33:20 | 18 | prevent violations and enforce its Terms of Service.  That's |
| 14:33:22 | 19 | all contained in the Terms of Service, which are a part of the |
| 14:33:25 | 20 | record. |
| 14:33:25 | 21 | THE COURT:  Right. |
| 14:33:25 | 22 | MR. HART:  And if you look at the -- if you look |
| 14:33:29 | 23 | at those Terms of Service, the defendant clearly violated the |
| 14:33:32 | 24 | Terms of Service of AOL, and AOL took appropriate action.  And |
| 14:33:37 | 25 | that is why this is similar to those hotel cases, is because |

14:33:40  1    it's not simply he got kicked out just because; it's that the

14:33:46  2    defendant did a thing which caused him to be kicked out and he

14:33:51  3    got kicked out.  His property interest is thus terminated at

14:33:56  4    that point, and that's before any law enforcement or NCMEC

14:34:02  5    involvement ever occurs, and so his property interest is thus

14:34:05  6    terminated.  So I don't think the *Jones* analysis --

14:34:10  7                THE COURT:  What do you think Judge Gorsuch's

14:34:14  8    conclusion is with respect to trespass?  Because it seems to me

14:34:19  9    that at the end of that section, which Judge Hartz didn't join,

14:34:25  10   he finds that a trespass occurred.  Do you agree?

14:34:30  11               MR. HART:  Well, I don't agree with that concept

14:34:32  12   that a trespass occurred, because AOL has the authority to

14:34:40  13   monitor its servers, and we know this not only because of the

14:34:45  14   Terms of Service but because there's been multitude cases, a

14:34:47  15   number of cases I should say, where ISPs like AOL, if not AOL

14:34:52  16   itself, have been found that that is appropriate and that they

14:34:56  17   may do that and they are lawfully allowed to do that.  So I

14:35:03  18   don't feel like there could be a trespass --

14:35:05  19               THE COURT:  But on the bottom of page 1307, Judge

14:35:09  20   Gorsuch's opinion says, "We are dealing with a warrantless

14:35:12  21   opening and examination of presumptively private correspondence

14:35:16  22   that could have contained much more besides the potential

14:35:19  23   contraband, and that seems pretty clearly to qualify as exactly

14:35:24  24   the type of trespass to chattels the framers sought to prevent

14:35:28  25   when they adopted the Fourth Amendment."

14:35:30  1                    Sounds to me like he found a trespass occurred.

14:35:33  2                    MR. HART:  Well, and, Your Honor, we addressed

14:35:35  3    that in our briefing, is that he uses fairly qualifying

14:35:39  4    language.

14:35:39  5                    THE COURT:  That doesn't sound like qualifying

14:35:41  6    language to me at all.

14:35:42  7                    MR. HART:  Well --

14:35:43  8                    THE COURT:  I mean, I'm not -- don't get me wrong.

14:35:48  9    I don't -- I didn't really track -- I understand Judge

14:35:56  10   Gorsuch's opinion and reversing me with respect to NCMEC being

14:35:59  11   a government agency.  I track that.  I understand that.  I

14:36:02  12   don't quibble with that.  I didn't really track or particularly

14:36:05  13   agree with his decision on the trespass issue.  But he now sits

14:36:08  14   on the Supreme Court and I don't, so what I think about it's

14:36:12  15   highly irrelevant.  But it does seem to me that he finds that

14:36:18  16   this is exactly the kind of trespass to chattels the framers

14:36:21  17   sought to prevent in adopting the Fourth Amendment.

14:36:23  18                   You say it's dicta.  It may certainly be

14:36:30  19   consistent with his tendency to sort of academically explore

14:36:34  20   other issues.  It may be an alternative grounds, which is how

14:36:38  21   he introduces it, an alternative grounds of their holding.  But

14:36:43  22   it does not seem to me that he leaves that question open,

14:36:47  23   certainly not open for me on remand to decide whether or not a

14:36:50  24   trespass occurs.  It looks to me like he finds that.

14:36:53  25                   You don't think so?

14:36:55  1          MR. HART:  I don't think so, Your Honor.

14:36:56  2          THE COURT:  Why?

14:36:56  3          MR. HART:  Because, one, I don't believe that was

14:37:01  4  actually the holding in the case.  The holding in the case is

14:37:07  5  NCMEC is a government entity and if not a government entity it

14:37:11  6  is a government actor.  The *Jones* analysis is dicta.  It is

14:37:17  7  presented as dicta.  There's somewhat musings that are separate

14:37:20  8  and apart from --

14:37:22  9          THE COURT:  It does not appear to be necessary for

14:37:24  10 the precise holding, particularly with respect to the issue

14:37:28  11 that the Government appeared -- I mean appealed, I agree with

14:37:31  12 you.

14:37:31  13         MR. HART:  And the matter has been remanded back

14:37:33  14 for the court to resolve.

14:37:34  15         THE COURT:  But not to resolve with respect to a

14:37:37  16 trespass issue.  I don't see that that's one of the issues, one

14:37:40  17 of the hard questions, he sent it back to me to address.

14:37:42  18         MR. HART:  Well, Your Honor --

14:37:43  19         THE COURT:  And I raise that argument because,

14:37:45  20 although, again, I think that it was not necessary to get into

14:37:48  21 the trespass issue, I think that what he's doing here is he's,

14:37:55  22 as I discussed with Mr. Hansmeier, sort of trumping this Fourth

14:38:01  23 Amendment privacy analysis on a trespass issue and finding that

14:38:06  24 a trespass to chattels occurred here, that's what the Fourth

14:38:09  25 Amendment exists to prevent, and so after he's gone through the

14:38:17  1  reasonable-expectation-of-privacy analysis, he then said -- and

14:38:23  2  I'm not clear whether he left that issue open for my decision

14:38:26  3  or not.  I thought that was a bit -- perhaps a bit vague.  But

14:38:30  4  then he goes on to say, but under the trespass theory, clearly

14:38:36  5  there's a Fourth Amendment search, which tells me that it

14:38:41  6  doesn't matter if I find an expectation of privacy or not

14:38:45  7  because he's told me there's a trespass, and he didn't have to

14:38:50  8  tell me that.  We could have limited the analysis to the

14:38:55  9  expectation-of-privacy discussion.  But he went on to say,

14:38:58  10  regardless of that, there's a trespass, which seems to box me

14:39:01  11  out of much of the Fourth Amendment analysis.

14:39:14  12           MR. HART:  Your Honor, it would seem to me to be

14:39:16  13  incongruent with the remand at the tail end to suggest that he

14:39:21  14  has boxed you --

14:39:22  15           THE COURT:  Well, as I've already told you, I'm

14:39:24  16  not entirely clear why he remanded it to me other than for the

14:39:27  17  third-party doctrine, which you've, of course, expressly

14:39:31  18  disavowed.  As I discussed it with Mr. Hansmeier, there's a

14:39:35  19  possibility, although he certainly confused this issue a bit,

14:39:39  20  as to whether to remand it to me for the good-faith exception.

14:39:42  21  But I don't know that he's remanded it to me to determine

14:39:45  22  whether a Fourth Amendment search occurred.  And I know that

14:39:48  23  you indicated in your briefing that you thought one of the

14:39:51  24  issues on remand was to determine whether or not there was a

14:39:54  25  reasonable expectation of privacy.  That issue, again, may have

14:40:03  1   been left open but I also think is mooted by his trespass

14:40:10  2   discussion, his and the one colleague.

14:40:16  3              MR. HART:  And, Your Honor, I -- I disagree with

14:40:20  4   that assessment.  I think it's pretty clear that they're not

14:40:23  5   foreclosing the Court's consideration of I think all of these

14:40:27  6   issues, because these are the difficulty questions.  And

14:40:30  7   there's a pretty good reason why I think Judge --

14:40:34  8              THE COURT:  Hartz.

14:40:34  9              MR. HART:  -- now Justice Gorsuch may have put

14:40:37  10  this out there --

14:40:38  11             THE COURT:  Oh.

14:40:39  12             MR. HART:  -- is to see how the parties might

14:40:40  13  respond to it, see how this court might respond to it, so that

14:40:44  14  they can review it again later.  But I think when you actually

14:40:48  15  look at the *Jones* trespass analysis, does it work for something

14:40:54  16  that you intend to divest yourself of, would be a question I

14:40:59  17  would ask.

14:40:59  18             THE COURT:  Well, I've already told you I don't

14:41:01  19  particularly agree with his trespass analysis, but no one cares

14:41:06  20  whether I agree with Judge Gorsuch's opinion.  It seems to me

14:41:10  21  that his opinion says there was a -- this is precisely the kind

14:41:15  22  of trespass the Fourth Amendment was adopted to avoid.

14:41:17  23             MR. HART:  If that were the case, I would think

14:41:19  24  that he would not have used "it seems" and language like that.

14:41:24  25             THE COURT:  Oh, that's his writing style.

14:41:26    1          MR. HART:  Well, it's not his writing style in the

14:41:30    2    other portions of the opinion, Your Honor.  He's pretty clear

14:41:34    3    when he intends to be clear.  The fact that this "reexamining

14:41:41    4    the facts of *Jacobsen* in light *Jones*, it seems at least

14:41:44    5    possible the court today would find that a search did take

14:41:47    6    place there."

14:41:49    7          THE COURT:  But if you look in -- under IV of the

14:41:53    8    opinion where he talks about why it's being remanded, I don't

14:41:56    9    see that he leaves those issues open for my determination on

14:42:02   10    remand.

14:42:05   11          MR. HART:  Well, Your Honor, I think -- I believe

14:42:10   12    that the fact that they avoided all of our arguments on the

14:42:15   13    Fourth Amendment, whether there was a Fourth Amendment search,

14:42:18   14    on appeal would suggest that they were expressly not figuring

14:42:21   15    out that issue.

14:42:23   16          THE COURT:  Say that again.  I'm not sure I

14:42:25   17    understood.

14:42:26   18          MR. HART:  On appeal.  So as the Court may

14:42:29   19    remember, when I filed our initial response to Mr. Henderson's

14:42:33   20    motion, we identified certain predicate requirements for the

14:42:36   21    court to determine:  whether or not there was a search, whether

14:42:39   22    there's a reasonable subjective expectation of privacy, the

14:42:41   23    reasonable expectation of privacy, and so forth.  Those

14:42:45   24    arguments were again made at the Tenth Circuit.  And they

14:42:47   25    expressly declined to reach those because this court did not

14:42:53   1    reach those.

14:42:54   2              I think the fact that Judge Gorsuch is -- and the

14:42:59   3    Tenth Circuit -- declined to address the Fourth Amendment

14:43:02   4    issues, whether there even a search, is indicative of this

14:43:11   5    is not the holding of the court, of the circuit.  Because if it

14:43:15   6    was, then there would be no reason -- they wouldn't have said

14:43:18   7    the Government's arguments --

14:43:20   8              THE COURT:  So what is the holding of the court?

14:43:22   9              MR. HART:  That NCMEC is a government entity and,

14:43:23   10   if it's not a Government entity, it's a Government actor.

14:43:29   11   And --

14:43:29   12             THE COURT:  Hard stuff.

14:43:32   13             MR. HART:  No, I believe there was a third.  Okay

14:43:36   14   the court of appeals held that "NCMEC is a government entity,

14:43:39   15   in the alternative, that it operated as a Government agent when

14:43:42   16   reviewing material submitted to the CyberTipline.  It also

14:43:45   17   ruled that NCMEC exceeded the scope of the private search

14:43:48   18   conducted by AOL."

14:43:50   19             THE COURT:  Oh, yeah, the factual determination.

14:43:52   20             MR. HART:  Right.

14:43:53   21             THE COURT:  Which, frankly, I had not recalled

14:43:56   22   discussing the last time we were here, that the hash mark

14:44:01   23   identification was only as to one email but there were four

14:44:03   24   emails sent to NCMEC.  I didn't recall that coming up.

14:44:09   25             MR. HART:  I don't recall that coming out either,

14:44:11  1    Your Honor.

14:44:11  2                THE COURT:  But that was obviously very central to

14:44:13  3    the Tenth Circuit's opinion with respect to that last issue.

14:44:17  4                MR. HART:  Yes.  So I think, Your Honor, those are

14:44:21  5    the holdings of the court, and the rest of this is sort of

14:44:24  6    legal musings and dicta.  And if they had intended -- if Judge

14:44:28  7    Gorsuch and I believe it was Phillips had intended to foreclose

14:44:31  8    this court considering the Fourth Amendment, whether there was

14:44:35  9    a search and those things, they certainly could have determined

14:44:38  10   that because it had been argued --

14:44:40  11               THE COURT:  Well, IV starts out, "Having

14:44:42  12   determined that NCMEC is a governmental entity or agent," which

14:44:44  13   is your point, and that it searched Mr. Ackerman's email

14:44:49  14   without a warrant, so it's determined that there was a

14:44:53  15   search --

14:44:54  16               MR. HART:  No, that's a determination that NCMEC

14:44:56  17   searched it, not that there was a search.

14:44:58  18               THE COURT:  All right.  I understand your argument

14:45:00  19   on that.

14:45:00  20               MR. HART:  Because it does, as the Court did in

14:45:05  21   the initial hearing, of assuming without deciding that there

14:45:09  22   was a search.

14:45:10  23               THE COURT:  And it goes on to say it's still --

14:45:12  24   well -- well, I guess that brings us to the argument that

14:45:22  25   Mr. Hansmeier and I discussed at the end of his section as to

14:45:25  1   whether, by not having adequately briefed those issues, you've

14:45:29  2   foreclosed my further consideration of them, particularly with

14:45:32  3   respect to the good-faith issue.

14:45:33  4              MR. HART:  To the good-faith argument.  Well, and,

14:45:35  5   Your Honor, just do you want me to move to that or do you want

14:45:38  6   me to stick with the *Jones* and the privacy issue?

14:45:40  7              THE COURT:  Well, if you're not finished with

14:45:42  8   that, let's finish that.

14:45:43  9              MR. HART:  Okay.  With regard to the *Jones*

14:45:47 10   analysis, a question that I've asked is does *Jones* work for

14:45:54 11   something that you intend to divest yourself of, which is a

14:45:59 12   communication like that.  And that's a question that I think

14:46:02 13   demonstrates that *Jones* is not really a good fit because *Jones*

14:46:05 14   was decided, as I recall in the context of --

14:46:10 15              THE COURT:  GPS in a car, wasn't it?

14:46:12 16              MR. HART:  Right, where they actually physically

14:46:14 17   attached a thing, they intruded upon a physical object and

14:46:18 18   attached a thing.  And does *Jones* work for something of which

14:46:24 19   you are divested by a third party of your interest?

14:46:27 20              THE COURT:  And so you would disagree with the

14:46:29 21   speculation that *Jac* --

14:46:33 22              MR. HART:  *Jacobsen*.

14:46:34 23              THE COURT:  I was going to say *Jacobsen*, however

14:46:37 24   it's pronounced, might be decided differently post-*Jones*,

14:46:40 25   because that was being sent through the mail?

14:46:42  1          MR. HART:  I don't know that it would -- I don't

14:46:43  2  know that it would -- I don't think it would.  I don't think it

14:46:51  3  would.  I don't agree with that assessment that it would.

14:46:55  4          We have a long -- a long history related to having

14:46:59  5  the privacy analysis, the reasonable and subjective

14:47:06  6  expectation, which was developed in part, I think, relative to

14:47:09  7  communications, and so you have that line of jurisprudence.

14:47:14  8  And these two do not necessarily marry up very well.  And while

14:47:19  9  I think the sort of musings of Judge Gorsuch in this opinion,

14:47:24  10  he may think that they do.  I think -- I don't think that they

14:47:27  11  do.

14:47:29  12          THE COURT:  Well, I can assure you that everybody

14:47:31  13  is far more concerned about what he thinks than they are about

14:47:34  14  what you are thinking.

14:47:35  15          MR. HART:  Well, I'm more concerned with what

14:47:37  16  eight other folks think because it's not just one judge on the

14:47:41  17  Supreme Court.  There's nine of them.

14:47:42  18          THE COURT:  That's true, but my point nevertheless

14:47:44  19  remains.

14:47:44  20          MR. HART:  And to the extent that we look at

14:47:48  21  analogies for email, what is this digital communication, well,

14:47:57  22  it's child pornography, for one thing, and child pornography,

14:48:01  23  if you apply this *Jones* analysis, the problem with the *Jones*

14:48:06  24  analysis is that you cannot have a privacy interest in

14:48:13  25  contraband.  And that hasn't been overturned and there's been a

14:48:19   1   Seventh Circuit case related to that, this *United States v.*

14:48:23   2   *Gutierrez*, *Gutierrez* [pronouncing], which is at 760 F.3d 750,

14:48:28   3   decided in 2014, and it's Seventh Circuit.  And they actually

14:48:36   4   talk about the *Jones* analysis in the context of a dog sniff.

14:48:42   5   And they said that "Nothing in *Jones* called into question the

14:48:45   6   underlying premise of *Caballes* and *Place* -- and thus of

14:48:50   7   *Brock* -- that an individual has no legitimate expectation of

14:48:53   8   privacy in contraband, and therefore that a drug dog sniff is

14:48:56   9   not a Fourth Amendment search."   [As read.]

14:48:57   10             THE COURT:  Well, the distinction between that

14:48:59   11   case and this one, as has been addressed elsewhere, is that all

14:49:03   12   the drug dog sniff would reveal was whether there was

14:49:07   13   contraband present, whereas the opening of emails here may have

14:49:11   14   disclosed other privacy interests.

14:49:14   15             MR. HART:  All right.  The reason why I bring that

14:49:17   16   case to light is because it addresses the "you don't have a

14:49:20   17   property interest in contraband," which that's what we're

14:49:24   18   dealing with in this case, is contraband, child pornography.

14:49:29   19             The second thing is, well, what would be the dog

14:49:32   20   sniff in the context of digital communications?  Dog sniff

14:49:38   21   would be pretty much what AOL did, which is their hash

14:49:43   22   matching, that they found child pornography within the

14:49:54   23   defendant's email.  So -- or within that email.  And then

14:49:59   24   they -- basically, they package it up and they send it along.

14:50:02   25   Now, this is different than the dog sniff because in the dog

14:50:05   1   sniff context the dog is with the officer, the dog is a law

14:50:11   2   enforcement officer.  And even in that context, that's not a

14:50:15   3   Fourth Amendment violation when the dog, the Government agent,

14:50:18   4   hits on, you know, detects the presence of contraband.  It's

14:50:23   5   not -- *Jones* does not apply as the Seventh Circuit has

14:50:27   6   suggested.

14:50:28   7          So in this we have an email that has been detected

14:50:32   8   by a third party.  They're not a government agent.  They

14:50:35   9   capture it and they box it up.  It's as though it's a dog

14:50:38   10  that's out there in the wild that is well trained to detect

14:50:42   11  this and does a detection on its own.  It grabs up the drugs

14:50:45   12  and then brings the drugs over to the law enforcement officer

14:50:47   13  and drops them at their feet.  And they say, "We got 'em from

14:50:51   14  this guy," 'cause it's a talking dog in this analogy.  But

14:50:55   15  that's sort of what this looks like.

14:50:57   16         And if you apply that analysis, if you look at the

14:51:01   17  *Gutierrez* case, the *Jones* analysis doesn't fit for an email

14:51:05   18  that contains contraband.  And that's what we have in this

14:51:10   19  case.

14:51:10   20         THE COURT:  Well, Mr. Hart, the problem is I agree

14:51:13   21  with you, but that doesn't explain why it's in Judge Gorsuch's

14:51:17   22  opinion, and at the end of the day I have to acknowledge and

14:51:23   23  reconcile the fact that this discussion is in Judge Gorsuch's

14:51:28   24  opinion on remand to me.

14:51:30   25         MR. HART:  Your Honor, I think the way the court

14:51:33   1   resolves that is Judge Gorsuch's opinion, that part of it, is

14:51:39   2   dicta.  And that's all that it is.  It's not the holdings of

14:51:43   3   the case.  It's not how they disposed of the case.  And there

14:51:49   4   is at least some indication that at least one of the other

14:51:52   5   judges did not agree with that assessment.

14:51:54   6           THE COURT:  Two's a majority.

14:51:55   7           MR. HART:  But I think ultimately, Your Honor, it

14:51:58   8   still remains dicta, even if it's signed on by another judge as

14:52:02   9   dicta.  The number of judges does not turn something from dicta

14:52:07   10   into a holding.

14:52:08   11           THE COURT:  Well, I understand.  I just -- I think

14:52:10   12   we've exhausted this topic, but I'm concerned with what to do

14:52:18   13   with Judge Gorsuch's trespass analysis, but I'm not sure you

14:52:22   14   and I discussing it further is going to help me.

14:52:25   15           MR. HART:  Well, Your Honor, I would submit to

14:52:27   16   this.  If he had intended to be clear, he -- or the other

14:52:31   17   judges that were involved -- it will certainly be clear the

14:52:34   18   second time around.  I don't think he was clear, and I don't

14:52:37   19   think he intended to foreclose the Court's consideration of

14:52:39   20   these issues precisely because --

14:52:43   21           THE COURT:  There were fewer appellate decisions

14:52:45   22   that were clear than I've read that weren't clear, so I wish I

14:52:48   23   could adopt your analysis but I don't.  Anyway let's move on.

14:52:51   24           MR. HART:  The privacy interest side of things.

14:52:54   25   Now, this is how the parties have all approached this case from

14:52:59  1   the outset.  We approached it initially as a privacy-interest

14:53:01  2   case.  That's how Mr. Henderson approached it.

14:53:03  3                  THE COURT:  Right.

14:53:04  4                  MR. HART:  That's how it was briefed.  And the

14:53:06  5   *Jones* thing kind of comes out of left field, and so the

14:53:10  6   parties, I mean --

14:53:10  7                  THE COURT:  We're not going to talk about *Jones*

14:53:12  8   anymore.

14:53:12  9                  MR. HART:  Right.  So the privacy interest is

14:53:14  10  where the Government focused most of its argument, both at the

14:53:17  11  very front end when we were here on the initial motion to

14:53:21  12  suppress.  That's where we focused on the -- at the court of

14:53:26  13  appeals because these are predicate issues, these are the --

14:53:29  14  you have to decide these issues before you get to the backside,

14:53:32  15  at least that's the way it works from my head because I'm a

14:53:35  16  linear thinker.  They decided the back ones and then sent it

14:53:38  17  back down to us.

14:53:39  18                  So as it relates to the privacy interest, you

14:53:43  19  know, in our briefing discusses the subjective interest, which

14:53:46  20  there's minimal facts in this case.

14:53:48  21                  THE COURT:  You don't think there's sufficient

14:53:50  22  facts?  Mr. Ackerman took the stand and said, "I had an

14:53:55  23  expectation that my emails would be private."

14:53:58  24                  MR. HART:  In fact, he actually just said "yes"

14:54:00  25  and then as to another question, said, "well, if I don't mind

14:54:04  1    saying" --

14:54:04  2        THE COURT:  Whatever he said, that was a

14:54:06  3    communication he made and it seemed -- it doesn't really seem

14:54:09  4    to me there's much of an open issue on this subjective prong.

14:54:15  5        MR. HART:  And if that's the Court's opinion, I'll

14:54:17  6    move on.

14:54:17  7        Your Honor, the more important one, I think, is

14:54:20  8    the objective expectation of privacy.  And what we have here in

14:54:23  9    this particular case is we have AOL telling the court that it's

14:54:27  10   in their business interest, based upon their experience with

14:54:31  11   customers, to undertake action to rid its servers of child

14:54:36  12   pornography.

14:54:36  13       Now, the importance of that is because it reveals

14:54:39  14   something about societal expectations, and those are

14:54:43  15   fundamental to this objective reasonableness consideration.  In

14:54:48  16   its Terms of Service it says a number of things, but basically

14:54:53  17   don't break the law, don't post stuff related to sex, and don't

14:54:56  18   do things that harm us or other individuals, all of which child

14:55:00  19   pornography does.

14:55:01  20       But it's unique to child pornography that society

14:55:07  21   expects that its ISPs will monitor for them.  There's pretty

14:55:11  22   good reason for that, because if you receive child pornography

14:55:15  23   in your email account, there's no unseeing it.  It doesn't have

14:55:21  24   the same harmful effect that, say, somebody missending a drug

14:55:28  25   deal to a person.  You don't actually get the drugs.  You don't

14:55:31   1   ingest the drugs.  It's not the same thing.  But child

14:55:34   2   pornography, just the mere introduction of it, is harmful.

14:55:38   3              And so these ISPs have created scanning parameters

14:55:44   4   that allow them to weed that stuff off of their servers.  And

14:55:47   5   that's the environment in which the defendant was using AOL.

14:55:53   6   Their Terms of Service allowed them to conduct that search.

14:55:57   7   Our Congress has authorized ISPs to specifically look for child

14:56:02   8   pornography and to report it.  They don't have the same

14:56:05   9   authorizations relative to, you know, threat to the president

14:56:08  10   or IRS tax fraud or drug deals or any of that stuff, but child

14:56:13  11   pornography, as a society, we have said this -- in a

14:56:19  12   consensus -- this is a thing that we think should be kept off

14:56:23  13   of our email.

14:56:26  14              And so I think in that context is where the

14:56:29  15   defendant's use of AOL becomes objectively unreasonable because

14:56:34  16   he's using a service that tells him don't do these things and

14:56:37  17   if you do them we can take any measures that we want.

14:56:40  18              THE COURT:  And it's irrelevant that Mr. Ackerman,

14:56:41  19   like every other living soul on the planet, has never read

14:56:45  20   those Terms of Service?

14:56:46  21              MR. HART:  I believe that's how courts have

14:56:48  22   actually approached it.  And I can't remember, of those three

14:56:50  23   cases that I cited earlier, the *Stratton* case, which is here in

14:57:04  24   the District of Kansas discusses the Terms of Service and they

14:57:10  25   focus on what was the Terms of Service right before.  In that

14:57:14   1   case the defendant asserted -- the opinion notes the defendant

14:57:19   2   only asserts that no evidence exists that he opened the user

14:57:23   3   agreement or read its terms.  Defendant thus has not

14:57:28   4   demonstrated that Sony's Terms of Service agreement is an

14:57:31   5   adhesion contract, and they went ahead and said that Terms of

14:57:38   6   Service vitiated his expectation of privacy.

14:57:41   7            In that case the Judge Crabtree also looked at the

14:57:45   8   analysis that the Tenth Circuit used in the employee regulation

14:57:51   9   cases where the employee's -- the employer's regulation reduced

14:57:56   10  the employee's expectation of privacy.  And in that case -- and

14:58:02   11  arguably while I may read those things because I'm a nerd like

14:58:06   12  that, I expect that there's a number of other employees that

14:58:09   13  haven't actually read the thing but they still pop up.  As

14:58:13   14  Judge Crabtree said, "The same rationale applies to Sony and

14:58:17   15  its PSN users.  The policy explicitly nullified its users

14:58:22   16  reasonable expectation of privacy.  Before users could sign up

14:58:25   17  for a PSN account they had to agree to the Terms of Service and

14:58:29   18  the Terms of Service agreement provided that the Sony reserves

14:58:32   19  the right to monitor online activity, also warned users that

14:58:36   20  they may not use PSN to violate any local, state, or federal

14:58:40   21  laws, and that any information Sony acquires while monitoring

14:58:43   22  the user's activities may be turned over to the appropriate law

14:58:47   23  enforcement authorities.  This agreement seemingly prevented

14:58:49   24  defendant from a having a reasonable expectation of privacy in

14:58:52   25  information he stored on the PS3 device."  [As read.]

14:58:56  1          So that same sort of analysis relative to the

14:59:02  2    Terms of Service is applied again in the *United States v.*

14:59:07  3    *Miller* case.  And in that case they talked about Google had

14:59:16  4    explained that it independently and voluntarily takes steps to

14:59:19  5    monitor and safeguard its platform, basically in the same ways

14:59:21  6    that AOL did in this case.  And they also noted that that

14:59:30  7    reflects a general societal consensus that images of child

14:59:34  8    pornography are hard -- or are harmful.

14:59:39  9          My point related to the Terms of Service argument

14:59:44  10   is that this is not -- this is not new.  This was actually

14:59:47  11   something that was contemplated way back in *Warshak*, which was,

14:59:52  12   I believe, a 2000 -- either a 2006 or 2010 case, I can't

14:59:58  13   remember which year it was, but that Terms of Service might

15:00:02  14   overwhelm a defendant's expectation of privacy or render it

15:00:07  15   objectively unreasonable.  And I think that's the climate in

15:00:10  16   which we currently live.

15:00:11  17          If this were a case involving something else, like

15:00:14  18   a terroristic threat or IRS fraud or something like that, there

15:00:19  19   might be some better argument the defense could make that,

15:00:24  20   well, society doesn't really expect that these ISPs will

15:00:28  21   provide your tax return to the Government when they think it's

15:00:32  22   fraudulent.  No.  But when it relates to child pornography,

15:00:36  23   people have expressed to the businesses, "We want you to make

15:00:40  24   sure we don't get this."  And that's the testimony that you

15:00:44  25   essentially received from AOL.

15:00:45   1            THE COURT:  Right.

15:00:45   2            MR. HART:  So that reflects a societal expectation

15:00:49   3    that our ISPs will do the thing that they did in this case,

15:00:54   4    which is to protect us from individuals like Mr. Ackerman.

15:00:58   5            Now, this is specific to child pornography, I

15:01:03   6    think, because of the way that the statutes in 2258 relate,

15:01:08   7    which authorize the ISPs to report whatever they want to report

15:01:15   8    to law enforcement when they find it.

15:01:17   9            I think it's also important that cases have

15:01:20   10   repeatedly held, in cases that predate Mr. Ackerman's

15:01:25   11   involvement -- or his conduct in this case, that cases have

15:01:30   12   repeatedly held that ISPs can do this monitoring, that it's in

15:01:34   13   their own business interest.  That would also suggest that, as

15:01:37   14   a society, we've recognized this is something that ISPs can and

15:01:42   15   will do because it's in their business interest.

15:01:46   16           The fact that they terminated -- that AOL

15:01:49   17   terminated his account in this case within -- after a violation

15:01:54   18   of the Terms of Service would signal a cessation of the

15:01:59   19   defendant's privacy interest as being no longer objectively

15:02:03   20   reasonable.

15:02:04   21           THE COURT:  So even though I continue to think

15:02:06   22   that your hotel cases are a bad analogy, that's the point of

15:02:10   23   connection, that just as I know when I rent a hotel, that at

15:02:19   24   the end of my lease or if I don't pay my lease and are evicted,

15:02:22   25   I lose expectations of privacy in that hotel room, so

15:02:26  1   objectively a user of an ISP should know that, if a user of

15:02:32  2   these illegal things, they'll lose their account?

15:02:36  3                   MR. HART:  Yes.

15:02:37  4                   THE COURT:  Of course, that question then goes

15:02:39  5   beyond whether they just lose their account or whether, in

15:02:42  6   addition to losing their account, they should objectively know

15:02:45  7   that they'll also be ratted out to the feds.

15:02:48  8                   MR. HART:  Right.  And that's why those cases

15:02:50  9   actually appear in our portion of the brief, our initial brief,

15:02:53  10  under the society would not recognize this as objectively

15:02:57  11  reasonable.  So those hotel cases, which I think do have

15:03:01  12  relation to the property-interest question, we're arguing them

15:03:07  13  more aggressively in the lack-of-privacy interest.

15:03:11  14                  If the Court were to find that, well, I don't know

15:03:15  15  about finding that he has no privacy interest in this email,

15:03:18  16  the Court could still find that it is substantially diminished,

15:03:23  17  which then gets back to, well, was NCMEC's review reasonable,

15:03:29  18  in comparison to his diminished privacy interest?

15:03:34  19                  My view is that the defendant lost his privacy

15:03:38  20  interest and lost any property interest in that email once AOL

15:03:45  21  captured it and terminated his account.  And it's only as

15:03:49  22  relates to the email, not his account.  I'm not getting into

15:03:54  23  that bucket of monkeys.

15:03:57  24                  So, Your Honor, I think -- I mean, there's

15:04:00  25  additional arguments that we've made in our brief, which I know

15:04:03  1    the Court has considered, but I thought it was important to

15:04:06  2    point out that when this is being analyzed by other courts,

15:04:12  3    district courts, they are tracking it along the privacy

15:04:16  4    analysis.

15:04:16  5                    THE COURT:  And not the trespass analysis?

15:04:18  6                    MR. HART:  Not the trespass analysis.

15:04:20  7                    THE COURT:  Okay.

15:04:20  8                    MR. HART:  And when they look at the privacy

15:04:22  9    analysis, they're focusing on that Terms of Service and

15:04:25  10   finding, yeah, these Terms of Service, this guy didn't have an

15:04:29  11   expectation of privacy, irrespective of any proof of whether

15:04:32  12   the guy read the Terms of Service.  It's basically you

15:04:39  13   continued to use this and did this thing, which you should have

15:04:45  14   reasonably expected would result in termination of your

15:04:48  15   account, and when it happened, you know, it's no longer

15:04:52  16   reasonable for you to expect that you retain a privacy

15:04:55  17   interest.

15:04:55  18                    You had some other issue you wanted me to address

15:04:58  19   or --

15:04:59  20                    THE COURT:  Whether you've waived the good-faith

15:05:01  21   exception.

15:05:01  22                    MR. HART:  And, Your Honor, I don't believe we

15:05:03  23   did.  And we've set that out in our brief.  That issue, so the

15:05:12  24   Court is aware, when this brief gets filed, this is not just me

15:05:16  25   filing something willy-nilly with the appellate court.  It is

15:05:20  1   reviewed by Mr. Brown.

15:05:20  2            THE COURT:  You may recall, Mr. Hart, that I used

15:05:22  3   to work in your office.

15:05:23  4            MR. HART:  Yes.

15:05:24  5            THE COURT:  So I know how it works.

15:05:26  6            MR. HART:  Well, and it still works that way.  And

15:05:28  7   these decisions, tactical decisions, are undertaken not just by

15:05:32  8   me but by folks that I think are infinitely smarter than me, in

15:05:36  9   determining what this is.

15:05:37  10           At the end of the day, it's my brief and it's my

15:05:40  11  arguments, and I stand by them.  I do not believe we waived the

15:05:43  12  issue.  I don't think the good-faith issue is so novel that it

15:05:48  13  requires so much briefing.

15:05:50  14           THE COURT:  But Judge Gorsuch, again, found that

15:05:53  15  your briefing on it was insufficient.

15:05:57  16           MR. HART:  Yes.

15:05:57  17           THE COURT:  So what's the legal effect of that

15:05:59  18  determination?

15:05:59  19           MR. HART:  I don't think there's any legal effect

15:06:01  20  on that other than we didn't prevail on that issue at the court

15:06:06  21  of appeals and the thing gets remanded back.  It wasn't

15:06:08  22  addressed on the merits here.  It wasn't addressed on the

15:06:10  23  merits there.

15:06:11  24           THE COURT:  So his exact statement was, "It is

15:06:17  25  insufficient to preserve a point for appellate review," which

15:06:24  1  is slightly different than saying it's insufficient for us to

15:06:27  2  trouble our pretty little heads about it.  It actually appears

15:06:31  3  to say that we, therefore, have expressly declined to give

15:06:35  4  appellate review to that point.

15:06:36  5          You don't think that forecloses the issue?

15:06:38  6          MR. HART:  I don't, in part because this court

15:06:41  7  didn't address the merits of that.  And they didn't address the

15:06:44  8  merits of that.

15:06:44  9          If either of those things had happened, perhaps.

15:06:48  10  But by virtue of the fact that this court hadn't addressed it

15:06:53  11  and had made no findings relative to that issue, I don't think

15:06:56  12  that the Tenth Circuit was in a position to -- I mean, to find

15:07:01  13  one way or another at that point.

15:07:02  14          THE COURT:  All right.

15:07:04  15          MR. HART:  So as it relates to that issue, Your

15:07:06  16  Honor, I don't believe it's -- this court is foreclosed.  And,

15:07:12  17  in fact, I think that the tail end of that opinion pretty much

15:07:16  18  throws wide open the door for this court to consider --

15:07:18  19          THE COURT:  Well, Mr. Hansmeier and I discussed

15:07:20  20  that and whether that was specific to this case or whether, to

15:07:23  21  use your terminology, that was merely more musings by Judge

15:07:28  22  Gorsuch about other things, affirming that -- whatever.

15:07:35  23          MR. HART:  Unless the Court has -- I'm trying to

15:07:39  24  think if there was any other issues.

15:07:40  25          THE COURT:  I think we've covered them.

| | | |
|---|---|---|
| 15:07:42 | 1 | MR. HART:  Thank you, Your Honor. |
| 15:07:44 | 2 | THE COURT:  Mr. Hansmeier, I'm having more fun |
| 15:07:47 | 3 | than a day at Kauffman Stadium, especially given the way the |
| 15:07:51 | 4 | Royals are playing, and I certainly don't want to foreclose any |
| 15:07:53 | 5 | time that you have; however, it strikes me that if you think |
| 15:07:59 | 6 | you want more than ten minutes, which you may well want, we |
| 15:08:03 | 7 | should probably take a break. |
| 15:08:04 | 8 | MR. HANSMEIER:  Yeah, I don't care, Judge.  I |
| 15:08:07 | 9 | can -- if you want a break -- |
| 15:08:09 | 10 | THE COURT:  I don't want to shortchange you.  I'm |
| 15:08:11 | 11 | just at some point my court reporter will start throwing sharp |
| 15:08:14 | 12 | objects at me and so I'm wondering if we need to take a break |
| 15:08:18 | 13 | before we go forward or if you think you're going to be pretty |
| 15:08:21 | 14 | brief. |
| 15:08:21 | 15 | MR. HANSMEIER:  I'm used to ten-minute arguments. |
| 15:08:23 | 16 | THE COURT:  Well, we've certainly blown that out |
| 15:08:25 | 17 | of the water. |
| 15:08:25 | 18 | MR. HANSMEIER:  Yeah, I mean, I think I can do ten |
| 15:08:29 | 19 | minutes. |
| 15:08:29 | 20 | THE COURT:  All right.  I'm not forcing you to, |
| 15:08:30 | 21 | but if you think you can, and not seeing my court reporter |
| 15:08:33 | 22 | reaching for any nearby sharp objects, then we'll proceed. |
| 15:08:36 | 23 | MR. HANSMEIER:  Okay.  Okay, I'll do this in ten |
| 15:08:40 | 24 | minutes.  So I'm a little confused.  I want to make clear that |
| 15:08:46 | 25 | *Illinois v. Krull* is a good-faith case.  I think the |

15:08:49  1   Government's sorting indicating that it had to do with

15:08:52  2   reasonableness review.  But it's a good-faith-exception case,

15:08:55  3   which means that the Supreme Court found that the search was

15:08:58  4   unconstitutional.  So if the Government's citing that for

15:09:00  5   reasonableness, that's not going to work.  The search in that

15:09:04  6   case was not reasonable.  It was unconstitutional.  It was just

15:09:07  7   upheld under the good-faith exception.

15:09:11  8              And I'll say one thing.  I just want to correct

15:09:16  9   one thing.  We did address the merits of the good-faith

15:09:20  10  exception on appeal.  We briefed it.

15:09:22  11             THE COURT:  I thought you told me your brief was

15:09:25  12  limited to the NCMEC status.

15:09:26  13             MR. HANSMEIER:  We briefed the waiver issue and

15:09:31  14  the good-faith exception on the merits, so we did --

15:09:34  15             THE COURT:  To the Tenth Circuit?

15:09:35  16             MR. HANSMEIER:  Yes, yeah.  And they agreed with

15:09:37  17  us --

15:09:37  18             THE COURT:  I've not read your appellate briefs

15:09:39  19  but I thought you'd said your appellate brief was limited only

15:09:42  20  to the NCMEC status.

15:09:42  21             MR. HANSMEIER:  Well, we briefed it in the reply

15:09:44  22  brief.

15:09:44  23             THE COURT:  Okay.  All right.

15:09:45  24             MR. HANSMEIER:  So the Government says good faith,

15:09:48  25  in the reply brief we say it's waived, and we say, on the

15:09:51   1    merits, you lose.  So we did do that.

15:09:53   2              The one argument the -- I think the Government has

15:09:59   3    this theory that if you make copies of something, you lose your

15:10:02   4    Fourth -- the way I look at the argument, this idea that cause,

15:10:07   5    what is it, AOL made a copy of the thing and sent the copy --

15:10:12   6              THE COURT:  I think -- it took me a long time to

15:10:15   7    understand Mr. Hart's argument on that.  But I think his

15:10:16   8    argument on that had nothing to do with privacy --

15:10:18   9              MR. HANSMEIER:  Okay.

15:10:18  10              THE COURT:  -- but only to do with property

15:10:20  11    interest under the trespass theory, that the -- and I'm not

15:10:26  12    sure I've decided that the substance of this, but that when the

15:10:35  13    matter was forwarded, to the extent that there was an invasion

15:10:39  14    on a property interest, at that point, even though the privacy

15:10:44  15    interests were still Mr. Ackerman's, the property interest,

15:10:46  16    under a trespass theory, was AOL's.

15:10:50  17              MR. HANSMEIER:  I mean, I don't see how that's

15:10:52  18    true.  I mean, just -- I mean, like a mail carrier couldn't

15:10:55  19    open your mail, make a copy of it, close up the mail, send the

15:10:59  20    thing and take the copy for his own, I don't think.  I don't

15:11:01  21    think copying something --

15:11:02  22              THE COURT:  I think the question would be I stick

15:11:04  23    a letter in a mailbox sitting outside on the street, one of

15:11:08  24    those funky blue things --

15:11:09  25              MR. HANSMEIER:  Yeah.

15:11:10   1        THE COURT:  -- somebody breaks into that mailbox

15:11:13   2   and steals my letter.  They've -- and reads it.  They've maybe

15:11:20   3   violated my privacy interest in the letter, but their property

15:11:25   4   trespass is against the United States Postal Service because I

15:11:29   5   don't own the post office box, the blue thing; the post office

15:11:33   6   does.  And so the trespass is against the post office but the

15:11:36   7   privacy violation's against me.

15:11:37   8        Again, I'm not sure I've decided the significance

15:11:42   9   of this, but I think that's the argument that essentially

15:11:45   10  Mr. Hart was trying to draw.

15:11:46   11       MR. HANSMEIER:  I would just say that that -- I

15:11:49   12  mean, if -- the cases since, you know, *Ex Parte Jackson* in

15:11:55   13  1877, it's crystal clear you have a right, a Fourth Amendment

15:11:58   14  right, in your mail.

15:11:59   15       THE COURT:  A privacy right, right.

15:12:01   16       MR. HANSMEIER:  I mean, I think it's more than

15:12:02   17  that because that case was decided almost a century before

15:12:06   18  *Katz*, so to say that it's not a -- to say that it's a privacy

15:12:09   19  right ignores the fact that that doctrine wasn't in existence

15:12:13   20  at the time that case was decided.

15:12:14   21       THE COURT:  Okay.

15:12:15   22       MR. HANSMEIER:  So I think it does go farther than

15:12:17   23  that.

15:12:17   24       The Terms of Service, I had thought the Government

15:12:21   25  did away with that argument.  I didn't see anything.

15:12:23  1        THE COURT:  Yeah, as I told Mr. Hart, I was
15:12:25  2   surprised that I didn't read more about the Terms of Service
15:12:27  3   argument in the briefing in the case on remand to me.
15:12:30  4        MR. HANSMEIER:  I didn't think he was relying on
15:12:32  5   the Terms of Service.  But to the extent that they are, if you
15:12:34  6   read the Terms of Service, the difference between the Terms of
15:12:37  7   Service in this case and I think in *Stratton*, in this *Young*
15:12:42  8   case that everyone cites for this proposition, there's nothing
15:12:44  9   in AOL's Terms of Service that talks about inspecting or
15:12:47  10  monitoring, any of that language.  And I think that's the key
15:12:50  11  language.  If you're on notice that AOL is inspecting your
15:12:52  12  stuff, monitoring your stuff, then you --
15:12:54  13       THE COURT:  Well, that's not the part of the Terms
15:12:57  14  of Service argument that troubles me.  The part that troubles
15:12:59  15  me -- and one of you cited the actual language in the Terms of
15:13:03  16  Service in your brief.  Can you tell me who did that?  I read
15:13:07  17  it but I don't remember where.
15:13:08  18       MR. HANSMEIER:  It's attached to my stuff, what I
15:13:11  19  filed, Document 88.
15:13:13  20       THE COURT:  I don't know, Mr. Hansmeier, that I
15:13:14  21  have your attachments in here.  But I actually read it --
15:13:17  22       MR. HANSMEIER:  On page 17 I talk about it.
15:13:19  23       THE COURT:  Of your brief?
15:13:20  24       MR. HANSMEIER:  Yeah.
15:13:23  25       THE COURT:  The issues about the Terms of Service

15:13:25  1   issue are a matter that -- I'm looking at page 17.  Do you

15:13:33  2   actually quote the TOS here?

15:13:37  3              MR. HANSMEIER:  I mean, that's where --

15:13:40  4              THE COURT:  I read that somewhere recently.  The

15:13:43  5   issue that I think concerns me there is I don't know that I'm

15:13:47  6   particularly troubled by whether or not they say -- clearly the

15:13:52  7   Terms of Service say, "If you do these illegal things, that

15:13:55  8   violates your Terms of Service."  I don't know that they have

15:13:57  9   to be told that they're being monitored because, if I see a

15:14:02  10  speed limit sign and it doesn't underneath "policeman watching

15:14:06  11  you here," that doesn't matter.  But what troubles me about the

15:14:11  12  Terms of Service is whether it's clear that AOL would not only

15:14:15  13  terminate his account and lock him out of his email, which they

15:14:18  14  did, but then, as I said to Mr. Hart, turn all that over to the

15:14:23  15  feds, which NCMEC now, in effect, apparently is.  And so that's

15:14:30  16  the point that I am juggling in my mind with respect to the

15:14:35  17  Terms of Service.

15:14:39  18              And there was some language in there, in the Terms

15:14:42  19  of Service that I read, that suggested that they might do a bit

15:14:45  20  more than just terminate the account.  But not being able to

15:14:49  21  put my finger on that language now, I can't address that.

15:14:53  22              MR. HANSMEIER:  I mean, the only other thing I

15:14:54  23  would -- I do think it matters that they say "monitor and

15:14:58  24  inspect."  We can agree.

15:14:59  25              THE COURT:  Tell me why you think that matters?

15:15:00  1                MR. HANSMEIER:  Because that's the cases.  I think

15:15:02  2    the case law that you see when you read these Terms of Service

15:15:04  3    cases, those terms -- what the courts are relying on is

15:15:08  4    language in there advising someone that the third party is

15:15:12  5    going to look at your stuff, and that's not what AOL's Terms of

15:15:16  6    Service say.

15:15:16  7                THE COURT:  Does it have to be that they're going

15:15:18  8    to look at your stuff or that they can look at your stuff?

15:15:21  9                MR. HANSMEIER:  No, they're authorized, that

15:15:22  10   they're telling you that it's a possibility.

15:15:24  11               THE COURT:  And you think AOL's Terms of Service,

15:15:28  12   although making illegal activity verboten does not give any

15:15:34  13   indication that they're going to take any initiative or might

15:15:38  14   take any initiative to determine that?

15:15:40  15               MR. HANSMEIER:  No, that language isn't in the

15:15:42  16   Terms of Service.

15:15:42  17               THE COURT:  Okay.

15:15:43  18               MR. HANSMEIER:  I mean, you would have to imply

15:15:45  19   it, I guess.  I mean, I wouldn't, to the extent people read the

15:15:48  20   stuff, I mean, I don't -- I think that's the distinction

15:15:50  21   between this case and those other cases.

15:15:52  22               I didn't know we were going to talk about the

15:15:54  23   three district court cases.  I actually have that *Stratton* case

15:15:57  24   on appeal.  I haven't looked at it yet.  I don't know anything

15:16:00  25   about the other two -- sorry about that -- so I don't really

15:16:02  1    have anything to say about those.  But I do know that the

15:16:09  2    *Stratton* case involves a PlayStation 3, which is not mail, and

15:16:12  3    I think that's significant.

15:16:14  4              The dog sniff issue's kind of weird because

15:16:22  5    *Florida v. Jardines* held the dog sniff issue -- that's the case

15:16:26  6    where the Supreme Court said the dog sniff of a home was a

15:16:28  7    trespass, so I don't --

15:16:30  8              THE COURT:  Well, actually, no.  Actually, what

15:16:32  9    they said, if I remember the case -- and, gosh, you work on

15:16:36  10   appellate issues more than I do so you're probably on top of

15:16:38  11   this stuff more -- but as I recall, of course, the Supreme

15:16:41  12   Court has said what a dog can smell is out in the open and

15:16:45  13   they're free to smell it, but I think that's the case where

15:16:47  14   they said but here the dog wasn't smelling it out in the open;

15:16:50  15   the dog had to trespass onto the porch --

15:16:53  16             MR. HANSMEIER:  Right.

15:16:53  17             THE COURT:  -- to be in a position where it could

15:16:55  18   smell what was out in the open, and so it wasn't the

15:16:58  19   smelling --

15:16:58  20             MR. HANSMEIER:  Yeah.

15:16:59  21             THE COURT:  -- so to speak that was the trespass;

15:17:01  22   it was the position of the dog where it could smell.  Isn't

15:17:03  23   that the same case?

15:17:05  24             MR. HANSMEIER:  Yeah.  I mean, I think that's

15:17:06  25   true.  I think my only point is that I don't think that a dog

15:17:10  1   sniff analogy helps much in terms of this issue in light of the

15:17:13  2   case.

15:17:13  3           THE COURT:  Well, I think that the dog sniff

15:17:15  4   analogy compares to AOL but because AOL is clearly not a

15:17:19  5   government actor, I'm not sure that AOL's initial actions bear

15:17:25  6   on the trespass argument.

15:17:27  7           MR. HANSMEIER:  Well, in that -- and, I mean, I

15:17:29  8   can finish with that point.  I think the problem with the

15:17:31  9   Government's argument is that it would obliterate the

15:17:34  10  private-search doctrine.  I think what the court did in

15:17:36  11  *Jacobsen* was draw a line between what private parties do and

15:17:39  12  then what the Government does once it receives information from

15:17:43  13  a private party.  And what the Supreme Court said in *Jacobsen*

15:17:46  14  is that you can do the search, the private party did.  You

15:17:50  15  can't do any more.  You have to get a warrant if you want to do

15:17:53  16  more.

15:17:53  17          If the Government's right in this case that when a

15:17:56  18  private party gives something, you know, to the Government, it

15:17:59  19  can do more because of this whole, whatever -- under any

15:18:03  20  theory.  I mean, *Jacobsen* involved mail.  It doesn't make sense

15:18:07  21  to me to say that we're going to obliterate Fourth Amendment

15:18:11  22  rights in mail because the private party turns it over to the

15:18:15  23  Government in these circumstances, 'cause *Jacobsen* says we

15:18:18  24  don't do that.

15:18:19  25          THE COURT:  That's probably an oversimplification

15:18:21  1   of the Government's argument.  I understand your concern, but I

15:18:25  2   think it's an oversimplification.

15:18:26  3              By the way, neither me nor my law clerk nor,

15:18:30  4   apparently, Mr. Hart remembered that when this case was argued

15:18:32  5   before me that it was clear that the hash tag only implicated

15:18:36  6   one of the attachments but there were four.  I know you weren't

15:18:39  7   here initially.  Did that come up in the record?  How did

15:18:41  8   that -- that was kind of a factual surprise to me.

15:18:45  9              MR. HANSMEIER:  I think -- I think they mention --

15:18:47  10  I think the panel asked the question.

15:18:49  11             THE COURT:  The panel found that itself.

15:18:52  12             MR. HANSMEIER:  I don't think that we briefed it,

15:18:54  13  to be honest with you.

15:18:55  14             THE COURT:  It's irrelevant.  I was just curious.

15:18:57  15             MR. HANSMEIER:  I think it came up in oral

15:18:59  16  argument for the first time, is how I remember it.  I remember

15:19:01  17  a question.

15:19:01  18             THE COURT:  They must have found that in the

15:19:03  19  record themselves.

15:19:03  20             MR. HANSMEIER:  And that's my ten minutes.

15:19:06  21             THE COURT:  Again, I'm not trying to foreclose

15:19:07  22  you.

15:19:08  23             MR. HANSMEIER:  I can be done.  I think I'm done.

15:19:10  24  I mean, the only other thing I would -- and the reasonableness

15:19:13  25  issues, I still don't understand it, to be honest with you.

15:19:17  1    You know, reasonableness review is for suspicionless searches.

15:19:20  2    It just seems to me that --

15:19:20  3                   THE COURT:  I'm going to have to go back and look

15:19:21  4    at some of those cases, but you're talking about the balancing?

15:19:24  5                   MR. HANSMEIER:  Yeah, I still don't understand.

15:19:25  6                   THE COURT:  I --

15:19:26  7                   MR. HANSMEIER:  Because it's an investigatory

15:19:28  8    search, I don't think reasonableness review applies, and

15:19:31  9    *Maryland v. King*, you know, that was the DNA testing case where

15:19:36  10   there was very clear, it was a five-to-four decision, Justice

15:19:40  11   Kennedy made it very clear that they were relying on

15:19:42  12   noninvestigatory purposes and that's the decision where Justice

15:19:46  13   Scalia dissented and basically said this is the first time

15:19:49  14   you've ever used special needs to do an investigatory search,

15:19:52  15   and that was the dissent, with the majority saying, no, no,

15:19:55  16   it's not investigatory.  So I don't think the Supreme Court has

15:19:58  17   ever said something that's investigatory gets a pass from the

15:20:02  18   warrant requirement and the warrantless search exceptions, so I

15:20:05  19   just -- I just think that that argument doesn't fly, in light

15:20:11  20   of the way things were at this stage.  But I really, unless you

15:20:17  21   have questions, I think, I'm done.

15:20:21  22                   THE COURT:  Thank you.  Do you need three minutes

15:20:24  23   of surrebuttal, Mr. Hart?

15:20:25  24                   MR. HART:  No, Your Honor.

15:20:27  25                   THE COURT:  All right.  Well, it's been an

15:20:33  1  intellectually challenging afternoon, more so than if I'd been

15:20:38  2  here in a change-of-plea colloquy, so for that I guess I'm

15:20:43  3  grateful.  I am not ruling from the bench.  And don't look for

15:20:50  4  this opinion next week either.  There's quite a bit we need to

15:20:53  5  work through, think about, but I will get a written opinion out

15:20:57  6  in a reasonable amount of time.  Thank you both.  We're in

15:21:01  7  recess.

15:21:02  8            CLERK NALL:  All rise.

15:21:03  9            (Whereupon, the proceedings were concluded at

15:21:04  10           3:21 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 13th day of December, 2017.


s/ Johanna L. Wilkinson
Johanna L. Wilkinson, CSR, CRR, RMR
United States Court Reporter